## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Mahmoud KHALIL, <br><br>           *Petitioner*, <br><br>   v. <br><br> Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, <br><br>           *Respondents*. | No. 25 Civ. 01935 |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR TRANSFER

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher
Robert Hodgson
Veronica Salama
Molly Biklen
New York Civil Liberties Union
Foundation
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300
abelsher@nyclu.org

*Pro hac vice application forthcoming*

*(Additional Counsel on next page)*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Brett Max Kaufman
Omar Jadwat
Noor Zafar
Sidra Mahfooz*
Brian Hauss
Esha Bhandari
Vera Eidelman
Tyler Takemoto*
American Civil Liberties Union
Foundation
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500
bkaufman@aclu.org

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem
Naz Ahmad
Shezza Abboushi Dallal
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
shezza.dallal@law.cuny.edu

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel:: (212)732-8805
Fax: (212) 571-3792
agreer@dratellewis.com

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay
Diala Shamas
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6436
bazmy@ccrjustice.org
ssisay@ccrjustice.org
dshamas@ccrjustice.org

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das, ESQ.
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430
alina.das@nyu.edu

*Counsel for Petitioner*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

ARGUMENT ...................................................................................................................... 6

    I.   This Court has jurisdiction over Mr. Khalil's petition.................................................... 7

        A.  Venue is proper in this District under the exceptions recognized by the majority and Justice Kennedy's concurrence in *Rumsfeld v. Padilla* ...................................... 7

        B.  Alternatively, venue is proper in this District because Acting Director Joyce was the "immediate custodian" throughout Mr. Khalil's detention on the morning he filed his habeas petition....................................................... 12

        C.  Alternatively, venue lies with this Court in light of Mr. Khalil's "non-core" claims................................................................................................................ 16

    II.  If the Court determines that the record is insufficient to deny the government's motion to dismiss or transfer Mr. Khalil's petition, it should grant leave for Petitioner to seek limited and expedited jurisdictional discovery ................................. 17

    III.  If the Court will not permit jurisdictional discovery and concludes that is not the proper venue for Mr. Khalil's "core" claims, it should give Petitioner an opportunity to amend, or transfer the petition to the District of New Jersey .................................... 19

CONCLUSION.................................................................................................................... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anariba v. Dir. Hudson Cnty. Corr. Ctr.*,
  17 F.4th 434 (3d Cir. 2021) ................................................................................. 20

*Ayyash v. Bank Al-Madina*,
  233 F.R.D. 325 (S.D.N.Y. 2005) ......................................................................... 18

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ............................................................................... 2, 7, 13

*Bowen v. Johnston*,
  306 U.S. 19 (1939) ............................................................................................ 21

*Calderon v. Sessions*,
  330 F. Supp. 3d 944 (S.D.N.Y. 2018) ................................................................. 17

*Corneil-Rodriguez v. INS*,
  532 F.2d 301 (2d Cir. 1976) ............................................................................... 12

*Eisel v. Sec'y of the Army*,
  477 F.2d 1251 (D.C. Cir. 1973) .......................................................................... 20

*Ex parte Endo*,
  323 U.S. 283 (1944) ...................................................................................... 8, 20

*Griffin v. Ebbert*,
  751 F.3d 288 (5th Cir. 2014) ................................................................................ 9

*Henderson v. INS*,
  157 F.3d 106 (2d Cir. 1998) .......................................................................... 13, 17

*Holiday v. Johnston*,
  313 U.S. 342 (1941) ............................................................................................ 7

*Lee You Fee v. Dulles*,
  236 F.2d 885 (7th Cir. 1956) .............................................................................. 12

*Notaro v. Koch*,
  95 F.R.D. 403 (S.D.N.Y. 1982) .......................................................................... 18

*OMG Fid., Inc. v. Sirius Techs., Inc.*,
  239 F.R.D. 300 (N.D.N.Y. 2006) ........................................................................ 19

ii

*Pearson Educ., Inc. v. Doe*,
   No. 12 Civ. 4786 (BSJ) (KNF), 2012 WL 4832816 (S.D.N.Y. Oct. 1, 2012)........................ 18

*Rasul v. Bush*,
   542 U.S. 466 (2004)...................................................................................................... 13

*Rumsfeld v. Padilla*,
   542 U.S. 426 (2004)...................................................... 2, 7, 8, 9, 10, 11, 12, 13, 15

*Schmitz v Zilveti*,
   20 F.3d 1043 (9th Cir. 1994) ...................................................................................... 9

*Semitool, Inc. v. Tokyo Electron America, Inc.*,
   208 F.R.D. 273 (N.D. Cal. 2002).............................................................................. 18

*Singh v. Holder*,
   No. 12 CIV. 4731, 2012 WL 5878677 (S.D.N.Y. Nov. 21, 2012) .............................. 13, 15, 16

*Sow v. Whitaker*,
   No. 18 Civ. 11394 (GBD) (RWL), 2019 WL 2023752 (S.D.N.Y. May 8, 2019) ............... 9, 17

*Standard Inv. Chartered, Inc.*,
   2007 WL 1121734 (S.D.N.Y. Apr. 11, 2007)........................................................... 18

*Vasquez v. Reno*,
   233 F.3d 688 (1st Cir. 2000)...................................................................................... 9

*Wales v. Whitney*,
   114 U.S. 564 (1885)................................................................................................... 15

## Statutes

28 U.S.C. § 2242 ............................................................................................................... 8

28 U.S.C. § 2243 ............................................................................................................... 18

## Other Authorities

Brief for the Commonwealth Lawyers Association as Amicus Curiae, *Boumediene v. Bush*,
   Nos. 06-1195 & 06-1196, 2007 WL 2414902 (U.S. Aug. 24, 2007) ........................................ 7

