# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Mahmoud KHALIL,

  *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

  *Respondents*.

Case No. 25-cv-1935 (JMF)

## DECLARATION OF NOOR RAMEZ ABDALLA

I, Noor Ramez Abdalla, under penalty of perjury, declare as follows:

1. I am a United States citizen, and Mahmoud Khalil's wife.

2. I was born in Flint, Michigan, and I was raised in Michigan until the sixth grade when my family and I moved to the United Arab Emirates because my father received an offer of employment there. After I graduated high school, my family and I moved back to Michigan. I completed my undergraduate degree at University of Michigan, Flint, where I earned a 4.0 grade point average and was my graduating class's commencement speaker. I continued on to complete dental school at Detroit Mercy Dental, graduating in May 2022 in the top ten percent of my class.

1

I started my career as a dentist the month after I graduated, and I have been working as a dentist in the tri-state area since December 2023.

3. My husband, Mahmoud, is a Palestinian who grew up a refugee in Syria. He has devoted much of his life and career to helping and serving others. In fact, it was his work on education in Syrian refugee communities in Lebanon that brought us together. I met Mahmoud in the summer of 2016, when I was volunteering with a nongovernmental organization that runs educational programs for Syrian refugee communities in Lebanon. Mahmoud was employed with that organization at the time and managed the volunteer program. We fell in love. We continued a long-distance relationship after I returned to the United States and managed to visit with one another one to two times per year between 2016 and 2022.

4. In December 2022, Mahmoud moved to the United States to begin a graduate program at Columbia University's School of International and Public Affairs the following month. We were finally able to reunite and be together after years of a long-distance relationship, and Mahmoud was working towards furthering his career in human rights.

5. In November 16, 2023 we married, and in 2024 Mahmoud became a lawful permanent resident. We are expecting our first child together at the end of next month. When we found out we were pregnant, we were both so thrilled to welcome our first child into the world.

6. When Israel began its genocide in Gaza in October 2023, Mahmoud felt compelled to speak out, based on his deep commitment and devotion to his Palestinian people and their rights and advocating for a swift end to their ongoing genocide. It is through this commitment to Palestinian rights that he came to be involved in the protests that erupted across college campuses in April 2024, and in Columbia University's encampments.

7. Mahmoud is a natural bridge builder, and so he quickly rose to prominence as a lead negotiator on behalf of the students mounting the encampments and protesting the genocide in Gaza. As part of those duties, he spent weeks on end liaising between the administration and the students, in pursuit of a just resolution. Mahmoud was so committed to this goal that he barely slept for weeks, and I recall having to drag him home to sleep.

8. His leadership in the protest movement was no surprise to me, because this is who he is: committed to his community, committed to serving others, and committed to justice. Mahmoud extended this care to his speech and organizing for Palestinians in Gaza and the West Bank, just as he did the people in his life—myself included.

9. As a result of his involvement as a public-facing figure in the Columbia University encampments, Mahmoud fell victim to an aggressive and devastating doxing campaign over the course of the months that followed, one that continues to this day. He was receiving heinous messages every day and the subject of all kinds of public statements on social media and in news broadcasting, defaming him and maligning his speech and activities for Palestinian rights.

10. Part of the doxing campaign included many public calls for the government to deport him. These targeted calls for his deportation became so frequent and aggressive that I recall Mahmoud asking me if I knew what to do if U.S. Immigration and Customs Enforcement (ICE) came to our home just last week. On March 7, 2025, the day before Department of Homeland Security (DHS) agents arrested Mahmoud, he even wrote an email to Columbia University Interim President Katrina Armstrong informing her of the targeted calls for his deportation, telling her he was so scared of adverse action by ICE that he was unable to sleep, and pleading for the university's support. I don't think anyone ever answered him, and we certainly did not receive any support.

3

11. On March 8, 2025, at approximately 8:25 PM, Mahmoud and I were returning from *iftar* (a meal breaking our daily fast, observed during the holy month of Ramadan) to our apartment in Columbia University housing. Around two agents in plain clothing approached us, following us from outside our building into the lobby. The agents asked if my husband was Mahmoud Khalil. He answered that he was, and they proceeded to state that they were going to detain him. A few other agents appeared with the original two agents at this point, apparently having entered through another entrance. One agent told me that I needed to leave and go up to my apartment, or else I would be arrested, too.

12. Mahmoud then asked if I could go up and get his green card, and the agents said that I could and that they would wait for me downstairs. I quickly made my way up to our apartment to get Mahmoud's green card, believing that there must be some confusion about his immigration status. I observed one agent upstairs in our hallway as I was entering the apartment. When I came back downstairs and provided Mahmoud's green card to the agents, they seemed confused, and we heard one agent who was speaking with someone else over the phone inform them that Mahmoud was a green card holder.

13. Despite seeing the green card, they insisted that they would be bringing him in anyway. The agents handcuffed him and forced him out of our apartment building. I called after him, asking how I would be able to reach him, and he directed me to call his attorney, Amy Greer, which I immediately did, keeping her on the line with me and asking for guidance on what to do.

14. When they took my husband to the street, I followed them, begging for their names, contact information, or any way to get in touch with my husband. I was still on the phone with Amy and explained his lawyer was requesting their names. The officers refused to provide me with any of that information, and instead told me he was being taken to "26 Federal Plaza." I

4

continued to approach the various cars of agents stationed outside, asking for the name of the agency they were from and trying to get someone to speak with Mahmoud's lawyer. The agents walked quickly away from me, some of them entered the cars, and drove off. I ultimately watched my husband driven off by the agents, having no idea why he was being arrested or how I could reach him.

