# EXHIBIT H

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JAVIER CASTILLO MARADIAGA,

 4                    Plaintiff,

 5           v.                          21 CV 842 (KPF)

 6   THOMAS DECKER, et al.,

 7                    Defendants.         Decision
                                          (via Microsoft Teams)
 8   ------------------------------x
                                          New York, N.Y.
 9                                        March 4, 2021
                                          4:05 p.m.
10
     Before:
11
                         HON. KATHERINE POLK FAILLA,
12
                                          District Judge
13

14                          APPEARANCES

15   ALINA DAS
     PAIGE AUSTIN
16        Attorneys for Plaintiff

17   AUDREY STRAUSS
          United States Attorney for the
18        Southern District of New York
     REBECCA FRIEDMAN
19        Assistant United States Attorney

20

21

22

23

24

25
```

         1              (Case called)

         2              MS. AUSTIN:  Good afternoon, your Honor, Paige Austin

         3    from Make the Road New York, and I am joined by my cocounsel,

         4    Alina Das, from the immigrants rights clinic at the New York

         5    University School of Law, also on behalf of petitioner.

         6              THE COURT:  Thank you, and good afternoon to you both.

         7              Ms. Friedman representing the government.

         8              MS. FRIEDMAN:  Yes.  Rebecca Friedman, your Honor,

         9    representing the government.

        10              THE COURT:  Thank you as well.  Thank you for

        11    participating, especially given the lateness of the hour.

        12              I do have a decision.  It is an oral decision.  And as

        13    a result of that, I would show you, but there are a lot of

        14    highlights and circles and arrows and it may not be the best

        15    prose, but it is, I believe, what is the best result in this

        16    case.  Before I render that decision there are a few questions

        17    that I wanted to ask you about recent developments.

        18              Ms. Austin, I'll ask you, and you'll defer to Ms. Das

        19    if it is appropriate.

        20              There was a hearing that occurred on Tuesday regarding

        21    a possible bond application.  The application was denied.

        22    Because it's an area with which I am unfamiliar, this Third

        23    Circuit convention, when there is such a hearing, are there

        24    actually conditions that are proposed or does the immigration

        25    judge, or whomever, agree to the concept of a bond and let the

 1   parties figure out what is an appropriate level?

 2         MS. AUSTIN:  That is a good question, your Honor, and

 3   I think could be answered in two ways.  The first is what the

 4   immigration judge would have the authority to do and the second

 5   is what he did in this case.

 6         We certainly think that the immigration judge does

 7   have the authority to set conditions.  However, that is a

 8   matter of some disputed practice in the immigration court and I

 9   do not believe, and my cocounsel, Ms. Das, can correct me if I

10   am wrong, but I do not believe in this case the immigration

11   judge considered any alternatives to detention or any

12   conditions of release apart from a monetary bond.

13         THE COURT:  I see.  What is apparently not an

14   analogue, which is the criminal setting that I face, it is

15   often the case that when a bail package or bail argument is

16   had, there is a proposal from which one begins.  It is not just

17   the idea of bail, no bail.  The defendant's counsel will

18   propose terms of bail that they submit meet the requirements of

19   the Bail Reform Act.

20         Here, are you saying to me that the IJ could have got

21   to that point but did not in fact get to that point and,

22   therefore, there never were conditions discussed?

23         MS. AUSTIN:  I can certainly represent that there were

24   no conditions discussed and that that is something, you know,

25   that could be considered.  So I think that your Honor is right,

 1  but I do want to give my cocounsel an opportunity to weigh in

 2  here if she has a different view on the matter.

 3          THE COURT:  Ms. Das.

 4          MS. DAS:  Yes, your Honor.  My cocounsel is right.

 5          I just would underscore that in this particular

 6  instance many immigration judges believe that they don't have

 7  the power to consider alternatives to detention, such as

 8  electronic monitoring or other conditions, in addition to a

 9  monetary bond, and that this judge in particular has taken that

10  position in the past, which is why we assume he did not

11  consider it here.  That issue has been litigated in other

12  cases.

13          So, for example, in the case that we cited in our most

14  recent letter today, the *Uzmande* case, this judge in particular

15  was faulted for not having considered alternatives to detention

16  as part of his analysis in a Guerrero-Sanchez bond hearing.  It

17  is an issue of dispute, and I think that is one of the reasons

18  why we have these administrative bond hearings.  This was a far

19  cry from the type of constitutionally adequate bond hearing

20  process that our clients often seek.

21          THE COURT:  I am going to hear from Ms. Friedman in a

22  moment on this topic.

23          But before I do, Ms. Austin, you did send me the

24  letter.  Each of you has sent me a number of letters.  I commit

25  to you that I've read them.

 1          But what is it that you would like me to deduce from

 2  the letter regarding the bail hearing?  I intuit that one of

 3  the things you want me to understand is, he's not been released

 4  on bail, *Mapp* relief would be really nice.  But I want to

 5  understand what, if anything, you are asking me to understand

 6  from that bail application and its failure.

 7          Ms. Friedman, to the extent there is something you

 8  want me to understand from what happened at that hearing, you

 9  will let me know.

10          Ms. Austin.

11          MS. AUSTIN:  Thank you, your Honor.  We did send you

12  two -- we filed two letters since that hearing took place.  The

13  first was simply to apprise the Court that he had not been

14  released and the *Mapp* claim for that reason does remain live.

15  It was not mooted out by the outcome of that hearing.

16          We went on to respond to the government with I think

17  some additional important takeaways from our perspective.

18          First, of course, the bond hearing and indeed the *Mapp*

19  requests have no bearing on the primary forms of relief at

20  issue here, namely, the stay that Mr. Castillo seeks for the

21  duration of his petition.

22          Second, we wanted to make the point that he does

23  continue to seek, as a secondary form of relief, release on

24  *Mapp* for the duration of this petition, and that is analyzed

25  under a different standard and, obviously, by your Honor, a

1   different court, than the bond hearing analysis that occurs in

2   the administrative proceedings.

3            Our position is that it really does not have any

4   bearing on the *Mapp* analysis, but we did want to make that

5   point to your Honor and also to underscore some of the issues

6   that arose in the bond hearing in our most recent letter,

7   again, not because we are seeking review of that bond hearing

8   before this Court or, you know, essentially seeking, for

9   example, an appeal through this court.

10           We submitted those points for your Honor only in

11  response to what he understood to be the government's

12  suggestion that this might in some way bear on Mr. Castillo's

13  claims to relief.  Our position here is that it does not,

14  though, of course, it is relevant inasmuch as the issue of

15  release under *Mapp* remains before your Honor.

16           THE COURT:  Thank you.

17           Ms. Friedman, just following on what Ms. Austin was

18  saying, are you making arguments to me today regarding the

19  instant motion for a preliminary injunction based on what

20  happened at that hearing on Tuesday?

21           MS. FRIEDMAN:  No, your Honor.

22           THE COURT:  That's the answer.  I didn't want to cut

