IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Mahmoud KHALIL,<br><br>　　　　　　　*Petitioner*,<br><br>　v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>　　　　　　　*Respondents*. | No. 25 Civ. 1935 |

## **DECLARATION OF MAHMOUD KHALIL**

I, Mahmoud Khalil, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. On the night of March 8 and into March 9, I was detained at 26 Federal Plaza in New York City, New York.

2. During my detention there, the agents processed me by taking my biometrics, ten fingerprints, a photograph of my face, and a saliva swab for DNA.

3. They also took my belt, shoes, jacket, and wedding ring. I was given different shoes without laces to wear.

4. A couple of hours after my arrival at 26 Federal Plaza, the agents presented several documents for me to sign. Among them were a "Notice to Appear" ("NTA") and a custody determination form, both of which I was seeing for the first time. When I asked to call my attorney before signing the NTA or the custody form—the same attorney one of the agents had spoken to during my arrest earlier that night—I was told that I would be

allowed to call my attorney if I signed the forms. I refused, and I was moved out of the room.

5. Some time later, agents returned with copies of the documents. I noticed that the copy of the NTA appeared to be different from the one I was originally asked to sign. This copy included an immigration court date several weeks away, a time, and a location in "LA"—which I have since learned meant "Louisiana." I remember being surprised to see these details in the copy of the NTA.

6. I have been shown the copy of the NTA that was provided to my attorneys and the details in that copy match the details in the second NTA copy I was shown that night.

7. At some point later, in the early hours of March 9, I was escorted to a white van and was told I would be traveling to New Jersey. While being escorted to the van, I asked about the belongings that the agents had taken at 26 Federal Plaza, and I was told that I would be coming back to 26 Federal Plaza the next day. My belongings were not in the van with me at that time. There was one driver and another agent in the van with me.

8. Some time later, we arrived at Elizabeth Detention facility in New Jersey. When we arrived, I waited for a little while in the van with the two agents who had escorted me. I was escorted by the two agents in the van and we were met by officers at the facility. After waiting a while, the door opened, and we went inside.

9. The moment I arrived at Elizabeth, I told the officers that I needed to call my attorney. They told me to ask another guy at the facility. I asked that guy, and he said I needed to wait until I was processed.

10. At Elizabeth, nobody took my biometrics or my photograph, and I was wearing my own clothes the entire time.

11. I was in a waiting room with about ten other people. We slept on the ground. Even though it was cold inside the room, there were no beds, mattresses, or blankets.

12. Later, in the morning, I asked a female officer to allow me to call my attorney, and she told me, like the first guy, to wait until I was processed.

13. Visible from where I was at Elizabeth was a room where people would change clothes into detention uniforms. Through a window in the room, I saw one person change clothes in the room. I saw two other people enter the changing room and leave a few minutes later. When they came out, they were in a uniform and holding a bag that looked like a military bag, which I understood to contain the person's clothes.

14. From time to time, someone from the group of people I was with would be called to the front of the waiting room, then escorted by an officer to a separate room where it seems officers were processing people so that they could enter a different part of the facility. I saw multiple people who were being taken out of the waiting room and understood that

they would be staying at the facility, as they did not return to the waiting room. By the time I left Elizabeth, there were only about five of us remaining in the waiting room.

15. At one point, I was called to the front, and a female officer escorted me to the processing room. I waited there for between five and ten minutes while an officer spoke to someone on the phone. The officer who was speaking on the phone told the female officer who escorted me to escort me back to the waiting room.

16. Later on, I was called to the front of the line in the waiting room, and when I told an officer that I had already previously been called to the processing room, she told me "they don't need you in that room" and "you're being transported."

17. The entire time I was at Elizabeth, I did not hear anyone mention bedbugs.

18. There was another man in the waiting room who was, like me, in his own clothes. He was a Pakistani man who told me he was being sent to Philadelphia.

19. At one point, I was told, "They're coming from New York," and "they'll be here shortly." An hour after that, I was told "you're being transported in ten minutes." Agents arrived for me about five or ten minutes after that.

20. Two agents arrived to get me. I believe that one of the two agents was a female African American agent that I recognized from the night before in New York, at 26 Federal Plaza. The other agent was a white male that I did not recognize. The two agents escorted me to a white van similar to the one I had arrived in from New York and similar to other white vans I saw in the parking lot in New York. In the van, I asked if we were going back to 26 Federal Plaza, and I was told, "no, we are going to JFK Airport." I was afraid they were trying to deport me.

21. In the van, I saw the clothing and other items that had been taken from me the night before, in two different bags.

22. We left Elizabeth around 12 p.m. noon, and arrived at JFK about an hour later.

23. When we arrived at JFK, there were two other agents in plainclothes waiting for me. I spent about ten hours in their custody on the way to Louisiana. At times I spoke with them, and at other times I overheard them talking to each other. From my conversations with them and their conversations with each other, I learned that they worked at a New York office. I asked them if they worked at 26 Federal Plaza, and one agent, whose name I learned was Abdul when I overheard him ordering food, told me he worked at a different office close to Federal Plaza. Abdul also told me that he lived in Queens and has Mauritanian neighbors there. The other agent wore a Yankees hat. Abdul told me that he was escorting me to Louisiana because "no one wanted to take it"—the job of escorting me—"because it was a Sunday."

24. When I arrived at the Louisiana Detention Facility, I was processed in a way that was almost exactly the same as the way I had seen other people processed in Elizabeth. First, I spoke with an officer who asked basic information about me. Then they took a picture of me and one fingerprint (left index). I was given a bag with a uniform, sent into a room, asked to change my clothes, and asked to return my stuff to them.

25. After going through processing to remain in detention at the Louisiana Detention Facility myself, I confirmed my understanding that at the Elizabeth facility, the other men I had seen were being processed to remain in detention in Elizabeth.

26. Because I am currently in detention at the Louisiana Detention Facility in Jena, Louisiana, I could not meet with my attorneys in person or sign this declaration myself. I have verified the contents of this declaration and gave my consent for my lawyers to sign it on my behalf via a privileged video teleconference.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 16th day of March, 2025.

/s/ *Mahmoud Khalil*
Mahmoud Khalil

I, RAMZI KASSEM, declare as follows:

1. My name is Ramzi Kassem. I am a licensed attorney in good standing in the state of New York. I am an attorney of record in the above referenced case.

2. I represent the Petitioner, Mahmoud Khalil.

3. I signed Mr. Khalil's declaration on his behalf with his express consent, after reviewing it with him, as reflected in his declaration.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on the 16th day of March, 2025.

/s/ *Ramzi Kassem*
Ramzi Kassem