## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE,
in his official capacity as Acting Field Office
Director of New York, Immigration and Customs
Enforcement; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement; Kristi
NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;
Marco RUBIO, in his official capacity as Secretary
of State; and Pamela BONDI, in her official capacity
as Attorney General, U.S. Department of Justice,

*Respondents*.

Case No. 2:25-cv-01963

Hon. Michael E. Farbiarz

**BRIEF OF FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION,
NATIONAL COALITION AGAINST CENSORSHIP, THE RUTHERFORD
INSTITUTE, PEN AMERICA, AND FIRST AMENDMENT LAWYERS
ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF PETITIONER'S
MOTION FOR PRELIMINARY INJUNCTION**

Greg H. Greubel
  (NJ Bar No. 171622015)
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
greg.greubel@thefire.org

Conor T. Fitzpatrick*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
conor.fitzpatrick@thefire.org

*Pro hac vice application forthcoming

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTEREST OF AMICI CURIAE ...................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 5

BACKGROUND ............................................................................................... 7

ARGUMENT .................................................................................................... 11

    I.    Mr. Khalil's Advocacy Is Core Protected Political Speech. ................... 11

        A.    Mr. Khalil has full First Amendment rights. ............................. 11

        B.    The First Amendment protects unpopular speech. .................... 13

        C.    Deporting Mr. Khalil for pro-Palestine advocacy would be unconstitutional viewpoint discrimination. ....................................................................... 15

        D.    The administration's attempt to deport Mr. Khalil amounts to unconstitutional retaliation. .................................... 18

    II.    The Foreign Policy Deportation Provision Is Unconstitutional. .................................................................................. 19

        A.    The FPDP is unconstitutionally vague, especially if the only deportable activity is protected speech......................... 19

        B.    Allowing deportation for expression the government deems adverse to America's "foreign policy" will chill expression at America's universities and beyond....................... 22

        C.    Allowing the Secretary of State to deport speakers deemed contrary to the national interest is an un-American approach to speech ...................................................... 24

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
  70 F.3d 1045 (9th Cir. 1995) ........................................................................ 11, 12

*Boos v. Barry*,
  485 U.S. 312 (1988) ............................................................................................ 14

*Bridges v. California*,
  314 U.S. 252 (1941) ......................................................................................... 7, 11

*Bridges v. Wixon*,
  326 U.S. 135 (1945) ............................................................................... 5, 11, 12, 13

*Brooks v. Auburn Univ.*,
  296 F. Supp. 188 (M.D. Ala. 1969) ................................................................... 16

*Connick v. Myers*,
  461 U.S. 138 (1983) ............................................................................................ 13

*Cox v. Louisiana*,
  379 U.S. 536 (1965) .............................................................................................. 5

*Dennis v. United States*,
  341 U.S. 494 (1951) ............................................................................................ 13

*Edwards v. South Carolina*,
  372 U.S. 229 (1963) ............................................................................................ 14

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ............................................................................................ 20

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) .............................................................................................. 13

*Gay & Lesbian Students Ass'n. v. Gohn*,
  850 F.2d 361 (8th Cir. 1988) ............................................................................. 16

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ............................................................................................ 19

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ............................................................................................ 13

*Hartman v. Moore,*
547 U.S. 250 (2006) ........................................................................ 18

*Healy v. James,*
408 U.S. 169 (1971) .................................................................... 16, 22

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ....................................................................... 15, 17

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ....................................................................... 17

*Int'l Soc'y for Krisha Consciousness, Inc. v. Barber,*
650 F.2d 430 (2d Cir. 1981) ......................................................... 23, 24

*Jones v. Parmley,*
465 F.3d 46 (2d Cir. 2006) .............................................................. 14

*Kleindienst v. Mandel,*
408 U.S. 753 (1972) ........................................................................ 13

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
594 U.S. 180 (2021) ........................................................................ 23

*Massieu v. Reno,*
915 F. Supp. 681 (D.N.J. 1996) ......................................... 7, 20, 21, 22

*Matal v. Tam,*
582 U.S. 218 (2017) ........................................................................ 17

*McCullen v. Coakley,*
573 U.S. 464 (2014) ........................................................................ 14

*Mendia v. Garcia,*
2016 WL 2654327 (N.D. Cal. May 10, 2016) ..................................... 19

*Molpus v. Fortune,*
432 F.2d 916 (5th Cir. 1970) ........................................................... 16

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964) ........................................................................ 13

*Ng Fung Ho v. White,*
259 U.S. 276 (1922) ........................................................................ 13

*Rafeedie v. I.N.S.,*
795 F. Supp. 13 (D.D.C. 1992) ................................................... 11, 12

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ................................................................ 16, 22

*Smith v. Goguen*,
    415 U.S. 566 (1974) ................................................................ 19

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ........................................................ 6, 13, 15

*Starnes v. Butler Cnty. Ct. of Common Pleas*,
    971 F.3d 416 (3d Cir. 2020) .................................................. 18

*Sweezy v. New Hampshire.*,
    354 U.S. 234 (1957) ................................................................ 6

*Terminiello v. City of Chicago*,
    337 U.S. 1 (1949) .................................................................... 5

*Texas v. Johnson*,
    491 U.S. 397 (1989) ................................................................ 6

*United States v. Alvarez*,
    567 U.S. 709 (2012) ................................................................ 14

