**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

Mahmoud KHALIL,

        *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting Field
Office Director of New York, Immigration and
Customs Enforcement[1]; Caleb VITELLO, Acting
Director, U.S. Immigration and Customs
Enforcement; Kristi NOEM, in her official
capacity as Secretary of the United States
Department of Homeland Security; Marco
RUBIO, in his official capacity as Secretary of
State; and Pamela BONDI, in her official
capacity as Attorney General, U.S. Department of
Justice,

        *Respondents*.

Case No. 25-cv-1963 (MEF)

**AMENDED MEMORANDUM OF
LAW IN SUPPORT OF MOTION
FOR RELEASE UNDER *LUCAS V.
HADDEN AND MAPP V. RENO***

**ORAL ARGUMENT REQUESTED**

Baher Azmy
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org

*Counsel for Petitioner*

---

[1] Respondent Yolanda Pittman, in her official capacity as Warden of Elizabeth Contact Detention
Facility, will be added.

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

FACTS ................................................................................................................................ 2

    I.    MR. KHALIL'S LIFE AND COMMUNITY TIES IN THE UNITED STATES....... 2

    II.   MR. KHALIL'S ARREST, BOOKING, AND TRANSFER ......................................... 5

    III.  THE ONGOING HARMS OF MR. KHALIL'S DETENTION................................. 10

ARGUMENT ..................................................................................................................... 12

    I.    THIS COURT HAS AUTHORITY TO GRANT MR. KHALIL'S IMMEDIATE
        RELEASE PENDING THE ADJUDICATION OF THIS HABEAS PETITION
        UNDER *LUCAS V. HADDEN* AND *MAPP V. RENO*. ................................................. 12

    II.   MR. KHALIL MEETS THE STANDARD FOR *LUCAS* AND *MAPP* RELEASE. 15

        A.    MR. KHALIL RAISES SUBSTANTIAL CLAIMS AND A CLEAR CASE
            FOR HABEAS RELIEF ..................................................................................... 15

        B.    MR. KHALIL'S CASE PRESENTS EXTRAORDINARY
            CIRCUMSTANCES. ......................................................................................... 19

        C.    THESE EXTRAORDINARY CIRCUMSTANCES MAKE THE GRANT OF
            BAIL NECESSARY TO MAKE THE HABEAS REMEDY EFFECTIVE..... 21

    CONCLUSION ......................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accardi v. Shaughnessy*,
    347 U.S. 260 (1954)..............................................................................................15, 17, 18

*Anariba v. Dir. Hudson Cnty. Corr. Ctr.*,
    17 F.4th 434 (3d Cir. 2021) ...................................................................................................15

*Anthony O. v. Decker,*
    No. CV 20-3856 (MCA), 2020 WL 2571897 (D.N.J. May 20, 2020) ....................................13

*Asmed B. v. Decker,*
    460 F. Supp. 3d 519 (D.N.J. 2020) ..............................................................................13, 18, 22

*Avendano Hernandez v. Decker,*
    450 F. Supp. 3d 443 (S.D.N.Y. 2020)...................................................................................19

*Barbecho v. Decker,*
    No. 20-CV-2821 (AJN), 2020 WL 2513468 (S.D.N.Y. May 15, 2020) ...............................19

*Bello-Reyes v. Gaynor,*
    985 F.3d 696 (9th Cir. 2021) ................................................................................................16

*Bridges v. California*,
    314 U.S. 252 (1941)..............................................................................................................15

*Bridges v. Wixon*,
    326 U.S. 135 (1945)..............................................................................................................15

*Calley v. Callaway,*
    496 F.2d 701 (5th Cir. 1974) ................................................................................................12

*Carlos M.R. v. Decker,*
    No. CV 20-6016 (MCA), 2020 WL 4339452 (D.N.J. July 28, 2020) ...................................13

*City of Houston v. Hill*,
    482 U.S. 451 (1987)..............................................................................................................15

*Connick v. Myers,*
    461 U.S. 138 (1983)..............................................................................................................15

*Coronel v. Decker*,
    449 F. Supp. 3d 274 (S.D.N.Y. 2020)..............................................................................19, 22

*Cristian A.R. v. Decker*,
    453 F. Supp. 3d 670 (D.N.J. 2020) .......................................................................................13

*D'Alessandro v. Mukasey,*
    No. 08 Civ. 914, 2009 WL 799957 (W.D.N.Y. Mar. 25, 2009)............................................13

*Demore v. Kim,*
    538 U.S. 510 (2003)........................................................................................................17

*Diop v. ICE/Homeland Sec.,*
    656 F.3d 221 (3d Cir. 2011)............................................................................................14

*Durel B. v. Decker,*
    455 F. Supp. 3d 99 (D.N.J. 2020)....................................................................................13

*Eaton v. Holbrook,*
    671 F.2d 670 (1st Cir. 1982)............................................................................................12

*Ex parte Endo,*
    323 U.S. 283 (1944)........................................................................................................14

*Gentile v. State Bar of Nev.,*
    501 U.S. 1030 (1991)......................................................................................................14

*German Santos v. Warden Pike Cnty. Corr. Facility,*
    965 F.3d 203 (3d Cir. 2020)............................................................................................16

*Gutierrez-Soto v. Sessions,*
    317 F. Supp. 3d 917 (W.D. Tex. 2018)............................................................................15

*Han Tak Lee v. Cameron,*
    No. 4:08-CV-1972, 2014 WL 4187590 (M.D. Pa. Aug. 22, 2014) ............................13, 17, 19

*Iuteri v. Nardoza,*
    662 F.2d 159 (2d Cir. 1981).............................................................................................12

*Jeferson V.G. v. Decker,*
    No. CV 20-3644 (KM), 2020 WL 1873018 (D.N.J. Apr. 15, 2020) .................................12

*Jose B.R. v. Tsoukaris,*
    No. CV 20-3347 (MCA), 2020 WL 2744586 (D.N.J. May 27, 2020) ..............................12

*Kiadii v. Decker,*
    423 F. Supp. 3d 18 (S.D.N.Y. 2018).......................................................................13, 17, 19, 21

*Kolawole O.T. v. Ahrendt,*
    466 F. Supp. 3d 457 (D.N.J. 2020) .........................................................................12, 17, 21

*Landano v. Rafferty,*
    970 F.2d 1230 (3d Cir. 1992).................................................................................12, 13, 14

*Leslie v. Att'y Gen. of U.S.*,
      611 F.3d 171 (3d Cir. 2010)................................................................................16

