# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

    *Petitioner*,

  v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE,
in his official capacity as Acting Field Office
Director of New York, Immigration and Customs
Enforcement;[1] Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement; Kristi
NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;
Marco RUBIO, in his official capacity as Secretary
of State; and Pamela BONDI, in her official capacity
as Attorney General, U.S. Department of Justice,

    *Respondents*.

No. 25-cv-1963-MEF-MAH

## PETITIONER'S MEMORANDUM OF LAW IN OPPOSITION TO RESPONDENTS' RENEWED MOTION TO DISMISS OR TRANSFER & IN SUPPORT OF HIS CROSS-MOTION FOR RE-TRANSFER

AMERICAN CIVIL LIBERTIES UNION OF NEW
JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Shezza Abboushi Dallal*
Natasha Hajo, *Law Student*
CUNY School of Law

---

[1] Respondent Yolanda Pittman, in her official capacity as Warden of Elizabeth Contact Detention Facility, will be added.

125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das*
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

*Pro hac vice application pending or
forthcoming

Counsel for Petitioner

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ............................................................................................ 1

FACTUAL BACKGROUND ............................................................................. 2

ARGUMENT.................................................................................................... 7

    I.  Venue is proper in the District of New Jersey............................................ 7

        A.  This Court has venue under the law of the case.............................. 7

        B.  Venue is proper in the District of New Jersey because Mr.
            Khalil could have filed his petition here at the time he filed
            it in the Southern District of New York ........................................ 12

        C.  Even if the law of the case and ordinary habeas principles
            did not venue the petition in this Court, the government's
            transfer of Mr. Khalil from New Jersey to Louisiana
            demands the application of an exception because the
            government frustrated the proper filing of his petition ................. 22

    II.  Purely for the purpose of preserving the argument for future
       appellate review, Petitioner maintains that venue was proper in the
       Southern District of New York ................................................................ 30

CONCLUSION................................................................................................ 31

CERTIFICATE OF SERVICE ......................................................................... 33

# TABLE OF AUTHORITIES

## Cases

*Anariba v. v. Dir. Hudson Cnty. Corr. Ctr.*,
    17 F.4th 434 (3d Cir. 2021) ....................................................................... *passim*

*Arizona v. California*,
    460 U.S. 605 (1984) ................................................................................. 10

*Barden v. Keohane*,
    921 F.2d 476 (3d Cir. 1990) ................................................................... 13

*Better Packages, Inc. v. Zheng*,
    No. CIV.A 05-4477-SRC, 2006 WL 1373055 (D.N.J. May 17, 2006)............. 29

*Blair–Bey v. Quick*,
    151 F.3d 1036 (D.C. Cir. 1998) .............................................................. 13

*Bobian v. CSA Czech Airlines*,
    222 F. Supp. 2d 598 (D.N.J. 2002)............................................................ 7

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ................................................................... 19, 21, 22

*Chapman v. Mairoanna*,
    No. 12–4116, 2013 WL 1491550 (3d Cir. Apr. 12, 2013) ............................ 13

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988) .............................................................................. 11, 12

*Corneil-Rodriguez v. INS*,
    532 F.2d 301 (2d Cir. 1976) .................................................................. 20

*Cruz v. Decker*,
    No. 18 Civ. 9948, 2019 WL 4038555 (S.D.N.Y. Aug. 27, 2019)..................... 11

*Cruz-Aguilera v. INS*,
    245 F.3d 1070 (9th Cir. 2001) ............................................................... 15

*Doe v. Barr*,
    No. 20-cv-02263, 2020 WL 1984266 (N.D. Cal. Apr. 27, 2020) ................... 19

*Durel B. v. Decker*,
No. 20-3430-KM (D.N.J. Apr. 1, 2020) (ECF 18) ........................................... 15

*Eisel v. Sec'y of the Army*,
477 F.2d 1251 (D.C. Cir. 1973)........................................................................ 21

*Ex parte Catanzaro*,
138 F.2d 100 (3d Cir. 1943) ............................................................................ 14

*Ex Parte Endo*,
323 U.S. 283 (1944) ......................................................................... 13, 18, 24

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*,
482 F.3d 247 (3d Cir. 2007) ............................................................................ 15

*Gallego v. Decker*,
No. 19 Civ. 8263, 2020 WL 5370448 (S.D.N.Y. Sept. 8, 2020)...................... 19

*Golding v. Sessions*,
No. 18-CV-3036, 2018 WL 6444400 (S.D.N.Y. Dec. 6, 2018)....................... 17

*Grayson v. Mayview State Hosp.*,
293 F.3d 103 (3d Cir. 2002) ............................................................................ 15

*Griffin v. Ebbert*,
751 F.3d 288 (5th Cir. 2014) ........................................................................... 25

*Grigorian v. Morton*,
No. CIV.A 10-3441, 2010 WL 2902537 (E.D. Pa. July 23, 2010) .................. 10

*Hayman Cash Reg. Co. v. Sarokin*,
669 F.2d 162 (3d Cir. 1982) ................................................................... 7, 8, 11

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
467 U.S. 51 (1984) ......................................................................................... 21

*Hinds v. Hufford*,
No. 17-CV-488, 2017 WL 6346413 (M.D. Pa. Dec. 12, 2017) ...................... 15

*Hoffenberg v. United States*,
No. 12-cv-4833-JBS, 2013 WL 135134 (D.N.J. Jan. 8, 2013).......................... 7

*Hoffman v. Blaski*,
  363 U.S. 335 (1960) ........................................................................ 9, 11

*Holiday v. Johnston*,
  313 U.S. 342 (1941) ............................................................................. 23

*Joseph v. Sniezek*,
  No. CV-13-1889, 2013 WL 5351078 (M.D. Pa. Sept. 23, 2013) ............... 13, 17

*Kaufman v. Trammell*,
  No. 08-CV-276, 2012 WL 380351 (N.D. Okla. Feb. 6, 2012) ......................... 15

*Latif v. Obama*,
  677 F.3d 1175 (D.C. Cir. 2011) ......................................................... 27

*Lee You Fee v. Dulles*,
  236 F.2d 885 (7th Cir. 1956) ............................................................ 20

*Mahmood v. Nielsen*,
  312 F. Supp. 3d 417 (S.D.N.Y. 2018) ............................................... 11

*Nascone v. Spudnuts, Inc.*,
  735 F.2d 763 (3d Cir. 1984) ............................................................ 30

*Nottingham v. U.S. Dist. Ct. for Middle Dist. of Penn.*,
  No. 21-CV-396, 2021 WL 1313526 (M.D. Pa. Apr. 8, 2021) ......................... 15

*Pittman v. Pullen*,
  No. 22-cv-01651, 2023 WL 6379371 (D. Conn. Sept. 29, 2023) .................... 17

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*,
   123 F.3d 111 (3d Cir. 1997) ........................................................ 8, 10

*Rivera-Perez v. Stover*,
  No. 23-CV-1348, 2024 WL 4819250 (D. Conn. Nov. 18, 2024) ..................... 11

*Rumsfeld v. Padilla*,
  542 U.S. 426 (2004) ................................................................. passim

*Schmitz v Zilveti*, 20 F.3d 1043 (9th Cir. 1994) ....................................... 23

