## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL, Petitioner,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement;1 Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice. | Case No. 2:25-cv-1963-MEF |

## BRIEF OF INTERNATIONAL LAW PROFESSORS, EXPERTS, PRACTITIONERS, AND SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PETITIONER

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ 3

INTEREST OF AMICI CURIAE ............................................................................ 11

INTRODUCTION ...................................................................................................... 11

ARGUMENT .............................................................................................................. 14

I.    International law requires the United States to respect the human rights to freedom of opinion, expression, association, and assembly. ......................................... 14

II.   International law requires the U.S. government to show that any restrictions on rights satisfy principles of legality, legitimacy, necessity and proportionality, and nondiscrimination. ............................................................................................ 19

    A.   International law prohibits restrictions that are vague, overbroad and overly discretionary. ................................................................................................... 20

    B.   International law prohibits restrictions that do not have a legitimate purpose and are not necessary and proportionate. ....................................................... 21

    C.   International law prohibits discriminatory restrictions. .............................. 25

    D.   International law prohibits retaliation against individuals exercising their rights. ........ 26

III.  The exercise of fundamental rights by all noncitizens in the United States is at risk of being chilled. ................................................................................................ 28

CONCLUSION .......................................................................................................... 30

**APPENDIX I**          *List of Amici*

# TABLE OF AUTHORITIES

**Relevant Case Files**

Brief of Over 150 Immigration Lawyers, Law Professors, and Scholars as *Amici Curiae* in
Support of Petitioner 9-10, ECF No. 110-1 ............................................................... 17

Decl. of Acting Field Office Director, ECF No. 48 ...................................................... 19

Pet'r's Am. Mem. of Law in Supp. of Prelim. Inj. 15, ECF. No. 124 ................................ 15, 23

Resp't Mem. of Law in Opp'n, ECF No. 47 .............................................................. 19

**U.S. Cases**

*Chung v. Trump,* 1:25-cv-02412 (S.D.N.Y. 2025) ...................................................... 23

*Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764 (1993) ...................................................... 9

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804) ................................................. 9

*Murray v. The Schooner Charming Betsy,* 6 U.S. (2 Cranch) (1804) .................................. 11

*Roper v. Simmons*, 543 U.S. 551 (2005) .................................................................. 11

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ......................................................... 8, 11

*Talbot v. Seeman*, 5 U.S. (1 Cranch) (1801) ............................................................. 11

*Thompson v. Oklahoma,* 487 U.S. 815 (1988) ........................................................... 11

**U.S. Statutes**

Exec. Order 14188, *Additional Measures to Combat Anti-Semitism,* 90 Fed. Reg. 8847 (Jan. 29, 2025) ........................................................................................................ 20

Immigration and Nationality Act .......................................................................... 9, 17

**Other U.S. Government Documents**

Declarations and Reservations by United States of America made upon ratification, accession or
succession of the ICCPR, 138 Cong. Rec. at *S4783 ................................................... 8

S. Comm. on Foreign Rel., Rep. on the International Covenant on Civil and Political Rights, S. Exec. Rep. No. 23, 1 (102d Sess. 1992) .................................................................................. 9, 12

**International Cases**

*Adylova et al v. Kazakhstan*, U.N. Hum. Rts. Comm., U.N. Doc. CCPR/C/140/D/3044/2017-3045/2017 (Aug. 20, 2024) ................................................................................... 19

*Alekhina v. Russia,* App. No. 38004/12, Eur. Ct. H.R. (July 17, 2018) ......................................... 18

*Alekseev v. Russian Federation*, Hum. Rts. Comm., U.N. Doc. CCPR/C/109/D/1873/2009 (Dec. 2, 2013) ................................................................................................................................... 22

*Amelkovich v. Belarus,* Hum. Rts. Comm., U.N. Doc. CCPR/C/125/D/2720/2016) (May 29, 2019) .............................................................................................................................................. 22

*Djavit An v. Turkey*, App. No. 20652/92, Eur. Ct. H.R. (Feb. 20, 2003) ...................................... 14

*Ivcher Bronstein v. Peru*, Judgment (Merits, Reparations, and Costs), Inter-Am. Ct. H.R. (ser. C) No. 79 (Feb. 6, 2001) ................................................................................................ 13

*Khadzhiyev v. Turkmenistan*, U.N. Hum. Rts. Comm., U.N. Doc. CCPR/C/122/D/2252/2013 (May 24, 2018) ........................................................................................................................... 22

*Kivenmaa v. Finland*, U.N. Hum. Rts. Comm'n, U.N. Doc. CCPR/C/50/D/412/1990 (June 9, 1994) ............................................................................................................................................. 14

*Nikolaichik v. Belarus*, U.N. Hum. Rts. Comm., U.N. Doc. CCPR/C/139/D/3056-3134/2018 (Oct. 12, 2023) ..................................................................................................................... 18, 19

*Rabbae v. The Netherlands*, U.N. Hum. Rts. Comm., U.N. Doc. CCPR/C/117/D/2124/2011 (Nov. 18, 2016) ..................................................................................................................... 13, 19

*Shin v. Republic of Korea*, U.N. Hum. Rts Comm., Comm. No. 926/2000, (Mar. 16, 2004) ...... 20

**International Treaties**

American Convention on Human Rights, *adopted on* Nov. 22, 1969, 1144 U.N.T.S. 123.... 14, 20

International Convention on the Elimination of All Forms of Racial Discrimination, Dec. 21,

1995, 660 U.N.T.S. 195 ................................................................................................ 10, 21

International Covenant on Civil and Political Rights, Dec. 16, 1966, T.I.A.S. 92-908, 999

U.N.T.S. 3 ................................................................................................................... passim

Organization of American States, American Convention on Human Rights art. 7(5), Nov. 22,

1969, 1144 U.N.T.S.123 ...................................................................................................... 11

Organization of American States, <u>Multilateral Treaties</u>, Signatories and Ratifications,

https://www.oas.org/dil/treaties_B-32_American_Convention_on_Human_Rights_sign.htm 11

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ........................ 11

**UN Documents**

American Declaration of the Rights and Duties of Man, *adopted by* the 9th International

Conference of American States, 1948, U.N. Doc. E/CN.4/122 ................................................ 10

Comm. on Economic, Social and Cultural Rights, *General Comment No. 13 on the right to*

*education (article 13)* U.N. Doc. E/C.12/1999/10 (Dec. 8, 1999) ........................................... 13

