# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Mahmoud KHALIL,<br><br>          *Petitioner*,<br><br>v.<br><br>William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement, *et al.*,<br><br>          *Respondents*. | Case No.: 2:25-cv-01963<br><br>Judge Michael E. Farbiarz |

## BRIEF OF *AMICUS CURIAE* THE NATIONAL JEWISH ADVOCACY CENTER IN SUPPORT OF RESPONDENTS

NATIONAL JEWISH ADVOCACY CENTER
Mark Goldfeder
Arielle F. Klepach
National Jewish Advocacy Center, Inc.
International Legal Forum
1718 General George Patton Drive
Brentwood, TN 37027
mark@njaclaw.org
Arielle@njaclaw.org
T. (800) 269-9895 F: (800) 758-5232


David Brown (NJ Bar # 433112024)
Naman, Howell, Smith & Lee, PLLC
Union Square II
10001 Reunion Place, Suite 600
San Antonio, TX 78216
Email: dbrown@namanhowell.com
Phone: (210) 731-6300
Fax: (210) 785-2975

Phillip M. Gordon*
Mark Altman, II
Abbi Harris
Naman, Howell, Smith & Lee, PLLC
400 Austin Ave., Suite 800
Waco, TX 76701
Email: pgordon@namanhowell.com
maltman@namanhowell.com
aharris@namanhowell.com
Phone: (254) 755-4100
Fax: (254) 754-6331


*application for admission *pro hac vice* forthcoming.

*Counsel for Amicus Curiae the National Jewish Advocacy Center*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. ii

IDENTITY AND INTEREST OF AMICUS CURIAE ....................................................1

INTRODUCTION ...............................................................................................................2

SUMMARY OF THE ARGUMENT .................................................................................2

ARGUMENT ......................................................................................................................3

    I. DISPARATE SPEECH RESTRICTIONS BASED ON IMMIGRATION
    STATUS ARE PERMISSIBLE AND DO NOT VIOLATION THE CONSTITUTION ............................3

        A. The Immigration and Nationality Act Supports Petitioner's
        Deportation and Contains No First Amendment Exception. ........................................3

        B. Noncitizens do not enjoy the same First Amendment protections as citizens, so
        Petitioner's First Amendment Claims are Subject to
        "Facially Legitimate and Bona Fide" Review ................................................................5

        C. Even if Strict Scrutiny Applies, the INA's Speech Restrictions are Supported by a
        Compelling Government Interest...................................................................................9

            *i. Petitioner's speech would be unlawful even if he were a citizen* ........................12

    II. PETITIONER'S LAWFUL DEPORTATION IS THE PRECISE RESULT INTENDED BY THE
    IMMIGRATION & NATIONALITY ACT. ...................................................................................13

        A. Petitioner's Involvement in the "Gaza Solidarity Encampment,"
        Students for Justice in Palestine, and Student Protests at
        Columbia University. .....................................................................................................13

        B. Petitioner's Former Employment by UNRWA Further
        Demonstrates That He is a National Security Threat.................................................17

    III.  SUPPORT OF TERRORIST ORGANIZATIONS BY U.S. RESIDENTS
    IS PRECISELY WHAT THE INA SEEKS TO PREVENT. ...........................................................18

CONCLUSION.................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Almog Meir Jan, et al. v. People Media Project, et al.*,
    No. 3:24-05553 (W. D. Wash. filed July 9, 2024) ................................................ 17-18

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986) ................................................................................................6

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ................................................................................................5

*Estate of Kedem et al v. United Nations Relief and Works Agency et al*,
    No. 24-04765 (S.D.N.Y. filed June 24, 2024) ..........................................................17

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ................................................................................................8

*Galvan v. Press*,
    347 U.S. 522 (1954) ................................................................................................8

*Graham v. Richardson*,
    403 U.S. 365 (1971) ................................................................................................6

*Haggai et al v. Kiswani et al*,
    No. 25-02400 (S.D.N.Y. filed March 24, 2025) ........................................................13

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ................................................................................................5

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ............................................................................................10, 12

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ................................................................................................7

*Lishay Lavi et al v. UNRWA USA National Committee, Inc.*,
    No. 24-00312 (D. Del. filed Mar. 7, 2024) ..............................................................17

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ................................................................................................6

*Morse v. Frederick*,
    551 U.S. 393 (2007) ................................................................................................6

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,

566 U.S. 639 (2012) ...................................................................................................4

*Rajah v. Mukasey*,
    544 F. 3d 427 (2nd Cir. 2008) ...........................................................................8

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .........................................................................................10

*Trump v. Hawaii*,
    585 U.S. 667 (2018) .................................................................................... 5, 7-9

*Turner v. Williams*,
    194 U.S. 279 (1904) ................................................................................ 6-7, 10

*Vidal v. Elster*,
    602 U.S. 286 (2024) .........................................................................................10

**Statutes**

8 U.S.C. § 1189 .....................................................................................................14

8 U.S.C. § 1227 .....................................................................................................20

8 U.S.C. § 1227(a)(4)(B) .................................................................................4, 9, 18

8 U.S.C. § 1227(a)(4)(C) .......................................................................................19

8 U.S.C. § 1227(a)(4)(C)(i) .........................................................................3-4, 12, 18

8 U.S.C. § 1182 .....................................................................................................20

8 U.S.C. § 1182(a)(3)(B) ...............................................................................4, 9, 18-19

8 U.S.C. § 1182(a)(3)(B)(i)(IV)(bb) ............................................................... *passim*

8 U.S.C. § 1182(a)(3)(B)(i)(VII) ................................................................... *passim*

8 U.S.C. § 1182(a)(3)(B)(iv) ................................................................................18

8 U.S.C. § 1182(a)(3)(C)(iii) ...........................................................................4, 19

18 U.S.C. § 2333(d)(2) ..........................................................................................13

18 U.S.C. § 2339B(a)-(b) .......................................................................................12

**Other**

Aviva Klompas (@avivaklompas), X (Apr. 21, 2024), https://x.com/Aviva
    Klompas/status/1782236780533633062/video/1........................................15

