**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

Mahmoud KHALIL,

        *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

        *Respondents*.

Case No. 25-cv-01963 (MEF-MAH)

**THIRD AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT**

| Deleted: SECOND |
| Deleted: ¹ |

**INTRODUCTION**

1.    This case concerns the government's targeted, retaliatory detention and attempted removal of a student protestor because of his constitutionally protected speech. Petitioner Mahmoud Khalil is Palestinian, a lawful permanent resident of the United States, and a recent graduate student at Columbia University. Over the last year and a half, Mr. Khalil has been a mediator, an active participant in, and at times the public face of, student protests on Columbia's campus related to Israel's military campaign in Gaza. The Trump administration has made no secret of its opposition to those protests and has repeatedly threatened to weaponize immigration law to punish noncitizens who have participated.

2.    On or before March 8, 2025, Respondents adopted a policy ("the Policy") to

1

retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Marco Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors.

3.      Pursuant to the Policy, Respondent Rubio, the Secretary of State, purportedly made such a determination as to Mr. Khalil (the "Rubio Determination"). Secretary Rubio made this determination based on Mr. Khalil's lawful activity protected by the First Amendment: his participation in protests and his statements regarding Palestine and Israel.

4.      Neither Secretary Rubio nor any other government official has alleged that Mr. Khalil has committed any crime or, indeed, broken any law whatsoever.

5.      Pursuant to the Rubio Determination, the Department of Homeland Security decided to arrest Mr. Khalil, detain him, and place him in removal proceedings. On the evening of March 8, 2025, agents from the Department of Homeland Security ("DHS") arrested Mr. Khalil with no prior notice at his home and initiated proceedings to remove him from this country. After repeatedly transferring him across jurisdictions, the government ultimately detained Mr. Khalil in Louisiana, a thousand miles from his attorneys and his wife, who is a U.S. citizen and due to give birth next month.

6.      During his arrest, the agents stated first that Mr. Khalil's "student visa" was being "revoked." After learning that he was in fact a lawful permanent resident, they instead stated that status was being "revoked" too.

7.     It later came to light that the Department of Homeland Security was charging Mr. Khalil with being removable based on Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the "Foreign Policy Ground") and the Rubio Determination.

8.     The Rubio Determination and the government's subsequent actions, including its ongoing detention of Mr. Khalil in rural Louisiana, isolating him from his wife, community, and legal team, are plainly intended as retaliation and punishment for Mr. Khalil's protected speech and intended to silence, or at the very least restrict and chill, his speech now and in the future, all in violation of the First Amendment. Indeed, contemporaneous and subsequent statements by administration officials expressly characterize the invocation of this rarely used provision as punishment for Mr. Khalil's lawful and protected speech. The Rubio Determination and Mr. Khalil's unjustified detention also violate his due process rights. Finally, the government's unlawful Policy of targeting noncitizens for removal based on protected speech is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, and viewpoint discriminatory in violation of the First Amendment. Accordingly, this Court should vacate the Rubio Determination and the Policy, order Mr. Khalil's immediate release, and set aside the government's unlawful policy.

**PARTIES**

9.     Petitioner Mahmoud Khalil is a Palestinian, born in a refugee camp in Syria, who holds Algerian citizenship. He is married to a U.S. Citizen, a soon-to-be father, a lawful permanent resident of the United States with no criminal history, and a Palestinian human rights activist on Columbia University's campus. In May 2025, he will graduate with a master's degree in public administration from the Columbia University's School of International and Public Affairs ("SIPA"), where he has been a student since January 2023. Mr. Khalil and his wife, who is eight months

3

pregnant, live in Columbia's residential housing in New York City.

10. Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security. Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

11. Respondent William P. Joyce is named in his official capacity as the Acting Field Office Director of the New York Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent Joyce's address is New York ICE Field Office, 26 Federal Plaza, New York, New York 10278.

11a. Respondent Yolanda Pittman is named in her official capacity as the Warden of Elizabeth Contract Detention Facility, also referred to as Elizabeth Detention Center. As Warden, she is responsible for the operations of Elizabeth Detention Center, including overseeing the people in the facility's custody, and as such she is a custodian of the Petitioner. Respondent Pittman's office address is Elizabeth Detention Center, 625 Evans St, Elizabeth, New Jersey, 07201.

12. Respondent Caleb Vitello is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

14.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i) (INA § 237(a)(4)(C)(i).) In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Southern District of New York and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

15.     Respondent Pamela Bondi is Attorney General of the United States. In this capacity, she routinely transacts business in the Southern District of New York; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g) (2007); and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

**JURISDICTION & VENUE**

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C.

