## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

*Respondents*.

Case No. 25-cv-01963 (MEF-MAH)

## PETITIONER'S SUPPLEMENTAL BRIEF REGARDING VAGUENESS CLAIMS

AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, NJ 07102

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Omar Jadwat*
Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Brett Max Kaufman*

(973) 854-1715

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Mudassar Hayat Toppa*
Shezza Abboushi Dallal*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

VAN DER HOUT LLP
Marc Van Der Hout*
Johnny Sinodis*
Oona Cahill*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000

Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

WASHINGTON SQUARE LEGAL
SERVICES, INC.
IMMIGRANT RIGHTS CLINIC
Alina Das*
245 Sullivan Street, 5th Floor
New York, NY 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212)732-8805

*Counsel for Petitioner*
*Admitted Pro Hac Vice*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................2

    I.   The Policy is unconstitutionally vague............................................................2

      A.   Courts, including the Supreme Court, routinely consider vagueness challenges to government policies............................................................3

      B.   Mr. Khalil is likely to succeed in demonstrating the existence of the Policy and that it is impermissibly vague. ...........................................................7

        i.   The undisputed preliminary injunction record confirms the government has adopted the Policy, and the government does not deny it exists. ...7

        ii.   The Policy is unconstitutionally vague...................................................10

    II.   The Foreign Policy Ground is unconstitutionally vague as applied to Mr. Khalil through the Rubio Determination. ..................................................14

CONCLUSION .................................................................................................20

i

# TABLE OF AUTHORITIES

**Cases** ................................................................................................Page(s)

*Abdullah v. St. Louis, Mo.*,
    52 F. Supp. 3d 936 (E.D. Mo. 2014) ............................................................5

*Am. Assn. of U. Professors v. Rubio*,
    No. 25-CV-10685, 2025 WL 1235084 (D. Mass. Apr. 29, 2025) ....5, 6, 9, 10

*Baggett v. Bullitt*,
    377 U.S. 360 (1964)...................................................................................4, 11

*Bennett v. Spear*,
    520 U.S. 154 (1997)........................................................................................9

*Borden v. Sch. Dist. of Twp. of E. Brunswick*,
    523 F.3d 153 (3d Cir. 2008) ........................................................................14

*Carolina Youth Action Project; D.S. by & through Ford v. Wilson*,
    60 F.4th 770 (4th Cir. 2023) ........................................................................20

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)................................................................................*passim*

*Families Achieving Indep. and Respect v. Nebraska Dept. of Soc. Services*,
    111 F.3d 1408 (8th Cir. 1997) .......................................................................6

*Faustin v. Denver, Colo.*,
    423 F.3d 1196 (10th Cir. 2005) .....................................................................6

*Gilles v. Garland*,
    281 F. App'x 501 (6th Cir. 2008).............................................................4, 5, 7

*Hassan v. City of New York*,
    804 F.3d 277 (3d Cir. 2015) ..........................................................................7

*Hisp. Affs. Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018).......................................................................7

*Johnson v. United States*,
    576 U.S. 591 (2015)...................................................................................13

*Jordan v. De George*,
    341 U.S. 223 (1951)...................................................................................15

*Lujan v. Nat'l Wildlife Federation*,
    497 U.S. 871 (1990).....................................................................................9

*Massieu v. Reno*,
    915 F. Supp. 681 (D.N.J. 1996),
    *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996).........................15, 16, 17

*Matter of Khalifah*,
    21 I&N Dec. 107 (BIA 1995)................................................................13, 17

*Matter of Ruiz-Massieu*,
    22 I&N Dec. 833 (BIA 1999)......................................................................13

*NAACP v. City of Philadelphia*,
    39 F. Supp. 3d 611 (E.D. Pa. 2014),
    *aff'd*, 834 F.3d 435 (3d Cir. 2016).................................................................7

*Powell v. Noble*,
    798 F.3d 690 (8th Cir. 2015) ........................................................................5

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015)...............................................................7, 9

*Reno v. ACLU*,
    521 U.S. 844 (1997)...................................................................................11

*Scavone v. Pennsylvania State Police*,
    501 F. App'x 179 (3d Cir. 2012)..................................................................4

*Sessions v. Dimaya*,
    584 U.S. 148 (2018).......................................................................13, 15, 16, 17

*United States v. Ferriero*,
    No. 13-CV-592, 2015 WL 225806 (D.N.J. Jan. 15, 2015) ..........................18

*Velesaca v. Decker*,
    458 F. Supp. 3d 224 (S.D.N.Y. 2020) ...........................................................7

