May 12, 2025

<u>VIA ECF</u>
Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street, Newark, New Jersey 07101

    **Re:**    ***Khalil v. Trump, et al.*, No. 2:25-cv-1963 (MEF) (MAH)**

Dear Judge Farbiarz:

    Petitioner respectfully writes to provide notice of further supplemental authorities relevant to the Court's consideration of Petitioner's motions. First, in *Ercelik v. Hyde*, No. 25-cv-11007, Dkt. 30 (D. Mass. May 8, 2025) (attached as Exhibit A), the district court granted the petitioner's motion for a preliminary injunction, finding that the government retaliated against him for his pro-Palestinian expression in violation of the First Amendment (retaliation) and the Fifth Amendment right to due process. The court ordered his "immediate release," and enjoined the government from effecting a future arrest on any similar grounds.

    Second, Petitioner submits the unofficial transcript from the bail hearing in the *Öztürk* case, held on May 9. In ordering the petitioner's immediate release from custody in Louisiana, the District of Vermont court made the following findings in its ruling from the bench, *Öztürk v. Hyde*, No. 25-cv-0374, Tr. Bail Hrg. 105:9-115:5 (D. Vt. May 9, 2025) (attached as Exhibit B):

- "Ms. Ozturk has sufficiently established all three factors" under *Mapp*. Tr. Bail Hrg. 105:22-23.

- That petitioner's claims, which are similar to Mr. Khalil's here, amounted to "very substantial claims of both due process and First Amendment violations." *Id.* at 107:21-23.

- That the government's efforts to quickly whisk the petitioner across multiple state lines from Massachusetts to Louisiana, which are comparable to the government's actions in Mr. Khalil's case, formed part of the extraordinary circumstances in that case. *Id.* at 108:14-109:16.

- That detention both "necessarily constitutes a continued infringement on Ms. Ozturk's First Amendment and due process rights" and "potentially chills the speech of the millions and millions of individuals in this country who are not citizens," and that, therefore, "her continued detention cannot stand" and "bail is necessary to make the habeas remedy effective." *Id.* at 109:25-110:12.

- That "immigration judges are Executive Branch employees subject to Executive Branch orders," not an "Article III court," and, notwithstanding "that an

immigration judge in Louisiana found danger and flight risk for Ms. Ozturk," noting that "there has been absolutely no evidence introduced by the government which in any way indicates that she poses a danger of flight or that she poses a risk to the community," weighed against "numerous sworn affidavits" submitted in her support, and concluding "that she does not pose a danger to the community, nor does she present a risk of flight." *Id.* at 110:21-112:1.

- That Ms. Ozturk's detention "has been a very traumatic event," *id.* at 113:1, that "the Court is not going to stay this order" releasing her on bail, *id.* at 113:20-21, and that the government must "monitor the situation in Louisiana" and inform the court "immediately when she's released, *id.* at 114:15-17.

In addition, on the same date, the court issued a supplemental order reaffirming its "finding of no flight risk and no danger to the community" concerning the petitioner and prohibiting the government from requiring any "Body-Worn GPS or other ICE monitoring at this time," to include ankle bracelets and the like, prior to the petitioner's immediate release from ICE custody on her own recognizance, which was effectuated shortly after the supplemental order issued. *Özturk v. Hyde*, No. 25-cv-0374, Dkt. 131 (D. Vt. May 9, 2025) (attached as Exhibit C).

Respectfully submitted,

/s/ Baher Azmy

AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

NEW YORK CIVIL LIBERTIES UNION FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Omar Jadwat

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Mudassar Toppa*
Shezza Abboushi Dallal*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das*
Immigrant Rights Clinic

Noor Zafar*
Sidra Mahfooz*
Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

* *Appearing Pro hac vice*

*Counsel for Petitioner*

# Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **EFE ERCELIK**,                                   ) | |
|                                        ) | |
|          Petitioner,              ) | |
|                                        ) | |
| v.                                       ) | Civil Action No. 1:25-CV-11007-AK |
|                                        ) | |
| **PATRICIA HYDE**, Acting Director of Boston   ) | |
| Field Office, U.S. Immigration and Customs   ) | |
| Enforcement; **KRISTI NOEM**, Secretary of the   ) | |
| U.S. Department of Homeland Security; **PAMELA** ) | |
| **BONDI**, Attorney General of the United States;   ) | |
| in their official capacities,                 ) | |
|                                        ) | |
|         Respondents.            ) | |
|                                        ) | |

## MEMORANDUM AND ORDER ON PETITIONER'S MOTION FOR INJUNCTIVE RELIEF

**ANGEL KELLEY, D.J.**

On April 16, 2025, Petitioner Efe Ercelik ("Petitioner") filed a Petition for Writ of Habeas Corpus for relief under 28 U.S.C. § 2241 ("Section 2241") against Patricia Hyde, in her official capacity as Acting Director of the Boston Field Office for Immigration and Customs Enforcement ("ICE"); Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security ("DHS"); and Pamela Bondi, in her official capacity as Attorney General of the United States (together, "Respondents"). [Dkt. 1].  Initially, Petitioner alleged that he was in Respondents' constructive custody, asserting that ICE agents were stationed outside his residence, poised to arrest him should he attempt to leave.  [See Dkt. 1].  At that time, whether Petitioner was indeed in custody for purposes of a Section 2241 habeas petition was contested. [See Dkt. 7].  However, Petitioner was taken into actual custody of the Respondents, as he was

arrested by ICE agents at the Eastern Hampshire District Court after attending to his state court obligations. [Dkt. 26]. The taking of Petitioner into physical custody resolved the dispute of whether constructive custody was sufficient to establish jurisdiction under Section 2241.

Currently before the Court is Petitioner's Motion for a Temporary Restraining Order ("Motion") [Dkt. 10] and Addendum [Dkt. 26] (collectively, the "Amended Motion"), requesting the Court to enjoin Respondents from further detaining him or interfering with his departure from the United States. For the reasons below, the Court finds that Petitioner has met the criteria for injunctive relief, and the Amended Motion is **GRANTED IN PART** pending further proceedings.[1] In summary, Respondents are **ORDERED** to **<u>immediately release</u>** Petitioner and are **RESTRAINED** from arresting or detaining him for civil immigration detention purposes during the pendency of these proceedings unless Respondents first provide advance notice to the Court and Petitioner's counsel, allowing Petitioner an opportunity to be heard.

I.     **BACKGROUND**

Petitioner entered the United States in Spring 2022 on an F-1 student visa, which he has maintained through his full-time undergraduate enrollment. In November 2023, Petitioner was involved in a verbal and physical altercation as a counter-protester during an on-campus political demonstration, resulting in several state criminal charges. He was granted bail.

More than 17 months later, on April 16, 2025, ICE agents arrived at Petitioner's residence, informed him of his visa revocation, and attempted to arrest him. At that time, Petitioner believed the agents were stationed outside his home, preventing him from leaving due

---

[1] The relief granted herein requires Respondents to release Petitioner from custody and refrain from detaining him during the pendency of these proceedings. However, the Court does not opine on whether Petitioner may or may not depart the United States. Petitioner's ability to leave the country remains a consequence of his own actions and is not explicitly authorized or prohibited by this Order.

to the imminent threat of arrest.  His defense counsel visited his residence, spoke with ICE agents, and was permitted to photograph a letter stating that the U.S. Department of State ("State Department") revoked his F-1 student and B-2 tourist visas on April 9, 2025.  [Dkt. 9-4].

That same day, Petitioner filed a habeas petition, alleging he was in Respondents' constructive custody and faced imminent arrest and detention, which would obstruct his ability to appear at his scheduled state criminal hearing.  He further argues that Respondents' detention efforts violate his rights under the First, Fifth, and Sixth Amendments, specifically that Respondents' actions constitute retaliation against his political speech and a misuse of immigration processes.  Further, he asserts that his detention lacks a legitimate purpose and unjustly impairs his ability to resolve pending state court charges.  On April 21, 2025, Respondents filed an opposition [Dkt. 7], contending that the Court lacks jurisdiction because Petitioner was not in their physical custody and, even if he were, judicial review of executive agency actions is precluded.

On April 23, 2025, Petitioner filed an Amended Petition for Writ of Habeas Corpus ("Petition") [Dkt. 9] under Section 2241, along with the instant Motion, continuing to seek relief from his constructive detention.  Respondents again opposed the requested relief [Dkt. 13], and the Court held a hearing on April 29, 2025, where the Court learned that formal removal proceedings had still not commenced through the issuance of a Notice to Appear ("NTA").  [Dkt. 12].  On May 5, 2025, the Court held a further conference, during which the parties reported no further updates on the initiation of immigration proceedings.  [Dkt. 20].

On May 7, 2025, while the Motion was still under advisement, Petitioner submitted an Addendum to his Motion, notifying the Court that Petitioner was arrested by Respondents' agents after he appeared in state court to resolve his criminal case.  [Dkt. 26].  Petitioner was

taken into their custody. The Court ordered a hearing on the same date in light of Petitioner's arrest. [Dkt. 29]. Finally, the Petitioner was served with an NTA in court, thereby initiating the removal process. Petitioner reiterated that his detention serves no lawful purpose beyond retaliatory punishment for his political speech and requests that the Court order his immediate release.

## II.    JURISDICTION

Before addressing the merits of Petitioner's request for injunctive relief, the Court must first establish its jurisdiction over this matter. Federal courts are courts of limited jurisdiction, possessing only the authority granted by the Constitution and statutes. See Corrigan v. Bos. Univ., 98 F.4th 346, 356 (1st Cir. 2024) (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)). Nonetheless, "district courts retain jurisdiction over challenges to the legality of detention in the immigration context." Hamada v. Gillen, 616 F. Supp. 2d 177, 181 (D. Mass. 2009) (quoting Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 11 (1st Cir. 2007)).

Under Section 2241, federal courts may grant habeas corpus relief to individuals who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The highest duty of a court under our constitutional system is the careful examination and adjudication of these habeas corpus petitions. See Harris v. Nelson, 394 U.S. 286, 292 (1969); Burns v. Wilson, 346 U.S. 137, 148 (1953) (concurring statement of Frankfurter, J.) ("The right to invoke habeas corpus to secure freedom is not to be confined by any a priori or technical notions of 'jurisdiction.' . . . And so, *if imprisonment is the result of a denial of due process, it may be challenged no matter under what authority of Government it was*

*brought about*." (emphasis added)).  Accordingly, the Court must determine: (1) whether Petitioner is in the custody of Respondents and (2) whether such custody violates constitutional or federal law.  Based on the record and the current procedural posture of this case, the Court finds that both conditions are met and retains jurisdiction over this matter.

### A.  Petitioner is in Custody

The first jurisdictional issue is whether Petitioner satisfies the "custody" requirement necessary for habeas review.  Section 2241's central requirement is custody; a concept courts consistently construe broadly.[2]  Indeed, case law confirms that habeas review even extends beyond mere physical incarceration, requiring instead that petitioners be subject to restraints "not shared by the public generally."  See Jones v. Cunningham, 371 U.S. 236, 240 (1963); Tinder v. Paula, 725 F.2d 801, 803 (1st Cir. 1984).

Initially, the issue of custody was contested.  Petitioner claimed constructive custody based on ICE agents' surveillance outside his residence, suggesting imminent arrest.  Courts have long recognized that custody is not limited to physical confinement but extends to situations where an individual's liberty is substantially restrained.  See Justs. of Bos. Mun. Ct. v. Lydon, 466 U.S. 294, 300 (1984) ("[T]he use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody." (citation omitted)).  Habeas review has traditionally encompassed individuals subject to government supervision, even in the absence of formal incarceration.  See, e.g., Hensley v. Mun. Ct., 411 U.S. 345 (1973) (finding release on personal recognizance constitutes custody); Jones, 371 U.S. at 243 (holding that parole meets the

---

[2] See Maleng v. Cook, 490 U.S. 488, 492 (1989) (noting that the custody requirement has been "very liberally construed"); Harris, 394 U.S. at 291 ("The scope and flexibility of the writ—its capacity to reach all manner of illegal detention. . . have always been emphasized and jealously guarded by courts and lawmakers."); Peyton v. Rowe, 391 U.S. 54, 64 (1968) (holding the custody requirement "should be liberally construed" because of the remedial goals of the statute); Jones v. Cunningham, 371 U.S. 236, 243 (1963) (acknowledging habeas relief has never "been a static, narrow, formalistic remedy").

custody requirement); Lydon, 466 U.S. at 300-01 (finding pretrial release qualifies as custody); Lefkowitz v. Fair, 816 F.2d 17, 19 (1st Cir. 1987) (same).  Petitioner's theory of constructive custody was a hurdle, one which the Court was uncertain could be established, but one Petitioner is no longer required to clear.

As of May 7, 2025, the question of custody is no longer theoretical.  Petitioner was physically detained by ICE agents after attending a state court hearing.  Unlike the prior claim of constructive custody, based primarily on his perceived restriction of movement due to ongoing surveillance, Petitioner is now undeniably subject to the executive's direct control.  Given this development, the Court finds that the threshold jurisdictional requirement of custody is satisfied.

### B.  Applicability of Jurisdiction-Stripping Immigration Statutes

Respondents advance several arguments to challenge this Court's authority to review the Petition.  First, they contend that the plain text of 8 U.S.C. § 1201(i) bars district court review of the State Department's revocation of visas.  Second, they invoke multiple jurisdiction-stripping statutes, arguing that: (1) Under 8 U.S.C. § 1252(g), district courts lack jurisdiction over ICE's decision to initiate removal proceedings and execute removal orders; (2) under 8 U.S.C. § 1226(e), judicial review of ICE's decision to arrest and detain Petitioner is foreclosed; and (3) under 8 U.S.C. §§ 1252(a) and 1252(b)(9), any future challenge to Petitioner's removal must proceed administratively before reaching a circuit court.  Finally, Respondents argue that under 8 U.S.C. § 1252(a)(2)(B)(i), the Court lacks jurisdiction over decisions concerning Petitioner's voluntary departure from the United States.  Petitioner refutes each argument and the Court examines them in turn.

### 1.  Section 1201(i)

On April 9, 2025, Petitioner's visa was revoked pursuant to Section 1201(i).

Respondents argue that the plain text of this statute categorically bars judicial review of such revocations.  Section 1201(i) states:

> After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation . . . There shall be no means of judicial review (including review pursuant to section 2241 of Title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title) of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201.  Respondents urge this Court to follow courts in other jurisdictions that found "themselves without jurisdiction to consider the merits of a visa revocation upon operation of Section 1201(i)'s language."  [Dkt. 13 at 9].  However, Petitioner does not contest the merits of the visa revocation.  He has repeatedly and unequivocally stated that he is not challenging the revocation itself, but rather the subsequent detention and imminent arrest.  [Dkt. 17 at 5].  Consequently, Respondents' reliance on Section 1201(i) is misplaced.  The statute does not preclude judicial review of Petitioner's detention, which arises independently of the visa revocation.  See Ozturk v. Trump, No. 25-CV-374, 2025 WL 1145250, at *12 (D. Vt. Apr. 18, 2025) (finding that Section 1201(i) does not bar judicial consideration of constitutional claims).  The Court thus proceeds to Respondents' next argument.

### 2.  Section 1252(g)

Respondents further argue that the Court lacks jurisdiction to review ICE's decision to commence removal proceedings and effectuate removal orders.  Respondents direct the Court to Section 1252(g), which is titled "Judicial review of orders of removal."  On its face, Section 1252(g) seems broad.  It was, indeed, enacted to "to streamline removal proceedings and enhance enforcement of immigration laws that had gone largely unchanged since 1952."  Patricia

Flynn & Judith Patterson, <u>Five Years Later: Fifth Circuit Case Law Developments Under the</u>

<u>Illegal Immigration Reform and Immigrant Responsibility Act</u>, 53 Baylor L. Rev. 557, 561

(2001).  However, "the rest of the legislative history makes clear that the majority of members of

Congress did not intend for this provision to be infinitely broad."  Matthew Miyamoto, <u>Whether</u>

<u>8 USC § 1252(g) Precludes the Exercise of Federal Jurisdiction over Claims Brought by</u>

<u>Wrongfully Removed Noncitizens</u>, 86 U. Chi. L. Rev. 1655, 1664 (2019).  This is confirmed by

the statute's express words:

> Except as provided in this section and notwithstanding any other
> provision of law (statutory or nonstatutory), including section 2241
> of Title 28, or any other habeas corpus provision, and sections 1361
> and 1651 of such title, no court shall have jurisdiction to hear any
> cause or claim by or on behalf of any alien arising from the decision
> or action by the Attorney General to commence proceedings,
> adjudicate cases, or execute removal orders against any alien under
> this chapter.

8 U.S.C. § 1252(g).  The plain text of the statute makes clear that Section 1252(g) applies to

cases when removal orders are entered against a noncitizen.  <u>See</u> <u>Kong v. United States</u>, 62 F.4th

608, 612 (1st Cir. 2023).  The question before the Court is whether it can also apply to cases

where an order of removal has not been entered.  In fact, when the Court held its initial hearings,

Respondents had yet to initiate removal proceedings through the service of an NTA.

Respondents argue that Section 1252(g) also applies to "actions to commence

proceedings that ultimately may end in the execution of a final removal order," in addition to

applying to actions or decision to "adjudicate cases or execute removal orders."  [Dkt. 13 at 11].

To bolster this argument, they point to several cases, almost all of which are out of circuit.  The

Court appreciates the complexities of United States immigration law and recognizes that courts

often arrive at opposing conclusions when faced with jurisdiction-stripping statutes.  <u>Compare</u>

<u>Taal v. Trump</u>, No. 25-CV-335-ECC-ML, 2025 WL 926207, at *2 (N.D.N.Y. Mar. 27, 2025)

(jurisdiction stripped), with Ozturk, 2025 WL 1145250, at *15 (jurisdiction not stripped).  This Court is guided by binding precedent.[3]  It will turn to out of circuit case law when the First Circuit and the Supreme Court are silent on an issue.  Here, the Supreme Court and the First Circuit have neither been silent nor lacked clarity.

In Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471 (1999), the Supreme Court narrowly construed Section 1252(g), holding that it applies "only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"  Id. at 482 (emphasis in original).  Justice Alito reaffirmed this limited scope twenty years later saying, "We did not interpret this language to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General.  Instead, we read the language to refer to just those three specific actions themselves."  Jennings v. Rodriguez, 583 U.S. 281, 294 (2018).  According to Reno and Jennings, Section 1252(g) is not an automatic bar to judicial review.

Reading the statute narrowly, as the Supreme Court instructs, does not allow this Court to expand Section 1252(g) to allow for "decisions and actions" that "ultimately may end in the execution of a final removal order," as Respondents suggest.  [Dkt. 13 at 11].  Petitioner here does not challenge the initiation of removal proceedings—rather, he challenges his detention, arguing that it is retaliatory and serves no legitimate governmental purpose.  The First Circuit has clarified that Section 1252(g) does not prevent judicial review of a petitioner's challenge to the legality of their detention and noted that many decisions and actions within the deportation process do not fall under the three specific exercises of discretion outlined in Section 1252(g).  See Kong, 62 F.4th at 617.  Similarly, district courts have recognized that habeas challenges to

---

[3] This Court also looks to our sister courts for persuasive authority.

9

discretionary detention—where a petitioner is not challenging the execution of a removal order—fall outside the scope of Section 1252(g).  See Ozturk, 2025 WL 1145250, at *14 ("[T]he Court is not considering a removal case. The Court is considering a habeas challenge to discretionary detention.").  Additionally, a sister court in this Circuit found that Section 1252(g) does not strip the court's jurisdiction when the alleged harm is purely motivated by the government's disagreement with certain speech.  Am. Ass'n of Univ. Professors v. Rubio, No. 25-CV-10685-WGY, 2025 WL 1235084, at *12 (D. Mass. Apr. 29, 2025) ("AAUP").  That court reasoned that habeas claims implicating constitutional violations should not be shoehorned into Section 1252(g).  Id.

Additionally, in dictum, the Reno court left open the possibility of an exception for outrageous conduct, stating there may be "a rare case in which the alleged basis of discrimination is so outrageous" that an exception might lie.  525 U.S. at 491.  The Supreme Court did not discuss what constitutes an "outrageous claim," but the Second Circuit expounded on factors for courts to consider:

> [Reno] compels courts to evaluate the gravity of the constitutional right affected; the extent to which the plaintiff's conduct or status that forms the basis for the alleged discrimination is actually protected; the egregiousness of the Government's alleged conduct; and the plaintiff's interest in avoiding selective treatment, as balanced against the Government's discretionary prerogative.

Ragbir v. Homan, 923 F.3d 53, 69 (2d Cir. 2019), cert. granted, judgment vacated sub nom. Pham v. Ragbir, 141 S. Ct. 227, 208 L. Ed. 2d 1 (2020).  However outrageous the claims might be is an inquiry that will not be addressed today.  While Petitioner does not invoke this exception, the Court highlights it to underscore the conclusion the Supreme Court first arrived at in 1999: Section 1252(g) is not an automatic bar to judicial review.  The Court thus rejects Respondents' argument and proceeds to the next theory.

10

### 3.  Section 1226(e)

Respondents contend that Section 1226(a) authorizes ICE to detain Petitioner and Section 1226(e) bars judicial review of ICE's decision to arrest and detain him.  Section 1226 governs apprehension and detention of noncitizens generally, while Section 1226(e) specifically limits judicial review.  It provides:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole.

8 U.S.C. § 1226(e).  The Court's analysis begins—and ends—with the Supreme Court's decision in Demore v. Kim, 538 U.S. 510 (2003).  There, the Court held that "where a provision precluding review is claimed to bar habeas review, the Court has required a particularly clear statement that such is Congress' intent."  Id. at 517 (citing Webster v. Doe, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.")).

Petitioner has raised several constitutional challenges to his detention, and Section 1226(e) contains no clear statement barring habeas review of such claims.  The First Circuit agrees.  See Hernandez-Lara v. Lyons, 10 F.4th 19, 33-34 (1st Cir. 2021) (holding that Section 1226(e) does not strip jurisdiction over habeas petitions challenging constitutional violations related to detention); see also Pensamiento v. McDonald, 315 F. Supp. 3d 684, 689 (D. Mass. 2018); Ozturk v. Trump, No. 25-CV-10695-DJC, 2025 WL 1009445, at *4 (D. Mass. Apr. 4, 2025); Campbell v. Chadbourne, 505 F. Supp. 2d 191, 196 (D. Mass. 2007) (same).  Since binding precedent has already determined that Section 1226(e) does not bar habeas jurisdiction, the Court rejects Respondents' argument and proceeds to the next theory.

#### 4.  Sections 1252(a)(5) and 1252(b)(9)

Respondents argue that any future challenge to removal must proceed administratively before reaching a circuit court, relying on Sections 1252(a)(5) and 1252(b)(9).  The Court finds this misstates the law—neither provision categorically bars jurisdiction over Petitioner's habeas petition.

Sections 1252(a)(5) and 1252(b)(9) must be read in conjunction to determine their scope. As statutory titles often provide context, see Singh v. Gonzales, 499 F.3d 969, 977 (9th Cir. 2007), the Court will examine the statutory text *and* the titles.  See also United States v. De La Cruz, 998 F.3d 508, 517 (1st Cir. 2021); Bollat Vasquez v. Wolf, 460 F. Supp. 3d 99 (D. Mass. 2020).  Section 1252(a)(5), titled "Exclusive means of review," provides that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of *an order of removal entered or issued* under any provision of this chapter."  (emphasis added).  Section 1252(b)(9), titled "Consolidation of questions for judicial review," provides that "judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review *of a final order under this section*." (emphasis added).

