UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MAHMOUD KHALIL,<br><br>                                          *Petitioner,*<br><br>          v.<br><br>WILLIAM P. JOYCE, *et al.*,<br><br>                                          *Respondents.* | *Civ. Act. No.* 25-cv-1963 (MEF) (MAH) |

---

## RESPONDENTS' SUPPLEMENTAL BRIEF ON VAGUENESS

---

On the brief:

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

SARAH S. WILSON
Assistant Director

ALANNA T. DUONG
DHRUMAN Y. SAMPAT
Senior Litigation Counsel

JOSHUA C. McCROSKEY
RACHEL BROWNING
Trial Attorneys

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION.................................................................................................................1

ARGUMENT........................................................................................................................2

    I.      The Foreign Policy Removability Ground is Not Unconstitutionally Vague as Applied. ...2

      A.    The Statute and its Legislative History Confirm the Broad Discretion Afforded to the Executive..........................................................................................................................2

      B.    Khalil's As-Applied Challenged Does Not Account for His Reported Conduct. .................8

    II.     Khalil's Policy Challenge is Meritless. .........................................................................10

      A.    The Vagueness Challenge Should Fail...........................................................................11

      B.    The Political Question Doctrine Bars Review..................................................................14

CONCLUSION...................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**<u>Cases</u>**

*Abourezk v. Reagan,*
   592 F. Supp. 880 (D.D.C. 1984) ............................................................................................ 3, 6

*Am. Ass'n Univ. Prof. v. Rubio,*
   --- F. Supp. 3d ---, 2025 WL 1235084 (D. Mass. Apr. 29, 2025) ......................................12

*Baker v. Carr,*
   369 U.S. 186 (1962) .............................................................................................................14

*Beckles v. United States,*
   580 U.S. 256, 263 (2017) ....................................................................................................11

*Boutilier v. INS,*
   387 U.S. 118 (1967) ...............................................................................................................8

*Chaplinsky v. New Hampshire,*
   315 U.S. 568 (1942) ...............................................................................................................9

*Cohen v. California,*
   403 U.S. 15 (1971) .................................................................................................................9

*Corrie v. Caterpillar, Inc.,*
   503 F.3d 974 (9th Cir. 2007) ...............................................................................................10

*Def. for Child. Int'l-Palestine v. Biden,*
   714 F. Supp. 3d 1160 (N.D. Cal. 2024) ...............................................................................10

*El-Shifa Pharmaceutical Industries Co. v. United States,*
   607 F.3d 836 (D.C. Cir. 2010) .............................................................................................14

*F.C.C. v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012) .............................................................................................................13

*Fiallo v. Bell,*
   430 U.S. 787 (1977) ...............................................................................................................2

*Garisto v. Topper,*
   No. 1:20-CV-0646, 2023 WL 2923129 (M.D. Pa. Apr. 12, 2023) ......................................12

*Gillis v. Garland,*
   281 F. App'x 501 (6th Cir. 2008) .........................................................................................14

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ...................................................................................................2

*Gross v. German Foundation Indus. Initiative,*
   456 F.3d 363 (3d Cir. 2006)........................................................................................14

*Harisiades v. Shaughnessy,*
   342 U.S. 580 (1952) ..................................................................................2, 3, 4, 15

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .................................................................................................12

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010)......................................................................................................10

*Jordan v. DeGeorge,*
   341 U.S. 223 (1951) ............................................................................................... 7, 8

*Kleindienst v. Mandel,*
   408 U.S. 753 (1972) .................................................................................................10

*Kolender v. Lawson,*
   461 U.S. 352 (1983) ...................................................................................................3

*Lujan v. Nat'l Wildlife Fed.,*
   497 U.S. 871 (1990) .................................................................................................14

*Mahler v. Eby,*
   264 U.S. 32 (1924) ................................................................................................ 7, 8

*Massieu v. Reno,*
   915 F. Supp. 681 (D.N.J. 1996) .................................................................................5

*Mathews v. Diaz,*
   426 U.S. 67 (1976) ..............................................................................................2, 15

*Maynard v. Cartwright,*
   486 U.S. 356 (1988) ...................................................................................................3

*Mobarez v. Kerry,*
   187 F. Supp. 3d 85 (D.D.C. 2016)............................................................................15

