## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*

*v.*

DONALD J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; and MARCO RUBIO, in his official capacity as Secretary of State, and Pamela BONDI, in her official capacity as Attorney U.S. Department of Justice,

*Respondents.*

25-CV-1963-MEF-MAH

### *AMICI CURIAE* BRIEF OF 36 INTERFAITH GROUPS IN SUPPORT OF PETITIONER MAHMOUD KHALIL'S PETITION FOR WRIT OF HABEAS CORPUS AND MOTIONS FOR RELEASE, RETURN, AND A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ 3

II. INTRODUCTION AND INTEREST OF AMICI ................................................ 6

III. ARGUMENT .................................................................................................. 8

A.   The Government's Targeting and Ongoing Detention of Mr. Khalil Violate His First Amendment Rights. ........................................................................... 8

B.   The Government's Retaliatory Policy and Its Application of the Foreign Policy Ground Statute to Mr. Khalil are Void for Vagueness. ........................................ 12

IV. Conclusion .................................................................................................... 15

APPENDIX A .................................................................................................... 17

## TABLE OF AUTHORITIES

### CONSTITUTIONAL PROVISIONS

U.S. Const., Amend. 1 ................................................................................................ 6

### UNITED STATES SUPREME COURT

*Bridges v. Wixon*, 326 U.S. 135 (1945) ....................................................................... 9
*Button,* 371 U.S. at 432, 435 ...................................................................................... 14
*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012)............................... 12
*Grayned v. City of Rockford,* 408 U.S. 104 (1972)...................................................... 14
*Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)................................... 10
*Houston v. Hill*, 482 U.S. 451 (1987) ......................................................................... 11
*Jordan v. DeGeorge,* 341 U.S. 223 (1951) .................................................................. 13
*Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965) ........................................... 10
*NAACP v. Button*, 371 U.S. 415 (1963) ...................................................................... 12
*Nieves v. Bartlett*, 587 U.S. 391 (2019) ...................................................................... 11
*Sessions v. Dimaya*, 584 U.S. 148 (2018) ................................................................... 13
*Snyder v. Phelps,* 562 U.S. 443 (2011) ....................................................................... 11
*Texas v. Johnson*, 491 U.S. 397 (1989) ...................................................................... 11

### UNITED STATES COURT OF APPEALS

*Aref v. Lynch,* 833 F.3d 242 (D.C. Cir. 2016)............................................................ 10
*Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) ......................................... 9
*Hannon v. Beard,* 645 F.3d 45 (1st Cir. 2011) ........................................................... 10
*Ragbir v. Homan*, 923 F.3d 53, 71-72 (2d Cir. 2019), *cert granted, judgement vacated on other grounds,* 141 S. Ct. 227 (2020);............................................................................. 9

### UNITED STATES DISTRICT COURT

*Aditya W. H. v. Trump*, No. 25-cv-1976 (KMM/JFD), Dkt. 21 (D. Minn. May 14, 2025) .......... 12
*Ercelik v. Hyde*, No. 25-cv-11007, Dkt. 30 (D. Mass. May 8, 2025) ........................... 12
*Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917 (W.D. Tex. 2018) ............................ 9
*Khan Suri v. Trump*, 25-cv-0480, Dkt. 65 (E.D. Va. May 14, 2025) ........................... 12
*Mahdawi v. Trump*, No. 25-cv-00389-GWC, -- F.Supp.3d -- , 2025 WL 1243135 (D.Vt. Apr 30, 2025) ............................................................................................................... 12
*Massieu v. Reno,* 915 F. Supp. 681, 699-701 (D.N.J. 1996), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996)............................................................................................. 14, 15
*Mohammed H. v. Trump*, No. 25-1576, Dkt 29 (D. Minn. May 5, 2025)....................... 12
*Öztürk v. Hyde*, No. 25-cv-0374, Tr. Bail Hrg. 105:9-115:5 (D. Vt. May 9, 2025)...................... 12
*Rafeedie v. I.N.S.*, 795 F. Supp. 13 (D.D.C. 1992). ................................................... 9, 14
*Rueda Vidal v. U.S. Dep't of Homeland Sec.*, 536 F. Supp. 3d 604 (C.D. Cal. 2021) ................. 9

### ARTICLES

David Cole, *The First Amendment's Borders,* 6 Harv. L. & Pol'y Rev. 147 (2012) .............. 9, 10

The Group Behind Project 2025 Has a Plan to Crush the Pro-Palestinian Movement, https://www.nytimes.com/2025/05/18/us/project-esther-heritage-foundation-palestine.html (May 18, 2025).................................................................................................................... 7

# I. STATEMENT OF IDENTIFICATION OF AMICI

The following congregations and organizations join in this *amici* brief in support of Petitioner Mahmoud Khalil's writ of habeas corpus and motions for release, return, and a preliminary injunction.