Petition, *Suraiya v. Cioppa*, No. 18 Civ. 6628 (S.D.N.Y. July 25, 2018) (ECF No. 7) .............. 15

Petition, *Tazu v. Barr*, No. 19 Civ. 1716 (S.D.N.Y. Feb. 25, 2019) (ECF No. 1) ........................ 15

Petition, *Thomas v. Decker*, No. 19 Civ. 8690 (S.D.N.Y. Sept. 19, 2019) (ECF No. 1)............. 15

Petition, *Traore v. Decker*, No. 18 Civ. 7909 (S.D.N.Y. Aug. 29, 2018) (ECF No. 1)............... 15

Petitioner's Resp. to Order to Show Cause, *Singh v. Holder*, No. 12 Civ. 4731 (S.D.N.Y. Sept. 20, 2012) (ECF No. 10) ................................................................................................ 15

Stephen I. Vladeck, *The New Habeas Revisionism*, 124 Harv. L. Rev. 941, 948 (2011).............. 7

Transcript, *Thomas v. Decker*, No. 19 Civ. 8690 (JMF) (S.D.N.Y. Oct. 16, 2019) .................... 10

## INTRODUCTION

The government moves to dismiss or transfer Mahmoud Khalil's petition by characterizing it as just one of the many ordinary habeas cases that this Court and other federal courts handle every day. It is not.

This unprecedented case involves government efforts to detain, under cover of night, Mahmoud Khalil, a lawful permanent resident, and then move him not just once but thrice across state lines in the span of roughly twelve hours. On the evening of Saturday, March 8, 2025, the Immigration and Customs Enforcement ("ICE") New York Field Office led an operation to detain Mr. Khalil at his home near the campus of Columbia University. During that arrest, a federal immigration officer told Mr. Khalil's wife, who was eight months pregnant, and Mr. Khalil's lawyer that he would be detained at 26 Federal Plaza in New York City. In the end, the government held him, incommunicado, until its goal—to transfer him outside of the district of Petitioner, his counsel, and this Court, to a remote private prison in Louisiana—was accomplished.

Mr. Khalil's attorneys filed a habeas petition on his behalf in this District in the early hours of the morning on March 9, 2025. At that point, based on the officer's representations and information in the official ICE online detainee locator, they understood that he was being detained at 26 Federal Plaza—just across Foley Square from, and in view of, this courthouse. That is where government agents had, during his arrest the previous evening, told them and his wife that he would be detained. That is where the government prepared and delivered to him a Notice to Appear in immigration proceedings. That is where the ICE detainee locator continued to state he was being held, until many hours after sunrise. That is the headquarters of the individual most directly responsible for Mr. Khalil's custody from the moment of his arrest

1

through his arrival, almost twenty-eight hours later, in Louisiana. And yet somehow, according to the government, this District is the one place that the government maintains has nothing to do with the proper venue for his habeas petition—a petition that challenges his unconstitutional and illegal detention and threatened deportation from a place he has lived and studied for years, a place in which he married a U.S. citizen, a place where, until this past weekend, he expected to soon bear witness to the birth of his first child.

The Court should reject the government's request and maintain jurisdiction over Mr. Khalil's petition and the urgent relief it seeks. Habeas is the most "adaptable" remedy in American law, *Boumediene v. Bush*, 553 U.S. 723, 779 (2008), and while default rules about proper custodians and appropriate venue make good sense in the mine run of habeas cases, those rules can, and must, bend in exceptional circumstances like these. *Rumsfeld v. Padilla,* 542 U.S. 426, 452–54 (2004) (Kennedy, J., concurring). First, this case is a paradigmatic example of the exception, acknowledged by the majority and the concurrence, to *Padilla*'s default "immediate custodian" rule. The exception applies where, like here, the government takes actions to thwart a court's jurisdiction. *See id.* at 454. Second, even if this Court believes that *Padilla*'s default rule does apply, the Court should conclude that the ICE New York Field Office Director is the proper immediate custodian, distinguishing its prior cases. And third, venue is proper in light of the inclusion of "non-core" habeas claims in Mr. Khalil's amended petition.

This is no ordinary case; it is an unconscionable one. Petitioner respectfully requests that the Court reject the government's motion and proceed expeditiously in addressing his motion to compel his return to the District, his application for bail, his petition for his release, and the various other relief he seeks through his petition.

## FACTUAL BACKGROUND

At approximately 8:30 p.m. on the night of March 8, 2025, Mr. Khalil and his wife, who is eight months pregnant, were returning to their home on the Upper West Side of Manhattan after attending an Iftar dinner, which is a meal eaten at sunset by Muslims to break their fast during the holy month of Ramadan. Am. Pet. ¶ 45 (ECF No. 38).[1] Plainclothes officers followed them into the lobby of their apartment building, asked to confirm Mr. Khalil's identity, and announced that they were Department of Homeland Security ("DHS") agents there to take him into custody. *Id.* ¶ 46–47. Two other agents were already waiting inside. *Id.* ¶ 47. After Mr. Khalil asked, one of the agents represented that they had a warrant on a mobile phone and they would show it to him. *Id.* ¶ 48. (Neither Mr. Khalil nor his lawyers have yet to see any warrant.) As Mr. Khalil explained that he was a permanent resident with a green card, the agents began to create a physical barrier between him and his wife, and then threatened his wife that she would be arrested if she did not comply with their orders. *Id.* ¶ 48.

Mr. Khalil called one of his lawyers, Amy Greer, who spoke with Special Agent Elvin Hernandez. *Id.* ¶ 49. Agent Hernandez represented that he and his colleagues had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. State Department. *Id.* When Ms. Greer informed Agent Hernandez that Mr. Khalil was a permanent resident, Agent Hernandez responded that the State Department had revoked that, too. *Id.* ¶ 51. He told Ms. Greer that he would be bringing Mr. Khalil to 26 Federal Plaza, the location of the ICE New York Field Office. *Id.* After Ms. Greer attempted to ask further questions, Agent Hernandez hung up the phone. *Id.*

---

[1] Petitioner has verified the facts in the Amended Petition. *See* Decl. of Veronica R. Salama.