15. I was unable to sleep that night, first working with Amy to secure immigration counsel for Mahmoud and then trying to find a way to make contact with him. The lawyers relayed to me that he seemed to be in Manhattan throughout the night, according to an ICE locator. By the early morning, they had filed a lawsuit in federal court, with my consent.

16. Within a few hours and still in the early morning on Sunday, the locator showed Mahmoud as being held at an immigration detention facility in Elizabeth, New Jersey. I immediately went there, desperate to see my husband. I attempted to see him twice and was told by employees at the facility that he was not there, and that I would not be able to see him. I waited outside of the facility for approximately two hours and was never able to see or be in contact with Mahmoud.

17. Just hours later, his attorney told me that Mahmoud might be on his way to a detention center in Louisiana. I was desperate for information that no one seemed able to give me. I felt like Mahmoud had been kidnapped from our home, and no one could tell me where he was or what was happening to him. His transfer to Louisiana seemed more and more likely throughout the day, as we learned new information from various sources, but still no one had heard from him. His attorneys could not reach him, and neither could I.

18. It wasn't until the following morning, on March 10, 2025, that I finally received a phone call from Mahmoud, confirming that he was at an ICE detention facility in Jena, Louisiana.

5

19. I cannot overstate how distressing this entire experience has been. The past week has been the worst of my life, and I find myself without my single greatest source of support, in my time of greatest need.

20. I am currently in my thirty-third week of pregnancy, and I am due to give birth to Mahmoud and I's first child on April 28th, 2025. We are expecting a son. The thought that Mahmoud may miss the birth of our son is devastating.

21. I am not exaggerating when I say that I would not have been able to get through my pregnancy without Mahmoud. At this stage of my pregnancy, I have biweekly appointments with my doctor scheduled. In just three weeks, those appointments will increase in frequency, becoming weekly appointments. Prior to his detention, Mahmoud attended almost every doctor's appointment with me. He cooks every meal for us, he cleans the house, he does our laundry and takes care of every need that we have as a household.

22. Mahmoud has been invaluable to me in helping me cope with the physical and mental impact of my pregnancy. Early on in my pregnancy, my doctor found indication that I might require a regimen to preempt preeclampsia, a very serious condition that can cause major complications for a pregnant person and their baby. I was prescribed two baby aspirin per day, and I am still supposed to be taking that medication. I forget to take medication, and Mahmoud reminded me to take the medication every night, getting it for me before bed. Since the agents took him away, I haven't been able to sleep well or focus and am afraid that I have forgotten to take that medication.

23. Just last month, on February 2, 2025, I had to be admitted to the hospital because I had not felt our baby in my stomach for a full day. I spent approximately four hours at the hospital, and Mahmoud supported me through the distress of being unable to feel our baby's movement in

6

my stomach and the experience of being hospitalized. Luckily, the doctors determined our baby to be in good health, and I was discharged home.

24. I also generally struggle with feelings of anxiety, and pregnancy had posed an extra toll on my emotional state. I have frequently felt anxious about the daily experience of pregnancy, ensuring my baby is in good health, and the prospect of bringing life into this world. Mahmoud offers me every bit of reprieve I could hope for. He massages my feet and back every day, he makes sure that I eat and sleep well, and he offers me so much emotional support.

25. Since his arrest, I have neither been able to sleep nor eat. I can feel my baby, and I hope that he is okay, but I know that this stress and all that comes with it is not good for him.

26. My family is in Michigan, but Mahmoud and I decided to raise our baby here in New York. He received a wonderful job offer in human rights work here and was due to start in April 2025. We were counting on his income to support our family, as I am scheduled to stop working in March and will only receive approximately half of my usual pay throughout my period of maternity leave.

27. I now face the prospect of delivering my baby without Mahmoud, and far from my family's home base in Michigan. As a result, I am left with only one source of income, my reduced maternity leave income—which is not enough for me and our baby to live off of. I am also without my husband, who is my sole and primary source of support here in New York.

28. I also worry about Mahmoud braving this period of detention. I desperately want to see him but traveling by plane is not advised at this late stage of pregnancy. We are in the month of Ramadan, and typically throughout this month Mahmoud and I would fast and attend iftars with members of our community and prayers after sundown and on Fridays organized by Columbia University's Muslim Student Association. Instead, Mahmoud is being detained 1200 miles away

7

in another state. He has told me that he is unable to eat much because of the stress of detention, even at the end of his day of fast. Mahmoud also takes medicine every day for a stomach ulcer he lives with (and was diagnosed with following an endoscopy more than three years ago), and I worry about that condition worsening without proper treatment and sustenance during his detention. I know they did not provide his medication to him until Tuesday evening, despite his requesting it when he first arrived.

29. Life has been extraordinarily difficult throughout the past week, and it will not improve short of Mahmoud's release. My family is receiving contact and visits from reporters, and Mahmoud's family in Germany and Syria are experiencing harassment. To make matters worse, Mahmoud was supposed to travel to visit his parents in Germany later this month, particularly to pay a visit to his disabled and elderly father who lives with Alzheimer's Disease. Instead, we are all living with this new horrific reality. People have been attacking us online, and saying the most vitriolic things about Mahmoud and I.

30. This experience has flipped our lives upside down. Mahmoud and I planned to have our baby boy next month and move into a new home. Now, I can only hope that he will be with me when I give birth to our first child. I implore that the Court set his bail and permit him to return home to resume living with me and our soon-to-be-born child.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 14th day of March, 2025 in New York, New York.

_____
NOOR RAMEZ ABDALLA