23  you off if there was something you wanted to add.

24           MS. FRIEDMAN:  No.  I would just like to answer the

25  question that your Honor had posed to the petitioner.

1        THE COURT:  Yes.

2        MS. FRIEDMAN:  The IJ in this case found that ICE had

3    met their burden of finding that petitioner is a danger to the

4    community.  And based on that fact, he did not need to go into

5    any other alternatives.

6        THE COURT:  Thank you.

7        Ms. Friedman, you are doing very well.  Your answers

8    are leading to my follow-up questions.

9        You've advised me about the charges that were brought

10   by the district attorney and that were later dismissed and the

11   reasons why they were dismissed.

12       If you know, are you suggesting to me that if I were

13   to let Mr. Castillo out on *Mapp* release that the DA's office

14   would reinstate the charges?  I ask this not knowing whether

15   they have an inclination to do so, whether they have the

16   ability to do so.  But I did not know if one of your reasons

17   for sending me that letter was to let me know that *Mapp* release

18   would be futile because he would just get picked up by the DA's

19   office anyway.

20       MS. FRIEDMAN:  I have no knowledge of what the DA's

21   office plan would be if he were to be released.

22       THE COURT:  Thank you.

23       You heard me ask Ms. Austin what I am to intuit from

24   her letter.  I ask you the same.  What do you want me to know

25   as I make this decision on the motion for a preliminary

 1   injunction regarding the fact of his arrest and what you now

 2   understand to be the reasons why the charges were dropped?

 3        MS. FRIEDMAN:  Sure.  In the oral argument I talked a

 4   lot about the factors that the field office director and the

 5   ombudsman considered, the criminal charges, the backgrounds.

 6   So this was part of the information that was considered, this

 7   type of criminal charges.  The information that was in front of

 8   the IJ was also information that ICE was aware of as well.

 9        THE COURT:  I see.

10        Thank you.

11        I hesitate to ask this question of each side and yet I

12   will.  I have been receiving daily letters from everybody.  Do

13   I have everything?  The most recent letter that I received was

14   the petitioner's letter in response to the government's letter

15   and that was received a few hours ago.

16        Ms. Austin, is there something else from you that I

17   should know about?  Because I don't want to decide this without

18   having all the documents with me.

19        MS. AUSTIN:  No, your Honor.  It is a fast-moving

20   case.  It is a case in which there are requests, you know,

21   being made to ICE and, obviously, now potentially an appeal in

22   the bond hearing.  So, as you have observed, I think our

23   ability to update you on the underlying events in the case is

24   basically limitless.  But I think you have before you at this

25   point the crucial information for the purposes of this motion.

 1          THE COURT:  Thank you.

 2          Ms. Friedman, is there additional information or

 3  letters that you have sent me that I didn't know to look for

 4  before signing on to this conference?

 5          MS. FRIEDMAN:  No, there is nothing else for the

 6  government.  The government believes that all of the issues

 7  have been well aired in the briefing, in oral argument, and the

 8  subsequent letters.

 9          THE COURT:  I will go with thoroughly.  I will decide

10  whether thoroughly and well equate in a moment.

11          Give me a moment, please, to look at my notes and make

12  sure I don't need to add anything based on the conversation

13  I've just had with you.

14          This will be an oral decision.  It won't be a short

15  one, although I'll try.  If you are not sitting down, please

16  sit down and make yourself comfortable for this.

17          I'm also going to ask you to excuse me in advance

18  because it is more important to me that I properly deliver my

19  decision and less important to me that I make eye contact with

20  you as I'm doing so.  If I end up staring down for the next 20

21  or so or more minutes, take no offense, please.  Just excuse me

22  while I make sure I don't have to add anything.

23          I will begin.

24          Let me begin by thanking you each of you, and the

25  three of you have done so much work on this, for the work that

1    you've done on a compressed schedule on these very significant

2    issues.  I was thanking the government for providing me

3    up-to-date information regarding the dates before which Mr.

4    Castillo would not be deported.  I also want to thank both

5    sides for providing me updated information about matters that

6    have developed in the other proceedings in the case.

7         I recognize, under the schedule most recently

8    submitted to me by the government, that I still have time to

9    think about this.  But I will be painfully candid with you.  I

10   have thought about little else but this case for the past

11   couple of days, and I've come to the point of realizing that

12   additional days are not going to provide me greater clarity.

13        That is because -- and I can say this, and you don't

14   have to agree with me, but maybe quietly you do -- this case

15   implicates a number of legal issues for which there is no clear

16   guidance from the Supreme Court or the Second Circuit.  I have

17   done my best to be faithful to the law, but as you will see,

18   there are issues I've identified as to which the relevant

19   precedents are in conflict, and there are issues as to the

20   which the relevant precedents hint at but do not supply an

21   answer.

22        It is the rare district judge who looks forward to

23   being appealed.  I am not that judge.  There are reasons for me

24   to hope that I am not appealed here.  But if I am, a possible

25   good that can come from this case, and from that appeal, is the

1    clarity that each of the participants to this litigation,

2    including myself, deserve on these knotty jurisdictional,

3    constitutional, and statutory issues.

4           For reasons that I will now explain, I am granting

5    petitioner's motion for preliminary injunctive relief, in the

6    form of staying his removal from this country so that he can

7    pursue his motion to reopen the case with the BIA and,

8    potentially, a petition for review with the Second Circuit and

9    so he can apply for renewal of his DACA eligibility.

10          On that latter point, because of the policy identified

11   by the parties that forecloses consideration of such renewal

12   while petitioner is detained, I am granting relief pursuant to

13   *Mapp v. Reno* to this extent.  I will release Mr. Castillo on a

14   bond so that he can seek DACA renewal.  And it may be that this

15   release permits him to address other aspects of his immigration

16   litigation more easily.  But it is the DACA renewal that, to

17   me, necessitates his release under *Mapp*.

18          If his DACA renewal request is denied, and if he runs

19   through his appeal process or if that appeal process does not

20   require him not to be detained, I will listen to the government

21   if they then move again for his redetention.  My point is, he's

22   out because you've told me that he can't apply for DACA renewal

23   while he's out.  If that matter comes to its resolution, then I

24   will reconsider as appropriate.

25          I will speak only very briefly about the factual

1    background because each of you is intimately familiar with it.

2    The petitioner came from Honduras at age 7 in approximately

3    2002.  His parents were here under a temporary protected status

4    for which he is not eligible.  He has been subject to a final

5    removal order since 2004.  He did have DACA status from 2012 to

6    2019 but did not thereafter review.  He was detained by the

7    NYPD in December of 2019 and turned over to ICE, I am told, in

8    violation of local detainer law and held in ICE custody since

9    then.  There was a motion to reopen the removal proceedings

10   that was denied by the immigration judge in January 2020.  The

11   BIA dismissed the appeal in October 2020, and there was no

12   appeal to the Second Circuit.

13            He is currently held at the Hudson County Correctional