*United States v. Robel*,
    389 U.S. 258 (1967) ................................................................ 5

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ................................................................ 15

## Statutes

8 U.S.C.
    § 1182(a)(3)(B)(i)(VII) ........................................................ 17
    § 1182(a)(3)(C)(iii) .............................................................. 5
    § 1227(a)(1) ......................................................................... 17
    § 1227(a)(4)(B) .................................................................... 17
    § 1227(a)(4)(C)(i) .............................................................. 5, 9

18 U.S.C.
    § 2339A(b)(1) ...................................................................... 15

## Other Authorities

*Enrollment Trends*, Inst. of Int'l Educ. ...................................... 22

Hans A. Linde, *"Clear and Present Danger" Reexamined: Dissonance in the Brandenburg Concerto*,
22 Stan. L. Rev. 1163 (1970) ............................................................. 13

Josh Dawsey et al.,
*Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators*, Wash. Post (May 27, 2024)....................................... 23

Luke Tress,
*Protesters Vandalize University buildings on Anniversary of Hind Rajab Killing*, Colum. Spectator (Jan. 30, 2025) ................................. 8

Michel Martin & Destinee Adams,
*DHS Official Defends Mahmoud Khalil Arrest, but Offers Few Details on Why It Happened*, NPR (Mar. 13, 2025) .................................. 11, 23

Sanya Mansoor,
*'Gaza Calls, Columbia Falls': Campus Protesters Defy Suspension Threats and Occupy Hall*, TIME (Apr. 30, 2024) ................................ 8

Secretary of State Marco Rubio Remarks to Press, U.S. Dep't of State,
Mar. 12, 2005 .................................................................................. 12, 23

*Teen Charged After Attacking Student Hanging Pro-Israel Posters at Columbia University*, ABC 7 (Oct. 16, 2023) ...................................... 8

Thomas Jefferson, *First Inaugural Address Mar. 4, 1801*, Avalon Project ............... 25

*White House Daily Briefing*, C-SPAN (Mar. 11, 2025) ...................................... passim

**Treatises**

1 Smolla & Nimmer on Freedom of Speech
§ 10:19.................................................................................................. 13

**Foreign Laws**

Federal'nyĭ Zakon RF ob Informatsii, Informatsionnykh Tekhnologiiākh i o Zashchite Informatsii [Federal Law of the Russian Federation on Information, Informational Technologies and the Protection of Information], Sobranie Zakonodatel'stva Rossiĭskoĭ Federatsii [SZ RF] [Russian Federation Collection of Legislation] 2006, No. 31, Item 3448........ 24

Law of Printing and Publication, 2006 (Royal Decree No. M/23, 3/9/1424 H),
art. 9 (Saudi Arabia) ......................................................................... 24

Xianfa [Constitution] art. 51 (1982) (China).......................................... 6, 24

## INTEREST OF AMICI CURIAE[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought— the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights on college campuses nationwide through public advocacy, targeted litigation, and *amicus curiae* filings in cases that implicate expressive rights. In June 2022, FIRE expanded its advocacy beyond the university setting and now defends First Amendment rights both on campus and in society at large. In lawsuits across the United States, FIRE works to vindicate First Amendment rights without regard to the speakers' views. *See, e.g.*, *Trump v. Selzer*, No. 4:24-cv-449 (S.D. Iowa filed Dec. 17, 2024); *Volokh v. James*, No. 23-356 (2d Cir. argued Feb. 16, 2024); *Novoa v. Diaz*, No. 4:22-cv-324, (N.D. Fla., Nov. 17, 2022), *appeal docketed*, No. 22-13994 (11th Cir. argued June 14, 2024); *Netchoice, LLC v. Bonta*, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025)); *Villarreal v. Alaniz*, 145 S. Ct. 368 (2024). As such, FIRE is deeply concerned by the government's claim of authority to subject resident aliens to adverse action for their expressed viewpoints.

The National Coalition Against Censorship (NCAC) is an alliance of more than 60 national non-profit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC was founded in 1974 in response to the United States

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission. *Amici* are filing a motion for leave to file this brief concurrently.

Supreme Court's landmark decision in *Miller v. California*, 413 U.S. 15 (1973), which narrowed First Amendment protections for sexual expression and opened the door to obscenity prosecutions. The organization's purpose is to promote freedom of thought, inquiry, and expression, and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support free expression rights of students, teachers, librarians, artists, and others. NCAC has long opposed attempts to censor or limit youth free expression on college campuses and tracks efforts to suppress artistic and cultural expression related to political conflict in Israel and Palestine. *See, e.g.*, Art Censorship Index: Israel and Palestine 2023-Onwards, NAT'L COAL. AGAINST CENSORSHIP, https://ncac.org/art-censorship-index-israel-palestine-2023-onwards. It therefore has a longstanding interest in assuring the continuance of robust First Amendment protections for all, including students and noncitizens. The positions advocated in this brief do not necessarily reflect the views of NCAC's member organizations.

The Rutherford Institute is a nonprofit civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its president, John W. Whitehead, the Institute provides legal assistance at no charge to individuals whose constitutional rights have been threatened or violated and educates the public about constitutional and human rights issues affecting their freedoms. The Rutherford Institute works tirelessly to resist tyranny and threats to freedom by seeking to ensure that the government abides by the rule of law and is held

accountable when it infringes on the rights guaranteed by the Constitution and laws of the United States.