*Leslie v. Holder*,
      865 F. Supp. 2d 627 (M.D. Pa. 2012).....................................11, 12, 13, 17, 19, 21

*Lucas v. Hadden*,
      790 F.2d 365 (3d Cir. 1986)..................................................................2, 11, 12, 17

*Mapp v. Reno*,
      241 F.3d 221 (2d Cir. 2001).............................................................2, 11, 12, 17, 20

*Nasr v. Hogan*,
      No. 08–415, 2008 WL 2705533 (M.D. Pa. July 10, 2008).........................................11

*Rafael L.O. v. Tsoukaris*,
      No. CV 20-3481 (JMV), 2020 WL 1808843 (D.N.J. Apr. 9, 2020)..........................13

*Ragbir v. Homan*,
      923 F.3d 53 (2d Cir. 2019)....................................................................................15

*Renat T. v. Decker*,
      No. CV 20-4658 (MCA), 2020 WL 3819227 (D.N.J. July 8, 2020) .........................13

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
      515 U.S. 819 (1995).............................................................................................15

*Rumsfeld v. Padilla*,
      542 U.S. 426 (2004).............................................................................................14

*S.N.C. v. Sessions*,
      No. 18 Civ. 7680 (LGS), 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018)............13, 17, 19, 21

*United States v. Loy*,
      237 F.3d 251 (3d Cir. 2001)..................................................................................17

*United States v. Nkanga*,
      452 F. Supp. 3d 91 (S.D.N.Y. 2020).......................................................19, 21, 22

*Zadvydas v. Davis*,
      533 U.S. 678 (2001).............................................................................................17

**Statutes**

5 U.S.C. § 706.................................................................................................................18

**Other authorities**

Memorandum of Kevin McAleenan, Dep't of Homeland Sec. (May 17, 2019) ..........................18

### INTRODUCTION

Petitioner Mahmoud Khalil is a beloved husband, soon-to-be father, graduate student, and Palestinian rights activist whom federal officials have imprisoned and targeted for deportation in retaliation for his protected political speech. After arresting him at his home on the campus of Columbia University, shackling and jailing him in the dead of night, and holding him incommunicado from his wife and lawyers, federal officials then transported Mr. Khalil across multiple state lines and subsequently transferred him to a remote private prison in Louisiana hours after the filing of his original habeas petition. As a result of the federal government's actions, Mr. Khalil faces the loss of his freedom, a profound silencing of his deeply held beliefs, lack of meaningful access to counsel and this Court, disruption in his medical care, loss of future employment, separation from his U.S. citizen wife, and most deeply personal of all, the prospect of missing the birth of his first child.

President Donald J. Trump and Secretary of State Marco Rubio have made abundantly clear the basis of their ire against Mr. Khalil: his speech and expression, as a member of the student body of Columbia University, related to the devastating human toll from Israel's systematic violence against Palestinians in Gaza over the past year and a half. Both President Trump and Secretary Rubio also have made plain their intention to make an example of Mr. Khalil, who has been the subject of aggressive doxing and misattribution of views that appear to have only whipped up a deeper frenzy of retribution. By targeting Mr. Khalil in this manner, the federal government's actions have had an immediate and palpable chilling effect on political debate, with many people across the country—including lawful permanent residents like Mr. Khalil—living in fear that they or their loved ones too will be next if their actual or imputed speech and expression brings them into the crosshairs of this administration.

This case raises serious and important constitutional and statutory issues that deserve a full and fair adjudication. Yet such a full and fair adjudication is not possible if Mr. Khalil is forced to endure the very retaliatory and punitive harms he is challenging during the pendency of this

litigation. To release Mr. Khalil at the end of what may prove to be a long and protracted litigation will be a hollow victory—many of the harms this litigation seeks to prevent will have already happened.

This Court has the power, pursuant to its inherent authority, to release Mr. Khalil pending the adjudication of his habeas petition. *See Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986); *see also Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). The authority to release a habeas petitioner *pendente lite* ensures that the writ of habeas corpus remains an effective remedy under extraordinary circumstances. *See Lucas*, 790 F.2d at 367; *Mapp*, 241 F.3d at 230. It is hard to imagine a more extraordinary set of circumstances than what Mr. Khalil, his pregnant wife, and his community of supporters have endured. He presents strong constitutional and statutory claims challenging his arrest, targeting, and detention, the harms of which accrue with each passing day. Moreover, Mr. Khalil is not a flight risk or danger to the community—to the contrary, Mr. Khalil has deep family and community ties and numerous people who attest to his character and commitment to human rights. Respondents have no valid justification for his detention and Mr. Khalil should not remain detained—and miss the birth of his first child—while the weighty issues in this case are litigated. This Court should grant Mr. Khalil immediate release.

## FACTS

### I.    MR. KHALIL'S LIFE AND COMMUNITY TIES IN THE UNITED STATES.

Mr. Khalil is Palestinian, but was born and raised in a Syrian refugee camp because militias associated with the nascent Israeli army forcibly removed his grandparents from their ancestral home in Tiberias, Palestine. ECF No. 39, Amended Petition ("Am. P.") at ¶ 19.[2] He has Algerian citizenship through his mother. When war broke out in Syria, his family was again displaced and are now dispersed throughout Europe and West Asia. Mr. Khalil entered the United

---

[2] *See also* ECF No. 18, Declaration of Veronica Salama (verifying factual statements as they pertain to Mr. Khalil).

States on a student visa in or around December 2022 to pursue a Master's degree in Public Administration from Columbia University's School of International and Public Affairs ("SIPA"). ECF No. 55, Declaration of Noor Ramez Abdalla ("Abdalla Decl.") at ¶ 4. Mr. Khalil completed his program in December 2024, and has an anticipated graduation date of May 2025. ECF No. 56-1, M.P.A. Confirmation for Mahmoud Khalil ("M.P.A. Confirmation"). Mr. Khalil has a significant and diverse community of support in the United States including his U.S. wife citizen, classmates and professors, professional colleagues, and friends who attest to his character, commitment to peace, and leadership. *See* ECF No. 56-6, Letters of Support for Mahmoud Khalil ("Letters of Support"); Abdalla Decl. at ¶¶ 4, 28-30; Ex. I, Supplemental Letters of Support for Mahmoud Khalil ("Supplemental Letters of Support").