*Smith v. Gaetz*,
  No. CIV 10-616, 2010 WL 3926868 (S.D. Ill. Oct. 5, 2010) .......................... 15

*SongByrd, Inc. v. Est. of Grossman*,
206 F.3d 172 (2d Cir. 2000) .............................................................. 30

*Soto v. Pugh*,
No. CV 306-092, 2007 WL 113945 (S.D. Ga. Jan. 10, 2007) ......................... 15

*Sow v. Whitaker*,
No. 18 Civ. 11394, 2019 WL 2023752 (S.D.N.Y. May 8, 2019) .................... 25

*Steele v. Beasley*,
No. 19-CV-23, 2019 WL 1270932 (E.D. Ark. Mar. 19, 2019) ........................ 15

*United States v. Asmar*,
827 F.2d 907 (3d Cir. 1987) ............................................................... 20

*Vasquez v. Reno*,
233 F.3d 688 (1st Cir. 2000) ............................................................... 25

**Statutes**

28 U.S.C. § 1406 ................................................................................. 9, 13

28 U.S.C. § 1631 ................................................................................... 11

28 U.S.C. § 2242 ................................................................................... 15

**Other Authorities**

Br. for the Commonwealth Lawyers Association as Amicus Curiae,
*Boumediene v. Bush*, Nos. 06-1195 & 06-1196, 2007 WL 2414902 (U.S.
Aug. 24, 2007) ................................................................................... 22

John Morton, ICE Director, *Policy 11022.1: Detainee Transfers* (Jan. 4,
2012) ................................................................................................ 28

Stephen I. Vladeck, *The New Habeas Revisionism*, 124 Harv. L. Rev. 941
(2011) ............................................................................................... 23

# INTRODUCTION

This unprecedented case involves government efforts to detain, under cover of night, Mahmoud Khalil, a lawful permanent resident, and then, "in the space of less than twenty-four hours, . . . haul[]" him "through at least six different districts (one likely twice)." Op. at 24 n.6 (ECF 78). Within hours of his arrest and detention, Petitioner Mahmoud Khalil filed a habeas petition to challenge the government's efforts to punish and silence him for his speech. All of the information his lawyers had that night pointed to New York as the location of his detention, and that is where they filed. But as the world now knows, Mr. Khalil was not in New York when his lawyers filed his petition. Instead, he was here, in New Jersey—though nobody but the government would know that until he was already gone.

The government renews a motion it has already lost to send Mr. Khalil's case on to its orchestrated venue, the Western District of Louisiana. Just five days ago, Judge Furman ruled that because Mr. Khalil was in New Jersey at the time of his habeas filing, Petitioner's case should be transferred here in the interests of justice. In his opinion, Judge Furman rejected all of the arguments the government makes here in its "renewed" motion to transfer the case to Louisiana, and his decision is the law of the case. Even if it were not, the government's arguments are contrary to binding precedent that holds that the proper venue for a habeas petition

is where the petitioner was being held at the time the petition was filed. Those arguments are also intolerably inconsistent with the fundamental purposes underlying habeas corpus.

As Judge Furman held, this Court is a proper venue for Mr. Khalil's petition, which challenges his unconstitutional and illegal detention and threatened deportation. While Mr. Khalil preserves his prior arguments that the Southern District of New York was a proper venue at the time he filed his petition, he is ready to proceed on his emergency motions and claims before this Court. The Court should deny the government's motion.[2]

## FACTUAL BACKGROUND

At approximately 8:30 p.m. on the night of March 8, 2025, Mr. Khalil and his wife, who is eight months pregnant, were returning to their home on the Upper West Side of Manhattan after attending an Iftar dinner, which is a meal eaten at sunset to break the daylong fast Muslims observe during the holy month of Ramadan. Am. Pet. ¶ 45 (ECF 38).[3] Plainclothes officers followed them into the lobby of their apartment building, asked to confirm Mr. Khalil's identity, and

---

[2] As explained below, Petitioner has filed a cross-motion for re-transfer to the S.D.N.Y. purely to preserve for any future appellate review the argument that venue over his petition was proper there. *See infra* Part II. He waives his reply on that cross-motion.

[3] Petitioner has verified the facts in the Amended Petition. *See* Salama Decl. (ECF 50-1).

announced that they were Department of Homeland Security ("DHS") agents there to take him into custody. *Id.* ¶¶ 46–47. Two other agents were already waiting inside. *Id.* ¶ 47. After Mr. Khalil asked, one of the agents represented that they had a warrant on a mobile phone and they would show it to him. *Id.* ¶ 48. (Neither Mr. Khalil nor his lawyers have yet to see any warrant.) As Mr. Khalil explained that he was a permanent resident with a green card, the agents began to create a physical barrier between him and his wife, and then threatened his wife that she would be arrested if she did not comply with their orders. *Id.*

Mr. Khalil called one of his lawyers, Amy Greer, who spoke with Special Agent Elvin Hernandez. *Id.* ¶ 49. Agent Hernandez represented that he and his colleagues had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. State Department. *Id.* When Ms. Greer informed Agent Hernandez that Mr. Khalil was a permanent resident, Agent Hernandez responded that the State Department had revoked that, too. *Id.* ¶ 51. He told Ms. Greer that he would be bringing Mr. Khalil to 26 Federal Plaza, the location of the ICE New York Field Office. *Id.* After Ms. Greer attempted to ask further questions, Agent Hernandez hung up the phone. *Id.*

After the DHS agents took Mr. Khalil outside, they told his wife that he would be brought to 26 Federal Plaza but otherwise refused to answer any

questions. *Id.* ¶ 53. They did not identify themselves, the grounds for her husband's arrest, or who she could contact to inquire about his location or condition. *Id.*

Believing that Mr. Khalil's arrest, detention, and threatened deportation were unlawful, Mr. Khalil's lawyers raced to draft a habeas petition on Mr. Khalil's behalf. That night, Ms. Greer checked the ICE online detainee locator multiple times to confirm the location of her client. *Id.* ¶ 54. At 10:00 p.m., Mr. Khalil was not yet entered in the system. *Id.* Hours later, at 1:35 a.m. the next morning, the system informed her that Mr. Khalil was in custody in New York City and instructed her to call the ICE New York Field Office for information. *Id.* Several hours after that, the locator revealed the same information. *Id.* ¶¶ 54–55.

While Mr. Khalil was being held at 26 Federal Plaza, as ICE agents took his biometrics, an agent approached Agent Hernandez and said, "the White House is requesting an update." *Id.* ¶ 58. As Mr. Khalil waited, agents prepared a Notice to Appear ("NTA"), a document that contains details about the grounds for a noncitizen's removal from the country. *Id.* ¶ 59. They presented the NTA to him for signature, but after they refused his request to speak with his lawyer, he declined to sign it. *Id.* The NTA indicated he had been assigned an immigration court date, several weeks out, in Louisiana. *Id.* ¶ 60.

At some point overnight, agents from the New York Field Office transported Mr. Khalil in handcuffs and shackles to Elizabeth Detention Center ("EDC") in

New Jersey. *Id.* ¶ 61. Upon arrival at EDC, Mr. Khalil requested yet again to speak with his lawyer and was again refused. *Id.* ¶ 62; Khalil Decl. ¶ 9 (ECF 73-1). He asked once more the next morning, and was again refused. Khalil Decl. ¶ 12.