Comm. on the Elimination of Racial Discrimination, *General Recommendation 30*:

Discrimination against non-citizens, U.N. Doc CERD/C/64/Msc.11/rev.3 (Feb. 23-Mar. 12,

2004)........................................................................................................................................ 21

David Kaye (Special Rapporteur on the Promotion and Protection of the Right to Freedom of

Opinion and Expression), *Report of the Special Rapporteur on the promotion and protection of*

*the right to freedom of opinion and expression*, U.N. Doc. A/75/261 (July 28, 2020) 13, 16, 17,

18

David Kaye (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Report of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression*, U.N. Doc. A/HRC/38/35 (Apr. 6, 2018)....... 19

Farida Shaheed (Special Rapporteur on the Right to Education), *Academic Freedom*, U.N. Doc. A/HRC/56/58 (June 27, 2024) ............................................................................................ 13

Farida Shaheed (Special Rapporteur on the Right to Education), *Statement by the Special Rapporteur on the right to education, Ms. Farida Shaheed on her visit to the United States of America* (May 10, 2024) ......................................................................................... 13

Frank La Rue (Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression), U.N. Doc. A/66/290 (Aug. 10, 2011) ......................................... 20, 21

G.A. Res. 217A, Universal Declaration of Human Rights (Dec. 10, 1948) ........................... 10, 21

G.A. Res. 66/164, Promotion of the Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms, U.N. Doc. A/66/164 (Dec. 19, 2011).......................................... 23

Gina Romero (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Protecting the Rights of Freedom of Assembly and Association from Stigmatization*, U.N. Doc. A/79/263 (July 31, 2024)....................................................... passim

Hum. Rts. Comm., *General Comment No. 15: The Position of Aliens Under the Covenant*, Twenty-Seven Session (1986), U.N. Doc HRI/GEN/1/Rev. 1 ................................................. 21

Hum. Rts. Comm., *General Comment No. 31*, U.N. Doc. CCPR/C/21/Rev.1/Add.13 (May 26, 2004)............................................................................................................................... 21

Hum. Rts. Comm., *General Comment No. 34: Article 19: Freedoms of Opinion and Expression*, U.N. Doc. CCPR/C/GC/34, (Sep. 12, 2011)..................................................................... passim

Hum. Rts. Comm., *General Comment No. 35: Article 9: Liberty and security of person*, U.N. Doc. CCPR/C/GC/35 (December 16, 2014) ............................................................. 22

Hum. Rts. Comm., *General Comment No. 37: Article 21: On the right to peaceful assembly*, U.N. Doc. CCPR/C/GC/37 (Sept. 17, 2020) ..................................................... passim

Irene Khan (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Report on global threats to freedom of expression arising from the conflict in Gaza*, U.N. Doc. A/79/319 (Aug. 23, 2024) ..................................................... passim

Letter to the United States from the U.N. Special Rapporteurs on Human Rights Defenders; Cultural Rights; Education; Food; Freedom of Expression; Freedom of Assembly and Association; Adequate Housing; Violence Against Women and Girls; and the Working Group on Discrimination Against Women and Girls, U.N. Doc. AL USA 12/2024 (May 10, 2024) . 14

Maina Kiai (Special Rapporteur on the Rights to Freedom of Peaceful Assembly and of Association), *Report of the Special Rapporteur on the rights to freedom of peaceful assembly and of association*, U.N. Doc. A/HRC/26/29 (Apr. 14, 2014) .................................................. 14

Margaret Sekaggya (Special Rapporteur on the situation of human rights defenders), *Commentary to the Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms* (July 2011) ....................................................................................... 15

Mary Lawlor (Special Rapporteur on the Situation of Human Rights Defenders), *"We are not just the future": challenges faced by child and youth human rights defenders,* U.N. Doc. A/HRC/55/50 (Jan. 17, 2024) .................................................................................................. 26

Press Release, Irene Khan, Special Rapporteur on the right to freedom of opinion and expression et al., U.S. must immediately release Palestinian rights-activist Mahmoud Khalil and stop

threats of deportation against foreign residents, say U.N. experts, U.N. Press Release (Mar. 20, 2025) .................................................................................................................... 8

Press Release, U.N. OHCHR, Deporting international students involved in pro-Palestinian protests will escalate trauma and polarisation on US campuses: U.N. experts, U.N. Press Release (Mar. 17, 2025) ......................................................................................... 25

Press Release, U.N. OHCHR, Deporting international students involved in pro-Palestinian protests will escalate trauma and polarisation on US campuses: UN experts, U.N. Press Release (Mar. 17, 2025) ......................................................................................... 22

Press Release, U.N. OHCHR, Speaking out on Gaza / Israel must be allowed: UN experts, U.N. Press Release (Nov. 23, 2023) ....................................................................... 25

Press Release, U.N. OHCHR, U.S. must immediately release Palestinian rights-activist Mahmoud Khalil and stop threats of deportation against foreign residents, say U.N. experts (Mar. 20, 2025) ....................................................................................................... 25

Press Release, U.N. OHCHR, USA: Free speech on campus needs to be protected, not attacked, say experts, U.N. Press Release (July 15, 2024) ...................................................... 25

*Statement by the Special Rapporteur on the right to education, Ms. Farida Shaheed on her visit to the United States of America*, 2 (May 10, 2024) ................................................. 26

U.N. Economic and Social Council, *The Siracusa Principles on the Limitation and Derogation Provisions in the International Covenant on Civil and Political Rights*, U.N. Doc. E/CN.4/1985/4 (Sep. 28, 1984) .................................................................................. 16

U.N. ESCOR, 160th mtg., U.N. Doc. E/CN.4/SR.160 (1950) .................................................... 12

U.N. GAOR, 3d Sess., 183d plen. mtg, U.N. Doc. A/PV.183 (Dec. 10, 1948) ........................... 11

U.N. High Comm'r for Hum. Rts., *Rep. on the expert workshops on the prohibition of incitement to national, racial or religious hatred*, U.N. Doc. A/HRC/22/17/Add.4 (Jan. 11, 2013).........21

U.N. Treaty Body Database, Ratification Status of United States of America, https://perma.cc/L88B-GHJT......................................................................................11

U.S. Mission to the U.N., Explanation of Position on the Commission on the Status of Women (CSW) Political Declaration (Mar. 10, 2025) ..........................................................12

**Books**

Amal Clooney & David Neuberger, Freedom of Speech in International Law 47 (2024).....18, 20