*Anti-Israel mob that stormed Barnard handed out 'Hamas Media Office' flyers glorifying Oct. 7: 'Still think they don't support terror?'*, NEW YORK POST (March 6, 2025), https://nypost.com/2025/03/06/us-news/barnard-protesters-shared-hamas-media-office-flyers/ ....................................................................................................16

Columbia Students for Justice in Palestine (@ColumbiaSJP), X (Apr. 23, 2024), https://x.com/ColumbiaSJP/status/1782986207892250850/photo/1 ...............................................................................................13

*Columbia Students for Justice in Palestine Statement of Solidarity*, INSTITUTE FOR PALESTINE STUDIES (Oct. 12, 2023), https://www.palestine-studies.org/en/node/1654384 [https://web.archive.org/web/20250128215638/https://www.palestine-studies.org/en/node/1654384] ...........................................................................................14, 16

*Columbia reaches settlement in class action suit alleging hostile environment for Jewish students, establishes additional security measures*, COLUMBIA SPECTATOR (Jun. 6, 2024), https://www.columbiaspectator.com/news/2024/06/06/columbia-reaches-settlement-in-class-action-suit-alleging-hostile-environment-for-jewish-students-establishes-additional-security-measures/ ....................................................................20

*Detained Columbia anti-Israel protestor Mahmoud Khalil seethed with hatred for Jewish state, ex-classmate says*, NEW YORK POST (MAR. 15, 2025), https://nypost.com/2025/03/15/us-news/columbia-anti-israel-protester-mahmoud-khalil-had-hatred-for-jewish-state-ex-classmate/ .........................................................................................14

Eitan Fischberger (@efischberger), X (Apr. 18, 2024), https://x.com/EFischberger/status/1780915336063177006 ...........................................15

*Inside the tense talks between Columbia protestors and administrators before NYPD moved in*, CNN (May 9, 2024), https://www.cnn.com/2024/05/09/business/columbia-protests-divestment-invs/index.html ...........................................................................16

*Mahmhoud Khalil*, CANARY MISSION (Mar. 13, 2025), https://canarymission.org/individual/Mahmoud_Khalil ...............................................11

*October 7 is about to be every day': Columbia rally sees Hamas support*, THE JERUSALEM POST (Apr. 21, 2024), https://www.jpost.com/diaspora/antisemitism/article-798049 .........................................15

Shai Davidai (@shaidavidai), X (Apr. 21, 2024), http://x.com/Shai Davidai/status/1781927150603427959 .........................................15

*Shocking video captures moment protest near Columbia University yells,*
     *'We're all Hamas,' 'Long live Hamas'*, NEW YORK POST (Apr. 18,
     2024), https://nypost.com/2024/04/18/us-news/columbia-university-
     Protestor-yells-were-all-hamas-video/?utm_source=twitter&utm_
     Medium=social&utm_campaign=nypost........................................................................14

Stu (@thestustustudio), X (Apr. 20, 2024), https://x.com/thestustustudio/
     status/1781904507611287981 ...............................................................................15

*The United Nations Relief and Works Agency for Palestine Refugees*
     *in the Near East (UNRWA): Overview and U.S. Funding Prohibition*,
     Congressional Research Service (June 14, 2024),
     https://tinyurl.com/mpfdy46a.................................................................................17

*Terrorist Groups: Hamas*, COUNTERTERRORISM GUIDE, Office of the
     Director of National Intelligence (Feb. 2025), https://www.dni.
     gov/nctc/terrorist_groups/hamas.html .................................................................14

*Terrorist who kept Israeli citizens as hostages knew about Oct. 7*
     *attack ahead of time, dressed kid as Hamas fighter: lawsuit*,
     NEW YORK POST (Feb. 24, 2025), https://nypost.com/2025/02/
     24/world-news/journalist-who-held-israeli-hostages-worked-
     for-hamas/ .............................................................................................................17

*What are the beliefs of Mahmoud Khalil's activist group CUAD? –*
     *analysis*, THE JERUSALEM POST (Mar. 11, 2025), https://
     www.jpost.com/diaspora/antisemitism/article-845664................................................11

v

**IDENTITY AND INTERESTS OF AMICUS CURIAE[1]**

Since its founding in 2020, the National Jewish Advocacy Center ("NJAC") has become recognized as a leader in combatting antisemitism by developing and supporting innovative legal solutions that drive change.  Antisemitic hate crimes, discriminatory rhetoric, and biased policies have become increasingly more common since Hamas's October 7, 2023 terrorist attack on Israel. Hamas and its affiliate organizations promote violent, pro-terror rhetoric to facilitate their efforts in their war against the Jewish people, which has led to the marked rise in antisemitism. American institutions have failed to adequately address and condemn these attitudes, normalizing the catastrophic rise of institutionalized antisemitism that has erupted across America and around the world.

The proper resolution of this matter is of critical importance to NJAC because it involves one of the United States' first post-October 7th attempts to hold individuals who espouse support for terrorism from within the United States accountable. There is a direct relationship between the normalization of terrorism and violence and the rise of antisemitism. To combat antisemitism and support national security, it is vital that the government be able to revoke legal status from individuals who espouse and provide support to Foreign Terrorist Organizations ("FTOs").

---

[1] No counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus*, its employees, and its counsel has contributed any funds for the preparation or submission of this brief.

1

## INTRODUCTION & SUMMARY OF THE ARGUMENT

Petitioner Mahmoud Khalil acted as a lead negotiator and spokesperson for Columbia University-based student groups that espoused support for Hamas, a designated foreign terrorist organization ("FTO"). Petitioner facilitated and advocated on behalf of students who took over buildings and committed extensive violent acts, including destruction of property, criminal possession of a weapon, false imprisonment, and others. Petitioner has advocated for "resistance by any means necessary," a euphemism for engaging in violence against innocent civilians to achieve a political objective—namely, the destruction of the State of Israel.