§ 2241, Article I, § 9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

17.    An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

18.    Venue is proper in the District of New Jersey under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. At the time Mr. Khalil filed his original petition, he was physically detained in this judicial district at the direction and under the authority of the Respondents at the Elizabeth Contract Detention Facility, in Elizabeth, New Jersey. Respondent Yolanda Pittman is the director of Elizabeth Contract Detention Facility, where Mr. Khalil was physically held at the time of the time of filing, and resides in the District of New Jersey. Respondent William P. Joyce is the Acting Field Office Director of the New York Field Office, whose officers under his authority initially arrested Mr. Khalil, communicated that he was being taken to 26 Federal Plaza in New York, arranged for Mr. Khalil's detention in this District, transported Mr. Khalil to and from this District, and directed the ICE Online Detainee Locator to show Mr. Khalil's location as 26 Federal Plaza in New York, which was the location specified for Mr. Khalil at the time of filing. Respondents Pittman and Joyce also denied Petitioner's requests to call his attorney or family members during the period immediately preceding, during, and following the filing of this petition, including during Mr. Khalil's transport to, detention in, and transport from this District.

**FACTS**

*Mr. Khalil's Background*

19.    Petitioner Mahmoud Khalil is Palestinian, but he grew up in a Palestinian refugee camp in Syria because his grandparents were forcibly removed from their ancestral home in

6

Deleted: Southern

Deleted: York

Deleted: U

Deleted: Petitioner is detained at the direction of Mr. Joyce, and a substantial part of the events giving rise to the claims and relevant facts occurred within this district. Moreover, according to the federal government's official records at the time of filing, Mr. Khalil was detained at 26 Federal Plaza at the time this habeas was initiated. The New York Field Office and Respondent Joyce directed Mr. Khalil's arrest and detention in New York, New York; told his counsel that he was being taken to 26 Federal Plaza in New York, New York; and entered his location on the ICE detainee locator as being in New York, New York. At the time of filing, the detainee locator stated that Mr. Khalil was held in New York, New York, information upon which his counsel reasonably relied to identify his location. To the extent the New York Field Office and Respondent Joyce moved Mr. Khalil across state lines to New Jersey for a transitory period of time shortly before his habeas was filed, the New York Field Office prevented Mr. Khalil from communicating that information to his counsel in bad faith. Moreover, the New York Field Office then brought Mr. Khalil back across state lines to New York before then transferring him, after the filing of the instant petition, to Louisiana

Tiberias, Palestine. When war broke out in Syria, his family was again displaced and are now dispersed throughout Europe and West Asia.

20.     Mr. Khalil entered the United States on a student visa in or around December 2022 to pursue a Master's degree in Public Administration from the Columbia University's School of International and Public Affairs ("SIPA"). Mr. Khalil completed his program in December 2024, and has an anticipated graduation date of May 2025.

21.     Mr. Khalil became a Lawful Permanent Resident in 2024. Mr. Khalil and his wife, a U.S. citizen, are expecting their first child next month, in April 2025. Together, they live in an apartment building owned and operated by Columbia University.

***Mr. Khalil's Student Activism and Speech on Matters of Public Concern***

22.     As a Palestinian, Mr. Khalil has felt compelled to be an outspoken advocate for Palestinian human rights and, since October 2023, has spoken repeatedly about Israel's military operation in Gaza. Mr. Khalil has called Israel's actions in Gaza a genocide and criticized Columbia University for, in his view, financing and in other ways facilitating such violence. Mr. Khalil is committed to peaceful protest and being a voice for his people.

23.     That commitment has taken on many forms. For example, in April 2023, Mr. Khalil became co-president of the Palestine Working Group at the School of International and Public Affairs (SIPA), where he helped organize educational events and lectures on Palestine. In the fall of 2023, Mr. Khalil became president of the Palestinian Student Society at Columbia (DAR), which "serves to engage with and celebrate Palestinian culture, history, and identity."

24.     Additionally, Mr. Khalil has acted as a mediator and negotiator, facilitating dialogue between Columbia University's administration and its students. In this role, Mr. Khalil has advocated for his peers to be treated humanely and fairly by the university, while helping to ensure student safety and the smooth functioning of the university. For example, in the Spring of

7

2024, Mr. Khalil facilitated negotiations between members of the Gaza Solidarity Encampment[2] and the university administration. Indeed, Mr. Khalil was approached to take on this role because of his prior work at a British Embassy overseas, an internship with the United Nations in New York, as well his established relationships with the university administration.