*Wright v. State of Ga.*,
    373 U.S. 284 (1963).....................................................................................19

**Statutes**

8 U.S.C. § 1101(a)(43)(F)....................................................................................16

8 U.S.C. § 1182(a)(3)(C)(iii) .........................................................................13, 15

8 U.S.C. § 1227(a)(4)(C)(i)............................................................................13, 15

18 U.S.C. § 16(b) ................................................................................................16

**Other Authorities**

Exec. Order 14161 (Jan. 20, 2025) ......................................................................8

Exec. Order 14188 (Jan. 29, 2025) ......................................................................8

Exec. Order 14188 "Fact Sheet" (Jan. 30, 2025),
    *available at* https://perma.cc/9EGD-T9P7 ................................................8, 11

H.R. Rep. No. 101-955 (1990) (Conf. Rep.),
    https://www.congress.gov/101/crecb/1990/10/26/GPO-CRECB-1990-pt24-
    1-1.pdf. ...................................................................................................18, 19

S. Rep. No. 100–75, 100th Cong., 1st Sess. (1987),
    reprinted in 133 Cong. Rec. S2326 (1987).....................................................18

## INTRODUCTION

Pursuant to this Court's order, ECF 228, the petitioner submits this supplemental briefing solely regarding his due process void-for-vagueness claims. These claims focus on the government's announced policy to arrest, detain, and seek to deport noncitizens who engage in protected expression in support of Palestinian rights or critical of Israel (the "Policy"), and its use of 8 U.S.C. § 1227(a)(4)(C) (the "Foreign Policy Ground") to effectuate the Policy. Mr. Khalil raises two independent but related vagueness arguments.

*First*, he argues that the government has adopted a Policy that is impermissibly vague and should be enjoined for the same reasons courts routinely find that *policies*, both written and unwritten, run afoul of due process: this Policy provides no notice to noncitizens regarding which of their otherwise-lawful expressive activity will result in the government targeting them for arrest, detention and removal, and it gives government officials unfettered discretion to target disfavored speech.

*Second*, Mr. Khalil argues that the Foreign Policy Ground is itself impermissibly vague as applied to him through the Rubio Determination because neither the statue, past executive practice, nor the legislative history gave Mr. Khalil any notice, in advance of the government's enforcement, that he could possibly be subject to detention and removal for participating—alongside thousands of others—

in protests. The Rubio Determination only confirms the application of the Foreign Policy Ground here was standardless and arbitrary.

Before turning to these arguments, the petitioner clarifies that these Fifth Amendment void-for-vagueness claims are wholly distinct from the four other claims on which he has moved for preliminary relief, namely: 1) his First Amendment claim that the Policy is viewpoint discriminatory; 2) his First Amendment claim that the Rubio Determination is retaliatory; 3) his First Amendment claim that the decision to apprehend and detain Mr. Khalil was retaliatory; and 4) his Fifth Amendment due process claim that his ongoing detention is unrelated to any legitimate government justification. Because none of these claims implicate the vagueness doctrine, they are not addressed below.

## ARGUMENT

### I. The Policy is unconstitutionally vague.

Mr. Khalil has moved for preliminary relief on his claim that the government's Policy—to "arrest, detain, and seek the removal of noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israeli policies," ECF 124 ("Am. PI MOL") at 1—"does not satisfy due process, because it is void for vagueness," *id.* at 23; *see also id.* at 23–31; ECF 67 at 15–19. In response, the government acknowledged Mr. Khalil's "void for vagueness" challenge against its "policy," ECF 156 ("PI Opp.") at 28, misidentified it as a "First Amendment claim," *id.*, and otherwise failed to dispute it or even discuss the vagueness standard,

*see id.* at 28–32; ECF 175 ("PI Reply") at 16 (noting government "effectively conced[ed]" issue).

Mr. Khalil is likely to succeed on the merits of his claim. Courts routinely consider the constitutionality of policies—whether or not those policies are spelled out in writing—and strike them down as vague where they fail to provide sufficient notice of prohibited conduct or where they give officials discretion to engage in arbitrary or discriminatory enforcement. The standard is particularly stringent where speech is implicated. Here, Mr. Khalil has demonstrated the existence of the Policy through facts undisputed in the record, and that Policy both fails to give noncitizens fair notice of what speech could subject them to arrest, detention and removal and gives government officials unbounded discretion to target disfavored speech.