Section 1252(a)(5) grants exclusive review of orders of removal to circuit courts, while Section 1252(b)(9) (also described as a "zipper clause") consolidates judicial review of immigration proceedings into one action in the circuit court.  Reno, 525 U.S. at 483.  But critically, both provisions apply only to judicial review of removal orders.  See I.N.S. v. St. Cyr, 533 U.S. 289, 311 (2001); see also Jimenez v. Nielsen, 334 F. Supp. 3d 370, 381 (D. Mass.

2018).  The Court now turns to Respondents' arguments.

Respondents rely on Aguilar to argue that challenges to the removal process must go to circuit courts.  Specifically, Respondents point to the words "arising from" in Section 1252(b)(9), which, according to this Court's discussion above, invokes Section(a)(5).  [Dkt. 13 at 17].  However, they misstate Aguilar.  The First Circuit explicitly rejected an expansive reading of Section 1252(b)(9): The words "'arising from' cannot be read to swallow all claims that might somehow touch upon, or be traced to, the government's efforts to remove an alien."  Aguilar, 510 F.3d at 10.  Had Congress intended to broadly bar all related claims, it could have used the more expansive language, "related to."  Id.  It did not.  See Coffey v. N.H. Jud. Ret. Plan, 957 F.3d 45 (1st Cir. 2020) (applying the presumption that Congress gives effect to every word of a statute).  Applying canons of construction, the Aguilar court said Section 1252(b)(9)'s jurisdiction-stripping feature does not exclude claims that are independent of the removal process.  Aguilar, 510 F.3d at 11.  This includes "challenges to the legality of detention in the immigration context."  Id.; see also Hernández v. Gonzales, 424 F.3d 42 (1st Cir. 2005) (holding that claims about detention are independent of removal proceedings and, thus, not barred by section 1252(b)(9)).

This Court cannot endorse Respondents' interpretation that "removability issues related to the revocation of [Petitioner's] visa or regarding his requests for relief" must be presented at the administrative level.  [Dkt. 13 at 18].  Such an interpretation would improperly sweep in all claims remotely related to the removal process.  This is also not an interpretation endorsed by the First Circuit.  In fact, the very case that Respondents rely on stands for the opposite interpretation.

> We thus read the words 'arising from' in section 1252(b)(9) to exclude claims that are independent of, or wholly collateral to,

> the removal process. Among others, claims that cannot effectively be handled through the available administrative process fall within that purview. This reading, we believe, is consistent with the wise presumption that Congress legislates with knowledge of longstanding rules of statutory construction.

Aguilar, 510 F.3d at 11.  Thus, Aguilar and Hernández confirm that challenges to detention—independent of removal proceedings—are not barred by Sections 1252(a)(5) or 1252(b)(9).  This Court is dutybound to apply binding precedent.  And this we do.  For the foregoing reasons, the Court concludes that Sections 1252(a)(5) and 1252(b)(9) do not deprive it of jurisdiction to adjudicate Petitioner's claims.  Since there is no order of removal, the claims are independent from the removal process.

### 5.  Voluntary Departure

Finally, Respondents assert that the Court lacks authority over decisions concerning Petitioner's voluntary departure from the United States.  Petitioner refutes having ever raised such a claim.  Instead, he argues that the mention of voluntary departure was merely intended to highlight the absurdity of Respondents' insistence on detaining him despite his clear intent to leave of his own accord.  [See Dkt. 17 at 10] (arguing the mention of voluntary departure "was simply meant to underscore the absurdity of Respondents' intent to prevent [Petitioner] from departing the U.S. voluntarily and at his own expense, in order to arrest him and put him in removal proceedings").  Regardless, this argument has no bearing on the Court's jurisdiction over the Petition, which challenges his detention, not his ability to depart voluntarily.

Having established that jurisdiction is proper, the Court now turns to Petitioner's Motion.

III.    **STANDARD OF REVIEW**

Rule 65 of the Federal Rules of Civil Procedure grants courts authority to issue temporary restraining orders and preliminary injunctions.  Courts apply the same standard in assessing a motion for temporary restraining order and a motion for preliminary injunction, which follow full briefing and the opportunity to be heard by the Court.  See Fed. R. Civ. P. 65; Wash. Tr. Advisors, Inc. v. Arnold, 646 F. Supp. 3d 210, 217 (D. Mass. 2022).  Following the briefing and oral argument in this matter, a preliminary injunction as opposed to a temporary restraining order, is appropriate.

A preliminary injunction is an extraordinary remedy, appropriate only under limited circumstances.  See Capen v. Campbell, No. 24-1061, 2025 WL 1135269, at *4 (1st Cir. Apr. 17, 2025) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).  The primary function of a preliminary injunction is to maintain the status quo between the parties until the court can resolve the case on its merits.  Savino v. Souza, 459 F. Supp. 3d 317, 324 (D. Mass. 2020) (citing Benisek v. Lamone, 585 U.S. 155, 161 (2018)).  It serves as an equitable safeguard, preventing either party from taking actions that could alter their legal positions during the litigation and ensuring they remain, as much as possible, in the same circumstances as when the suit commenced.  Id. (citing Francisco Sanchez v. Esso Standard Oil Co., 572 F.3d 1, 15 (1st Cir. 2009)).

To secure injunctive relief, Petitioner must satisfy four criteria: (1) likelihood of success on the merits; (2) risk of irreparable harm without relief; (3) balance of equities favoring the petitioner; and (4) alignment with public interest.  Capen, No. 24-1061, 2025 WL 1135269, at *4 (quoting Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013)).  Courts have emphasized that likelihood of success is weighed most heavily in this analysis.  Id. (citing Akebia

Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020)).  Still, "the measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," such that a greater likelihood of success on the merits permits "somewhat less" of a showing of irreparable harm.  Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (quoting EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996)).  Additionally, when the government is a party, the balance of equities merges with the public interest.  See D.V.D. v. U.S. Dep't of Homeland Sec., No. 25-CV-10676-BEM, 2025 WL 1142968, at *23 (D. Mass. Apr. 18, 2025) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

## IV.   DISCUSSION

Petitioner satisfies the requirements for injunctive relief, as he has demonstrated that there are valid constitutional claims, and further established he is likely to succeed on the merits of these claims, faces imminent and irreparable harm, and the balance of the equities weigh in his favor.

### A.  Likelihood of Success on the Merits

As to the first and most important prong, Petitioner is likely to succeed on his claims that his detention violates his constitutional rights.

#### 1.  Facts Relevant to the Constitutional Claims

On November 3, 2023, Petitioner walked past and then approached a pro-Israel event at the University of Massachusetts Amherst, where he was previously enrolled.  Before engaging in a physical altercation with a pro-Israel protester, Petitioner waved a Palestinian flag, raised his middle fingers to pro-Israel protestors, and expressed his own pro-Palestine views using

sometimes crude language.  Following the above-mentioned physical altercation, a police officer

arrived on the scene.  Three days later, Petitioner was charged for the altercation in East

Hampshire District Court.  After it was determined that Petitioner was neither a flight risk nor a

danger to the community, he was released on $250.00 bail.

Over the next 16 months, very little happened in connection to Petitioner's conduct on

November 3.  Instead, he complied with all conditions of release and, with permission, traveled

outside of the United States on two occasions, interacting with immigration officials upon

reentry each time.  Petitioner has since pled guilty to misdemeanors,[4] with no required

imprisonment, resolving the criminal matter in whole.

During this time, a profile for Petitioner appeared on the website for Canary Mission, an

organization that claims its mission is to "document[] individuals and organizations that promote

hatred of the USA, Israel and Jews on North American college campuses and beyond."  The

profile of Petitioner discusses the events of November 3.  On April 8, 2025, Betar Worldwide, an

organization that claims its mission is "to empower Jews to stand strong, speak out, and defend

their heritage and Israel against all threats," tweeted an image from Petitioner's Canary Mission

profile.  Along with the image, the tweet claimed to "have submitted [Petitioner's] name for

deportation."  [Dkt. 9-5].   It appears that Petitioner's name had, in fact, recently been "submitted

for deportation."  On April 9, 2025, just a day after the tweet, the Deputy Assistant Secretary of

State for Visa Services sent a memo to ICE regarding revocation of Petitioner's visa, effective

that same day.[5]  On April 10, 2025, the Department of Homeland Security issued an

---

[4] Both Petitioner and Respondents confirmed that the pled-to misdemeanors cannot serve as grounds for removability.

[5] The memo read: "On March 31, 2025, in response to a request from DHS/ICE and the assessment from DHS/ICE that Efe ERCELIK had been involved in antisemitic activities that 'involvement in antisemitic activities, his hateful rhetoric against Jewish students, and his violent attack of Jewish student on campus may indicate support for a

administrative warrant for Petitioner's arrest, claiming "the execution of a charging document to initiate removal proceedings against the subject" as a basis for the arrest.

On April 16, nearly a week after the issuance of the warrant, ICE agents arrived at Petitioner's home, demanding to arrest him.  [Dkt. 9 at ¶ 25].  When asked for the warrant, officers stated they did not have one.  Id.  Despite Petitioner remaining in lawful immigration status,[6] officers claimed Petitioner was now "illegal" in the country and, according to the Petition, "that if [Petitioner] declined to surrender himself to those officers' custody, regardless of their lack of a warrant, they would ensure that Petitioner will be charged with a federal hate crime and spend many years in federal prison."  Id. at ¶ 26.

It so followed that Petitioner filed a habeas petition and a request for a temporary restraining order, asking this Court to direct ICE to refrain from arresting or detaining him until he resolved his criminal matter, and then to allow Petitioner to depart from the United States to Turkey, his home country, on a flight for which he had already bought a ticket.  While Petitioner has made clear his intention to leave the country voluntarily (often referred to as self-deportation), his plan on its own is irrelevant to the Court's analysis.  Instead, the Respondents' actions to disrupt and delay his plan contrasts with the Trump Administration's stated policy initiatives.  This contrast offers additional evidence of the Respondents' improper motive to detain the Petitioner.

On May 5, 2025, the Government announced its intention to support those who planned to self-deport by providing financial and travel document assistance, including purchasing plane

---

designated terrorist organization and undermine U.S. foreign policy by creating a hostile environment for Jewish Students.' Including assault of a Jewish student on campus, the Bureau of Consular Affairs approved revocation on April 9, effective immediately."  [Dkt. 9-4].

[6] While revocation of his visa renders Petitioner deportable, he remained in lawful immigration status until his SEVIS profile was terminated.  Petitioner's SEVIS profile was not terminated until 2:07 P.M. on May 7, 2025, seemingly after ICE took him into custody.

tickets, a $1,000 stipend, deprioritization for detention and removal by ICE, and the ability to "leave safely, travel normally."  Homeland Sec., CBP Home: Assistance to Voluntarily Self Deport (May 5, 2025).  In the press release announcing the program, Respondent Noem stated, "If you are here illegally, self-deportation is the best, safest and most cost-effective way to leave the United States to avoid arrest . . . .This is the safest option for our law enforcement, aliens and is a 70% savings for US taxpayers."  Press Release, Dep't Homeland Sec., DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation (May 5, 2025).  While it is unclear if Petitioner qualifies for the program, the preference for self-deportation is clear, preserving ICE's resources and saving money for the American taxpayer.

In his Amended Motion, Petitioner argues that there is "no basis for Petitioner's detention aside from Respondents' impermissible desire to inflict punishment on Petitioner for his political viewpoint."  [Dkt. 26 at 2].

## 2. First Amendment

Petitioner alleges that his detention is motivated by retaliatory animus, targeting him for his political activism and speech.  The facts leading to Petitioner's arrest point to a likelihood of success on the merits of his First Amendment retaliation claim.

The Supreme Court has said that "it is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys."  Matal v. Tam, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring).  Importantly, "speech on public issues [(i.e., political speech)] occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  Connick v. Myers, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); see also Virginia v.

<u>Black</u>, 538 U.S. 343, 365 (2003).  These protections have long extended to noncitizens residing within the country.  <u>See</u> <u>Bridges v. Wixon</u>, 326 U.S. 135 (1945).

Here, Petitioner claims that ICE's detention is retaliation for his protected speech.  For his First Amendment retaliation claim, Petitioner must prove: (1) he engaged in constitutionally protected conduct; (2) he was subjected to an adverse action by the defendant; and (3) the protected conduct was a substantial or motivating factor in the adverse action.  <u>D.B. ex rel. Elizabeth B. v. Esposito</u>, 675 F.3d 26, 43 (1st Cir. 2012) (citing <u>González-Droz v. González-Colón</u>, 660 F.3d 1, 16 (1st Cir. 2011)); <u>Gorelik v. Costin</u>, 605 F.3d 118, 123 (1st Cir. 2010); <u>Centro Medico del Turabo, Inc. v. Feliciano de Melecio</u>, 406 F.3d 1, 10 (1st Cir. 2005).

As to the first element, Petitioner was likely engaged in protected speech.  While, as Respondents argued, it is true that the Supreme Court has recognized specific categories of speech that are not protected, including true threats of, or actual, violence, <u>Counterman v. Colorado</u>, 600 U.S. 66, 72 (2023), the existence of acts that fall outside of the Amendment's core protections does not wipe away safeguards for protected speech—particularly political speech.  <u>Cf.</u> <u>Ashcroft v. Free Speech Coal.</u>, 535 U.S. 234, 255 (2002) ("The Government may not suppress lawful speech as the means to suppress unlawful speech.").  Respondents argue that none of Petitioner's conduct is protected, as his alleged physical altercation with another protestor falls within an unprotected category; however, this fails to acknowledge Petitioner's other conduct, which certainly falls within the penumbras of protected speech.

This protected speech includes engaging in a counter protest, waving of a Palestinian flag, the showing of his middle fingers, and his political, albeit sometimes crude, speech, all in the name of advocating for the Palestinian people.  <u>See, e.g.</u>, <u>Texas v. Johnson</u>, 491 U.S. 397, 404-05 (1989) ("Especially pertinent to this case are our decisions recognizing the

20

communicative nature of conduct relating to flags. Attaching a peace sign to the flag; refusing to salute the flag; and displaying a red flag, we have held, all may find shelter under the First Amendment." (citation omitted)); Cantrell v. Brunswick Me. Police, No. 23-CV-00283-NT, 2024 WL 1859800, at *7 (D. Me. Apr. 29, 2024) ("Any reasonable officer would know that a citizen who raises [his] middle finger—an all-too-familiar gesture—engages in speech protected by the First Amendment." (internal quotation marks omitted) (quoting Cruise-Gulyas v. Minard, 918 F.3d 494, 495, 497 (6th Cir. 2019))). As a result, Petitioner was engaged in protected speech.

Turning to the second element, clearly Petitioner has been subjected to an adverse action by the Respondents, namely, his detention.

Finally, as to the third element, every fact points to Petitioner's protected conduct as the substantial or motivating factor for Respondents' pursuit of detention. First, as Respondents admitted, there is no ground other than the Secretary of State's revocation of his visa that would render Petitioner deportable, and by extension, subject to ICE's detention. As of May 7, 2025, Petitioner has pled guilty to misdemeanors and received a sentence of probation with no term of imprisonment. This conviction does not make Petitioner deportable. Further, the state prosecutor and judge involved in meting out Petitioner's punishment for his behavior on November 3 determined that imprisonment would be an inappropriate resolution to the criminal matter.

Second, the sequence of events, from Petitioner's conduct on November 3 to his criminal arrest, to his appearance on politically motivated websites, to the revocation of his visa, to his arrest by immigration officers, strongly support the inference that Petitioner's protected conduct was the motivating factor for his detention. More specifically, Petitioner took part in a protest

and was then arrested for the altercation on November 3, 2023.  Petitioner was criminally charged on November 6 and released on $250.00 bail.  Petitioner remained free on bail until the resolution of his criminal matter on May 7.  ICE took no interest in Petitioner until March of 2025, a period of at least 16 months.  During that 16-month period, Petitioner complied with his conditions of release and even traveled out of the country on multiple occasions, interacting with immigration authorities at the airport.

Instead, Respondents' pursuit of detention seems to have been almost exclusively triggered by Betar Worldwide.  On April 8, 2025, Betar Worldwide tweeted the profile of Petitioner hosted on the website for Canary Mission.  Canary Mission and Betar Worldwide commonly identify pro-Palestinian students, professors, and professionals as targets for removal proceedings.  The tweet from Betar Worldwide read: "We identify Efe Ercelik as one here on a visa and we have submitted his name for deportation. There's so many of these bastards nationwide he's an egregious one in Massachusetts, a rotten state." [Dkt. 9-5].  On April 9, just the day after the Betar Worldwide tweet, the State Department issued a memo stating that Petitioner had been submitted by DHS/ICE for review on March 31, 2025 and revoking his visa, effective immediately.  [Dkt. 9-4].  The memo itself identifies Petitioner's protected conduct as a basis for the revocation, namely his "activities" and "rhetoric."

Third, Petitioner's detention is contrary to the Government's own policy initiatives.  As discussed in depth at the hearings before the Court, there are a myriad of options to pursue removal absent initial detention.  This is particularly true for someone like Petitioner, who identified as neither a flight risk nor a danger to the community in his criminal case and remained on bond for more than a year and a half.  Meanwhile, the Trump administration is actively offering a free plane ticket and $1,000.00 to any immigrant willing to self-deport.  Press

Release, Dep't of Homeland Sec., DHS Announces Historic Travel Assistance and Stipend for

Voluntary Self-Deportation (May 5, 2025).  Respondent Noem claimed that self-deportation is

the safest option, both for the individual and for law enforcement, and argued that self-

deportation eliminates a great deal of waste of taxpayer funds.[7]  Id.  Petitioner purchased his own

plane ticket to return to Turkey and is not asking for a stipend, but instead of allowing the "safest

option for our law enforcement" and a "70% savings for US taxpayers," Respondents demand

detention.  It rises to the level of near absurdity that Respondents are working to deport many

people quickly and at minimal expense to the American taxpayer, but absent an improper

purpose, intend to extend Petitioner's detention.  While the Court must offer due deference to

ICE's enforcement prerogative, it is not a leap that it is Petitioner's protected conduct (political

viewpoint) that keeps Respondents so thoroughly intent on his detention.  Instead, the Court is

simply following the breadcrumbs left by the Government itself.

      Taken together, all these circumstances underscore Petitioner's protected conduct as the

substantial or motivating factor for ICE's pursuit of his detention.

      Finally, at oral argument, Respondents discussed Reno to argue that such a retaliatory

claim is unavailable to Petitioner.  In Reno, the Supreme Court confronted a somewhat

analogous case.  There, six temporary residents and two lawful permanent residents brought a

First Amendment claim seeking to enjoin their deportation proceedings.  See generally Reno,

525 U.S. 471.  The Court explained that "an alien unlawfully in this country has no constitutional

right to assert selective enforcement as a defense against his deportation."  Id. at 488.  The Court

went on to say, "in all cases, deportation is necessary in order to bring to an end *an ongoing*

*violation* of United States law.  The contention that a violation must be allowed to continue

---

[7] For reference, imprisonment of one person in a Bureau of Prisons facility is $142.00 per day, $4,309.00 per month, and $51,711.00 per year.

because it has been improperly selected is not powerfully appealing . . . . When an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity." Id. at 491-92 (emphasis in original). The Supreme Court's reliance on the petitioners' ongoing violation makes Reno inapposite to the case at hand. As acknowledged by all parties, there is no other ground for Petitioner's removal beyond his actions at the protest. In fact, Petitioner remained in lawful immigration status until his SEVIS was terminated at 2:07 P.M. on May 7.[8] There was no "ongoing" violation of United States law until after he had been detained.

Instead, Petitioner is more similarly position to the petitioner in Ragbir, in which Ragbir, a former legal permanent resident, alleged retaliation for protected speech. 923 F.3d 53. There the Second Circuit found that "[b]ecause Ragbir's speech concerns 'political change,' it is also 'core political speech' and thus 'trenches upon an area in which the importance of First Amendment protections is at its zenith.'" (emphasis in original) Id. at 70. The court went on to say that "[a] plausible, clear inference is drawn that Ragbir's public expression of his criticism . . . played a significant role in the recent attempts to remove him . . . . To allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to final orders of deportation but also those citizens and other residents who would fear retaliation against others." Id. at 71. In the same way the Second Circuit found it appropriate to consider the selective deportation claim in these circumstances, this Court finds it appropriate to consider Petitioner's detention-as-retaliation claim.

---

[8] Petitioner questioned whether the proper procedures were followed in terminating his SEVIS, but that is not presently before the Court.

In light of the above, the Court finds that Petitioner has a high likelihood of success on the merits of his First Amendment claim.

### 3. Fifth Amendment

Petitioner also alleges a Fifth Amendment due process violation, claiming his detention lacks legitimate justification. Indeed, the state court previously determined that Petitioner was neither a flight risk nor a danger to the community, setting bail at $250.00 and allowing him to remain free under conditions of release. He has not only complied with all conditions imposed on him, but has also traveled outside of the country twice while on pre-trial release. Thus, his current detention appears punitive rather than administrative, raising significant due process concerns. It so follows that Petitioner has demonstrated a likelihood of success on his Fifth Amendment claim.

The Due Process Clause of the Fifth Amendment provides that "[n]o person . . . [shall be] deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). Further, "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent" and substantive due process claims are available in the context of immigration detention. Id. at 693-94 (citing Wong Wing v. U.S., 163 U.S. 228).

Petitioner claims that his immigration detention violates the Due Process Clause because it is motivated by an improper purpose. While the Supreme Court has held that "[d]etention during deportation proceedings [i]s a constitutionally valid aspect of the deportation process . . . [and] the Due Process Clause does not require [the government] to employ the least burdensome

25

means to accomplish its goal," the ability to detain a noncitizen is not unlimited.  <u>Demore</u>, 538 U.S. at 523, 528.  Specifically, civil detention cannot be punitive.  <u>Fong Yue Ting v. United States</u>, 149 U.S. 698, 730 (1893); <u>see also</u> <u>Zadvydas</u>, 533 U.S. at 690. "Rather than punishment, immigration detention must be motivated by the two valid regulatory goals that the government has previously argued motivate the statute: 'ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community.'" <u>Ozturk</u>, 2025 WL 1145250, at *20 (quoting <u>Zadvydas</u>, 533 U.S. at 690).

Petitioner is likely to succeed on the merits of his due process claim because the pursuit of detention here is punitive.  In addition to the First Amendment retaliation claim discussed above, at the motion hearing held before this Court, Respondents' counsel stated in no uncertain terms that ICE is seeking detention because "actions have consequences."  Immigration detention cannot be a punitive "consequence" for actions addressed in the state criminal court.  Even the arrest warrant for Petitioner, only produced by Respondents the day after the May 5 hearing before this Court, reinforces the idea that Petitioner's arrest is punitive.  [Dkt. 21-1].  The arrest warrant, issued April 10, 2025, is based upon "the execution of a charging document to initiate removal proceedings against the subject." <u>Id.</u>  Yet, the charging document, also known as an NTA, which was provided by Respondents on May 7 at the third hearing before this Court, was not completed until April 25—nine days after ICE agents attempted to detain the Petitioner.  The NTA also includes a certificate of service where an agent signs to confirm service.  According to the NTA provided, an agent signed to affirm it had been served upon the Petitioner in person on the same day as its creation, April 25.  This cannot be true.  In brief, not only was there no charging document when Respondents attempted to detain Petitioner on April 16, agents then misrepresented the date of service, which is no earlier than May 7.

Respondents have done nothing to disabuse the Court of the most obvious conclusion: prolonging the Petitioner's detention was intended to be punitive. Thus, Petitioner is likely to succeed on his Fifth Amendment claim. Respondents have claimed nothing but ICE's discretion as a talisman of protection. In the name of discretion, Respondents ask the Court to close its eyes to reality. The guarantees of the Constitution allow no such thing.