*Nguyen v. United States,*
   No. 23-CV-06047-VKD, 2024 WL 1382470 (N.D. Cal. Apr. 1, 2024)....................10

*Palestine Info. Off. v. Shultz,*
   853 F.2d 932 (D.C. Cir. 1988)....................................................................................3

*Regan v. Wald,*
    468 U.S. 222, 104 S. Ct. 3026, 82 L. Ed. 2d 171 (1984) ................................................ 3, 8

*Reno v. Am.Arab-Discrimination Comm.,*
    525 U.S. 471 (1999) ................................................................................................................ 3

*Sessions v. Dimaya,*
    584 U.S. 148 (2018) ........................................................................................................ 3, 7, 8

*State of California v. United States,*
    104 F.3d 1086 (9th Cir. 1997) ........................................................................................... 14

*State of New Jersey v. United States,*
    91 F.3d 463 (3d Cir. 1996) .................................................................................................. 15

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ....................................................................................................... 2, 10

*United States v. Curtiss–Wright Export Corp.,*
    299 U.S. 304 (1936) ......................................................................................................... 3, 4

*United States v. Matchett,*
    837 F.3d 1118 (11th Cir. 2016) ......................................................................................... 12

*United States v. Williams,*
    553 U.S. 285 (2008) ............................................................................................................. 9

*United States v. Woods,*
    915 F.2d 854 (3d Cir. 1990) ................................................................................................ 3

*Virginia v. Black,*
    538 U.S. 343 (2003) ............................................................................................................. 9

*Wills v. Pszczolkowski,*
    125 F.4th 534 (4th Cir. 2025) ............................................................................................ 13

*Zemel v. Rusk,*
    381 U.S. 1 (1965) ............................................................................................................ 3, 4

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1, (2015) ................................................................................................................ 4

**Statutes**

8 U.S.C. § 1182(a)(27) (1988) ..................................................................................................... 6

8 U.S.C. § 1227(a)(1)(A) .............................................................................................................. 1

iv

8 U.S.C. § 1227(a)(4)(B) ...................................................................................................... 9

8 U.S.C. § 1227(a)(4)(C) .............................................................................................. *passim*

8 U.S.C. § 1251(a)(5) (1994) ............................................................................................... 8

8 U.S.C. § 1251(a)(8) (1988) ............................................................................................... 8

## INTRODUCTION

Respondents ("the Government") submit this supplemental brief per the Court's request. Petitioner Mahmoud Khalil is charged as removable under 8 U.S.C. § 1227(a)(4)(C) and 8 U.S.C. § 1227(a)(1)(A). For the purposes of his preliminary injunction motion, the only relevant removability charge is 8 U.S.C. § 1227(a)(4)(C), which provides that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." The Secretary of State personally exercised his authority with respect to Khalil, because he believed Khalil's presence or activities would have potentially serious adverse foreign policy consequences, and they compromise a compelling foreign policy interest. Congress entrusted the Secretary with this narrow but important power so that he could effectuate removals when they implicated American foreign policy. And Congress committed this power to the Secretary's' discretion, because foreign policy considerations are exclusively within the purview of the Executive. For this reason, § 1227(a)(4)(C) is not amenable to a vagueness challenge, and Khalil's claim should fail. Even on its own terms, Khalil's challenge is lacking: text, legislative history, and prior usage provide sufficient context to § 1227(a)(4)(C) such that an alien is on notice as to what that provision entails.

Khalil's vagueness challenge to the alleged unwritten "policy" also fails. To start, Khalil's vagueness challenge fails on its own terms: By his account, the "policy" at issue regulates how the Executive chooses to wield its existing enforcement authority; it does not constitute any change in law, or alter the immigration scheme governing Khalil. The void-for-vagueness doctrine does not apply to that sort of internal directive. All the more so, because the "policy" at issue is one of Khalil's own making. But a petitioner cannot cobble together a "policy" via clippings from executive orders, interviews, posts on social media, and public statements, and then turn around and fault the *Government*

for its alleged vagaries. His challenge is rather a blatant attempt to second-guess the Executive's foreign policy considerations. The political question doctrine bars judicial review of such decisions.

Because Khalil's vagueness challenge fails, the Court should deny his motion for a preliminary injunction.