The Beacon
Bend The Arc
Berkeley Zen Center
Buddhist Coalition for Democracy
Cece Jones-Davis
Congregation Beit Simchat Torah
Dai Bai Zan Cho Bo Zen Ji
Dharma Heart Zen
The Episcopal Diocese of Long Island
The Episcopal Diocese Of New York
Faithful America
First Spanish United Methodist Church (the People's Church), East Harlem
Heart Circle Zen
Hindus for Human Rights
HopeBuilds, LLC
Immigration Law & Justice New York
Interfaith Center Of New York  (ICNY)
Jewish Center For Justice
Jikoji Zen Center
Masjid Al Haram
Mid-City Zen
New Birth Missionary Baptist Church
New Jewish Narrative
New York State Council on Churches
OKC First Church (Oklahoma City)
Pax Christi New York State
Presbytery Of New York City (PCUSA)
Religious Nationalisms Project
Riverside Church, New York
St. Ann & the Holy Trinity Episcopal Church
St. Mary's Episcopal Church, Harlem
T'ruah: The Rabbinic Call for Human Rights
UCC Movement for Palestinian Solidarity (UCC PIN)
Union Theological Seminary
Upaya Zen Center
Village Zendo

5

For descriptions of the amici, please see Appendix A attached hereto.

## II. INTRODUCTION AND INTEREST OF AMICI

*Amici* are leaders, congregations and organizations across faiths who revere the Constitution and cherish its guarantee of freedom of speech. Without presuming to speak for all American faiths—a diverse community that holds a multitude of viewpoints—*amici* are compelled to file this brief because the arrest, detention and potential deportation of petitioner Mahmoud Khalil for his protected speech violate the most basic constitutional rights. We share with him a profound interest in the integrity and protection of the First Amendment to the United States Constitution (U.S. Const., Amend. 1).

Khalil, a Palestinian husband and now father, came to the U.S. to study international policy as a human rights defender. He is now a lawful permanent resident with deep ties to this country. Because of his background in diplomacy, Khalil was asked to serve as a negotiator for students—of varying faiths, including many Jewish students—who were engaged in pro-Palestinian protest at Columbia University.

Khalil became the first target of the Trump Administration's policy to arrest, detain, and attempt to deport pro-Palestinian students and scholars on "foreign policy" grounds. On March 8, 2025, during the Holy Month of Ramadan, on his way home from an Iftar dinner, Mr. Khalil and his pregnant wife were surrounded in the lobby of his apartment by officers who handcuffed him, placed him in a vehicle, and moved him across several state lines over the course of several hours in order to detain him in a private immigration prison in Louisiana. The video of his arrest was shocking, and President Trump and Secretary of State Marco Rubio made clear that he was to be the first of many.

Secretary Rubio later attempted to justify these extraordinary measures under a rarely invoked statute that permits the deportation of certain individuals on "foreign policy" grounds. The statute expressly prohibits the Secretary of State from detaining and removing a noncitizen because of the individual's  past, current, or expected beliefs, statements, or associations" when lawful within the United States, unless the Secretary deems an individual s presence or activities to  compromise a compelling U.S. foreign policy interest." Secretary Rubio relies on this unusual exception to deport Khalil for his lawful speech.

Secretary Rubio has not shown how Khalil s continued presence in this country, or his freedom pending any immigration decision, would pose such a threat--because he cannot make such a showing. They do not pose a threat. The Administration claims its actions against Khalil support efforts to combat antisemitism. While antisemitism is a persistent scourge that has threatened the Jewish people for centuries, and *amici* are united in condemnation of antisemitism and all forms of religious discrimination, arresting, detaining, and potentially deporting Khalil for his protected free speech does not assist in eradicating antisemitism. Nor was that the government s real purpose. Rather, the government is instead exploiting legitimate concerns about antisemitism as pretext for undermining core pillars of American democracy, the rule of law, and the fundamental rights of free speech and academic debate on which this nation was built. The government's actions jeopardizing the free exercise and expression of faith concern all the *amici.*

Many religious minorities, including Jewish people, came to America to escape generations of similar predations. Every faith group represented in this filing has members whose ancestors or who themselves, for a broad range of reasons, battled prejudice, repression, danger and trauma to make a safe home here in the United States. The images of Khalil's arrest in twenty-first century New York City evoke the oppressive tactics employed by the authoritarian regimes that ancestors

of many of *amici*'s members left behind in Odessa, Kishinev, and Warsaw, as well as other places around the globe that more recently have engaged in these tactics. Even some groups originating in this country found themselves, amid the struggle for civil rights, targeted as pursuing faith-based aims at odds with those held by their government and their communities. To watch state authorities undermine the same fundamental rights that empowered so many Jewish Americans and others fleeing dangerous homelands is chilling; to know it is being done in the name of the Jewish people and on behalf of faith is profoundly disturbing. It is especially troubling that this governmental action is undertaken in a country whose very founders fled religious oppression. If anything, *amici* believe such unjust treatment of lawful residents like Khalil will aggravate risks to American Jews and other people of faith, not ease them, because an intolerant government is never good for the free exercise of faith. That bedrock principle stands at the very foundation of our country.