After the DHS agents took Mr. Khalil outside, they told his wife that he would be brought to 26 Federal Plaza but otherwise refused to answer any questions. *Id.* ¶ 53. They did not identify themselves, the grounds for her husband's arrest, or who she could contact to inquire about his location or condition. *Id.*

Believing that Mr. Khalil's arrest, detention, and threatened deportation were unlawful, Mr. Khalil's lawyers were racing to draft a habeas petition on Mr. Khalil's behalf. That night, Ms. Greer checked the ICE online detainee locator multiple times to confirm the location of her client. *Id.* ¶ 54. At 10:00 p.m., Mr. Khalil was not yet entered in the system. *Id.* Hours later, at 1:35 a.m. the next morning, the system informed her that Mr. Khalil was in custody in New York City and instructed her to call the ICE New York Field Office for information. *Id.* Several hours after that, the locator revealed the same information. *Id.* ¶ 54–55.

While Mr. Khalil was being held at 26 Federal Plaza, as ICE agents took his biometrics, an agent approached Agent Hernandez and said, "the White House is requesting an update." *Id.* ¶ 58. As Mr. Khalil waited, agents prepared a Notice to Appear ("NTA"), a document that contains details about the grounds for a noncitizen's removal from the country. *Id.* ¶ 59. They presented the NTA to him for signature, but after they refused his request to speak with his lawyer, he declined to sign it. *Id.* The NTA indicated he had been assigned an immigration court date, several weeks out, in Louisiana. *Id.* ¶ 60.

At some point overnight, agents from the New York Field Office transported Mr. Khalil in handcuffs and shackles to Elizabeth Detention Center in New Jersey, but he was not allowed to take his belongings—his shoes, jacket, and belt—with him. When Mr. Khalil asked about his stuff, he was told that he would be coming back to 26 Federal Plaza tomorrow, but that he could

not spend the night there. *Id.* ¶ 61. He requested yet again to speak with his lawyer and was again refused. *Id.* ¶ 62.

Meanwhile, Mr. Khalil's attorneys continued to work on Mr. Khalil's habeas petition. At 4:40 a.m. on March 9, after confirming that the locator showed that Mr. Khalil remained in New York City, Ms. Greer filed the petition in this District. Pet. (ECF No. 2). Almost four hours later, Ms. Greer checked the ICE locator again, and it still showed Mr. Khalil as being in New York City. Am. Pet. ¶ 55. Some time after that, she checked once more, and found that the system had updated to show that Mr. Khalil was being held in Elizabeth, New Jersey, at the Elizabeth Detention Center, a detention center privately operated by the corporation CoreCivic. *Id.* Alarmed and scared, Ms. Greer made two attempts to contact her client by phone, but no one at the facility answers. *Id.* And around 11:20 a.m., Mr. Khalil's wife arrived at the facility to look for him, but she was told that her husband was not showing up in their system. *Id.*

The night before, Mr. Khalil had slept in a waiting room at the Elizabeth facility, after being denied so much as a blanket. *Id.* ¶ 62. And the next morning, without ever being processed, he was told that ICE officers were coming from New York to transport him yet again. *Id.* Around noon, ICE officers—including one Mr. Khalil believes he recognized from the night before at 26 Federal Plaza—handcuffed and shackled him and placed him in a van. *Id.* ¶ 63. The van had Mr. Khalil's belongings inside that were kept the night before at 26 Federal Plaza. *Id.* Mr. Khalil was told he was then going to JFK without further clarification. *Id.*

That afternoon, ICE informed Mr. Khalil's counsel that the government was in the process of transferring Mr. Khalil to its New Orleans Field Office, almost 1500 miles away. *Id.* ¶ 56. Mr. Khalil's counsel emailed attorneys in the U.S. Attorney's Office for the Southern District of New York, who confirmed that Mr. Khalil was on the way to Louisiana. *Id.* She

requested Mr. Khalil's immediate return to New York, but was told that ICE would not consent to his return absent a court order. *Id.* And when Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that, for detained immigrants in New York, typically occurs the same or next day—authorities in the Louisiana ICE detention facility offered a date ten days away. *Id.*

In the early hours of the morning on March 10, almost forty hours after his arrest, Mr. Khalil arrived at the Louisiana Detention Facility in Jena, Louisiana, where he remains today. *Id.* ¶¶ 67, 70, 99.

## ARGUMENT

The government argues that because the ordinary rule is that a habeas petition challenging detention must be brought against the "immediate custodian" and filed in the district where the petitioner is detained, venue is improper here. Respondents' Mem. 4 (ECF No. 31). Petitioner does not dispute this rule, which the government acknowledges is just a "default." *Id.* at 9. But as Justice Kennedy forewarned at length in *Padilla*, this is the rare case that merits an exception to the immediate custodian rule. Alternatively, even if the rule applies, the Court should find that venue is proper in this District because Respondent Joyce was the immediate custodian over Mr. Khalil at all relevant times during his detention until his arrival in Louisiana. Finally, venue is also proper because Mr. Khalil's petition involves both core and non-core habeas claims.

In the alternative, if the Court is not prepared to deny the motion on the current record, it should grant Petitioner leave to seek limited, expedited jurisdictional discovery to ensure the facts before the Court are complete, before it is too late.