14   Center in New Jersey.  There was a motion to reopen removal

15   proceedings pending before BIA since January 28 of 2021.  It

16   claims, among other things, ineffective assistance of counsel

17   in the prior motion-to-reopen proceedings.  The BIA has not

18   decided the motion to reopen, but they have denied the stay of

19   removal.  This habeas petition was filed on January 29 of 2021.

20   Since then, ICE has denied requests for release from custody

21   pending resolution of the motion to reconsider or to reopen.

22            There are four claims brought in the habeas petition.

23   The first is a violation of constitutional, statutory, and

24   regulatory rights to adjudication of the motion to reconsider

25   and to reopen removal proceedings for persecution-based claims.

 1                There is a claim of violation of constitutional and

 2    statutory rights adjudication of the parole request and DACA

 3    protection.

 4                There is a claim of violation of agency policy

 5    protecting petitioner from imminent deportation.  It is a

 6    claimed violation of the Administrative Procedure Act.  And

 7    there is a request for release pending adjudication, pursuant

 8    to *Mapp v. Reno*.

 9                The instance preliminary injunction motion seeks an

10    injunction of removal, a stay of removal pending adjudication

11    of the habeas petition, as well as release on bail under *Mapp*.

12    The government has asked for denial of petition on the merits

13    and denial of the preliminary injunction motion as mooted by

14    the denial of the petition on the merits.

15                I am going to begin by speaking of the preliminary

16    injunction standards.  I would say that's the parties' first

17    dispute.  I guess that's the first dispute that's coming up in

18    the resolution of this motion.

19                The government is arguing for the strictest standard,

20    which requires a showing of clear or substantial likelihood of

21    success on the merits.  This is based on the theory that the

22    relief the petitioner seeks would either alter the status quo

23    or provide the ultimate relief sought in the petition.

24                I just want to pause and recognize that I know the

25    government actually wishes that I dispense with this motion

1    entirely, acknowledge that I lack jurisdiction to consider the

2    petitioner's claims, and separately lack venue for his fourth

3    claim, and deny and dismiss the habeas petition.  But as I'm

4    about to explain, I'm not prepared to do that on this record,

5    where petitioner has claimed to be mounting only noncore

6    claims, and I will instead consider the petitioner's motion.

7         The petitioner himself is arguing for a lower

8    standard, which requires a showing of a likelihood of success

9    on the merits, or a serious question going to the merits to

10   make them a fair ground for trial, with the balance of

11   hardships tipping decidedly in petitioner's favor.  Ultimately,

12   I'm adopting the serious-questions standard, but I want to

13   explain to you how I get there because it wasn't evident to me

14   and it may not be evident to you.

15        To begin, I don't believe that petitioner is seeking a

16   mandatory injunction, but rather a prohibitory injunction.  The

17   difference being that the prohibitory injunctions maintain the

18   status quo and the mandatory injunctions alter it.  There are

19   many cases for this proposition.  Just one is *North American*

20   *Soccer League, LLC v. U.S. Soccer Federation*, 883 F.3d 32, a

21   Second Circuit decision from 2018, citing *Tom Doherty*

22   *Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, a

23   Second Circuit decision from 1995.

24        It is true that a mandatory preliminary injunction,

25   because it alters the status quo, requires the movant to meet a

1  heightened standard of a clear or substantial likelihood of

2  success on the merits and a strong showing of irreparable harm.

3  I'm quoting there from *People ex. rel. Schneiderman v. Actavis*

4  *PLC*, a Second Circuit decision from 2015 reported at 787 F.3d

5  638.

6     But the statute quo, as I understand it, is often

7  defined as the last actual, peaceable uncontested status which

8  preceded the pending controversy.  And that is from *Mastrio v.*

9  *Sebelius*, 768 F.3d 116, a Second Circuit decision from 2014.

10  My understanding, therefore, of the status quo, as this is

11  defined, is the situation in which petitioner was neither

12  detained nor subject to removal.

13     It is true as well that a heightened standard has also

14  been required where an injunction will provide the movant with

15  substantially all the relief sought and that relief cannot be

16  undone even if defendant prevails at a trial on the merits.

17  That is the *Doherty* case I mentioned a few moments ago.  It is

18  echoed as well in *Yang v. Kosinski*, 960 F.3d 119, a Second

19  Circuit decision from 2020.

20     I think one can fairly argue that granting

21  petitioner's application for injunctive relief would provide

22  him with substantially all of the relief he seeks in the

23  petition.  I find that the second prong is not met because if

24  the government prevails, the petitioner can be redetained and

25  can be placed back in removal proceedings.

1          The more complicated issues stem from the fact that

2     the petitioner is challenging government action.  It is

3     ordinarily the case in the preliminary injunction setting that

4     a preliminary injunction can be granted where a party

5     establishes either that it is likely to succeed on the merits

6     or that there are sufficiently serious questions going to the

7     merits to make them a fair ground for litigation, with the

8     balance of hardships tipping decidedly in favor of the moving

9     party.  There I'm citing to *Otokoyama Co. Ltd. v. Wine of Japan*

10    *Import, Inc.*, 175 F.3d 266.

11          However, "when a preliminary injunction will affect

12    government action taken in the public interest pursuant to a

13    statutory or regulatory scheme, the moving party must

14    demonstrate irreparable harm absent injunctive relief, a

15    likelihood of success on the merits, and public interest

16    weighing in favor of granting the injunction."  I am quoting

17    there from *Agudath Israel of America v. Cuomo*, 983 F.3d 620, a

18    Second Circuit decision from 2020.  Similar sentiments are in

19    the cases of *Winter v. Natural Resources Defense Council, Inc.*,

20    555 U.S. 7 from 2008, and *New York v. United States Department*

21    *of Homeland Security*, 969 F.3d 42, a Second Circuit decision

22    from 2020.  And in this setting the substantial questions or

23    the serious questions standard ought not be used.

24          I wanted to understand the parameters of this

25    particular body of law.  So I did what I will colloquially

1    describe as a deep dive into these cases, going back to *Medical*

2    *Society of the State of New York v. Toia* from 1977, and

3    *Hamilton Watch Co. v. Benrus Watch Company* from 1953.  What

4    I've learned is that the standard is often cited, but it is not

5    always followed and not followed with perfect consistency.

6    That particular fact was discussed by the Second Circuit in the

7    case of *Trump v. Deutsche Bank AG*, 943 F.3d 627.  I recognize

8    that the case was reversed by the Supreme Court, but on other

9    grounds.

10           The Court there examined what it termed the government

11   action exception to the use of the serious-questions standard.

12   In its discussion it recognized that, despite repeated

13   citations to the more restrictive standard, the Court had in

14   two decisions affirmed preliminary injunctions against

15   government action issued using the less rigorous

16   serious-questions standard.  Those two cases were *Haitian*

17   *Centers Council, Inc. v. McNary*, 969 F.2d 1326, a Second

18   Circuit decision from 1992, enjoining the INS, and *Mitchell v.*

19   *Cuomo*, 748 F.2d 804, a Second Circuit decision from 1984,

20   enjoining state prison officials.

21           Also in the Trump decision, the Second Circuit

22   acknowledged that it had sometimes affirmed decisions that

23   issued or denied preliminary injunctions against government