PEN American Center, Inc. ("PEN America") is a non-partisan, not-for-profit organization dedicated to creative expression and the liberties that make it possible. Founded in 1922, PEN America engages in advocacy, research, and public programming related to free expression in the United States and around the world. PEN America stands for the unhampered transmission of thought within each nation and between all nations, working to ensure that people everywhere have the freedom to create literature, to convey information and ideas, express their views, and access the views, ideas, and literature of others. PEN America has engaged in research and advocacy related to protest rights and the free speech rights of immigrants.

The First Amendment Lawyers Association (FALA) is a nonpartisan, nonprofit bar association comprised of attorneys throughout the United States and elsewhere whose practices emphasize defense of Freedom of Speech and of the Press, and which advocates against all forms of government censorship. Formed in the mid-1960s, FALA's members practice throughout the U.S. in defense of the free speech. Since its founding, its members have been involved in many of the nation's landmark free expression cases, including cases before the Supreme Court. *See*, *e.g.*, *Ashcroft v. Free Speech Coalition, Inc.*, 535 U.S. 234 (2002) (successful challenge to Child Pornography Prevention Act argued by FALA member and former president H. Louis Sirkin); *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803 (2000) (successful challenge to "signal bleed" portion of Telecommunications Act argued by FALA

member and former president Robert Corn-Revere). In addition, FALA has a tradition of submitting *amicus* briefs to the Supreme Court on issues pertaining to the First Amendment. *See*, *e.g.*, *City of Littleton v. Z.J. Gifts D-4, LLC*, 2004 WL 199239 (Jan. 26, 2004) (*amicus* brief submitted by FALA); *United States v. 12,200-ft Reels of Super 8mm Film*, 409 U.S. 909 (1972) (order granting FALA's motion to submit *amicus* brief).

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness."

## INTRODUCTION AND SUMMARY OF ARGUMENT

America's founding principle, core to who and what we are as a Nation, is that liberty comes not from the benevolent hand of a king, but is an inherent right of every man, woman, and child. That includes "the opportunity for free political discussion" as "a basic tenet of our constitutional democracy." *Cox v. Louisiana*, 379 U.S. 536, 552 (1965). And "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). For these reasons, along with all citizens, "freedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

Secretary of State Marco Rubio, however, is attempting to deport a permanent resident, Mahmoud Khalil, not because the government claims he committed a crime or other deportable offense, but for the seemingly sole reason that his expression stirred the Trump administration to anger. The Secretary claims he can deport Mr. Khalil under a Cold War–era statute giving the secretary of state the power to deport anyone he "personally determines" is contrary to America's "foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i). And he argues this power extends even to deporting *permanent residents* for *protected* speech. It does not.

The First Amendment's protection for free speech trumps a federal statute. *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967). Accepting Secretary Rubio's

position would irreparably damage free expression in the United States, particularly on college campuses. Foreign students would (with good reason) fear criticizing the American government during classroom debates, in term papers, and on social media, lest they risk deportation. That result is utterly incompatible with the longstanding recognition that "[t]he essentiality of freedom in the community of American universities is almost self-evident," and that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

Secretary Rubio claims (as do all censors) that this time is different, that the supposed repulsiveness of Mr. Khalil's pro-Palestine (and, as Secretary Rubio alleges, pro-Hamas) views cannot be tolerated. But "if there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (holding the First Amendment protects burning the American flag in protest); *see also Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (holding the First Amendment protects displaying "God Hates Fags" and "Thank God for Dead Soldiers" posters outside a military funeral).

Allowing the Secretary of State to deport any non-citizen whose views, in his subjective judgment, are against America's foreign policy interests places free expression in mortal peril. China's Constitution, for example, provides that "when exercising their freedoms and rights, citizens … shall not undermine the interests of the state." Xianfa [Constitution] art. 51 (1982) (China). As China's experience shows,

allowing the government to step in as censor when it believes speech threatens the government's interests is a loophole with infinite diameter. It has no place in America's tradition of individual liberty.

The only court to address the deportation provision Secretary Rubio relies upon to deport Mr. Khalil reached a similar conclusion, holding the law unconstitutional. As that court explained, "If the Constitution was adopted to protect individuals against anything, it was the abuses made possible through just this type of unbounded executive authority." *Massieu v. Reno*, 915 F. Supp. 681, 702 (D.N.J. 1996), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996) (reversing for failure to exhaust remedies).

The "First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." *Bridges v. California*, 314 U.S. 252, 263 (1941) (invalidating criminal convictions, including of a non-citizen, based on protected speech). Our "liberty-loving society" does not permit deportation as a punishment solely based on expression the government disfavors. The Court should grant Mr. Khalil's motion.