Mr. Khalil met his wife, Noor Abdalla, a United States citizen, in 2016 while they both were volunteering for a nongovernmental organization in Lebanon, supporting education for Syrian refugees. Abdalla Decl. at ¶ 3. After Mr. Khalil arrived in the United States in 2022, Mr. Khalil and Ms. Abdalla got married and began to build their lives together in New York City. *Id.* at ¶¶ 4-5. In 2024, Mr. Khalil became a Lawful Permanent Resident through his marriage to Ms. Abdalla and they are expecting their first child next month, in April 2025. *Id.* Together, they live in an apartment building owned and operated by Columbia University. *Id.* at ¶ 11.

As a Palestinian, Mr. Khalil has felt compelled to be an outspoken advocate for Palestinian rights and, since October 2023, has remained committed to denouncing what he sees as Israel's systematic violence against Palestinians in Gaza. *Id.* at ¶ 6. Mr. Khalil has also criticized Columbia University for, in his view, financing and in other ways facilitating ongoing atrocities. Mr. Khalil is committed to peaceful protest and being a voice for his people. *See* Letters of Support; Supplemental Letters of Support.

Additionally, during the student protest movement across university campuses in April 2024, Mr. Khalil was chosen by his fellow students to be a lead mediator and negotiator on campus, facilitating dialogue between Columbia University's administration and its students. Am. P. ¶ 24. In this role, Mr. Khalil advocated for his peers to be treated humanely and fairly by the university, while helping to ensure student safety and the smooth functioning of the university. *Id.*; *see also* Letters of Support; Supplemental Letters of Support. For example, in the spring of 2024, Mr. Khalil facilitated negotiations between members of the Gaza Solidarity Encampment and the university administration. Am. P. ¶ 24. Indeed, Mr. Khalil was approached to take on this role because of his work at a British Embassy overseas, an internship with the United Nations in New York, as well his established relationships with the university administration. *Id.*

Mr. Khalil stated in a CNN interview in the spring of 2024 that "as a Palestinian student, I believe that the liberation of the Palestinian people and the Jewish people are intertwined and go hand-by-hand and you cannot achieve one without the other."[3] Mr. Khalil's prominence as an outspoken student activist, along with Columbia University's position as a national focal point of student protests against Israel's military campaign in Gaza over the past year and a half, have propelled Mr. Khalil into the public eye. His visibility has been further amplified through his continued participation in interviews with national and international media outlets, including the BBC, as well as local press conferences.

Mr. Khalil's speech regarding international law, the obligations that the U.S. and Columbia University have under that law, the human rights of the Palestinian people, and

---

[3] Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN (March 11, 2025), https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.

related matters addresses matters of public concern and is clearly protected by the First Amendment. Like many student activists advocating for Palestinian rights, Mr. Khalil has endured immense scrutiny and personal attacks by private actors, including doxing and harassment. Am. P. ¶ 28. But until recently, he understood that because of the First Amendment, the government would not be able to retaliate against or punish him for his speech, or silence him by locking him up or banishing him from the country, even if powerful government officials disagreed with his speech or viewpoints. *Id.*

## II.    MR. KHALIL'S ARREST, BOOKING, AND TRANSFER

On the evening of Saturday, March 8, 2025, at approximately 8:30 p.m., Mr. Khalil and Ms. Abdalla were returning to their Columbia University apartment from an Iftar dinner at a friend's home. Am. P. ¶ 45; Abdalla Decl. at ¶ 11. When they arrived at their apartment building, two individuals followed Mr. Khalil and Ms. Abdalla into the lobby of the apartment building, which is owned and operated by Columbia University, while two other individuals entered the building through a separate entrance waiting for Mr. Khalil's arrival. *See* ECF No. 11-1, Declaration of Amy Greer ("Greer Decl.") at ¶ 4; Abdalla Decl. at ¶ 11.

When the individuals approached Mr. Khalil and Ms. Abdalla, they asked: "Are you Mahmoud Khalil?" *Id.* When Mr. Khalil answered in the affirmative, the men identified themselves as being with the Department of Homeland Security and stated that they had to take Mr. Khalil into custody. *Id.*; Greer Decl. at ¶ 4. The agents told Ms. Abdalla to go up to her apartment, and threatened that if she refused, they would arrest her, too.  Abdalla Decl. at ¶ 11.

Ms. Abdalla retrieved his immigration documents to show the DHS agents that Mr. Khalil is a lawful permanent resident. *Id.* at ¶ 12. She handed the documents to an agent, who was talking to someone on the phone. The agent looked confused when he saw the documents

and said: "he has a green card." *Id.* The agent repeated that they were ordered to bring Mr. Khalil in anyway. Abdalla Decl. at ¶ 13.

Mr. Khalil placed a call to his attorney, Amy Greer. Attorney Greer spoke with an agent who identified himself as Special Agent Elvin Hernandez. Greer Decl. at ¶ 4. Agent Hernandez stated they had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. Department of State and therefore they were detaining him.  Despite several requests by Mr. Khalil to see the warrant, the agents never showed him the administrative warrant. Greer Decl. at ¶ 5.

Attorney Greer advised Agent Hernandez that Mr. Khalil is a lawful permanent resident and has the right to due process. Agent Hernandez responded that the Department of State had revoked Mr. Khalil's green card, too, and that he would be brought in front of an immigration judge.  Agent Hernandez stated that he would be taking Mr. Khalil to 26 Federal Plaza, the location of the ICE Field Office in Manhattan, New York. *See* Greer Decl. at ¶ 7; Abdalla Decl. at ¶ 14.

When Attorney Greer began to ask more questions, Agent Hernandez hung up on her. Greer Decl. at ¶ 5. When Mr. Khalil requested to call her back, Agent Hernandez refused to allow Mr. Khalil to speak to his attorney again. Ms. Abdalla began recording her husband's arrest and then called Attorney Greer.[4]

The agents then handcuffed Mr. Khalil and brought him outside where there were multiple vehicles waiting. Abdalla Decl. at ¶¶ 13, 14. Ms. Abdalla asked for the names of the agents, their contact information, and how to reach them to follow up on her husband's

---

[4] Armando Garcia & Laura Romero, *Video shows moment Columbia activist Mahmoud Khalil is detained*, ABC News, https://abcnews.go.com/US/video-shows-moment-columbia-activist-mahmoud-khalil-detained/story?id=119815662 (March 14, 2025, 8:09PM).

detention, but they only advised her that Mr. Khalil would be taken to 26 Federal Plaza (in Manhattan), and otherwise refused to speak with her. *Id.* at 14; Greer Decl. at ¶ 6. They left her no business card or any information at all as to how to find out where her husband was to be taken, on what grounds, or who she can contact. Greer Decl. at ¶ 7; Abdalla Decl. at ¶ 14.