Meanwhile, Mr. Khalil's attorneys continued to work on Mr. Khalil's habeas petition. At 4:40 a.m. on March 9, after confirming that the locator showed that Mr. Khalil remained in New York City, Ms. Greer filed the petition in the U.S. District Court for the Southern District of New York. Am. Pet. ¶ 54; *see* Pet. (ECF 2). The petition sought, among other things, to enjoin transfer outside the district. *See* Pet. at 10–11. Almost four hours later after filing the petition, Ms. Greer checked the ICE locator again, and it still showed Mr. Khalil as being in New York City. Am. Pet. ¶ 55. Some time after that, she checked once more, and found that the system had updated to show that Mr. Khalil was being held in Elizabeth, New Jersey, at the EDC, a detention center privately operated by the corporation CoreCivic. *Id.* Alarmed and scared, Ms. Greer and a colleague made two attempts to contact her client by phone, but no one at the facility answered. *Id.* And around 11:20 a.m., Mr. Khalil's wife arrived at the facility to look for him, but she was told he was not in their system, and she was turned away. *Id.*

Mr. Khalil had spent the night in EDC and was there, according to the government, at the time that Ms. Greer filed his habeas petition. Second Suppl. Joyce Decl. ¶ 17 (ECF 72). Around noon, ICE officers—including one Mr. Khalil

believes he recognized from the night before at 26 Federal Plaza—arrived at the EDC and handcuffed and shackled him and placed him in a van, where he also found two plastic bags containing the clothing and items the ICE agents had taken from him the night before. Am. Pet. ¶ 63; Khalil Decl. ¶¶ 20–21. Mr. Khalil was told he was then going to JFK without further clarification. Am. Pet. ¶ 63; Khalil Decl. ¶ 20.

That afternoon, ICE informed Mr. Khalil's counsel that the government was in the process of transferring Mr. Khalil to its New Orleans Field Office, almost 1500 miles away. Am. Pet. ¶ 56. Mr. Khalil's counsel emailed attorneys in the U.S. Attorney's Office for the Southern District of New York, who confirmed that Mr. Khalil was on the way to Louisiana. *Id.* She requested Mr. Khalil's immediate return to New York, but was told that ICE would not consent to his return absent a court order. *Id.* And when Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that, for detained immigrants in New York, typically occurs the same or next day—authorities in the Louisiana ICE detention facility offered a date ten days away. *Id.*

In the early hours of the morning on March 10, almost 40 hours after his arrest, Mr. Khalil arrived at the Louisiana Detention Facility in Jena, Louisiana, where he remains today. *Id.* ¶¶ 67, 70, 99.

# ARGUMENT

As Judge Furman has already held, venue is proper in this District. That is the law of the case, and regardless, it is correct.

## I.    Venue is proper in the District of New Jersey.

### A.    This Court has venue under the law of the case.

That the government has "renew[ed]" its motion to transfer gives the game away. ECF 89 at 1. Judge Furman rejected the government's argument that dismissal or transfer to Louisiana was appropriate in a reasoned opinion that was fully litigated by the government. *See* Op. at 25–32 (ECF 78).[4] In this Circuit, venue transfer decisions made by the transferor court are the law of the case. *Hayman Cash Reg. Co. v. Sarokin*, 669 F.2d 162, 166 (3d Cir. 1982); *Bobian v. CSA Czech Airlines*, 222 F. Supp. 2d 598, 602 (D.N.J. 2002). The "only" circumstances in which the transferee court—this Court—may make "a determination of venue and jurisdiction" is when that "determination has not previously been made by the transferor court." *Sarokin*, 669 F.2d at 166; *see Hoffenberg v. United States*, No. 12-cv-4833-JBS, 2013 WL 135134, at *1 (D.N.J. Jan. 8, 2013) (Where "the transferor court . . . expressly ma[kes] a reasoned determination that venue is proper in this District" and the Court "has personal

---

[4] *Available at Khalil v. Joyce*, No. 25 Civ. 1935 (JMF), 2025 WL 849803 (S.D.N.Y. Mar. 19, 2025).

jurisdiction" over the defendant, "the law of the case doctrine prohibits reconsideration of venue transfer . . . ."). The matter is closed.[5]

The government says that the "law of the case doctrine" does not apply here, or at least that it is "discretion[ary]." Renewed Transfer Mem. at 11 (ECF 90). But the government's own case makes clear that even where the Court maintains the *power* to reconsider an earlier decision, it should be "loathe" to exercise that power, and it may do so only in cases of manifest injustice to the party seeking reconsideration. *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc. (PIRG of N.J.)*, 123 F.3d 111, 117 (3d Cir. 1997). The government suggests that "the substantial jurisdictional concerns with the original petition and the lack of filing in the proper district at the outset" amount to such circumstances, Renewed Transfer Mem. at 11, but they are not even close. Nothing about Judge Furman's decision suggests reevaluation based on "new evidence," "supervening new law," or "clear[] erro[r]" that would "create manifest injustice." *PIRG of N.J.*, 123 F.3d at 117. Judge Furman ruled five days ago. And in his opinion, he articulated why transfer to this Court *served* the interest of justice, instead of working the opposite. Op. at 26–27 (explaining that even the government agreed that "prompt resolution"

---

[5] The Third Circuit has suggested that a party challenging a transfer could "seek reconsideration in the transferor court." *Sarokin*, 669 F.2d at 168. The government did not seek reconsideration of Judge Furman's order here.

is "imperative," and concluding that dismissal and delay "would prejudice Mr. Khalil in several important ways").

There is also no argument that Judge Furman's decision to transfer Mr. Khalil's petition to this District was clear error. Judge Furman firmly grounded his decision in the clear language of one of the federal transfer statutes, 28 U.S.C. § 1406(a), which permits transfer of a case filed in the wrong district "to any district . . . in which [the case] could have been brought." Op. at 28. As he explained, the transfer statute does not permit transfer to a district (like the Western District of Louisiana) where a case "may now be *rebrought*," but only where it "could have been brought" in the first place. *Id.* at 29 (quoting *Hoffman v. Blaski*, 363 U.S. 335, 342 (1960)). As Judge Furman explained, the D.N.J. was "the one and only district in which [Mr. Khalil] could have filed" his petition at just past 4 o'clock in the morning on March 9, when the petition was filed in the S.D.N.Y. *Id.* at 30. And, he found, justice would be served by transfer here in lieu of dismissal, because the latter would have meant "litigating far from [Mr. Khalil's] lawyers, from his eight-months-pregnant wife, and from the location where most (if not all) of the events relevant to his petition took place," and his "lawyers filed the Petition in [the S.D.N.Y.] based on a good-faith and reasonable belief that he was then detained [t]here." *Id.* at 26–27.