**Articles**

Louis Henkin, *Constitutional Rights and Human Rights*, 13 HARV. C.R.-C.L. L. REV. 593 (1978) ...............................................................................................................................9

**Other Authorities**

Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Mar. 10, 2025, 11:05 AM), https://perma.cc/BML5-GR84......................................................................................24

Inter-Am. Comm'n H.R., *Criminalization of the Work of Human Rights Defenders*, OEA/Ser.L/V/II., doc. 49/15 (Dec. 31, 2015) ..........................................................23

Inter-Am. Comm'n H.R., *Second Report on the Situation of Human Rights Defenders in the Americas*, OEA/Ser.L/V/II., Doc. 66 (Dec. 31, 2011) ............................................16

Jazzmin Jiwa, *'I could be next': international students at Columbia University feel 'targeted' after Mahmoud Khalil's arrest*, THE GUARDIAN (Mar. 19, 2025, 11:00 AM), https://perma.cc/MBF6-XPJ5......................................................................................24

Jocelyn Gecker, *After Columbia arrests, international college students fall silent*, ABC NEWS (Mar. 15, 2025, 1:09 AM), https://perma.cc/ZC2G-86JB.......................................24

Restatement (Third) of Foreign Rel. § 114 (Aм. L. Iɴsт. 1987) .............................................. 9, 11

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* are international law and human rights professors, experts, practitioners, and scholars.[2] *Amici* respectfully submit this brief to provide the Court with analysis of the international law issues at stake in this case. *Amici* have a strong interest in the outcome of this case and its impacts on human rights. *Amici* are profoundly concerned that Respondents' actions in this case threaten universal human rights protected by international law, including the rights to opinion, expression, association, and assembly on a nondiscriminatory basis. Some *Amici* themselves fear retaliation for exercising these rights, including in relation to signing onto this amicus. *Amici* know other similarly qualified individuals who wanted to join in this brief, but felt that they could not do so for fear of retaliation, including arrest or deportation.

## INTRODUCTION

*Amici* are deeply concerned that the arrest, detention, and threatened deportation of Mr. Mahmoud Khalil violates his fundamental human rights and puts the rights of many others at risk. At stake in this case are the human rights to opinion, expression, association, and assembly, and their protection on a nondiscriminatory basis. These rights are essential to free debate, personal development, education, and societal progress, and are necessary pillars of democracy. They are protected by international law—including through the International Covenant on Civil and Political Rights ("ICCPR"),[3] which the United States has ratified—as well as by the U.S. Constitution.

---

[1] No counsel for any party has authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than *amici* or their counsel contributed money intended to fund preparing or submitting this brief.

[2] A list of *amici* is set forth in Appendix I. The positions taken in this brief are those of *amici* alone and should not be attributed to any institution with which *amici* are or have been affiliated.

[3] International Covenant on Civil and Political Rights, Dec. 16, 1966, T.I.A.S. 92-908, 999 U.N.T.S. 3 [hereinafter ICCPR].

Because of the fundamental nature of these rights, international law permits only limited restrictions on their exercise, and those restrictions must respect principles of legality, legitimacy, proportionality and necessity, and nondiscrimination. Leading independent human rights experts—appointed by governments at the United Nations ("U.N.") and mandated to monitor human rights globally—have expressed alarm that "U.S. authorities are openly weaponising deportation as a tool to censor critical voices, seriously damaging the precious rights of free speech and assembly that the U.S. has long cherished and promoted at home and abroad." Press Release, Irene Khan, Special Rapporteur on the right to freedom of opinion and expression et al., U.S. must immediately release Palestinian rights-activist Mahmoud Khalil and stop threats of deportation against foreign residents, say U.N. experts, U.N. Press Release (Mar. 20, 2025). The case is likely to reverberate globally: restrictions on rights in this case could set a precedent for diminishing the enjoyment of human rights around the world and could also seriously impact the rights and safety of any U.S. citizen abroad who expresses views disfavored by a foreign government.

International law's recognition of the protections of the freedoms of expression, association, assembly, and opinion echoes the robust domestic protections provided under the First Amendment of the U.S. Constitution. In ratifying the ICCPR in 1992, the U.S. government committed to implementing civil and political rights protections consistent with the Covenant. As a matter of international law, the ICCPR is binding on the United States. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004) (stating "the Covenant does bind the United States as a matter of international law."). While articles 1 through 27 of the ICCPR are not self-executing under U.S. law, *see* Declarations and Reservations by United States of America made upon ratification, accession or succession of the ICCPR, 138 Cong. Rec. at *S4783, by ratifying the Covenant, the United States committed to "take the necessary steps . . . to adopt such laws or other measures as

may be necessary to give effect to the rights recognized [therein]." ICCPR art. 2(2). The ICCPR-guaranteed rights "are similar to those guaranteed by the U.S. Constitution and the Bill of Rights," S. Comm. on Foreign Rel., Rep. on the International Covenant on Civil and Political Rights, S. Exec. Rep. No. 23, 1 (102d Sess. 1992) [hereinafter: Senate Report on ICCPR Ratification]; *see also* Louis Henkin, *Constitutional Rights and Human Rights*, 13 HARV. C.R.-C.L. L. REV. 593, 609, 620 (1978)).

Respondents have restricted Mr. Khalil's rights by arresting him, detaining him, and threatening to deport him. They claim his presence in the United States has "potentially serious adverse foreign policy consequences for the United States" under the Immigration and Nationality Act ("INA"). 8 U.S.C. §1227(a)(4)(C)(i); INA §237(a)(4)(C)(i). Both the law being invoked by the government to justify deportation, and its specific application in this case, raise international law concerns. It has long been recognized that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 81 (1804); *see also Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764, 814-15 (1993); Restatement (Third) of Foreign Rel. § 114 (AM. L. INST. 1987) ("Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States.").

The law on which the government relies is vague and overbroad, and allows one government official unfettered discretion to decide to deport an individual, thus likely violating the international law principle that any restrictions on the rights of freedom of expression, assembly, and association must satisfy the principle of legality. Further, "foreign policy" is not a permitted ground under international law to restrict these basic rights, and the rights cannot be restricted in a discriminatory manner, including against noncitizens. The government has not

13

shown a legitimate purpose for restricting the rights, but even if it did have such a purpose, it has not shown that its extreme actions of arrest, detention, and attempted deportation are necessary and proportionate to a legitimate aim. The lack of a legitimate basis for restricting Mr. Khalil's rights raises concern that the government is using administrative processes to retaliate against him for his speech. Any such retaliation would be prohibited by international law.