For his conduct, the Secretary of State determined that Petitioner poses "potentially serious adverse foreign policy consequences. . . ." 8 U.S.C. § 1227(a)(4)(C)(i), and has therefore ordered his removal. Petitioner claims that his removal is unconstitutional for, among other reasons, violating his rights to free speech under the First Amendment. Petitioner is mistaken.

Petitioner's deportation is amply supported by the law.

***First***, the Immigration and Nationality Act ("INA") supports petitioner's deportation and does not contain a First Amendment exception. Because noncitizens do not enjoy the same First Amendment rights as citizens, Petitioner's First Amendment claims are subject to only the "facially legitimate and bona fide" standard of review, a highly deferential standard deeming that courts may not look behind the exercise of that discretion, nor test it by balancing its justification' against the asserted constitutional interests of U.S. citizens.

***Second***, even if strict scrutiny applies, the Government amply satisfies that standard because the INA's speech restrictions are narrowly tailored to serve a compelling government interest in national security. The INA's speech restrictions constitute content-based restrictions, not

viewpoint-based restrictions. The INA's limitations on speech supporting terrorist organizations satisfies a compelling government interest.

*Third*, the INA was designed to ensure that individuals like Petitioner could not reap the benefits of American residency while subverting important foreign policy and other values. Espousing support for terrorist organizations and leading groups of students who violated a slew of laws constitutes impermissible conduct for citizens and noncitizens alike. Petitioner's conduct violated the Anti-Terrorism Act, a provision that would apply to him whether he was a citizen or not.

Petitioner's removal is amply supported by statutory and constitutional authority. His motion for a Preliminary Injunction should therefore be denied.

## ARGUMENT

## I. DISPARATE SPEECH RESTRICTIONS BASED ON IMMIGRATION STATUS ARE PERMISSIBLE AND DO NOT VIOLATION THE CONSTITUTION.

Disparate speech restrictions based on immigration status find ample support in the law because citizens and noncitizens do not enjoy legal parity. Petitioner's deportation is both statutorily and constitutionally authorized.

### A. The Immigration and Nationality Act Supports Petitioner's Deportation and Contains No First Amendment Exception.

First, Petitioner's deportation is statutorily authorized. As an initial matter, the Government cites 8 U.S.C. § 1227(a)(4)(C)(i)[2] as its basis for removing Petitioner. *See* Resp. Opp. to Motion for P.I. (ECF No. 156 at 4)[3]. This provision gives the Secretary of State the power to order the deportation of an alien if "the Secretary of State has reasonable ground to believe [that Petitioner's

---

[2] Also referred to as Section 237(a)(4)(C)(i) of the INA.
[3] Petitioner is now also charged as removable as inadmissible at the time of his adjustment of status due to "fraud and willful misrepresentation. . . ." (ECF No. 156 at 4-5).

presence or activities in the United States] would have potentially serious adverse foreign policy consequences. . . ." 8 U.S.C. § 1227(a)(4)(C)(i). This section incorporates by reference the exception found in Section 1182(a)(3)(C)(iii)[4], which ordinarily governs exclusion of aliens outside the United States and makes it equally applicable to deportations under Section 1227.

The exception in Section 1182 (sometimes referred to in part as the "Foreign Policy Bar") prevents the Government from refusing entry or deporting an alien "because of [an] alien's past, current, or expected beliefs, statements, or associations,[5] if such beliefs, statements, or associations would be lawful within the United States, **unless** the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest." 8 U.S.C § 1182(a)(3)(C)(iii) (emphasis added). This exception provides the only statutory connection between Petitioner's deportation and a possible First Amendment question. *See* Petitioner's Amended Petition for Writ of Habeas Corpus and Complaint ¶ 84 (Mar. 13, 2025).

---

[4] Also referred to as Section 212(a)(3)(C)(iv) of the INA, or "Section 212" more broadly.

[5] There is an apparent inherent tension with this subsection and the incorporation of 8 U.S.C. § 1182(a)(3)(B) via 8 U.S.C. § 1227(a)(4)(B). Section 1182(a)(3)(B) deems inadmissible and deportable any alien who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(i)(VII). Further, the INA explicitly deems inadmissible any alien who is "a *representative* of a political, social, or other group that *endorses or espouses terrorist activity*." 8 U.S.C. § 1182(a)(3)(B)(i)(IV)(bb) (emphasis added). The tension arises because 8 U.S.C. § 1182(a)(3)(C)(iii) seems to prevent the deportation of an alien based on "beliefs, statements, or associations" and subsections (a)(3)(B)(i)(VII)(bb) and (a)(3)(B)(i)(VII) specifically allow the denial of a visa (and therefore deportation) of those who do the exact things seemingly forbidden by 1182(a)(3)(C)(iii). This tension is easily resolved by a simple application of the basic tenants of statutory construction, which mandates that the specific control the general. *See, e.g., RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general. That is particularly true where Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." (internal quotation and citation omitted)). Therefore, the denial of a visa and deportability under the terrorism provisions of 1182 are exceptions to the general rule found in 1182(a)(3)(C)(iii). *Id*. ("To eliminate the [specific/general] contradiction, the specific provision is construed as an exception to the general one.)"

Since the Government relies upon the Secretary's determination for its action, the 1182 exception is simply inapplicable. Therefore, for the reasons explained in more detail below, section 1182 neither protects Petitioner from deportation nor invites the Court to conduct a full First Amendment analysis in the first instance. To the extent that it does, Petitioner's rights under the First Amendment are not coextensive with those of a citizen.

### B.    Noncitizens do not enjoy the same First Amendment protections as citizens, so Petitioner's First Amendment Claims are Subject to "Facially Legitimate and Bona Fide" Review.

It is well-established that citizens and noncitizens do not enjoy legal parity.