25.    Mr. Khalil stated in a CNN interview in Spring of 2024 that "as a Palestinian student, I believe that the liberation of the Palestinian people and the Jewish people are intertwined and go hand-by-hand and you cannot achieve one without the other."   Mr. Khalil also explained that the student movement "is a movement for social justice and freedom and equality for everyone."[3]

26.    Mr. Khalil's prominence as an outspoken student activist, along with Columbia University's position as a national focal point of student protests against Israel's military campaign in Gaza over the past year and a half, has propelled Mr. Khalil into the public eye. His visibility has been further amplified through his continued participation in interviews with national and international media outlets, including the BBC and CNN, as well as local press conferences.

27.    Mr. Khalil's speech regarding international law, the obligations that the U.S. and Columbia University have under that law, the human rights of the Palestinian people, and related matters is speech protected by the First Amendment, including because it is speech on matters of public concern and is political speech at the core of the protection of the First Amendment.

---

[2] *See* Isha Banerjee, *Timeline of the Gaza Solidarity Encampment*, Columbia Spectator (May 2, 2024),   *available at*   https://www.columbiaspectator.com/news/2024/05/02/timeline-the-gaza-solidarity-encampment/.
[3] Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN (March 11, 2025), *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.
Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN, *available at*:  https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.

28.     Like many student activists advocating for Palestinian rights, Mr. Khalil has endured immense scrutiny and personal attacks by private actors, including doxing and harassment. But until recently, he understood that because of the First Amendment, the government would not be able to retaliate against or punish him for his speech, or silence him by locking him up or banishing him from the country, even if powerful government officials disagreed with what he had to say.

**The Federal Government's Hostile Campaign Against Palestinian Rights Advocacy: A Concerted Effort to Silence Protected Political Speech**

29.     In the fall of 2023, students from diverse racial, ethnic, religious, and socioeconomic backgrounds—including Mr. Khalil—began to mobilize on their campuses, many criticizing what they characterized as their universities' and the United States government's unwavering support for Israel's policies. These protests included Jewish students who sought to convey the message that such policies were "not in our name." In response, opponents of these students' messages—including President Donald J.  Trump—frequently characterized peaceful protest and any speech in favor of Palestinian rights as inherently  supportive of Hamas and antisemitic. For example, in several instances, he President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[4]

30.     During his campaign for re-election, President Trump repeatedly vowed to revoke the visas of international students engaged in pro-Palestinian protests or who publicly criticized

---

[4] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (March 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur/. Indeed, in his first term, President Trump also issued Executive Order 13899, titled "Combating Anti-Semitism," which, among other things, adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis").

Israel's actions.

31.    For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[5]

32.    While the Gaza Solidarity encampments at college campuses took place in the Spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[6]

33.    Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[7]

***President Trump Issues Executive Orders to Target Speech of Noncitizen Protestors***

34.    Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety

---

[5] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/

[6] *Trump told donors he will crush pro-Palestinian protestors*, Washington Post, available at: https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

[7] Twitter, *available at*: https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

35.     Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including Palestinian rights advocacy.

36.     Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[8] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

***The Government Responds to Groups Identifying Noncitizen Protestors for Deportation By Adopting the Unlawful Policy***

37.     In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, prominent groups at Columbia University opposed to Palestinian rights protests began publicizing names of individuals they wanted the government to deport. Specifically,

---

[8] *See supra* note 3 (describing definitions adopted in Executive Order 13899, titled "Combating Anti-Semitism," 84 Fed. Reg. 68779 (Dec. 11, 2019), and reaffirmed in Executive Order 14188).

these groups compiled lists of students who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line.[9]

38.    For example, Betar USA—a self-described "Zionist activist organization"[10]—has published lists of Columbia student protestors, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump administration."[11]

39.    Betar identified Mr. Khalil, specifically, as one of its targets for deportation, including him on their "deport list." On January 29, the organization posted on social media that ICE is "aware of his home address and whereabouts" and confirmed that they "have provided all his information to multiple contacts."[12]

40.    Media reports in March of this year described widespread fear of retaliation for pro-Palestine speech among noncitizen students, noting that the executive orders "already appear to be chilling political activism."[13]

41.    Then, the week beginning Monday, March 3, 2025, ICE was spotted on Columbia's campus, increasing fears and further chilling students' ability to speak freely.