## A. Courts, including the Supreme Court, routinely consider vagueness challenges to government policies.

The due process vagueness analysis applies in the same manner across statutes, regulations, ordinances, and policies. In *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), the Supreme Court considered a vagueness challenge to the FCC's "indecency policy," which was set out in a series of directives, letters, and orders applying the policy to certain broadcasts, and held the "policy in place at the time of the broadcasts" was unconstitutionally vague, *id.* at 254–58. It laid out the vagueness analysis straightforwardly: "first . . . regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are

necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* at 253. And "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54. Applying this standard, the Court held the FCC's policy was vague because it "gave no notice" of what "could be actionably indecent," because it "fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited," and because it "touch[ed] upon 'sensitive areas of basic First Amendment freedoms.'" *Id.* at 254 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)); *cf. Scavone v. Pennsylvania State Police*, 501 F. App'x 179, 181–82 (3d Cir. 2012) (applying the same standard and holding "tattoo removal policy" was not "void for vagueness" because state employee "was fairly put on notice" his tattoo would have to be removed).

That a policy may not exist in written form or in a single document does not mean it cannot be challenged as vague. To the contrary, in *Fox*, the Court looked to evidence of concurrent statements, guidance documents, decisions, and letters from the agency to determine what the agency's "then-existing policies" were, 567 U.S. at 257–58, before finding them vague. In *Gilles v. Garland*, the Sixth Circuit considered a public university's "unwritten policy" regarding campus speakers, 281 F. App'x 501, 507 (6th Cir. 2008). It held that the plaintiff stated a "due process vagueness claim" because the policy was, as alleged, "devoid of standards," *id.* at

4

508, and it further held the district court should "define the contours of the unwritten speech policy and its operation" based on a factual record in order to rule, *id.* at 512.

Similarly, the Eighth Circuit considered a vagueness challenge to "unwritten, informal rules" regarding access to a public fairground in *Powell v. Noble*, 798 F.3d 690, 698 (8th Cir. 2015), and it remanded for consideration of whether the plaintiff was entitled to "preliminary injunctive relief," *id.* at 704. This was because, while an "unwritten rule or policy is not automatically vague," it still "must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply it," and in that case the claim "warrant[ed] consideration, particularly given" the policy implicated "protected" speech. *Id.* at 703–04 (internal citations omitted). *See also Abdullah v. St. Louis, Mo.*, 52 F. Supp. 3d 936, 946 (E.D. Mo. 2014) (issuing preliminary injunction enjoining a police department's "unwritten policy, given to officers . . . instructing them to order people to keep moving," and holding it was likely void for vagueness because it "provided no notice to citizens of what conduct was unlawful, and its enforcement was entirely arbitrary and left to the unfettered discretion of the officers").

The government will likely point to *Am. Assn. of U. Professors v. Rubio* ("*AAUP*"), No. 25-CV-10685, 2025 WL 1235084 (D. Mass. Apr. 29, 2025), where, in a decision otherwise holding that a challenge to the same policy at issue here stated claims under the First Amendment and the APA, the court dismissed the

plaintiffs' vagueness challenge solely because it found "Due Process-based vagueness challenges have not been extended beyond the statutory sphere or, at most, to written rules and regulations," *id.* at *20. But the very short discussion in that case is incorrect, cites no authority supporting its sweeping conclusion, and asserts that the relevant argument appeared only in "a footnote" in briefing that did not identify any vagueness challenges to "policies" specifically. *Id.*

As demonstrated above, courts, including the Supreme Court and the Third Circuit, routinely consider vagueness challenges to policies, and they apply the same test that would apply to any other government action that carries the possibility of imposing harm or legally cognizable consequences on an individual or group. *See supra; see also, e.g.*, *Faustin v. Denver, Colo.*, 423 F.3d 1196 (10th Cir. 2005) (considering "the precise parameters of Denver's unwritten policy" regarding signs on overpasses and applying standard vagueness analysis); *Families Achieving Indep. and Respect v. Nebraska Dept. of Soc. Services*, 111 F.3d 1408, 1415-18 (8th Cir. 1997) (noting unwritten policy can be made "explicit by 'well-established practice'" and can be challenged for vagueness pursuant to standard analysis); *NAACP v. City of Philadelphia*, 39 F. Supp. 3d 611, 634 (E.D. Pa. 2014) ("If a plaintiff can show the existence of an unconstitutional unwritten policy, a court will invalidate the policy as unconstitutional."), *aff'd*, 834 F.3d 435 (3d Cir. 2016).