### 4. Sixth Amendment

While Petitioner also raises a claim on Sixth Amendment grounds, the Court declines to assess the claim here, as the criminal matter on which the claim was based has concluded.

### B. Irreparable Harm

Petitioner has and will continue to suffer irreparable harm absent court intervention. Petitioner was arrested and detained as retaliation, depriving him of his liberty as a consequence for other constitutionally protected conduct. The right to be free from government detention is one of the most basic guarantees of our democracy. His confinement inflicts immense stress and fear, which on its own, constitutes irreparable harm. See Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (recognizing that the fear of being subject to unlawful detention may itself constitute irreparable harm). Further, Petitioner's fear of detention is particularly acute as Respondents negotiate with foreign governments to place those in immigration custody in detention facilities in countries such as Libya, Rwanda, Saudi Arabia and El Salvador. The plan to send detained immigrants to Libya has been reported widely despite a report from the State Department stating that "[p]risons and detention facilities were often overcrowded, and conditions were harsh and life threatening." U.S. Dep't of State, Libya 2023 Human Rights Report 9 (2023) ("[D]etainees were denied adequate access to water, food, toilets, sanitation, light, exercise, medical care, legal counsel, and communication with family members. Poor and

unsafe infrastructure was common and exacerbated sanitation problems, which contributed to the spread of communicable diseases."); see also Eric Schmitt, Hamed Aleaziz, Maggie Haberman & Michael Crowley, Trump Administration Plans to Send Migrants to Libya on a Military Flight, N.Y. Times (May 6, 2025).

Conversely, Respondents will not suffer irreparable harm if injunctive relief is granted. Respondents remain free to pursue formal removal proceedings.  By contrast, every day Petitioner is detained because of his political views constitutes a significant injury.  Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable harm.").

As a result, the irreparable harm to Petitioner, and lack of harm to Respondents, supports the issuance of a preliminary injunction.

**C.  Balancing of Equities and Public Interest**

Finally, the Court must balance the parties' relative hardships and consider the public interest.  These factors merge because the Respondents oppose the preliminary injunction.  Nken, 556 U.S. at 435.

Petitioner's detention raises serious First and Fifth Amendment concerns.  Beyond the obvious hardship that comes with Petitioner suffering an unconstitutional harm, which grows with every moment spent in custody, there is "substantial public interest 'in having governmental agencies abide by the federal laws.'"  League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)). Unlawfully restricting protected speech or interfering with due process rights is squarely against public interest.

Conversely, there seems to be little to counterbalance the other side of the ledger.  As discussed, Petitioner intended to leave the United States following the conclusion of his criminal matter.  That would both address any concerns Respondents have for the public safety, despite a criminal court finding that Petitioner did not pose a risk of danger, and would seemingly support the Respondents' policy initiatives.  As Respondent Noem stated, "self-deportation is the best, safest and most cost-effective way to leave the United States."  Press Release, Dep't Homeland Sec., DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation (May 5, 2025).

In sum, granting the preliminary injunction would serve the Petitioner and the public by protecting against continuing constitutional violations.  Further, it would help to serve the Respondents' policy interests in quickly removing Petitioner at the lowest expense to the American taxpayer.  As a result, the balance of the parties' relative hardships strongly weighs in favor of issuing the injunction.

## V.   CONCLUSION

"The court is invested with the largest power to control and direct the form of judgment to be entered in cases brought up before it on habeas corpus."  In re Bonner, 151 U.S. 242, 261 (1894).  If detention is found unlawful, the court has power to delay discharge until steps to correct the defects are taken.  See Mahler v. Eby, 264 U.S. 32, 46 (1924) (citing cases).  Indeed, the fundamental purpose of habeas corpus is to allow individuals in custody to challenge the legality of their detention, with its traditional function being "to secure release from" unlawful confinement.  Gicharu v. Moniz, No. 23-CV-11672-MJJ, 2023 WL 5833115, at *1 (D. Mass. Sept. 8, 2023) (quoting Preiser v. Rodriguez, 411 U.S. 475, 484 (1973)).

Elections have consequences.  Actions have consequences.  These are two true statements.  Congress granted ICE broad authority and discretion to discharge its lawful duties and generally stripped district courts from judicial review.  However, district courts do not lose authority to address constitutional violations.  This is especially important since, in the end, constitutional issues cannot be reviewed by an immigration court.  When an agency procrastinates and prolongs detention to mete out punishment, as demonstrated here, it is an unlawful use of its authority.

Having considered the Petition, Amended Motion, supporting memorandum, exhibits, and applicable legal principles, and in light of the severe consequences for Petitioner and broader public interest in ensuring governmental adherence to Constitutional principles, the Court finds that Petitioner has met the necessary criteria for injunctive relief and **ORDERS** as follows:

1. Petitioner's Amended Motion is **GRANTED**;

2. Respondents are **ORDERED** to release Petitioner from custody immediately;

3. Respondents—along with their officers, agents, servants, employees, attorneys, successors, assigns, and all persons acting in concert or participation with them— are **ENJOINED** from arresting, detaining, or otherwise restricting Petitioner's liberty in any manner until further order of this Court for any reason related to the issues litigated herein;

4. Should Respondents seek to detain Petitioner on any basis other than that addressed in the Petition [Dkt. 9], they are **ORDERED** to provide sufficient advance notice to the Court and Petitioner's counsel, allowing Petitioner an opportunity to be heard on whether such asserted basis for detention constitutes a pretext for retaliation;

30

5.  Respondents are **ORDERED** to return Petitioner's personal property to him;

6.  No security bond is required under Federal Rule of Civil Procedure 65(c);

7.  This Order shall remain in effect until further order of this Court; and

8.  Respondents' request for a stay pending appeal is **DENIED**.

       **SO ORDERED.**

Dated: May 8, 2025                        /s/ Angel Kelley
                                             Hon. Angel Kelley
                                             United States District Judge

Exhibit B

2

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

RUMEYSA OZTURK,                    )    CIVIL ACTION NO.
              Petitioner,          )    2:25-cv-374
                                   )
      v.                           )
                                   )
PATRICIA HYDE, in her official     )
capacity as the New England        )
Field Office Director, U.S.        )
Immigration and Customs            )
Enforcement; MICHAEL KROL, in his  )
official capacity as HSI New       )
England Special Agent in           )
Charge, U.S. Immigration and       )
Customs Enforcement; TODD          )
LYONS, in his official capacity as )
Acting Director, U.S. Immigration  )
and Customs Enforcement; KRISTI    )
NOEM, in her official capacity as  )
Secretary of the United States     )
Department of Homeland Security;   )
MARCO RUBIO, in his official       )
capacity as Secretary of State;    )
and DONALD J. TRUMP, in his        )
official capacity as President     )
of the United States,              )
              Respondents.         )

BAIL HEARING
Friday, May 9, 2025
Burlington, Vermont

BEFORE:

      THE HONORABLE WILLIAM K. SESSIONS III,
      District Judge

Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

APPEARANCES:

JESSIE ROSSMAN, ESQ., JULIAN B. BAVA, ESQ., RACHEL E. DAVIDSON,
      ESQ., and ADRIANA LAFAILLE, ACLU Foundation of
      Massachusetts, Inc., One Center Plaza, Suite 850, Boston,
      MA 02108, Counsel for the Petitioner

NOOR ZAFAR, ESQ., American Civil Liberties Union Foundation,
      125 Broad Street, Floor 18, New York, NY 10004, Counsel
      for the Petitioner

LIA N. ERNST, ESQ., and MONICA H. ALLARD, ACLU Foundation of
      Vermont, 137 Elm Street, P. O. Box 277, Montpelier, VT
      05601-0277, Counsel for the Petitioner

MAHSA KHANBABAI, ESQ., Khanbabai Immigration Law, 115 Main
      Street, Suite 1B, North Easton, MA 02356, Counsel for the
      Petitioner (Via Videoconference)

MUDASSAR H. TOPPA, ESQ., CLEAR Project, Main Street Legal
      Services, Inc., CUNY School of Law, 2 Court Square, 5th
      Floor, Long Island City, NY 11101, Counsel for the
      Petitioner

MICHAEL P. DRESCHER, ESQ., Acting United States Attorney, 11
      Elmwood Avenue, 3rd Floor, P. O. Box 570, Burlington, VT
      05402-0570, Counsel for the Respondents

INDEX TO EXAMINATIONS

| WITNESS | PAGE |
|---|---|
| RUMEYSA OZTURK | |
| Direct by Mr. Bava | 19 |
| | |
| JESSICA B. McCANNON, M.D. | |
| Direct by Ms. Rossman | 45 |
| Cross by Mr. Drescher | 64 |
| Redirect by Ms. Rossman | 66 |
| | |
| SARA K. JOHNSON, Ph.D. | |
| Direct by Ms. Zafar | 68 |
| | |
| BECKY PENBERTHY | |
| Direct by Ms. Allard | 81 |
| Cross by Mr. Drescher | 94 |

4

1   Friday, May 9, 2025

2       (The following was held in open court at 10:17 AM.)

3           COURTROOM DEPUTY:  This is civil case number 25-374,

4   Rumeysa Ozturk v. Patricia Hyde, *et al.*  Present for the

5   petitioners -- petitioner in the courtroom are Attorneys

6   Adriana Lafaille, Jessie Rossman, Julian Bava, Lia Ernst,

7   Monica Allard, Mudassar Toppa, Noor Zafar, and Rachel Davidson.

8   Present remotely with the petitioner is Attorney Mahsa

9   Khanbabai.  Also present in the courtroom for the respondent is

10  Assistant United States Attorney Michael Drescher.

11      The matter before the Court is a bail hearing.

12          THE COURT:  Okay.  Good morning, everyone.  I

13  appreciate people attending the hearing, the public.  You

14  certainly are welcome, and I just want to remind all of you

15  that this is -- this is a court of law, which follows the rule

16  of law, and so that any emotional outbursts should not happen.

17      So we were here initially on a status conference.  The

18  United States Court of Appeals for the Second Circuit issued

19  its decision on May 7th.  We had initially scheduled a bail

20  hearing for this day because the Circuit Court ruled on the

21  7th -- it extended the time for Ms. Ozturk to be here, to be

22  transported here.

23      I had initially said that I thought it was very important,

24  in particular in a bail hearing or setting conditions of

25  release, together with a habeas hearing, that she be afforded

5                                                                                      6

1  the opportunity to be present, and so as a result, I postponed
2  the bail hearing.  And then we were going to go forward with
3  the status conference, and then I learned from petitioner's
4  counsel that she wished to waive her right to be present and be
5  here virtually, and petitioners were asking that we reinstate
6  the bail hearing.
7       My view was that the Circuit in its decision postponed the
8  bail hearing because it wanted to afford the petitioner the
9  opportunity to be present here in court, to speak with counsel,
10 and to participate in the preparation of today's hearing, and
11 so really it was a concern over whether Ms. Ozturk could
12 adequately participate.  And when I learned that she wished to
13 waive her right to be present here and be here virtually and
14 that that would not prejudice her in any particular way, then
15 we changed again this hearing to a bail hearing.
16      So I guess my first question is to counsel for the
17 petitioners:  Do you wish to go forward on the bail hearing, or
18 would you wish to postpone the bail hearing until your client
19 is present in Vermont and is able to participate personally?
20      MS. ROSSMAN:  We -- oh.
21      MS. ALLARD:  Thank you, Your Honor.
22      We'd like to move forward with the bail hearing.
23      THE COURT:  So are we going to have bouncing --
24 bouncing lawyers here?  Let's see.  Who wants to speak on that
25 issue?

1       MS. ALLARD:  On this issue, I'll speak, Your Honor.
2  My name is Monica Allard.  I'm with ACLU of Vermont.
3       THE COURT:  Okay.
4       MS. ALLARD:  We would like to move forward with the
5  bail hearing today.  We don't believe that our client will be
6  prejudiced by moving forward virtually.
7       THE COURT:  Okay.  Ms. Ozturk, good morning.
8       THE PETITIONER:  Good morning, Your Honor.
9       THE COURT:  Your lawyers have said that you wish to go
10 forward with the hearing even though obviously you're not in
11 Vermont but you're here virtually and that you would not be
12 prejudiced by going forward now.  Is that your wish at this
13 point?
14      THE PETITIONER:  Yes, that's true, Your Honor.
15      THE COURT:  Okay.  And you had an opportunity to speak
16 with your lawyers to make sure that you go over the need for
17 you to be here present -- to be in person but that you really
18 want to go forward?
19      THE PETITIONER:  Yes, that's true, Your Honor.
20      THE COURT:  Okay.  All right.  Thank you.
21      THE PETITIONER:  Thank you, Your Honor.
22      THE COURT:  All right.  So regarding a bail hearing,
23 let me turn first to the petitioner.  It's your request that
24 your client be released, and who is going to argue on behalf of
25 the petitioner?

7

1    MS. ROSSMAN:  Your Honor, we have several individuals
2    who are ready to present witnesses, but I'm happy to present an
3    opening for Your Honor if that would be helpful.
4        THE COURT:  All right.  It would be helpful.  But
5    another thing that would be helpful would be to go to the
6    podium, because I find this courtroom to be just a little bit
7    long and distant, and it's really helpful for me to have
8    someone close.
9        MS. ROSSMAN:  Good morning, Your Honor.
10       THE COURT:  Good morning.
11       MS. ROSSMAN:  And again, petitioners appreciate the
12   Court's efforts to transfer Ms. Ozturk here in advance of this
13   bail hearing and attention to her ability to participate and
14   also the accommodation of both Your Honor and the entire
15   courtroom staff to facilitate this happening remotely.
16       THE COURT:  Okay.
17       MS. ROSSMAN:  Your Honor, three weeks ago, this court
18   held Ms. Ozturk had raised serious free speech and due process
19   concerns in her pending habeas petition.  Twenty-one days have
20   passed since Your Honor's ruling, and some things have changed,
21   some things have remained the same, but everything presents an
22   even stronger case for Ms. Ozturk's bail petition today than it
23   did when we were last before Your Honor.
24       So what has changed?  Your Honor had asked for additional
25   evidence of the connection between Ms. Ozturk's protected

8

1    speech, the student op-ed that she had co-authored, and her
2    detention, and the petitioners responded.  In our most recent
3    filing last week, we put forth a declaration of two experts in
4    student immigration visas - that is both Ms. French and
5    Ms. Goss - and both of them declared that in their decades of
6    experience as experts in student visas in higher education,
7    they had never seen a student who had been detained as a result
8    of a visa revocation or student status termination.  And as we
9    know from cases like *Women's Interart* from the Southern
10   District of New York, these kinds of departures from normal
11   procedures are the kinds of things that a court can infer
12   improper motivations from.
13       This court had also flagged that medical conditions was
14   one of the things that was going to need to be considered as a
15   part of Your Honor's bail consideration.
16       THE COURT:  As a part of extraordinary circumstances,
17   yes.
18       MS. ROSSMAN:  Exactly, Your Honor.
19       THE COURT:  Right.  And my understanding is she's had
20   eight separate asthma attacks?
21       MS. ROSSMAN:  Your Honor, that was at the last time
22   that there was a declaration, and I believe you're going to
23   hear from Ms. Ozturk today that in fact from the last time she
24   submitted a declaration to this court, there have been
25   additional asthma attacks that she has experienced while she

9

1  has been in detention.

2      And again, the petitioner responded to Your Honor's

3  request.  There's a lengthy declaration that Ms. Ozturk herself

4  provided that went into far more detail about her experiences

5  with asthma, both while she was still at Tufts and during her

6  time in detention.  In addition, there's a declaration from

7  Dr. Caggiano, who's the medical director at Tufts University,

8  and she spoke about the care that Ms. Ozturk had received and

9  would receive if she went back to Tufts.

10     THE COURT:  Yeah.  And Dr. McCannon.

11     MS. ROSSMAN:  Exactly, Your Honor.  Dr. McCannon is a

12 board certified pulmonologist and who you'll also hear live

13 testimony from today.

14     In addition, Your Honor had indicated that you were

15 inclined to hear some information about what release could look

16 like for Ms. Ozturk and what are the kinds of systems that

17 would be in place, and petitioners again responded.  There's a

18 declaration from Thomas from Tufts University - Dean Thomas, I

19 should say, excuse me - articulating the steps that Tufts is

20 ready to take both with respect to financial grants and awards

21 to Ms. Ozturk that she has pending for her as well as housing

22 and other steps that the university would take.

23     THE COURT:  So the housing that was suggested is

24 actually going to be on campus?  I mean, this is -- this is

25 moving her away from where she has been living to campus

10

1  housing; is that correct?

2      MS. ROSSMAN:  Tufts has offered several different

3  options, Your Honor, of housing, including on-campus housing,

4  and as you'll hear today from Becky Penberthy, who is here in

5  Burlington at the CJC, Community Justice Center, that is

6  something that she is able and willing to help Ms. Ozturk look

7  through her different options and choose one of the housing

8  options that Tufts is making available to her, and that is a

9  declaration in addition to the declaration that Tufts submitted

10 that, again, Ms. Penberthy, who is at the Burlington Community

11 Justice Center, has decades of experience in restorative

12 justice, has spent time both speaking with Ms. Ozturk as well

13 as officials at Tufts, and has indicated that she's ready and

14 willing to help with pretrial services if Ms. Ozturk is

15 released.

16     THE COURT:  All right.  So there's a little bit of a

17 complicated issue as to who would supervise her if she is

18 released.  It doesn't require necessarily the supervision of a

19 probation officer, but because this is a civil as opposed to a

20 criminal case, you can't get probation officers to supervise.

21     My understanding is that Ms. Penberthy at the Burlington

22 center would be willing to provide some supervision?

23     MS. ROSSMAN:  That is correct, Your Honor.  You're

24 going to be hearing from her directly today.  We'll be

25 presenting her testimony.  If Your Honor has additional

11    12

1  questions for her, she'll be able to answer them about what

2  that could look like.

3      In addition to providing responses to the questions that

4  petitioners understood were outstanding from the Court, in the

5  past ten days, two other courts, both one court here in the

6  District of Vermont - that is in Mr. Mahdawi's case - and in

7  the District of Minnesota in the case of Mr. Mohammed H., two

8  different courts in the past ten days have granted bail pending

9  habeas petitions that similarly alleged unconstitutional

10 government retaliation for protected speech.

11     THE COURT:  Well, let me ask you about the Minnesota

12 case.  Was that petitioner in Minnesota at the time that that

13 order was in effect, or was that petitioner also in Louisiana?

14     MS. ROSSMAN:  That petitioner was in Minnesota, Your

15 Honor.  But it's -- there's a long line of cases of instances

16 where district courts, once they have established habeas

17 jurisdiction, as Your Honor has here and as the Second Circuit

18 has recognized, then being able to, because they have

19 jurisdiction over habeas, effectuate a bail order even if the

20 individual is not physically in the location of the court at

21 the time of the bail determination.

22     And there's a series of cases, for example, Your Honor,

23 during COVID when, in the Southern District of New York,

24 different courts were issuing bail petitions when petitioners

25 were either in the Northern District of New York, Eastern

1  District of New York, and sometimes even in New Jersey.  And

2  I'd be happy to provide those citations to Your Honor of

3  instances and examples here in the Circuit where judges have

4  been able to issue bail orders.

5      THE COURT:  Well, so you obviously know that there's

6  been a disagreement between the sides, between the government

7  and you, as to the jurisdiction of the Court.  That's been

8  resolved by the Circuit.  That's been resolved, I think, by my

9  earlier decision, but it's also been resolved pretty

10 definitively, very definitively, by the Circuit.  So you do not

11 anticipate any problem if this court were to order her to be

12 released?

13     MS. ROSSMAN:  We would anticipate the government and

14 would want the question to be put directly to the government's

15 attorney of them complying with any order that this court

16 issued as a part of its habeas power, which would include, of

17 course, Your Honor being able to issue a bail order.

18     THE COURT:  And do you know if there is a pattern

19 established in Louisiana in which the authorities in Louisiana,

20 the ICE authorities, have complied with judicial orders

21 requiring the release of habeas petitioners?

22     MS. ROSSMAN:  Well, I believe what is really pressing

23 here, Your Honor, is that the government is here in this

24 courtroom, of course, being represented, and a lawful order, as

25 a bail order under this court's habeas jurisdiction would be,

13                                                    14

1  that is issued to the government then needs to be complied
2  with.  The mere fact that ICE is -- there are ICE officials in
3  Louisiana, they're still the client of the government that is
4  here, and we heard opposing counsel the last time we were
5  before this court say directly on the record that the
6  government was ready, willing, and able to comply with any
7  orders that Your Honor --
8          THE COURT:  I certainly --
9          MS. ROSSMAN:  -- issued.
10         THE COURT:  -- anticipate that, but my question was a
11  little bit different.  Is there a pattern of acceptance of
12  orders from Article III judges who have persons in ICE custody
13  before them on habeas petitions, is there a pattern of
14  authorities -- ICE authorities in Louisiana accepting those
15  orders and releasing --
16         MS. ROSSMAN:  I don't know specifically, Your Honor,
17  with respect to ICE officials in Louisiana.
18         THE COURT:  Okay.  All right.
19         MS. ROSSMAN:  But I would expect them to comply with
20  any court order.
21         THE COURT:  No, I would as well, but I'm interested to
22  know whether there is that established pattern.  But go ahead.
23         MS. ROSSMAN:  So I believe, Your Honor, we've spoken
24  about all of the things that have changed since the last time
25  we were before you.

1          THE COURT:  Yes.
2          MS. ROSSMAN:  I think it's also really important to
3  focus on what has remained the same.  The government still has
4  not produced a single piece of evidence to petitioners or to
5  this court in support of its detention of Ms. Ozturk or to
6  oppose bail.
7          THE COURT:  Okay.  So what about -- what about the
8  report in the *Washington Post* that immigration authorities had
9  investigated your client and found that there was no evidence
10  of her participating in any groups that would be advocating
11  violence or Hamas or anything else?  Have you received that?
12         MS. ROSSMAN:  We have not, Your Honor, and as you are
13  aware, we asked multiple times both to the government counsel
14  themselves and had moved for this court and had asked that the
15  government produce it at the least by the May 2nd deadline that
16  Your Honor had set for any evidence that was going to be
17  produced by the time of bail.  Of course, the government both
18  refused to produce it to us; it opposed our motion to this
19  court.  We think at the very least any inference that would be
20  made from that memo that still has not been produced needs to
21  be in furtherance of the petitioner's request here to get bail.
22         THE COURT:  Well, did the government to you
23  acknowledge that they were in possession of that report, that
24  investigation, but for whatever reason refused to surrender it
25  to you?

15                                                                                           16

1      MS. ROSSMAN:  What the -- I don't recall, Your Honor,

2  specifically hearing from opposing counsel whether or not they

3  were in possession of the report.  I believe the specific

4  wording was if the report that is in the *Washington Post* is

5  accurate, they then alleged two different reasons why they felt

6  that they could not produce it.  Both of those, Your Honor,

7  both as a statutory matter and the deliberative process

8  privilege, are, of course, qualified privileges, and both of

9  them yield to the interest of justice.  Here, where the very

10 motivations of the government in detaining Ms. Ozturk,

11 particularly when they have not been able to point to anything

12 other than her protected speech, are, of course, at the heart

13 of this matter, it would certainly be in the interest of

14 justice to produce the memo.  They have not done so.

15     THE COURT:  All right.

16     MS. ROSSMAN:  The government has also, Your Honor,

17 continued to use procedural mechanisms that has further delayed

18 Ms. Ozturk's time in detention.  Of course, when Your Honor

19 issued the April 18th order, you provided a four-day stay of

20 that order.  The government did not file their notice of appeal

21 on the first, second, or third day.  It took until the evening

22 of the fourth day for the notice of appeal to be filed and a

23 request for a second stay from this court at that same time.