## **ARGUMENT**

I.    The Foreign Policy Removability Ground is Not Unconstitutionally Vague as Applied.

    A.    The Statute and its Legislative History Confirm the Broad Discretion Afforded to the Executive.

Khalil asks this Court to strike down a federal law that has been in place, in one form or another, for 35 years, and entrusts the Secretary of State to make a discrete decision within the core of the Executive Branch's exclusive constitutional competency. This Court should not take that radical step.

"For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."). "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications . . . defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Hawaii*, 585 U.S. at 702 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).

The vagueness doctrine is meant to avoid "arbitrary and discriminatory enforcement" by providing "fair warning[s]" that are "clearly defined." G*rayned v. City of Rockford*, 408 U.S. 104, 108

(1972); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). But "[t]he Supreme Court has long recognized that the special exigencies of foreign policy require Congress to draft statutes that 'provide a standard far more general than that which has always been considered requisite with regard to domestic affairs.'" *Palestine Info. Off. v. Shultz*, 853 F.2d 932, 944 (D.C. Cir. 1988) (quoting *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 324 (1936)). As the Supreme Court instructed, "because of the leeway necessary to represent adequately this nation's interests in foreign affairs, Congress 'must of necessity paint with a brush broader than that it customarily wields in domestic areas.'" *Id.* (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)).

Khalil may not bring an as-applied void-for-vagueness challenge to 8 U.S.C. § 1227(a)(4)(C). Doing so would require an examination of the underlying facts. *See Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *United States v. Woods*, 915 F.2d 854, 862 (3d Cir. 1990). Reviewing those facts would necessarily require the Executive "to disclose its 'real' reasons for deeming [Khalil] a special threat[,]" and "a court would be ill equipped to determine [the reasons'] authenticity and utterly unable to assess their adequacy." *Reno v. Am. Arab-Discrimination Comm.*, 525 U.S. 471, 491 (1999); *see also Zemel*, 381 U.S. at 17. The Government is not aware of the Supreme Court ever invalidating an immigration statute, facially or as-applied, on void-for-vagueness grounds.[1] *See Abourezk v. Reagan*, 592 F. Supp. 880, 886 n.19 (D.D.C. 1984), *vacated*, 785 F.2d 1043 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). Given this fatal flaw, the Court should reject the inquiry at the outset. Foreclosing Khalil's challenge here ensures the preservation of the separation-of-powers doctrine. *See Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating 'to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'") (quoting *Harisiades*, 342 U.S. at 589).

---

[1] *Sessions v. Dimaya* did not deem an entire immigration statute invalid for vagueness. *See* 584 U.S. 148, 174–75 (2018) (holding that a "residual clause" is vague).

Section 1227(a)(4)(C)(i) reflects the broad brush that Congress must take to foreign policy-related statutes, and its application to Khalil is constitutional. Congress specifically and clearly stated that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(a)(4)(C)(i). That removability ground is subject to limited exceptions, such that the individual would not be removable based on his "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States." 8 U.S.C. § 1182(a)(3)(C)(iii). Congress created an exception to that exception: the Secretary of State could override that consideration if he "personally determines that the alien's admission would compromise a compelling United States foreign policy interest." *Id.* The removability ground and its exception create a careful scheme. Under that scheme, the Executive has significant discretion to determine that one's mere presence, let alone activities, would potentially have serious adverse foreign policy consequences and compromise compelling foreign policy interests. The Executive's constitutional role in determining what constitutes foreign policy considerations must be respected.

That Congress did not define what constitutes "potentially serious adverse foreign policy consequences" is telling. Expecting Congress to do so would be problematic when the issue of "foreign policy" is specifically within the Executive's bailiwick. *See, e.g.*, *Zemel*, 381 U.S. at 17 (reiterating that Congress must "paint with a brush broader" in this area "because of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature"); *Curtiss-Wright Export Corp.*, 299 U.S. at 320 (describing the President as "the sole organ of the federal government in the field of international relations"); *cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32, (2015) ("To allow Congress to control the President's communication in the context of a formal