Our Constitution secures to all students and scholars, including noncitizens, the right to peacefully express political beliefs without fear of government reprisal. Contrary to Secretary Rubio's claim, Khalil's constitutionally protected expression does not, and cannot, cause his continued presence in the U.S. to compromise a compelling U.S. foreign policy interest. Our foreign policy is not so fragile that a person's words in support of his homeland could so easily compromise it, and our constitutional guarantees are not so feeble that they may be so easily discarded. The Court should grant the petition for writ of habeas corpus and Khalil's motion for release, return, and a preliminary injunction.

## III. ARGUMENT

### A. The Government s Targeting and Ongoing Detention of Mr. Khalil Violate His First Amendment Rights.

It is well settled that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). While the government may have broad

discretion to deny entry to noncitizens, "once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders." *Id.* at 161 (Murphy, J., concurring); *see also Rafeedie v. I.N.S.*, 795 F. Supp. 13, 22 (D.D.C. 1992).

Immigration laws permitting the government to deport a foreign resident who merely "advocates or teaches . . . proscribed political doctrines" are unconstitutionally overbroad. *Rafeedie,* 795 F. Supp. at 22-23 (invalidating former 8 U.S.C. §§ 1182(a)(27) and (a)(28)(f) as overbroad). Federal courts have likewise enjoined attempts to detain, deport, or otherwise punish lawful foreign residents because they expressed views the government opposed. *See, e.g.*, *Ragbir v. Homan*, 923 F.3d 53, 71-72 (2d Cir. 2019), *cert granted, judgement vacated on other grounds,* 141 S. Ct. 227 (2020); *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) (bond revocation); *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921-22 (W.D. Tex. 2018) (parole revocation); *Rueda Vidal v. U.S. Dep't of Homeland Sec.*, 536 F. Supp. 3d 604, 619–623 (C.D. Cal. 2021)(denial of DAC Application).

The government's pretextual assertion of U.S. foreign policy interests cannot justify its censorship of noncitizen speakers. *See generally* David Cole, *The First Amendment's Borders,* 6 Harv. L. & Pol'y Rev. 147 (2012). Foreign policy or national defense "cannot be invoked as a talismanic incantation" to support any government action "which can be brought within its ambit." *United States v. Robel,* 389 U.S. 258, 263 (1967) "Implicit in the term 'national defense 'is the notion of defending those values and ideals which set this Nation apart," and the risks inherent in a free society have never licensed the government to trammel the foundational expressive liberties that "make[] defense of the Nation worthwhile." *Id.* at 264. Enforcing the First Amendment's protections for all speakers in the United States only "highlights the cherished values of our

9

constitutional framework." *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 310 (1965)
(Brennan, J., concurring). Since the First Amendment applies to foreign students attending
American universities, government action to remove such students or revoke their visas or
terminate their lawful permanent resident status must comport with the First Amendment's
protections.

The First Amendment "prohibits government officials from subjecting individuals to
'retaliatory actions' after the fact for having engaged in protected speech.*" Houston Cmty. Coll.
Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation omitted). A violation occurs when (1) a speaker
engages in protected speech, (2) the government takes adverse action against her, and (3) the
speaker's exercise of her speech rights is a reason for the government's action. S*ee Hannon v.
Beard,* 645 F.3d 45, 48 (1st Cir. 2011); *Aref v. Lynch,* 833 F.3d 242, 258 (D.C. Cir. 2016).