I.       **This Court has jurisdiction over Mr. Khalil's petition.**

     A.       **Venue is proper in this District under the exceptions recognized by the majority and Justice Kennedy's concurrence in *Rumsfeld v. Padilla*.**

Historically, the writ of habeas has been about principles, not rules. The Framers who codified habeas corpus in essentially the form in which it exists today modeled it on England's Habeas Corpus Act of 1679. *See Boumediene*, 553 U.S. at 742. That Act, in turn, was specifically meant to counter practices that de facto threatened access to the writ, in ways that reverberate today through this case: "Prisoners were moved from gaol to gaol so that it was impossible to serve the proper gaoler with the writ and some prisoners were removed overseas so giving rise to practical difficulties in terms of communication (between the detained person and those acting on his behalf), service (on the relevant gaoler), and enforcement of the writ (by production of the detained person) if the writ was issued." Br. for the Commonwealth Lawyers Ass'n as Amicus Curiae at *6, *Boumediene v. Bush*, Nos. 06-1195 & 06-1196, 2007 WL 2414902 (U.S. Aug. 24, 2007). And it is clear that the writ was never intended to depend on technicalities that could easily be abused by the executive to restrict relief. *See* Stephen I. Vladeck, *The New Habeas Revisionism*, 124 Harv. L. Rev. 941, 948 (2011); *see also Holiday v. Johnston*, 313 U.S. 342, 350 (1941).

Of course, rules still matter, and this Court must apply them. The federal habeas statute identifies the proper respondent to a habeas petition as "the person who has custody over him." *See* 28 U.S.C. § 2242. In *Rumsfeld v. Padilla*, the Supreme Court interpreted that language to mean the person "with the power to produce the body of such party before the court or judge." 542 U.S. at 435. There is no dispute that the "default rule" in habeas cases is "that the proper respondent is the warden of the facility where the prisoner is being held" at the time the petition was filed. *Id.* at 435–36.

But the Supreme Court in *Padilla* also accepted that, in rare but important cases, the default rule would not apply. In a widely recognized concurring opinion, Justice Kennedy, joined by Justice O'Connor, explained that the immediate custodian rule is "subject to exceptions." 542 U.S. at 452 (Kennedy, J., concurring). And he emphasized that the five-vote majority opinion— of which the two concurring Justices were a pivotal part—"acknowledged" the same thing. *Id.* (citing *id.* at 435–36, 437–42, 444–47 (majority op.)). The exceptions allow courts to fashion flexible outcomes in unique, outlier cases that are tailored to the particular situation. They do not open the door to a free-for-all, permitting the filing of a petition in "any one of the federal district courts," but only in "the one with the most immediate connection to the named custodian." *Id.* at 453.

Justice Kennedy listed various examples of past exceptions the Supreme Court had made to the immediate custodian rule. *See id.* at 454 (citing, e.g., *Ex parte Endo*, 323 U.S. 283 (1944) (addressing removal of a prisoner from the territory of a district after a petition had been filed)). And of particular relevance here, he explained that, as a matter of fairness and in the interests of justice, he "would acknowledge an exception if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." *Id.* "In cases of that sort," he continued:

> habeas jurisdiction would be in the district court from whose territory the petitioner had been removed. In this case, if the Government had removed Padilla from the Southern District of New York but refused to tell his lawyer where he had been taken, the District Court would have had jurisdiction over the petition. Or, if the Government did inform the lawyer where a prisoner was being taken but kept moving him so a filing could not catch up to the prisoner, again, in my view, habeas jurisdiction would lie in the district or districts from which he had been removed.

*Id.*

The government acknowledges Justice Kennedy's opinion, but dismisses it as "not the law." Respondents' Mem. 8. But where the vote of a Supreme Court Justice (let alone two of them) is "necessary to the formation of a majority," that Justice's concurrence is "therefore . . . given particular weight." *Schmitz v Zilveti*, 20 F.3d 1043, 1045 (9th Cir. 1994). The majority and concurrence took pains to ensure that future courts—courts just like this one—would exercise their habeas authority to address extraordinary circumstances, in extraordinary moments, and prevent the grave injustice they imagined, but did not see directly before them, from ever coming to pass.[2]

Other courts, including in this District, have seen clearly just what Justice Kennedy meant to do—even as they did not conclude that the kind of extreme case he wrote about was before them. *See, e.g.*, *Vasquez v. Reno*, 233 F.3d 688, 696 (1st Cir. 2000) ("[W]e can envision that there may be extraordinary circumstances in which the Attorney General appropriately might be named as the respondent to an alien habeas petition. . . . An[] example of an extraordinary circumstance might be a case in which the INS spirited an alien from one site to another in an attempt to manipulate jurisdiction."); *Griffin v. Ebbert*, 751 F.3d 288, 290 (5th Cir. 2014) (warning against the potential that the government would "play[] forum games or ke[ep] moving" a detainee "so that his filing could not catch up"); *Sow v. Whitaker*, No. 18 Civ. 11394, 2019 WL 2023752, at *6 (S.D.N.Y. May 8, 2019) (Lehrburger, M.J.) ("This Court agrees that *Padilla* should not be interpreted so as to condone or encourage misbehavior or deceptive

---

[2] The *Padilla* majority—again, of which both Justice Kennedy and Justice O'Connor formed a crucial part—felt it important to twice emphasize that Justice Kennedy's proposed exception had not been met in the case before the Court. *See* 542 U.S. at 435–36 (majority op.) ("No exceptions to this rule, either recognized or proposed, apply here." (cleaned up)); *id.* at 441–42 ("There is no indication that there was any attempt to manipulate behind Padilla's transfer—he was taken to the same facility where other al Qaeda members were already being held, and the Government did not attempt to hide from Padilla's lawyer where it had taken him.").

conduct by the Government in transferring immigrant detainees."); *see also* Tr. at 6–9, *Thomas v. Decker*, No. 19 Civ. 8690 (JMF) (S.D.N.Y. Oct. 16, 2019) (ECF No. 28) (this Court questioning the government about the type of circumstances in which it believed the *Padilla* exception would apply).