24   action using both standards.

25           As it happened, the *Trump* court ultimately adopted the

1    more rigorous likelihood-of-success standard to the challenges

2    to subpoenas issued by a congressional committee, but then it

3    ended up deciding the matter under both standards.  It's the

4    Court's discussion of competing public interests that informs

5    my decision here.

6          The Court discussed the *Haitian Centers* case and then

7    the original case on which it relied, which was *Plaza Health*

8    *Laboratories v. Perales* from 1989.  And what it concluded was

9    that *Haitian Centers* had found that no party had an exclusive

10   claim on the public interest.  It is actually a quote from the

11   *Haitian Centers* case.  And that point later influenced, it

12   appeared, in the Court's decision in *Time Warner Cable of New*

13   *York City LP v. Bloomberg L.P.*, where the Court found, in

14   noting that there were public interest concerns on both sides

15   of the litigation, they found that the serious-questions

16   standard would be applicable even though the case was

17   ultimately decided under the likelihood-of-success standard.

18          Here, in this case as well, I have identified and the

19   parties have identified for me public-interest concerns on both

20   sides.  I recognize that petitioner is challenging a statutory

21   framework that was implemented with due regard for the

22   executive branch's primacy in immigration matters.  But the

23   record reflects competing governmental interests at a federal

24   level, and strong countervailing governmental interests at the

25   state and local level.

1          First, I note that this dispute is taking place

2     against the backdrop of a change in administration and a

3     consequent reconsideration of federal immigration policies.

4     That includes the DACA program as to which petitioner seeks

5     renewal, and the policy that forecloses his renewal while he is

6     detained.  I recognize -- I want to make clear that I recognize

7     that DACA status is not an entitlement.

8          But the current administration has recognized that the

9     DACA program is a government priority and the government's

10    prioritization of that program is itself a strong

11    countervailing Federal Government action in the public

12    interest.

13         Petitioner was formerly eligible, and might be

14    eligible still, and, thus, there is a countervailing interest

15    in allowing petitioner to pursue this program.  I am not in

16    this regard bound by respondent's decision not to grant

17    petitioner parole to pursue the program.  It remains a priority

18    for the new administration.

19         Additionally, although respondent argues that

20    petitioner is challenging government action taken in the public

21    interest, the petitioner has pointed to developments that

22    complicate this picture.

23         At oral argument petitioner highlighted three

24    governmental actions that suggested that there are more

25    complicated, more nuanced public interest concerns than

 1    petitioner's removal pursuant to the INA.  And these include

 2    the January 20 executive order and memo, the February 2

 3    executive order, and the February 18 memo.

 4         The January 20 memorandum, for example, demonstrates

 5    that the government prioritized a moratorium on deportations,

 6    and the petitioner would fall within that moratorium.  The

 7    government maintains that petitioner is not entitled to relief

 8    under any of these memos or executive orders or policies.

 9         But, more generally, these statements suggest that

10    this is not simply a case where the government's sole interest

11    is removing people pursuant to the INA.  Rather, the government

12    has expressed an interest in implementing the INA in a certain

13    way by establishing enforcement priorities, and petitioner is

14    challenging the application of the government's stated

15    priorities to his case.

16         While petitioner may not be entitled to an order

17    directing the government to prioritize exercise of its

18    enforcement discretion in a particular way, these statements of

19    the government's enforcement priorities suggest that a more

20    nuanced view of government action in the public interest, with

21    that phrase in quotes, is warranted than is asserted by

22    respondents and reinforce that there are public-interest issues

23    on both sides.

24         Second, and separately, New York City and the State of

25    New York have articulated strong countervailing interests in

1    petitioner's favor.  Petitioner has received a letter from the

2    Law Department of the City of New York, relating that

3    petitioner had been turned over to ICE in violation of the

4    City's detainer law.  And New York State has publicly expressed

5    a strong public interest against the removal of individuals

6    like petitioner, for example, in its amicus brief in the Texas

7    litigation, mirroring the Federal Government's own priorities,

8    as articulated in the January 20 memo and the executive order.

9         The *Trump* court noted, and the cases it cited were the

10    *Time Warner* case and the *Hatian Centers* case, that where there

11    are public-interest concerns on both sides of the litigation,

12    the serious-questions standard would be applicable.  And for

13    these reasons, and on what I believe to be the rather unique

14    facts of this case, I am using the serious-question standard.

15         And what I'll do now is to explain why I find why that

16    there are substantial or serious questions regarding my own

17    jurisdiction to hear this case and regarding petitioner's due

18    process issues.

19         I will note, in the issue of jurisdiction and other

20    sort of opening issues, I don't believe the venue issues are an

21    issue in this case.  I do have my view regarding core and

22    noncore claims, and that was set forth in the case of *Gomez v.*

23    *Decker*, but I also agree that noncore claims can be brought in

24    a legal custodian district, such as the Southern District of

25    New York, and I've been advised that petitioner is arguing only

 1    noncore claims here, so I don't find a venue problem.

 2         The larger issue for me is the issue identified by

 3    respondent about whether I have jurisdiction to review

 4    petitioner's claims.  For that I turn to Section 1252 of Title

 5    8 of the United States Code, which is the section of the INA

 6    that covers judicial review of removal orders.  I'm also

 7    looking at the amendments over time and the court cases

 8    interpreting it.

 9         After doing that, I conclude that there are

10    substantial or serious questions that both prevent me from

11    dismissing the petition outright and that satisfy the

12    serious-questions prong of the preliminary injunction standard.

13         Beginning at the beginning with the Real ID Act, in

14    2005, after the Supreme Court's decision in *INS v. St. Cyr*,

15    Congress amended the statute to expressly include habeas review

16    under 2241 in the forms of prohibited judicial review of

17    removal orders, thereby superseding that portion of *St. Cyr.*

18    And Section 1252(a)(5) provides, in essence, for a pipeline

19    that begins with the immigration judge, goes next to the BIA,

20    and next to the Court of Appeals.

21         The Second Circuit has construed this provision

22    broadly to preclude district courts from exercising subject

23    matter jurisdiction over an action that even indirectly

24    challenges an order of removal.  As one case for that

25    proposition I cite *Delgado v. Quarantillo*, 643 F.3d 52, 55, a

 1    per curiam Second Circuit decision from 2011.

 2         But the parties have focused on 1252(g).  I won't read

 3    all of it into the record, because the parties are so familiar

 4    with it, but in large measure the focus is on this part.  No

 5    court shall have jurisdiction to hear any cause or claim by or

 6    on behalf of any alien arising from the decision or action by

 7    the Attorney General to commence proceedings, adjudicate cases,

 8    or execute removal orders against any alien under this chapter.

 9         The intended effect of this provision is to strip