## BACKGROUND

Petitioner Mahmoud Khalil attests he is a lawful permanent resident of the United States and a recent graduate student at Columbia University. Am. Pet. for Writ of Habeas Corpus & Compl. ¶ 1, ECF No. 38 ("Am. Pet."). He lives in New York City with his wife, Noor, who is eight months pregnant. *Id.* ¶ 9. Since the October 7,

2023, Hamas attack in southern Israel (and Israel's subsequent military campaign in Gaza), Mr. Khalil has been an active participant at Columbia in demonstrations and advocacy against Israel's actions. For example, Mr. Khalil has repeatedly criticized Israel's military operations in Gaza and what he believes is Columbia's financing and facilitation of those activities. *Id.* ¶ 22. He leads several Palestine-focused student groups and helped organize lectures and educational events about Palestine. *Id.* ¶ 23. He has also served as a mediator between protestors and Columbia's administration to ensure protestors receive fair treatment while the University safeguards institutional operations and student safety. *Id.* ¶ 24.

Though some Gaza protests at Columbia have involved actions the First Amendment does not immunize, including vandalism,[2] physical violence,[3] and unlawful building occupations,[4] neither the Trump administration nor Columbia

---

[2] Luke Tress, *Protesters Vandalize University buildings on Anniversary of Hind Rajab Killing*, Colum. Spectator (Jan. 30, 2025), https://www.columbiaspectator.com/news/2025/01/30/protesters-vandalize-university-buildings-on-anniversary-of-hind-rajab-killing/ [https://perma.cc/E9W4-4783].

[3] *Teen Charged After Attacking Student Hanging Pro-Israel Posters at Columbia University*, ABC 7 (Oct. 16, 2023), https://abc7ny.com/nyc-columbia-university-israel-war/13914229/ [https://perma.cc/96TK-T8CK].

[4] Sanya Mansoor, *'Gaza Calls, Columbia Falls': Campus Protesters Defy Suspension Threats and Occupy Hall*, TIME (Apr. 30, 2024), https://time.com/6972454/columbia-protesters-defy-university-orders-to-clear-encampment/ [https://perma.cc/Y7BC-BQGN].

have alleged Mr. Khalil engaged in those or any other unlawful actions. Indeed, Mr. Khalil has not been charged with any crime.[5]

However, on March 8, 2025, agents from the Department of Homeland Security ("DHS") arrested Mr. Khalil with no prior notice at his Columbia university apartment and initiated proceedings to deport him from the United States. Am. Pet. ¶¶ 45–53, 59–60. At some point in the night, DHS transferred Mr. Khalil to New Jersey, then transported him again soon thereafter to Louisiana, where he arrived on March 10 and remains detained. Am. Pet. ¶¶ 8, 61, 63–67.

DHS documentation indicates Mr. Khalil was being deported based on Section 1227(a)(4)(C)(i) of the Immigration and Nationality Act (the "Foreign Policy Deportation Provision" or "FPDP"). Am. Pet. ¶¶ 14, 82. This provision states that "an alien whose presence or activities in the United States the secretary of state has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(a)(4)(C)(i).

The Trump administration immediately made clear it is attempting to deport Mr. Khalil because of his pro-Palestine advocacy. On March 9, 2025, Secretary of State Marco Rubio reacted to Mr. Khalil's detention on social media, writing, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Am. Pet. ¶ 75. The next day, President Donald Trump, commenting on Mr. Khalil's detention and planned deportation, warned that additional foreign

---

[5] When asked about the administration's rationale for deporting Khalil, DHS Deputy Secretary Troy Edgar did not dispute that Khalil had not broken any laws. Am. Pet. ¶ 81 (citing NPR interview).

students involved in "pro-terrorist, anti-Semitic, anti-American activity" will be found and deported, vowing, "the Trump administration will not tolerate it." *Id.* ¶ 73. President Trump vowed Mr. Khalil's arrest was the "first" of "many to come." *Id.*

Then, on March 11, 2025, White House Press Secretary Karoline Leavitt confirmed to reporters that Mr. Khalil faced deportation because he "sid[ed] with terrorists, Hamas terrorists, who have killed innocent men, women, and children."[6] She claimed Mr. Khalil "organized group protests that … harassed Jewish American students," though she did not allege Mr. Khalil engaged in any harassment.[7] Ms. Leavitt also asserted Mr. Khalil "distributed pro-Hamas propaganda flyers with the logo of Hamas" on Columbia's campus.[8] She emphasized, "This administration is not going to tolerate individuals … siding with pro-terrorist organizations."[9]

On March 13, 2025, Deputy Homeland Security Secretary Troy Edgar conceded in an interview with NPR that Mr. Khalil's deportable "offense" was participating in a protest:

> **Martin**: Is any criticism of the government a deportable offense?
>
> **Edgar**: Let me put it this way, Michel, imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What

---

[6] *White House Daily Briefing*, C-SPAN, at 11:01 (Mar. 11, 2025), https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022 [https://perma.cc/858N-F4WY]; *see also* Am. Pet. ¶ 79.

[7] *White House Daily Briefing*, *supra* note 6, at 11:09.

[8] *Id.* at 11:20.

[9] *Id.* at 11:46.

are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country.[10]

Mr. Khalil filed his Petition for Writ of Habeas Corpus on March 9, 2025, ECF No. 2, and his Amended Petition and Complaint on March 13, ECF No. 38. On March 17, Khalil filed his Motion for a Preliminary Injunction. ECF No. 66. On March 19, the Southern District of New York transferred the action to this Court. ECF No. 79.