That same night, Attorney Greer checked the ICE Detainee Locator ("ICE Locator") several times to confirm her client's location, which eventually listed him as being in custody in New York. Greer Decl. at ¶ 10. At around 4:40 a.m. on Sunday, March 9, after again confirming his location through the ICE Locator as being in New York, Attorney Greer filed the original habeas corpus petition in in this case (ECF # 2) in the Southern District of New York. *Id.* at ¶ 9. During this time, Mr. Khalil made continuous requests to contact his attorney, including when agents asked him to sign several documents—including a Notice to Appear ("NTA") for removal proceedings and a Custody Determination document—but he was repeatedly denied. Am. P. ¶ 59. Officers told him he could speak to an attorney only after signing the documents they presented to him. He refused to sign without an attorney present. *Id.* At some point in the night, Mr. Khalil was transported in handcuffs and shackles to Elizabeth Detention Center in New Jersey ("Elizabeth"). *Id.* at ¶ 61.

The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated that Mr. Khalil was still in New York. Greer Decl. at ¶ 10. Sometime after 9 a.m. on Sunday, the ICE locator changed to say that Mr. Khalil was detained in Elizabeth, New Jersey. *Id.* at ¶ 11. Around 11:20 a.m., Ms. Abdalla went to the Elizabeth Detention Center to see him, but she was told that Mr. Khalil was not showing up in the system. *Id.*; Abdalla Decl. at ¶ 16.

Around 2 p.m. on Sunday, March 9, after multiple emails to ICE to attempt to reach Mr. Khalil, counsel was informed that Mr. Khalil was in the process of being transferred to a detention

facility within the New Orleans ERO Field Office, over 1,000 miles away. Greer Decl. at ¶ 12. Counsel reached out to the U.S. Attorney's Office for the Southern District of New York, which confirmed that Mr. Khalil was en route to Louisiana. Counsel requested Mr. Khalil's immediate return, but was told that ICE would not consent to his return absent a court order. Around 12 p.m. on Sunday, March 9, ICE officers handcuffed and shackled Mr. Khalil and placed him in a van and told him he was then going back into New York City to JFK Airport. Am. P. ¶ 63. He was booked into the Central Louisiana ICE Processing Center in Jena, LA, early in the morning of Monday, March 10. When Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that typically occurs the same day or the next day in New York—authorities in the Louisiana ICE detention facility, run by a private prison operator, offered a date ten days away. Ms. Abdalla, who is 8-months pregnant, is unable to travel to Louisiana to see Mr. Khalil because she is in her third trimester. Abdalla Decl. at ¶ 28.

On March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University."[5] The President emphasized that Mr. Khalil's arrest was "the first of many to come," declaring that his administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."

The White House reposted President Trump's statement on the social media platform X, accompanied by a mug-style graphic featuring an image of Mr. Khalil. Surrounding the photo were

---

[5] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, 1:05 PM), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

the words "ARRESTED BY ICE ON MARCH 9, 2025" and "LED ACTIVITIES ALIGNED TO HAMAS."[6] The White House caption included the phrase "SHALOM, MAHMOUD" before quoting the President's statement.

Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." The following day, the Department of Homeland Security issued a statement through its social media account, X, confirming Mr. Khalil's arrest by ICE was carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to Hamas, a designated terrorist organization" and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[7]

On March 11, in response to an inquiry from the NY Times regarding Mr. Khalil's arrest, a spokesperson for the administration reportedly stated that "United States' foreign policy includes combating antisemitism across the globe and that Mr. Khalil's residency in the nation undermines that policy objective."[8]

At a White House Press Briefing on March 11, Press Secretary Karoline Leavitt responded to questions about the arrest, asserting that the Secretary of state has "the right to revoke a green

---

[6] The White House (@WhiteHouse), X (Mar. 10, 2025, 1:34 PM), https://x.com/WhiteHouse/status/1899151926777749618.

[7] Homeland Security (@DHSgov), X (Mar. 9, 2025, 9:29 PM), https://x.com/DHSgov/status/1898908955675357314; Surina Venkat, *Department of Homeland Security confirms arrest of Palestinian activist Mahmoud Khalil, SIPA '24*, COLUMBIA SPECTATOR, https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/ (Mar. 10, 2025, 12:43AM).

[8] https://archive.ph/rD4sk#selection-1147.0-1159.428

card or a visa for individuals who serve or are adversarial to the foreign policy and national security interest" and accusing Mr. Khalil of "siding with terrorists."[9] In a press conference regarding this case on March 13, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . antisemitic activities," and "if you end up having a green card . . . we're gonna kick you out."[10]

## III.   THE ONGOING HARMS OF MR. KHALIL'S DETENTION

Mr. Khalil's wife, Ms. Abdalla, is presently in her eighth month of pregnancy, and is due to give birth at the end of April 2025. Abdalla Decl. at ¶ 20; ECF No. 56-5, Medical Letters for Noor Abdalla ("Abdalla Medical Letters"). Mr. Khalil has constituted the entirety of her support system since the start of her pregnancy, regularly attending doctor's appointments with her, undertaking all household chores for the both of them, and ensuring her compliance with prescribed medication regimens. Abdalla Decl. at ¶¶ 20-24. Ms. Abdalla has experienced physical and mental health complications associated with her pregnancy, including an episode of hospitalization, that Mr. Khalil has dutifully supported her through. *Id.* at ¶¶ 22-24. Presently, Ms. Abdalla is without this essential support from her husband, all while enduring the insurmountable emotional toll of his continued detention and the prospect of giving birth without him. *Id.* at ¶¶ 25, 29-30.

Mr. Khalil and Ms. Abdalla also shaped their plans for the forthcoming months and the birth of their child naturally assuming that Mr. Khalil—a lawful permanent resident with no criminal record—would remain free, at Ms. Abdalla's side. *Id.* at ¶ 26-27. As such, Ms. Abdalla planned to begin her maternity leave, just as Mr. Khalil was due to begin employment at a human

---

[9] White House Daily Briefing, C-SPAN (Mar. 11, 2025), https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022 (timestamp 10:16).
[10] Secretary of State Marco Rubio Remarks to Press (Mar. 12, 2025), http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/.

rights organization in New York City at the start of April. *Id.* Now, Ms. Abdalla commences her maternity leave without the projected income from Mr. Khalil's new, full-time employment, and is left with only a diminished percentage of her ordinary salary. *Id.* at ¶ 27. The couple also planned for Ms. Abdalla to give birth in New York City, instead of Michigan—where her family resides— anticipating the needs of Mr. Khalil's employer. *Id.* at ¶ 26. Should Mr. Khalil's detention prolong, his wife will give birth far from her family's residence and without her husband. *Id.* at ¶ 27.