9

The government does not specifically take issue with that analysis so much as suggest that this Court must undertake it all anew and somehow arrive at a new result. The government appears to rely on *PIRG of N.J.* for the proposition that this Court can and should send the case to Louisiana because it must re-evaluate its own "jurisdiction[]," and because Judge Furman got that question wrong.[6] But *PIRG of N.J.* was about a court's non-negotiable Article III jurisdiction over a matter; there, a prior decision on standing had been "undermine[d]" by later-in-time factual findings. 123 F.3d at 117. That is a *real* question of jurisdiction.[7]

Judge Furman, addressing the government's "jurisdictional" argument, made clear that it "suffers from a . . . misunderstanding of" the Supreme Court's decision in *Rumsfeld v. Padilla*, 542 U.S. 426 (2004). Op. at 30. "[H]abeas jurisdiction is 'not jurisdictional in the sense of a limitation on subject-matter jurisdiction.'" *Id.* (quoting *Padilla*, 542 U.S. at 451 (Kennedy, J., concurring)); *see Grigorian v. Morton*, No. CIV.A 10-3441, 2010 WL 2902537, at *2 n.4 (E.D. Pa. July 23,

---

[6] Actually, all the government can muster is "concern[]" with Judge Furman's ruling. Renewed Transfer Mem. at 11. That is far from a clarion call for clear error.

[7] The government also cites *Arizona v. California*, 460 U.S. 605 (1984), but the law-of-the-case issue there concerned the unique scenario of the Supreme Court's original jurisdiction, and even without directly applying the doctrine, the Court invoked "the principles upon which" it is based to decide against reconsideration of the previously litigated jurisdictional question before it. *Id.* at 619. The Court also reiterated that the doctrine applied absent a showing of clear error or manifest injustice. *Id.* at 619 n.8.

2010) ("the term 'jurisdiction,' as used in [the habeas] context, does not refer to a limitation on the power of the Court to hear the case" (citing *Padilla*, 542 U.S. at 451–52)). Instead, it is a venue rule. *Padilla*, 542 U.S. at 452 ("Because the immediate-custodian and territorial-jurisdiction rules are like personal-jurisdiction or venue rules, objections to the filing of petitions based on those grounds can be waived by the Government.").[8] As a result, "[n]o statute is required to 'vest' the District of New Jersey with otherwise-absent jurisdiction." Op. at 30 (rejecting the government's argument found in Transfer Reply Mem. at 14 (ECF 71)).[9]

Even if the question of *subject-matter* jurisdiction were both actually at issue and a close call here, the law of the case doctrine would still apply. The Supreme Court has explained that, in cases transferred under the federal statutes, courts "should encourage, not discourage, quick settlement of questions of transfer." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 819 (1988) (quoting *Hoffman*, 363 U.S. at 349 (Frankfurter, J., dissenting)); *accord Sarokin*, 669 F.2d at 167–68. As important as jurisdiction is in any given case, courts should work to

---

[8] *See also Cruz v. Decker*, No. 18 Civ. 9948, 2019 WL 4038555, at *2 (S.D.N.Y. Aug. 27, 2019) ("*Padilla*'s 'immediate custodian rule is a venue rule.'" (quoting *Mahmood v. Nielsen*, 312 F. Supp. 3d 417, 423 (S.D.N.Y. 2018)), *aff'd*, 2019 WL 6318627 (S.D.N.Y. Nov. 26, 2019))); *Rivera-Perez v. Stover*, No. 23-CV-1348, 2024 WL 4819250, at *5 (D. Conn. Nov. 18, 2024) (same).

[9] Judge Furman pointed out that, "even if the defect were one of subject-matter jurisdiction," the Court "would arguably" have had a basis to transfer Mr. Khalil's petition under 28 U.S.C. § 1631. Op. at 26. n.7.

avoid engaging "in a perpetual game of jurisdictional ping-pong . . . until one of the parties surrenders to futility." *Id.* at 818. That would "undermine public confidence in our judiciary" and "squander private and public resources" in ways Congress's transfer statutes never intended. *Id.* at 818–19. That rationale applies with even more force in a case like this, involving an unprecedented exercise of executive power that, for two weeks, a detained Petitioner has been challenging as blatantly unconstitutional. As a result, and because "the doctrine of the law of the case is . . . a heavy deterrent to vacillation on arguable issues," "reversals" of a transferor court's decisions "should necessarily be exceptional," and "if the transferee court can find the transfer decision *plausible*, its jurisdictional inquiry is at an end." *Id.* at 819 (cleaned up). Judge Furman's transfer decision easily clears that low bar.

> **B.    Venue is proper in the District of New Jersey because Mr. Khalil could have filed his petition here at the time he filed it in the Southern District of New York.**

Judge Furman's analysis is all more than sound, and there is no reason for this Court to even revisit it, let alone overrule it as clearly wrong. It is consistent with the "default" rule in habeas cases—at least outside of the immigration context, *Padilla*, 542 U.S. at 435 n.8 (majority op.), and in this Circuit within it as well, *Anariba v. v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 444 (3d Cir. 2021)—that the proper respondent is the warden of the facility where the prisoner

is being held" at the time the petition was filed. *Padilla*, 542 U.S. at 435–36. It is also consistent with this Circuit's law regarding the transfers of habeas petitioners. "When a prisoner is transferred while the litigation is pending, habeas jurisdiction as a general matter continues to be in the district where the prisoner was incarcerated at the time the habeas petition was filed." *Chapman v. Mairoanna*, No. 12–4116, 2013 WL 1491550, at *1 n.1 (3d Cir. Apr. 12, 2013) (cleaned up) (quoting *Blair–Bey v. Quick*, 151 F.3d 1036, 1039 n. 1 (D.C. Cir. 1998)); *Anariba*, 17 F.4th at 445–46; *Barden v. Keohane*, 921 F.2d 476, 477 n.1 (3d Cir. 1990). And where a habeas petitioner is "transferred multiple times" after his petition was filed, "[p]roper jurisdiction over the action thus remains in the District Petitioner was incarcerated at the time of filing." *Joseph v. Sniezek*, No. CV-13-1889, 2013 WL 5351078, at *3–4 (M.D. Pa. Sept. 23, 2013).

This caselaw synthesizes both the longstanding federal transfer statutes and the rule of *Ex Parte Endo*, 323 U.S. 283 (1944), which no court has seriously questioned in more than eighty years. The federal transfer statutes, including (as in this case) 28 U.S.C. § 1406(a), permit courts, "in the interest of justice," to "transfer" cases "laying venue in the wrong . . . district" to "any district . . . in which it could have been brought." And, under *Endo*, "[t]he fact that a detainee has been transferred far away from a district that otherwise has jurisdiction to hear his or her claims does not necessarily deprive that district of habeas jurisdiction." Op.

13

at 30 (citing *Padilla*, 542 U.S. at 441 (majority op.), itself discussing *Endo*).

Indeed, even before *Endo*, the Third Circuit had "adhere[d] to the general rule . . .

that the government's post-filing transfer of a § 2241 petitioner out of the court's

territorial jurisdiction does not strip the court of jurisdiction over the petition."

*Anariba*, 17 F.4th at 445–46 (discussing *Ex parte Catanzaro*, 138 F.2d 100 (3d Cir.

1943)).

All of that compels the same conclusion that Judge Furman already

reached. Despite this, the government argues that because Mr. Khalil "has

never filed a habeas petition in this Court, . . . habeas jurisdiction has never

vested in this Court." Renewed Transfer Mem. at 7; *see id.* (suggesting that

*Endo* does not apply because Mr. Khalil's petition was never "*properly*"

filed in the District of New Jersey); Transfer Reply Mem. at 13–14 (same).