The government's treatment of Mr. Khalil, and its threats to arrest and deport others, has chilled the exercise of basic rights across the United States. Noncitizens fear that if Mr. Khalil can be arrested and detained for political speech disfavored by the government, then they could similarly be punished for voicing their opinions and engaging in debate on social or political issues. Allowing the government to detain and deport noncitizens based on their expression, opinions, and participation in assemblies, and pursuant to a vague and overbroad law, would have devastating effects on the human rights of noncitizens in the United States and would chill the exercise of fundamental rights across the country. *Amici* thus respectfully urge this court to rule in favor of Petitioners' Motion for a Preliminary Injunction.

## ARGUMENT

## I.  International law requires the United States to respect the human rights to freedom of opinion, expression, association, and assembly.

International human rights law protects the rights to opinion, freedom of expression, association, and assembly.[4] The United States ratified the ICCPR in 1992, and that instrument is

---

[4] *See, e.g.*, ICCPR arts. 19, 21, 22; G.A. Res. 217A, Universal Declaration of Human Rights arts. 19-20 (Dec. 10, 1948), [hereinafter UDHR]; American Declaration of the Rights and Duties of Man arts. IV, XXI, XXII, *adopted by* the 9th International Conference of American States, 1948, U.N. Doc. E/CN.4/122; *see also* International Convention on the Elimination of All Forms of Racial Discrimination art. 5(d)(viii), (ix), Dec. 21, 1995, 660 U.N.T.S. 195, [*hereinafter* ICERD] (state parties undertake to eliminate discrimination with regard to these rights).

binding on the United States.[5] The Universal Declaration on Human Rights ("UDHR"), which the United States helped to draft and voted for in 1948,[6] and the American Convention on Human Rights ("ACHR"), which the United States signed in 1977,[7] also enshrine these rights. While the United States has signed but not ratified the ACHR, under international law it cannot defeat the object and purpose of the Convention. *See* Vienna Convention on the Law of Treaties art. 18, May 23, 1969, 1155 U.N.T.S. 331. While the ICCPR is not self-executing in the United States, the U.S. Supreme Court has cited to the ICCPR in interpreting constitutional protections. *See Thompson v. Oklahoma,* 487 U.S. 815, 831 n.34 (1988); *Roper v. Simmons*, 543 U.S. 551, 575-578 (2005). In *Murray v. The Schooner Charming Betsy*, the Supreme Court established: "[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 81 (1804); *accord Talbot v. Seeman*, 5 U.S. (1 Cranch) (1801); *see also* Restatement (Third) of Foreign Rel. § 114 (AM. L. INST. 1987) ("Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States").

The rights to freedom of opinion, expression, association, and assembly are critical to the exercise of democracy and to the realization of all other rights. *See* UDHR Preamble; Gina Romero (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Protecting the Rights of Freedom of Assembly and Association from Stigmatization*,

---

[5] *See* U.N. Treaty Body Database, Ratification Status of United States of America, https://perma.cc/L88B-GHJT; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004) (ICCPR "does bind the United States as a matter of international law…").

[6] *See* U.N. GAOR, 3d Sess., 183d plen. mtg. at 933–34, U.N. Doc. A/PV.183 (Dec. 10, 1948) (recorded vote: 48-0-8).

[7] Organization of American States, American Convention on Human Rights art. 7(5), Nov. 22, 1969, 1144 U.N.T.S.123; Organization of American States, Multilateral Treaties, Signatories and Ratifications, https://www.oas.org/dil/treaties_B-32_American_Convention_on_Human_Rights_sign.htm.

U.N. Doc. A/79/263 (July 31, 2024) [*hereinafter* Romero Report]. They are "cornerstones of a democratic society." Senate Report on ICCPR Ratification at 3. As the U.S. Mission to the United Nations recently articulated, "[g]overnment censorship of speech is intolerable to a free society." U.S. Mission to the U.N., Explanation of Position on the Commission on the Status of Women (CSW) Political Declaration (Mar. 10, 2025). Indeed, the rights to opinion and expression "constitute the foundation stone for every free and democratic society." Hum. Rts. Comm., *General Comment No. 34: Article 19: Freedoms of Opinion and Expression*, para. 2, U.N. Doc. CCPR/C/GC/34, (Sep. 12, 2011).

**The right to opinion** protects the holding of "opinions without interference." ICCPR art. 19(1). The U.N. Human Rights Committee, tasked with interpreting the ICCPR and state compliance with the treaty, has observed that the ICCPR permits "no exception or restriction" on this right, and other rights under the ICCPR cannot be violated because of a person's "actual, perceived, or supposed opinions." *General Comment No. 34*, paras. 5, 9. Importantly, "[a]ll forms of opinion are protected," whether they be of a "political, scientific, historic, moral or religious nature." *Id*. para. 9. It is a violation of the ICCPR for a state party to "criminalize the holding of an opinion," or to engage in acts of "harassment, intimidation, or stigmatization of a person, including arrest, detention, trial or imprisonment for reasons of the opinions they may hold." *Id.*

The **right to expression** includes the right "to seek, receive and impart information and ideas of all kinds." ICCPR art. 19(2); *see also General Comment No. 34*, para. 11. During the drafting of the ICCPR, the United States stated that it was "devoted" to freedom of speech, and that the freedom of information "must not be compromised," noting that it "was one of the first freedoms to be stamped out when undemocratic regimes seized power." U.N. ESCOR, 160th mtg., para. 33, U.N. Doc. E/CN.4/SR.160 (1950). The right includes expression related to "political