> Under our law, the alien in several respects stands on an equal footing with citizens, but in others has never been conceded legal parity with the citizen. Most importantly, to protract this ambiguous status within the country is not his right but is a matter of permission and tolerance. The Government's power to terminate its hospitality has been asserted and sustained by this Court since the question first arose.

*Harisiades v. Shaughnessy*, 342 U.S. 580, 586-87 (1952); *see also Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (recognizing the inherent power of the "Government's political departments" to admit or exclude foreign nationals, because these types of questions are "largely immune from judicial control." (quotation omitted).

Speech restrictions are no exception to this rule. The fact that Petitioner is subject to heightened speech restrictions as compared to a naturalized U.S. citizen has been continually recognized by the courts in varying context for more than 100 years. The Supreme Court has long acknowledged that U.S. residents with varying immigration statuses can be subject to varying degrees of First Amendment protection to serve compelling government interests. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 420-22 (2010) (Stevens, J., dissenting):

> The Government routinely places special restrictions on the speech rights of students, prisoners, members of the Armed Forces, **foreigners**, and its own employees. When such restrictions are justified by a legitimate governmental interest, they do not necessarily raise

5

constitutional problems.... **[T]he Government's interests may be more or less compelling with respect to different classes of speakers, … and [] the constitutional rights of certain categories of speakers, in certain contexts, 'are not automatically coextensive with the rights' that are normally accorded to members of our society.**

(citing *Morse v. Frederick*, 551 U.S. 393, 396–97, 404 (2007) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986))) (emphasis added); *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) ("[D]ifferential treatment is constitutionally suspect *unless* justified by some special characteristic of the regulated class of speakers" (emphasis added and quotations omitted)); *Graham v. Richardson*, 403 U.S. 365, 377 (1971) ("[t]he national government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization").

*Turner* is a particularly informative case. In *Turner v. Williams*, 194 U.S. 279, 293 (1904), the Supreme Court affirmed that the First Amendment is no bar to the deportation of an alien. The Court in *Turner* considered whether the government could deport alien John Turner because of his anarchist beliefs and advocacy for the violent overthrow of government. *Id*. at 293. The Court in *Turner* held as follows:

> Congress was of opinion that the tendency of the general exploitation of such views is so dangerous to the public weal that aliens who hold and advocate them would be undesirable additions to our population, whether permanently or temporarily, whether many or few; and, in the light of previous decisions, the act, even in this aspect, would not be unconstitutional, as applicable to any alien who is opposed to all organized government. . . . We are not to be understood as depreciating the vital importance of freedom of speech and of the press, or as suggesting limitations on the spirit of liberty, in itself, unconquerable, but this case does not involve those considerations. The flaming brand which guards the realm where no human government is needed still bars the entrance, and as long as human governments endure, they cannot be denied the power of self-preservation, as that question is presented here.

6

*Id.* at 294. As expressed in *Turner*, the Government has an interest in self-preservation and in the public well-being, which permits it to restrict freedom of speech by disallowing or deporting "undesirable" aliens who call for political violence. *Id.*

The principles elucidated in *Turner* have stood the test of time. In *Trump v. Hawaii*, the Court again explored the reach of the Executive's power in matters relating to national security and immigration. A simple application of *Hawaii* and the precedent it sets forth lays out the forgiving standard that should be applied to any assertion of First Amendment rights with respect to immigration and deportation. That is why any restriction on speech that is asserted by an alien when national security issues are impacted is subject to "facially legitimate and bona fide" review.

This standard is overwhelmingly deferential and allows the Government to survive judicial review when its negative exercise of statutorily delegated power is based on a "facially legitimate and bona fide" reason(s). *Hawaii*, 585 U.S. at 703[6] (citing and quoting *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972)). When the Government exercises such power, "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification' against the asserted constitutional interests of U.S. citizens." *Id.*  This standard of review was first articulated in *Kleindienst v. Mandel* and is a "narrow standard of review" that "has particular force in admission and immigration cases that overlap with the area of national security," as it does here. *Hawaii*, 585 U.S. at 704 (quotations omitted).

The Supreme Court applied and reiterated this rule in *Hawaii* due to separation of powers concerns and the court's "lack of competence" in "collecting evidence and drawing inferences" in

---

[6] While the reference here to "U.S. citizens" arises out of the fact that the claim in *Hawaii* was based on U.S. citizens asserting their rights as a basis for standing, it would be hard to fathom a scenario where an alien, even in the country legally, would have rights that would supersede those of a U.S. citizen in this context.

matters involving national security. *Id*. Because, fundamentally, "*[a]ny rule* of constitutional law that would inhibit the flexibility of the President to respond to changing world conditions should be adopted only with the greatest caution…." *Id*. (emphasis added).

The mere fact that *Hawaii* arose in the context of excluding foreign nationals from receiving visas is no bar to the application of the "bona fide" standard of review here because *Mandel*—as overwhelmingly approved of in *Hawaii*—articulated the sweeping power of the executive as applicable to *both* denials of entry *and* deportations. *Mandel*, 408 U.S. 766 (relying on the deportation case *Galvan v. Press*, 347 U.S. 522, 531-33 (1954)) ("Policies pertaining to the entry of aliens *and their right to remain here* are peculiarly concerned with the political conduct of government. . . . [T]he formulation of these policies is entrusted to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government. . . .")) (emphasis added).

Furthermore, the language of *Hawaii* itself targets its holding to immigration law more broadly, not simply entry, when citing approvingly multiple cases that either address or make reference to the broad power of either Congress or the Executive (*i.e.* the political branches) to deport aliens. *Hawaii*, 585 U.S. at 703-704. For instance, the *Hawaii* court cites approvingly to the Second Circuit's application of *Mandel* "to broad executive action." *Hawaii*, 585 U.S. at 704 (citing *Rajah v. Mukasey*, 544 F. 3d 427, 433, 438-439 (2d Cir. 2008) (upholding National Security Entry-Exit Registration System instituted after September 11, 2001))[7]. The *Hawaii* Court similarly cited approvingly to *Fiallo v. Bell*, 430 U.S. 787 (1977). The *Fiallo* Court said it has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by

---

[7] For its own part, the Second Circuit states that "the *most exacting* level of scrutiny that the court will impose on immigration legislation is rational basis review." *Rajah*, 544 F.3d at 438 (emphasis added).

the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 791 (internal quotations omitted).