42.    That same week, pro-Israel activists reportedly met with members of Congress as well as Secretary of State Rubio, specifically seeking Mr. Khalil's deportation.[14]

---

[9] https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/
[10]    https://betarus.org/;    https://www.middleeasteye.net/explainers/betar-who-is-far-right-jewish-american-group-blood-gaza
[11] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.
[12] https://x.com/Betar_USA/status/1884796686020550930. This social media post falsely accused Mr. Khalil of saying inflammatory statements. *See id. See also* https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice
[13]    https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreign-students-protests-hamas-hezbollah-israel
[14] https://forward.com/news/703018/mahmoud-khalil-columbia-cuad-ice/

43.    On March 7, 2025, Mr. Khalil emailed the Columbia University interim president writing that, "I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home."[15]

44.    On or before March 8, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors

***DHS Arrests Mr. Khalil as a First Implementation of the Policy and a "Blueprint" for Future Investigations and Deportations of Prominent Student Activists***

45.    On the evening of March 8, 2025, at approximately 8:30 p.m., Mr. Khalil and his wife were returning to their apartment from an Iftar[16] dinner at a friend's home.

46.    When Mr. Khalil and his wife arrived at their apartment building, two individuals in plain clothes followed them into the lobby of the apartment building, which is owned and operated by Columbia University.

47.    The individuals approached Mr. Khalil and asked, "Are you Mahmoud Khalil?" When Mr. Khalil answered in the affirmative, the men identified themselves as being with the Department of Homeland Security ("DHS") and announced that they had to take Mr. Khalil into custody. Mr. Khalil heard them announce on a radio, "he's here," at which point Mr. Khalil noticed two other individuals approach from inside of the building. Based on their location, they would

---

[15] https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice
[16] Iftar is the name of the evening meal eaten at sunset by Muslims to break their fast during the holy month of Ramadan.

13

have required a key or otherwise been given permission to enter the building.

48.    Mr. Khalil asked whether the agents had a warrant and they said that they had one on the phone and that they would show it to him. However, the agents never showed him a warrant. Mr. Khalil asked why they were here and they asserted that Mr. Khalil's visa was revoked. Mr. Khalil explained that he has a green card. At this point, the agents were creating a barrier between Mr. Khalil and his wife. The agents threatened Mr. Khalil's wife that she would also be arrested if she did not comply.

49.    Mr. Khalil called his attorney, Amy Greer.  Attorney Greer spoke with an agent who identified himself as Special Agent Elvin Hernandez. Agent Hernandez stated they had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. Department of State and therefore they were detaining him.  Despite several requests by Mr. Khalil to see the warrant, the agents never showed him the administrative warrant.

50.    Mr. Khalil's wife then went to the apartment to retrieve Mr. Khalil's immigration documents. She saw another individual in plain clothes on their floor of the apartment building holding a radio.

51.    Attorney Greer advised Agent Hernandez that Mr. Khalil is a lawful permanent resident and has the right to due process.  Agent Hernandez responded that the Department of State had revoked Mr. Khalil's green card, too, and that he would be brought in front of an immigration judge.  Agent Hernandez stated that he would be taking Mr. Khalil to 26 Federal Plaza, the location of the ICE Field Office in Manhattan, New York. When Attorney Greer began to ask more questions, Agent Hernandez hung up on her. When Mr. Khalil requested to call her back, Agent Hernandez refused to allow Mr. Khalil to speak to his attorney again.

52.    Mr. Khalil's wife presented the DHS agents with documents confirming Mr.

Khalil's status as a lawful permanent resident, handing them to an agent who was speaking on the phone. The agent looked confused when he saw the documents and said, "He has a green card" to the individual with whom he was on the phone.  Mr. Khalil's wife heard the agent repeat that they were being ordered to bring Mr. Khalil in anyway.

53.    The agents then handcuffed Mr. Khalil and brought him outside where there were multiple unmarked vehicles waiting.  Mr. Khalil's wife asked for the names of the agents, their contact information, and how to reach them to follow up on her husband's detention, but they only advised her that Mr. Khalil would be taken to 26 Federal Plaza and otherwise refused to speak with her.  They left her no business card or any information at all as to how to find out where her husband would be taken, on what grounds, or who she could contact.