This makes sense, since adopting *AAUP*'s rule would permit the government

to avoid review of an unconstitutional policy by simply declining to put it in writing. But courts rule on the lawfulness of unwritten policies all the time, and they treat both the question of whether such a policy exists and the parameters of that policy as factual questions to be determined on the record presented by the parties. *See Gilles*, 281 F. App'x at 512; *see also Hassan v. City of New York*, 804 F.3d 277, 295 n.5 (3d Cir. 2015) ("[T]he primary—indeed, perhaps only—difference between a suit involving a written and unwritten policy is an evidentiary one.") (cleaned up); *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018) (conducting APA review of unwritten "policy and practice"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184–85 (D.D.C. 2015) ("Denying review of agency action that is . . . unwritten would fly in the face of the Supreme Court's instruction that finality be interpreted pragmatically") (cleaned up); *Velesaca v. Decker*, 458 F. Supp. 3d 224, 242-43 (S.D.N.Y. 2020) (enjoining contested unwritten policy and noting a policy "can be gleaned from agency action"). Here, as discussed below, the uncontested record demonstrates both the existence of Respondents' Policy and its vagueness.

### B. Mr. Khalil is likely to succeed in demonstrating the existence of the Policy and that it is impermissibly vague.

i.  The undisputed preliminary injunction record confirms the government has adopted the Policy, and the government does not deny it exists.

Through unrebutted allegations in his petition, declarations and exhibits in support of his preliminary injunction motion, and further exhibits submitted to this

Court as part of the immigration court record, Mr. Khalil is likely to succeed in demonstrating the government has implemented a policy to "arrest, detain, and seek the removal of noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israeli policies."[1] Am. PI MOL at 1. The record evidence is consistent, overwhelming, and undisputed.

It includes Respondents' and other senior officials' "public statements, multiple Executive Orders, and . . . legal documents" chronicling the announcement and implementation of the Policy. *Id.* at 4; *see also id.* at 4-9 (summarizing Policy evidence and citing First Am. Pet. ¶¶ 29-44, 73-82); Exec. Order 14161 (Jan. 20, 2025) (instructing agencies to target noncitizens who "espouse hateful ideology"); Exec. Order 14188 (Jan. 29, 2025) (instructing agencies to investigate "campus anti-Semitism"); Exec. Order 14188 "Fact Sheet" (Jan. 30, 2025) (describing the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a message to all "resident aliens who participated in pro-jihadist protests" that the government "will find you . . . and deport you"), available at https://perma.cc/9EGD-T9P7; ECF 68 ("Salama PI Decl.") Exs. A-D (collecting interviews, public statements, and reporting where the government conflates any participation in pro-

---

[1] This memorandum is primarily submitted in further support of Mr. Khalil's motion for a preliminary injunction, ECF 66, and so he focuses on the preliminary injunction standard here. For all the same reasons discussed here, he also satisfies the standard relevant to his "Motion for Release." *See* ECF 93 at 14.

Palestinian advocacy or protest with being "pro-jihadist," "pro-Hamas," and antisemitic); ECF 175-2 ("Linhorst PI Decl.") Exs. A-S (same, plus multiple court documents from suits related to other individuals subjected to the Policy).

In response, the government has submitted no record evidence on the issue. It has not challenged the accuracy or authenticity of any of Mr. Khalil's submissions. In its legal arguments, the government notably has *not* denied the existence of the Policy. *See* PI Opp. The entirety of the government's argument on this issue has been to place the word "Policy" in quotation marks and refer to it as "undefined," but without actually contesting Mr. Khalil's definition of the policy, let alone identifying any deficiencies or inconsistencies in that definition. *See id.* at 6, 21, 22, 28, 32.[2]

To the contrary, Mr. Khalil has consistently defined Respondents' Policy as

_____

[2] The government glancingly cites *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871 (1990), and *Bennett v. Spear*, 520 U.S. 154 (1997), without discussion beyond brief parenthetical summaries, *see* PI Opp. at 32, seemingly to suggest that the Policy may not constitute reviewable "final agency action" under the APA. But—leaving aside that these cases would only be relevant to Mr. Khalil's APA claims, on which he has not moved—any "analogy to *Lujan*, where the plaintiffs challenged a constellation of [agency] actions announcing its intent to grant permission to certain activities, to decline to interfere with others, and to take other action if requested, is inapposite, because the Plaintiffs allege a specific 'policy of revoking the visas and green cards of [noncitizens] engaged in pro-Palestinian advocacy,' not a constellation of independent decisions or a general drift in agency priorities." *AAUP*, 2025 WL 1235084, at *21 (also holding "[t]his case is closer to [*R.I.L-R v.*] *Johnson* than *Lujan*," since "Plaintiffs allege that the Public Officials are targeting noncitizens who engage in pro-Palestinian advocacy for visa revocation and deportation, not that they have become anti-Palestinian or suppressive of speech in some general way"); *see also R.I.L-R*, 80 F. Supp. 3d at 184 (finding unwritten agency policy regarding immigration detention was final agency action).