24 Of course, both Your Honor and ultimately the Second Circuit

25 denied that request for stay as not justified.  Nevertheless,

1  it ended up pushing back even further Ms. Ozturk's ability to

2  be here in person.  So we have seen time and again that this is

3  getting pushed back farther because of procedural mechanisms.

4      And, of course, Ms. Ozturk is still in detention.  That is

5  the thing that is the most important that has remained the

6  same, but it has now been for weeks longer, experiencing

7  numerous additional asthma attacks, all because she wrote an

8  op-ed.

9      Petitioners are prepared today to provide live testimony,

10 both from Ms. Ozturk herself as well as Dr. Jessica McCannon,

11 which will underscore her significant health risks if she

12 remains in detention and her need for release.  Ms. Ozturk is

13 also going to testify, along with Professor Sara Johnson, to

14 describe her deep ties to Tufts University, her integration

15 into the community, her need to return in order to continue her

16 academic pursuits, and the supports that she will have at the

17 university if she returns, as well as, as we were discussing

18 earlier, the testimony of Ms. Becky Penberthy from the

19 Burlington Community Justice Center about the systems that she

20 can assist -- help put in place to make sure that her release

21 is successful.

22     THE COURT:  So my understanding is that Professor

23 Johnson worked closely with your client in her field.  She's

24 not the one responsible for setting up the housing, the

25 compensation that she's receiving; that's the dean, as I

17

1   thought.

2       MS. ROSSMAN:  That's correct, Your Honor.

3       THE COURT:  And is she testifying?

4       MS. ROSSMAN:  She is not testifying here today, Your

5   Honor.

6       THE COURT:  She has an affidavit -- she has produced

7   an affidavit.

8       MS. ROSSMAN:  That's correct.  There's a sworn

9   declaration from the dean, and in addition, Ms. Becky Penberthy

10  had conversations with Tufts University about all of those

11  supports, and she would be ready to testify to that as well.

12      After all of this testimony, Your Honor, as well as the

13  written testimony which I know is voluminous before the Court,

14  Ms. Ozturk is going to ask this court to grant bail and to do

15  so immediately and to do so without a stay, Your Honor, and the

16  core of the writ of habeas corpus and the government's behavior

17  since March 25th demand nothing less.

18      Right now the clear message that the government is sending

19  to everyone who is watching is that you can be detained

20  thousands of miles from your home for more than six weeks for

21  writing a single student newspaper article.  The petitioner

22  needs this court to uphold the power of the writ to alleviate

23  that constitutional violation and also to ameliorate the chill

24  that it is casting on anyone else who is watching.

25      THE COURT:  Okay.

18

1       MS. ROSSMAN:  Thank you, Your Honor.

2       THE COURT:  So you've got three witnesses to present.

3       MS. ROSSMAN:  Four witnesses, Your Honor.

4       THE COURT: Four.  Okay.

5       MS. ROSSMAN: Yes.

6       THE COURT:  All right.  So let me ask the government,

7   do you have any witnesses to present at this point?

8       MR. DRESCHER:  No.

9       THE COURT:  Okay.

10      MS. ROSSMAN:  May we proceed, Your Honor?

11      THE COURT:  I think we can go right to the witnesses.

12  Whom do you wish to call first?

13      MS. ROSSMAN:  Our first witness, Your Honor, is going

14  to be Ms. Ozturk herself.

15      THE COURT:  Okay.  Ms. Ozturk, would you stand and be

16  sworn, please.

17      THE WITNESS:  Yes.

18      COURTROOM DEPUTY:  Please raise your right hand.

19      THE WITNESS:  Yes, Judge.

20          RUMEYSA OZTURK,

21  having been first duly sworn by the courtroom deputy,

22      was examined and testified as follows:

23      THE WITNESS:  I do swear, Your Honor.

24      THE COURT:  Okay.  You can proceed.

25      MR. BAVA:  Thank you.

| | |
|---|---|
| 1 DIRECT EXAMINATION | 1 my department. For example, I have been included -- like, I |
| 2 BY MR. BAVA: | 2 have been participated in department service events, including |
| 3 Q Ms. Ozturk, would you please state your full name. | 3 doctoral student union, belonging committee, including student |
| 4 A Of course. My name is Rumeysa Ozturk. | 4 presentation day committee. |
| 5 Q And where are you currently located? | 5 Also, I have -- like, I was included -- like, I was part |
| 6 A I am currently located in South Louisiana ICE Processing | 6 of some community art projects, such as -- |
| 7 Center. | 7 (Interruption by the reporter.) |
| 8 Q And how long have you been there? | 8 Q BY MR. BAVA: Ms. Ozturk, sorry. I think the court |
| 9 A I have been here for six weeks, I believe. | 9 reporter's having trouble understanding what you're saying, so |
| 10 Q And where were you studying before you were detained? | 10 maybe if you can slow down. |
| 11 A I was studying at Tufts University -- | 11 A Okay. Of course. Would you prefer that I start from the |
| 12 (Interruption by the reporter.) | 12 beginning? |
| 13 Q BY MR. BAVA: Ms. Ozturk, can you repeat your answer? | 13 Q Yes. Why don't you repeat your answer. |
| 14 A Yes. I was studying at Child Study and Human Development | 14 A Okay. Of course. So my primary participation has been in |
| 15 Department as a Ph.D. student at Tufts University. | 15 my department. I have been -- I have participated in various |
| 16 Q And how far along were you in your Ph.D. when you were | 16 activities including department service events, student |
| 17 detained? | 17 activities, and some activities that I organized by myself. |
| 18 A I am in my fifth year in my doctoral program, and I have | 18 For example, I have been part of doctoral student committee. I |
| 19 submitted my dissertation proposal's first draft. | 19 have been part of belonging committee. I have been part of |
| 20 Q And about how much time do you have remaining in your | 20 faculty search committee. I have been part of a community art |
| 21 Ph.D.? | 21 project called Beautiful Stuff where we make mosaics in all |
| 22 A I have about seven to nine months to finish my studies. | 22 parts of our community, including children, professors, and |
| 23 Q And, Ms. Ozturk, what kind of activities were you engaged | 23 community members. |
| 24 in at Tufts University before you were detained? | 24 (Interruption by the reporter.) |
| 25 A I have been included in various activities, primarily in | 25 Q BY MR. BAVA: I'm sorry. Ms. Ozturk, can you pause for |

21

1  one second?

2  A    Yes.

3      THE COURT:  So can I just interrupt just for a second?

4      MR. BAVA:  Yes.

5      THE COURT:  So you were talking about being a

6  participant in a larger group dealing with your studies.  I

7  think your studies in general with the department, but also

8  maybe specifically about the focus of your thesis.  Can you

9  just describe what that work entails.

10     THE WITNESS:  Of course.  So the work that I do is

11  about children's and adolescents' positive media use, and,

12  like, over the years I have been -- like, I have been

13  participating in various activities related to this.  The first

14  one included, like, being a teaching assistant for almost all

15  the courses offered related to children's and adolescents'

16  media use.

17     (Interruption by the reporter.)

18     THE COURT:  Okay.  Hold on just one second.  I think

19  we're having trouble understanding you.  I think it's probably

20  the -- because of the long distance, somewhere between

21  Louisiana and Vermont.  So if you can just slow down a little

22  bit.  Maybe try to cut it in half so that you're going twice as

23  slowly, and I think then we'll be able to understand.

24     THE WITNESS:  Of course.  Thank you, Your Honor.

25     So the first activity that I was involved was being a

22

1  teaching assistant to all the courses that were offered at my

2  department related to children's and adolescents' media use

3  that includes media literacy, creating media for children,

4  children on mass media, and one more course.  I can't remember

5  its name.

6      The second --

7      THE COURT:  Okay.  So you have been an assistant to

8  many of the classes that are a part of the Child Study and

9  Human Development program.

10     THE WITNESS:  That's --

11     THE COURT:  And also you're focusing, at least in

12  part, on media presentations, in particular in youth

13  development; is that right?

14     THE WITNESS:  I am right now in my dissertation study

15  particularly studying how young people use media in a positive

16  way, in a prosocial way, benefiting others.  When I say

17  "benefiting others," I talk about, like, how young people use

18  media to, like, give support to their friends who are

19  experiencing some emotional difficulties, who are -- who need

20  some help with their assignments, or I am talking about, like,

21  students or, like, you know, young people in creating some

22  creativity projects, helping each other, or supporting some

23  community projects such as, like, helping homeless people --

24     THE COURT:  So --

25     THE WITNESS:  Um-hum.

1    THE COURT:  So this study on how young people use
2  media and the full range of how they use media to contribute to
3  their education, is that part of your thesis for your
4  doctorate?
5    THE WITNESS:  Yes.
6    THE COURT:  Is that right?
7    THE WITNESS:  This is my -- this is my -- part of my
8  dissertation study to explore how young people use media in a
9  prosocial way.
10    THE COURT:  Okay.
11    THE WITNESS:  It is also -- this work is also broadly
12  related to the work that I did already last five years as my
13  Ph.D. program and two years in my master's program.
14    THE COURT:  Okay.  That was part of your master's as
15  well as -- as your doctorate.
16    THE WITNESS:  Yes.
17    THE COURT:  And your master's program, I thought --
18  and correct me if I'm wrong, but I thought you are a Fulbright
19  Scholar.
20    THE WITNESS:  That's true, Your Honor.
21    THE COURT:  And you were attending Columbia --
22    THE WITNESS:  That's correct.
23    THE COURT:  -- I think for your master's.  Had you
24  been living in New York at that point?
25    THE WITNESS:  Yes.  I did my master's at Teachers

1  College - Columbia University, and I lived there in Upper
2  Manhattan between 2018 and 2020.
3    THE COURT:  All right.
4  Q    BY MR. BAVA:  And, Ms. Ozturk, can you describe your
5  community engagement work at Tufts University.
6  A    Of course.  I would love to describe.  I will give some
7  examples of my involvement in the Tufts community.  For
8  example, very recently, one of the last activities that I by
9  myself was part of organizing was a collective grieving event
10  for children suffering all around the world experiencing
11  [unclear] conflict.
12    (Interruption by the reporter.)
13    THE COURT:  So if you can hold on just one second.
14  I'd again try to remind you to be quite slow in your
15  presentation and try to be quite distinct in your language.
16    THE WITNESS:  Okay.
17    THE COURT:  Okay?
18    THE WITNESS:  Okay.  Thank you.
19    THE COURT:  Because, you know, we have a court
20  reporter here who's taking down every word that you say, which
21  is a difficult process, so first she has to be able to
22  understand what you're saying and then write it down at the
23  same time you're speaking.  It's almost a magical effort.
24    THE WITNESS:  Of course.
25    THE COURT:  But it's made easier if you are more

25    25                                                                                          26

1  slow -- you speak more slowly.  Okay?

2       THE WITNESS:  Okay.  Thank you very much, Your Honor.

3  I will do my best to be slower.

4       THE COURT:  Okay.

5       THE WITNESS:  So one of the last activities that I

6  have, alongside with my colleagues, organized was an event

7  called Collective Grieving for Children Experiencing War and

8  Conflict all around the world.  So in this event, I and my

9  colleagues organized the event in three sessions.  The first

10 part, first of all, we came all together to grieve for

11 children, all children, from [unclear] to Israel, from Russia

12 to Ukraine, from Sudan to --

13      (Interruption by the reporter.)

14 Q    BY MR. BAVA:  Sorry.  Just hold on one second.

15 Ms. Ozturk, can you repeat the list of places where the

16 children that you were grieving for.  And just a little slower

17 for the court reporter.

18 A    Of course.  In this event, we want everyone to come with

19 children that are in the youth care circle, hopefully all

20 children all around the world.  That included all community

21 members coming with concerns and compassion and grief for

22 children from Gaza to Israel, from Russia to Ukraine, from

23 Congo to Haiti, from Sudan to Yemen, from Cameroon to

24 Afghanistan, from all parts of the world that the youth care

25 circle can extend.

1       THE COURT:  Can I ask you, how do you do that?  How do

2  you get children from Russia, Israel, Ukraine, and all over the

3  world to participate in your services?

4       THE WITNESS:  I -- we didn't -- this was an event for

5  us as people working for child development and well-being.

6  This was a department-specific confidential place where, like,

7  Tufts faculty and students, doctoral students, came together to

8  grieve.  I think as people who are working in academia for

9  child development and well-being, it is sometimes possible that

10 we forget the emotional touch and/or grief extending to

11 children that we don't necessarily work directly.

12      THE COURT:  Um-hum.

13      THE WITNESS:  So that doesn't mean that we don't

14 grieve for our children.  All of them are ours, from all part

15 of the world experiencing very sad events including war and

16 conflict, so --

17      THE COURT:  And is this the program of the entire

18 department --

19      THE WITNESS:  No.

20      THE COURT:  -- or is it your -- is this your focus?

21      THE WITNESS:  It is just one of the activities I

22 organize in my department alongside with my colleagues.  This

23 is one of the first examples I wanted to give.  This event was

24 a day-long -- like, three, four hours of event where we came

25 together to share some poetry from -- from artists -- from

1 poets from Turkey to --

2     (Interruption by the reporter.)

3 Q   BY MR. BAVA:  Sorry.  We're just going to ask you to pause

4 again.

5 A   Okay.

6     THE COURT:  Can I just ask another question?  So you

7 are speaking with children from different parts of the world,

8 and oftentimes those children will be speaking with other

9 children who may be a part of communities that are in conflict,

10 but is it your effort to try to bring them together so that the

11 tension among children is reduced?

12     THE WITNESS:  This -- the purpose of the project was

13 for -- not for children but for people who are working for

14 child development.  That includes professors, students, and

15 staff in my department who are grieving for children.  So the

16 event was not for children.  It was for us, for people who care

17 about innocent children all around the world.

18     THE COURT:  So you're working with people, adults, who

19 are in your field of study to essentially work with children to

20 reduce tension; is that right?

21     THE WITNESS:  Thank you so much for asking.  I was

22 just trying to give some of the projects that I do.  In this

23 project, the purpose was for us to just create some safe space

24 to grieve, to grieve for children that we don't necessarily

25 work together, that we don't have touch, but our compassion

1 extends.  So it was a project of poetry and art and silence

2 that we shared as adults.  We shared concern for our children.

3     So I just want to give one last example that I did.  If

4 you would like me, I want to start to give more examples about

5 some projects that I was involved at my department at Tufts.  I

6 am prepared to provide more explanations.

7     THE COURT:  Okay.  Do you want to go to your next

8 topic?

9     MR. BAVA:  Sure.

10 Q   BY MR. BAVA:  So, Ms. Ozturk, I'd like to ask you some

11 questions about your medical conditions, if that's all right.

12 A   Of course.  Yes.

13 Q   When were you diagnosed with asthma?

14 A   Can you repeat one more time, please?

15 Q   When were you diagnosed with asthma?

16 A   I was diagnosed with asthma in 2023.

17 Q   And where did this diagnosis take place?

18 A   It took place in Turkey when I was visiting my hometown.

19 Q   What were the symptoms you were experiencing before you

20 sought medical care at that time?

21 A   At the time I had constant coughing, chest tightness, and

22 breathing difficulties that lasted multiple days, and after

23 that I went to the doctor to learn what was happening.

24 Q   And, Ms. Ozturk, have you ever experienced an asthma

25 attack?

29

30

1  A    I experienced asthma attacks before my detention for

2  around nine times, yes.

3  Q    And can you describe the symptoms you feel during an

4  asthma attack.

5  A    Of course.  So during an asthma attack, I generally

6  experience chest tightness, having difficulty with breathing,

7  and constant coughs that sometimes goes beyond control.  I

8  experience stress and anxiety and exhaustion.

9  Q    And can you tell me about how your doctor in Turkey

10  advised you to manage your condition.

11  A    At the time my doctor provided me different inhalers.  One

12  of them included a maintenance inhaler that prevents asthma

13  attacks, and also he provided me an emergency inhaler that I

14  need to use during an asthma attack.  Also, he suggested that I

15  significantly make some changes in my life that includes, like,

16  avoiding from strong smells like perfumes, chemicals,

17  detergents and being careful about air ventilation, stress, and

18  making sure that I don't, like, enter very crowded places.

19  Just managing my daily life to avoid triggers and have a less

20  stressful life.

21  Q    Thank you, Ms. Ozturk.  And are there -- I think you may

22  have mentioned this, but are there any non-environmental

23  triggers that also contribute to your asthma?

24  A    Definitely.  I think -- although it is not the primary

25  cause of triggers, I think stress definitely triggers my

1  asthma.

2  Q    Okay.  And can you describe the different things you did

3  while you were living in Massachusetts prior to your arrest and

4  detention to help manage your asthma.

5  A    Of course.  One of the things that I was doing was going

6  to my lab or library really early on.  So I was living very

7  close to my department.  Sometimes I went there at 6:00 AM,

8  6:30 AM, and I always, like, tried to go to library in the

9  earliest time, 7:, like, 45 or 8:00 when they open.  I tried to

10  avoid from crowded places.  I, like, tried to talk with my

11  friends so they know what I am experiencing.  I am avoiding

12  non-hypoallergenic pets.

13      I am also having a very stress-free life that includes,

14  like, my daily life mainly, like, me going to the library or

15  lab and then working on my dissertation work for -- until,

16  like, afternoon and having my walk and cooking and finishing --

17  and reading books and, you know, going to bed.

18  Q    And what steps did you take in your home to help manage

19  your asthma?

20  A    There were multiple steps that I took.  First of all, I

21  was using -- like, if I needed to use detergents or cleaning

22  supplies, I was experimenting with them and I was only using

23  very natural-ingredient cleaning supplies.  I also was living

24  in a very spacious home, and I was being very careful about air

25  ventilation.  I was opening my window many times, especially if

1  I have coughs.  Also, I was keeping all the cleaning supplies

2  in a very closed closet.

3  　　　　THE COURT:  That's cleaning supplies, did you say?

4  　　　　THE WITNESS:  Yes.  Cleaning supplies in a closed

5  closet, yes.

6  Q    And, Ms. Ozturk, I think you may have already mentioned

7  this, but just to confirm, how many asthma attacks did you

8  suffer prior to your arrest and detention?

9  A    I -- in my best knowledge, I had around nine asthma

10  attacks prior to my arrest over the, like, two and a half --

11  two, three years, after my diagnosis.

12  Q    And on average, how long did those asthma attacks last

13  for?

14  A    On average, those asthma attacks lasted for five to 15

15  minutes, except one incident where it took multiple days, and

16  it was outside of my control.

17  Q    Can you describe the circumstances of that severe asthma

18  attack that you just mentioned was out of control.

19  A    Yes.  Of course.  This happened, in my best knowledge, in

20  2023 after I came from Turkey.  I had COVID at that time, and

21  having both things together really increased my symptoms, and

22  for many days I wasn't able to stop my cough, and I couldn't

23  eat.  I couldn't sleep.  And I get in touch with my providers

24  at Tufts Medical Center to get adequate help.

25  Q    And so did the Tufts Medical Center help continue to

1  manage your asthma condition going forward?

2  A    For the next two months, they were in touch with me.

3  During that time, I met with them in person, also online, and

4  they did follow-up and adjusted my inhaler.

5  Q    And how effective were all the measures you were taking,

6  including at home, at the lab, and through your contact with

7  the Tufts Medical Center, at managing your asthma prior to your

8  detention?

9  A    Except the one incident that I described, my asthma was

10  well maintained.  It was under control most of the times.  I

11  was, of course, using my maintenance inhaler and also emergency

12  inhaler when I had exposure, but I believe it was well

13  maintained.

14  Q    And just to confirm, how often do you take your

15  maintenance inhaler?

16  A    The maintenance inhaler is something that I use daily, but

17  there has been some months that I was able to quit it or reduce

18  it because of a lack of triggers.  For example, in winter there

19  is not a lot of exposure to pollens and other triggers, so it

20  was more, like, easier to control.

21  Q    Moving on, Ms. Ozturk, when did you suffer your first

22  asthma attack after your arrest by ICE agents in March of this

23  year?

24  A    I had my first asthma attack when they took me to Atlanta

25  airport.  We were waiting there, and I started to cough and had

1  my asthma attack, lasting for a while.

2  Q    How severe was this asthma attack?

3  A    I believe it was a severe asthma attack because, although

4  I used my inhaler for two times, I couldn't get over it easily.

5  Q    And what do you think contributed to this asthma attack?

6  A    I definitely think that stress and anxiety and the

7  physical tiredness, hunger because of the, like, whole process

8  of being carried across different places really -- like, it

9  really increased my stress, and I think it really triggered my

10  asthma.

11  Q    Were you afraid during that time?

12  A    I was afraid and I was crying.

13  Q    Did you have all your asthma medication when you were at

14  the airport in Atlanta?

15  A    Unfortunately, no, because the day that I left my home, I

16  was going to go to iftar, which is -- during the holy month of

17  Ramadan, it is dinnertime, so I only had my emergency inhaler

18  that had left only a little bit in it.  So when I was in

19  Vermont, I ask for my -- the maintenance inhaler.

20  Unfortunately, it wasn't provided to me.  And when I was in

21  Atlanta, I asked for medication -- like, inhaler again.

22  Unfortunately, they told me that there is no place to buy, you

23  know, like, medication.  Also, I requested for fresh air, but

24  it was also not possible, like, at that time.

25  Q    And, Ms. Ozturk, when did you suffer your second asthma

1  attack after your arrest?

2  A    I suffered from my second asthma attack and first one here

3  on March 30, as far as I remember.

4  Q    And so you were at this -- the current ICE processing

5  center in south Louisiana when that happened?

6  A    That is true.  That's true.

7  Q    How severe was this asthma attack?

8  A    Again, this asthma attack was severe.  It happened after

9  being exposed to smoke inside of the room.

10  Q    Can you describe the symptoms you experienced during the

11  asthma attack.

12  A    Of course.  I was experiencing, again, chest tightness,

13  difficulty breathing, and coughs that I couldn't stop after

14  using my emergency inhaler for two times, and I was feeling

15  very exhausted.

16  Q    And what did you do to help manage your condition during

17  this asthma attack?

18  A    First of all, I used my inhaler.  It didn't work, and I

19  asked to go to the corridor because there was smoke inside, and

20  finally I was -- they let me to go to the corridor.

21  Q    And were you seen by the medical center at the detention

22  center at this time?

23  A    So it took quite a long time for me to be -- like, for

24  them to let me to take fresh air and go to the medical center.

25  And when I went to the medical center, I only had seen a nurse

1  that was staying there at night.

2  Q    And can you describe your experience at the medical center

3  with the nurse.

4  A    Yes.  I would like to give some details on that.  When I

5  went to the medical center, they, like -- I was -- because it

6  took, I think, more than -- almost, like, one hour or a little

7  bit less or a little bit more for them to -- from the first

8  onset to go to there, when I went there, again, I was crying

9  and I was in a really difficult situation.

10    Because of many coughs, I had fever.  They measured my

11  fever, and they told me that I have fever, and then the nurse

12  told me that you need to take that thing from your head, and

13  she forcibly took off my hijab.  I told her that she cannot

14  take my hijab without my consent, but unfortunately, she didn't

15  give it back.  It took me a while to be able to get it back.

16    And after that, I believe she, like, did COVID testing,

17  cold testing, and she measured my oxygen, but when she measured

18  my oxygen, I was already -- it was already after a long time

19  from my asthma, and at that day she also gave me ibuprofen, and

20  I waited there for a while, and we talked about a few other

21  medicine that I requested from them, and they explained that it

22  will take time.  That is what I remember from the day.