recognition determination is to allow Congress to exercise that exclusive power itself. As a result, the statute is unconstitutional."). Indeed, even Judge Barry recognized that Congress would have no place to dictate matters of foreign policy and their seriousness. *See Massieu v. Reno*, 915 F. Supp. 681, 701 (D.N.J. 1996) (acknowledging that "Congress could not have statutorily dictated to the Secretary the seriousness of particular foreign policy consequences" and that "neither the legislature nor the judiciary possesses the institutional competence to question the Secretary of State's decisions on matters of foreign policy" because "this nation's foreign policy is an ever-changing amalgamation of interests and alliances often known only to the Secretary, himself"), *rev'd*, 91 F.3d 416 (3d Cir. 1996). Hence, Khalil's reliance on *Massieu* is misplaced. Supp. Br. 22.

Put otherwise, so long as Congress wanted to make aliens removable whose presence threatened American foreign policy interests—something that not even Khalil challenges as a valid legislative purpose—the only way to do so was draft a statute like § 1227(a)(4)(C). This is because the relevant standard—whether an alien's presence and activities would potentially have serious adverse foreign policy consequences—is something that is *necessarily* within the competency of the Executive, and the Executive alone. Congress cannot preemptively adopt a comprehensive standard on the front-end to predict every fact pattern that might fit this mold; nor can courts intelligently review on the back-end whether an alien meets any such standard. Instead, given our constitutional system, the decision is inevitably one that must turn on the Executive's discretion. And nothing in the Fifth Amendment prevents that.

Unsurprisingly, the provision's statutory history tracks this understanding. Section 1251(a)(4)(C)(i) (the predecessor to Section 1227(a)(4)(C)(i)) resulted from efforts to revise and restructure the various grounds for deportation and exclusion contained in the Immigration and Nationality ("INA"). Prior to 1990, the INA provided that an alien could be excluded from this country if there was reason to believe that the alien sought "to enter the United States solely,

5

principally, or incidentally to engage in activities which would be prejudicial to the public interest." 8 U.S.C. § 1182(a)(27) (1988). The "public interest" ground—which was arguably *broader* than the current provision—was long interpreted to permit the government to exclude aliens for foreign policy reasons. *See Abourezk*, 592 F. Supp. at 885 (noting that Otto Skorzeny and Mme. Ngo Dinh Nhu had been excluded on foreign policy grounds). When some representatives proposed to eliminate that provision in 1987, *see* H.R. 1119, 100th Cong., 1st Sess., there were strong objections. *See Exclusion and Deportation of Aliens: Hearing before the Subcomm. on Immigration, Refugees and International Law of the H. Comm. on the Judiciary*, 100th Cong., 1st Sess. 30 (1987) ("1987 Hearing") (testimony of Judge Abraham D. Sofaer, State Department Legal Adviser); *id.* at 45 (testimony of INS Commissioner Alan Nelson); *id.* at 47 (letter from Ass't Atty Gen. John R. Bolton). Recognizing, however, that the public interest standard contained in the INA was "broad," the Executive therefore suggested replacing that standard "with language that limits the grounds of exclusion to potentially serious foreign policy consequences." *Id.* at 40 (testimony of Legal Adviser Sofaer).

Just as the statute's structure reveals that the "potentially serious adverse foreign policy consequence" standard was intended to include less than "compelling foreign policy interests", the legislative history makes clear that the standard was to be more stringent than the "public interest" standard contained in former subsection 1182(a)(27). Even as narrowed, the standard "leaves considerable discretion in the Executive Branch." 1987 Hearing, at 41. Congress understood that "the Executive needs to have some flexibility to respond to new crises or difficulties in our international relations." H.R. Rep. No. 100-882, 100th Cong., 2d Sess. 26 (1988). Indeed, given that "[n]ew crises and difficulties arise every day in our international relations," it would be "difficult and inadvisable to be more precise in defining what constitutes a serious adverse foreign policy consequence." 1987 Hearing, at 41. The statute's legislative history clearly shows that the standard it sets forth is intended to be narrower than the "public interest" standard contained in a prior, broader version of the law.