The government acknowledged that Khalil's protected speech was the basis of his arrest.
Secretary of State Rubio issued a memorandum, filed in Khalil's removal proceedings on April 9,
2025, with the conclusion that allowing Khalil to stay in the U.S. would create a 'hostile
environment' for Jewish students in the United States," asserting that because "the foreign policy
of the United States champions core American interests and American citizens," "condoning anti-
Semitic conduct and disruptive protests in the United States would severely undermine that
significant foreign policy objective."[1] Yet the sole offense the government identifies to date is his
vocal and lawful role as a mediator in the Columbia University pro-Palestinian demonstrations of
2024. It is unclear what speech in particular the government attributes to Khalil, or if it is holding

---

[1] *See* Tab A, *Notification of Removability Determinations under Section 237(a)(4)(C) of the
Immigration and Nationality Act (INA)*, *Department of Homeland Security,*,
https://s3.documentcloud.org/documents/25894225/dhs-documents-mahmoud-khalil.pdf,  (April
9, 2025).

him responsible for everything that anyone involved in the demonstrations have said. Either way, Khalil cannot be detained and deported because of this speech. While some *amici* may not agree with the views expressed in the demonstrations, and some may even disagree strongly with them, we are united in our belief that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

As this Court has already found, Khalil's speech addresses a subject of broad, complex public debate and constitutes core political speech at "the heart of . . . First Amendment [ ] protection." *Snyder v. Phelps,* 562 U.S. 443, 451-52 (2011). The freedom to express even unpopular ideas without risking arrest is "one of the principal characteristics by which we distinguish a free nation." *Houston v. Hill*, 482 U.S. 451, 463 (1987). If the government could simply "silence those who voice unpopular ideas, little would be left of our First Amendment liberties, and little would separate us from the tyrannies of the past or the malignant fiefdoms of our own age." *Nieves v. Bartlett,* 587 U.S. 391, 412 (2019) (Gorsuch, J., concurring). And when the voices in question overlap with the faith-driven missions of *amici* such as speaking out on behalf of the oppressed, the hungry, the endangered, the migrant and the voiceless, the result is a profound assault on the First Amendment. Arresting and detaining Khalil for his words is a betrayal of the constitutional values that attracted many *amici* and their families who immigrated to this great country's shores.

It is a testament to our justice system that our federal courts have appropriately acted promptly to protect the First Amendment rights of many of the students and scholars who have been similarly detained in the weeks following Khalil's detention. *See Khan Suri v. Trump*, 25-cv-0480, Dkt. 65 (E.D. Va. May 14, 2025) (ordering release); *Aditya W. H. v. Trump*, No. 25-cv-1976

(KMM/JFD), Dkt. 21 (D. Minn. May 14, 2025) (ordering release); *Öztürk v. Hyde*, No. 25-cv-0374, Tr. Bail Hrg. 105:9-115:5 (D. Vt. May 9, 2025) (ordering release); *Ercelik v. Hyde*, No. 25-cv-11007, Dkt. 30 (D. Mass. May 8, 2025) (ordering release); *Mohammed H. v. Trump*, No. 25-1576, Dkt 29 (D. Minn. May 5, 2025); *Mahdawi v. Trump*, No. 25-cv-00389-GWC, -- F.Supp.3d -- , 2025 WL 1243135 (D.Vt. Apr 30, 2025). These decisions protect all of our First Amendment rights, and would support a decision by this Court to order Khalil's release.

## B.  The Government's Retaliatory Policy and its Application of the Foreign Policy Ground Statute to Mr. Khalil are Void for Vagueness.

The government's actions raise serious constitutional concerns for an additional reason: the government's retaliatory policy and invocation of 8 U.S.C. 1227(a)(4)(C)(i) (the foreign policy ground) as applied to Mr. Khalil is unconstitutionally vague.

A policy or as-applied law is void for vagueness when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012). Extra care must be taken "[w]hen speech is involved": "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54. Thus laws regulating expression face an even more stringent test, as vague speech regulations invite arbitrary enforcement against less popular viewpoints and cause speakers to self-censor. *See NAACP v. Button*, 371 U.S. 415, 432, 435 (1963). Because extraordinary penalties such as removal amplify the risks of vague speech regulation, courts must apply the "most exacting vagueness standard" when assessing such statutes. *Sessions v. Dimaya*, 584 U.S. 148, 150 (2018) (portion of Immigration and Nationality Act ["INA"]void for vagueness) (citing *Jordan v. DeGeorge,* 341 U.S. 223, 231 (1951).

The government's policy and Secretary Rubio's determination under the foreign policy ground as pretexts to arrest Khalil fail that test. The policy and law purport to permit the

deportation of noncitizen campus speakers like Khalil because the Secretary has deemed his presence or activities to pose "potentially serious adverse foreign policy consequences for the United States."  And while the law expressly prohibits the Secretary from taking such action against a noncitizen based on the individual's protected "beliefs, statements, or associations," it nevertheless purports to permit the Secretary to deport a noncitizen if he determines that allowing the individual to remain "would compromise a compelling U.S. foreign policy interest." *See* 8 U.S.C. § 1227(a)(4)(C)(i)-(ii). Importantly, the legislative history states Congress's intention that the Foreign Policy Ground should be "used sparingly" and "only in unusual circumstances" and "not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies." 101 Cong. Rec. 35417 (1990) (enacted).[2]  Despite this unambiguous congressional intent, Secretary Rubio does not appear to recognize any material constraints on his discretion to invoke the foreign policy ground to target Khalil for removal based on his protected speech.