In the government's anodyne telling, there's nothing to see here that "would implicate the concerns behind Justice Kennedy's concurrence." Respondents' Mem. 8. After all, ICE officers "accurately" informed Mr. Khalil's wife that he was heading to 26 Federal Plaza. *Id.* And the ICE system for tracking detainees was not promptly updated simply because it was "around 4am on a weekend." *Id.* Mr. Khalil was sent to New Jersey, for a matter of hours, so that he could take advantage of the "comprehensive overnight accommodations" available there. Respondents' Mem. 2 n.1. And besides, the government suggests, what Justice Kennedy *really* meant was not that the government should be forbidden, in *all* cases, from "refus[ing] to tell" a detainee's "lawyer where he had been taken," or "inform[ing] the lawyer where a prisoner was being taken but ke[ep] moving him so a filing could not catch up to the prisoner." *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring). Instead, the government says, Justice Kennedy meant to forewarn only against "*prolonged*, wrongful conduct—i.e., a *sustained* governmental effort to evade habeas jurisdiction." Respondents' Mem. 8 (emphasis added). According to the government, Justice Kennedy might have objected to a matter of days, or weeks, of judicial manipulation, perhaps, but not misconduct that merely stretched "[o]ver the span of a day." *Id.*

The government's story, and its dismissal of Justice Kennedy's illumination of venue considerations in these circumstances, do not hold up.

However much the government tries to present the facts as business as usual, it was anything but—highlighted not just by their movement of him across four states within twenty-

four hours of his arrest, but the direct involvement of the White House as the plan for Mr. Khalil to be transferred to Louisiana took shape at 26 Federal Plaza. Am. Pet. ¶ 58. What is not in doubt about that night is that after Mr. Khalil's arrest, Mr. Khalil's attorney acted with all deliberate speed to protect his rights, press the government for answers about his whereabouts, make use of the official government information ICE provides online, and file a petition on his behalf to challenge his unlawful detention. Despite this, the government, which was fully aware that Mr. Khalil was represented, frustrated his attorney's efforts at every turn. After his arrest, government officials told Mr. Khalil's lawyers that he was being taken to 26 Federal Plaza, and, through well past the time his lawyers filed the petition, the government's official detainee information system misinformed them that he remained present in New York City. Am. Pet. ¶ 55. Then, even after the government had removed Mr. Khalil from the District, he was still under the supervisory authority of Respondent Joyce. And after a brief stopover in New Jersey to rest, agents working for Respondent Joyce put Mr. Khalil on the move again, as planned back in this District, finally transporting him through New York City before then flying him to Louisiana, *see* Am. Pet. ¶ 61–65—a fact that is omitted from Respondent Joyce's declaration and the government's brief.

The truth is that Justice Kennedy's concurrence speaks directly to this case. Here, there is far more than "an indication" that the government sent Mr. Khalil to New Jersey (and then back to New York, and on to Texas, and then on to Louisiana) "to make it difficult for his lawyer to know where the habeas petition should be filed." *Padilla*, 542 U.S. at 454. And there is far more than "an indication" that "the Government was not forthcoming with respect to the identity of the custodian and the place of detention." *Id*. The government's imagined bright-line durational limitation on Justice Kennedy's concerns has no basis in his analysis, and it makes no sense.

That the government whisked Mr. Khalil around town and then the country rapidly, rather than over a longer period of time, means its conduct goes even *more* to the core of Justice Kennedy's concerns, not less. Moreover, even if the government were not intentionally manipulating venue, its affirmative communications to Mr. Khalil's wife, lawyer, and on the ICE detainee locator that he was being held at 26 Federal Plaza, and its decision to hold Mr. Khalil incommunicado during the transfers, are also sufficient to meet the exception described in *Padilla*.[3]

This Court should therefore hold that it has venue over Mr. Khalil's detention claims based on the exceptions to *Padilla*'s default rule. If those exceptions do not apply to this case, it becomes difficult to imagine what kinds of scenarios the majority and concurrence were contemplating at all.

> **B.    Alternatively, venue is proper in this District because Acting Director Joyce was the "immediate custodian" throughout Mr. Khalil's detention on the morning he filed his habeas petition.**

Respondent Joyce and the ICE New York Field Office took and never relinquished custody over Mr. Khalil until he stepped off the plane in Alexandria, Louisiana, almost twenty-eight hours after his arrest. And eight hours into Mr. Khalil's ordeal, his attorney field a habeas petition on his behalf. Thus, even without resort to the exception described in Justice Kennedy's concurrence in *Padilla* and embraced by the majority, *see supra* Part I.A, this Court has jurisdiction over the petition. *See Padilla*, 542 U.S. at 444 (holding that jurisdiction is proper in the "district court that has territorial jurisdiction over the proper respondent"); *accord id.* at 451

---

[3] Notably, the Second Circuit has applied equitable estoppel in an immigration case where the withholding of critical information caused a noncitizen grave harm. *See Corneil-Rodriguez v. INS*, 532 F.2d 301, 306 (2d Cir. 1976) (the "failure to provide the warning mandated by [a regulation] was fully as misleading as the misinformation given to" an individual in a persuasive Seventh Circuit case, "and certainly as unjust and as seriously prejudicial to her interests" (citing *Lee You Fee v. Dulles*, 236 F.2d 885 (7th Cir. 1956), *rev'd on other grounds*, 355 U.S. 61 (1957))).

(explaining that a petition "must be filed in the district court whose territorial jurisdiction includes the place where the custodian is located"); *see also Rasul v. Bush*, 542 U.S. 466, 478–79 (2004) (explaining that "because the writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody, a district court acts within its respective jurisdiction" under the habeas statute as long as it has jurisdiction over the custodian (cleaned up)).