10    district courts of jurisdiction, to hear removal order-related

11    claims that ought to be funneled through the BIA to the circuit

12    court, in accordance with subsection (a)(5).

13         The issue, however, is that the Supreme Court itself

14    has said that the language in 1252(g) does not sweep in any

15    claim that can technically be said to arise from the three

16    listed actions of the Attorney General.  Instead, we read the

17    language to refer just to those three specific actions

18    themselves:  Commencing proceedings, adjudicating cases, and

19    executing removal orders.  That is from the Supreme Court's

20    decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 from 2018,

21    and it, in turn, is relying on a case cited to me by the

22    parties, *Reno v. American-Arab Anti-Discrimination Committee*,

23    525 U.S. 471 from 1999.

24         So the issue and the question before us is whether a

25    suit brought against immigration authorities is or amounts to a

1    challenge to a removal order.  Many courts have found in this

2    district that it is not per se a challenge to a removal order,

3    and whether it is or not turns on the substance of the relief

4    that plaintiff seeks.  One of many cases for that proposition,

5    *Vidhja v. Whitaker*, 2019 WL 1090369.

6          The *Vidhja* case notes, and it is true, that numerous

7    courts in this circuit have held that a request for a stay of

8    removal constitutes a challenge to a removal order, and that,

9    accordingly, district courts lack jurisdiction to grant such

10   relief.  But other cases have found that subsection (g) doesn't

11   preclude jurisdiction under certain circumstances, including

12   the *You* case, 321 F.Supp. 3d 451, or *Calderon v. Sessions*, 330

13   F.Supp. 3d 954.

14         Of the courts that have decided that 1252(g) does not

15   strip jurisdiction to hear habeas petitions under certain

16   circumstances, some have read the provision not to apply to

17   challenges to the legal authority to remove in a general or in

18   a particular way, and others have acknowledged that the

19   provision might apply to nondiscretionary decisions, but must

20   be read not to apply, so as to avoid constitutional problems.

21   The *S.N.C.* decision that we have discussed at oral argument and

22   the *Siahaan* decision that we discussed at oral argument also

23   speak to these issues.

24         Related or interrelated with this question of the

25   scope or interpretation of 1252(g) is the issue of reading

1   1252(g), as respondents request that I do, would run afoul of

2   the suspension clause.  And in that regard I have considered

3   the principal Supreme Court cases on the issue, as well as the

4   most recent Court of Appeals decision.

5          We begin with *INS v. St. Cyr*, which I mentioned

6   earlier.  However, that case was, as noted, superseded by the

7   Real ID Act.  It noted in that case, and this has consequences

8   for later analysis that, at the absolute minimum, the

9   suspension clause protects the writ as it existed in 1789.

10          After *St. Cyr*, there was *Boumediene v. Bush*.  I know

11   it was not an immigration case, but it was nonetheless

12   significant in that it listed requirements or gave ideas and

13   guidance on requirements for adequate and effective substitutes

14   in lieu of habeas, which were designed to avoid suspension

15   clause problems, and it discussed minimum criteria for

16   substitute procedures.

17          And then, most recently, we have had *Department of*

18   *Homeland Security v. Thuraissigiam* from last year, and it's the

19   case on which the parties have focused the most.  It was an

20   immigration case.  It concerned the availability of habeas

21   relief to challenge expedited removal orders, where the

22   applicable jurisdiction-stripping provision was Section

23   1252(e).

24          In that case, however, again, the focus was on

25   Founding Era precedent.  Justice Alito, writing for the Court,

1  claimed that the petitioner had so conceded.  I actually went

2  back, and I don't think that was the case, but that is what he

3  found.

4        It doesn't purport to decide whether the scope of the

5  habeas writ has expanded since the Founding Era.  It does

6  suggest that the suspension clause only applies to core habeas

7  claims, as understood at the Founding Era, and it summarily

8  dismissed due process arguments, asserting that petitioner had

9  no due process rights because he was effectively stopped at the

10  border.

11       There are differences though.  Let me say this.  I

12  recognize that there is language in *Thuraissigiam* that would

13  seem to doom petitioner's claims.  There is language, for

14  example, that the relief sought might fit an injunction or writ

15  of mandamus, but falls outside the scope of the common law

16  habeas writ.

17       But here, unlike in *Thuraissigiam*, Mr. Castillo, the

18  petitioner, is not asking this Court either for vacatur of his

19  removal order or for a directive of any kind to the BIA.

20  Rather, he's seeking merely to be permitted to remain in this

21  country while his motion to reopen proceeds through the BIA and

22  possibly to the Second Circuit.

23       That said, it seems to me that his request for the

24  Court to direct ICE to follow parole request procedures would

25  seem to fall within the scope of that paragraph or that

1    language in *Thuraissigiam*.

2         *Thuraissigiam* also noted that simply releasing

3    Mr. Thuraissigiam would not provide the right to stay in the

4    country that his petition ultimately seeks.  Without a change

5    in status, he would remain subject to arrest, detention, and

6    removal.

7         But here, by comparison, releasing Mr. Castillo would

8    give him the chance to pursue DACA relief and would make his

9    opportunity to obtain relief through the motion-to-review and

10   the petition-for-review process considerably more meaningful.

11        I have looked at other cases, both pre and post

12   *Thuraissigiam*.  Justice Alito speaks of the case of *Heikkila v.*

13   *Barber*, 345 U.S. 229 from 1953.  That case itself assumes that

14   the constitutional scope of the writ covers collateral attacks

15   on deportation orders.  I think Justice Alito may have

16   misspoken or misperceived that in the *Thuraissigiam* decision,

17   but I leave that for someone else to ultimately determine.

18        There are also cases, pre and post *Thuraissigiam*,

19   discussing whether the motion to reopen proceeding is an

20   adequate and effective substitute.  What is interesting to me

21   is that in several of these cases they have distinguished their

22   case from situations in which the petitioner not only could not

23   be removed before the motion was adjudicated, but also had a

24   credible fear of persecution or torture in the country of

25   removal, such that he may not have an opportunity to file or

1    have adjudicated a postremoval motion to reopen.  I am quoting

2    here from the case of *Barros Anguisaca v. Decker*, 393 F.Supp.

3    3d.  This pinpoint cite is at 352, and it lists a series of

4    cases.  I do think that this case before me is and fits within

5    those circumstances.

6            The *Joshua M. v. Barr* case from the Eastern District

7    of Virginia, the *Siahaan* case that I mentioned earlier, were

8    cases in which district courts had concluded that threats of

9    physical injury within a country of removal undermined the

10   ability to effectively prosecute claims before the BIA and to

11   bring a petition for review to a circuit court from the removed

12   country and, therefore, made the process an inadequate

13   substitute for habeas relief.

14           I will just note in that regard as well that the Sixth

15   Circuit's decision in *Hamama v. Adducci*, in particular, the

16   dissenting opinion of Judge White noted that protection against

17   the executive action of removal is within the recognized scope

18   of habeas, and the petition for review procedure provides an

19   inadequate substitute for habeas under the circumstances

20   presented here, which are akin to the ones in this case.  And

21   the district court, therefore, properly exercised jurisdiction

22   over that claim.