## ARGUMENT

## I.    Mr. Khalil's Advocacy Is Core Protected Political Speech.

### A.    Mr. Khalil has full First Amendment rights.

The First Amendment provides "Congress shall make no law … abridging the freedom of speech, or of the press." U.S. Const. amend. I. And the Supreme Court has made clear the Constitution's "freedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148 (citing *Bridges*, 314 U.S. 252).

This has stood as established law for more than 70 years. *See, e.g.*, *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1065 (9th Cir. 1995); *Rafeedie v. I.N.S.*, 795 F. Supp. 13, 22 (D.D.C. 1992) ("It has long been settled that aliens within the United States enjoy the protection of the First Amendment ….") (footnote and citations omitted). "[O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders … including those protected by the First Amendment." *Wixon*, 326 U.S.

---

[10] Michel Martin & Destinee Adams, *DHS Official Defends Mahmoud Khalil Arrest, but Offers Few Details on Why It Happened*, NPR (Mar. 13, 2025), https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump [https://perma.cc/2FFN-QUZT]; *see also* Am. Pet. ¶ 81.

at 161 (Murphy, J., concurring) (cleaned up). The Bill of Rights "does not acknowledge[] any distinction between citizens and resident aliens." *Id.*

Administration officials' statements about Mr. Khalil and his arrest have confused fundamental distinctions between government powers to permit or deny an individual's request to enter the United States versus the rights of an individual who has entered and subsequently became a permanent legal resident.[11] To be sure, Congress has broad powers to set rules for allowing or excluding aliens from entry. But that is entirely different from "the constitutional constraints that operate at deportation." *Am.-Arab Anti-Discrimination Comm.*, 70 F.3d at 1065. And it is especially different when the government seeks to deport a lawfully present permanent legal resident.

There is no merit to a government argument that, because the political branches have broad authority over immigration matters, the government can cast aside the constitutional rights of legal residents like Mr. Khalil. Because "resident aliens have constitutional rights it follows that Congress may not ignore them in the exercise of its 'plenary' power of deportation." *Wixon*, 326 U.S. at 161 (Murphy, J., concurring).  Like all permanent legal residents, Mr. Khalil "is entitled to the same First Amendment protections as United States citizens." *Rafeedie*, 795 F. Supp. at 22. And the importance of protecting and preserving First Amendment rights here is no

---

[11] *See* Secretary of State Marco Rubio Remarks to Press, U.S. Dep't of State, at 9:18, Mar. 12, 2005, http://state.gov/secretary-of-state-marco-rubio-remarks-to-press [https://perma.cc/LTK4-BLMW].

less important than for any U.S. citizen, as deportation can result in the loss "of all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).[12]

## B.    The First Amendment protects unpopular speech.

America's First Amendment and commitment to freedom of speech reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*, 562 U.S. at 452 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)) (quotation marks omitted).

Mr. Khalil's pro-Palestine advocacy and his involvement supporting Palestinian rights are core protected political speech. "The Supreme Court has declared that the First Amendment protects political demonstrations and protests—

---

[12] In 1952, the Supreme Court held the First Amendment did not pose a barrier to deporting an immigrant for being a member of the Communist Party. *Harisiades v. Shaughnessy*, 342 U.S. 580, 592 (1952). To reach its holding, and applying the First Amendment jurisprudence at that time, the Court noted citizens could be punished for the same affiliation. *Id.* at n.18 (citing *Dennis v. United States*, 341 U.S. 494 (1951)); *see also* 1 Smolla & Nimmer on Freedom of Speech § 10:19 (detailing how subsequent Supreme Court precedent limited *Dennis*); Hans A. Linde, *"Clear and Present Danger" Reexamined: Dissonance in the Brandenburg Concerto*, 22 Stan. L. Rev. 1163, 1186 (1970) (same). In 1972, the Supreme Court held the First Amendment does not bar the government from considering speech when deciding whether to *admit* an immigrant because "unadmitted and nonresident alien[s] ha[ve] no constitutional right of entry to this country." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). Neither case contradicts *Wixon*'s holding that "freedom of speech and of press is accorded aliens *residing in* this country." 326 U.S. at 148 (emphasis added).

activities at the heart of what the Bill of Rights was designed to safeguard." *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (Sotomayor, J.) (citing *Boos v. Barry*, 485 U.S. 312, 318 (1988)). Political protests are an exercise of "basic constitutional rights in their most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

So too is handing out flyers, one of the specific justifications Ms. Leavitt offered for Mr. Khalil's deportation.[13] Distributing "leaflets in the advocacy of a politically controversial viewpoint is the essence of First Amendment expression," and "no form of speech is entitled to greater constitutional protection." *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014) (cleaned up). None of the posters Ms. Leavitt cited contain or consist of unprotected speech, and the government does not assert otherwise.[14]

Nor can the administration justify its deportation by alleging Mr. Khalil's speech supported "terrorism." The Antiterrorism and Effective Death Penalty Act of 1996 criminalizes providing specified foreign terrorist organizations like Hamas, ISIS, and Al-Qaeda "material support or resources," defined as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or

---

[13] *White House Daily Briefing*, *supra* note 6, at 11:20; *see also* Am. Pet. ¶ 79.