Mr. Khalil experiences detention untethered from his habitual familial, religious, and collegiate community. He faces the prospect of missing the birth of his first child, and is already losing precious time supporting his wife through her pregnancy. And rather than experiencing the holy month of Ramadan with his wife, in the company of their community and practice of the prayer and rituals that usually mark the month for the couple, Mr. Khalil languishes in detention, far from his anchoring religious community, unable to stomach food and continuing to navigate the side effects of a pervasive stomach ulcer. Abdalla Decl. at ¶ 28. All the while, Mr. Khalil's wife, bearing the final weeks of her pregnancy, is also unable to sleep or eat, or otherwise care for herself, experiencing the immense hardship of his absence. *Id.* at ¶¶ 24, 29-30. Mr. Khalil's "absence is not only felt by his friends and family, but by the entire academic and professional community that he is a part of." *See* Letters of Support.

If released, Mr. Khalil will return to his home with his U.S. citizen wife and help her prepare for the birth of their child. *Id.* at ¶ 30. He will begin his job in New York City and provide for his family. *Id.* He will have the support of the many current and former classmates, professors, colleagues, and friends who are calling for his release. *See* Letters of Support; Supplemental Letters of Support. He has never been accused of being a flight risk or a danger to the community, and any social-media-fueled suggestion otherwise is belied by the detailed statements of support by those who actually know him in personal, academic, and professional settings. *Id.*

## ARGUMENT

**I.    THIS COURT HAS AUTHORITY TO GRANT MR. KHALIL'S IMMEDIATE RELEASE PENDING THE ADJUDICATION OF THIS HABEAS PETITION UNDER *LUCAS V. HADDEN* AND *MAPP V. RENO*.**

This Court has the authority to grant Mr. Khalil's release pending adjudication of his habeas under *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986); *see also Mapp v. Reno*, 241 F.3d 221, (2d Cir. 2001).[11] Under *Lucas,* "courts that have been faced with requests for bail prior to ruling on a habeas petition have developed standards requiring that a habeas petitioner (1) make out a clear case for habeas relief on the law and facts, or (2) establish that exceptional circumstances exist warranting special treatment, or both." 790 F.2d at 367 (citing *Eaton v. Holbrook*, 671 F.2d 670, 670 (1st Cir.1982); *Iuteri v. Nardoza*, 662 F.2d 159, 161 (2d Cir.1981); *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir.1974)); *see also Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (recognizing inherent power to release person on bail in the criminal context); *Mapp v. Reno*, 241 F.3d at 223 (recognizing inherent power to release person on bail in the immigration habeas context). Courts in the Third Circuit have accordingly released individuals pursuant to this authority, including in the immigration habeas context. *See, e.g., Leslie v. Holder*, 865 F.Supp.2d 627, 634 (M. D. Pa. Mar. 29, 2012) ("[S]ettled case law …has long recognized that the power to order bail in habeas proceedings is a legal and logical concomitant of the court's habeas corpus jurisdiction. In fact, our authority to act in these matters has been long recognized, and carefully defined, by the courts which have held generally in habeas corpus matters that the court may consider bail motions and have prescribed legal standards for such relief.").

Under the applicable standards, "a court considering a habeas petitioner's fitness for bail must inquire into whether 'the habeas petition raise[s] substantial claims and [whether]

---

[11] Numerous courts in the Third Circuit have cited *Lucas* and *Mapp* in support of the inherent authority of courts to release habeas petitioners on bail *pendente lite. See, e.g., Leslie v. Holder*, 865 F. Supp. 2d 627, 634–35 (M.D. Pa. 2012) ("The *Mapp* court's analysis of this issue is consistent with case law in this circuit, is highly persuasive, and this Court has previously cited *Mapp*'s analytical paradigm with approval.") (internal citations omitted); *Nasr v. Hogan*, No. 08–415, 2008 WL 2705533, at *2 (M.D. Pa. July 10, 2008) ("Although *Mapp* is from the Second Circuit, we believe its reasoning is sound and equally applicable to the instant case.").

extraordinary circumstances exist [ ] that make the grant of bail necessary to make the habeas remedy effective.'" *Leslie*, 865 F.Supp.2d at 635 (applying *Lucas* and *Mapp*). Extraordinary circumstances under *Lucas* and *Mapp* include the absence of indicia of flight risk or dangerousness, strong family or community ties, health concerns, and impact on minor children. *See Leslie*, 865 F.Supp.2d at 638 (ordering immediate release of petitioner that had been in detention due in part to an excessive bond set by the agency, suffered from health conditions, had earned his GED and engaged in drug treatment and counseling while in prison, and had substantial family ties in the U.S.); *see also Cristian A.R. v. Decker,* 453 F. Supp. 3d 670, 689-90 (D.N.J. 2020) (ordering release in light of substantial due process challenge to detention and extraordinary circumstance posed by risk of serious injury due to COVID-19);[12] *Han Tak Lee v. Cameron*, No. 4:08-CV-1972, 2014 WL 4187590, at *3-*4 (M.D. Pa. Aug. 22, 2014) (ordering release on bail in criminal case seeking new trial based on several factors, including petitioner's lack of a prior criminal record, minimal disciplinary record while incarcerated, and the support of third parties upon his release); *see also S.N.C. v. Sessions,* No. 18 CIV. 7680 (LGS), 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (ordering immediate release in light of petitioner's due process claim and need for counseling and care for her minor children); *Kiadii v. Sessions*, 423 F. Supp. 3d 18, 20-21 (S.D.N.Y. Mar. 2, 2018) (ordering immediate release when the petitioner presented strong constitutional claim and evidence that "her health has deteriorated while in ICE's custody"); *D'Alessandro v. Mukasey*, No. 08 Civ. 914, 2009 WL 799957, at *3 (W.D.N.Y. Mar. 25, 2009) (ordering immediate release given his prolonged detention, his "strong family ties," "a number of