But the government's position makes no sense.

First, as Judge Furman found, because the government did not even

mention section 1406(a) in its brief supporting its first motion to transfer

(ECF 31), the government has "forfeited any argument against application

of" the transfer statute in this case. Op. at 27 n.9.

Second, Judge Furman already dealt with the government's objection,

explaining that because habeas jurisdiction is not the same as subject-matter

jurisdiction, the government's "vesting" argument goes nowhere. Op. at 30.

14

Third, to the extent that the government might be arguing that the problem here is that Mr. Khalil named the wrong respondent in his initial petition, *see* Renewed Transfer Mem. at 8 (implying, in a somewhat inaccurate case parenthetical, that its argument might be that Mr. Khalil's petition lacks a "properly named respondent"), that issue is easily and routinely cured.[10] And notably, the habeas pleading statute only requires the

---

[10] Petitioner maintains that Respondent Joyce is was and is a proper Respondent, *see infra* Part II; *see* Opp'n to Transfer Mem. at 12–16 (ECF 50), and that substitute of the EDC warden here is a pro forma matter. Courts frequently (and *sua sponte*) direct the Clerk of Court to substitute the name of the proper warden upon the transfer of habeas cases. *See, e.g.*, Order, *Durel B. v. Decker*, No. 20-3430-KM (D.N.J. Apr. 1, 2020) (ECF 18) (after transfer from S.D.N.Y. to D.N.J., reviewing a habeas petition for COVID-19 relief and directly adding the "proper respondent"); *see also, e.g.*, *Hinds v. Hufford*, No. 17-CV-488, 2017 WL 6346413, at *3 n.1 (M.D. Pa. Dec. 12, 2017); *Smith v. Gaetz*, No. CIV 10-616, 2010 WL 3926868, at *2 (S.D. Ill. Oct. 5, 2010); *Kaufman v. Trammell*, No. 08-CV-276, 2012 WL 380351, at *6 n.1 (N.D. Okla. Feb. 6, 2012); *Soto v. Pugh*, No. CV 306-092, 2007 WL 113945, at *3 n.1 (S.D. Ga. Jan. 10, 2007); *Steele v. Beasley*, No. 19-CV-23, 2019 WL 1270932, at *3 n.1 (E.D. Ark. Mar. 19, 2019), *report and recommendation adopted*, No. 19-CV-23, 2019 WL 1461909 (E.D. Ark. Apr. 2, 2019), *aff'd sub nom. Steele v. Doe*, No. 19-1830, 2019 WL 5390950 (8th Cir. Aug. 6, 2019).

However, should the Court believe a motion to amend the caption is required, Petitioner respectfully requests leave to promptly file such a motion. *See, e.g.*, *Cruz-Aguilera v. INS*, 245 F.3d 1070, 1073 n.2 (9th Cir. 2001) ("Necessary amendments to perfect the form of the habeas petition can be made in the district court upon transfer."); *see also, e.g.*, *Nottingham v. U.S. Dist. Ct. for Middle Dist. of Penn.*, No. 21-CV-396, 2021 WL 1313526, at *4 (M.D. Pa. Apr. 8, 2021) ("The Third Circuit Court of Appeals requires district courts to grant leave to amend before dismissing a civil rights complaint when curative amendment is conceivable." (citing *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*,

naming of the petitioner's warden "if known." 28 U.S.C. § 2242. Mr.

Khalil's lawyers did not and could not have known to name the EDC warden

when they filed the initial petition. Am. Pet. ¶ 54.

Fourth, the government's reading of the transfer statute is circular, and

it would thwart Congress' explicit purpose in enacting the statute. The

government argues that Judge Furman's transfer of the case to this District is

inoperative because "no court has yet had proper habeas jurisdiction over

this matter." Renewed Transfer Mem. at 8. But the whole point of the

congressionally granted transfer authority is to move a case from a place a

case was filed (but cannot be litigated) to a place where it "could have been

brought" (but, in fact, was not). And the government's argument renders the

statute completely useless. Under its view, jurisdiction never vested in the

original court (under the immediate custodian rule), so the case cannot be

heard there. And, it continues, jurisdiction never vested in the transferee

court (because it was not brought there originally), so the case cannot be

heard there, either. If that were somehow correct, no court could *ever*

transfer an action under section 1406(a), even "in the interest of justice," and

---

482 F.3d 247, 251 (3d Cir. 2007); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002))).

courts would simply dismiss all improperly filed petitions as a matter of course.

As Judge Furman pointed out, that view is belied the "legion" of "cases in which district courts have relied on Section 1406(a) to transfer immigration habeas cases filed in the wrong district." Op. at 27 (citing, as examples, multiple cases). As those cases make clear, detainees file habeas petitions in the wrong place all the time, and courts routinely, and very often at the government's urging, send those petitions to the districts where the petitioners were detained at the time of filing.[11] No habeas case that is transferred after a habeas petitioner "erred at the outset by filing" in the wrong district, *Joseph*, 2013 WL 5351078, at *4, had already "vested" in the transferee court prior to the transfer. And that is likely why, despite four opportunities, the government has been unable to cite a single case where a court agreed with the argument it is making here[12]—or, even more telling, a

---

[11] *See, e.g.*, *Golding v. Sessions*, No. 18-CV-3036, 2018 WL 6444400, at *1, *3 (S.D.N.Y. Dec. 6, 2018) (granting government's requested transfer of habeas petition to the D.N.J. upon government's argument that the immediate custodian rule, under which a petitioner should "file that action in the district in which he is physically present at the time of filing," required it—despite the fact that the petitioner had named the Attorney General instead of "the person with day-to-day control over Petitioner (at the time of filing)," namely "the warden of the Bergen County Jail").

[12] The government has cited *Pittman v. Pullen*, No. 22-cv-01651, 2023 WL 6379371 (D. Conn. Sept. 29, 2023), which it claims supports the notion that "where a petitioner improperly filed a petition, but has since been moved to a

single case in which the government even *made* the argument it is making

here.[13]

Fifth, the government's argument would profoundly undermine the *Endo*

rule. According to the government, *Endo* means that the government cannot move

a petitioner who has "properly filed" a petition in order to unilaterally choose a

different venue—but *Endo* has nothing to say about the government moving a

petitioner in a way that prevents any "proper" filing in the first place. That is a

bafflingly dim view of *Endo*, which is bedrock habeas law. *See Anariba*, 17 F. 4th

at 445–46. "The objective of habeas relief," the Supreme Court held in *Endo*, "may

be *in no way* impaired or defeated by the removal of the prisoner from the

territorial jurisdiction of the District Court." 323 U.S. at 307 (cleaned up and

emphasis added). And the Third Circuit has been explicit, when addressing an

*Endo* issue in a related context that speaks directly to this case, that the

---

different location[,] courts typically dismiss without prejudice." Transfer Reply
Mem. at 14 (citing no other cases). But *Pittman* is irrelevant. In that case, a
petitioner sought injunctive relief regarding conditions claims he brought against
the warden of a facility, and was then transferred to another facility, mooting his
claims. 2023 WL 6379371, at *2. Under those circumstances, dismissal was
appropriate because, under the federal transfer statutes, the petition could *not* have
been brought in the district of confinement (N.D. Ga.) at the time it was filed. *Id.*

[13] *See* Transfer Mem. at 10 n.4 (ECF 31) (arguing that cases going against its
position are irrelevant because, in them, the government did not make the
argument it makes here).

consequences of undermining the rule would be intolerable. In applying *Endo*,

courts cannot allow the government to:

> willingly transfer an ICE detainee seeking habeas relief from
> continued detention to a jurisdiction that is more amenable to the
> Government's position, or . . . transfer an ICE detainee for the purpose
> of intentionally introducing complicated jurisdictional defects to delay
> the merits review of already lengthy § 2241 claims. Taken to an
> extreme, the Government could transfer a petitioner with such
> consistency as to evade a district court ever even obtaining
> jurisdiction over a petitioner's § 2241 claims.