discourse," "public affairs," "discussion of human rights," and "teaching." *General Comment No. 34*, para. 11. Protected speech includes that which may be "deeply offensive" to some, *General Comment No. 34*, para. 11; *Rabbae v. The Netherlands,* U.N. Hum. Rts. Comm., para. 10.4, U.N. Doc. CCPR/C/117/D/2124/2011 (Nov. 18, 2016), or disfavored or "unwelcome or shock the State." *Ivcher Bronstein v. Peru*, Judgment (Merits, Reparations, and Costs), Inter-Am. Ct. H.R. (ser. C) No. 79, para. 152 (Feb. 6, 2001). International law provides that "[e]xpressing support for, or opposition to, a specific government, is fully guaranteed by the rights to freedom of expression, association, and peaceful assembly. . . ." Farida Shaheed (Special Rapporteur on the Right to Education), *Statement by the Special Rapporteur on the right to education, Ms. Farida Shaheed on her visit to the United States of America* (May 10, 2024). Freedom of expression also protects speech in support of Palestine. *See* Irene Khan (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Report on global threats to freedom of expression arising from the conflict in Gaza*, para. 88, U.N. Doc. A/79/319 (Aug. 23, 2024) [*hereinafter* Khan Report]. In addition, the right to expression underpins academic freedom, which the state is required to respect and protect. *See* Farida Shaheed (Special Rapporteur on the Right to Education), *Academic Freedom*, para. 21, U.N. Doc. A/HRC/56/58 (June 27, 2024); David Kaye (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression), *Report of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression*, para. 8, U.N. Doc. A/75/261 (July 28, 2020) [*hereinafter* Kaye Report]; Comm. on Economic, Social and Cultural Rights, *General Comment No. 13 on the right to education (article 13)*, para. 39, U.N. Doc. E/C.12/1999/10 (Dec. 8, 1999). At universities, "the right to express views on a campus inside or outside of class is at the heart of academic freedom." Letter to the United States from the U.N. Special Rapporteurs on Human

Rights Defenders; Cultural Rights; Education; Food; Freedom of Expression; Freedom of Assembly and Association; Adequate Housing; Violence Against Women and Girls; and the Working Group on Discrimination Against Women and Girls, at 4, U.N. Doc. AL USA 12/2024 (May 10, 2024).The **right to association** enables people to join together "freely for ideological, religious, political, economic, labor, social, cultural . . . or other purposes," to advance shared views. American Convention on Human Rights art. 16(1), *adopted on* Nov. 22, 1969, 1144 U.N.T.S. 123 (*entered into force* July 18, 1978). *See also* ICCPR art. 22. This right is considered "a key component in the empowerment of marginalized communities and individuals." Maina Kiai (Special Rapporteur on the Rights to Freedom of Peaceful Assembly and of Association), *Report of the Special Rapporteur on the rights to freedom of peaceful assembly and of association*, para. 15, U.N. Doc. A/HRC/26/29 (Apr. 14, 2014).

The **right to assembly** protects peaceful activities in many forms, such as private or public meetings, demonstrations, processions, rallies, and sits-ins. *See* Hum. Rts. Comm., *General Comment No. 37: Article 21: On the right to peaceful assembly*, para. 6, U.N. Doc. CCPR/C/GC/37 (Sept. 17, 2020); *Kivenmaa v. Finland*, U.N. Hum. Rts. Comm'n, para. 9.3, U.N. Doc. CCPR/C/50/D/412/1990 (June 9, 1994); *Djavit An v. Turkey*, App. No. 20652/92, Eur. Ct. H.R. para. 56 (Feb. 20, 2003). The right "enables individuals to express themselves collectively and to participate in shaping their societies." *General Comment No. 37* . It is fundamental to "a system of participatory governance based on democracy, human rights, the rule of law and pluralism." *General Comment No. 37*, para. 1. Public demonstrations are "critical to the consolidation of democratic life in societies" as well as "engines" of political change and advancement in human rights. Margaret Sekaggya (Special Rapporteur on the situation of human rights defenders), *Commentary to the Declaration on the Right and Responsibility of Individuals, Groups and*

*Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms*, 71-72 (July 2011). As "political speech enjoys particular protection . . . assemblies with a political message should enjoy a heightened level of accommodation and protection." *General Comment No. 37*, para. 32. States must not restrict peaceful assemblies "without compelling justification" and must not "sanction participants or organizers without legitimate cause." *General Comment No. 37*, para. 23.

"Peaceful protest" as a form of assembly can (1) advocate for "contentious ideas or goals;" (2) cause "disruption, for example of a vehicular or pedestrian movement or economic activity;'' and (3) include "[c]ollective civil disobedience or direct action campaigns." *General Comment No. 37*, para. 7, 16. The "isolated acts of violence by some participants should not be attributed to others, to the organizers or to the assembly as such." *General Comment No. 37*, para. 19.

II.    **International law requires the U.S. government to show that any restrictions on rights satisfy principles of legality, legitimacy, necessity and proportionality, and nondiscrimination.**

According to the Petitioner's brief, Mr. Khalil is a recent graduate of Columbia University who is "an outspoken defender of Palestinian human rights," and "committed to peaceful protest." Pet'r's Am. Mem. of Law in Supp. of Prelim. Inj. 15, ECF. No. 124. Such activism is at the core of international law protections for the rights to opinion, expression, association, and assembly outlined above.

Under international law, *holding* an opinion—no matter how contentious—cannot be restricted in any way. *General Comment No. 34*, para. 9 (noting "[t]his is a right to which the Covenant permits no exception or restriction."). International law allows only limited restrictions on expression, association, and assembly, and for any restriction, a government must satisfy an

established three part test of 1) legality, 2) legitimacy, and 3) necessity and proportionality. Further, restrictions cannot be discriminatory. *Amici* are deeply concerned that this test has not been satisfied, and that Mr. Khalil's detention and threatened deportation violates his fundamental human rights.

**A. International law prohibits restrictions that are vague, overbroad and overly discretionary.**

The principle of **legality** requires that restrictions on expression, association, and assembly are "provided by law," and must be "drafted with sufficient precision to enable an individual to regulate his or his conduct accordingly." *General Comment No. 34*, paras. 24-25; *General Comment No. 37*, paras. 36, 39; Kaye Report, para. 24. Governments are prohibited from "imposing vague or arbitrary limitations," and must ensure "adequate safeguards and effective remedies against abuse." U.N. Economic and Social Council, *The Siracusa Principles on the Limitation and Derogation Provisions in the International Covenant on Civil and Political Rights*, para. 31, U.N. Doc. E/CN.4/1985/4 (Sep. 28, 1984). "A restriction may not be unduly vague or overbroad such that it could confer unfettered discretion on officials." Kaye Report, para. 24; *see also General Comment No. 37*, para. 39; *General Comment No. 34*, para. 25. Concerns about vagueness are particularly acute for those who advocate for human rights, as it increases the risk that the law could be used in retaliation for their work. *See* Inter-Am. Comm'n H.R., *Second Report on the Situation of Human Rights Defenders in the Americas*, para. 92-93, OEA/Ser.L/V/II., Doc. 66 (Dec. 31, 2011); Khan Report, para. 70 (vague laws "leave a lot of room for misuse, which often leads to the silencing of legitimate human rights advocacy.").