Finally, the construction of the INA itself incorporates the statutory reasons for denying entry as suitable reasons for deportation. *See supra* at n.5; *see also* 8 U.S.C. § 1182(a)(3)(B); 8 U.S.C. § 1227(a)(4)(B); 8 U.S.C. § 1182(a)(3)(B)(i)(VII).

Here, through the INA, Congress has delegated decisions regarding immigration to the Executive (in this instance, the Secretary of State), thereby preventing courts from "looking behind" the Government when it exercises its discretion based on a "facially legitimate and bona fide" reason(s). This delegation of power similarly bars courts from weighing the Government's justification against First Amendment considerations. *See Hawaii*, 585 U.S. at 703.

The Secretary of State, in his discretion, determined that Petitioner remining in the United States was adverse to American foreign policy interests. This Court cannot, therefore, "look behind" the Government's decision to exercise its discretion to remove Petitioner, which is based on facially legitimate and bona fide foreign policy concerns. This court, therefore, may not weigh the Government's justification for removing Petitioner against any First Amendment concerns.

As such, the fact that Petitioner is subject to more stringent speech restrictions than a U.S. citizen does not raise, and has never raised, a serious First Amendment issue. Petitioner's removal is constitutional.

### C. Even if Strict Scrutiny Applies, the INA's Speech Restrictions are Supported by a Compelling Government Interest.

Even if the Court were to apply the same standard that it would to a U.S. citizen, requiring a strict scrutiny analysis, the INA's speech prohibitions would still be constitutional because they are supported by a compelling government interest.

9

The INA rules in question survive strict scrutiny because they are narrowly tailored to achieve the government's compelling interest in national security. The INA permits deportation of an alien based on his endorsement, espousal, or persuasion of others to endorse or espouse terrorist activities or support a terrorist organization, or his role as a representative or spokesperson for an organization that endorses or espouses terrorist activity. *See* 8 U.S.C. §§ 1182(a)(3)(B)(i)(IV)(bb), (a)(3)(B)(i)(VII). Content-based restrictions that target speech based on communicative content are subject to strict scrutiny, meaning that they are presumptively unconstitutional unless narrowly tailored to serve a compelling government interest. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). This prohibition on aliens' speech in support of terrorist organizations is a content-based restriction because it creates a penalty based on the ideas being expressed. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 45 (2010) (reasoning that a statute applying criminal penalties based on the content of speech is content-based and therefore warrants strict scrutiny).

But this Court should not go so far as to regard the INA's speech prohibitions as viewpoint-based restriction because the restrictions are viewpoint neutral as to the speaker, ideology, or terrorist group. Rather, the INA considers support for *any* terrorist organization as grounds for deportation or exclusion, with no consideration of what the terrorist group believes, endorses, or seeks to accomplish. *See Vidal v. Elster*, 602 U.S. 286 (2024) ("[a] viewpoint-based regulation targets not merely a subject matter, but particular views taken by speakers on a subject"). Therefore, the content-based strict scrutiny analysis is the appropriate standard.

To survive strict scrutiny, a regulation must be narrowly tailored to serve a compelling government interest. Unlike the anarchist views held by Mr. Turner, *see supra* at 7, no speculation is required as to what the impact of Petitioner's speech or political beliefs might be. Petitioner's actions have already proven dangerous to the well-being of the American public by leading a

10

radical, pro-terrorist movement that has committed unlawful actions on college campuses throughout the United States, provoking a nationwide swell of support within the U.S. for the terrorist acts committed by Hamas on October 7, and creating a hostile environment for Jewish and Israeli students at Columbia University and elsewhere.

Notably, the protests and encampments at Columbia University acted as the model for many other college campuses. The Columbia protests were organized by at least two terror-supporting groups, including Students for Justice in Palestine ("SJP") and Columbia University Apartheid Divest ("CUAD").[8] Petitioner was a self-described leader of these groups[9] and the lead negotiator for the groups and their "demands" during the April 2024 Gaza Solidarity Encampment ("Encampment"). (ECF No. 162 at ¶ 1). His actions during the Encampment and its subsequent impacts put the dangers of Petitioner's presence in the United States on full display. *See, e.g., infra* at Section II. If the Government has a compelling governmental interest in removing aliens like Mr. Turner, who generally oppose all organized government, it certainly has a much greater interest in removing Petitioner, who has led and represented groups that endorse and espouse terrorism and played a central role in persuading members of the American public to endorse and espouse the same, while *also* calling for the  "total eradication of Western civilization."

Espousing support for terrorist ideologies poses an inherent danger of political violence, in this case against Jews. Normalization of violent terrorist rhetoric also creates increased sympathy for Hamas and other FTOs among U.S. residents and citizens.[10]

---

[8] *What are the beliefs of Mahmoud Khalil's activist group CUAD? – analysis,* The Jerusalem Post (Mar. 11, 2025)*,*  https://www.jpost.com/diaspora/antisemitism/article-845664.
[9] *Mahmhoud Khalil*, CANARY MISSION (Mar. 13, 2025),
https://canarymission.org/individual/Mahmoud_Khalil
[10] This provides ample grounds for the Secretary of State's removal order under the INA as such conduct has potentially serious foreign policy consequences for the United States, particularly with its relationship with our ally Isreal.