54.    The night of the arrest, Attorney Greer checked the ICE Detainee Locator ("ICE Locator") several times to confirm her client's location. She first checked the locator at 10:00 p.m. on Saturday, March 8th and found that Mr. Khalil was not yet listed in the system. She checked again at 1:35 a.m. on Sunday, March 9th, and saw that Mr. Khalil was listed as being in custody in New York. The ICE Locator entry also included an instruction to contact the New York field office. At 4:29 a.m. on Sunday, March 9,[17] Attorney Greer checked the locator once more, and the information remained the same. Shortly thereafter, at around 4:40 a.m. on Sunday, March 9th, Attorney Greer filed the original habeas corpus petition in in this case (ECF 2) in the Southern District of New York, based on information and belief that ICE was still holding Mr. Khalil at 26 Federal Plaza. During this time, Mr. Khalil made continuous requests to contact his attorney, including when agents asked him to sign several documents, but he was repeatedly denied.

55.    The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated

---

[17] Daylight Saving time began on March 9, meaning that clocks moved forward from 1:59am to 3am over the course of these events.

that Mr. Khalil was still in New York. Sometime after 9 a.m. on Sunday, the ICE locator changed to say that Mahmoud was detained in Elizabeth, New Jersey, at the Elizabeth Contract Detention Facility, a detention center privately owned and operated by the corporation CoreCivic. At 9:29 am, Mr. Khalil's immigration attorney attempted to call the Elizabeth facility twice, but no one answered. Around 11:20 a.m., Mahmoud's wife went to the Elizabeth Detention Center to see him, but she was told that Mahmoud was not showing up in the system.

56.     At 1:47 p.m. on Sunday, March 9, after counsel had submitted a G-28 and sent a 1:22 p.m. email to ICE asking to be connected with him immediately, ICE responded by email informing that Mr. Khalil was in the process of being transferred to a detention facility within the New Orleans ERO Field Office, over 1,000 miles away.[18] Counsel emailed the U.S. Attorney's Office for the Southern District of New York, which confirmed that Mr. Khalil was en route to Louisiana. Counsel requested Mr. Khalil's immediate return, but was told that ICE would not consent to his return absent a court order. When Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that typically occurs the same day or the next day in New York—authorities in the Louisiana ICE detention facility offered a date ten days away.

57.     Mr. Khalil's wife, who is 8-months pregnant, is unable to travel to Louisiana to see Mr. Khalil.

***Mr. Khalil's Experience being Transferred Repeatedly and in Detention in Louisiana***

58.     While at 26 Federal Plaza on the night of March 8, the ICE agents took Mr. Khalil's biometrics. As they did so, Mr. Khalil saw an agent approach Agent Hernandez and say, "the White House is requesting an update."

---

[18] According to the copy of the NTA that Mr. Khalil's Counsel received on March 11, ICE was already preparing to transfer Mr. Khalil to the Central Louisiana ICE Processing Center while he was still detained at 26 Federal Plaza a few hours after his arrest.

59.    Mr. Khalil was subsequently presented with several documents and asked to sign them, including a Notice to Appear ("NTA") for removal proceedings and a Custody Determination document. Mr. Khalil reviewed the NTA and Custody Determination and, because he did not fully understand the implications of signing them, he requested to speak with his lawyer before doing so. The ICE agent denied his request, prompting Mr. Khalil to refuse to sign.

60.    The copy of the NTA states "YOU ARE ORDERED to appear before the immigration judge of the United States Department of Justice at: 830 Pinehill Rd, Jena, LA, 71342, LASALLE DETENTION FACILITY on March 27, 2025 at 8:30 AM to show why you should not be removed from the United States based on the charges set forth above." The copy is dated March 9, 2025, timestamped at 12:40 a.m., and signed by Supervisory Special Agent Timothy Moran at 26 Federal Plaza, New York, NY.

61.    At some point in the night, Mr. Khalil was transported in handcuffs and shackles to Elizabeth Detention Center in New Jersey ("Elizabeth") but was not allowed to take his belongings—his shoes, jacket, and belt—with him. When Mr. Khalil asked about his belongings, he was told that he would be coming back to 26 Federal Plaza tomorrow, but that he could not spend the night there.

62.    While at Elizabeth, Mr. Khalil again requested to speak with his lawyer, to which the officers responded that he would be allowed to do so after he was processed. Mr. Khalil spent the night in the cold waiting room for processing. Mr. Khalil requested a blanket but was denied. The next morning, as Mr. Khalil reached the front of the line to be processed, he was informed that processing would not be completed because ICE was coming from New York to transport him.

63.    Around 12 p.m., ICE officers—one of whom Mr. Khalil believes he recognized from the night before at 26 Federal Plaza—handcuffed and shackled Mr. Khalil and placed him in

17

a van. The van had Mr. Khalil's belongings inside that were kept in 26 Federal Plaza. Mr. Khalil

was told he was then going to JFK without further clarification.