being to arrest, detain, and seek to deport noncitizens who engage in protected expression in support of Palestinian rights or critical of Israel—including by invoking the Foreign Policy Ground to effectuate its Policy. *See* Th. Am. Pet. ¶¶ 2, 3, 8, 44, 98; *id.* at p. 28; Am. PI MOL at 1, 4-7, 40. And, as discussed above, he has created an undisputed preliminary-injunction record confirming its existence. *See supra*. Furthermore, both shortly before and since Mr. Khalil filed his petition, at least six additional noncitizens have been subjected to the same Policy, and several of them—along with one putative class—have filed suits identifying and challenging aspects of it. *See AAUP*, 2025 WL 1235084, at *2-4, *4 n.6 (describing the cases of Mr. Khalil, Mohsen Mahdawi, Rümeysa Öztürk, Ranjani Srinivasan, Yunseo Chung, Badar Khan Suri, Momodou Taal). In light of these developments, the court in *AAUP* has already held that "the Plaintiffs have plausibly alleged the existence of . . . an ideological-deportation policy."[3] *Id.* at *20. Here, on the undisputed record relevant to his preliminary injunction motion, Mr. Khalil has plainly shown he is likely to succeed in demonstrating the existence of the Policy he challenges.

ii.    <u>The Policy is unconstitutionally vague.</u>

As discussed in Mr. Khalil's prior briefing, the Policy is impermissibly vague

---

[3] The "ideological-deportation policy" is defined as a "policy of targeting noncitizens who engage in pro-Palestinian or anti-Israel speech and association for arrest, detainment, and deportation." *AAUP*, 2025 WL 1235084, at *1. In other words, it is the same Policy at issue in this case.

both because it "does not give proper notice to anyone residing in the country which of their otherwise-lawful speech, opinions, beliefs, or advocacy will result in the government targeting them for detention and removal," and because "it provides government officials with unfettered discretion to target disfavored speech." Am. PI MOL at 24; *see also id.* at 23-31 (discussing, *inter alia*, *F.C.C. v Fox*). The government acknowledges the argument but does not address or dispute it. *See* PI Opp. at 28. As such, the government does not articulate how any noncitizen could be on notice as to what pro-Palestinian expressive activity would result in their arrest or deportation—because they can't—and it otherwise concedes that "there is simply no manageable standard" to prevent the arbitrary or discriminatory application of a key aspect of its Policy, the use of the Foreign Policy Ground. *Id.* at 24.

Mr. Khalil does not repeat his arguments here but notes that the Supreme Court's analysis in *F.C.C. v. Fox*—another vagueness case analyzing a policy that "touch[ed] upon 'sensitive areas of basic First Amendment freedoms,'" 567 U.S. at 254 (quoting *Baggett,* 377 U.S. at 372, and *Reno v. ACLU,* 521 U.S. 844, 870–871 (1997) ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect."))—is particularly instructive for two reasons.

First, in *Fox* the Court considered a series of contemporaneous and preceding FCC opinions, directives, guidance, and letters to glean the indecency "policy in

place at the time" the plaintiffs were punished for broadcasting fleeting expletives or brief nudity. 567 U.S. at 254. The Court found the FCC had painted a confusing picture of what material was prohibited and that the "broad language" the FCC relied on to justify its fines did not resolve that confusion. *Id.* at 254–58 (holding, as a result, the FCC "failed to give . . . fair notice prior to the broadcasts in question that fleeting expletives and momentary nudity" were "indecent"). Similarly, here, the government announced a Policy that "promise[s]" noncitizens "who participated in pro-jihadist protests" the government will "find you and deport you," Exec. Order 14188 Fact Sheet—but its guidance regarding what specific expressive activity is prohibited is even more confusing than the FCC's statements in *Fox*, *see, e.g.*, Salama Decl. Ex. C (ECF 68-3) at 3 (Deputy DHS Secretary Troy Edgar refusing to provide a direct answer when asked if "any criticism of the Israeli government," "any criticism of the U.S," "any criticism of the government," or "protesting" are deportable offenses), and it ultimately justifies its actions in this instance through the breathtakingly "broad language," *Fox*, 567 U.S. at 257, of the Foreign Policy Ground, which it concedes has "no manageable standard," PI Opp. at 24. Nor does the Policy appear to impose any temporal limit on what expression might be captured. For these reasons, as in *Fox*, the Policy is vague both because it fails to give notice of prohibited expression and because it leaves people subject to arbitrary enforcement—"at the mercy of *noblesse oblige*." 567 U.S. at 255 (internal quotation

omitted); *see also Sessions v. Dimaya*, 584 U.S. 148, 174 (2018) (finding provision vague when interpreting key terms "necessarily 'devolv[ed] into guesswork and intuition'") (quoting *Johnson v. United States*, 576 U.S. 591, 600 (2015)).