23        THE COURT:  Can I make a suggestion?  She actually

24  submitted a 14-page declaration, which I've read, which goes

25  over many of these same areas of testimony and also her

1  criticism of the medical care that she received.

2      I'm interested to know whether the frequency of asthma

3  attacks has increased or decreased and the severity of the

4  asthma attacks, whether they've increased or decreased.  I

5  don't think it's important to go over each one of them, just is

6  there a pattern that she sees as a result of her placement in

7  this facility.

8        MR. BAVA:  Sure, Your Honor.

9  Q    So I'll ask a question, Ms. Ozturk, relating to that.  How

10  many asthma attacks have you suffered since your detention?

11  A    Since the first time they took me, I experienced 12 asthma

12  attacks, increasing.  And what I am observing is that they both

13  increase in length - now they are between five to 45 minutes -

14  and they are more intense coming from, like, lower, like,

15  chest, and also they are lasting longer and harder to stop.

16  Q    Since you last submitted your declaration, which was

17  submitted last week, last Friday, how many asthma attacks have

18  you suffered?

19  A    I have suffered four more asthma attacks.

20  Q    And why do you think you're suffering more frequent and

21  intense asthma attacks?

22  A    I believe there are different reasons.  First of all, the

23  room condition, as I described in my declarations, is really

24  challenging for an asthma patient because there's constant

25  exposure to dust, triggers.  There's, like, not proper air

1   ventilation.  We are not allowed to take fresh air when we need
2   to take it.  And outside time is very limited.
3       Also, there is no divider between the showers, like on the
4   top, and toilets and sinks.  So unfortunately, also the room --
5   the maximum capacity for the room is indicated as -- is
6   indicated as, like, seating capacity for 14 people, but we are
7   24 people living in a small area spanning almost 22 -- like,
8   more than 22 hours inside of the same locked cell.
9   Q    And how would you describe the difference between how well
10  your asthma was managed before detention compared to now?
11  A    I think there's an incredible difference because before,
12  as I mentioned, I was being very careful with my exposure to
13  triggers, having a less stressful life, but here,
14  unfortunately, I am constantly exposed to, like, cleaning
15  supplies, dust, and there's a mice issue inside of our room.
16  Also, the situation, of course, is very stressful with -- being
17  defined as overcontrol and constant pressure in the detention
18  center.
19      THE COURT:  So you think that the frequency and the
20  seriousness of these attacks has increased because of your
21  exposure to such things as cleaning supplies, *et cetera*, and
22  that you're not careful about what you're exposed to in general
23  and -- I mean, is that what you've said?
24      THE WITNESS:  I am -- yes.  I am indicating that both
25  the length -- both the duration, intensity, and frequency has

1   increased because of both the constant triggers surrounding me
2   and also stressful environment that I am living right now.
3       THE COURT:  Okay.
4   Q    And other than your asthma, Ms. Ozturk, how has being in
5   detention impaired your general health or well-being?
6   A    Unfortunately, I think it is affecting me in a very
7   negative way alongside with other women living here not
8   accessing enough medical care and medication.  So
9   unfortunately, in this system, requesting any medicine or
10  medical treatment is really hard, and also, when you access
11  them, unfortunately, the interactions with many medical staff
12  is very stressful because of their condescending manner,
13  because of raising voice, because of not believing in patients
14  that they have diseases.  Yeah.
15  Q    Ms. Ozturk, I want to move ahead to discuss your release
16  plans if the Court does grant you bail.  Where do you plan to
17  live if you are ordered released by the Court?
18  A    Thank you very much for asking the question.  I am
19  grateful that Tufts University offered me multiple options, and
20  I would like to go with one of their options.  Right now I have
21  my lease ending at the end of May.  I will move my stuff to
22  Tufts housing as soon as I am released.
23  Q    Okay.  And, sorry, just to confirm, your current lease is
24  expiring at the end of this month?
25  A    This is true.

39

40

1  Q    How do you know that Tufts University is going to be
2  providing you housing upon your release?
3  A    My lawyers communicated with them and confirmed that they
4  are providing me housing.
5  Q    And how do you plan to support yourself financially after
6  you're released?
7  A    I am a doctoral student who is on full scholarship that
8  includes my educational tuition fees and also my living
9  stipends, so for this summer I will be providing my
10 financial -- my finance through teaching a course called
11 Introduction to Children's Media, which I taught already two
12 years.  Also, I will be receiving a grant from Tufts University
13 alongside with another additional funding from a project of my
14 adviser.  Next year I will be getting my stipend through being
15 her research assistant or teaching assistant in my department.
16 Q    And how important is completing your Ph.D. to you?
17 A    Completing my Ph.D. is very important for me.  I have
18 worked for this Ph.D. for a long time.  I have been in graduate
19 school already last seven years.  The work that I do is very
20 meaningful for me because I believe I am doing my best to
21 learn, grow, connect, to develop as a developmental scientist,
22 as a child development scholar, to contribute to well-being and
23 development of children all around the world.
24 Q    And can you describe the work you intend to complete as
25 part of your Ph.D. if you are released from custody.

1  A    Of course.  Until this point, I have completed many of the
2  competencies and course work and internships in my department.
3  After I am released, I will be first taking my qualifying
4  review.  After that I will be -- start working on and
5  submitting my dissertation proposal.  Later I will be
6  submitting my report application to Institutional Review Board,
7  which is the ethical community.  That's a committee that
8  oversees our research projects in the university.
9       After this I will be starting my data collection process,
10 which includes interviewing participants, in my case
11 interviewing young people at college age; and later I will be
12 starting analyzing my data.  And in between of this processes,
13 there is a data-hearing process where I receive feedback from
14 my advisers in my remaining analysis.
15      After that I will be finishing my analysis, write-up, and
16 I am planning to defend and submit my final dissertation and
17 portfolio to Graduate School of Arts and Sciences.
18 Q    And is it possible for you to do any of that work while
19 you're being detained?
20 A    It is impossible to do any work here because of many
21 reasons.  First of all, I don't have an access to my computer,
22 library resources, articles, advisers, and peers, which are
23 really integral to be able to do a high-quality dissertation
24 work.  Also, here it is impossible to, like, control time
25 because, for example, there are many times that they call us

41                                                               42

1   and we lose so much time, almost like four hours inside of our

2   bed, and there's constant noise and there is no place where I

3   can focus and work on my dissertation study and access the

4   resources.

5        THE COURT:  So my understanding is that in May you

6   have obligations -- some preliminary obligations that must be

7   completed in May and you were concerned that unless you were

8   released very quickly you would not be able to complete those

9   preliminary obligations.  Is that right?

10       THE WITNESS:  This is true, Your Honor.  I had my

11  qualifying review scheduled, which I worked for five years.

12  That includes my competencies in research, statistics, cultural

13  sensitivity, and grant writing, among other competencies, and I

14  need to -- I am really in need of, like, taking my qualifying

15  review to be able to start my dissertation process.

16       Everything takes time in a dissertation journey, and, yes,

17  I am very concerned that I am missing the availability of my

18  professors and I am missing my deadlines alongside with other

19  work that is related to my doctoral program.  For example,

20  during this time I missed two conferences that I was going to

21  attend and I missed one very important conference for me that I

22  was going to present one of my qualifying papers related to

23  character role models.

24       THE COURT:  So I would imagine Tufts would be

25  flexible, but, yes, I understand that you feel that you're

1   under pressure to -- to address those competencies.

2        Okay.  Is there anything else that --

3        MR. BAVA:  Just a couple more questions, Your Honor.

4        THE COURT:  Okay.

5   Q   BY MR. BAVA:  If you are released, Ms. Ozturk, what type

6   of arrangements have you made or will you make to ensure you

7   are able to attend hearings at this court in Vermont?

8   A   Of course.  Thank you very much for your question.  I am

9   going there with my lawyer.  They have been providing me

10  transportation support, and I know that also my colleagues are

11  willing to provide me with transportation support.

12       Also, for the court hearings in immigration court, I will

13  be joining them on Zoom.  I know that, like, being present in

14  the courtroom is very important, and I will -- I will follow

15  all the rules and I will be present in all the courts.

16       MR. BAVA:  Thank you, Ms. Ozturk.

17       THE COURT:  Okay.

18       THE WITNESS:  Thank you.

19       THE COURT:  Mr. Drescher, do you have any questions?

20       MR. DRESCHER:  I do not.

21       THE COURT:  Thank you, Ms. Ozturk.

22  I think the petitioner should call the next witness.

23       MS. ROSSMAN:  Thank you, Your Honor.

24       THE COURT:  And thank you for being slow in your

25  presentation.  So I know that you will, if released, be

1   teaching again very soon.  Try that slow technique.

2          THE WITNESS:  Thank you, Your Honor.  I will do my

3   best to try to be slow.

4          THE COURT:  You will do your best?  All right.

5          THE WITNESS:  Yes, I will do my best.  Thank you, Your

6   Honor.

7        (The witness was excused.)

8          MS. ROSSMAN:  Thank you, Your Honor.  Petitioners call

9   Dr. Jessica McCannon.

10         COURTROOM DEPUTY:  On the other side of the pillar

11  here -- come right up through here.  We keep it very well

12  hidden.  Right up there against the wall, there's a ramp up to

13  the witness stand.

14         THE COURT:  Good morning, Dr. McCannon.

15         THE WITNESS:  Good morning.

16         COURTROOM DEPUTY:  Could I ask you to state your name

17  and spell your name for the record, please.

18         THE WITNESS:  Yes.  Jessica McCannon.  Jessica is

19  J-E-S-S-I-C-A.  McCannon is M-C-C-A-N-N-O-N.

20       (The witness was placed under oath.)

21         THE WITNESS:  I do.

22         THE COURT:  Okay.  Good morning.  I should say that I

23  have read Dr. McCannon's six- or seven-page report.  I've also

24  looked at her curriculum vitae.  It's already a part of the

25  evidence.  So you don't need to go through the curriculum

1   vitae, because we'd be here for a long time, I think, it being

2   lengthy.  So -- but recognize that I've already read all of her

3   report.  Okay?

4          MS. ROSSMAN:  Two questions, Your Honor.  First, may I

5   approach so I can get her some water?

6          THE COURT:  Oh, yes.

7          MS. ROSSMAN:  Thank you.

8          THE COURT:  Absolutely.  Right.

9          THE WITNESS:  Thank you.

10         MS. ROSSMAN:  And second, Your Honor, would you

11  prefer -- we can -- if -- given that you have read the

12  materials -- we had been prepared to present her expertise, but

13  we can jump directly to her substantive testimony.

14         THE COURT:  Yeah.  I've taken a look at her expertise

15  and gone through her curriculum vitae, and she is clearly

16  qualified.  I think perhaps focusing in directly on her

17  observations of Ms. Ozturk and the risk that may be created by

18  continued incarceration would be helpful.

19         MS. ROSSMAN:  Okay, Your Honor.  And if we may, I

20  think to lay that groundwork, some general building blocks with

21  respect to asthma, if we can have the Court's indulgence.

22         THE COURT:  Yes.  That's fine.

23             JESSICA B. McCANNON, M.D.,

24       having been first duly sworn by the courtroom deputy,

25            was examined and testified as follows:

1        DIRECT EXAMINATION

2   BY MS. ROSSMAN:

3   Q    All right.  Good morning, Dr. McCannon.

4   A    Good morning.

5   Q    We've already heard from the Court you have some expertise

6   in asthma, so I'd like to speak with you a bit about that.  Is

7   that all right?

8   A    Of course.

9   Q    For the laypeople in the room, could you please describe,

10  what is asthma?

11  A    You bet.  Asthma is a chronic inflammatory disorder of the

12  airways --

13       THE COURT:  I wonder if you could speak right into the

14  microphone.

15       THE WITNESS:  Oh, sure.  Yeah.

16       THE COURT:  Because I couldn't hear you there.

17       THE WITNESS:  Is this better?

18       THE COURT:  That's better.

19  A    Okay.  Asthma is a chronic inflammatory disorder of the

20  airways associated with variation in airflow limitation, which

21  means changes in how the air flows out of the lungs at

22  different times, and is associated with a number of very common

23  symptoms, including cough, chest tightness, shortness of

24  breath, and wheeze.

25  Q    What happens if those symptoms of asthma that you just

1   described are not properly treated?

2   A    So if symptoms are worsening and are not properly treated,

3   patients are at higher risk of developing an asthma

4   exacerbation, which is a subacute or acute experience of

5   symptoms worsening, airflow obstruction worsening, and

6   potentially the need for emergent medical evaluation.

7   Q    And what are the risks, Dr. McCannon, of if you have an

8   exacerbation of your asthma symptoms?

9   A    If you have an exacerbation of your asthma symptoms, those

10  symptoms will get worse.  You are at risk of requiring an

11  emergency room evaluation, a hospitalization, and if a severe

12  asthma exacerbation goes untreated, there is some risk of death

13  as well.

14  Q    You've been talking about these exacerbations.  What can

15  trigger an asthma exacerbation?

16  A    There are many, many triggers of asthma.  Among the most

17  common are upper respiratory infections, particularly viral

18  infections; exercise; outdoor and indoor allergens.  So for

19  outdoors, we think about pollen.  Indoor, we worry about

20  exposure to dust, to animals, to mold.  We also worry about

21  exposure to irritants, so strong-smelling items like cleaning

22  detergents, bleach, perfumes, cigarette smoke.  And stress is

23  also known to worsen asthma control.

24       THE COURT:  Can I just ask one question about

25  outdoors?

1    THE WITNESS:  Sure.

2    THE COURT:  She -- there's another submission from

3    Ms. Ozturk that she only has an hour -- up to an hour a day

4    outside.  Does that create difficulties?

5    THE WITNESS:  It can create difficulties, particularly

6    if that period outdoors is associated with exposure to pollen,

7    right?  On the one hand, being outside with fresh air can be

8    helpful, yet at the same time, if that period of time outdoors

9    is associated with other triggers, that can also be

10   problematic.

11   Q    In your experience, Dr. McCannon, of treating hundreds of

12   asthma patients over the course of your career, have you

13   learned from them what an asthma attack feels like?

14   A    Yes.

15   Q    What have you learned about what an asthma attack feels

16   like?

17   A    My patients have described for me feeling frightened and

18   scared and often describing feeling like they are suffocated

19   and cannot take a deep breath.

20   Q    I know you mentioned earlier that asthma is a chronic

21   condition.  Does that mean that asthma can be cured?

22   A    No.  We do not consider asthma as something being curable,

23   merely controlled with attention to symptoms and reducing risk

24   factors.

25   Q    What are the methods that you can -- that, excuse me, a

---

1    patient can use to control their asthma?

2    A    Sure.  So we prescribe a range of medications, inhaled

3    medications, two major categories.  There are inhaled

4    corticosteroids, which reduce the inflammation in the airways;

5    there are also inhaled bronchodilators, which open the airways

6    to make it easier to breathe.  Those are often used in a moment

7    where they're experiencing distress.  We have some devices that

8    combine those two agents as well.

9    But in addition to thinking about the range of

10   pharmacologic or medication approaches to asthma, we always

11   make recommendations for considering mitigation of exposures as

12   well as part of our management plan.

13   Q    I want to take those two pieces a little bit in turn.  So

14   you were talking about inhaling medications.  Are those -- do

15   laypeople sometimes refer to those as inhalers?

16   A    Yes.

17   Q    Okay.  And are there different ways in which patients with

18   asthma can use inhalers?

19   A    Yes.

20   Q    What are those ways?

21   A    So there are inhalers that are used on a daily basis no

22   matter how patients are feeling on any given day, right, so to

23   maintain or control the disease.  And then there are other

24   inhalers which are used for quick relief or emergency use to

25   alleviate suddenly worsening symptoms.

1  Q    And you also mentioned the separate component of

2  controlling symptoms was -- I believe you mentioned avoidance

3  and mitigation.  What is avoidance and mitigation of triggers?

4  A    So it means having a good understanding of what your

5  personal triggers are and taking measures to avoid those

6  triggers.  This can be managed in a number of different ways

7  depending on those triggers.

8  Q    And how important is avoidance and mitigation as a part of

9  an asthma patient's control of their symptoms?

10  A    It is incredibly important because oftentimes use of

11  medications, even in the face of triggers, is not sufficient,

12  and ongoing exposure to triggers can undermine the benefits of

13  the medications.

14  Q    In your experience, if an asthma exacerbation is caused by

15  an environmental factor and the patient isn't able to remove

16  themself from the trigger, can inhalers be enough in that

17  situation?

18  A    They may help, but they would not be enough to prevent

19  worsening of disease.

20  Q    And what, in your experience, would happen under those

21  circumstances?

22  A    I think there would be increasing risk of developing a

23  more severe asthma exacerbation requiring an emergent

24  evaluation, potentially requiring an emergency room evaluation

25  for more specific medications, more intense medications.

1  Q    And have you seen examples of that occurring in your

2  practice as a board certified pulmonologist?

3  A    Yes.  Frequently.

4  Q    You mentioned earlier that the goal of asthma is control

5  of a patient's symptoms; is that right?

6  A    Yes.  Control of symptoms and reducing risk of

7  exacerbation.

8  Q    Are there tools and instruments that you as a clinician

9  can use to measure a patient's asthma control?

10  A    Yes.  There are many tools and instruments.  There are

11  several that are used quite frequently in clinical practice

12  because they are practical and easy to administer.

13  Q    And can you name one of those tools for us here today?

14  A    Sure.  The Asthma Control Test is a validated tool which

15  consists of five questions, and depending on how your patient

16  answers those questions and how they score, it gives you a

17  sense of how their asthma has been controlled in the preceding

18  four weeks.

19  Q    Are there any other tests that you use regularly in your

20  practice to measure asthma control?

21  A    Yes.  There's one other that I like to use.  So GINA,

22  G-I-N-A, which stands for Global Initiative for Asthma, is a

23  worldwide collaborative which consists of asthma experts from

24  around the world who provide strategic guidance on managing and

25  evaluating asthma.  They have a tool, a four-question tool, and

1    depending how your patients answer four questions, it also

2    gives you a sense of whether their asthma has been well

3    controlled, partly controlled, or poorly controlled in the

4    preceding four weeks.

5    Q    Aside from the two tests that you've just described, are

6    there other methods that you use in your practice to measure

7    asthma control for your patients?

8    A    Yes.  With that, it's really just having a sense of

9    somebody's clinical history, trajectory, and experience over

10   preceding months and years.  We do not have great tools to

11   assess asthma control other than that four-week period, but

12   it's just by taking a clinical history.

13   Q    We've been talking a bit about folks who have

14   well-controlled asthma, sometimes less well-controlled asthma.

15   Has the field of pulmonary medicine learned anything about the

16   risks for people with well-controlled asthma over the course of

17   the past decade?

18   A    Yes.  I would say there's been growing attention and

19   appreciation for the fact that even among patients who are

20   considered to have mild or well-controlled asthma, they are

21   still at risk of developing exacerbations, severe

22   exacerbations, near-fatal exacerbations, and sometimes deadly

23   exacerbations.

24   Q    I want to turn your attention now to your evaluation of

25   Ms. Ozturk.  In the course of preparing for this hearing, did

1    you form any opinions about Ms. Ozturk's health and in

2    particular her asthma condition?

3    A    Yes, I did.

4    Q    And on what did you base your professional opinions,

5    Dr. McCannon?

6    A    So I had access to medical records from her first

7    evaluation in Turkey, I had access to her evaluations from

8    Tufts Health Center, and I was able to have a clinical

9    interview with Ms. Ozturk.

10   Q    Were you able to physically examine Ms. Ozturk?

11   A    Aside from being able to see her on the screen, no.

12   Q    Why not?

13   A    Because she was detained in Louisiana at the time of our

14   conversation.

15   Q    If you had been able to be in the same physical space as

16   Ms. Ozturk, were there additional examinations that you would

17   have performed?

18   A    Yes.  I would have performed a complete physical

19   examination but obviously would have auscultated, or listened

20   to, her lungs and would have considered using tools to assess

21   her lung function as well, either with a peak flow meter or

22   with spirometry.

23   Q    Are there other times in your practice when you have been

24   assessing or diagnosing your patients remotely?

25   A    Yes.

1  Q    When has that been?

2  A    So during the pandemic, we have -- the medical field has

3  gained considerable practice in evaluating patients using

4  virtual platforms, and we continue to use those virtual

5  platforms often, just having access to our view of our patients

6  and a clinical history.

7  Q    And how often are you now in your clinical practice

8  assessing and diagnosing patients remotely?

9  A    Every week I have at least a handful of patients who have

10  opted for a virtual visit, so I continue to use that modality.

11  Q    With respect to Ms. Ozturk, did the fact that you could

12  not examine her physically impact the confidence you have in

13  the opinions that you're going to express here today?

14  A    No.

15  Q    And why is that?

16  A    Because I have considerable experience, again, with those

17  virtual platforms operating and making judgments based on

18  clinical history, and based on her particular clinical history,

19  it tells for me a very clear story of her diagnosis.

20  Q    So I'd like to get to that story with you.  Based on the

21  clinical history that you conducted with Ms. Ozturk and the

22  medical records you reviewed, did you form an opinion about

23  whether Ms. Ozturk had asthma?

24  A    Yes.

25  Q    And what was your opinion?

1  A    I believe that Ms. Ozturk has a diagnosis of asthma,

2  specifically cough-variant asthma with an element of allergic

3  asthma as well.

4  Q    What was the basis for that opinion?

5  A    The basis of that opinion is related to her clinical

6  history of having allergic rhinitis and seasonal and

7  environmental allergies, the assessment at the time of her

8  diagnosis, her response to therapies, and some other elements

9  of her history as well.

10  Q    Based on the clinical history that you conducted with

11  Ms. Ozturk, did you form an opinion about whether her asthma

12  was well controlled during the period of time that she was at

13  Tufts?

14  A    Yes.

15  Q    And what was that opinion?

16  A    My opinion was that during the time she was at Tufts, for

17  the majority of the time, with the exception of a period around

18  the time of a COVID infection, her disease was well controlled.

19  Q    So I'll take those in turn.  Why did you think her asthma

20  was not well controlled during the period that you just

21  described of her COVID infection?

22  A    So during her infection with COVID, she had periods of

23  cough that were very difficult to control and more chest

24  tightness and shortness of breath.  This is a very common

25  occurrence among patients with asthma that they suffer

55   56

1  worsening symptoms in the setting of a viral infection.

2  Q    In the course of your --

3      MS. KHANBABAI:  Excuse me.  I'm so sorry to interrupt,

4  but Rumeysa is actually having an asthma attack right now and

5  needs to use the bathroom so she can rinse after she has her

6  asthma medication.  Your Honor, I'm so sorry, but may she have

7  permission to leave to use the bathroom?

8      THE COURT:  Yes.

9      THE WITNESS:  Thank you.

10     MS. KHANBABAI:  Thank you, Your Honor.

11     THE COURT:  Okay.  Do you wish to proceed while she's

12  just taking a break, or --

13     MS. ROSSMAN:  Attorney Khanbabai, were you able to ask

14  Ms. Ozturk if she wanted us to proceed or to wait?

15     MS. KHANBABAI:  She was okay with proceeding.

16     THE COURT:  Okay.

17     MS. ROSSMAN:  Thank you.

18     THE COURT:  All right.

19  Q    I apologize, Dr. McCannon.  I think you were in the middle

20  of describing what the typical experience is for your patients

21  with asthma who sometimes contract upper respiratory

22  infections.  Could you pick up there?

23  A    You bet.  So patients with asthma, when exposed to upper

24  respiratory infections or viral infections, frequently suffer

25  worsening of their symptoms and control.  This is a common

1  cause of worsening asthma.