Nothing in the legislative history suggests that Congress intended for the provision to be used *only* against high-ranking government officials. Supp. Br. 23, 25. Congress only "*expect[ed]*" the authority "would apply *primarily* to senior government officials (or candidates for senior government posts)." 1990 U.S.C.C.A.N. 6784, 6794 (emphasis added). Congress similarly "*intend[ed]*" that this provision be used only in unusual circumstances." *Id.* (emphasis added). The conferees went so far as to provide exemplars of when the removability "*might* be appropriate[.]" *Id.* at 6795. This makes clear that Congress did not intend to handcuff the Executive in any way in determining *who* poses a serious foreign policy consequence and compromises a compelling foreign policy interest or *when* those factors may be implicated. This significant deference is exactly why "'the most exacting vagueness standard'" has no place in the analysis to an as-applied challenge to 8 U.S.C. § 1227(a)(4)(C). Supp. Br. 20–22 (quoting and relying on *Dimaya*, 584 U.S. at 156).

The standard set forth in § 1227(a)(4)(C)(i)—which again, reflects a deliberate congressional effort to narrow and define this basis for removal—is plainly *more* definite than other provisions that the Supreme Court has upheld against vagueness challenges, even assuming the doctrine applies here. In *Jordan v. DeGeorge*, the Court upheld the constitutionality of section 19(a) of the Immigration Act of 1917, which provided for the deportation of any alien who was convicted in this country of a "crime involving moral turpitude." *See* 341 U.S. 223, 225 (1951). Emphasizing that the Constitution does not require "[i]mpossible standards of specificity," the Court found that the term "conveys sufficiently definite warning as to the prescribed conduct when measured by common understandings and practices." *Id.* at 232-32.

In *Mahler v. Eby*, 264 U.S. 32 (1924), the Court upheld the deportation of an alien who had been found to be an "undesirable resident" by reason of his violation of a specified federal statute. "[T]he expression 'undesirable residents of the United States' is sufficiently definite to make the delegation quite within the power of Congress." 264 U.S. at 40. Indeed, the "discretion vested …

under such circumstances is [no] more vague or uncertain or any less defined than that exercised in deciding whether aliens are likely to become a public charge, a discretion vested in the immigration executives for half a century and never questioned." *Id.* at 41; *see* 8 U.S.C. § 1251(a)(8) (1988); 8 U.S.C. § 1251(a)(5) (1994). Particularly given that it is concerned with foreign relations, Section 1227(a)(4)(C) is not unconstitutionally vague as applied to Khalil when domestic statutes employing the "public interest" standard are not.

Similarly, in *Boutilier v. INS*, an alien was ordered deported on the ground that he was "afflicted with psychopathic personality" at the time of his entry. 387 U.S. 118, 118 (1967). There, the alien argued that he had not received adequate warning that sexual orientation was included in the statutory phrase, and the Supreme Court still declined to find the relevant statute vague. *Id.* at 123. The Court explained that because the deportability provision imposed "neither regulation of nor sanction for conduct," "no necessity exists for guidance so that one may avoid the applicability of the law." *Id.* Thus, like *Boutilier*, Khalil need not have guidance of what makes him removable when the removability does not stem from downstream consequences of criminal misconduct: crimes involving moral turpitude or crimes of violence. *See Dimaya*, 584 U.S. at 157; *Jordan*, 341 U.S. at 229.[2]

In short, at every turn, Khalil's vagueness challenge fails.

B.  Khalil's As-Applied Challenged Does Not Account for His Reported Conduct.

Khalil's derivate as-applied vagueness challenge fails for all the same reasons. And his additional points are lacking.

Foremost, Khalil contends that he could not have possibly been on notice that this removability ground would apply to his "speech and expressive activity." Supp. Br. 23-24. But this is wrong twice over. First, the premise is incorrect: He participated in "antisemitic protests and disruptive

---

[2] Even if the Court were to entertain Khalil's void-for-vagueness challenge, it must still apply a deferential standard of review, which takes the Executive's foreign policy prerogatives into considerations. *See Regan*, 468 U.S. at 242. The challenge would fail for the same reasons.