The vagueness doctrine prohibits precisely this kind of discriminatory enforcement against disfavored speakers. *See Button,* 371 U.S. at 432, 435. Without standards delineating what may "compromise[] a compelling U.S. foreign policy interest" (or even what the U.S.'s foreign policy is), noncitizens are left to guess what otherwise protected speech could lead to their detention and deportation. Does *all* speech expressing solidarity with or even sympathy for the Palestinian people

---

[2] To put a finer point on it, Congress cited two examples where the Foreign Policy Ground might apply: (1) when an alien s mere entry into the United States could result in imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad (as occurred with the former Shah of Iran)"; and (2)  when an alien s entry would violate a treaty or international agreement to which the United States is party." *Id*.

compromise a compelling U.S. foreign policy interest?[3] Should the political winds shift, what is to stop a future Secretary of State from deciding certain pro-Israel speech compromises a compelling U.S. foreign policy interest? Do protests of Russian activities in Ukraine, or conversely of Ukrainian actions in response, compromise a compelling U.S. foreign policy interest? No one can know—the statute's enforcement delegates plenary censorship authority "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford,* 408 U.S. 104, 109 (1972). "[U]ncertain meanings" lead individuals "to steer far wider of the unlawful zone" and self-censor. *Baggett v. Bullitt,* 377 U.S. 360, 372 (1964).

It is this very uncertainty that led a federal court to hold the foreign policy ground unconstitutionally vague. *See Massieu v. Reno,* 915 F. Supp. 681, 699-701 (D.N.J. 1996), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996).[4] The two fatal defects Judge Maryanne Trump Barry identified in *Massieu* are cogent and persuasive here. First, and as discussed above, the law contains no "standards" for determining what a noncitizen must do to avoid adverse action since enforcement lies entirely within the Secretary's personal and undisclosed judgment. *Massieu*, 915

---

[3] Concern that the Trump Administration is using its purported fight against antisemitism as cover for targeting groups, including citizens, whom it sees as standing in disagreement with its political policies is not merely speculative. *See* "The Group Behind Project 2025 Has a Plan to Crush the Pro-Palestinian Movement," https://www.nytimes.com/2025/05/18/us/project-esther-heritage-foundation-palestine.html. (May 18, 2025)[reporting on Project Esther, the Heritage Foundation's proposal to rapidly dismantle the pro-Palestinian movement in the United States, along with its support at schools and universities, at progressive organizations and in Congress].
[4] *See also Rafeedie*, 795 F. Supp. 13, where the court held a similar provision of the INA void for vagueness. That provision authorized the Attorney General to detain and deport any noncitizen whom he knows or has reason to believe seek(s) to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States," (*id.* at 15), as an unconstitutionally vague abridgment of freedom of speech because [t]he undefined terms of the statute—'activities, prejudicial, endanger'—are so broad and vague as to deny plaintiff a reasonable opportunity to know what he may or may not say or do." *Id.* at 23.

F. Supp. at 699, n.16. Second, given that American foreign policy is "unpublished, ever-changing and often highly confidential," no noncitizen "could know, ex-ante, how to conform his or her activities to requirements of the law" or when "his or her mere presence here would cause adverse foreign policy consequence." *Id.* at 700.

These constitutional concerns are as apt today as they were in 1996. The government's shocking new policy and its application of foreign policy ground to Khalil provides absolutely no notice to noncitizens like Khalil as to what speech it proscribes. Instead, the government's policy and application of the statute vest the Secretary of State with seemingly unfettered discretion to take action against any noncitizen lawfully in the U.S. based on whatever constitutionally suspect ground he chooses, including lawful speech the Secretary deems contrary to his nebulous and ever-changing view of "foreign policy." The First Amendment does not abide laws that invite such sweeping censorship.

## IV. CONCLUSION

While *amici* may hold different views on the substance of Khalil's statements, they firmly stand behind his right to voice dissent and will not condone the government's invocation of antisemitism as a pretext for his arrest, detention, and deportation. In our republic founded on the separation of powers, it is the duty of the federal judiciary to defend liberty and protect our most fundamental freedoms whenever the government attempts to undermine them. The Court should exercise its authority to safeguard these freedoms in this case. *Amici* respectfully urge the Court to grant Khalil's petition for a writ of habeas corpus and his motions for release, return, and a preliminary injunction.