As this Court has observed, the Supreme Court in *Padilla* expressly left open the question of whether the immediate custodian rule applied in immigration matters. *See id.* at 435–36 & n.8; *see also Singh v. Holder*, No. 12 Civ. 4731, 2012 WL 5878677, at *1 (S.D.N.Y. Nov. 21, 2012). In so doing, the *Padilla* Court referenced the Second Circuit's analysis in *Henderson v. INS*, 157 F.3d 106 (2d Cir. 1998). In *Henderson*, the Second Circuit addressed, at length, whether the default immediate custodian rule applied in the immigration habeas context. *Id.* at 122–28. While the court stopped short of deciding the question, *id.* at 128, it explained that, "[h]istorically, the question of who is 'the custodian,' and therefore the appropriate respondent in a habeas suit, depends primarily on who has power over the petitioner and . . . on the convenience of the parties and the court." *Id.* at 122. And it found that "the case law . . . reflects a preference for a practical approach to such issues." *Id.* at 125; *see id.* (observing a "flexible approach" in past cases and finding an "increasing appreciation for practical concerns" in more recent ones").

The elasticity of the habeas remedy is what, since before the Founding, has made it one of the most critical legal backstops against executive abuse. As the Supreme Court explained in *Boumediene*, because "the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers, . . . [t]he test for determining [its] scope . . . must not be subject to manipulation by those whose power it is designed to restrain." 553 U.S. at 765–66.

13

The extraordinary events at issue in this case make clear that Mr. Khalil was at all times under the supervisory control of the ICE New York Field Office, and that Respondent Joyce was his immediate custodian. Am. Pet. ¶ 18. According to the federal government's official information system at the time of filing, Mr. Khalil was detained at 26 Federal Plaza—headquarters of the New York Field Office—at the time this habeas was initiated. *Id.* ¶ 55. The New York Field Office directed Mr. Khalil's arrest and detention in New York City, told his counsel that he was being taken to 26 Federal Plaza in New York City, and entered his location on the ICE detainee locator as being in New York City. *Id.* ¶ 53–54 At the time of filing, the detainee locator stated that Mr. Khalil was held in New York City, information upon which his counsel reasonably relied to identify his location in order to choose a habeas venue. *Id.* ¶ 55. And when the New York Field Office moved Mr. Khalil across state lines to New Jersey for a transient pause shortly before his habeas was filed, they prevented Mr. Khalil from communicating that information to his counsel. *Id.* ¶ 61–62 The New York Field Office also told Mr. Khalil that he would be brought back into the District after a brief trip to New Jersey to rest in a more comfortable facility, going so far as to refuse to allow him to bring his belongings, as he would soon be back in New York City. *Id.* ¶ 61. Even when he was brought to the detention facility in New Jersey, he wasn't even processed or admitted, and he slept in the waiting room. *Id.* ¶ 62. And the New York Field Office came to collect him—in a van that had his belongings that were taken from him the night before at 26 Federal Plaza—and move him back across state lines, across New York City (and quite possibly this District) en route to JFK Airport, before then transferring him, again, after the filing of the instant petition, to Louisiana. *Id.* ¶ 62–64.

The government cites a series of cases decided by this Court and other judges in the District and matter-of-factly asserts that they easily decide this case. *See* Respondents' Mem. 5–

8. But those cases, and others in this District, apply the immediate custodian rule in an utterly common, and wholly distinct, scenario. Those are the kinds of cases the federal courts see day in and day out, involving ICE Field Office Directors depositing a person with the warden of a facility for long-term detention during the pendency of their removal cases. *See id.* 5 (discussing five cases in this Court).[4] But cases like that say hardly anything about this one, where a single custodian shepherded Mr. Khalil around town and back and forth across state lines on the way to a final destination that the custodian knew before Mr. Khalil ever left the District in the first place. Am. Pet. ¶ 60. And under longstanding immediate custodian first principles, at all times before Mr. Khalil's arrival in Louisiana, the New York Field Office Director—Respondent Joyce—was the one who could, at the command of this Court or another, "produce the body . . . before the court." *Padilla*, 542 U.S. at 435 (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)). Here, all existing evidence—down to who has submitted the government's declaration

---

[4] These cases do not support dismissal of Mr. Khalil's petition. This Court's only published decision on these issues, *Singh*, involved a pro se habeas petition filed by an individual with a final order of removal on appeal to the Second Circuit who was detained in Alabama at the time he filed his petition. 2012 WL 5878677, at *1–2. He argued for jurisdiction in this District based on where his removal proceedings had taken place, family ties, and the fact that the Alabama courts were "overwhelmed." Pet'r's Resp. to Order to Show Cause at 1, *Singh v. Holder*, No. 12 Civ. 4731 (S.D.N.Y. Sept. 20, 2012) (ECF No. 10). The other cases involved petitioners who, at the time of filing, had been detained outside the District for more than eleven days, and in one case for more than a year. *See* Pet. at 1, *Thomas v. Decker*, No. 19 Civ. 8690 (S.D.N.Y. Sept. 19, 2019) (ECF No. 1) (394 days); Pet. at 2, *Traore v. Decker*, No. 18 Civ. 7909 (S.D.N.Y. Aug. 29, 2018) (ECF No. 1) (267 days); Pet. at 2, *Suraiya v. Cioppa*, No. 18 Civ. 6628 (S.D.N.Y. July 25, 2018) (ECF No. 7) (23 days); Pet. at 1, *Tazu v. Barr*, No. 19 Civ. 1716 (S.D.N.Y. Feb. 25, 2019) (ECF No. 1) (11 days).