23           Looking at those cases, they still left open the

24   possibility that there were situations in which either 1252(g)

25   ought not apply or, if it did apply, there would be suspension

1  clause issues for which there was not an adequate and effective

2  substitute.

3      I recognize that post-*Thuraissigiam* the circuit courts

4  that have decided the issue have not found suspension clause

5  issues.  But with appropriate respect to those circuits, I

6  found that the reasoning didn't engage fully with the issues

7  that the parties have brought to my attention in this case, and

8  so I note them.  But it doesn't detract from my ultimate

9  conclusion that there is a substantial or serious question on

10  the issue.

11      These cases include *Gicharu v. Carr* from the First

12  Circuit, reported at 983 F.3d 13; *EFL v. Prim*, the very recent

13  decision from the Second Circuit contained at 2021 WL 244606;

14  and *Tazu v. Attorney General*, 975 F.3d 292, a Third Circuit

15  decision from 2020.

16      *Tazu*, in particular, I find not persuasive because

17  having told me that there is no problem and there are no due

18  process issues, it then ends by saying, and I quote,

19  "fortunately, his removal is already stayed before the Second

20  Circuit.  We trust that he will be able to stay here with his

21  family while he seeks relief."  As precedent, that helps me not

22  at all.

23      Ultimately, and I thank you for your indulgence as I

24  went through that case law, I find substantial questions

25  regarding whether 1252(g) strips me of jurisdiction, and if so,

1   whether such jurisdiction stripping would violate the

2   suspension clause.

3        To begin, I find that the courts' disparate

4   constructions of the scope of 1252(g) itself both prevents me

5   from concluding that I lack jurisdiction and raises a

6   substantial question as to whether the bar even applies in this

7   case.  The plain text of the statute would seem to cover a

8   broad range of proceedings.  But the Supreme Court in *Jennings*

9   instructed courts to read the provision narrowly and not

10  literally.  How narrowly is an open question that has led

11  courts to differing conclusions, often influenced, whether

12  expressly acknowledged or not, by the canon of constitutional

13  avoidance, and I cannot say with certainty that that statute

14  operates to strip me of jurisdiction.

15       If I did, I would proceed to the next level of

16  substantial or serious questions, addressing suspension clause

17  issues, and this conclusion proceeds from two findings:  (i)

18  there is support in the case law for holding that the writ has

19  evolved since 1789 and extends to this situation, such that the

20  suspension clause would apply; and (ii) the statutory

21  channeling of claims from the immigration judge, to the BIA, to

22  the circuit Court of Appeals, is an inadequate substitute for

23  habeas on the facts of this case.

24       Let me speak first about the support in the case law.

25  The cases that I mentioned from the Supreme Court, *St. Cyr*,

1    *Boumediene*, and even *Thuraissigiam*, acknowledged, through use

2    of their "at a minimum" language, that the Court was discussing

3    the writ as existed in 1789.  But this repeated use of

4    qualifying language suggests that the writ is or could be

5    broader than what had been outlined in those decisions.  The

6    *Heikkila* Supreme Court decision and the *Hamama* dissent, to

7    which I referred above, presented evidence from the founding

8    period and beyond regarding a broader conception of the writ to

9    which the suspension clause would apply.

10           On the issue of what qualifies as an adequate and

11   effective substitute, I'm drawing my instruction from the

12   Second Circuit's decision in *Luna v. Holder*, and there are

13   several factors that are called to my attention.

14           One is that the purpose and effect of the substitute

15   was to expedite consideration of the detainee's claims and not

16   to delay or frustrate it.  One is that the scope of the

17   substitute procedure ought not be subject to manipulation by

18   the government.  Third, a mechanism for review that is wholly a

19   discretionary one is an insufficient replacement for habeas.

20   And, fourth, the entity substituting for a habeas court must

21   have adequate authority to formulate and issue appropriate

22   orders for relief, including the power to order the conditional

23   release of an individual unlawfully detained.

24           The petitioner has argued here that the existing

25   statutory scheme does not satisfy these requirements, at least

1    on the facts of this case.  I conclude that these arguments

2    raise a substantial question regarding my jurisdiction and

3    regarding the constitutional problems that would adhere if

4    Section 1252(g) were found to bar jurisdiction here.

5         The BIA handling of stay-of-removal requests is, it

6    has been submitted to me, opaque and rushed.  It is unclear

7    what the standards are for granting or denying a stay, and it

8    is argued that it yields arbitrary results.  I have also been

9    presented with an amicus brief in the *Ixcoy Caal v. Decker* case

10   making that point as well.

11        Another complaint is that the stay request and the

12   motion to reopen are not handled together, creating what at

13   least one court has called a jurisdictional no man's land.

14        A third challenge is that the petitioner is likely to

15   be removed before he has the chance to petition the Second

16   Circuit for a stay, thereby undermining the effectiveness of

17   the alternative process.  It doesn't provide relief from the

18   underlying executive action, which is removing him to a country

19   where, petitioner alleges, he faces a risk of persecution and

20   violence.

21        For these reasons, I am finding substantial questions

22   dealing with 1252(g) itself.  I am also finding substantial

23   questions regarding the procedural due process to which

24   petitioner is entitled.

25        Now, petitioner argues that he has a right under the

1    Fifth Amendment due process clause, to adjudication of his

2    motion to reopen and his parole request before he is removed.

3    Many of the arguments are ones I have just repeated, that it is

4    unlawful to deport people before they have had a full and fair

5    opportunity for review particularly in the asylum and CAT

6    context, the jurisdictional no man's land argument, and that

7    the ability to get a stay of removal from an IJ or the BIA is

8    inadequate to protect one's rights because the process results

9    in arbitrary and capricious decisions and no ability to appeal

10   a stay of the denial to the circuit court before a final

11   decision on the motion to reopen.

12           Ultimately, I do conclude that these do raise serious

13   or substantial questions regarding the due process rights.

14           The Fifth Amendment's due process clause mandates that

15   no person shall be deprived of liberty without due process of

16   law.  This clause applies to all persons within the United

17   States, including aliens, whether their presence here is

18   lawful, unlawful, temporary, or permanent.  I am quoting here

19   from *Zadvydas v. Davis*, 533 U.S. 678, a Supreme Court decision

20   from 2001, and *Thuraissigiam* itself confirms that aliens who

21   have established connections in this country have due process

22   rights in deportation proceedings.

23           The next issue, therefore, is whether there is a

24   cognizable liberty or property interest.  Petitioner has

25   suggested to me that there are.  He has cited a liberty

1    interest in remaining in the United States, a statutory right

2    to move to reopen his proceedings, and an entitlement under law

3    to not be deported to a country where persecution would occur.

4         The fundamental requirement of dues process is the

5    opportunity to be heard at a meaningful time and in a

6    meaningful manner.  I quote there from *Mathews v. Eldridge*, 424

7    U.S. 319 from 1976.

8         The adequacy of these procedures is a function, in

9    part, of the magnitude of the interest at stake and the

10   likelihood of erroneous deprivation.

11        In the Second Circuit's decision in *Hechavarria v.*