[14] *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (holding categories of speech unprotected by the First Amendment are carefully cabined and limited to: incitement, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, true threats, and speech presenting a "grave and imminent threat the government has the power to prevent, although a restriction under [this] last category is most difficult to sustain") (citations omitted).

include oneself), and transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1). In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court held that under this definition, expressing support for a terrorist organization or its goals, without more, does not qualify as providing material support. As the Court explained:

> Congress has not … sought to suppress ideas or opinions in the form of "pure political speech." Rather, Congress has prohibited "material support," which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations.

*Id.* at 26. In short, philosophical support for a terrorist organization (let alone mere overlap of certain political beliefs) is fully protected by the First Amendment.

"Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow and—as it did here—inflict great pain." *Snyder*, 562 U.S. at 460–61. Some nations react to such expression by "punishing the speaker." *Id.* at 461. But as a "Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.*

## C. Deporting Mr. Khalil for pro-Palestine advocacy would be unconstitutional viewpoint discrimination.

It is a core tenet of American free speech that the government may not punish people based on their opinions. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). That means "the government must

abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). And courts have for decades rejected viewpoint discrimination in particular at public universities, rebuffing efforts to restrict ideas by limiting who may teach,[15] who may be invited to speak,[16] which publications to fund,[17] and what organizations to recognize or fund.[18]

The government's attempt to deport Mr. Khalil on the bases proffered to date amounts to confessed viewpoint discrimination. The administration said Mr. Khalil would be deported for "siding with terrorists, Hamas terrorists."[19] President Trump has also declared that his administration's actions against students holding lawful visas are aimed to eliminate anyone involved in "pro-terrorist, anti-Semitic, anti-American activity." Am. Pet. ¶ 73. This is the American government engaging in open and blatant viewpoint discrimination.

---

[15] *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 602–603 (1967) (loyalty oaths for university faculty).

[16] *Molpus v. Fortune*, 432 F.2d 916, 917 (5th Cir. 1970) (university speaker bans); *Brooks v. Auburn Univ.*, 296 F. Supp. 188, 196 (M.D. Ala. 1969) (holding the "State of Alabama cannot … regulate the content of the ideas students may hear" because that is "unconstitutional censorship in its rawest form").

[17] *Rosenberger*, 515 U.S. at 825–29 (denial of funding to Christian student newspaper).

[18] *Healy v. James*, 408 U.S. 169 (1971) (denial of recognition to student political group); *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 363–67 (8th Cir. 1988) (refusal of funding to student gay rights group following state legislature's resolution).

[19] *White House Daily Briefing*, *supra* note 6, at 11:01; *accord* Am. Pet. ¶ 79.

The administration claims Mr. Khalil's opinions were "anti-Semitic" and made Jewish students "feel unsafe."[20] But viewpoint discrimination remains unlawful even when others find the speaker's message deeply offensive or hurtful. Indeed, "the proudest boast of our free speech jurisprudence is that we protect the freedom to express the thought that we hate." *Matal v. Tam*, 582 U.S. 218, 246 (2017) (citation omitted); *see also Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (protecting speech "offensive to many Americans," including on the subject of "terrorism," because "a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment") (citation omitted).

The government has not claimed Mr. Khalil ever engaged in any terrorist activity. It does not allege he ever provided material support to a terrorist organization. The government has not purported to rely on any of the provisions of the Immigration and Nationality Act that concern terrorist activity. *E.g.*, 8 U.S.C. §§ 1227(a)(1), (4)(B), 1182(a)(3)(B)(i)(VII). Instead, the government has targeted Mr. Khalil because of his advocacy for Palestinians, calls his advocacy "pro-terrorist," and is trying to deport him from the country. As the Supreme Court made clear in *Holder*, independent advocacy of views or causes remains fully within the First Amendment's protection. 561 U.S. at 39.

To be sure, vandalism and blockading students from attending class are not protected by the Constitution. But the government's justification for deporting Mr.

---

[20] Am. Pet. ¶ 73 (President Trump statement on social media); *White House Daily Briefing*, *supra* note 6, at 11:14 (Press Secretary Leavitt comments).

Khalil has not included allegations that he engaged in those unprotected acts. Instead, the government relies solely on Mr. Khalil's protected expression, claiming it has a "zero-tolerance policy for siding with terrorists."[21] That is unacceptable under our Constitution and under bedrock American principles of free speech.

### D. The administration's attempt to deport Mr. Khalil amounts to unconstitutional retaliation.

Insofar as the government seeks to deport Mr. Khalil because of his expression, it engages in textbook unlawful retaliation. "The law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Unlawful retaliation occurs when, after an individual engages in protected conduct, the government takes "retaliatory action" against them, and there is a "causal link between the constitutionally protected conduct and the retaliatory action." *Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 429 (3d Cir. 2020) (cleaned up). Action is retaliatory when it is "sufficient to deter a person of ordinary firmness from exercising" their freedom of speech. *Id.* (citation omitted).

The administration's attempt to deport Mr. Khalil ticks each unconstitutional box. As explained above, attending protests and passing out flyers on a matter of public concern is quintessential protected speech. There can be no doubt *deportation from the United States* would deter a person of ordinary firmness from attending a protest or handing out leaflets. *See, e.g.*, *Mendia v. Garcia*, 2016 WL 2654327, at *9

---

[21] *White House Daily Briefing*, *supra* note 6, at 11:57 (Press Secretary Leavitt comments); *accord* Am. Pet. ¶ 73 (President Trump statement on social media).