---

[12] Several district courts, similar to *Cristian A.R.*, ordered the immediate release of petitioners at heightened risk of serious injury or death due to COVID-19. *See, e.g., Asmed B. v. Decker,* 460 F. Supp. 3d 519 (D.N.J. 2020); *Kolawole O.T. v. Ahrendt,* 466 F. Supp. 3d 457 (D.N.J. 2020); *Anthony O. v. Decker,* No. CV 20-3856 (MCA), 2020 WL 2571897 (D.N.J. May 20, 2020); *Jeferson V. G. v. Decker,* No. CV 20-3644 (KM), 2020 WL 1873018 (D.N.J. Apr. 15, 2020); *Jose B.R. v. Tsoukaris,* No. CV 20-3347 (MCA), 2020 WL 2744586 (D.N.J. May 27, 2020); *Durel B. v. Decker,* 455 F. Supp. 3d 99 (D.N.J. 2020); *Rafael L.O. v. Tsoukaris,* No. CV 20-3481 (JMV), 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Carlos M. R. v. Decker*, No. CV 20-6016 (MCA), 2020 WL 4339452 (D.N.J. July 28, 2020); *Renat T. v. Decker*, No. CV 20-4658 (MCA), 2020 WL 3819227 (D.N.J. July 8, 2020).

serious, potentially debilitating health problems," and that "[t]here is no evidence in the record whatsoever to support a finding that D'Alessandro is a flight risk or is a danger to the community"). Unless the Government is able to show that "'continued detention is necessary to fulfill the purposes of the detention statute,'" the individual must be released. *Leslie*, 865 F.Supp.2d at 636 (citing *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 233 (3d Cir. 2011), *overruled on other grounds by Jennings v. Rodriguez*, 138 S.Ct. 830 (2018)).

Courts have applied different standards to assess what constitutes "substantial claims" and/or "clear relief" for the purpose of release pending habeas adjudication. *See Landano*, 970 F.2d at 1236 (discussing, in a criminal habeas case, that a petitioner must raise "substantial constitutional claims upon which he has a high probability of success"); *Leslie*, 865 F.Supp.2d at 635 (discussing standards applying in immigration and criminal cases, including that "the necessity that the petition present merits that are more than slightly in petitioner's favor"). Because this case involves a dispute over the legality of Respondents' targeting, arrest, transfer, and detention of Mr. Khalil pending civil immigration proceedings (such that the status quo prior to the present controversy is Mr. Khalil being free from detention), Petitioner argues that he need only demonstrate serious questions going to the merits of his claims (and extraordinary circumstances) in order to be considered for bail. However, even under the heightened standard articulated in *Landano*, Petitioner does raise substantial constitutional claims upon which he has a high probability of success. Moreover, in this case, there is no harm to the government if Petitioner remains at liberty pending adjudication of the petition, or even emergent relief, because no law mandates his detention and he is not a flight risk or danger. On the other hand, the harm of continued detention to Petitioner is extraordinary, in light of the birth of his first child in the coming days or weeks and the underlying First Amendment and Due Process issues in this case.

## II.    MR. KHALIL MEETS THE STANDARD FOR *LUCAS* AND *MAPP* RELEASE.

### A.  MR. KHALIL RAISES SUBSTANTIAL CLAIMS AND A CLEAR CASE FOR HABEAS RELIEF

Mr. Khalil raises substantial claims and a clear case for habeas relief. Through his amended habeas corpus petition,[13] Mr. Khalil seeks to protect his rights under the First Amendment, the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act and the *Accardi* doctrine. Each of these claims are substantial.

First, the First Amendment claims are substantial and demonstrate a clear basis for unconstitutional First Amendment retaliation and viewpoint discrimination. "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers,* 461 U.S. 138, 145 (1983). In particular, "speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

Mr. Khalil's claims—that he is being punished as a result of his political speech and the views he expresses—therefore implicate the heart of the First Amendment. Few governmental actions could be more chilling on speech than a federal agency choosing to jail an individual based on their political speech critical of government policies. *See City of Houston v. Hill*, 482 U.S. 451, 46263 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). It is beyond contest that "[f]reedom of speech and press is accorded aliens

---

[13] Respondents' transfer of Mr. Khalil to Louisiana after the filing of his petition does not alter this Court's jurisdiction and venue. *See Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 445 (3d Cir. 2021) ("When the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004) (citing *Ex parte Endo*, 323 U.S. 283, 306-07 (1944))).

residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (citing *Bridges v. California*, 314 U.S. 252 (1941)). Several courts have held that the First Amendment protects noncitizens who are detained and threatened with deportation as a result of their protected speech. *See, e.g., Bello-Reyes v. Gaynor*, 985 F.3d 696, 698 (9th Cir. 2021); *Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019), *cert. granted, remanded, and vacated sub nom. on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020); *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921 (W.D. Tex. 2018). Respondents' targeting of Mr. Khalil—as well as the overall policy (to arrest, detain, and seek to remove noncitizens who engage in expressive activities in the United States supporting Palestinian rights) and the determination by Secretary Rubio ("Rubio Determination") upon which Mr. Khalil's targeting is based—represent a textbook case of First Amendment retaliation and viewpoint discrimination.

Second, Mr. Khalil's claim that the policy and Rubio Determination are "void for vagueness" is also a substantial claim that presents a clear basis for relief. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972). A policy can be vague for two independent reasons: if the government fails to "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or if it would "authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). When acts affecting speech are involved, particularly "rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–55 (2012). And the requirement for rigorous scrutiny is only heightened where a law or policy carries serious penalties. *See, e.g., Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (noting that the "severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images."). Because removal from the United States is "a particularly severe penalty," *Lee v. United States*, 582 U.S. 357, 370 (2017) (quoting *Padilla*, 559 U.S. at 365), the policy of deporting noncitizens for pro-

Palestine speech must satisfy the most exacting vagueness standard. Here, it cannot. Nor is the specific Determination of how the Policy applies to Petitioner any more clear. *United States v. Loy*, 237 F.3d 251, 262 (3d Cir. 2001).