*Anariba*, 17 F.4th at 447; *see id.* at 448 (casting doubt upon the legitimacy of

"[t]he frequency and circumstances surrounding" the government's frequent

transfers of ICE detainees, including the government's apparent practice of

"often repeatedly mov[ing] ICE detainees to remote locations far from

counsel or their community without informing counsel of the transfer or

updating the ICE detainee locator" (quoting a declaration)).

Last, but surely not least, the government's argument is wholly

inconsistent with the fundamental purpose of habeas. As the Supreme Court

has instructed, habeas corpus "must not be subject to manipulation by those

whose power it is designed to restrain." *Boumediene v. Bush*, 553 U.S. 723,

765–66 (2008). And while *Padilla* was premised in part on concerns that

habeas petitioners might engage in forum-shopping, "it is equally true that

the government should also be dissuaded from forum shopping" under

*Padilla*, "particularly considering that ICE unilaterally directs where

immigrants are detained, there would be almost no check on the government's ability to forum shop." *Gallego v. Decker*, No. 19 Civ. 8263, 2020 WL 5370448, at *4 (S.D.N.Y. Sept. 8, 2020) (cleaned up), *vacated as moot* (Sept. 22, 2020); *see Doe v. Barr*, No. 20-cv-02263, 2020 WL 1984266, at *5 (N.D. Cal. Apr. 27, 2020) ("[I]t should not go without mention that by detaining immigration prisoners in remote jail facilities . . . it at least appears that Respondents may be attempting to take advantage of the immediate custodian rule to frustrate Petitioner's effective access to habeas corpus litigation.").

The government's argument here is radical. It maintains that the longstanding, protective rule of *Endo*, based in the equitable nature of habeas corpus, and a protective transfer statute explicitly aimed at achieving "justice," do not protect Mr. Khalil because the government never told Mr. Khalil's lawyers that he was being detained in New Jersey, after it had consistently told them that he was being detained in New York, until he was already on the way to being detained in Louisiana—even though his lawyers, who he was not permitted to contact despite multiple requests, filed a petition for his release in the middle of the night.

Under either law or equity, that does not hold up.[14] The purpose of habeas,
including its most rigorous rules, is not to err on the side of executive authority, but
to ensure the legitimacy of the judicial check upon it. *Cf. Boumediene*, 553 U.S. at
779. The government's renewed motion to transfer this case is nothing but an
invitation to the Court to abide "the Kafkaesque specter" of Mr. Khalil "wandering
endlessly from one jurisdiction to another in search of a proper forum, only to find
that it lies elsewhere." *Eisel v. Sec'y of the Army*, 477 F.2d 1251, 1257–58 (D.C.
Cir. 1973); *see* Op. at 33 (emphasizing the need to "avoid any unnecessary delay,"
Mr. Khalil's multiple pending motions, and waiving the ordinary seven-day
waiting period after transfer under local rules).

Enough is enough: Mr. Khalil's petition should stay with this Court.

---

[14] Notably, the Second Circuit has applied equitable estoppel in an immigration
case where the withholding of critical information caused a noncitizen grave harm.
*See Corniel-Rodriguez v. INS*, 532 F.2d 301, 306 (2d Cir. 1976) (the "failure to
provide the warning mandated by [a regulation] was fully as misleading as the
misinformation given to" an individual in a persuasive Seventh Circuit case, "and
certainly as unjust and as seriously prejudicial to her interests" (citing *Lee You Fee
v. Dulles*, 236 F.2d 885 (7th Cir. 1956), *rev'd on other grounds*, 355 U.S. 61
(1957) (per curium))); *see United States v. Asmar*, 827 F.2d 907, 911–13 (3d Cir.
1987) (discussing availability of equitable estoppel against the government where
it engages in "affirmative misconduct"); *see also Heckler v. Cmty. Health Servs. of
Crawford Cnty., Inc.*, 467 U.S. 51, 60–61 (1984) ("[W]e are hesitant, when it is
unnecessary to decide this case, to say that there are no cases in which the public
interest in ensuring that the Government can enforce the law free from estoppel
might be outweighed by the countervailing interest of citizens in some minimum
standard of decency, honor, and reliability in their dealings with their
Government.").

**C.** **Even if the law of the case and ordinary habeas principles did not venue the petition in this Court, the government's transfer of Mr. Khalil from New Jersey to Louisiana demands the application of an exception because the government frustrated the proper filing of his petition.**

The above more than justifies rejection of the government's renewed motion, and there is no need for the Court to address anything more. But if the Court disagrees, it should still keep the case in this District, relying on the exceptions to the immediate custodian rule described in *Padilla*. Habeas is the most "adaptable" remedy in American law. *Boumediene*, 553 U.S. at 779. And as the *Padilla* exceptions suggest, it simply cannot be that the government may detain a person, keep their counsel and family from knowing where they are being held, look on as that counsel timely files a habeas petition challenging the unlawful detention in the only place the detainee was known to be for more than 12 hours after his arrest, move the detainee 1000 miles away, and end up in the venue the government intended to manufacture all along.

Historically, the writ of habeas has been about principles, not rules. The Framers who codified habeas corpus in essentially the form in which it exists today modeled it on England's Habeas Corpus Act of 1679. *See id.* at 742. That Act, in turn, was specifically meant to counter practices that de facto threatened access to the writ, in ways that reverberate today through this case: "Prisoners were moved from gaol to gaol so that it was impossible to serve the proper gaoler with the writ

and some prisoners were removed overseas so giving rise to practical difficulties in terms of communication (between the detained person and those acting on his behalf), service (on the relevant gaoler), and enforcement of the writ (by production of the detained person) if the writ was issued." Br. for the Commonwealth Lawyers Ass'n as Amicus Curiae at *6, *Boumediene v. Bush*, Nos. 06-1195 & 06-1196, 2007 WL 2414902 (U.S. Aug. 24, 2007) (quoting the Act). And it is clear that the writ was never intended to depend on technicalities that could easily be abused by the executive to restrict relief. *See* Stephen I. Vladeck, *The New Habeas Revisionism*, 124 Harv. L. Rev. 941, 948 (2011); *see also Holiday v. Johnston*, 313 U.S. 342, 350 (1941).