Based on the available evidence, Mr. Khalil's detention and threatened deportation appear to run afoul of the legality principle. Respondents rely on a vague and overbroad law that provides

"unfettered discretion" to one official to restrict otherwise legally protected speech. Respondents have not charged Mr. Khalil with any crime. Instead, they claim the legal authority to deport Mr. Khalil on "foreign policy" grounds: Section 237(a)(4)(C)(iii) of the INA, upon which Respondents rely, incorporates by reference 8 U.S.C. §1182 (a)(3)(C)(iii)(2025) and INA §212 (a)(3)(C)(iii), which provide that while normally a noncitizen may *not* be removed because of their lawful "beliefs, statements, or associations," they *can* be removed if the Secretary of State "personally determines" that their presence "would compromise a compelling United States foreign policy interest." The law does not clarify which activities are restricted, and confers "unfettered discretion" on the Secretary of State to make the decision, making it difficult for an individual to "regulate his or her conduct accordingly." *General Comment No. 34*, paras. 24-25; Kaye Report, para. 24. "Foreign policy" is an exceedingly broad and vague ground that can cover a wide-range of issues, from economic and trade policy, to the environment, women's rights, humanitarian aid, and public health, among others. Government foreign policies frequently shift, and are not necessarily made public. The Respondents have yet to explain what foreign policy interest is at stake in this case. Moreover, as immigration lawyers, law professors, and scholars have raised in their amicus brief, "the only federal district court to have considered the constitutionality of this ground held that it violates due process because it is unconstitutionally vague and deprives noncitizens of a meaningful opportunity to be heard." Brief of Over 150 Immigration Lawyers, Law Professors, and Scholars as *Amici Curiae* in Support of Petitioner 9-10, ECF No. 110-1.

**B. International law prohibits restrictions that do not have a legitimate purpose and are not necessary and proportionate.**

The government must also show that restrictions on expression, association, and assembly are grounded in a **legitimate purpose** as well as **necessary** and **proportionate** to that purpose.

21

For a restriction to be **legitimate**, it must have a valid purpose. Freedom of opinion cannot be restricted, ICCPR art. 19, while the rights to expression, association, and assembly may only be limited to protect "the rights or reputations of others," "national security," "public order," or "public health or morals." ICCPR arts. 19(3), 21-22.[8] This list of legitimate aims is "exhaustive, and cannot be used pretextually to curtail speech." Amal Clooney & David Neuberger, Freedom of Speech in International Law 47 (2024). Governments have the burden of showing "that the restriction actually protects, or is likely to protect, the legitimate State interest at issue," Kaye Report, para. 24, and must demonstrate in an "individualized fashion" the direct and immediate connection between the threat and expression. *General Comment No. 34*, para. 35. Restrictions must not "impair the essence of the right, or be aimed at . . . causing a chilling effect." *Nikolaichik v. Belarus*, U.N. Hum. Rts. Comm., para. 7.4, U.N. Doc. CCPR/C/139/D/3056-3134/2018 (Oct. 12, 2023). The value placed on political discourse is particularly high, and restrictions on such discourse "require very strong reasons . . . for broad restrictions imposed in individual cases would undoubtedly affect respect for the freedom of expression in general in the State concerned." *Alekhina v. Russia,* App. No. 38004/12, Eur. Ct. H.R. para. 212 (July 17, 2018); *see also General Comment No. 34*, para. 35; Clooney & Neuberger, *supra*, at 50 ("Across the board, [international

---

[8] Upon its ratification of the ICCPR, the United States issued a declaration that sought "to *increase* the scope of protection of the right to free expression." Amal Clooney & David Neuberger, Freedom of Speech in International Law 29 (2024). The United States declared: "[I]t is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant." 138 Cong. Rec. S4781-01 (daily ed. Apr. 2, 1992) (U.S. reservations, declarations, and understandings to the International Covenant on Civil and Political Rights).The United States then specifically referenced Article 19 of the ICCPR (freedom of expression) and its permissible restrictions. *Id.*

human rights bodies] recognize that when speech addresses a matter of public interest, this should be a factor favouring a higher degree of protection.").

**Proportionality** and **necessity** are "strict tests." *Rabbae v. The Netherlands,* para. 10.4, U.N. Doc. CCPR/C/117/D/2124/2011. They require states to "demonstrate that the restriction imposes the least burden on the exercise of the right and actually protects, or is likely to protect, the legitimate state interest at issue. States may not merely assert necessity, but must demonstrate it." David Kaye (Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression) *Report of the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression*, U.N. Doc. A/HRC/38/35, para. 7 (Apr. 6, 2018); *see also Adylova et al v. Kazakhstan*, U.N. Hum. Rts. Comm., para. 8.4, U.N. Doc. CCPR/C/140/D/3044/2017-3045/2017 (Aug. 20, 2024) (violation where state did not demonstrate that considerable fine and 10-15 days detention were necessary and proportionate); *Nikolaichik*, U.N. Doc. CCPR/C/139/D/3056-3134/2018, para. 7.9 (violation where state did not show that "heavy administrative fines or administrative detention for participating in peaceful, albeit unauthorized, meetings" were "least intrusive in nature or proportionate to the interest that it sought to protect, particularly in the light of the chilling effect of such measures.").

In this case, Respondents have thus far not shown that Mr. Khalil's detention and threatened deportation serve a legitimate purpose. As noted above, the only interest stated by the government in filings to date in the present case is a vague "foreign policy" interest, Resp't Mem. of Law in Opp'n, ECF No. 47; Decl. of Acting Field Office Director, ECF No. 48; Brief in Opposition to Petitioner's Motion for Release, ECF No. 99, which is not one of the enumerated grounds for limiting the rights in question. ICCPR arts. 19, 21; *General Comment No. 34*, para. 22. If the government did show a legitimate purpose, its restrictions would still need to be