The INA's speech restrictions are narrowly tailored to serve the Government's compelling interest in national security because they do not disallow all unpopular, unpalatable, or potentially dangerous political speech. The regulations only disallow certain speech that supports terrorism and terrorist groups. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(IV)(bb) and (VII). Therefore, even though the INA restricts aliens' speech rights in a limited fashion, these restrictions are not constitutionally infirm. Rather, the regulations ensure that Petitioner and individuals like him cannot express support for terrorism—for the killing of innocent civilians, for violence against Jews, for resistance "by any means necessary," and for conduct antithetical to American values, without consequence. Because the INA's speech restrictions are narrowly tailored to serve the Government's compelling interest in protecting national security, Petitioner's removal is constitutionally permissible.

As it relates to the government's invocation of 8 U.S.C. § 1227(a)(4)(C)(i) as its basis for removing Petitioner, it is hard to imagine a greater foreign policy interest than not allowing an organization literally designated as a Foreign Terrorist Organization by the State Department to gain a solid foothold in our country. But Petitioner's speech would be unlawful even if he were a citizen.

### i.  *Petitioner's speech would be unlawful even if he were a citizen.*

Even if Petitioner were a citizen, his speech would still violate the law. The First Amendment is not absolute, and all residents of the United States–including naturalized citizens–are subject to speech restrictions. For example, even a citizen who engages in advocacy in coordination with or provides material support to terrorist organizations can be subject to criminal penalties. *See generally*, *Holder*, 561 U.S. at 45; *see also* 18 U.S.C. § 2339B(a)-(b) (creates civil and criminal penalties for providing "material support" to terrorist organizations). There is also compelling reason to believe that Petitioner and the student groups he led, collaborated directly

12

with Hamas, knowingly participated in Hamas' global propaganda campaign, and had advance knowledge of Hamas' plans to commit mass murder on October 7. *See generally, Haggai et al v. Kiswani et al*, 25-02400 (S.D.N.Y. filed March 24, 2025), Complaint (ECF No. 1) (alleging Columbia SJP, CUAD, and affiliated groups coordinated with Hamas and its affiliates prior to October 7 and take direct instructions from Hamas regarding the spread of pro-Hamas and pro-terror propaganda in the United States in furtherance of Hamas' stated goals). If true, these allegations likely violate the Anti-Terrorism Act, 18 U.S.C. § 2333(d)(2), which provides grounds for imprisonment of up to 20 years (or life, in some cases) and fines of up to $250,000. Therefore, Petitioner's speech would not be constitutionally protected even if he were a naturalized citizen. Petitioner's actions are exactly the sort that the INA seeks to restrict.

## II.    PETITIONER'S LAWFUL DEPORTATION IS THE PRECISE RESULT INTENDED BY THE IMMIGRATION & NATIONALITY ACT.

Petitioner's leadership role in pro-terror groups, the Encampment, and subsequent building takeovers has created substantial national security concerns. Petitioner's conduct is representative of a broader effort by Hamas to infiltrate American civil society and garner sympathy for its cause through propagandistic methods. These are precisely the results the INA seeks to address and prevent.

### A.    Petitioner's Involvement in the "Gaza Solidarity Encampment," Students for Justice in Palestine, and Student Protests at Columbia University.

Petitioner admits in his First Amended Complaint that he was a "mediator, an active participant in, and at times the public face of" the Columbia University student protests in 2023-2024.[11] *See* Petitioner's Second Amended Complaint (ECF No. 162 at ¶ 1). These protests began

---

[11] Columbia Students for Justice in Palestine (@ColumbiaSJP), X (Apr. 23, 2024), https://x.com/ColumbiaSJP/status/1782986207892250850/photo/1

13

shortly after October 7, 2023, when Hamas[12,13] massacred nearly 1,200 Israelis, men, women, and children, while raping, kidnapping, and systematically torturing hundreds of others. Approximately 48 hours after that attack began, the Columbia chapter of SJP published a letter affirming their "full solidarity with Palestinian resistance," an obvious euphemism for Hamas and its recent attack.[14] This letter praised the October 7th attack as "an unprecedented historic moment for the Palestinians," and called for protests on campus.[15] Petitioner reportedly led the Columbia SJP at that time. Columbia suspended SJP for its violent and threatening rhetoric, but the group rebranded and began operating as a coalition known as Columbia University Apartheid Divest ("CUAD") instead. Petitioner soon became the public face of CUAD.[16]

During the weeks and months following October 7, students at Columbia University, led in large part by Petitioner, CUAD, and affiliated organizations, clarified their stance on Hamas' violence toward Israelis with chants and slogans such as:

- "We are all Hamas. Long live Hamas."[17]

---

[12] *Terrorist Groups: Hamas*, Counterterrorism Guide, Office of the Director of National Intelligence (Feb. 2025), https://www.dni.gov/nctc/terrorist_groups/hamas.html.

[13] Hamas earned its designation as a Foreign Terrorist Organization under 8 U.S.C. § 1189 via Executive Order No. 12947 in 1997 and was named a Specially Designated Global Terrorist Group via Executive Order No. 13224 in 2001.

[14] *Columbia Students for Justice in Palestine Statement of Solidarity*, Institute for Palestine Studies (Oct. 12, 2023) https://web.archive.org/web/20250128215638/https://www.palestine-studies.org/en/node/1654384

[15] *Id.*

[16] *Detained Columbia anti-Israel protestor Mahmoud Khalil seethed with hatred for Jewish state, ex-classmate says*, New York Post (Mar. 15, 2025), https://nypost.com/2025/03/15/us-news/columbia-anti-israel-protester-mahmoud-khalil-had-hatred-for-jewish-state-ex-classmate/

[17]*Shocking video captures moment protest near Columbia University yells, 'We're all Hamas,' 'Long live Hamas'*, New York Post (Apr. 18, 2024), https://nypost.com/2024/04/18/us-news/columbia-university-protester-yells-were-all-hamas-video/?utm_source=twitter&utm_medium=social&utm_campaign=nypost