64.    At JFK, he was transferred to other government agents. None of the agents

identified themselves or provided their badge information. At one point, Mr. Khalil noticed one of

the agents received a text message instructing not to let his escort, Mr. Khalil, use his phone.

65.    Mr. Khalil took an American Airlines flight from JFK around 2:45 p.m. to Dallas,

Texas. During that flight, Mr. Khalil saw one of the officers receive a text message that instructed

him not to let Mr. Khalil have a phone call.

66.    Mr. Khalil arrived in Dallas, Texas around 5:30 p.m. and remained there until 9:30

p.m., at which time he was placed on another American Airlines flight—this time to Alexandria,

Louisiana.

67.    Mr. Khalil arrived in in Alexandria, Louisiana around 1:00 a.m. on Monday March

10. Upon his arrival, he saw between about four to five agents waiting for him. He was again

shackled and placed in handcuffs. He was then placed in an ICE car, driven for about a minute, and

then placed in a police car. The agents drove him to Jena, Louisiana.

68.    Throughout this process, Mr. Khalil felt as though he was being kidnapped. He was

reminded of prior experience fleeing arbitrary detention in Syria and forced disappearance of his

friends in Syria in 2013. It was shortly after this that Mr. Khalil left Syria.

69.    At no time throughout this process did any of the agents identify themselves.

70.    Mr. Khalil then arrived at the Louisiana Detention Facility, where he was processed

again. During his initial medical examination in Elizabeth, Mr. Khalil notified agents that he has an

ulcer and needs to take his medication for it every day. Despite this, he was not given access to his

medication until Tuesday evening. He sleeps in a bunker without a pillow or blanket. He continues

to worry about the wellbeing of 8-month pregnant wife and what will happen to them. He's also very concerned about missing the birth of his first child. In fact, Mr. Khalil turned down job offers that would have required him to miss the birth of his child. Throughout his wife's pregnancy, Mr. Khalil has been present for her doctor appointments.

71.    Mr. Khalil also recently secured a coveted job position after four months of searching, and was scheduled to start this role in April of this year. In addition to fearing the loss of his expected salary, Mr. Khalil and his wife planned to obtain medical insurance through this role in order to cover health care costs, including for the birth and care of their expected child. Mr. Khalil continues to worry about the loss of income and health care, especially so close to the expected birth of his child.

72.    It is very important to Mr. Khalil to be able to continue his protected political speech, advocating and protesting for the rights of Palestinians—both domestically and abroad. Indeed, Mr. Khalil was recently invited to go to Copenhagen to attend the premiere of a documentary in which he is featured and to speak on the panel after the premiere.

***The Government Confirms that Mr. Khalil was Targeted for Deportation Because of His Protected Political Speech, in the First Implementation of their Policy***

73.    On March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University." The President warned that Mr. Khalil's arrest was "the first of many to come," declaring that his administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[19]

---

[19] https://truthsocial.com/@realDonaldTrump/posts/114139222625284782

19

74.    The White House reposted President Trump's statement on the social media platform X, accompanied by a mug-style graphic featuring an image of Mr. Khalil. Surrounding the photo were the words "ARRESTED BY ICE ON MARCH 9, 2025" and "LED ACTIVITIES ALIGNED TO HAMAS." The White House caption included the phrase "SHALOM, MAHMOUD" before quoting the President's statement.[20]

75.    Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[21]

76.    The following day, the Department of Homeland Security issued a statement through its social media account, X, confirming Mr. Khalil's arrest by ICE was carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to Hamas, a designated terrorist organization" and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[22]

77.    In a statement to The Free Press on March 10, a White House official stated that Mr. Khalil was a 'threat to the foreign policy and national security interests of the United States' and that the federal government's "basis" for targeting Mr. Khalil was being used "as a blueprint for investigations against other students."[23]

78.    On March 11, in response to an inquiry from the NY Times regarding Mr. Khalil's arrest, a spokesperson for the administration reportedly stated that "United States' foreign policy

---

[20] https://x.com/WhiteHouse/status/1899151926777749618

[21] https://x.com/marcorubio/status/1898858967532441945

[22] https://x.com/DHSgov/status/1898908955675357314; https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/

[23] https://www.thefp.com/p/the-ice-detention-of-a-columbia-student

includes combating antisemitism across the globe and that Mr. Khalil's residency in the nation

undermines that policy objective."[24]

79.    At a White House Press Briefing on March 11, Press Secretary Karoline Leavitt

responded to questions about the arrest, asserting that the Secretary of State has "the right to revoke

a green card or a visa for individuals who serve or are adversarial to the foreign policy and national

security interest" and accusing Mr. Khalil of "siding with terrorists."[25]

80.    In a press conference regarding this case on March 12, 2025, Secretary of State

Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . .

. I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . anti-Semitic

activities," and "if you end up having a green card . . . we're going to kick you out."[26]

81.    On March 13, 2025, when asked to justify the government's actions, Troy Edgar,

the Deputy Secretary of DHS, did not dispute that Mr. Khalil had not broken any laws and instead

asserted that he was "agitating and supporting Hamas" by "put[ting] himself in the middle of the

process of basically pro-Palestinian activity." When asked directly if "any criticism of the Israeli

government [is] a deportable offense," if "any criticism of the United States [is] a deportable

offense," if "any criticism of the government [is] a deportable offense," and if "protesting [is] a

deportable offense," Deputy Secretary Edgar did not dispute any of those statements.[27]

***DHS Invokes the INA's Foreign Policy Ground against Mr. Khalil, in violation of the INA and the Constitution***

82.    Mr. Khalil's counsel did not receive DHS's asserted legal basis for his arrest and

---

[24] https://archive.ph/rD4sk#selection-1147.0-1159.428
[25] https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022
(timestamp 10:16)
[26] http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/
[27] NPR, *Morning Edition* (March 13, 2025), *available at* https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.

detention until the afternoon of Tuesday, March 11, pursuant to an agreement with counsel for the government. His NTA states "the Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States." Citing Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the Foreign Policy Ground), the NTA further states "the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States."

83.    The Rubio Determination was exclusively motivated by Mr. Khalil's lawful, constitutionally-protected past, current, or expected beliefs, statements, or associations. Public statements by government officials, up to and including the President and Secretary of State, establish that Respondents are punishing, detaining, and attempting to silence Mr. Khalil because of his constitutionally-protected past, current, or expected beliefs, statements, or associations.

84.    The Foreign Policy Bar expressly prohibits the Secretary of State from issuing a policy to exclude or condition entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)).  Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Mr. Khalil to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

85.    Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan

22

Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

86.     Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

87.     In the decades since the Foreign Policy Ground was enacted, it appears to have been rarely invoked and reserved for cases involving high-ranking government officials or an alleged terrorist removable on other grounds and subject to high-profile prosecutions in their country of origin. It does not appear to have ever been applied to any person for engaging in First Amendment protected speech.

***The government adds new allegations and a charge of removability pursuant to the Policy and in further retaliation for Mr. Khalil's speech and initiation of this lawsuit***

88.     One week after Mr. Khalil filed the present action, the government engaged in further retaliatory action. On March 17, 2025, the government amended Mr. Khalil's NTA to include new—false—allegations that Mr. Khalil engaged in "fraud" and "willfully misrepresent[ed]

**Formatted:** Font: Not Bold, Not Italic

**Formatted:** Normal, Left, Line spacing:  single,  No bullets or numbering, Tab stops: Not at  0.58"

a material fact" on his application for adjustment of status process (the "Post-hoc Charge"). *See* ECF 90-1 (basing these allegations on purported employment and associations not reported or reported incorrectly on an application which were, and still are, immaterial as to his eligibility for lawful permanent residency).

89.    The Post-hoc Charge is meritless, pretextual, and further evidence of the government's unlawful Policy of targeting for detention and removal noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israel. Like the Rubio Determination, the government added the Post-hoc Charge pursuant to this Policy as applied to Mr. Khalil. The Post-hoc Charge is retaliation for Mr. Khalil's speech and initiation of this lawsuit.

## CLAIMS FOR RELIEF

### FIRST CLAIM
**Violation of the First Amendment to the United States Constitution**

90.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens.

91.    The Rubio Determination, Policy, and Post-hoc Charge, Mr. Khalil's targeting, arrest, transfer, and ongoing detention violate the First Amendment because they:

- retaliate against and punish Mr. Khalil for his past protected speech;

- prevent him from speaking now (through detention);

- attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States;

• deprive audiences of his present and future speech on matters of public concern; and

• chill other individuals from expressing views sympathetic to Palestinians.