Second, the Court in *Fox* found it particularly relevant that the challenged policy included key provisions whose "interpretation had changed" because the agency abruptly "changed course" and started targeting content that had previously gone unpunished. 567 U.S. at 254 (describing how these changes contributed to lack of notice of prohibited expression). Similarly, here the government's interpretation of the key terms it invokes to implement its Policy—the Foreign Policy Ground's "serious adverse foreign policy consequences," and expression that compromises "compelling" foreign policy interests, 8 U.S.C. §§ 1227(a)(4)(C)(i), 1182(a)(3)(C)(iii)—reflect an abrupt change from every previously reported use of the Foreign Policy Ground, none of which, on information and belief, involved the punishment of speech, protestors, or those engaging in expressive activity within the United States. *See* Th. Am. Pet. ¶87;[4] *see also Matter of Ruiz-Massieu*, 22 I&N Dec. 833 (BIA 1999) (describing *Matter of Khalifah*, 21 I&N Dec. 107 (BIA 1995), as "the only published Board case involving" the Foreign Policy Ground)). As in *Fox*,

---

[4] Noting the Foreign Policy Ground, according to all published records, appears to have been "reserved for cases involving high-ranking government officials or an alleged terrorist removable on other grounds and subject to high-profile prosecutions in their country of origin."

these abrupt changes to the government's practice and interpretation further support the conclusion that, as a result, there is no "fair notice of what has been prohibited."

For all these reasons, and for those discussed in his previous briefing, *see* Am. PI MOL at 23-31; PI Reply at 16, Mr. Khalil is likely to succeed on the merits of his claim that Respondents' Policy is unconstitutionally vague.

## II.    The Foreign Policy Ground is unconstitutionally vague as applied to Mr. Khalil through the Rubio Determination.

In separately challenging the Rubio Determination as unconstitutionally vague, *see* Am. PI MOL at 26-31, Mr. Khalil brings an as-applied challenge to the Foreign Policy Ground—the statutory basis for that Determination. The government's application of the Foreign Policy Ground to Mr. Khalil is impermissibly vague because the statutory text failed to provide fair notice to him and failed to provide standards for its application. The historical application of the statute is further evidence of that failure, as is the text of the Determination itself.[5]

In an as-applied challenge, the plaintiff must show that the statute was "vague as applied to him." *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 167 (3d Cir. 2008). When a statute involves "removal," courts will apply "the most

---

[5] At a hearing on May 2, the Court asked whether Mr. Khalil is making a separate claim challenging the Rubio Determination itself as a vague "explanation" of the alleged violation. May 2 Tr. (ECF 229) at 8:23-25. He does not do so, and clarifies here that text of the Determination's explanation is evidence in support of his as-applied void-for-vagueness claim challenging the government's application of the Foreign Policy Ground to him.

exacting vagueness standard" because of the consequences that flow from a violation, *Dimaya*, 584 U.S. at 156 (citing *Jordan v. De George*, 341 U.S. 223, 229 (1951)), and "[w]hen speech is involved," the analysis is also more "rigorous . . . to ensure that ambiguity does not chill protected speech," *Fox*, 567 U.S. at 253–54.

Here, the Foreign Policy Ground states that a noncitizen "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(a)(4)(C)(i). Where a person's lawful, past, current, or even "expected" beliefs, statements, or associations are cited as the basis for their deportation, removal is barred unless the Secretary of State personally determines that the noncitizen's continued presence or activities would compromise a "compelling" foreign policy interest. 8 U.S.C. § 1182(a)(3)(C)(iii).