2  Q    In the course of your review of the medical records for

3  Ms. Ozturk, were you able to see the type of treatment that she

4  received for that exacerbation during the period of her COVID

5  infection?

6  A    Yes.

7  Q    And how often was she able to receive medical care during

8  that time, Dr. McCannon?

9  A    So she was assessed by the team at the health center on

10  several occasions and had frequent communication with her

11  medical team throughout this period of time.

12  Q    I believe you said outside of this one example that it was

13  your professional opinion that her asthma was well controlled

14  for the remainder of her time at Tufts.  Is that right?

15  A    That is correct.

16  Q    And what was the basis for that opinion?

17  A    So during the subsequent approximately 18 months, she was

18  able to have periods of time where she did not use a

19  maintenance inhaler and only needed to resume with the onset of

20  change of seasons, exposure to pollen; and when she suffered

21  onset of her asthma symptoms, the cough that she describes, she

22  was able to handle it with her approach to mitigation and use

23  of her quick-relief medication.

24  Q    Based on your clinical history of Ms. Ozturk, did you form

25  an opinion about whether there were steps that she herself was

57

58

1  taking to help control her asthma symptoms?

2  A    Yes.

3  Q    And what was that opinion?

4  A    So she took great pains to be careful about what she used

5  to clean her living space and how she did it; she often opened

6  windows, wore a mask, took great care at choosing what she used

7  to make sure that she was not exposed to strong odors; she made

8  changes to her schedule, traveling to the library early in the

9  morning to avoid foot traffic and any associated odors from

10  perfumes, *et cetera*, from her classmates; avoiding pets.  Those

11  are just a few examples.

12  Q    And did you have an opinion about whether this was an

13  important element of her asthma control?

14  A    Yes.

15  Q    And what was that opinion?

16  A    It is incredibly important.

17  Q    Based on your clinical history of Ms. Ozturk, did you form

18  an opinion about her asthma condition since she has been in

19  detention, so that would be since she's been detained on

20  March 25th this year?

21  A    Yes.

22  Q    And what is that opinion?

23  A    In my opinion, her asthma control has worsened

24  significantly.

25  Q    What's the basis for your opinion -- well, before I get

1  there, you said that -- described her control as worsening

2  significantly.  Would you consider it poorly controlled at this

3  point in time?

4  A    Yes.

5  Q    Would you consider it poorly controlled throughout the

6  period of time she's been in detention?

7  A    Yes.

8  Q    What's the basis for that opinion, Dr. McCannon?

9  A    So based on our conversation and the history that she has

10  recounted about the periods of worsening cough and chest

11  tightness lasting for longer periods of time and not responding

12  as well to her emergency medications, in addition to

13  administering those two instruments that I mentioned earlier.

14  Q    So let's talk about those instruments.  When you say that,

15  are those the validated tests that we discussed?

16  A    Yes.  The Asthma Control Test, ACT, and the GINA

17  assessment control questions.

18  Q    And do you recall the score that Ms. Ozturk got on the ACT

19  test?

20  A    Yes.  Her score was 14, which is consistent with poorly

21  controlled asthma.

22  Q    And do you recall the score that she obtained on the GINA

23  assessment?

24  A    Yes.  She answered three of the four questions in such a

25  way that led to the correlation with poorly controlled asthma.

59

1  Q    How would you describe the degree of change from
2  Ms. Ozturk's asthma condition while she was at Tufts to her
3  asthma condition since she has been detained?
4  A    It is a very high degree of change.  She has experienced
5  the same number of what she refers to as asthma attacks and
6  more severe in intensity over this period of time of just four
7  to five weeks compared to a period of 18-plus months, almost
8  two years.
9  Q    And I want to talk about that period because I know
10  that -- do you recall when you took a -- last took a clinical
11  history of Ms. Ozturk?
12  A    Yes.  The last time we spoke I believe was May 5th --
13  May -- wait.
14  Q    So if I -- why don't we go by date.
15  A    Yeah.
16  Q    So today is Friday.
17  A    Yeah.
18  Q    Do you recall the last weekday -- day of the week that you
19  spoke to Ms. Ozturk?
20  A    I think we spoke on a Monday.  Oh, shoot.  I can't --
21  actually, it's all a blur.  I can't remember.  Forgive me.
22  Q    If I were to suggest to you that your declaration was
23  signed on May 2nd --
24  A    Yes.
25  Q    -- would that help refresh your recollection?

60

1  A    Yes.  I would not have spoken to her after that point.
2  Q    And have you been in court here today, Dr. McCannon?
3  A    Yes.
4  Q    And did you hear Ms. Ozturk's testimony?
5  A    Yes.
6  Q    And did you hear Ms. Ozturk's testimony that she has
7  experienced additional asthma attacks?
8  A    Yes.
9  Q    And that has been since the last time you spoke with her;
10  is that right?
11  A    That is correct.
12  Q    Based on your clinical history of Ms. Ozturk, did you form
13  an opinion about what was causing her asthma to worsen since
14  she had entered detention?
15  A    Yes.
16  Q    And what was that opinion?
17  A    I think it is directly related to her current living
18  situation.
19  Q    And in your professional opinion, are there particular
20  elements of the condition that she's experiencing in detention
21  that's leading to her having poorly controlled asthma?
22  A    Yes.
23  Q    And what are those elements?
24  A    So she's currently living in a space which, as we heard
25  her share earlier, I think is designed for 14 people sitting,

61

62

1 and she is essentially living almost 24 hours a day with 23

2 other people in the space, exposed to the humidity from the

3 showers that are open to that space, and exposed to strong

4 odors from detergents, shampoos, cleaning supplies.  And as I

5 understand as well, there also has been seen rodents and

6 insects as well, not to mention the considerable stress that

7 she's experiencing.  All of these things are known to worsen

8 asthma, and we know that they worsen her asthma.

9 Q    Do you have any other professional concerns about

10 Ms. Ozturk's condition while she's in detention?

11 A    Yes.

12 Q    What are those concerns?

13 A    From what I have learned from Ms. Ozturk, her ability to

14 obtain timely medical assessments is a concern for me.

15 Patients with asthma who are experiencing worsening asthma

16 control can deteriorate very quickly, and if worsening symptoms

17 are not addressed, the risk increases of developing more severe

18 asthma exacerbation, requiring urgent medical attention.

19 Q    You previously mentioned that you think one of the

20 elements that have led to her worsening condition is the number

21 of women that she is living with in one space.  Do you recall

22 that?

23 A    Yes.

24 Q    Do the number of women that Ms. Ozturk is living with give

25 you any other professional concerns about her condition in

1 detention?

2 A    Yes.

3 Q    And what are those concerns?

4 A    I am concerned about the ease with which viruses can be

5 transmitted in small spaces, particularly those upper

6 respiratory viruses that are known to cause asthma

7 exacerbations.

8 Q    Based on your clinical history of Ms. Ozturk, did you form

9 an opinion about the risk of her condition worsening if she's

10 not released from detention?

11 A    Yes.

12      THE COURT:  Ms. Ozturk has just returned.

13      MS. ROSSMAN:  Thank you.

14 Q    What is your professional opinion about the risk of

15 Ms. Ozturk's condition worsening if she's not released from

16 detention?

17 A    My opinion is that she is at significantly increased risk

18 of developing an asthma exacerbation if not released that would

19 potentially require emergency evaluation.

20 Q    And when you say "emergency evaluation," what are the

21 locations at which that might occur?

22 A    So oftentimes patients require evaluation in an emergency

23 room setting.  Sometimes they are required to be hospitalized

24 on a general medical service or in an ICU.  And as I mentioned

25 earlier, if not treated appropriately and quickly, patients can

1  suffer morbidity and mortality related to asthma exacerbations.
2  Q    So the locations that you just mentioned that urgent
3  evaluation might need to take place, are those locations that
4  you believe Ms. Ozturk is at risk of needing to go to as a
5  result of her worsening condition?
6  A    Yes.
7  Q    What is the basis for that opinion, Dr. McCannon?
8  A    The basis for that opinion is in the increased frequency
9  and worsening of her symptoms and particularly the increased
10  use of her quick-relief inhaler, which we know to be associated
11  with those previously stated risks, not to mention her
12  inability to protect herself from her known triggers.
13  Q    And when you say "protect herself," is that referring to
14  the mitigation and avoidance techniques we discussed earlier?
15  A    Exactly.
16  Q    Based on your clinical history of Ms. Ozturk, did you form
17  an opinion about whether her condition will improve if she's
18  released and able to return to Somerville?
19  A    Yes.
20  Q    And what is that opinion?
21  A    My opinion is if she is released and able to return to
22  Somerville, that her asthma control will improve based on her
23  ability to control her environment and her ability to easily
24  access medical care and work with her medical treatment to
25  address any issues that may come up.

1  Q    And I guess the flip of that, based on your clinical
2  history of Ms. Ozturk, did you form an opinion about whether
3  her asthma condition will improve if she remains in detention?
4  A    Yes.
5  Q    And what is that opinion?
6  A    If she remains in detention, I believe that her asthma
7  control will worsen.
8      MS. ROSSMAN:  No further questions, Your Honor.
9      THE COURT:  Thank you.
10  All right.  Mr. Drescher.
11          CROSS-EXAMINATION
12  BY MR. DRESCHER:
13  Q    Good morning, Doctor.
14  A    Good morning.
15  Q    A moment ago I think you described a conversation or a
16  communication you were having with Ms. Ozturk, and I believe
17  you said something to the effect of "something that she
18  described as an asthma attack."  Is that -- I wanted to explore
19  that.
20      Is that -- was that choice of language on your part
21  especially careful that she was describing something as an
22  asthma attack that perhaps wasn't an asthma attack?  I'd like
23  to understand what you were trying to communicate there.
24  A    Sure.  So Ms. Ozturk, in my short time speaking with her,
25  uses the phrase "asthma attack" to describe episodes of

1  worsening symptoms, so worsening cough, chest tightness,

2  *et cetera*, that requires her to use her quick relief.  I will

3  make a distinction between that and my use of the phrase

4  "asthma exacerbation."  Does that help?

5  Q    Yes.  Is there a clinical definition of asthma attack?

6  A    There is not.  There is, sadly, very loose and messy

7  terminology.  In my practice, it is just important for me to

8  understand what my patients mean and what they experience when

9  they use certain terminology.  When I use the phrase "asthma

10  exacerbation," what that means is sort of subacute or acute

11  worsening in symptoms requiring particular medications and

12  interventions.

13  Q    How many times have you spoken with Ms. Ozturk since she's

14  been detained?

15  A    We spoke twice.

16  Q    And have you had a chance to review the medical records

17  from the facility where she is currently detained?

18  A    No.

19  Q    Do you know how many times she reported what she's

20  described as asthma attacks to the medical team at that

21  facility?

22  A    I -- no.

23  Q    Have you had any communication with the medical team at

24  that facility?

25  A    No.

1  Q    Are you aware of any medicines that Ms. Ozturk should have

2  access to relative to her asthma that she does not have access

3  to at the medical facility?

4  A    Yes.

5  Q    What is that?

6  A    She has access to Pulmicort, is my understanding, and a

7  quick-relief inhaler, albuterol.

8  Q    And are those appropriate medicines?

9  A    They are, I believe, not adequate based on her current

10  control but better than nothing.

11  Q    Have -- to your knowledge, has anybody made an effort to

12  communicate with the medical team at the facility as to

13  Ms. Ozturk's need for other medicines?

14  A    I don't know.

15        MR. DRESCHER:  I have nothing further.

16        THE COURT:  Okay.  Thank you.

17  Any further questions?

18        MS. ROSSMAN:  Just one, Your Honor.

19        THE COURT:  Yes.

20                REDIRECT EXAMINATION

21  BY MS. ROSSMAN:

22  Q    Hi, Dr. McCannon.

23  A    Hello.

24  Q    You were just asked by opposing counsel a couple of

25  questions about terminology.

67

1  A    Yes.

2  Q    Regardless of the words that Ms. Ozturk has used, what has

3  the symptoms that she has described to you told you about her

4  current condition?

5  A    Her symptoms clearly tell me a story of a patient with

6  asthma whose asthma control has worsened significantly.

7       MS. ROSSMAN:  Thank you.

8       THE COURT:  Okay.  Mr. Drescher, any further

9  questions?

10      MR. DRESCHER:  Nothing further.

11      THE COURT:  All right.  Thank you very much, Doctor.

12      THE WITNESS:  Yup.  My pleasure.

13      (The witness was excused.)

14      THE COURT:  Okay.  Want to call the next witness?

15  Good morning.

16      MS. ZAFAR:  Good morning, Your Honor.  Petitioner

17  calls Dr. Sara K. Johnson.

18      THE COURT:  Good morning, Professor Johnson.

19      THE WITNESS:  Good morning.

20      COURTROOM DEPUTY:  Could I ask you to state your first

21  and last name and spell it for the record, please.

22      THE WITNESS:  Sure.  Sara, S-A-R-A, Johnson,

23  J-O-H-N-S-O-N.

24  / / /

25  / / /

68

1           SARA K. JOHNSON, Ph.D.,

2       having been first duly sworn by the courtroom deputy,

3            was examined and testified as follows:

4       THE WITNESS:  I do.

5       MS. ZAFAR:  Thank you.  Your Honor, may I approach the

6  witness just to give her some water?

7       THE COURT:  Yes.

8       THE WITNESS:  Thank you.

9            DIRECT EXAMINATION

10  BY MS. ZAFAR:

11  Q    Good morning, Dr. Johnson.

12  A    Good morning.

13  Q    Where are you employed and what is your title?

14  A    I am associate professor and director of graduate studies

15  in the Department of Child Study and Human Development at Tufts

16  University.

17  Q    And what is your connection to Rumeysa Ozturk?

18  A    I am her primary adviser, which means I'm responsible for

19  supervising her completion of all the requirements of her

20  doctoral program.

21  Q    And how long have you known Ms. Ozturk?

22  A    I have known her since September 2020, so almost five

23  years.

24  Q    And what does your role as Ms. Ozturk's primary adviser

25  entail?

1  A    So I am responsible for making sure that she fulfills the

2  program requirements.  And for our doctoral program, students

3  have to fulfill a number of what we call academic milestones,

4  so, for example, several papers that have to be written, the

5  largest and most final of which is the dissertation.  We also

6  have, which Rumeysa referred to, several competencies, so those

7  are, for example, presentation scales, teaching scales, things

8  of that nature.  And so I make sure that she is working towards

9  those, that she is completing them, and also to a level of high

10 quality and in a timely manner.

11     THE COURT:  Can I ask a question?  She testified about

12 some competencies which were, I guess, due in May.

13     THE WITNESS:  Yes, Your Honor.

14     THE COURT:  And is there flexibility in regard to

15 whether she can be offered to satisfy those competencies in the

16 future?

17     THE WITNESS:  Yes.  Absolutely.  We are prepared to

18 offer her flexibility.

19 Q    How many students do you supervise, including Ms. Ozturk?

20 A    I personally supervise four doctoral students right now.

21 Q    And how often and in what context do you meet with these

22 students?

23 A    So I use the same schedule with Rumeysa as all my

24 students, which is that every other week we meet for an hour,

25 sometimes more often if it's a busy or intense time, and then

1  we also have group meetings in the off weeks, and we have very

2  extensive informal communication.  Their office is right down

3  the hall from mine, so I see Rumeysa constantly walking back

4  and forth.  Also over e-mail, over -- over text, and we also

5  have social gatherings as -- at the lab.

6  Q    Thank you.  So I'd like to turn to Ms. Ozturk's

7  scholarship, which I know she briefly talked about today.  But

8  can you describe her research and the focus of her

9  dissertation.

10 A    Absolutely.  Broadly speaking, her research is on positive

11 develop- -- media development and positive media use of

12 children and adolescents, and for her dissertation, they have

13 to focus a little more specifically, and so she's looking at

14 how late adolescents use social media in what are called

15 prosocial ways, which "prosocial" means to the benefit of other

16 people rather than oneself.

17 Q    And how would you situate Ms. Ozturk's research within the

18 broader field?

19 A    So Rumeysa's research is innovative for many reasons, but

20 two that I think are particularly important is I'm sure folks

21 have read a lot of news about social media and there's a lot of

22 concern, and so it's really important that research addresses

23 what is happening with social media with young people, and

24 Rumeysa brings a strengths-based perspective to that which does

25 not ignore the potential negative consequences of social media

1  but brings that essential voice of positivity to the

2  conversation.

3      And she's also connecting social media not just to how we

4  communicate but how we develop prosocially.  So prosocial

5  development is a really important what we call developmental

6  task, and so understanding how social media plays into that is

7  extremely important for developmental science.

8  Q    And I'd like to now turn to discussing the importance of

9  Ms. Ozturk being on campus at this stage in her studies.  So

10 when is Ms. Ozturk expected to complete her degree?

11 A    At the time of her detention, Rumeysa was on track to

12 finish her dissertation in December of this year, which at

13 Tufts means she would receive her degree in February 2026.

14 Q    And what happens if Ms. Ozturk cannot complete her

15 dissertation and her degree on this timeline?

16 A    She will absolutely still be able to complete it, but with

17 every day goes -- you know, that goes by, she's missing out on

18 opportunities for her future career, such as grant proposals,

19 opportunities for publication that she needs to have her degree

20 in hand, we would say, to be able to apply for.

21 Q    And what stage of the Ph.D. program is she currently in?

22 A    Rumeysa is, as she mentioned, at the point -- it's a very

23 critical juncture between finishing everything else and being

24 able to start on her dissertation.  So she mentioned her

25 qualifying review, which actually had been originally scheduled

1  for yesterday, and that is where she would meet with members of

2  her committee to review everything that she's done, her entire

3  body of academic work in our program, and then we would decide

4  whether she was ready to move forward with her dissertation,

5  and it's a really big deal for Ph.D. students in our -- in our

6  program to do that, and so that's where she's at right now.

7  Q    And at this stage -- I know you mentioned she had a

8  qualifying review.  What are the other types of activities that

9  she would be doing in order to prepare to eventually defend her

10 dissertation?

11 A    Absolutely.  So because this is really the final stretch,

12 the home stretch, of her program, she is working on her

13 dissertation, which is a major undertaking that has many

14 different components that -- you know, academia has to be

15 completed in a very particular order with very particular

16 amounts of time in between, and she really needs to be there

17 with -- with us to communicate about that.

18 Q    And are there courses that Ms. Ozturk would be teaching

19 that are also -- would be in furtherance of her requirements?

20 A    Yes.  Definitely so.  Rumeysa is scheduled to teach this

21 summer a course that she mentioned called Introduction to Youth

22 and Media.  It's through the Tufts Pre-College Program, so

23 it's, of course, for high school students, and this would be

24 the third year that she has taught that course.  It's a much

25 beloved course.  Scheduled to be taught in July.

1  Q    And during her testimony today, Ms. Ozturk mentioned that

2  she has served as a research assistant.

3  A    Um-hum.

4  Q    Is that something that she would also be doing as part of

5  this stage of her studies?

6  A    Yes.  Absolutely.  She is scheduled to be a research

7  assistant on a project we are starting about a podcast that is

8  designed for adolescents that we're doing the data collection

9  around how adolescents experience the podcast.  Because it's a

10  podcast, it's about media, so she is -- she's our media expert

11  on that project.  Her expertise is absolutely critical.

12  Q    And for these various projects that you've described, how

13  important is it for Ms. Ozturk to physically be on campus in

14  order to participate in them?

15  A    It's basically the only way that she can participate.  As

16  she described, it's not really possible for her to participate

17  in detention.  She, in theory, can work on a few small parts of

18  her dissertation.  I've sent her a proposal.  But it's really,

19  really challenging, and things that if we were down the hall

20  could take one day would take several weeks to complete, if it

21  was possible at all.

22  Q    And for the course that she's expected to teach, if she's

23  unable to teach it, what happens with that course?

24  A    She's really not replaceable as an instructor.  It is the

25  course she has designed herself from scratch with many, many

1  hours of effort, and there's no one else to teach it, so they

2  would have to cancel it.

3  Q    And similarly with the podcast project you mentioned, you

4  said that she is the sort of resident media expert.  What

5  happens to that project if Ms. Ozturk is not able to

6  participate?

7  A    Her expertise is really difficult to replicate.  It will

8  greatly extend the timeline of the project because the rest of

9  us will have to learn the expertise that she already has and

10  can already bring to the project, and we won't be able to do it

11  as well.

12  Q    I'd like to shift to opportunities that Ms. Ozturk has

13  already missed given her detention.  So one major milestone

14  that you mentioned was her qualifying review that was expected

15  to take place, I believe --

16  A    Yesterday.

17  Q    -- yesterday.  So given that she missed it, is there a way

18  for her to complete that review upon release from detention,

19  and how long would that process take?

20  A    So it is absolutely possible to reschedule.  Typically if

21  we weren't trying to expedite it, which of course we will under

22  these circumstances, it may take a month or more to reschedule.

23  I don't anticipate it would -- would take that long in this

24  case, but the intensity of what she needs to be doing is such

25  that every day that goes by where that meeting doesn't happen

1 and she can't start on her dissertation puts her at risk of not

2 meeting that December deadline.

3 Q     And are there other projects or other milestones that

4 Ms. Ozturk has already missed out on?

5 A     An absolutely major one that she missed was being able to

6 attend and present her work at a major professional conference

7 in our field called the Society for Research in Child

8 Development.  She was scheduled to present there last week,

9 and, you know, she's in her fifth year, and that's very prime

10 networking time at these conferences.  She would have been

11 talking to people about postdoctoral fellowships and jobs, and

12 she missed out on that.

13     And she has also missed the dissertation thesis defenses

14 of several close peers, particularly one where she really

15 played a second mentorship role to the student in their

16 analysis, and that was really devastating to not have her there

17 for that.

18 Q     And finally, I'd like to talk about your impression of

19 Ms. Ozturk given your close relationship with her as her

20 primary adviser and her integration into the -- to the Tufts

21 community.  What will Ms. Ozturk's presence on campus

22 contribute to the work not only of her colleagues but to the

23 broader campus community?

24 A     Absolutely.  So Rumeysa is a critical part of our lab.  My

25 students, my four Ph.D. students, including Rumeysa, run a peer

1 review group of all of their work, and they are missing out on

2 her very constructive yet extremely rigorous comments, and

3 Rumeysa is also a mentor to many more junior students in our

4 department, and so they are missing those -- those

5 opportunities to learn from her.  We have so many students who

6 are interested in media, media in child development, and

7 Rumeysa is really the one who can -- who can teach them about

8 those topics.

9 Q     In your letter of support that was submitted alongside

10 Ms. Ozturk's bail application, you described her as

11 "prosocial."

12 A     Um-hum.

13 Q     Are there specific instances you recall where Ms. Ozturk

14 demonstrated this prosocial characteristic?