activities, which foster[ed] a hostile environment for Jewish students" during campus protests that gripped the country. ECF No. 198-1 at 6-7. Creating a hostile environment for Jews is unprotected *conduct*, not protected *speech*. *See e.g.*, *Virginia v. Black*, 538 U.S. 343, 359 (2003) (explaining that the First Amendment does not encompass "[t]rue threats . . . where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"); *Cohen v. California*, 403 U.S. 15, 20 (1971) ("[P]ersonally abusive epithets which, when addressed to the ordinary citizen, are . . . inherently likely to provoke violent reaction" are generally proscribable under the First Amendment); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (noting that a state may punish words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace"); *United States v. Williams*, 553 U.S. 285, 298–99 (2008) ("[T]here remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality."). Second, as described above, the immigration laws *expressly contemplate* that an alien's "beliefs, statements, or associations" can give rise to removal, so long as the Secretary of State personally determines the alien would still compromise compelling American foreign policy interests. 8 U.S.C. § 1182(a)(3)(C)(iii). And the immigration laws *specifically* state that espousing or endorsing a foreign terrorist organization (like Hamas) is grounds for removal too. 8 U.S.C. § 1227(a)(4)(B); 8 U.S.C. § 1182(a)(3)(B)(VII). Khalil was on complete constitutional notice that his actions here as an alien could give rise to immigration consequences.[3]

---

[3] Khalil's conduct is not the only thing at issue in this case. Per his own LinkedIn page, Khalil served as a political affairs officer with the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA). Georgett Roberts, *These are the extremist student leaders of the anti-Israel protest camp bringing Columbia to its knees*, NY POST, Apr. 26, 2024, https://nypost.com/2024/04/26/us-news/the-extremist-student-leaders-leading-columbias-anti-israel-camp/ (last visited May 14, 2025). On January 26, 2024, the prior Administration paused all funding to UNRWA after allegations that twelve employees were involved in the October 7 attacks. See The United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA): Overview and U.S. Funding Prohibition (2025), https://www.congress.gov/crs-product/IN12316 (last visited May 14, 2025)

Khalil cannot dispute that the Israel-Palestine conflict raises serious foreign policy concerns. *See, e.g.*, *Def. for Child. Int'l-Palestine v. Biden*, 714 F. Supp. 3d 1160, 1166 (N.D. Cal. 2024), *aff'd*, 107 F.4th 926 (9th Cir. 2024); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 984 (9th Cir. 2007); *Nguyen v. United States*, No. 23-CV-06047-VKD, 2024 WL 1382470, at *4 (N.D. Cal. Apr. 1, 2024). The Executive has exercised its discretion on when lodging 8 U.S.C. § 1227(a)(4)(C) as a removability ground when related to that conflict. *Compare* ECF No. 241 *with Ozturk v. Trump*, Civ. Act. No. 25-10695 (D. Vt.), Dkt. No. 12-1 (not charging foreign policy ground), *Taal v. Trump*, Civ. Act. No. 25-335 (N.D.N.Y.), Dkt. No. 38 (same); *Kordia v. Noem*, Civ. Act. No. 25-1072 (N.D. Tex.), Dkt. No. 1 (same).

Khalil points to the Secretary's determination as evidence that the statute is unconstitutionally vague. Supp. Br. 19–20; *id.* n.5; *id.* 25. But "when it comes to collecting evidence and drawing inferences" on questions of national security and foreign affairs, "the lack of competence on the part of the courts is marked." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010); *see also* 1987 Hearing, at 42.16 (testimony that "[f]oreign policy decisions are essentially matters of national policy and they should be made by the Executive branch, subject to oversight by Congress. Courts have no standards by which to judge the importance of foreign policy interests."). The Secretary's determination reflects the "facially legitimate and bona fide" explanation that the Supreme Court has repeatedly held that is the most an alien can demand. *See Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972); *cf. Hawaii*, 585 U.S. at 685–86; *Humanitarian Law Project*, 561 U.S. at 35 (when the President adopts "a preventive measure . . . in the context of international affairs and national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions").

## II.    Khalil's Policy Challenge is Meritless.

Khalil's main gripe is that the Government has adopted in unconstitutionally vague "policy" that permits selective enforcement of those critical to the United States' foreign policy position regarding the Israel-Palestine conflict. Supp. Br. 8-20. Khalil's vagueness challenge is one of his own

making. He has strung together various public statements and social media posts, called it a "policy," but then faults the Government for it being vague. That is wrong. In any event, this challenge seeks to undermine foreign policy considerations, and therefore, presents a nonjusticiable question. Therefore, his challenge fails on all fronts.