Date:   May 21, 2025
        New York, NY

                                    Respectfully Submitted,

                                    Luna Droubi
                                    Partner
                                    Beldock Levine & Hoffman LLP
                                    99 Park Avenue, PH/26th Fl.
                                    New York, NY 10016
                                    Tel: (212) 277-5875
                                    Fax: (212) 277-5880
                                    LDroubi@blhny.com

                                    *Counsel for Amici Curiae*

16

## APPENDIX A

Proposed *Amici* consist of the following organizations and congregations:

1.   **THE BEACON** is a project of Union Theological Seminary, with community partners,
     The Interfaith Center of NY and NY Jewish Agenda (NYJA), and T'ruah: The Rabbinic
     Call for Human Rights. The Beacon brings together people of all faiths and secular
     backgrounds who feel called to stand with those facing injustice. Through WhatsApp
     groups, The Beacon mobilizes its diverse community members to take action. Where there
     is cruelty, we create visible acts of solidarity and compassion. Where there is fear, we build
     community and mutual understanding.

2.   **BEND THE ARC** is the nation's leading progressive Jewish voice empowering Jewish
     Americans to fight for justice and equality for all and is the only national Jewish
     organization focused exclusively on social change in the United States. Bend the Arc
     mobilizes Jewish Americans beyond religious and institutional boundaries through bold
     leadership development, innovative civic engagement, and robust advocacy.

3.   **BERKELEY ZEN CENTER (BZC)** is a Soto Zen Buddhist practice center in Berkeley,
     California. Founded in 1967, it is one of the oldest Buddhist temples in the US. BZC offers
     twice daily Zen meditation, along with a Saturday morning dharma talk.

4.  **BUDDHIST COALITION FOR DEMOCRACY** The Buddhist Coalition for Democracy is a national non-denominational Buddhist non-profit organization that serves as a vehicle for Buddhists to support democratic norms, institutions, and processes. We believe democratic governance is the best means for: 1) ensuring the dignity and fundamental rights of all persons, 2) enabling all members of society to lead meaningful and fulfilling lives, 3) and settling passionately held differences through peaceful means. We commit to supporting democracy with methods that are consistent with the Buddhist principles of wisdom, compassion, right speech, and nonviolence

5.  **CECE JONES-DAVIS** For the past 20 years, Cece has partnered with national organizations and brands, organized and led dynamic grassroots movements and used her voice to address issues of equity and inequity. Her activism ranges from fighting to abolish the death penalty to advocating for menstrual equity—work that she does both on the ground to create immediate impact and in high-level rooms to drive policy changes, awareness and education. She served in the Obama Administration under Ambassador Ron Kirk, the first African American U.S. Trade Representative. She is known most recently for her work in creating the #JusticeforJulius campaign that saved Julius Jones in Oklahoma just hours before his scheduled execution in 2021.

6.  **CONGREGATION BEIT SIMCHAT TORAH** is a spiritual home for people of all sexual orientations and gender identities. Passionate, provocative, and deeply Jewish, our community engages in spirited debate and activism: rejoicing in diversity, denouncing social injustice wherever it exists, and striving for civil rights for all people.

18

7.    **DAI BAI ZAN CHO BO ZEN JI** is a Seattle temple in the Rinzai Zen Dharma line, and a diverse, welcoming community engaged in deep spiritual inquiry and caring action for the benefit of all beings, great and small, animate and inanimate. Our community engagement includes feeding programs, prison outreach, and ecumenical social justice advocacy through the Faith Action Network.

8.    **DHARMA HEART ZEN**, as members of the Soto Zen Buddhist Association, reject any attempt to oppress marginalized groups and treat them as outsiders who do not deserve the same rights, opportunities and respect as those in power. We are diverse in many ways-- sex, gender expression, race, ability, religion--and this is our greatest strength, a strength that should be celebrated. Marginalization, oppression, and rejection are the antithesis of Zen practice, and we oppose any attempts to make such behaviors law or national policy. We oppose the creation of a culture that deliberately normalizes marginalization, isolation or oppression of any group. We call for compassionate treatment of those who are marginalized and living in fear.

9.    **THE EPISCOPAL DIOCESE OF LONG ISLAND** The Episcopal Diocese of Long Island is composed of 129 congregations in Brooklyn, Queens, and Nassau and Suffolk counties. It encompasses the largest and most populous island in the continental United States, covering 1,400 square miles of rural farmlands, urban cityscapes, and everything in between. The people of this diocese are among the most diverse in the world, yet are united in their mission to serve the people of God in their midst.