None of the cases involves an allegation that the government interfered with counsel's access to their client or that the government had failed to disclose the location of detention. None involved the swift and pre-planned transfer of an individual to a distant location. Instead, they involved general claims that the New York Field Office Director is an appropriate custodian for all individuals held in ICE-contracted facilities in New Jersey, and typical immigration habeas issues such as whether the prolonged detention in a given case was unreasonable or whether the individual was properly classified as an arriving alien.

supporting venue—points to Respondent Joyce as the actual immediate custodian and true warden in this case, including during periods after the habeas was filed.

The record is clear on this, but even its gaps are probative. In his declaration supporting transfer or dismissal of the petition, Acting Director Joyce does not mention the personnel, actions, or decisions of the Newark Field Office a single time. *See* Joyce Decl. ¶¶ 8–11 (ECF No. 32). He omits from his account that Mr. Khalil was transported back through New York City and out of *JFK* Airport. *See id.* ¶ 11 ("the airport"). And he repeatedly uses the passive voice, avoiding assigning responsibility for anything that happened in Elizabeth at all, or for Mr. Khalil's transport after leaving New Jersey. *See id.* ¶ 8 (Mr. Khalil "was . . . booked" into Elizabeth Detention Facility); *id.* ¶ 9 (Mr. Khalil "was detained" at the time his petition was filed); *id.* ¶ 11 (Mr. Khalil "was brought to the airport").

Consistent with *Padilla*, and with the habeas statute's command to the true custodian to "make a return certifying the true cause of detention," 28 U.S.C. § 2243, in this case, Acting Director Joyce was Mr. Khalil's immediate custodian the night he was detained, the next morning when he filed his petition, and throughout the day en route to JFK and ultimately Louisiana. As a result, he is a proper Respondent to the petition.

### C.    Alternatively, venue lies with this Court in light of Mr. Khalil's "non-core" claims.

Both Mr. Khalil's initial and amended habeas petitions allege claims that, together, seek various forms of relief that include both "core" and "non-core" habeas claims—that is, a core habeas order that his detention is unlawful and therefore he must be released from custody, and a non-core order providing types of declaratory and injunctive relief other than release. *See, e.g.*, *Singh*, 2012 WL 5878677, at *1. The initial petition sought declaratory relief that Respondents' actions violated the First Amendment and the Due Process Clause of the Fifth Amendment, and

16

sought to enjoin transfer—the very thing that occurred after the petition was filed. Pet. ¶ 10; *see* Am. Pet. ¶ 31. And the amended petition raises several claims in light of new information about the basis of Respondents' treatment of Mr. Khalil. Am. Pet. ¶ 99. What runs through all of the claims, core and non-core, is the retaliatory nature of all of Respondents' aggressive actions taken against Mr. Khalil.

This Court therefore has venue over both sets of claims. *See Calderon v. Sessions*, 330 F. Supp. 3d 944, 952 (S.D.N.Y. 2018) ("Since the non-core challenges predominate, it simply makes no sense to apply the legal custodian rule to the non-core challenges and the immediate custodian rule to the core challenges, and then litigate in separate venues."). "In these circumstances, 'the convenience of the parties and the court' favors applying the same custodian rule to both the core challenges and non-core challenges, and because the predominant non-core challenges clearly belong to legal custodians, the core challenges go along, as well." *Id.* (cleaned up) (quoting *Henderson*, 157 F.3d at 122).[5]

## II. If the Court determines that the record is insufficient to deny the government's motion to dismiss or transfer Mr. Khalil's petition, it should grant leave for Petitioner to seek limited and expedited jurisdictional discovery.

All of the above, and the existing factual record, make it crystal clear that Mr. Khalil's petition should remain before this Court. But if the Court is still not persuaded to deny the government's motion, it should allow Petitioner to conduct limited and expedited jurisdictional discovery before deciding that a grant of the motion is appropriate. At the very least, the

---

[5] Several courts in this District have gone the other way on the issue of "mixed" habeas petitions, determining that it is the "core" claims that should determine venue. *See, e.g.*, *Sow v. Whitaker*, No. 18 Civ. 11394 (GBD) (RWL), 2019 WL 2023752, at *4 (S.D.N.Y. May 8, 2019) (collecting cases). However, none of these cases involved a First Amendment challenge not only to the ongoing detention but the initial decision to target and arrest the individual in the first instance, or exceptions to *Padilla*'s default rule. *See* Am. Pet. ¶¶ 88–90. As explained above, *supra* Part I.A–B, venue over Mr. Khalil's "core" claims also lies in this District.

circumstances of this case raise serious questions about the government's conduct in handling Mr. Khalil's detention. And given the stakes, those questions would demand a fulsome examination before an irreversible resolution on the government's motion sends Mr. Khalil out of the District—possibly forever. Because the interest in swift proceedings is Mr. Khalil's, and not the government's, the government will not be prejudiced by a short delay for discovery, and the interests of justice will be served.

Courts in this District grant requests for expedited discovery under a "flexible standard of reasonableness and good cause." *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005). "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Pearson Educ., Inc. v. Doe*, No. 12 Civ. 4786 (BSJ) (KNF), 2012 WL 4832816, at *4 (S.D.N.Y. Oct. 1, 2012) (quoting *Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002)).[6]

Here, Petitioner would seek leave to advance targeted requests in order to more fully develop the record relevant to Petitioner's arguments above. *See* Part I. Both of those arguments would, in the case of the Court's doubt, benefit from the development of details about the role of the New York Field Office throughout the night and next day of Mr. Khalil's initial detention, the ways in which his treatment deviated from the standard operating procedures that the Field Office employs in the regular course of its functions, and the planning (or lack thereof) that precipitated these events. Petitioner would likely seek specific records from Respondent Joyce and the ICE New York Field Office in their exclusive possession that would not require an

---

[6] Although some courts have applied a test that mimics the requirements of the standard for injunctive relief, citing *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982), that standard is not controlling and would be inappropriate as applied here. *Standard Inv. Chartered, Inc.*, 2007 WL 1121734, at *5, n.4 (S.D.N.Y. Apr. 11, 2007).

extensive search. And Petitioner would likewise seek to depose a limited set of relevant officials, including Respondent Joyce, to test the gaps in his affidavit and the government's evidentiary record before the Court.