12   *Sessions*, the Court noted that the statutory procedural

13   protections of judicial review and stays are essential tools in

14   meeting the government's constitutional obligation to provide

15   procedural due process for immigrants facing removal.  Our

16   power and obligation to participate meaningfully in the

17   statutory scheme, as structured by the Constitution, is a

18   foundational element of our analysis in this appeal.

19        Turning now to the application of these principles to

20   the facts of this case.

21        I conclude that the deportation of the petitioner

22   before he is able to file a petitioner for review at the Second

23   Circuit makes the opportunity for judicial review by the Second

24   Circuit less meaningful.

25        There is also the distinct possibility that he will

1    suffer -- in fact, he will suffer irreparable harm in the

2    meantime, not merely the threat of harm to himself, in

3    Honduras.  But the foreclosure of his eligibility for DACA

4    renewal.

5         I would also like to reiterate and remind the parties

6    of the concerns I just raised with respect to the suspension

7    clause analysis regarding how BIA stay request review works and

8    whether it is sufficient to protect against the erroneous

9    deprivation of liberty.

10        I'm also persuaded by the analysis of a district court

11   in California, to be sure, in *Chhoeun v. Marin*, 306 F.Supp. 3d,

12   1147, noting there that the requested injunction would ensure

13   that petitioners have adequate time and opportunity to access

14   the system that has been constructed to prevent erroneous

15   removals.  It is a system that includes the thorough exhaustion

16   of an administrative process and judicial review by the

17   appropriate Court of Appeals.  The Court finds that the

18   requested procedural protections are necessary to comport with

19   due process.  So I do find substantial question as to the scope

20   and operation of 1252(g) and the due process issues raised by

21   petitioner.

22        I want to just note, for completeness, that there is a

23   third argument that I do not find to be a substantial question.

24   That is the argument that petitioner has made that removal

25   would violate the 100-day moratorium and DHS' own enforcement

1   priorities and that the injunction issued in the Southern

2   District of Texas should not apply to him.

3        This particular challenge would seem to me to be

4   barred by 1252(g) and not appropriately a subject of the

5   *Accardi* doctrine or a claimed violation of the APA to

6   circumvent that bar.

7        The February memorandum recited that it may not be

8   relied upon to create any right or benefit, substantive or

9   procedural, enforceable at law by any party in any

10  administrative, civil, or criminal matter.  More pointedly, the

11  memorandum makes clear that it enjoins blanket removal, but it

12  leaves DHS with the discretion to pursue removal in individual

13  circumstances.  Based on the submissions of the parties and the

14  representations made to me in oral argument, I'm confident that

15  DHS did not misperceive its discretion in placing or replacing

16  the petitioner in removal proceedings.

17       Nonetheless, I do find serious questions on the other

18  two areas, the scope of the writ and how it interacts with the

19  suspension clause, and the possibility of due process issues.

20       Having found that, and I realize -- I promise you, for

21  a moment of levity, that the rest of this is a lot shorter.

22  But having found this issue, I focused the most time on the

23  merits issue, on the substantial questions issue, because it

24  has the most complexities.  But petitioner must also

25  demonstrate that the balance of hardships tips decidedly in his

1    favor, and on that I find that it does.

2            The Second Circuit has shown or has held, excuse me,

3    that a showing of irreparable harm is the single most important

4    prerequisite.  I'm quoting from the *Yang* decision I mentioned

5    earlier.  To demonstrate irreparable harm, the movant must

6    demonstrate that they will suffer an injury that is neither

7    remote nor speculative, but actual and imminent, and one that

8    cannot be remedied if a court waits until the end of the trial

9    to resolve the harm.  I'm quoting there from *Faiveley*

10   *Transportation Malmo AB v. Wabtech Corporation*, 559 F.3d 110, a

11   Second Circuit decision from 2009.

12           I accept the petitioner's arguments in this regard

13   that removal prior to adjudication of his motion to reopen

14   would violate his due process rights, and that there would be a

15   presumption of irreparable injury that flows from a violation

16   of constitutional rights.  It would make him ineligible for

17   DACA.  It would render him vulnerable to the risk of

18   persecution and harm in Honduras, and there is a personal cost

19   of being separated from his family in the United States.

20           A lot of these irreparable harm issues flow naturally

21   into the question of the balance of equities and the public

22   interest, and for this reason I find as well that the balance

23   of equities tips decisively and decidedly in petitioner's

24   favor.

25           There are other issues, though, including the medical

1    issues that have been identified by petitioner's counsel.

2    There is also a public interest in the constitutionally sound

3    and fair administration of the immigration laws.  There are

4    completing public interests in terms of New York City's

5    detainer law and New York State's interest as expressed in its

6    amicus brief.

7            And, conversely, it is not as evident why there needs

8    to be such a rush to remove petitioner at this time,

9    particularly since he does not seem to fall within the

10   administration's enforcement priorities set forth in the

11   various memoranda that were identified last week.

12           I have reviewed the government's letter of yesterday

13   discussing the circumstances of the dropping of the criminal

14   charges against petitioner.  The fact of his arrest, however,

15   does not affect my decision.  I had a reference to allegations

16   that were dropped.  I have no evidence substantiating them.

17           I do want to make clear what I am and am not doing

18   here.  In granting injunctive relief I am not saying that

19   petitioner is entitled to have this case reopened by the BIA.

20   I am not saying that he is entitled to DACA eligibility

21   renewal.  All that I'm saying is that he has raised

22   sufficiently meritorious legal issues and that he has presented

23   sufficiently compelling evidence on the remaining factors of

24   the preliminary injunction analysis that he should not be

25   removed from this country by undertaking those efforts.

1    Related to this issue is the question of *Mapp* relief.

2    The Court has inherent authority to grant bail to habeas

3    petitioners when the petition raises substantial claims and

4    extraordinary circumstances make the grant of bail necessary to

5    make the habeas remedy effective.  I am quoting there from the

6    decision itself.

7    The *Mapp* holding has been affirmed and extended post

8    Real ID Act.  It's done so in the first instance in *Elkimiya v.*

9    *Department of Homeland Security*, 484 F.3d 151, a Second Circuit

10    decision from 2007, and the *S.N.C.* district court decision from

11    2018 also makes reference to it.

12    I find that petitioner has raised substantial claims.

13    More pointedly, I am advised that he cannot effectively apply

14    for renewal of his DACA eligibility or relief while detained

15    and that bail is necessary to permit him to do that.  ICE has

16    denied his parole request, and he was not granted bail earlier

17    this week.

18    There are certain medical issues that I understand may

19    not be or may not be as well addressed while he is detained.  I

20    do recognize that severe health issues have been a basis for

21    *Mapp* relief in the past, and this happened particularly last

22    year in the context of certain habeas requests that were

23    occasioned by the COVID-19 pandemic.

24    They are not the principal basis for the relief that I

25    am awarding.  I am expecting that the medical issues of which