(N.D. Cal. May 10, 2016) (issuing an "immigration detainer" was an "adverse action"). And the Trump administration has repeatedly confirmed its actions against Mr. Khalil are predicated on his protected speech.[22] The administration's attempted deportation of Mr. Khalil is quintessential retaliation and barred by the Constitution.

## II.    The Foreign Policy Deportation Provision Is Unconstitutional.[23]

### A.    The FPDP is unconstitutionally vague, especially if the only deportable activity is protected speech.

Especially insofar as it can apply, as here, based solely on protected speech, the FPDP is unconstitutionally vague in granting the secretary of state unfettered discretion while giving permanent residents like Mr. Khalil no notice of what conduct can trigger expulsion from the United States. Vagueness concerns are heightened in the context of speech because, fearing government punishment, speakers will self-censor and "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up) (citations omitted). Consequently, a regulation affecting protected speech "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). A vague regulation may violate due process for either of two reasons, both of which apply here: when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or when it "is so standardless

---

[22] *See, e.g.*, *White House Daily Briefing*, *supra* note 6, at 10:24 (Press Secretary Leavitt comments).

[23] Though Petitioner's Motion does not raise this argument, *amici* wish to alert the Court to significant concerns regarding the constitutionality of the FPDP.

that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted).

The only court to address the FPDP's constitutionality (so far as we can find) held it unconstitutionally vague—even outside the context of speech. *Massieu*, 915 F. Supp. 681, *rev'd on other grounds*, 91 F.3d 416 (reversing for failure to exhaust administrative remedies).[24] The *Massieu* court noted the FPDP vests "virtually boundless" authority in granting the secretary of state powers to deport simply by declaring it related to "foreign policy" reasons the Secretary "need neither explicate nor defend." *Id.* at 701–02. As the FPDP affords "unrestrained power" with "utterly no standards" guiding it, the provision is void for vagueness. *Id.* at 702–03.

The court also held the statute unconstitutionally vague because, as even the government did not dispute in that case, it gives "absolutely no notice to aliens as to what is required of them." *Id.* at 699. In contrast with other "clearly defined" grounds for deportation—such as entering the country illegally or committing a crime—a person has no meaningful notice of when his mere presence in the United States will cause "adverse foreign policy consequences." *Id.* at 699, 702. In this way, the FPDP:

> represents a breathtaking departure both from well established legislative precedent which commands deportation based on adjudications of defined impermissible conduct by the alien in the United States, and from well established precedent with respect to extradition which commands extradition based on adjudications of probable cause to believe that the alien has engaged in defined impermissible conduct elsewhere.

*Id.* at 686.

---

[24] At that time, Section 237(a)(4)(C)(i) of the INA was Section 241(a)(4)(C)(i).

America's foreign policy is an "unpublished, ever-changing, and often highly confidential" "amalgamation of interests and alliances" known to few outside the State Department and the President himself at any given time. *Id.* at 700–01. This leaves the regulated non-citizen no way of knowing how to avoid running afoul of the FPDP. *Id.* "'Foreign policy' cannot serve as the talisman behind which Congress may abdicate responsibility to pass only sufficiently clear and definite laws when those laws may be enforced against the individual." *Id.* at 701.

As the *Massieu* court explained, it may be such that "neither the legislature nor the judiciary possesses the institutional competence to question the Secretary of State's decisions." *Id.* at 701. And it may consequently be that "Congress could not have statutorily dictated to the Secretary the seriousness of particular foreign policy consequences." *Id.* "The fact remains, however, that Congress cannot hide behind this required deference as a justification for granting the Secretary carte blanche to declare an alien's deportability at will." *Id.* The fact "that Congress might not have been able to provide more definite standards *does not excuse it from its constitutional obligation to do so.*" *Id.* at 701–02 (emphasis added).

For all these reasons, the FPDP is unconstitutional because there is "no conceivable way" a person can know ahead of time how to "conform his or her activities to the requirements of the law." *Id.* at 700.[25] At bottom, the court held, our

---

[25] For these and related reasons, the court held the statute was not only unconstitutionally vague, but also an unconstitutional deprivation of the due process right to be heard and an unconstitutional delegation of legislative powers. *Massieu*, 915 F. Supp. at 703–11.

Constitution does not allow seizure and deportation of people lawfully in our country "in the unfettered discretion of the Secretary of State and without any meaningful opportunity to be heard." *Id.* at 686. This Court should hold the same.

### B. Allowing deportation for expression the government deems adverse to America's "foreign policy" will chill expression at America's universities and beyond.

Attempting to deport Mr. Khalil for engaging in protected expression on a university campus is irreconcilable with the Supreme Court's admonition that colleges and their "surrounding environs" are "peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180–81 (quoting *Keyishian*, 385 U.S. at 603). We count on universities to act as the historic "center of our intellectual and philosophic tradition" of open debate and inquiry. *Rosenberger*, 515 U.S. at 835.

There are more than a million international students studying at America's universities.[26] None of them will feel safe criticizing the American government of the day—in class, scholarship, or on their own time—if a current or future secretary of state may, whenever he chooses and at his unreviewable discretion, deem them adverse to American foreign policy and have them deported.