Third, the Due Process claims related to the unreasonableness and arbitrariness of Mr. Khalil's detention are similarly substantial and present a clear basis for relief. The Due Process Clause of the Fifth Amendment protects "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Id.* at 690. Immigration detention is civil, not criminal, and thus only justified when necessary to ensure a noncitizen's appearance during removal proceedings and to prevent danger to the community. *Id.* The government's detention of Mr. Khalil is wholly unjustified. The government has not demonstrated that Mr. Khalil—a husband to a U.S. citizen, soon-to-be father to a U.S. citizen, and lawful permanent resident with no criminal history—needs to be detained. And there is no credible argument that Mr. Khalil cannot be safely released back to his family. Rather, Mr. Khalil's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Id.* (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"); *cf. German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 211 (3d Cir. 2020) ("Removal proceedings are civil, not criminal. So if an alien's civil detention . . . looks penal, that tilts the scales toward finding the detention unreasonable.") (citation omitted). The asserted bases of his detention—the Foreign Policy Ground and the Rubio Determination which led to Mr. Khalil's arrest—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

Finally, the APA and *Accardi* doctrine claims are substantial and present a clear basis for setting aside the policy and determinations underlying Respondents' targeting of Mr. Khalil. The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C). In addition, to the extent the Secretary of State has determined that Mr. Khalil's "presence or activities would potentially have serious adverse foreign policy consequences for the United States," or "would compromise a compelling United States foreign policy interest," such determinations are arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C). Moreover, the government's actions present a classic violation of the *Accardi* doctrine, as the government is violating its regular processes and rules, including those pertaining to First Amendment activity, in order to detain and deport Mr. Khalil because he has been prejudged as undesirable. *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (agency may not violate its own rules and processes simply because Attorney General singled him out for deportation); *Leslie v. Attorney Gen. of U.S.,* 611 F.3d 171, 175 (3d Cir. 2010) ("rules promulgated by a federal agency that regulate the rights and interests of others are controlling upon the agency"); *see also, e.g.*, DHS, Memorandum of Kevin McAleenan (May 17, 2019) (stating DHS "does not profile, target, or discriminate against any individual for exercising his or her First Amendment Rights"), https://www.dhs.gov/sites/default/files/publications/info_regarding _first_amendment_protected_activities_as1_signed_05.17.2019.pdf .

Courts have routinely found challenges of this nature—particularly those involving constitutional concerns—to be "substantial claims" demonstrating a clear case for habeas relief for purposes of *Lucas* and *Mapp* release. *See Leslie*, 865 F.Supp.2d at 638 (finding petitioner's due process challenge to his prolonged detention and deficiencies in his bond hearing to present substantial claims); *Cristian A.R.*, 453 F. Supp. 3d at 685-88 (finding substantial claim involving

substantive due process challenge to detention); *Asmed B.*, 460 F. Supp. 3d at 531-32 (same); *Kolawole O.T.*, 466 F. Supp. 3d at 469-70 (same); *Han Tak Lee*, 2014 WL 4187590, at *4 (finding petitioner's challenge to prior trial to be substantial claim); *see also United States v. Nkanga*, 452 F. Supp. 3d 91, 95 (S.D.N.Y. 2020) (finding petitioner's ineffective assistance of counsel claim to be substantial claim); *S.N.C.*, 2018 WL 6175902, at *6 (finding substantial claims that petitioner's "due process rights are infringed if she is removed before her visa applications are adjudicated"); *Coronel v. Decker*, 449 F. Supp. 3d 274, 289 (S.D.N.Y. 2020) (finding substantial claims of substantive and procedural due process challenges to detention); *Avendano Hernandez v. Decker*, 450 F. Supp. 3d 443, 448 (S.D.N.Y. 2020) (finding substantial claim of substantive due process challenge to detention); *Barbecho v. Decker*, No. 20-CV-2821 (AJN), 2020 WL 2513468, at *7 (S.D.N.Y. May 15, 2020) (same); *Kiadii v. Decker*, 423 F. Supp. 3d at 18 (S.D.N.Y. 2018) (finding substantial claims of unjustified detention and placement in removal proceedings based on asserted U.S. citizenship). Mr. Khalil's claims more than meet this prong of the *Lucas* and *Mapp* standard.

### B. MR. KHALIL'S CASE PRESENTS EXTRAORDINARY CIRCUMSTANCES.

The circumstances of Mr. Khalil's detention and placement in removal proceedings have been extraordinary from the start. Federal officials have orchestrated an abrupt and highly-publicized arrest and detention of a Columbia University graduate student as punishment for his speech, unjustified by any indicia of flight risk or danger. They arrested him on a Saturday evening in the lobby of his campus housing and in front of his eight-month-pregnant U.S. citizen wife, held him incommunicado from his family and counsel for more than 24 hours, and transferred him out of state even after the filing of this habeas petition seeking his release and to enjoin transfer. Greer Decl. at ¶¶ 5-6, 9-13, 15; Abdalla Decl. at ¶¶ 12, 14-18. The President and Secretary of State have posted images of Mr. Khalil online, celebrating his detention. Am. P. ¶ 74. The Department of Homeland Security publicly explained that it targeted Mr. Khalil because of his protected political speech. Am. P. ¶ 81; NPR, Morning Edition (March 13, 2025), available at

https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.
Now, Mr. Khalil sits in a remote private prison, notorious for poor health care, unable to
communicate effectively with counsel without a court order, unable to see his pregnant wife or
attend medical appointments with her, and unable to speak freely to the outside world.

Today, Mr. Khalil's detention poses a myriad of insurmountable harms. Chiefly, Mr. Khalil
and his eight-month pregnant wife, a citizen of the United States, face the daunting, painful
prospect of Ms. Abdalla giving birth to their first child in New York City without Mr. Khalil. *See*
Abdalla Medical Letters.  Ms. Abdalla, who is at risk of preeclampsia, is also faced with the task
of carrying her pregnancy to term while enduring the overwhelming stress of her husband's initial
disappearance, his covert, overnight transfer across multiple state lines to a detention facility more
than 1200 miles away (where she cannot reach him), and the ensuing strain of his indefinite
absence. *See* Abdalla Decl. at ¶ 22; Abdalla Medical Letters. What's more, Mr. Khalil suffers in
detention in Louisiana, far from his community, counsel, wife, and forthcoming son. Abdalla Decl.
at ¶ 28.

Moreover, there are no allegations that Mr. Khalil is a flight risk or a danger to the
community. Mr. Khalil has never been arrested or convicted of a crime. He is the loving husband
of a U.S. citizen, is about to become the father of a U.S. citizen infant, and is a visible presence on
the campus of Columbia University, where he is set to graduate later this year. *See* Abdalla Medical
Letters; M.P.A. Confirmation. He has an offer of employment set to begin next month, when he
will be the main financial provider for his family as his wife takes maternity leave. Abdalla Decl.
at ¶ 26. Many people—including classmates and professors at Columbia University, friends and
colleagues who have known Mr. Khalil for years—attest to his character, community ties, and lack
of flight risk or dangerousness. *See* Letters of Support; Supplemental Letters of Support.