Of course, rules still matter, and this Court must apply them. *See supra* Part I.A–B. But the Supreme Court in *Padilla* also accepted that, in rare but important cases, the default rule would not apply. In a widely recognized concurring opinion, Justice Kennedy, joined by Justice O'Connor, explained that the immediate custodian rule is "subject to exceptions." 542 U.S. at 452 (Kennedy, J., concurring). And he emphasized that the five-vote majority opinion—of which the two concurring Justices were a pivotal part—"acknowledged" the same thing. *Id.* (citing *id.* at 435–36, 437–42, 444–47 (majority op.)).[15] The exceptions allow

---

[15] Judge Furman was uncertain whether these exceptions were "the law of the land," Op. at 3, but where the vote of a Supreme Court Justice (let alone two of them) is "necessary to the formation of a majority," that Justice's concurrence is at

courts to fashion flexible outcomes in unique, outlier cases that are tailored to the particular situation. They do not open the door to a free-for-all, permitting the filing of a petition in "any one of the federal district courts," but only in "the one with the most immediate connection to the named custodian." *Id.* at 453 (Kennedy, J., concurring).

Justice Kennedy listed various examples of past exceptions the Supreme Court had made to the immediate custodian rule. *See id.* at 454 (citing, e.g., *Endo*, 323 U.S. 283). And, of particular relevance here, he explained that, as a matter of fairness and in the interests of justice, he would acknowledge exceptions "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." *Id.* "In cases of that sort," he continued:

> habeas jurisdiction would be in the district court from whose territory the petitioner had been removed. In this case, if the Government had removed Padilla from the Southern District of New York but refused to tell his lawyer where he had been taken, the District Court would have had jurisdiction over the petition. Or, if the Government did inform the lawyer where a prisoner was being taken but kept moving him so a filing could not catch up to the prisoner, again, in my view, habeas jurisdiction would lie in the district or districts from which he had been removed.

*Id.*

---

least "given particular weight." *Schmitz v Zilveti*, 20 F.3d 1043, 1045 (9th Cir. 1994).

In *Padilla*, the majority and concurrence took pains to ensure that future courts—courts just like this one—would exercise their habeas authority to address extraordinary circumstances, in extraordinary moments, and prevent the grave injustice they imagined, but did not see directly before them, from ever coming to pass.[16] It is true, as Judge Furman observed, that while courts have left open the possibility that the *Padilla* exceptions remained available in a shocking case,[17] that apparently no court to date has invoked them to "award relief" to a habeas

---

[16] The *Padilla* majority—again, of which both Justice Kennedy and Justice O'Connor formed a crucial part—twice emphasized that Justice Kennedy's proposed exception had not been met in the case before the Court. *See* 542 U.S. at 435–36 (majority op.) ("No exceptions to this rule, either recognized or proposed, apply here." (cleaned up)); *id.* at 441–42 ("There is no indication that there was any attempt to manipulate behind Padilla's transfer—he was taken to the same facility where other al Qaeda members were already being held, and the Government did not attempt to hide from Padilla's lawyer where it had taken him.").

[17] *See, e.g.*, *Vasquez v. Reno*, 233 F.3d 688, 696 (1st Cir. 2000) ("[W]e can envision that there may be extraordinary circumstances in which the Attorney General appropriately might be named as the respondent to an alien habeas petition. . . . An[] example of an extraordinary circumstance might be a case in which the INS spirited an alien from one site to another in an attempt to manipulate jurisdiction."); *Griffin v. Ebbert*, 751 F.3d 288, 290 (5th Cir. 2014) (warning against the potential that the government would "play[] forum games or ke[ep] moving" a detainee "so that his filing could not catch up"); *Sow v. Whitaker*, No. 18 Civ. 11394, 2019 WL 2023752, at *6 (S.D.N.Y. May 8, 2019) ("This Court agrees that *Padilla* should not be interpreted so as to condone or encourage misbehavior or deceptive conduct by the Government in transferring immigrant detainees.").

petitioner. Op. at 18. But of course, *some* court, *some* day, would have to become the first, if the circumstances demanded it.

In asking Judge Furman to keep his case, Petitioner made a similar argument, and despite acknowledging that it was "compelling," the court rejected it. Op. at 17.[18] But critically, Judge Furman was careful to spell out that his conclusion only applied to Mr. Khalil's "transfer from [the S.D.N.Y.] to the District of New Jersey," as that was "the only transfer relevant to the jurisdictional analysis" before him. Op. at 3; *see id.* at 18. Judge Furman concluded that the evidence "f[e]ll short" when it came to the first transfer. *Id.* at 18. To get there, he called on his "own experience that noncitizens arrested and detained by immigration authorities in New York City are routinely processed at 26 Federal Plaza and then transferred to New Jersey for detention" to call Mr. Khalil's transfer from New York to New Jersey "far from anomalous." *Id.* at 19. But even as he did, he acknowledged that Mr. Khalil's second transfer, from New Jersey to Louisiana, was something else entirely—particularly given the White House's apparent

---

[18] Judge Furman remarked that *Padilla* "could be described as even more extraordinary than this one." Op. at 2. In at least one way—the military detention of a U.S. citizen on U.S. soil—that is true. But in the way that is critical to the application of the exceptions, it is not. The *Padilla* petition was incorrectly filed in the S.D.N.Y. two days after the petitioner was transferred to South Carolina. 542 U.S. at 431–32. But here, even according to the government's account, Mr. Khalil's petition was incorrectly filed in the S.D.N.Y. a mere 80 minutes after he arrived in New Jersey. *See* Second Suppl. Joyce Decl. ¶ 16; Am. Pet. ¶ 54.

"direct[] involve[ment] in the plan to move him there, . . . and the fact that, in the space of less than twenty-four hours, the Government hauled Khalil through at least six different districts (one likely twice)." Op. at 24 n.6.

The government's given justifications for transferring Mr. Khalil, after a brief stay in New Jersey, to Louisiana—again, without ever telling his lawyers that he was in this District, or permitting him an opportunity to call them—are not credible.[19]

- Sometime between the night of March 8 and early hours of March 9, the government decided, apparently in coordination with the White House, that it intended to send Mr. Khalil to Louisiana. Am. Pet. ¶¶ 58–60. By setting that plan in place, but then moving Mr. Khalil to a location that was never disclosed to his lawyers or family until he was sent down South, the government ensured that it would be able to argue—as it did from the start of this case—that "jurisdiction never vested" in this District. Tr. at 9:8–9 (ECF 44).

- The government did not, in fact, ever inquire into whether ICE facilities had a single bed for Mr. Khalil in any of its many detention centers in the tri-state area. It says that "[t]he decision for the petitioner to be ultimately detained in Louisiana was made pursuant to neutral operational considerations," Transfer Reply Mem. at 5–6, including "an awareness of general paucity of bedspace" in detention facilities around the tri-state area "compared to the known availability of bedspace" in Louisiana, Second Suppl. Joyce Decl. ¶ 11. But had the government actually

---

[19] As Judge Furman pointed out, to whatever extent the government is generally relying on any presumption of regularity (and it does not raise the point in its brief supporting its renewed motion), all that presumption does—"to the extent it is not rebutted"—is "require[] a court to treat the Government's record as accurate; it does not compel a determination that the record establishes what it is offered to prove.'" Op. at 20–21 n.5 (quoting *Latif v. Obama*, 677 F.3d 1175, 1180-81 (D.C. Cir. 2011)).

inquired, rather than relying on a general "awareness," it would have learned that Orange County Jail in Goshen, New York, was accepting new detainees during the same time period that Respondent Joyce contends it could not accommodate Mr. Khalil. Kim Decl. ¶¶ 9–10 (ECF 73-2).[20]

- The government says that Mr. Khalil could not remain at EDC for long-term detention because the facility was "experienc[ing] a bedbug issue that prevented them from accepting detainees as full transfers"—full stop. Second Suppl. Joyce Decl. ¶ 11. But the facility processed at least four individuals for detention at Elizabeth between March 6 and March 13, 2025, Major Decl. ¶¶ 6 (ECF 73-3), and Mr. Khalil himself saw at least three men being processed for detention, to be kept at Elizabeth, during his time in that facility, Khalil Decl. ¶¶ 13–14.