necessary and proportionate to achieve that purpose. *Amici* note that the Government framed the Executive Order where it made public its intent to target student protestors using the immigration system with the aim of "combat[ting] antisemitism." Exec. Order 14188, *Additional Measures to Combat Anti-Semitism,* 90 Fed. Reg. 8847 (Jan. 29, 2025). International law requires states to "protect individuals from violence and discrimination," Clooney & Neuberger, *supra,* at 153. *See also* Frank La Rue (Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression), U.N. Doc. A/66/290, paras. 26-31 (Aug. 10, 2011) [*hereinafter* La Rue Report]; ACHR art. 13(5), including antisemitic violence and discrimination, wherever they occur. However, Respondents have not raised that purpose in their filings to date in this case. Moreover, a government invoking any legitimate ground must "demonstrate in specific and individualized fashion the precise nature of the threat, and the necessity and proportionality of the specific action taken, in particular by establishing a direct and immediate connection between the expression and the threat." *General Comment No. 34*, para. 35; *see also Shin v. Republic of Korea*, U.N. Hum. Rts Comm., para. 7.3, Comm. No. 926/2000, (Mar. 16, 2004). There is a documented pattern of stigmatization of those who advocate for Palestinian human rights. *See* Romero Report, para. 57 ("High-level government officials, public figures and the media have used demonizing and vilifying rhetoric against global pro-Palestinian solidarity protests. This stigmatization has been framed as a fight against anti-Semitism and hate speech."). It is a mistake to "confuse and conflate criticism of the policies of Israel, which is a legitimate exercise of freedom of expression, with antisemitism." Khan Report, para. 75. Any restrictions on speech or assembly designed to combat hate speech must be consistent with other applicable international law, "proportionate, non-discriminatory in nature," and must "not be based on ambiguous or overbroadly defined offences." Clooney & Neuberger, *supra,* at 173, 175; *General Comment No. 37*, para. 67. *See also General*

24

*Comment No. 34*, paras. 50-52 (The acts that are addressed in article 20 are all subject to restriction

pursuant to article 19, paragraph 3); U.N. High Comm'r for Hum. Rts., *Rep. on the expert*

*workshops on the prohibition of incitement to national, racial or religious hatred*, para. 18, U.N.

Doc. A/HRC/22/17/Add.4 (Jan. 11, 2013) [*hereinafter* Rabat Plan of Action]; La Rue Report, para.

28-30. Limitations on speech "must remain an exception," and there is a "high threshold." Rabat

Plan of Action, para. 18. Speech must not be restricted in a "wide or untargeted way." *Id.*

### C. International law prohibits discriminatory restrictions.

The rights to freedom of expression, opinion, assembly, and association must be guaranteed

without discrimination. *See* ICCPR art. 2(1); *General Comment No. 34*, para. 26; ICERD art.

5(d)(viii), (ix); UDHR art. 2; Comm. on the Elimination of Racial Discrimination, *General*

*Recommendation 30*: Discrimination against non-citizens, para. 3, U.N. Doc

CERD/C/64/Msc.11/rev.3 (Feb. 23-Mar. 12, 2004). In restricting these rights, governments may

not discriminate between citizens and noncitizens, or on the basis of nationality or national or

ethnic origin. *See* ICCPR art. 2(1); UDHR art. 2; ICERD art. 5(d); Hum. Rts. Comm., *General*

*Comment No. 15: The Position of Aliens Under the Covenant*, Twenty-Seven Session (1986), para.

7, U.N. Doc HRI/GEN/1/Rev. 1 (noncitizens "have the right to freedom of thought, conscience . .

. [and] to hold opinions and express them [as well as] receive the benefit of the right of peace

assembly and of freedom association. . . . There shall be no discrimination between aliens and

citizens in the application of these rights."); Hum. Rts. Comm., *General Comment No. 31*, para.

10, U.N. Doc. CCPR/C/21/Rev.1/Add.13 (May 26, 2004) ("a State party must respect and ensure

the rights laid down in the Covenant to anyone within the power or effective control of that State

Party"); *General Comment No. 37*, para. 5. The use of Section 237(a)(4)(C)(iii)—an immigration-

related provision—restricts speech for noncitizens that is protected for citizens. Moreover, no

distinction can be made "on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs." UDHR art. 2. Viewpoint discrimination is also prohibited, and any restrictions on the rights must be content-neutral. *General Comment No. 37,* para. 22; *see also Alekseev v. Russian Federation*, Hum. Rts. Comm., para. 9.6, U.N. Doc. CCPR/C/109/D/1873/2009 (Dec. 2, 2013) (Russian government's rejection of individual's right to organize a protest based on its subject is "one of the most serious interferences with the freedom of peaceful assembly"); *Amelkovich v. Belarus,* Hum. Rts. Comm., U.N. Doc. CCPR/C/125/D/2720/2016) (May 29, 2019) (rejecting controversial ideas as valid basis for restricting freedom of expression and assembly). Restrictions targeting expression in support of Palestinian human rights are thus impermissible. *See* Romero Report, para. 58; *see generally* Khan Report. In March 2025, the top international law experts with U.N. mandates to monitor and assess human rights stated that the "arbitrary detention of U.S. lawful permanent residents, and removal of international students who have participated in university protests in solidarity with Palestine" is "disproportionate, unnecessary, and discriminatory." Press Release, U.N. OHCHR, Deporting international students involved in pro-Palestinian protests will escalate trauma and polarisation on US campuses: UN experts, U.N. Press Release (Mar. 17, 2025).

### D.  International law prohibits retaliation against individuals exercising their rights.

Under international law, states are prohibited from using criminal, judicial, and administrative processes to retaliate against individuals exercising their protected rights. States may not use "an arrest or detention as punishment for the legitimate exercise of the rights as guaranteed by the [ICCPR] . . . including freedom of opinion and expression." Hum. Rts. Comm., *General Comment No. 35: Article 9: Liberty and security of person*, para. 23, U.N. Doc. CCPR/C/GC/35 (December 16, 2014); *Khadzhiyev v. Turkmenistan*, U.N. Hum. Rts. Comm. para.

7.7, U.N. Doc. CCPR/C/122/D/2252/2013 (May 24, 2018). International law also prohibits states from imposing "reprisals" on individuals "as a result of their presence at or affiliation with a peaceful assembly." *General Comment* No. 37, para. 33. A State's punitive power is misused when it is targeted to hinder legitimate activities in defense of human rights. Inter-Am. Comm'n H.R., *Criminalization of the Work of Human Rights Defenders*, 3, 7-8, 41-43, OEA/Ser.L/V/II., doc. 49/15 (Dec. 31, 2015). States must ensure that human rights defenders are not subject to abuse of criminal and civil proceedings for their role in peaceful assemblies. *See* G.A. Res. 66/164, Promotion of the Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms, para. 6, U.N. Doc. A/66/164 (Dec. 19, 2011). This is also true with respect to advocacy for Palestinian human rights; the U.N. Special Rapporteur for freedom of opinion and expression has observed that international law "creates an imperative for all States to change their laws, policies and practices restricting or prohibiting [such] advocacy." Khan Report, para. 84.