14

- "Let it be known that it was the Al-Aqsa Flood (the October 7 attack) that put the Global Intifada back on the table again."[18]

- "We say justice, you say how? Burn Tel Aviv to the ground. Hamas, we love you. We support your rockets, too."[19]

- "Remember the 7th of October! That will happen not one more time, not five more times, not ten more times, not 100 more times, not 1,000 more times, but 10,000 times!"[20]

- "Oh Al-Qassam Brigades" – a reference to Hamas' military wing – "you Make us proud, kill another soldier now! Israel will fall! Palestine is Arab."[21]

- One protestor held this sign while standing in front of a group of fellow students staging a counter-protest.[22]



[23]

---

[18] Stu (@thestustustudio), X (Apr. 20, 2024),
https://x.com/thestustustudio/status/1781904507611287981
[19] Aviva Klompas (@avivaklompas), X (Apr. 21, 2024),
https://x.com/AvivaKlompas/status/1782236780533633062/video/1
[20] *October 7 is about to be every day': Columbia rally sees Hamas support*, The Jerusalem Post (Apr. 21, 2024), https://www.jpost.com/diaspora/antisemitism/article-798049
[21] Eitan Fischberger (@efischberger), X (Apr. 18, 2024),
https://x.com/EFischberger/status/1780915336063177006
[22] Shai Davidai (@shaidavidai), X (Apr. 21, 2024),
http://x.com/ShaiDavidai/status/1781927150603427959
[23] This photo is one of many examples of Columbia student protestors' blatant antagonism toward Jews and Israelis and their open support of Hamas' terrorist acts on October 7. Al-Qassam (or the Al-Qassam Brigades) is one of the best equipped militias operating in Gaza. *See*

15

In addition to their support for Hamas' terroristic acts, the students who participated in the Encampment sought to force Columbia to stop using its endowment to invest in companies with connections to Israel, subverting American foreign policy and national security interests in the Middle East.[24] On April 29, 2024, Petitioner participated in a televised interview with CNN, in which he discussed his role as lead negotiator between student protestors and the administration and reported updates regarding the status of those negotiations.[25]

Aside from making their support for Hamas abundantly clear with chants of "Hamas we love you," "we are all Hamas," and "long live Hamas," the coalition of student groups obstructed campus operations, and engaged in all manner of illegal activity, including trespass, assault, vandalism, robbery, destruction of property, arson, criminal possession of a weapon, burglary, false imprisonment and intimidation. Petitioner was one of their leaders and acted as their representative and spokesperson. Dozens of his followers were arrested for committing crimes.

Indeed, Petitioner's actions did not cease upon his graduation from Columbia. In March 2025, CUAD and its affiliates overtook Barnard College's Milstein Library and distributed propaganda bearing the Hamas Media Office's Logo.[26] Despite his graduation, Petitioner

---

https://www.nbclosangeles.com/news/business/money-report/what-is-hamas-what-you-need-to-know-about-the-militant-group-that-rules-the-gaza-strip/3240133/?os=firetvno_journeystruekjuhl2zj&ref=app. As one can plainly see, this protester is openly calling for an attack on the Jewish protesters behind him or her.

[24] *Columbia Students for Justice in Palestine Statement of Solidarity*, Institute for Palestine Studies (Oct. 12, 2023), https://web.archive.org/web/20250128215638/https://www.palestine-studies.org/en/node/1654384

[25] *Inside the tense talks between Columbia protestors and administrators before NYPD moved in*, CNN (May 9, 2024), https://www.cnn.com/2024/05/09/business/columbia-protests-divestment-invs/index.html

[26] *Anti-Israel mob that stormed Barnard handed out 'Hamas Media Office' flyers glorifying Oct. 7: 'Still think they don't support terror?'*, New York Post (March 6, 2025), https://nypost.com/2025/03/06/us-news/barnard-protesters-shared-hamas-media-office-flyers/

16

continued acting as a lead negotiator for CUAD and Hamas' Columbia-based propaganda foot soldiers.

### B. Petitioner's Former Employment by UNRWA Further Demonstrates That He is a National Security Threat.

Petitioner's story is part of a much larger web of Hamas sympathizers embedded within American institutions. Petitioner previously worked for the highly controversial United Nations Relief and Work Agency ("UNRWA"), which has extensive ties to Hamas.[27] More than one thousand UNRWA employees are alleged to be directly involved with the terrorist organization.[28] Some UNRWA employees even allegedly joined Hamas in the murder, rape, kidnapping, and torture of Israelis during and after October 7. *See Estate of Kedem et al* v. *United Nations Relief and Works Agency et al*, No. 24-04765 (S.D.N.Y. filed June 24, 2024) (Complaint ¶¶ 543-60, 566-73, 578-80); *see also Lishay Lavi et al* v. *UNRWA USA National Committee, Inc.*, No. 24-00312 (D. Del. filed Mar. 7, 2024) (Complaint ¶¶ 21, 34-70, 94-98).

In addition to universities and the UNRWA, Hamas has successfully gained influence in some corners of the non-profit world and news media, such as the Washington State-based "news" service known as the Palestine Chronicle. As detailed in a lawsuit brought by three former hostages of the October 7 attack, an employee of the Palestine Chronicle (employed since 2019) is alleged to have personally held at least three hostages during this time, worked directly with Hamas, and published pro-Hamas propaganda through the Palestine Chronicle while actively coordinating with his affiliates in the media and on college campuses.[29] *See* Amended Complaint, *Almog Meir Jan,*

---

[27] *The United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA): Overview and U.S. Funding Prohibition*, Congressional Research Service (June 14, 2024), https://tinyurl.com/mpfdy46a
[28] *Id.*
[29] *Terrorist who kept Israeli citizens as hostages knew about Oct. 7 attack ahead of time, dressed kid as Hamas fighter: lawsuit*, New York Post (Feb. 24, 2025),

*Bethel Sch. et al. v. People Media Project, et al.*, No. 3:24-05553 (W. D. Wash. filed Feb. 21, 2025) (ECF No. 41 at ¶ 70). One of the freed hostages has reported that during his captivity Hamas would brag to him about their operatives on American campuses.