92. These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Mr. Khalil and are, in government officials' own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

**SECOND CLAIM**
**Violation of the Due Process Clause of the Fifth Amendment to the**
**United States Constitution**

93. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

94. The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

95. The government's detention of Mr. Khalil is wholly unjustified. *See Black*, F.4th at 157 (collecting cases stating that "[w]here an individual's liberty is at stake, the Supreme Court has consistently required the government to justify continued detention by clear and convincing evidence."). The government has not demonstrated that Mr. Khalil—a husband to a U.S. citizen, soon-to-be father to a U.S. citizen, and lawful permanent resident with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Mr. Khalil cannot be safely released

25

back to his family.

96.     Moreover, Mr. Khalil's detention is punitive as it bears no "reasonable relation" to

any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is

civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—the

Foreign Policy Ground and the Rubio Determination—are unlawful for the reasons discussed

*supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect

against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538

U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

97.     The Policy and the Rubio Determination also violate Mr. Khalil's right to due

process. The government's policy of targeting people like Mr. Khalil—lawful permanent residents,

living peacefully in the country who engage in speech advocating for Palestinian rights—is

unconstitutionally vague.

**THIRD CLAIM**
**Violation of the Administrative Procedure Act and the *Accardi* Doctrine**

98.     Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a

policy of targeting noncitizens for removal based on First Amendment protected speech advocating

for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to

constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A),

(B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v.

Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Mr.

Khalil's "presence or activities would potentially have serious adverse foreign policy consequences

for the United States" and "would compromise a compelling United States foreign policy interest"

**Deleted:** Foreign Policy Ground making such determinations concerning

is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## FOURTH CLAIM
### Release on Bail Pending Adjudication

99.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

100.    This Court has the "inherent authority" to grant bail to habeas petitioners like Mr. Khalil. *See Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001) (holding that federal courts have inherent authority to set bail pending the adjudication of a habeas petition when the petition has raised substantial claims and extraordinary circumstances "make the grant of bail necessary to make the habeas remedy effective"). In considering a petitioner's fitness for bail, courts assess (1) "whether the petition raises substantial claims" and (2) "whether extraordinary circumstances exist that make the grant of bail necessary to make the remedy effective." *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007) (cleaned up).

101.    This petition raises numerous substantial constitutional and statutory claims challenging Mr. Khalil's retaliatory detention. As for the second factor, extraordinary circumstances exist here that make Mr. Khalil's release necessary to make the remedy effective. As long as Mr. Khalil remains in ICE custody, he will be prevented from speaking freely and openly—instead, his speech is severely curtailed and controlled by DHS. And it is effectively impossible for him to speak to the broader public at all. His detention is also preventing him from adequately litigating his removal proceedings, which the government has chosen to justify only in the press. Moreover, Mr. Khalil's wife is eight months pregnant with their first child. Not only is she unable to visit him where ICE has chosen to detain him, in Louisiana, but his continued detention prevents

27

him from caring for her at a critical time and will cause him to miss the birth of his first child. *See, e.g.*, *S.N.C. v. Sessions*, No. 18-CV-7680, 2018 WL 6175902, at \*6 (S.D.N.Y. Nov. 26, 2018) (ordering immediate release of petitioner pending consideration of her claim that her abrupt deportation would violate her due process right to an opportunity to be heard on her application and in order to care for her children).

### PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

1)     Assume jurisdiction over this matter;

2)     Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights, including as applied to Mr. Khalil through the Rubio Determination and the Post-Hoc Charge;

3)     Vacate and set aside the Rubio Determination;

4)     Enjoin Respondents from transferring the Petitioner from the jurisdiction of this District pending these proceedings;

5)     Order the immediate release of Petitioner pending these proceedings;

6)     Order the release of Petitioner;

7)     Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

8)     Award reasonable attorneys' fees and costs for this action; and

9)     Grant such further relief as the Court deems just and proper.

Dated: May 1, 2025         Respectfully submitted,
Newark, NJ                        */s/* Jeanne LoCicero
                                    AMERICAN CIVIL LIBERTIES UNION
NEW YORK CIVIL LIBERTIES UNION         OF NEW JERSEY FOUNDATION

**Deleted:** April 3

28

FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen *
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Shezza Abboushi Dallal*
Mudassar Toppa*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

VAN DER HOUT LLP
Marc Van Der Hout**
Johnny Sinodis**
Oona Cahill**
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000

WASHINGTON SQUARE LEGAL
SERVICES, INC.
IMMIGRANT RIGHTS CLINIC
Alina Das*
245 Sullivan Street, 5th Floor
New York, NY 10012
Tel: (212) 998-6430

Counsels for Petitioner
*Admitted Pro Hac Vice

Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, NJ 07102
Tel: (973) 854-1715

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat*
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Brett Max Kaufman*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212)732-8805