The text of the Foreign Policy Ground does not identify what past, current, or future activities would make someone subject to it or how that person could conform their expression or activities to its requirements. *See Massieu v. Reno*, 915 F. Supp. 681, 699 (D.N.J. 1996) (reviewing facial challenge to the Foreign Policy Ground and concluding "the statute provides absolutely no notice to aliens as to what is required of them under the statute"), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996). The requirement that a noncitizen's presence or activities would compromise a "compelling" U.S. foreign policy interest does not provide any further clarity or

15

discernable standard for enforcement. *Massieu*, 915 F. Supp. at 702 n.21 (noting "the phrase 'compelling United States foreign policy interest' lacked definite standards" and "gives absolutely no guidance" as to how it "should be interpreted").

The Supreme Court's decision in *Dimaya*, 584 U.S. 148, is instructive with respect to this type of qualitative provision. In that case, the Court analyzed the definition of the term "crime of violence" as used in the statutory residual clause, 18 U.S.C. § 16(b), and incorporated in the definition of an "aggravated felony" in the INA, 8 U.S.C. §1101(a)(43)(F). The residual clause defined a "crime of violence" as one that, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Dimaya*, 584 U.S. at 153. The Court held that this formulation was unconstitutionally vague for two reasons. First, because it required a court to identify a crime's "ordinary case" without any standards for doing so. *Id.* at 160. And most relevant here, the "second fatal feature" of the law was the uncertainty of what constitutes a "substantial risk" that physical force may be used. *Id.* at 161. Such a "fuzzy risk" standard will necessarily devolve into judicial "guesswork." *Id.* at 171, 174.

So too here, where what is "potentially serious" or "compelling" to one administration at one point in time will not necessarily be serious or compelling to another or even the same administration at a later point, leading to conjecture and guesswork as to what expression could be subject to the Foreign Policy Ground. *See*

16

Am. PI MOL at 25–26. These concerns are heightened where attempts to divine how the "fuzzy" provision could have applied to Mr. Khalil's expressive activity are currently chilling protected speech. *See Fox*, 567 U.S. at 253–54.

The historical application of the Foreign Policy Ground—specifically the absence of any history of applying the statute or of Congress intending to apply the statute to students engaged in routine political speech in the United States on a matter of public concern—is further evidence that Mr. Khalil could not have been on notice that the government would or could apply the Foreign Policy Ground to his expressive activity. *See id.* at 254 (evidence of "changed course" in application of a standard, particularly an "abrupt" change involving "sensitive areas of basic First Amendment Freedoms," demonstrated lack of notice) (cleaned up). Here, as *amici* describe, in the 35 years since the Foreign Policy Ground's enactment, out of 11.7 million cases, DHS has invoked it approximately fifteen times, and never based on any conduct or expression that was anything like Mr. Khalil's.[6] *See* Amicus Br. of Immigration Lawyers, Law Professors, and Scholars (ECF 110-1) at 7–8 ("It may well be that Mr. Khalil's case is unprecedented in the history of this provision and in

---

[6] Of those few cases, only two are publicly identifiable. The first is *Massieu*, (ECF 214 at V.D), involving a former senior Mexican official under investigation by the Mexican government whose continued "presence [in the United States] had become a thorn in the side of U.S.-Mexico relations." *Id*. at 81. The second is Mohammed Khalifah, a relative of Osama Bin Laden, where the government invoked the Foreign Policy Ground based on the Jordanian government's allegations of his involvement in terrorist attacks. *See Matter of Khalifah*, 21 I&N Dec. 107 (BIA 1995).

the history of the United States."). In light of this history, when Mr. Khalil was engaging in speech and expressive activity alongside thousands of other students during 2023 and 2024, *see* Th. Am. Pet ¶¶ 22-24, he could not possibly have been on notice that the Foreign Policy Ground would apply to his actions. *See United States v. Ferriero*, No. 13-CV-592, 2015 WL 225806, at *16–17 (D.N.J. Jan. 15, 2015) (noting the "touchstone" of the fair notice prong is "whether the statute, either standing alone or as construed" gives the individual "fair warning") (cleaned up).

Similarly, even if he had studied the statute's legislative history, he would have had no notice the government here could one day apply it to him via the Rubio Determination. When Congress amended the INA to add the Foreign Policy Ground in its current form, it was *removing* McCarthy-era ideological exclusion grounds and made clear its intent "to take away the executive branch's authority" to target "political beliefs" and "speech in the United States," and to "[affirm] the principles of the First Amendment." S. Rep. No. 100–75, at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987). Congressional conference reports indicated the provision would be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies." H.R. Rep. No. 101-955, at 35417 (1990) (Conf. Rep.)[7] (giving as examples

---

[7] *Available at* https://www.congress.gov/101/crecb/1990/10/26/GPO-CRECB-1990-pt24-1-1.pdf.

high-level individuals implicated in the "violat[ion of] a treaty or international agreement," and the admission of the Shah of Iran, which precipitated the Iranian Hostage Crisis). To the extent the respondents here have adopted "new principle[s]," *see Fox*, 567 U.S. at 254, untethered to this legislative history, Mr. Khalil plainly had "no notice" that his expressive activity could be swept up as a result, *id.*; *see also Wright v. State of Ga.*, 373 U.S. 284, 291–93 (1963) (noting when a "generally worded statute" is "construed to punish conduct which cannot be constitutionally punished," that application "is unconstitutionally vague") (cleaned up).