15 A     Well, I'll speak to a few that have involved me

16 personally.  And I know we've talked a lot about Rumeysa's

17 allergy-induced asthma, but from a distance, she really loves

18 cats, and she loves my cats in particular, and so she's always

19 asking me to show her pictures of the cats, and recently one of

20 them underwent treatment for cancer, and I didn't know it at

21 the time, but in our meeting Rumeysa wrote down the dates of

22 the treatment that my cat was having for cancer, and then on

23 that day she sent me a text that said, "I hope everything goes

24 well with" - his name is Barsic - "Barsic's cancer treatment

25 today.  My thoughts are with you" and my husband and our -- and

77

1  our cats.  So that's just a very small story that illustrates
2  the level of care she shows for -- for other people.
3      She has also befriended my mother when she moved from
4  Kentucky to Somerville.  My mom's bucket list trip is to go to
5  Turkey, and so Rumeysa, first time she met my mother, sat and
6  talked with her for hours on her recommendations of places to
7  go and things to visit.
8  Q    And what are Ms. Ozturk's interactions like with her
9  peers, with other students in her cohort, and with the
10  department writ large?
11  A    I already mentioned the peer review group that she has
12  with the other Ph.D. students.  They give comments to each
13  other.  I often see those when they send them on to me, and
14  Rumeysa gives the most rigorous but constructive feedback,
15  which is a lot more difficult than it seems like it would be,
16  and she also has friends throughout our department.  Sometimes
17  we walk from my office to the Ph.D. students' office and
18  everyone's always "Hi, Rumeysa" and she says, "Oh, hi.  So nice
19  to see you."
20      And we -- we do these departmental events.  Rumeysa
21  mentioned some of them.  And sometimes I will walk in and I
22  will see her sitting with various groups, undergraduate
23  students, master's students.  Some Ph.D. students really stick,
24  you know, with their little cohort, and that's good, but that's
25  absolutely not Rumeysa.  She really makes an effort to get to

78

1  know everybody across all levels in the department community.
2  Q    And how have your students, Ms. Ozturk's peers,
3  experienced her absence from campus over these last six weeks?
4  A    It's -- it's been devastating.  It -- especially at the --
5  it's both the everyday occurrences but also the major things
6  like that master's thesis defense where she wasn't able to be
7  there despite having -- having mentored this student with their
8  analysis, and that was so hard for that particular student.
9      But one of the ways I know how much everyone has been
10  impacted was I helped coordinate the submission of letters for
11  her bail application, and I asked a very large number of
12  people.  Everyone agreed.  And then after that I kept getting
13  e-mails and I kept getting texts and I kept getting people who
14  would stop by my office and say, "I would also like to write a
15  letter on behalf of Rumeysa, because we miss her and we need
16  her back."  And every day since she has been detained, I get an
17  e-mail, I get a call, I get a text:  "How is Rumeysa doing?"
18  "When is she going to be back with us?"  "It's not the same at
19  all of these events without her."  It's a very consistent
20  message across the department.
21  Q    And then finally, to your knowledge, was Ms. Ozturk
22  involved in campus activities outside of her research and her
23  academic pursuits?
24  A    I know of two ways that Rumeysa has been involved.  One is
25  through the departmental student organizations that she

1  mentioned, and the other is through -- the Tufts Office of the

2  Chaplain has an interfaith friendship program called Be-Friend

3  that Rumeysa has participated in that we have talked about

4  because we've had to schedule our advising meetings around when

5  she needs to be there for -- for those events.

6        MS. ZAFAR:  Thank you.

7        THE COURT:  Okay.  Mr. Drescher?

8        MR. DRESCHER:  No questions.

9        THE COURT:  All right.  Can I just ask, I mean, it's

10  hard to qualify -- quantify, but her level of engagement in the

11  program, I mean, is she one of the students who is, like,

12  totally engaged in the doctoral process and in the study,

13  almost to the exclusion of all other interests or --

14        THE WITNESS:  Yes.  I would -- I would characterize

15  Rumeysa's level of engagement in our program as exceptionally

16  high.  I point to her with other Ph.D. students as a sort of

17  role model in that respect of really taking advantage of all

18  that our program has to offer and being so thorough in

19  fulfilling all of the requirements and participating in all

20  kinds of activities.  Yes.

21        THE COURT:  All right.  Any further questions?

22        MS. ZAFAR:  No, Your Honor.

23        THE COURT:  All right.  Any --

24        MR. DRESCHER:  No.  Thank you.

25        THE COURT:  All right.  Thank you, Doctor.

1        (The witness was excused.)

2        THE COURT:  All right.  So let's talk about the

3  schedule here for today.  I mean, I was hoping that we would be

4  done relatively quickly.  We have one more witness to testify.

5  How long would that take?

6        MS. ALLARD:  Your Honor, if we could have 20 minutes

7  for the next witness, I think that would be sufficient.

8        THE COURT:  Okay.  And then argument.

9        The government has no witnesses; is that right?

10        MR. DRESCHER:  Right.

11        THE COURT:  So the arguments -- my question is whether

12  we just take a short break now and just go until, like,

13  1 o'clock and finish, which would be my preference.

14        MS. ROSSMAN:  We can do that, Your Honor.

15        THE COURT:  Pardon me?  That's your preference as

16  well?

17        MS. ROSSMAN:  We're happy to do whatever the

18  preference is of the Court, but we can certainly make that

19  work.

20        THE COURT:  Okay.  Mr. Drescher, any objection to

21  taking a ten-minute break at this point and going till

22  1 o'clock and finish it?

23        MR. DRESCHER:  No objection.  That's fine.

24        THE COURT:  Okay.  So let's take a ten-minute break.

25  I'm really concerned about the communications with Ms. Ozturk

81

1  and her being available on Zoom, so if we can just take a

2  ten-minute break at this point and we'll start again, and

3  hopefully we'll finish arguments of counsel and then I'll

4  render a decision.  Okay.

5  (A recess was taken from 12:11-12:24 PM.)

6  THE COURT:  Petitioner, call next witness.

7  MS. ALLARD:  Thank you, Your Honor.

8  We call Becky Penberthy to the stand.

9  THE COURT:  Okay.  Good afternoon, Ms. Penberthy.

10  THE WITNESS:  Good afternoon, Your Honor.

11  COURTROOM DEPUTY:  I'd ask you to state your first and

12  last name for the record and spell it as well.

13  THE WITNESS:  Becky, B-E-C-K-Y, and Penberthy is

14  P-E-N-B-E-R-T-H-Y.

15  BECKY PENBERTHY,

16  having been first duly sworn by the courtroom deputy,

17  was examined and testified as follows:

18  THE WITNESS:  I do.

19  MS. ALLARD:  Permission to approach, Your Honor.

20  THE COURT:  Yes.

21  THE WITNESS:  Thank you.

22  DIRECT EXAMINATION

23  BY MS. ALLARD:

24  Q  Good afternoon, Ms. Penberthy.

25  A  Good afternoon.

82

1  Q  What do you do for work?

2  A  I'm the adult restorative services manager at the

3  Burlington Community Justice Center.

4  THE COURT:  I wonder if you could just come -- move up

5  just a little bit and speak right into the microphone.

6  THE WITNESS:  Certainly.

7  Q  And what is the Burlington Community Justice Center?

8  A  The Burlington Community Justice Center is an organization

9  under the City of Burlington with 17 staff members.  We serve

10  youth age 12 and up, and, I mean, I guess the oldest person

11  I've ever worked with was 82 years old.  We serve folks who are

12  looking for support from the community all the way up to people

13  who are returning from a period of incarceration.

14  Q  And is the Burlington CJC publicly funded?  Do people pay

15  you directly for your services?  How does that work?

16  A  So we do have some fees for some of our programs, small

17  fees for participation, but primarily we're funded by public

18  sources.  So we get funding from the Vermont Attorney General's

19  Office, the Vermont Department of Corrections, the Vermont

20  Department for Children and Families, as well as some funding

21  for victim services.

22  Q  And what educational background and experience led you to

23  this role with the Burlington CJC?

24  A  So my educational focus was primarily sociology with a

25  little bit of philosophy thrown in.  I -- I -- once I left

83

1  college, I worked for a period of 16 years at a place for

2  at-risk youth.  I left there and was hired by --

3        THE COURT:  I'm sorry.  That was at-risk youth?

4        THE WITNESS:  Correct.

5  A    I left there and was hired by a place that's essentially

6  like the Burlington Community Justice Center called Lamoille

7  Restorative Center in Lamoille County, Vermont.  Worked there

8  for 16 years.  When I left that position, I left as the

9  restorative programs director and the Vermont director of

10 pretrial services.

11 Q    And did you spend any time working for the courts?

12 A    Oh, I did.  I took a position at Addison Superior Court

13 supervising their four dockets as the court operations manager.

14 I left there on -- in February of 2022 and took a job at the

15 Burlington Community Justice Center.

16 Q    In total, in all of your years of experience in

17 restorative justice, how long have you been in that field?

18 A    Just a little more than 21 years at this point.

19 Q    Do you have any other roles currently in addition to your

20 position at the Burlington CJC?

21 A    I also teach a graduate-level class at the Vermont Law and

22 Graduate School in applied restorative justice facilitation.

23 Q    And now that you're at the Burlington CJC, you stated that

24 you manage adult restorative services.  What are those?

25 A    So those are programs with names such as Precharge; Court

84

1  Diversion; Tamarack, which is essentially like a diversion

2  program for folks who have a criminal history, a longer

3  criminal history.  I also supervise a reentry program for folks

4  coming back from a period of incarceration as well as a program

5  that's been in effect since 2015 called Pretrial Services.

6        THE COURT:  Can I just ask about -- about the

7  structure of your organization?  Is it private, nonprofit?

8        THE WITNESS:  No.  It's part of the municipal

9  government here in the city.

10       THE COURT:  It's part of the municipal government.

11       THE WITNESS:  Absolutely.

12       THE COURT:  Okay.  Not the state.

13       THE WITNESS:  Not the state.

14       THE COURT:  Okay.

15 Q    Can you tell us a little bit more about that structure on

16 a statewide level.  How do pretrial services work across the

17 state?

18 A    So in every county in Vermont, there's an agency much like

19 mine that has all of those services that I just spoke of.

20 It's -- some are different, though.  Like, mine is municipally

21 based.  Others are private nonprofits.  Others are part of

22 other organizations.  But we offer the same services.  We're

23 supervised by the Vermont Attorney General's Office.  In those

24 programs, we have common protocols, manuals, that sort of thing

25 that we adhere to.

85

1  Q    And how did this statewide pretrial services program come

2  to be?

3  A    There was some legislation suggested prior to 2015, and as

4  it worked its way through the legislation, it was passed and

5  enacted at -- I'd say just prior to 2015.  Once that law was

6  enacted, a committee of folks was developed, you know, people

7  from Corrections, Attorney General's Office, judges, and we --

8  I was appointed to that committee as well, and we took about a

9  period of six months developing what this program would look

10 like and working on its statewide rollout.

11 Q    And here at the Burlington CJC, how do folks get referred

12 to you for pretrial services?

13 A    By order of the judge.

14      THE COURT:  I'm sorry.  By what?

15      THE WITNESS:  Order of a judge.  Judge's order.

16      THE COURT:  Okay.

17 Q    Are there any other methods by which folks can get

18 referred to you for pretrial services?

19 A    They can self-refer.  So sometimes people want our support

20 and reminders, and so they can self-refer, but it's primarily a

21 court order.

22      THE COURT:  So I read your submission, and I

23 interpreted it as you offering your services to provide support

24 for Ms. Ozturk.  Is there any particular problem, in light of

25 the fact that you are in fact employed by a city organization,

86

1  first; and would there be any limitations on your supervision

2  of -- of her if she was released partially under your care?

3       THE WITNESS:  Can you say your first question again?

4       THE COURT:  Yeah.  I mean, I'm just -- this is

5  obviously the federal court, and you are working theoretically

6  as a municipal organization, and I wonder whether, because

7  you're employed by a municipal organization, it creates a

8  difficulty for you spending time on a case which is a federal

9  case, not one which is brought to you by the municipality.

10      THE WITNESS:  So I have talked with my supervisors and

11 members of the City about this, not in specifics but in

12 generalities.

13      THE COURT:  Okay.

14      THE WITNESS:  I have actually worked in other federal

15 cases before.  I have one other federal case that I'm working

16 on, and sometimes people who return from federal custody, an

17 incarcerative sentence, work with my team.  Our services are

18 countywide, so even though I'm employed by the City of

19 Burlington, we do serve people all across the county and

20 sometimes outside of the county if their cases are transferred

21 to us.

22      THE COURT:  All right.  So even if you're being paid

23 by Burlington, you theoretically practice throughout the

24 county, and in fact, you have dedicated your services to some

25 federal persons as well?

1    THE WITNESS:  Yes.

2    THE COURT:  And are you paid for the time that you put

3    in in regard to the federal supervision, or is this just a part

4    of your general job?

5    THE WITNESS:  In one case I'm -- my agency is paid.

6    In the other cases, not paid.  We do have some general funds

7    that we're able to determine how we want to spend those funds

8    ourselves, so we're using our general funds to do this.

9    THE COURT:  Okay.  But when you offered to actually

10    provide that kind of supervision, that's to help her become

11    established back in Somerville and also just to make sure that

12    she's complying with whatever conditions --

13    THE WITNESS:  Absolutely.

14    THE COURT:  -- are imposed; that doesn't necessarily

15    require you to be paid by the federal government, does it?

16    THE WITNESS:  I don't think it does.  It's nice when

17    we get funding from sources that we're working with, but

18    there's times when we do not.

19    THE COURT:  Right.  And this is a situation in which

20    she couldn't be on federal probation because this is not a

21    criminal case?

22    THE WITNESS:  Right.  It's not a criminal matter.

23    THE COURT:  It's a complicated case.  But you think

24    that you would be able to provide that kind of support?

25    THE WITNESS:  I think I could.  And if I could just

1    say one more thing about the funding piece.  I -- her attorneys

2    are not paying me to provide the services because the services

3    that we provide are -- are for all of the parties and for the

4    person that is subject to whatever the conditions are, so I

5    would either want sort of an overarching funding source or no

6    funding source so that I can provide this neutral -- neutral

7    option to the Court.

8    THE COURT:  Okay.  And when you're providing those

9    services and you become aware that someone has violated the

10    rule; that is, that they've violated some requirement, and your

11    obligation is to inform the authorities that -- that she is in

12    violation or he's in violation of the rules, do you have

13    reluctance to do that?

14    THE WITNESS:  I don't have reluctance to do that.  I

15    see my role as following the court order.  So it's sort of this

16    coupling of accountability and support.  So the accountability

17    piece I take very seriously.

18    THE COURT:  Okay.  All right.

19    Q    BY MS. ALLARD:  About how many people go through your

20    pretrial services in a year?

21    A    Last year we had 362 people.

22    Q    Okay.  And going through pretrial services, what are some

23    of the specific services that are included or involved in that

24    process?

25    A    Well, it usually starts with whatever the court order

89

1  says.  So not -- I don't always have an opportunity to talk to
2  someone prior to the court order, so we would start with a
3  court order, and I would want to make sure that whoever it was
4  understood what those conditions were.
5      After we sort of get through that point, it's more
6  about -- it's sort of twofold.  Like, reminders about those
7  conditions but also reminders about court hearings, making sure
8  that that person has transportation, and then thinking about
9  all of the support things folks need in their life just to be
10 successful:  that transportation; housing; things -- having
11 their basic needs met; making sure -- if they're coming out of
12 a period of incarceration, reconnecting with their social
13 supports, their health care supports, and their housing
14 supports.
15 Q    In your declaration I believe you mentioned supervision
16 specifically.  How do you go about supervising someone in a
17 case like this?
18 A    So because Ms. Ozturk would be in Massachusetts in theory
19 and I would be here in Vermont, I would want to use Zoom
20 platforms or Teams platforms.  So I would want to meet with her
21 regularly and be able to see her.  That could be on a schedule
22 set by me or a schedule set by the Court.
23      I would also want to check in with her maybe another -- if
24 it was, say, weekly, I would want to check in with her by phone
25 at random times.

90

1      And then I would have -- I have contact information for --
2  for Dr. Johnson, who just testified, and also for one of her
3  deans, who is Ayanna John- -- no, Ayanna Thomas.
4  Q    And you mentioned as well that part of your job is
5  conducting an assessment of the various needs that a person
6  might have related to supports so that they could be successful
7  pretrial.  What are some of those areas that you inquire into?
8  A    So I've met with Ms. Ozturk on two occasions, and we
9  talked about all of those things that I mentioned.  We've
10 talked about her housing; we've talked about her health care.
11 I'm aware that Tufts University has several options for her to
12 choose from for her housing.  I was able to read others'
13 declarations, so I'm very -- I feel like I have a good
14 understanding from those declarations and from today about her
15 health care needs and how others are attending to that.
16     I am aware that she has a very supportive community around
17 her of peers and professionals and that those are things that
18 she holds very dear.  She said something to me on -- during one
19 of our meetings, and I hope I get it right.  It was something
20 like "Friendships are the joy of life."  And so as someone who
21 does this work, it's important for me to hear that someone has
22 social supports, because when we have a community of people
23 around us, we're more likely to do well with whatever we're
24 trying to manage at the time.
25 Q    And in addition to meeting with Ms. Ozturk and reading the

1   declarations, hearing testimony here today, did you take any

2   other steps to gather information about the services/supports

3   available to her?

4   A    I did meet with members of her team from Tufts University

5   so that I could verify some of those details that Ms. Ozturk

6   had shared with me.  And so I've met with folks from the

7   medical center; we had a long conversation about housing.  The

8   people that I met with did share that she is very deeply

9   connected and rooted in the Tufts community and a very valued

10  member of that community, as we've heard here today.

11  Q    Specifically with assessing her academic support, what did

12  you learn?

13  A    I learned that Ms. Ozturk is nearing the end of her Ph.D.

14  studies, that she has already missed some very important

15  deadlines, that it is really solely her focus in life at this

16  point to be successful in school.  I also learned that she's a

17  teacher and that she really appreciates that role that she

18  holds.

19  Q    And with respect to Tufts' role, did you learn anything

20  about their ability to support her academically?

21  A    I learned that they are wholeheartedly and professionally

22  ready and willing to support her and are anxious to do so.

23  Q    You mentioned that you met with someone from the medical

24  center.  Did you learn anything about her access to medical

25  care upon her release?

1   A    Yes.  She is already a patient at the medical center, and

2   she has access to that medical center, and, you know, they have

3   some concerns about her current health status and are hoping to

4   meet with her in person soon to evaluate her status and make

5   sure that she can regain her health.

6   Q    In addition, you mentioned transportation.  Did you gather

7   any information about her plans for transportation to and from

8   court appearances?

9   A    Yes.  Ms. Ozturk talked about having many people that

10  would be willing to transport her, friends, but specifically

11  her immigration attorney is willing to transport her to

12  hearings.

13  Q    And finally, you discussed her connections to community

14  and support.  I think we've heard from you on this already, but

15  to the extent there's anything else you'd like to share about

16  what you've learned about her connections to community.

17  A    Well, I know that her family is in Turkey and she -- they

18  are part of her community.  She shared with me that she

19  typically speaks with her mother on the phone every day and her

20  grandparents on the weekends, so that's a connection that's

21  dear and important to her, and it's also essential for her for

22  her health.

23       I learned that she has -- that most of her connections are

24  centered around her academia and she has several peers that --

25  that are important to her, that she's important to.  They spend

1   time in the library.  They -- I heard some stories about

2   potlucks.  And the professionals that I've met with have the

3   utmost of respect for her and just are truly looking forward to

4   her rejoining them.

5        THE COURT:  Do you know if her parents and

6   grandparents are still in Turkey?

7        THE WITNESS:  I believe they are, yes.

8        THE COURT:  They're in Turkey.

9        THE WITNESS:  Yes.  Yes.

10       THE COURT:  Okay.

11  Q    If Ms. Ozturk was ordered released today, would you be

12  prepared to supervise her pursuant to whatever conditions the

13  Court may set?

14  A    I would.

15  Q    And if she was ordered released today, what would your

16  next steps be?

17  A    I would want to talk with her attorneys about connecting

18  with her today and just setting up whatever our next meeting

19  was, our next connection was.  I'd also need her to sign some

20  releases so that I can communicate with people on her team so

21  that I can have independent verification.

22       So when -- typically when I do -- working with pretrial

23  service participants, I'll meet with them, but I also have to

24  verify that what they're telling me is real and true, so I

25  would need to be able to check on that as well.

1   Q    And you mentioned that you have contacts for two people at

2   Tufts that you could reach out to; is that right?

3   A    That's correct.

4        MS. ALLARD:  Any further questions, Your Honor?

5        THE COURT:  Okay.  No.

6        MS. ALLARD:  All right.  Thank you.

7        THE COURT:  All right.  Mr. Drescher.

8             CROSS-EXAMINATION

9   BY MR. DRESCHER:

10  Q    Good afternoon.

11  A    Good afternoon.

12  Q    Does the Burlington Community Justice Center supervise

13  anybody outside of Chittenden County?

14  A    Yes.

15  Q    And what's the -- how far away is the most farthest person

16  the center supervises?

17  A    Yeah.  They can really be anywhere.  I had a person in our

18  court diversion program who was in New Zealand.  We do get

19  cases where a judge will order pretrial services for someone

20  who has visited the state of Vermont and something has happened

21  and they go back to their home state.  So that does happen

22  quite a bit.

23  Q    And when you are acting at the direction of a court, it's

24  my understanding that it is a State of Vermont -- State of

25  Vermont court?

| | |
|---|---|
| 1 A  Correct. | 1          MS. ROSSMAN:  Yes, Your Honor. |
| 2 Q  And it's my understanding that those are in criminal | 2          THE COURT:  Okay.  Mr. Drescher, any witnesses to be |
| 3 cases? | 3 called? |
| 4 A  They are. | 4          MR. DRESCHER:  No. |
| 5 Q  Do you have any experience supervising somebody who is | 5          THE COURT:  All right.  So then we can address the |
| 6 subject to removal proceedings in immigration court? | 6 motion.  Again, I would just want to remind everyone that I've |
| 7 A  I do not. | 7 read all of your submissions.  I've read all of the -- well, |
| 8 Q  Would you have any reservation about reporting somebody's | 8 the statements from various individuals and thought about this |
| 9 failure to comply with conditions to immigration authorities if | 9 a lot, so you can be relatively brief, it seems to me. |
| 10 she were subject to removal proceedings in immigration court? | 10          And who is going to argue on behalf of Ms. Ozturk? |
| 11 A  I would not have any problem with that. | 11          MS. ROSSMAN:  I'll be doing that, Your Honor. |
| 12 Q  Would that -- and as -- it's my understanding you are an | 12          THE COURT:  Okay. |
| 13 employee of the City of Burlington? | 13          MS. ROSSMAN:  So I can now say good afternoon, Your |
| 14 A  Correct. | 14 Honor. |
| 15 Q  Would that role restrict you in any way with cooperating | 15          THE COURT:  Yes.  Right. |
| 16 with immigration authorities? | 16          MS. ROSSMAN:  I hear Your Honor given that we've moved |
| 17 A  No, it would not. | 17 from morning to the afternoon, so I will keep this brief. |
| 18          MR. DRESCHER:  I have nothing further. | 18          This court is obviously quite familiar with the standard |
| 19          THE COURT:  Okay.  Any further questions? | 19 that we are using here under *Mapp*, that we need to establish |
| 20          MS. ALLARD:  No further questions, Your Honor. | 20 substantial claims and extraordinary circumstances that render |
| 21          THE COURT:  All right.  Thank you. | 21 the grant of bail necessary to make the habeas remedy |
| 22          THE WITNESS:  Thank you. | 22 effective, and in addition here, as I had mentioned at the |
| 23          (The witness was excused.) | 23 beginning of this morning, Your Honor, we're seeking an |
| 24          THE COURT:  All right.  Is that it for witnesses from | 24 immediate grant of bail with no stay. |
| 25 the petitioner? | 25          Given that Your Honor discussed the substantial claims at |

97                                          98

1  great length in the --

2         THE COURT:  And so did the Circuit.

3         MS. ROSSMAN:  Exactly, Your Honor.

4         THE COURT:  And so did the Circuit.  So I don't think

5  you need to spend a lot of time on substantial claims.

6      Extraordinary circumstances, what's your position on that?

7         MS. ROSSMAN:  Absolutely, Your Honor.  So as Your

8  Honor read in the submissions and heard today, there are

9  extraordinary circumstances here with respect to Ms. Ozturk's

10  health as well as her academic pursuits that require bail in

11  order to make a habeas effective remedy.