A.    The Vagueness Challenge Should Fail.

Khalil does not challenge any policy that has been captured in a law, rule, regulation, or directive. Instead, he alleges that one exists in the ether, and he stitches it together from various public statements, tweets, and interviews. Khalil then faults this policy for being vague. This challenge is one of his own making. And it does not work.

As the Government has already explained, "[n]o ideological deportation policy has been developed or implemented" by the Departments of State and Homeland Security. *See AAUP v. Rubio*, Civ. Act. No. 25-10685 (D. Mass.), Dkt. Nos. 65-1 ("Armstrong Decl.") ¶ 14, 65-2 ("Watson Decl."), ¶ 10. Government officials' public statements regarding revocation and removal of Hamas supporters are "consistent with the State Department's long-standing implementation of visa and immigration laws, across administrations." Armstrong Decl. ¶ 15. ICE's enforcement actions are carried out through "ICE's existing civil immigration authorities under the INA," allowing removability charges to be lodged if "supported by fact and law." Watson Decl. ¶ 10. That should be the end of it.

Regardless, Khalil's challenge fails on its own terms. The supposed "policy" here is an internal directive, in essence, that regulates how the Executive should prioritize its existing enforcement authority; it does not change any aspect of substantive law governing aliens, or the existing legal framework under which they exist. But that sort of internal measure is not amenable to a vagueness challenge, any more than a command from the President to be "tough on Wall Street" would be.

For good reason, the Supreme Court has refused to extend the vagueness doctrine beyond the statutory context. *See, e.g.*, *Beckles v. United States*, 580 U.S. 256, 263 (2017) (refusing to apply the void

for vagueness doctrine to the sentencing guidelines). This is because the vagueness doctrine applies to legal rules that regulate private conduct and bind private parties. *See United States v. Matchett*, 837 F.3d 1118, 1122 (11th Cir. 2016) (citing Supreme Court cases). Directives to other government officials cannot "notify [Khalil]" of what his conduct should be or should have been. *Id.* Rather, they operate analogously to sentencing guidelines, which informs government officials on how to conduct its enforcement actions. Since "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," "[it] is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985).

The District Court for the District of Massachusetts recently rejected "a challenge to the same policy at issue here." Supp. Br. 11. The district court there dismissed the plaintiffs' vagueness challenge because "Due Process-based vagueness challenges have not been extended beyond the statutory sphere or, at most, to written rules and regulations." *Am. Ass'n Univ. Prof. v. Rubio*, --- F. Supp. 3d ---, 2025 WL 1235084, at *20 (D. Mass. Apr. 29, 2025). The Third Circuit has not yet recognized that an unwritten policy could be subject to a void-for-vagueness challenge. Doing so could require courts to "guess the policy Plaintiff purports to challenge." *Garisto v. Topper*, No. 1:20-CV-0646, 2023 WL 2923129, at *17 (M.D. Pa. Apr. 12, 2023). That is exactly what Khalil asks this Court to do here. *See* Supp. Br. 14-15 (asking the Court to piece together executive orders, interviews, public articles amongst other things).

To the extent that Khalil is seeking to use Executive Orders ("EOs") 14161 and 14188 as the hooks for his policy challenge, they do not carry the day. Supp. Br. 17-18. EO 14161 (90 Fed. Reg. 9451) declares the United States' policy to "protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." Sec. 1(a). It further declares the need to ensure that aliens

12

"do not advocate for, aid or support designated foreign terrorists and other threats to our national security." Sec. 1(b). Per the EO, executive departments and agencies are called to "identify resources" and "recommend" actions to this end. To the extent that EO1 requires departments or agencies to act in furtherance of its policy goals, Section 4 makes express that any such action must be done consistent with all applicable law. Sec. 4(a)(i)-(ii).

Similarly, EO 14188 calls for targeted federal enforcement in the wake of an "unprecedented wave" of antisemitic "discrimination, vandalism, and violence" against citizens and "especially in our schools and on our campuses." Sec. 1. It directs executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." Sec. 2. As above, the EO makes expressly clear that any such action must be taken "consistent with applicable law," and affirms that "agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment." Sec. 4(b).

These two EOs allow agencies to use existing authority to implement the President's agenda. Armstrong Decl. ¶¶ 5-7, Watson Decl. ¶ 10. At bottom, nothing in the EOs or public statements regulate private conduct. They are expressly internal directives to executive agencies about how to exercise their existing authority. The President's instructions to his subordinates do not implicate the Fifth Amendment at all. If they are unclear, that is a matter for internal administration; no different than if the instructions came orally at a cabinet meeting. *Cf. Wills v. Pszczolkowski*, 125 F.4th 534, 539 (4th Cir. 2025).

This is exactly why Khalil's reliance on *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ("*Fox*"), is misplaced. Supp. Br. 9-10, 17-18. There, the Court was reviewing the FCC's indecency policy. *Fox*, 567 U.S. at 243. In concluding that the policy was unconstitutionally vague, the Court pointed to administrative decisions and agency files as evidence that regulated parties did not have adequate notice of improper conduct. *See id.* at 249, 250, 257. Similarly, in *Gilles v. Garland*, the general

counsel for Miami University wrote a letter explaining the University's "policy and practice," which prompted the Sixth Circuit's reversal. 281 F. App'x 501, 502-03 (6th Cir. 2008); *id.* at 507 ("Defendants would have us assume that Parker's characterization of the unwritten policy is accurate and complete; that this unwritten policy has been consistently and uniformly applied; and that this evidence of the unwritten policy is conclusively sufficient to pass constitutional muster and summarily foreclose further proceedings on plaintiff's vagueness challenge—even though the policy, as described, hardly seems believable."). There is no analogy to the evidence Khalil submits here. As the Supreme Court noted, this is why challenging wholesale policies, as defined by one party, would pose numerous problems for the courts. *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 890–94 (1990) (espousing the different ways by which it would be wrong for one to "seek wholesale improvement of [a] program by court decree, rather than in the offices of [executive departments] or the halls of Congress").

B.    The Political Question Doctrine Bars Review.

Khalil's "policy" challenge is nothing more than a backdoor attempt to reverse the Government's foreign policy considerations: He seeks to peer behind the Secretary's determination, and have this Court set it aside as the fruit of a constitutionally suspect initiative. But the Secretary's determination under 8 U.S.C. § 1227(a)(4)(C) is an unreviewable political question. *See Gross v. German Foundation Indus. Initiative*, 456 F.3d 363, 377 (3d Cir. 2006) (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)). Khalil's attempt to collaterally attack it does not work.

The Secretary's determination as to whether an alien "would have potentially serious adverse foreign policy consequences for the United States" necessarily involves two subject-matters that are textually and structurally committed to the political branches of the government under the Constitution: (1) foreign affairs, *see State of California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) ("the issue of protection of the States from invasion implicates foreign policy concerns which have been constitutionally committed to the political branches."); *see also El-Shifa Pharmaceutical Industries Co.*

14

*v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion."); and (2) immigration policy, *see Diaz*, 426 U.S. at 81 ("the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."). "[A]ny policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and … are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades*, 342 U.S. at 588-89.

The Secretary's determination is thus the precise sort of decision committed to the Executive Branch alone, over which the Judiciary lacks any manageable standard to competently review. *See State of New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996). Indeed, Khalil's vagueness challenge necessarily thrusts federal courts into superintending every aspect of these decisions. That is obviously problematic. *See also Mobarez v. Kerry*, 187 F. Supp. 3d 85, 92 (D.D.C. 2016) (Brown Jackson, J.) ("[I]f the court is being called upon to serve as a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security, then the political-question doctrine is implicated, and the court cannot proceed.").

Therefore, the Court should not entertain his vagueness challenge related to this alleged policy.

## CONCLUSION

For these foregoing reasons and those argued in the Government's opposition, the Court should deny Khalil's motion for a preliminary injunction.

Dated: May 14, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation

SARAH S. WILSON
Assistant Director

ALANNA T. DUONG
Senior Litigation Counsel

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation and Appeals Section
PO Box 878, Ben Franklin Station
Washington, D.C. 20044
dhruman.y.sampat@usdoj.gov.

JOSHUA C. McCROSKEY
RACHEL BROWNING
Trial Attorneys

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing filing was served on counsel of record via this Court's CM/ECF system on May 14, 2025.

*s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
Senior Litigation Counsel