10.    **THE EPISCOPAL DIOCESE OF NEW YORK** is comprised of over 180 Episcopal parishes throughout New York City and the Hudson Valley, as well as independent schools and Bard College. Our faith calls upon us to love God, to welcome the stranger, and to care for our neighbors. The Episcopal Diocese of New York is profoundly committed to Sanctuary and serving our immigrant community. We also have a presence at Columbia University, through our chaplain and through Columbia Canterbury, and minister to the student body there. We strive to elevate our local communities and repair our relationships with each other and the planet.

11.    **FAITHFUL AMERICA** is an online community of Christians putting faith into action for love and social justice. Faithful America is organizing the faithful to challenge Christian nationalism and white supremacy and to renew the church's prophetic role in building a more free and just society.

12.    **FIRST SPANISH UNITED METHODIST CHURCH (THE PEOPLE'S CHURCH)** is an historic Latino congregation (Puerto Rican in origin since 1922) that has been a community anchoring institution in East Harlem, known for the Young Lord's Takeover 50 years ago, when we were baptized with a nickname known in the community as "the People's Church." We still have close connections with the new generation of the Young Lords as a partner in community outreach and conscientization effort. FSUMC is committed to proclaiming and practicing the Gospel of Our Lord and Savior Jesus Christ for the transformation of the world to become a global village where peace and justice and shalom of God prevails. We are doing our part in our locality toward that vision and yearning of Jesus Christ. The Palestine liberation issue has been dear to many of the church

members and in our discussion and proclamation for some time, as we are a congregation
that has been historically committed to the liberation of Puerto Rico.

13.     **HEART CIRCLE ZEN** fosters the practice and study of Buddhism in the Soto Zen
tradition through meditation, study, services, koan practice, retreats and workshops. We
are committed to serving our communities and the world. All are welcome to join us.

14.     **HINDUS FOR HUMAN RIGHTS** advocates for pluralism, civil and human rights in
South Asia and North America, rooted in the values of our faith: shanti (peace), nyaya
(justice) and satya (truth). We provide a Hindu voice of resistance to all forms of bigotry
and oppression.

15.     **HOPEBUILDS, LLC** is a consultancy for communities, corporations, and congregations
eager to build the just and equitable worlds they imagine. The group, led by the Rev.Traci
Blackmon, engages in broad outreach and social justice advocacy, guided by Isaiah
6:8: *"Then I heard the voice of the Lord asking: Who will I send? Who will go for us? I
said: Here I am. Send me."*

16.     **IMMIGRATION LAW & JUSTICE NEW YORK** welcomes immigrants with
compassion, dignity, and love by providing free, high-quality legal services to low-income
and vulnerable immigrants, education to communities of faith and the public about the
immigration system, and advocacy for immigrant rights.

21

17.  **INTERFAITH CENTER OF NEW YORK (ICNY)** is a secular non-profit organization with a mission to overcome prejudice, violence, and misunderstanding by activating the power of the city's grassroots religious and civic leaders and their communities. Over the course of 25 years, ICNY has built the most religiously-diverse and civically-engaged network of grassroots and immigrant religious leaders across the five boroughs of Manhattan, Queens, Brooklyn, Staten Island and The Bronx. These include Muslim, Sikh, Hindu, Buddhist, Christian, Jewish, Afro Caribbean, and Native American New Yorkers who have either attended one or more of our social justice retreats, participated in our religious diversity education programs for social workers, teachers, lawyers, and NYPD officers, or joined multi-faith advocacy work on immigration and religious freedom.

18.  **JEWISH CENTER FOR JUSTICE** is a distinguished social justice, education, and leadership development platform that meets each individual where they are in their journey to inspire change.

19.  **JIKOJI ZEN CENTER** is a Soto Zen temple in the lineage of Kobun Chino Otogawa Roshi and located in the hills above Los Gatos, California. Kindness, mutual respect, and compassion are guiding principles.

20.  **MASJID AL HARAM**, also known as the Islamic Multicultural Center, is a Sunni mosque located in The Bronx, New York. The mosque provides a welcoming environment for its community, offering services like five daily prayers and special Jumu'ah prayers on Fridays. Overall, Al Haram Masjid serves as a vital place for worship and community gathering in The Bronx, focusing on inclusivity and spiritual connection.

21.    **MID-CITY ZEN** (New Orleans, LA) is a Soto Zen temple in the lineage of Suzuki Roshi.

22.    **NEW BIRTH MISSIONARY BAPTIST CHURCH** is a vibrant and rapidly growing ministry located in Stonecrest, Georgia. Dedicated to spreading the message of Jesus Christ, New Birth focuses on transforming lives through worship, fellowship, and community outreach. The church serves a diverse congregation committed to spiritual growth, social justice, and community service.

23.    **NEW JEWISH NARRATIVE** is a progressive American Jewish organization that works towards peace, justice, and a better future for Israelis and Palestinians alike.

24.    **NEW YORK STATE COUNCIL ON CHURCHES** is a New York Statewide organization which is committed to the promotion of religious freedom and human rights not only in New York but through out the United States and around the world. We fervently are committed to the rule of law, free speech and academic freedom.

25.    **OKC FIRST** is an Oklahoma City faith community that exists to retell, faithfully and courageously, God's Story of hope and redemption, embody and bear witness to the reality of Christ and His kingdom, be the voice of truth that dares to speak to power, make peace and bring people together in the light in the Resurrection. We are a strong faith and community presence supporting our neighbors through the Cole Community Center.

26.    **PAX CHRISTI NEW YORK STATE** was founded in 1983, and provides a community for Catholic New Yorkers where peacemaking is paramount within the context of their

23

faith.  It offers support, instruction, and inspiration.  Members include individuals and local groups centered in parishes or school campuses, lay people and vowed religious. PCMNY deeply values collaboration with members of other faith traditions and civic groups who share a commitment to non-violence, and actively seeks creative opportunities to work together for peace and justice.

27.    **PRESBYTERY OF NEW YORK CITY (PCUSA)** is a Presbyterian Church community comprised of 88 of the congregations and 11 fellowships and worshiping communities who make up 14,000 people gathering for the worship and service of God in the five boroughs of New York City. Our Mission is to embody God's gracious love in Jesus Christ through our ministries, our congregations, our partnerships, our service and witness, and our common life together. We proclaim God's Word and promote God's justice to all persons and in all places, public and private, throughout NYC.

28.    **RELIGIOUS NATIONALISMS PROJECT** is a national initiative designed to convene, educate, train, and mobilize faith communities in response to the rising threat of religious nationalisms in the United States.

29.    **RIVERSIDE CHURCH, NEW YORK CITY** is an interdenominational, interracial, international, open, welcoming, and affirming church and congregation. We seek to be a community of faith. Our members are united in the worship of God, known in Jesus, the Christ, through the inspiration of the Holy Spirit.  Our Mission is to serve God through word and witness; to treat all human beings as siblings; and to foster responsible stewardship of all God's creation. We have long history of advocating for peace and social

24

justice and have been a sanctuary church since 1984.Our motto:  Whoever you are: You are safe here. You are loved here. You are invited into full participation in our life together

30.    **St. Ann & the Holy Trinity Episcopal Church** (Brooklyn, New York) is a Christian house of worship and community gathering place for people of all faiths. We seek peace, pursue justice, and engage in loving service for the common good.

31.    **ST. MARY'S EPISCOPAL CHURCH, HARLEM** is an Episcopal parish serving the Manhattanville community. The parish commits to respect the dignity of every human being, is not afraid to practice what we preach, strive to choose to make peace and spread the way of love.

32.    **T'RUAH: The Rabbinic Call for Human Rights,** a coalition of many hundreds of rabbis, brings the Torah's ideals of human dignity, equality, and justice to life by empowering rabbis and cantors to be moral voices and to lead Jewish communities in advancing democracy and human rights for all people in the United States, Canada, Israel, and the occupied Palestinian territories.

33.    **UNION THEOLOGICAL SEMINARY** is deeply rooted in a critical understanding of the breadth of Christian traditions yet significantly instructed by the insights of other faiths. It makes connections between these traditions and the most profoundly challenging issues of our contemporary experience: the realities of suffering and injustice, world religious pluralism, the fragility of our planet, and discoveries of modern science.

34.     **UCC MOVEMENT FOR PALESTINIAN SOLIDARITY (UCC PIN)** is a grassroots network of UCC members working, whenever possible, in collaboration with the national ministries of the United Church of Christ. Gathered in the Spirit as a United Church of Christ Palestine/Israel Network (UCC PIN) we covenant together in prayer and bold action for a just peace to end the conflict in Palestine/Israel. We seek to educate and motivate our churches on the issues within Palestine/Israel. Our actions are guided by General Synod Resolutions, consultation reports, engagement with the Kairos Palestine Document and our personal experiences.  We strive to join in solidarity with our mission partners and with Jews, Christians, Muslims and others who are prophetic witnesses and risk takers for human rights, security, and a just peace in Palestine/Israel.

35.     **UPAYA ZEN CENTER** is a socially engaged Buddhist center in Santa Fe, New Mexico.

36.     **VILLAGE ZENDO** was founded in 1986 and is committed to authentically continuing the Zen tradition while keeping it contemporary and relevant to today's world. We are located in lower Manhattan, offering a place of healing and sanctuary in the midst of one of the world's busiest and most vital cities. Through its commitment to "Action," Village Zendo participates in refugee resettlement, prison ministry, and advocacy in support of equal justice.

26