While, as described above, the extraordinary circumstances here mandate denial of the government's motion, such targeted requests would be relevant and necessary to justify any contemplated grant of the significant relief the government seeks. And if the Court is prepared to grant the government's motion without discovery, Petitioner will be unfairly prejudiced because they will be deprived of the opportunity to develop key evidence supporting their opposition. *See OMG Fid., Inc. v. Sirius Techs., Inc.*, 239 F.R.D. 300, 305 (N.D.N.Y. 2006). This prejudice to Petitioner vastly outweighs any burden these discovery requests may impose on Respondents. Of course, Petitioner would confer with the government in due course about his planned discovery and seek to limit his requests as much as possible, given Mr. Khalil's strong interest in proceeding expeditiously to the merits of his petition.

Respectfully, the Court should not grant the government's motion without an opportunity for discovery.

III.    **If the Court will not permit jurisdictional discovery and concludes that is not the proper venue for Mr. Khalil's "core" claims, it should give Petitioner an opportunity to amend, or transfer the petition to the District of New Jersey.**

As explained above, *see supra* Parts I.A–B, the Court should deny the government's motion to dismiss or transfer Mr. Khalil's petition, and should adjudicate his claims, including for return to the District and release on bond, expeditiously. Moreover, given the other "non-core" claims raised by Mr. Khalil's case, this Court has venue over the entire petition. *See supra* Part I.C. And if the Court has doubts about Petitioner's arguments regarding jurisdiction, it

should allow Petitioner to engage in jurisdictional discovery to further probe the government's incomplete and non-credible account of its actions. *See supra* Part II.

If, however, the Court concludes that Mr. Khalil's habeas petition cannot be heard in this District, the Court should allow Mr. Khalil to further amend or, if not, transfer the petition to the District of New Jersey based on the immediate custodian rule. The government argues that, instead, the proper venue is the Western District of Louisiana. But this is nothing but playing "gotcha." Mr. Khalil's lawyer was too late to file a petition in this District while Mr. Khalil was here, the government says. Having failed in her first attempt, she should have filed the petition again, in the District of New Jersey. But how? No one from the government had told his lawyer, or his wife, that he was across the river, and they had refused Mr. Khalil's requests to call one of them from custody. And when the government's ICE locator finally did reveal his location in New Jersey, he was already gone, swooped back to New York City, then Dallas, and finally Alexandria, Louisiana. The government says that, now, Mr. Khalil is free to file there—though one has to wonder whether he would still be there when he did.

Even the government acknowledges that its request is unsupported. *See* Respondents' Mem. 10 n.4 (acknowledging cases in this District that have held that petitions erroneously filed in a given district "should be transferred to the District where the petitioner was detained at the moment the original habeas petition was filed"); *see also, e.g.*, *Ex parte Endo*, 323 U.S. 283; *Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434 (3d Cir. 2021). It is also absurd. The government's promise to continue objecting to jurisdiction, *see* Respondents' Mem. 11, presents the potential for "the Kafkaesque specter" of Mr. Khalil "wandering endlessly from one jurisdiction to another in search of a proper forum, only to find that it lies elsewhere." *Eisel v. Sec'y of the Army*, 477 F.2d 1251, 1257–58 (D.C. Cir. 1973). Enough is enough.

## CONCLUSION

As the Supreme Court has explained, "[i]t must never be forgotten that the writ of habeas corpus is the precious safeguard of personal liberty and there is no higher duty than to maintain it unimpaired." *Bowen v. Johnston*, 306 U.S. 19, 26 (1939). And in deciding this case, it is important to recognize that the implications of the government's behavior here go beyond Mr. Khalil. To agree to dismiss or transfer the petition now, especially without discovery, would effectively sanction the government's efforts—even if they prove to be only apparent—to manipulate and undermine the protections of habeas in future cases as well.

Respectfully, the Court should deny the government's motion to dismiss or transfer venue.

Dated: March 14, 2025                    /s/ *Brett Max Kaufman*

NEW YORK CIVIL LIBERTIES UNION           AMERICAN CIVIL LIBERTIES UNION
FOUNDATION                               FOUNDATION
Amy Belsher                              Brett Max Kaufman
Robert Hodgson                           Omar Jadwat
Veronica Salama                          Noor Zafar
Molly Biklen                             Sidra Mahfooz*
New York Civil Liberties Union           Brian Hauss
Foundation                               Esha Bhandari
125 Broad Street, 19th Floor             Vera Eidelman
New York, N.Y. 10004                     Tyler Takemoto*
Tel: (212) 607-3300                      American Civil Liberties Union
abelsher@nyclu.org                       Foundation
                                         125 Broad Street, Floor 18
                                         New York, NY 10004
                                         Tel: (212) 549-2500
                                         bkaufman@aclu.org

*(Additional Counsel on next page)*      \**Application for admission* pro hac vice
                                         *forthcoming*

21

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem
Naz Ahmad
Shezza Abboushi Dallal
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
shezza.dallal@law.cuny.edu

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel:: (212)732-8805
agreer@dratellewis.com

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay
Diala Shamas
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6436
bazmy@ccrjustice.org
ssisay@ccrjustice.org
dshamas@ccrjustice.org

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das, ESQ.
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430
alina.das@nyu.edu

*Counsel for Petitioner*