```
 1    petitioner complains will be addressed very promptly upon his

 2    release.

 3            As I noted earlier, and want to underscore again, I am

 4    granting Mapp relief in order to allow petitioner to pursue his

 5    DACA renewal.  I recognize that the effect may be to ease other

 6    burdens that he has, his medical issues or his immigration

 7    litigation more broadly.  But I'm granting the relief to allow

 8    the DACA process to proceed.  If that concludes before the

 9    motion to reopen is resolved, that may well amount to changed

10    circumstances warranting the resumption of petitioner's

11    detention.

12            That is my resolution of the preliminary injunction

13    motion.  There are a few sort of miscellaneous matters I want

14    to address with the parties.

15            Again, perhaps reflecting my experience, which may be

16    different from all of your experiences, I would expect the

17    parties would be able to agree on the conditions of a bond for

18    Mr. Castillo's release.  It was not my intention to just let

19    him out with no conditions whatsoever.  So my hope would be

20    that I could allow a period of time that would be sufficient

21    for the parties to either come to a decision or to come to me

22    with your competing proposals and let me decide.  That's what I

23    am proposing for the parties.

24            Related to that, I'd like to just address Ms. Friedman

25    for a moment.
```

1          Ms. Friedman, if this is a matter where the government

2    wishes to appeal and wishes to prevent Mr. Castillo from ever

3    leaving the facility, I am prepared to stay my decision for a

4    couple of days because I do think -- I want to give the

5    parties -- let me say this.  As I am staying this decision,

6    what I'm expecting is that the parties will get together and

7    figure out bail conditions and/or the government will appeal to

8    the circuit and ask for what I've done today to be undone.

9          Ms. Friedman, I realize I am springing this on you

10   with no notice, but it was my intention to stay the effect of

11   my decision or -- in other words, that Mr. Castillo was not

12   getting out before Wednesday of next week -- to give everybody

13   a chance to propose a bond and to give the government a chance

14   to decide whether it wants to appeal.

15         Ms. Friedman, beginning with you, is there any reason

16   why I may not do that?

17         MS. FRIEDMAN:  I am not aware of any, your Honor.  ICE

18   has already committed that he will not be removed prior to that

19   date anyway, so I'm not aware of any.

20         THE COURT:  Ms. Friedman, on my larger point about you

21   and your adversaries consulting about a bond, you heard me

22   mention last year, and last year during the height of the early

23   pandemic, I had discussions with members of your office

24   regarding meetings to propose bonds for folks who were detained

25   at the Orange County Jail.  In those cases they were let out

1    because of very serious medical conditions, but they weren't

2    let out on their own recognizance.  There was a bond.  For this

3    reason, I thought or I think that the parties could get

4    together and agree upon conditions.

5            Ms. Friedman, is that a thing that can be done or is

6    what I'm saying completely foreign in this context?

7            MS. FRIEDMAN:  My office has definitely had

8    conversations where they have agreed and presented things to

9    judges, so I definitely think we can have conversations with

10   opposing counsel.

11           THE COURT:  Thank you.

12           Ms. Friedman, is there anything that I have omitted

13   resolving from your perspective?

14           MS. FRIEDMAN:  I don't believe so, your Honor.

15           THE COURT:  Thank you.

16           I know one of the downsides of having an oral decision

17   is, you need to think about everything I've said and perhaps

18   get a transcript and look at everything I have said, but I

19   believe I addressed everything that the parties wanted me to

20   address.

21           Ms. Austin, the same questions to you.  I am not

22   letting your client out the door before Wednesday, hoping that

23   the parties can agree on a bond or the Second Circuit will do

24   something or not do something.

25           Do I understand that you will be able to have those

1  discussions or another member of your team will be able to have

2  those discussions with the government about the bond?

3       MS. AUSTIN:  We absolutely can, your Honor.  I would

4  ask, given that in the past my experience in this situation is

5  often that we diverge on at least some points, whether you

6  would want a single letter summarizing both parties' positions,

7  or two, and also by what date, to the extent that we do not

8  reach agreement on full conditions.  I think we could do that

9  as soon as 24 hours from now or tomorrow afternoon, but I think

10  we are eager to keep the process moving and give your Honor

11  time, to the extent there is any disagreement, but we would, of

12  course, conform with whatever schedule you set for the

13  submission of that one or two letters.

14       THE COURT:  I think one or two letters by end of day

15  Monday because I'm telling myself that if you have additional

16  time you will get that much closer to resolution.  But Monday

17  will still give me time to decide the issues.  Close of

18  business.  The normal close of business hours.  Not midnight,

19  please.  But that seems to make the most sense.

20       I've had it both ways.  If the parties want to have

21  one letter with both sets of positions, fine.  If you want two

22  letters, fine.  I'm agnostic on the issue.  I just want

23  everyone's views on things.

24       Ms. Austin, this second line of questioning is, from

25  your perspective, is there anything that I have left open?

1          MS. AUSTIN:  I don't believe so, your Honor.

2          To the extent that there is anything logistical, I

3    think we could include it in our letter as far as the

4    logistical steps necessary for a district court to enter a

5    bond.  That's been somewhat difficult to effectuate in the

6    past, but we can incorporate that into our discussions with the

7    government and address any issues in our submission.

8          THE COURT:  I know I've done it, because I know I've

9    done it last year, and I know a number of my colleagues have

10   done it last year, with particular respect to the Orange County

11   Jail.  So I'm assuming something similar could be put together,

12   and I will let you speak with your colleagues and see what that

13   is.  Again, I just did not want to leave anyone with unresolved

14   issues.

15         Ms. Austin, from your perspective and your colleague's

16   perspective, is there anything else to address in this

17   proceeding?

18         MS. AUSTIN:  I don't believe so, your Honor.

19         THE COURT:  Ms. Friedman, is there anything else to

20   address in this proceeding?

21         MS. FRIEDMAN:  No, your Honor.

22         THE COURT:  I thank you all very much.  I thank you in

23   particular for your patience as I reviewed the oral decision.

24         Be well each of you.  We are adjourned.  Thank you.

25         (Adjourned)