That is not the American free speech tradition. Our schools "have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190

---

[26] *Enrollment Trends*, Inst. of Int'l Educ., https://opendoorsdata.org/data/international-students/enrollment-trends (last visited Mar. 16, 2025) [https://perma.cc/5UQU-X3SQ].

(2021). Secretary Rubio may disapprove of what Mr. Khalil has to say, but his constitutional duty is to defend his right to say it, whether on or off campus.

The point of the administration's action against Mr. Khalil *is* the chill—to scare the Nation's million-plus foreign students and tens of millions of lawful resident non-citizens from engaging in pro-Palestine advocacy. That is what candidate Trump promised on the campaign trail. In 2024, he vowed, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[27] Then, after Mr. Khalil's arrest, Secretary Rubio warned foreign students that if they were a "supporter of Hamas" and engage in "anti-Jewish student, anti-Semitic activities" then "we're going to revoke [your lawful status] and kick you out."[28] The equation for foreign students is simple: Support the administration's view of the war in Gaza, or else.

This must not stand. "Our commitment to precious First Amendment freedoms is tested when unpopular" speakers and groups "seek refuge within its scope." *Int'l Soc'y for Krisha Consciousness, Inc. v. Barber*, 650 F.2d 430, 447 (2d Cir. 1981). In America, some advocate ideas that are "discomforting, unsettling, and obnoxious." *Id.*

---

[27] Josh Dawsey et al., *Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators*, Wash. Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors. [https://perma.cc/2EU2-GNG9].

[28] *See Secretary of State Marco Rubio Remarks to Press*, *supra* note 11; *see also* Martin & Adams, *supra* note 10.

(citations omitted). But they "are entitled to the First Amendment freedoms we all enjoy, and considerations of comfort or convenience cannot prevail." *Id.*

### C.    Allowing the Secretary of State to deport speakers deemed contrary to the national interest is an un-American approach to speech

Allowing the Secretary of State to retaliate against speakers if he deems it in the national interest would place the United States among strange bedfellows when it comes to freedom of speech. For example, Article 51 of China's Constitution provides that individual liberty gives way if the government decides the expression "undermine[s] the interests of the state." Xianfa [Constitution] art. 51 (1982) (China).[29] Russia's laws, too, permit the "[r]estriction of access to information" in the name of protecting "morality," its system of government, and the "security of the state."  Federal'nyĭ Zakon RF ob Informat͡sii, Informat͡sionnykh Tekhnologiiakh i o Zashchite Informat͡sii [Federal Law of the Russian Federation on Information, Informational Technologies and the Protection of Information], Sobranie Zakonodatel'stva Rossiĭskoĭ Federatsii [SZ RF] [Russian Federation Collection of Legislation] 2006, No. 31, Item 3448.[30] And Saudi Arabia prohibits expression that serves any "foreign interest" conflicting with the "national interest" or that "stir[s] up

---

[29] Available at:
https://english.www.gov.cn/archive/lawsregulations/201911/20/content_WS5ed8856ec6d0b3f0e9499913.html.

[30] Available at:
https://www.wto.org/english/thewto_e/acc_e/rus_e/wtaccrus58_leg_369.pdf.

discord among citizens." Law of Printing and Publication, 2006 (Royal Decree No. M/23, 3/9/1424 H), art. 9 (Saudi Arabia).[31]

America, however, has charted a different course than the world's censorial kings and regimes. In 1801, President Thomas Jefferson used his first inaugural address to defend the free speech rights of those who called for dissolution of the Union. He proclaimed, "If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of safety with which error of opinion may be tolerated and where reason is left free to combat it."[32] Little could be more dangerous to the interests of a fledgling nation than calling for its extinction, yet our commitment to free speech remained. So it should today, 224 years later.

## CONCLUSION

"Make no mistake about it. This case is about the Constitution of the United States and the panoply of protections that document provides to the citizens of this country and those non-citizens who are here legally and, thus, here as our guests." *Massieu*, 915 F. Supp. at 686. Secretary Rubio's attempt to deport Mr. Khalil violates the First Amendment and betrays more than two centuries of American commitment to free and open expression. The Court should grant Mr. Khalil's requested relief.

---

[31] Available at: https://www.saudiembassy.net/law-printing-and-publication.

[32] Thomas Jefferson, *First Inaugural Address Mar. 4, 1801*, Avalon Project https://avalon.law.yale.edu/19th_century/jefinau1.asp (last visited Mar. 18, 2025) [https://perma.cc/PJ5G-F2GF].

Dated: March 20, 2025                    Respectfully Submitted,

                                         /s/ *Greg H. Greubel*
                                         Greg H. Greubel

                                         Conor T. Fitzpatrick*
                                         FOUNDATION FOR INDIVIDUAL
                                            RIGHTS AND EXPRESSION
                                         700 Pennsylvania Ave. SE, Ste. 340
                                         Washington, DC 20003
                                         (215) 717-3473
                                         conor.fitzpatrick@thefire.org

                                         Greg H. Greubel
                                            (NJ Bar No. 171622015)
                                         FOUNDATION FOR INDIVIDUAL
                                            RIGHTS AND EXPRESSION
                                         510 Walnut St., Ste. 900
                                         Philadelphia, PA 19106
                                         (215) 717-3473
                                         greg.greubel@thefire.org

                                         *Counsel for Amici Curiae*
                                         *Pro hac vice application forthcoming