Numerous courts have found extraordinary circumstances in light of similar factors,
including factors related to individualized circumstances, family, health concerns, and lack of
flight risk and dangerousness. *See Leslie*, 865 F.Supp.2d at 638 (describing extraordinary

circumstances including petitioner's substantial family ties in the U.S., health concerns, and completion of GED and programming); *Han Tak Lee*, 2014 WL 4187590, at *3 (describing extraordinary circumstances in criminal case to include lack of prior criminal history, minimal disciplinary history while incarcerated, and support from community); *Nkanga*, 452 F. Supp. 3d at 96 (describing extraordinary circumstances in criminal case to "include the defendant's age; his multiple health issues; the nature of the defendant's offense; the precise timing of the sentencing proceeding …in relation to the emerging COVID-19 pandemic; and the conclusions already reached by the Court in previous aspects of this litigation regarding the defendant's health issues, and apparent lack of dangerousness or risk of flight"); *S.N.C.*, 2018 WL 6175902, at *6 (finding extraordinary circumstances in light of petitioner's health care needs, impact of detention,  and need to care for her children); *Kiaddii*, 423 F. Supp. 3d at 18 (finding extraordinary circumstances based on claims that detention was unjustified and based on impact of detention on health); *D'Alessandro*, 2009 WL 799957, at *3 (finding extraordinary circumstances with respect to petitioner's family ties, prospects for employment, and health issues).  The silencing and chilling effect on speech, the impact on Mr. Khalil's ability to support his wife through her pregnancy and be present for the birth of their child, the impact of detention on his own health and wellbeing, and the lack of any factors justifying physical confinement, all demonstrate extraordinary circumstances.

### C. THESE EXTRAORDINARY CIRCUMSTANCES MAKE THE GRANT OF BAIL NECESSARY TO MAKE THE HABEAS REMEDY EFFECTIVE.

The extraordinary circumstances described render the habeas remedy ineffective if Mr. Khalil is forced to remain in detention pending the litigation of his claims. First, with respect to Mr. Khalil's First Amendment claims, a core part of the remedy sought is designed to prevent the federal government from retaliating against Mr. Khalil for his protected political speech. His detention unquestionably chills his speech, as the federal government monitors and controls his ability to communicate with the outside world and has complete power over all of the decisions

that impact his daily life inside a remote private prison. If Mr. Khalil ultimately wins his habeas claims, the effectiveness of an order of release to vindicate his rights will be vastly diminished if the federal government was able to detain him for the pendency of the litigation. *See Nkanga*, 452 F. Supp. 3d at 96 (agreeing that bail pending resolution of defendant's claim "may be necessary to effectuate the relief sought" where "but for counsel's allegedly ineffective assistance, the judgment would have included a surrender date permitting the defendant to be released on bail pending the COVID-19 crisis"). His challenge to the constitutionality of the government's decision to detain him in the first place is a significant part of the First Amendment and Due Process injury at the center of this litigation.

Second, the habeas remedy is designed to ensure that Mr. Khalil maintains meaningful access to the judicial process. He cannot meaningfully assist in the litigation of this case when he is far away from his legal team and the government controls his ability to speak to counsel. Release would allow Mr. Khalil to have regular access to counsel and address the rapidly unfolding issues in his case.

Third, the habeas remedy is necessary to avoid what, on a personal level, is the most punitive consequence of his detention—being unable to support his U.S. citizen wife during the last month of her pregnancy and missing the birth of their first child. Mr. Khalil spends most of his time in detention deeply stressed about the health of his wife and unborn baby, which is detrimental to his own health. Numerous courts in this district have ordered release under *Mapp* to petitioners like Mr. Khalil, where justice delayed means justice denied. *See, e.g., Leslie*, 865 F. Supp. 2d at 638-40; *Cristian A.R.*,. 453 F. Supp. 3d at 689-90; *Asmed B.*, 460 F. Supp. 3d at 534; *Kolawole O.T.*, 466 F. Supp. 3d at 472; *Nkanga*, 452 F. Supp. 3d at 96; *S.N.C.*, 2018 WL 6175902, at *6; *Kiaddii*, 423 F. Supp. 3d at 18; *Avendano-Hernandez*, 450 F. Supp. 3d at 447-449; *D'Alessandro*, 2009 WL 799957, at *3; *Coronel*, 449 F. Supp. 3d at 289; *Barbecho*, 2020 WL 2513468, at *7. Mr. Khalil's separation from his loved ones and community also detracts from his ability to enjoy the spiritual succor that he normally experiences during the holy month of

Ramadan. If Mr. Khalil is forced to remain isolated in a remote private prison, he will be suffering exactly the retaliatory and punitive harms he seeks to prevent through this litigation.

## CONCLUSION

For the foregoing reasons, this motion should be granted, and this Court should order Respondents to release Mr. Khalil pending the adjudication of this case. Doing so restores Mr. Khalil to the status quo prior to this controversy and puts an end to the extraordinary harms he is experiencing in detention so that the habeas remedies he seeks in this case will be effective. This serves the interests of justice by allowing the parties and this Court a full and fair opportunity to consider the weighty and pressing issues in this case.

Dated: March 20, 2025
New York, NY

Respectfully submitted,

**/s/ Baher Azmy**
Baher Azmy, Esq.

**CENTER FOR CONSTITUTIONAL RIGHTS**
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org
ssisay@ccrjustice.org
dshamas@ccrjustice.org

**WASHINGTON SQUARE LEGAL SERVICES, INC.**
**IMMIGRANT RIGHTS CLINIC**
ALINA DAS*
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430
alina.das@nyu.edu

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Mudassar Hayat Toppa*
Shezza Abboushi Dallal*
CUNY School of Law
2 Court Square
Long Island City, NY  11101
(718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
mudassar.toppa@law.cuny.edu
shezza.dallal@law.cuny.edu


NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300
abelsher@nyclu.org


AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat*
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Brett Max Kaufman*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
ojadwat@aclu.org

**DRATEL & LEWIS**
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Phone:(212)732-8805
Fax: (212) 571-3792
Email: agreer@dratellewis.com

*Application for admission* pro hac vice
*pending or forthcoming*

*Counsel for Petitioner*