- Upon arrival at EDC, Mr. Khalil requested to speak with his lawyer, and he was refused. Am. Pet. ¶ 62; Khalil Decl. ¶ 9. He asked once more the next morning, and he was again refused. Khalil Decl. ¶ 12.

- The government appears to have violated its own policy to avoid transfers of detainees where there is immediate family or an attorney of record in the area.[21]

The truth is that the *Padilla* exceptions speak directly to this case. There is

far more than "an indication" that "the Government was not forthcoming with

respect to the identity of the custodian and the place of detention," *Padilla*, 542

---

[20] Importantly, in part because Judge Furman narrowed the question before him to the propriety of Mr. Khalil's transfer from New York to New Jersey, and not his second transfer from New Jersey to Louisiana, Judge Furman's opinion did address the evidence submitted by Petitioner that is cited in this and the next paragraph. That evidence was submitted in connection with Petitioner's reply brief in support of his motion for a temporary restraining order. ECF 73.

[21] *See* John Morton, ICE Director, *Policy 11022.1: Detainee Transfers* (Jan. 4, 2012), https://www.ice.gov/doclib/detention-reform/pdf/hd-detainee-transfers.pdf.

U.S. at 454—it simply was not. This alone is sufficient for this Court to invoke that exception. And, separately, there is far more than "an indication" that the government sent Mr. Khalil to Louisiana before ever telling his lawyers that he even set foot in this District "to make it difficult . . . to know where the habeas petition should be filed." *Id.* There is no way to read *Padilla* and conclude that not only Justices Kennedy and O'Connor, but anyone in the majority, would have approved of the government's attempt here to "manipulate" and "hide" critical facts from Mr. Khalil's lawyers, *id.* at 441 (majority op.), then—over weeks of litigation that has delayed the prompt resolution of Mr. Khalil's urgent claims (and motions for return to the area and release)—argue that, as a result, the lawyers had missed their chance at a "proper" habeas filing. *See Anariba*, 17 F.4th at 448 ("When continuous transfer permeates the reality of ICE detention, it suggests that the Government has the machinery already in place to permit extensive forum shopping.").

This Court should therefore hold that it has venue over Mr. Khalil's detention claims based on the exceptions to *Padilla*'s default rule. If those exceptions do not apply to this case, it becomes difficult to imagine what kinds of scenarios the majority and concurrence were contemplating at all.[22]

---

[22] All of the above, and the existing factual record, make it crystal clear that Mr. Khalil's petition should remain before this Court. But if the Court is still not persuaded to deny the government's motion, it should allow Petitioner to conduct

## II.    Purely for the purpose of preserving the argument for future appellate review, Petitioner maintains that venue was proper in the Southern District of New York.

Petitioner has already argued the merits of his position that the Southern

District of New York was a proper venue for his petition. *See* Opp'n to Transfer

Mem. at 7–17 (arguing that the *Padilla* exceptions, the facts regarding Mr. Khalil's

"immediate custodian," and the inclusion of both core and non-core habeas claims

in his petition yielded venue in the S.D.N.Y.).[23] He lost that argument, accepts that

he did, and has no desire to waste the Court's time re-arguing a closed issue. *See*

*supra* Part I.A (explaining why Judge Furman's transfer order is the law of the

case). But in order to preserve any potential future appellate review of that

question, should it become necessary, Petitioner has also filed a cross-motion for

---

limited and expedited jurisdictional discovery before deciding that dismissal or transfer to Louisiana is appropriate. At the very least, the circumstances of this case raise serious questions about the government's conduct in handling Mr. Khalil's detention. And given the stakes, those questions would demand a fulsome examination before an irreversible resolution on the government's motion sends Mr. Khalil out of the District—possibly forever. Op. at 24 n.6 (explaining why "the case for jurisdictional discovery would be stronger" in the context of the New Jersey-to-Louisiana transfer than in the context of the New-York-to-New-Jersey one). Because the interest in swift proceedings is Mr. Khalil's, and not the government's, the government will not be prejudiced by a short delay for discovery, and the interests of justice will be served. *See, e.g.*, *Better Packages, Inc. v. Zheng*, No. CIV.A 05-4477-SRC, 2006 WL 1373055, at *4 (D.N.J. May 17, 2006) (applying a "reasonableness standard" to a request for expedited discovery, and citing cases); *see also* Opp'n to Transfer Mem. at 17–19.

[23] Petitioner incorporates those arguments, made in opposition to the government's first motion to transfer in this litigation, into this brief.

re-transfer to the S.D.N.Y. *See SongByrd, Inc. v. Est. of Grossman*, 206 F.3d 172, 177 (2d Cir. 2000) ("Most Circuits," including the Third, "have held that in order to preserve the opportunity for review of a transfer order in the transferee Circuit, a party must move for retransfer in the transferee district court."); *see Nascone v. Spudnuts, Inc.*, 735 F.2d 763, 765–66 (3d Cir. 1984).[24]

## CONCLUSION

Respectfully, the Court should deny the government's renewed motion to dismiss or transfer venue and proceed to deciding the important and urgent issues raised by Mr. Khalil's petition and pending motions before the Court.

Dated: March 24, 2025                    /s/*Baher Azmy*

AMERICAN CIVIL LIBERTIES UNION OF        CENTER FOR CONSTITUTIONAL RIGHTS
NEW JERSEY FOUNDATION                    Baher Azmy
Jeanne LoCicero                          Samah Sisay*
Farrin R. Anello                         Diala Shamas*
Molly K.C. Linhorst                      666 Broadway, 7th Floor
570 Broad Street, 11th Floor             New York, NY 10012
Newark, New Jersey 07102                 Tel: (212) 614-6464
973-854-1715
                                         CLEAR PROJECT
NEW YORK CIVIL LIBERTIES UNION           MAIN STREET LEGAL SERVICES, INC.
FOUNDATION                               Ramzi Kassem*
Amy Belsher*                             Naz Ahmad
Robert Hodgson*                          Shezza Abboushi Dallal*
Veronica Salama*                         CUNY School of Law
Molly Biklen*                            2 Court Square

---

[24] Petitioner waives reply on his cross-motion.

125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

Long Island City, NY 11101
Tel: (718) 340-4558

WASHINGTON SQUARE LEGAL
SERVICES, INC.
Alina Das*
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

*Pro hac vice application pending or
forthcoming

Counsel for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing filing was

served on counsel of record via this Court's CM/ECF system on March 24, 2025.


/s/ *Baher Azmy*
Baher Azmy
*Counsel for Petitioner*