Taken together, the available facts suggest that Mr. Khalil's detention and threatened deportation are likely due to his political speech, activism, and participation in protests related to Palestine. Government representatives have consistently made statements indicating that they disagree with the purpose and content of the protests. Pet'r's Am. Mem. of Law in Supp. of Prelim. Inj. 16-17, 19, ECF No. 124. On March 13, 2025, when asked to justify the government's actions, Troy Edgar, the Deputy Secretary of the Department of Homeland Security, did not dispute that Mr. Khalil had not broken any laws and instead asserted that Mr. Khalil was "put[ting] himself in the middle of the process of basically pro-Palestinian activity." *Id.* at 19. The treatment of Mr. Khalil appears to be part of an escalating government response to protests for Palestinian human rights. *Id.* at 20-21; *see e.g., Chung v. Trump,* 1:25-cv-02412 (S.D.N.Y. 2025). U.N. experts have

documented a pattern of stigmatization and criminalization against student protestors advocating for Palestinian human rights. *See* Khan Report, para. 36 (noting over 45 state and federal measures had been proposed "aimed at restricting street protests in support of Palestine, punishing student protestors and stigmatizing their Palestinian advocacy as 'terrorism'"); Romero Report, para. 57 ("In various universities in the United States of America, such as Columbia University, authorities and law enforcement have responded disproportionately, with vilification, criminalization, sanctions, arrests, detentions, and the use of excessive force."). If Respondents have detained and sought to deport Mr. Khalil in retaliation for his exercise of his basic rights, such retaliation would be illegal under international law.

Further, if Mr. Khalil's arrest and detention have no legal basis, they are also violations of the right to liberty and security of the person, ICCPR, art. 9, and further implicate other fundamental human rights, including the right not be subjected to unlawful interference with privacy, family, or home, or unlawful attacks on reputation. ICCPR, arts. 17, 23.

III.    **The exercise of fundamental rights by all noncitizens in the United States is at risk of being chilled.**

The impacts of the government's restrictions on human rights reverberate far beyond the case of Mr. Khalil. Indeed, President Trump has warned that "[t]his is the first arrest of many to come." Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Mar. 10, 2025, 11:05 AM), https://perma.cc/BML5-GR84. Noncitizens across the United States are now uncertain about which activities may result in punishment, and they fear that they could similarly face arrest, detention, and deportation for exercising their human rights to opinion, expression, association, and assembly. *See, e.g.*, Jazzmin Jiwa, *'I could be next': international students at Columbia University feel 'targeted' after Mahmoud Khalil's arrest*, THE GUARDIAN (Mar. 19, 2025, 11:00

AM), https://perma.cc/MBF6-XPJ5; Jocelyn Gecker, *After Columbia arrests, international college students fall silent*, ABC NEWS (Mar. 15, 2025, 1:09 AM), https://perma.cc/ZC2G-86JB. As noted in the statement on interest of *amici* above, such retaliation fears impact even the filing of this brief, as it has chilled the participation of some highly qualified *amici*.

On March 17, 2025, a group of world's top human rights experts–appointed by governments at the U.N. to monitor human rights globally–raised alarm that the government's actions in this case "create a chilling effect on the rights to freedom of expression, assembly and of association." Press Release, U.N. OHCHR, Deporting international students involved in pro-Palestinian protests will escalate trauma and polarisation on US campuses: U.N. experts, U.N. Press Release (Mar. 17, 2025). In a further statement on March 20, 2025, more U.N. experts expressed alarm that the targeting of foreign nationals in the United States with threats to revoke student visas or residency rights is "highly dangerous as it seeks to exert a chilling effect on free expression among immigrants going far beyond the Palestinian issue." Press Release, U.N. OHCHR, U.S. must immediately release Palestinian rights-activist Mahmoud Khalil and stop threats of deportation against foreign residents, say U.N. experts (Mar. 20, 2025).  They called on the United States to "immediately end retaliation against students supporting Palestinians' rights." *Id.*

Even prior to the government's arrest of Mr. Khalil, U.N. experts have repeatedly expressed alarm that sanctions against student protesters, including deportation or threats of deportation from the United States, have "a chilling effect on the diversity of views, affecting academic freedom on campus, in and outside classrooms." Press Release, U.N. OHCHR, USA: Free speech on campus needs to be protected, not attacked, say experts, U.N. Press Release (July 15, 2024); *see also* Press Release, U.N. OHCHR, Speaking out on Gaza / Israel must be allowed:

UN experts, U.N. Press Release (Nov. 23, 2023). Experts have emphasized how sanctions such as deportation create a climate of fear and intimidation which discourages others from freely expressing their views or engaging in human rights work more broadly. *See* Farida Shaheed (Special Rapporteur on the Right to Education), *Statement by the Special Rapporteur on the right to education, Ms. Farida Shaheed on her visit to the United States of America*, 2 (May 10, 2024); *see generally* Mary Lawlor (Special Rapporteur on the Situation of Human Rights Defenders), *"We are not just the future": challenges faced by child and youth human rights defenders,* U.N. Doc. A/HRC/55/50 (Jan. 17, 2024). Further, experts have highlighted how stigmatizing narratives that misrepresent legitimate exercises of rights as illegal activities and those involved as threats to national security can have a "severe and lasting" chilling effect on "civic space broadly." Romero Report, para. 14.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that the Court grant petitioners' motion for preliminary injunction.


DATED: March 26, 2025                        /s/ Leena Khandwala
                                             Leena Khandwala, Esq. Counsel of Record
                                             Anjum Gupta, Esq. on Brief
                                             Professor of Law
                                             Immigrant Rights Clinic
                                             Rutgers Law School
                                             123 Washington Street, 402A
                                             Newark, NJ 07102
                                             Tel: (973) 353 - 3182
                                             leena.khandwala@rutgers.edu

                                             *Counsel for Amici Curiae*

31

**Certificate of Service**

I certify that on March 26, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States District Court for the District of New Jersey. To the best of my knowledge, all participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/  Leena Khandwala
Leena Khandwala
Managing Attorney
Anjum Gupta

Immigrant Rights Clinic
Rutgers Law School
123 Washington Street, 402A
Newark, NJ 07102
Tel: 973-353-3182
leena.khandwala@rutgers.edu

*Counsel for Amici Curiae*