Petitioner's employment by UNRWA is not a benign indicator of his desire to provide aid to struggling Palestinian civilians. Rather, it is an indicator of his long-term relationship and comfort with Hamas and its terroristic ideologies, which undoubtedly endanger national security and the fabric of American civil society.

### III. SUPPORT OF TERRORIST ORGANIZATIONS BY U.S. RESIDENTS IS PRECISELY WHAT THE INA SEEKS TO PREVENT.

The Government has cited 8 U.S.C. § 1227(a)(4)(C)(i) in support of its decision to revoke Petitioner's permanent resident status. This section permits deportation of any alien on "security and related grounds," including any alien "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse consequences for the United States." 8 U.S.C. § 1227(a)(4)(C)(i). The Government's revocation of Petitioner's permanent resident status is further justified by 8 U.S.C. § 1227(a)(4)(B), which allows deportation of any alien described in 8 U.S.C. § 1182(a)(3)(B). Section 1182(a)(3)(B) deems inadmissible and deportable any alien who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(i)(VII). Further, the INA explicitly deems inadmissible any alien who is "a *representative* of a political, social, or other group that *endorses or espouses terrorist activity*." 8 U.S.C. § 1182(a)(3)(B)(i)(IV)(bb) (emphasis added); *see also* § 1182(a)(3)(B)(iv) (a

---

https://nypost.com/2025/02/24/world-news/journalist-who-held-israeli-hostages-worked-for-hamas/

"representative" is an "officer, official, or spokesman of an organization").[30] The obvious purpose of these restrictions is to prevent enemies of the United States, such as Hamas from using the American immigration system to import individuals who support terrorist groups and/or coordinate terrorist activities from inside the United States.

For the reasons explained herein, Petitioner's conduct is precisely the sort described in 8 U.S.C. §§ 1182(a)(3)(B)(IV)(bb) and 1182(a)(3)(B)(VII). Whether Petitioner has received direct orders from agents of Hamas or has personally materially supported terrorism is of no moment. Section 1182(a)(3)(B) explicitly distinguishes between aliens who are inadmissible or deportable based on membership in a terrorist organization or engagement in terrorist activity and those who are inadmissible or deportable based on their endorsement, espousal, or persuasion of others to endorse or espouse terrorism or support terrorist organizations. It necessarily follows that speech made in support of terrorism, even absent any corresponding membership in a terrorist organization or involvement in terrorist activity is, *by itself*, grounds for exclusion or deportation. Petitioner's violations of Sections 1182 (a)(3)(B)(IV)(bb) and 1182(a)(3)(B)(VII) therefore provides the Secretary of State "reasonable ground[s] to believe" the non-removal of Petitioner "would have potentially serious adverse foreign policy consequences for the United States." 8 U.S.C. § 1227(a)(4)(C); *see also* 8 U.S.C § 1182(a)(3)(C)(iii).

Petitioner, through his leadership of CUAD and full-throated support for the "Palestinian resistance" by "any means necessary" has openly endorsed terrorist activity and sought to persuade others to do the same. When SJP published a letter affirming their ardent support of the October 7th attack, Petitioner was one of their leaders. When members of the Encampment shouted, "we

---

[30] As discussed *supra*, these sections also make an individual deportable under the INA. *See supra* at n.5.

19

are Hamas," "Hamas we love you," "burn Tel Aviv to the ground," and shouted at their Jewish classmates, "the 7th of October will be every day for you,"[31] Petitioner was their spokesperson. There is no question that Petitioner's speech and conduct render him removable under 8 U.S.C. §§ 1182 and 1227.

## CONCLUSION

For the reasons stated herein, Petitioner's removal is both statutorily and constitutionally authorized. The First Amendment presents no bar to the deportation of non-citizens where national security interests are concerned. In fact, the very point of the INA provisions referenced by the Government and *Amicus* are to provide a mechanism by which aliens may be deported from the United States to protect the nation's security and foreign policy interests. To view this issue otherwise is to invite an abuse of the immigration system and the First Amendment's constitutional protections by our nation's adversaries. For the aforementioned reasons, as well as those set forth in the Government's response, Petitioner's Motion for Preliminary Injunction should be denied.

Dated: April 5, 2025                           Respectfully Submitted,

                                               */s/David Brown*
                                               David Brown (NJ Bar # 433112024)

Mark Goldfeder                                 Phillip M. Gordon*
Arielle F. Klepach                             Mark Altman, II
National Jewish Advocacy Center, Inc.          Abbi Harris
International Legal Forum                       Naman, Howell, Smith & Lee, PLLC
1718 General George Patton Drive               400 Austin Ave., Suite 800
Brentwood, TN 37027                            Waco, TX 76701
mark@njaclaw.org                               Email: pgordon@namanhowell.com
Arielle@njaclaw.org                            maltman@namanhowell.com
T. (800) 269-9895 F: (800) 758-5232           aharris@namanhowell.com

---

*Columbia reaches settlement in class action suit alleging hostile environ-ment for Jewish students, establishes additional security measures*, Columbia Spectator (Jun. 6, 2024), https://www.columbiaspectator.com/news/2024/06/06/columbia-reaches-settlement-in-class-action-suit-alleging-hostile-environment-for-jewish-students-establishes-additional-security-measures/

Phone: (254) 755-4100
Fax: (254) 754-6331

David Brown (NJ Bar # 433112024)
Naman, Howell, Smith & Lee, PLLC
Union Square II
10001 Reunion Place, Suite 600
San Antonio, TX 78216
Email: dbrown@namanhowell.com
Phone: (210) 731-6300
Fax: (210) 785-2975

*application for admission *pro hac vice*
forthcoming.

*Counsel for Amicus Curiae the National
Jewish Advocacy Center*