Finally, the text of the Rubio Determination itself further demonstrates the lack of notice and arbitrary and discriminatory enforcement that render this application of the statute impermissibly vague. It generically alleges the "participation" of Mr. Khalil in unnamed "antisemitic protests and disruptive activities," which it further alleges "undermine U.S. policy to combat anti-Semitism around the world." *See* ECF 198-1 at 7. These terms are versions of the same ambiguous, standardless language employed by the government in its public statements about the Policy and discussed in Section I(B) of this memorandum, *see supra* at 7–14; Am. PI MOL at 23–31, and they do not reflect any narrowing principle as to what specific protected activity is prohibited or rises to the level of compromising a compelling foreign policy interest. The Determination makes plain the government has given itself absolute discretion to apply similar language

arbitrarily and to any noncitizen engaging in pro-Palestinian expressive activity. *See* Am. PI. MOL 26–27; *cf. Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 783 (4th Cir. 2023) (holding disorderly conduct statute vague as applied to students because the terms "disorderly," "boisterous," "obscene" or "profane" do not "explain the law's scope or limit the discretion with enforcing it").

For all these reasons, and those discussed in Mr. Khalil's earlier briefing on this issue, *see* Am. PI MOL at 26–30, the Court should find that Mr. Khalil is likely to succeed on his claim that the Foreign Policy Ground, as applied to him through the Rubio Determination, is unconstitutionally vague.

## CONCLUSION

For the foregoing reasons, and for all the reasons discussed in his submissions in support of his motion for a preliminary injunction and for release, those motions should be granted.

Dated: May 7, 2025                          Respectfully submitted,
Newark, NJ

                                            */s/Jeanne LoCicero*

NEW YORK CIVIL LIBERTIES UNION              AMERICAN CIVIL LIBERTIES UNION OF
FOUNDATION                                  NEW JERSEY FOUNDATION
Amy Belsher*                                Jeanne LoCicero
Robert Hodgson*                             Farrin R. Anello
Veronica Salama*                            Molly K.C. Linhorst
Molly Biklen*                               570 Broad Street, 11th Floor
125 Broad Street, 19th Floor                Newark, New Jersey 07102
New York, N.Y. 10004                        973-854-1715
Tel: (212) 607-3300

                                            CENTER FOR CONSTITUTIONAL RIGHTS
AMERICAN CIVIL LIBERTIES UNION              Baher Azmy
FOUNDATION                                  Samah Sisay*
Omar Jadwat                                 Diala Shamas*
Noor Zafar*                                 666 Broadway, 7th Floor
Sidra Mahfooz*                              New York, NY 10012
Brian Hauss*                                Tel: (212) 614-6464
Esha Bhandari*
Vera Eidelman*                              CLEAR PROJECT
Tyler Takemoto*                             MAIN STREET LEGAL SERVICES, INC.
Brett Max Kaufman*                          Ramzi Kassem
125 Broad Street, 18th Floor                Naz Ahmad
New York, NY 10004                          Shezza Abboushi Dallal
Tel: (212) 549-2500                         CUNY School of Law
                                            2 Court Square
WASHINGTON SQUARE LEGAL SERVICES,           Long Island City, NY 11101
INC.                                        Tel: (718) 340-4558
Alina Das*
Immigrant Rights Clinic                     DRATEL & LEWIS
245 Sullivan Street, 5th Floor              Amy E. Greer
New York, New York 10012                    29 Broadway, Suite 1412
Tel: (212) 998-6430                         New York, NY 10006
                                            Tel: (212) 732-8805
                                            Fax: (212) 571-3792

21

*Appearing pro hac vice*

*Counsel for Petitioner*

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing filing was

served on counsel of record via this Court's CM/ECF system on May 7, 2025.

/s/ Jeanne LoCicero
Jeanne LoCicero
AMERICAN CIVIL LIBERTIES UNION OF
NEW JERSEY FOUNDATION
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

*Counsel for Petitioner*