12      You've heard today both from Ms. Ozturk herself and from

13  Dr. McCannon that her asthma is poorly controlled; that it's

14  significantly deteriorated; that she is at risk of serious

15  exacerbation, including the necessity for emergency care.  You

16  also heard from Ms. Ozturk herself on your questioning, Your

17  Honor, that both the severity, the duration, and the frequency

18  of her symptoms have all increased in detention, and in fact,

19  we experienced that here today.

20      I want to also talk, Your Honor, about the fact that not

21  only do these health risks -- are they extraordinary

22  circumstances, but these are extraordinary circumstances that

23  require bail in order to ensure that the habeas remedy is

24  effective.

25      The relief that Ms. Ozturk is seeking here in her habeas

1  petition is release from unjustified and unlawful detention,

2  and we are now more than six and a half weeks into Ms. Ozturk's

3  detention for an op-ed that she wrote, and over the course of

4  those six and a half weeks, as Your Honor just mentioned, both

5  this court and the Second Circuit have made very clear that the

6  jurisdictional bars do not apply to restrict this court's

7  authority to order bail and to rule on her habeas petition.

8  And over the course of those six and a half weeks, the

9  government has had multiple opportunities before the District

10  of Massachusetts, before this court, and the Second Circuit to

11  produce any evidence to either justify the detention or oppose

12  petitioner's bail motion.  And in the face of explicit requests

13  from both the petitioner and this court, the government has not

14  done so.

15      Without bail as a result, Ms. Ozturk is facing the very

16  harm, the very harm, that she's challenging in her habeas

17  petition, which is the unlawful retaliation and punishment for

18  her speech that violates her rights and sends a chilling

19  message to everyone who's watching.  And this is without any

20  evidence except for a newspaper article that she's been held

21  for this period of time.  This is really the exemplar of an

22  affront to the Great Writ, and we need bail now to preserve the

23  very purpose of habeas.

24      When Mr. Mahdawi was arrested, it was the same day that

25  Ms. Ozturk was last before this court, and he is now out, and

1  that was based on a ruling from a court in this district that

2  found that if he's being detained in retaliation for exercising

3  his First Amendment rights, "release is essential to make

4  habeas relief effective," and that was necessary and

5  appropriate in Mr. Mahdawi's case.  And I will say while we've

6  been in this hearing, Your Honor, the Second Circuit has denied

7  a stay in Mr. Mahdawi's case.

8       Bail is equally necessary and appropriate here.  And that

9  same undercurrent of why bail is necessary to effectuate the

10  habeas relief indicates why this court should do so immediately

11  and without any stay.

12       The Federal Rules of Appellate Procedure 23(c)

13  unambiguously state that absent a court order, a person who is

14  on bail during habeas must be released, and the Supreme Court

15  made clear in *Hilton* that this establishes a presumption of

16  release for someone on bail, and the only way that's overcome

17  is through an analysis of whether the government makes a strong

18  showing of a likelihood of success on the merits, irreparable

19  injury, whether the stay would injure a third party, or if a

20  stay would be in the public interest.  And just as in

21  Mr. Mahdawi's case, which the Second Circuit just denied the

22  stay as well, all of those factors favor a denial of a stay

23  here.

24       If this court agrees that there is bail here that is on

25  the basis of a finding that the petitioner has, as we believe

1  we had -- have, excuse me, made a substantial showing of the

2  substantial basis for our claims, there has been absolutely no

3  showing of a government injury for a stay here, and that is

4  placed along -- or it's -- excuse me, that is placed against

5  the other side of the ledger here, and that's Ms. Ozturk.  And

6  for Ms. Ozturk, every day that she is detained is a significant

7  injury to her, particularly when First Amendment rights are at

8  issue and particularly when her health is at issue.

9       There's been no allegation that there's a third-party

10  injury that would be required, and the public interest here

11  favors release, Your Honor, which is what the courts have said

12  time and time again when First Amendment rights are at issue,

13  as they are here.

14       And here there's a particular reason, Your Honor, to deny

15  a stay, and that's because we know how stays have been used in

16  the past in this very case.  The petitioner and every court

17  that has been involved in this case has moved Ms. Ozturk's

18  petition expeditiously in recognition that she is being

19  detained on the basis of a newspaper article that she wrote and

20  that every day that she's detained continues that violation.

21       The government, however, has delayed and used stays in the

22  past to increase the length of Ms. Ozturk's detention, and

23  although two courts denied a stay, both this court and the

24  Second Circuit, her release -- or, excuse me, her transfer was

25  already delayed as a result of the government's use of a stay.

101                                                                 102

1  If past is prologue, we would anticipate the government may do
2  the same if a stay was issued here, waiting until the last
3  minute and potentially dragging out Ms. Ozturk's time in
4  detention, and this flies in the face of the writ; it flies in
5  the face of the presumption that the Federal Rules require.
6  This compounds her constitutional violation to both her and it
7  magnifies the chill, and that's why we would ask this court to
8  order the immediate release for Ms. Ozturk today without a
9  stay.
10      You've heard from Ms. Penberthy, who said she's ready to
11  begin supervision today, and you can see Attorney Khanbabai,
12  who is there right next to Ms. Ozturk.  Attorney Khanbabai is
13  ready, able, and willing to walk out with Ms. Ozturk today to
14  make sure that she has accommodations tonight and to get her
15  back safely home, and that's why we ask this court to grant
16  bail and to do so without a stay.
17          THE COURT:  All right.  Mr. Drescher.
18          MR. DRESCHER:  Your Honor, our principal objection to
19  the release under *Mapp* continues to be a legal one.  We
20  appreciate that Your Honor has rejected those arguments
21  previously.  We appreciate that the Second Circuit has signaled
22  very strongly that it agrees with Your Honor's analysis.  The
23  government continues --
24          THE COURT:  Is that why I said that the opinion was so
25  great?  I think I started with saying the Second Circuit

1  opinion was just wonderful.  You're acknowledging that it's
2  because --
3          MR. DRESCHER:  I recognize that the Second Circuit had
4  compliments going both directions, Your Honor.
5          THE COURT:  Oh, you noticed that they complimented our
6  decision.
7          MR. DRESCHER:  I noticed that as well.
8          THE COURT:  Yeah.
9          MR. DRESCHER:  Fully recognizing Your Honor's previous
10  decision and the Circuit's recognition of -- the Circuit's
11  treatment of Your Honor's position, we continue to assert that
12  this court is neither the right forum nor is this the right
13  time for hearing this habeas claim.
14      In the absence of habeas jurisdiction, the Court, in our
15  view, would lack authority to issue release under *Mapp*, and I
16  just want to be clear that respondents are in no way abandoning
17  those arguments.  We want to reiterate them, and we want to
18  preserve them for further litigation, if appropriate.  I
19  appreciate there's no intent to revisit any of them, but I want
20  to make clear that that's our fundamental objection to the idea
21  of releasing Ms. Ozturk today on bail, though I'd be happy to
22  answer any questions that you may have in that regard.
23      If Your Honor is inclined to release her on bail, I think
24  we need to have some consideration here in this hearing as to
25  what conditions should be imposed.  Ms. Ozturk, as Your Honor

103

104

1 knows, will continue to be subject to removal proceedings.

2 Customarily, if somebody has been released from immigration

3 custody while still subject to removal proceedings, ICE imposes

4 a series of conditions that require reporting to immigration

5 authorities and it requires complying with state and local and

6 federal laws, including laws about the need for noncitizens to

7 stay registered with immigration authorities, and I think it's

8 important -- it's extremely important that if Your Honor is

9 going to issue a release order today, that everybody is on the

10 same page as to what conditions attach to that order.

11 And I think we all need to recognize that she will --

12 because Ms. Ozturk will continue to be subject to removal

13 proceedings, that there will necessarily have to be some

14 jurisdiction over her by the immigration authorities.  I'm not

15 suggesting for a moment that the Executive Branch is going to

16 disobey a release order, but given the fact that there is an

17 immigration court proceeding going on, given the fact that it's

18 customary for people who are in such a proceeding who have been

19 released from immigration custody to be subject to conditions,

20 I would ask as a threshold that the Court order, as a condition

21 of release, if you are going to issue a release order today,

22 that Ms. Ozturk be subject to any conditions imposed by ICE.

23 I understand those conditions might include location

24 monitoring administered by ICE; they might include limitations

25 on travel along the lines that Ms. Ozturk has already

1 volunteered.  That would be between Massachusetts and Vermont.

2 As she indicated in her declaration, she'd be comfortable with

3 that; the obligation to report her residence to immigration

4 authorities and any change in residence to immigration

5 authorities; certainly continued compliance with federal,

6 state, and local laws to include, for example, laws that are

7 specific to people who are in this country on -- in

8 nonimmigrant status.

9 So, for example, it's unlawful for somebody in

10 Ms. Ozturk's position to possess a firearm, or it would be

11 unlawful for her to fail to register with immigration

12 authorities.  Some of that's already spelled out in her notice

13 to appear that she's in receipt of.  I understand she has very

14 capable immigration counsel who can help her navigate those

15 obligations under Title 8, and, you know, I urge the Court, in

16 formulating any conditions that are going to apply, to dovetail

17 those as much as possible to the conditions that would be

18 imposed by ICE.

19 I appreciate the testimony of the previous witness and her

20 willingness to assist the Court in administering any

21 conditions.  It may be as simple as just having the immigration

22 authorities perform their standard supervision -- supervisory

23 functions, and the Court may want to overlay, you know, some

24 additional conditions on that.

25 And so with that, we would ask any release order to direct

105                                                                106

1  Ms. Ozturk, as a condition of release, to comply with

2  conditions imposed by immigration authorities, the regular and

3  customary conditions of immigration authorities, for somebody

4  who would be released from immigration custody but who is still

5  subject to removal proceedings, and those could include the

6  things I spoke about but also, no matter what, the obligation

7  to abide by -- not commit offenses and to make all appearances,

8  whether it's in this court or in immigration court.

9          THE COURT:  All right.  I appreciate your offer.

10         All right.  So both parties have raised the question of

11  what law applies.  In evaluating release on bail, both sides

12  refer to *Mapp v. Reno*, which sets the standards.  The Court

13  agrees that *Mapp* remains the controlling standard here.  The

14  Second Circuit has said that *Mapp* is "a difficult standard to

15  meet," and sister courts in this Circuit have found that

16  petitioner bears the burden of demonstrating she meets it.

17         *Mapp* requires this court to find three separate factors:

18  The first, whether the habeas petition raises substantial

19  claims; second, whether extraordinary circumstances exist; and

20  third, whether a grant of bail is necessary to make the habeas

21  remedy effective.

22         The Court finds that Ms. Ozturk has sufficiently

23  established all three factors.

24         First, substantial claims.  Ms. Ozturk has raised a very

25  substantial First Amendment claim.  I addressed that in the

1  earlier ruling.  The Second Circuit has addressed that as well.

2  In the Court's opinion on April 18th, it considered the

3  evidence submitted by Ms. Ozturk to show that her detention was

4  in retaliation for her co-authoring an op-ed.  The Court held

5  that in the absence of additional information from the

6  government, the Court's habeas review is likely to conclude

7  that Ms. Ozturk has presented a substantial claim.

8          So I essentially suggested to the government that they

9  produce any additional information which would suggest that she

10  posed a substantial risk or that she could contest that

11  determination that she did not raise a substantial claim.  In

12  particular, I put the government on notice that they should

13  immediately introduce any such evidence, and that was three

14  weeks ago, and there has been no evidence that has been

15  introduced by the government other than the op-ed.  I mean,

16  that literally is the case.

17         There is no evidence here as to the motivation absent

18  consideration of the op-ed, so that creates unto itself a very

19  significant substantial claim that the op-ed; that is, the

20  expression of one's opinion as ordinarily protected by the

21  First Amendment, formed the basis of this particular detention,

22  and that sets out the argument that the petitioner has made

23  that the reason that she has been detained is simply and purely

24  the expression that she made or shared in the op-ed, in

25  violation of her First Amendment rights.

1    The Court need not decide at this stage whether her
2    detention actually constitutes a First Amendment violation.
3    The Court can address that at the later hearing.  But
4    regardless, the Court finds that Ms. Ozturk has raised a
5    substantial claim of a constitutional violation.
6        And in addition, the Court also finds that she has raised
7    a substantial claim in regard to the due process issues that
8    she has raised, in particular a number of issues that raise
9    very significant concerns about whether her detention was in
10   violation of her due process rights.  She's submitted various
11   statements as evidence by officials of the government that
12   support those arguments that in fact the objective was
13   punitive.  Of course, this is a civil contempt situation.  It's
14   not a punitive contempt situation.  And they have raised -- the
15   petitioner has raised very significant questions about whether
16   the intention of the government in detaining her was punitive
17   in nature.  That raises a very significant due process claim.
18       Secondarily, the process by which she was placed in
19   detention raises very significant due process concerns.  Again,
20   the Court need not answer those questions.  That can be
21   addressed when we deal with the habeas hearing.  But I do find,
22   frankly, that these are very substantial claims of both due
23   process and First Amendment violations.
24       So then one goes to *Mapp* again and goes to extraordinary
25   circumstances.  The extraordinary circumstances in this case

1    are really self-evident.  First, she is asthmatic.  She is
2    suffering as a result of her incarceration.  I found
3    Dr. Glendon's *[sic]* testimony to be very persuasive that,
4    assuming that she remains incarcerated in the situation that
5    exposes her to 23 other individuals in one large cell and
6    exposes her to all of the smells and the scents of cleaning
7    supplies, *et cetera*, while she's incarcerated, which exacerbate
8    her difficulties, she may very well suffer additional damage to
9    her health.  That's an extraordinary circumstance.  And in
10   fact, in light of the relative quickness in which these kinds
11   of cases are resolved, this needs to be resolved at this point,
12   because it could very well impact her health going forward, and
13   that's an extraordinary circumstance.
14       There are other extraordinary circumstances in this
15   particular case, and I think I mentioned briefly one in the
16   earlier opinion.  Essentially, she was arrested in
17   Massachusetts.  She was then quickly moved to New Hampshire and
18   then to Vermont.  She was in transit at the time of the filing
19   of the petition.  But she was not taken to fly to Louisiana --
20   taken to the airport to fly to Louisiana for at least another
21   six hours.  There were efforts that were made by the petitioner
22   to contact the government and indicate to the government that
23   in fact there was a stay that a judge in Massachusetts at 10:01
24   had ordered that she not be moved out of the state.
25       Of course, she was out of the state at that point, but the

109                                                                                    110

1  question is whether that is compliance with -- in good faith
2  with the order even though she is not in Massachusetts at the
3  time of the order.  It's unclear; I have no clue at this point
4  as to whether the government was aware of the order, whether
5  the agents that were in charge of her knew of the order and
6  just disregarded it, or if they just never knew about it.
7  Perhaps that will come up at the time of the ultimate hearing.
8  But this is an extraordinary situation.
9       When you have an Article III judge order that you not be
10 taken out of the state of Massachusetts, even if -- even if
11 they didn't know it until she was in Vermont, but never
12 responding to the Court to indicate that she is in fact at a
13 different location and can be brought back -- I don't know if
14 that is in fact the facts.  That could be very well developed
15 later on.  But it raises substantial questions and
16 extraordinary circumstances of this particular litigation.
17      So the third factor is the grant of bail is "necessary to
18 make the habeas remedy effective."  This factor dovetails with
19 the two that I've just discussed.
20      First, Ms. Ozturk has raised serious concerns about her
21 health while in custody in a sworn affidavit.  A doctor has
22 consulted -- and in testimony today.  A doctor has consulted
23 with her while in ICE custody, and she has deteriorated
24 health-wise.
25      Furthermore, detention necessarily constitutes a continued

1  infringement on Ms. Ozturk's First Amendment and due process
2  rights.  That infringement may be justified if the government
3  had presented a legitimate case for it, but as discussed, it
4  has not done so.  Meanwhile, her continued detention
5  potentially chills the speech of the millions and millions of
6  individuals in this country who are not citizens.  Any one of
7  them may now avoid exercising their First Amendment rights for
8  fear of being whisked away to a detention center from their
9  home.
10      For all of those reasons, the Court finds that her
11 continued detention cannot stand, that bail is necessary to
12 make the habeas remedy effective.
13      So then the Court turns to the question of conditions and
14 are there conditions which are necessary to assure that she
15 would not pose a danger to the community or that she would not
16 pose a risk of flight.  As are common in determinations of
17 release from custody, the district court in *Mapp* considered the
18 petitioner's dangerousness and risk of flight.  The Court's
19 aware that an immigration judge in Louisiana found danger and
20 flight risk for Ms. Ozturk.
21      The immigration judges are Executive Branch employees
22 subject to Executive Branch orders.  This is an Article III
23 court.  It's obligated to conduct an independent and rigorous
24 review of the evidence that is a part of the record in this
25 case.  In the April 18 opinion, the Court invited the

111                                                                112

1    government to submit any evidence it presented to the
2    immigration judge that would support a finding of
3    dangerousness, dangerousness of flight -- the risk of flight,
4    but dangerousness to the community, and there has been
5    absolutely no evidence introduced by the government which in
6    any way indicates that she poses a danger of flight or that she
7    poses a risk to the community.
8         On the other hand, she has submitted numerous sworn
9    affidavits - I think I counted 28 in the first submission, and
10   then there were a number just recently - attesting to her
11   peaceful and compassionate character as well as her ties to the
12   university and community.
13        And I will just express my own observation in that this is
14   a woman who's just totally committed to her academic career.  I
15   mean, this is -- this is someone who probably doesn't have a
16   whole lot of other things going on other than reaching out to
17   other members of the community in a caring and compassionate
18   way.  There is absolutely no evidence that she has engaged in
19   violence or advocated violence.  She has no criminal record.
20   She has done nothing other than essentially attend her
21   university and expand her contacts within the community in such
22   a supportive way.  I do not find that any of the contacts that
23   she's had in the community create any danger or any risk of
24   flight in my mind.  So therefore, the Court finds that she does
25   not pose a danger to the community, nor does she present a risk

1    of flight.
2         The Court orders the government to release Ms. Ozturk from
3    custody immediately pending further proceedings in this court
4    on the merits of her habeas petition.  Ms. Ozturk is free to
5    return to her home in Massachusetts.  She's also free to travel
6    to Massachusetts and Vermont as she sees fit.  And I am not
7    going to put a travel restriction on her because, frankly, I
8    don't find that she poses any risk of flight.  And secondarily,
9    she's engaged in an academic career at the top of her career
10   which will require her to attend out-of-state programs, give
11   out-of-state lectures, and as a part of her career, I think
12   she's very likely to be traveling outside of these areas.
13        So what I'm going to suggest in terms of conditions are,
14   first, that she be released on her own recognizance; second,
15   that -- that the Burlington Center for Justice be engaged to
16   participate in her support and supervision.  That's both
17   support and supervision.
18        To the extent that she will be supervising Ms. Ozturk, I'm
19   going to order that Ms. Ozturk have at least monthly contact
20   with the Burlington Justice Center and that each month, once
21   per month, the center submits to this court, to me in
22   particular, a report as to how she's doing, what she's doing,
23   what she has done over the past month, and the future plans in
24   the future -- and the future plans that she has.  The idea, of
25   course, is for her to try to reintegrate into the Somerville

1  community after what has been a very traumatic event, incident.
2  So I think the support and also the reporting requirements will
3  assist in that way.
4      Now, I appreciate that ICE may have conditions that are
5  standard in release of cases that involve persons who are in
6  removal proceedings.  Of course, she's not here, not in this
7  court, involved in the removal proceedings.  We have nothing to
8  do with removal proceedings.  This has to do with the habeas.
9  But I do understand that ICE has a legitimate interest in
10 making sure that she does not pose a risk of flight or danger
11 to the community.
12     So what I propose is - I'm not going to impose those
13 conditions at this point - that the government submit a
14 proposed set of conditions that ICE would request, and with
15 consultation with petitioner's counsel, perhaps you can arrive
16 at a joint recommendation.  Perhaps Ms. Penberthy could
17 actually make recommendations of what conditions should be
18 imposed.  And then within a short period of time, I will amend
19 her release order to reflect those -- those conditions.
20     Next, although the government has not asked for this, the
21 Court is not going to stay this order.  I think I've addressed
22 in other -- the other opinion the standards that you apply.
23 The four factors the Court must consider are, number one, a
24 strong showing that the moving party is likely to succeed in
25 the merits.  That's the government.  -- likely to succeed in

1  the merits, and I do not find they are likely to succeed on the
2  merits.
3      Irreparable injury to the moving party.  I don't find that
4  the government is irreparably harmed by her release into the
5  community.
6      Whether a stay will substantially injure the nonmoving
7  party.
8      And where the public interest lies.  I think all of those
9  factors weigh in light of Ms. Ozturk.
10     So it is the order of the Court that the defendant *[sic]*
11 is to be released on her own recognizance subject to the
12 conditions that I've just imposed.  The motion to stay, if
13 there is a motion, has not been filed, but if there is a
14 motion, would be denied.
15     Then I'd ask the government to monitor the situation in
16 Louisiana and that I would like to know immediately when she's
17 released.
18     Are you willing to do that, Mr. Drescher?
19     MR. DRESCHER:  Yes.  I will communicate the substance
20 of the Court's order to ICE as soon as I'm back in the office
21 and will ask them to alert me when Ms. Ozturk has been released
22 from custody, and I will advise chambers when I get that
23 confirmation.
24     THE COURT:  Great.  All right.  And again, I
25 appreciate ICE has interest in conditions, and I'd like to hear

115

01:22:18  1  what they feel is necessary.  I don't think electronic

01:22:22  2  monitoring would be required, but certainly, you know,

01:22:30  3  modest -- modest conditions may very well be appropriate.  But

01:22:34  4  again, I just find she doesn't pose a risk.

01:22:41  5      Thank you.

          6      (Court was in recess at 1:22 PM.)

          7

          8

          9           C E R T I F I C A T I O N

          10     I certify that the foregoing is a correct transcript from

          11  the record of proceedings in the above-entitled matter.

          12

          13

          14  May 12, 2025        _____

          15                      Johanna Massé, RMR, CRR

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

Exhibit C

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

RUMEYSA OZTURK,                    )
                                   )
        Petitioner,                )
                                   )
    v.                             )    Case No. 2:25-cv-374
                                   )
DONALD J. TRUMP, in his            )
official capacity as               )
President of the United            )
States; PATRICIA HYDE, in her )
official capacity as the New )
England Field Director for    )
U.S. Immigration and Customs  )
Enforcement; MICHAEL KROL, in )
his official capacity as HSI  )
New England Special Agent in  )
Charge, U.S. Immigration and  )
Customs Enforcement; TODD     )
LYONS, in his official        )
capacity as Acting Director,  )
U.S. Immigration and Customs  )
Enforcement; KRISTI NOEM, in  )
her official capacity as      )
Secretary of the United       )
States Department of          )
Homeland Security; and MARCO  )
RUBIO, in his official        )
capacity as Secretary of      )
State,                        )
                              )
        Respondents.          )

**ORDER**

The Court held a telephonic conference with counsel for
Petitioner and counsel for Respondent at 4:50pm. The Court
reaffirmed its ruling made at the bail hearing earlier on
5/9/25. In light of the Court's finding of no risk of flight and
no danger to the community, Petitioner is to be released from

ICE custody immediately on her own recognizance, without any form of Body-Worn GPS or other ICE monitoring at this time. Petitioner is not subject to any travel restrictions. Respondent's counsel shall submit proposed conditions of release after conferring with ICE no later than 5/12/2025.

DATED at Burlington, in the District of Vermont, this 9th day of May 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge