UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

        *Petitioner*,

  v.

DONALD TRUMP et al.,

        *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

OPINION and ORDER

## Table of Contents

I.    **Background**

    A.    **The Facts**

    B.    **Procedural History**

        1.    **Immigration Court**

        2.    **Federal Court**

    C.    **The Motion**

II.  **The Court's Approach**

III. **Vagueness: Legal Principles**

IV.  **The Secretary of State's Determination**

V.   **Vagueness**

    A.    **Section 1227**

        1.    **The Relevant Part**

        2.    **Sources**

        3.    **Meaning**

    B.    **Other Countries**

        1.    **"Want of Proper Words"**

        2.    **Domestic Impact**

C.    **In Comparison**

    1.    **Precedent**

        **a)    Kolender**

        **b)    Akron**

        **c)    Cramp**

    2.    **The Counterargument**

    3.    **Implications**

D.    **History**

    1.    **Legislative History**

        a)    **Its Role**

        b)    **The Conference Report**

        c)    **The Prior Statute**

    2.    **Enforcement History**

E.    **Difficulty**

F.    **The First Amendment**

G.    **Another Approach**

H.    **Conclusion**

VI.    **Failure to Disclose**

VII.   **Remedy**

VIII.  **Conclusion**

\*        \*        \*

Federal officials detained a lawful permanent resident and seek to remove him from the United States for two reasons.

First, because his application for lawful permanent residence was allegedly inaccurate.

And second, because the Secretary of State has determined that his presence in the United States "compromise[s] a compelling . . . foreign policy interest."

The lawful permanent resident filed a habeas corpus petition, and has moved to preliminarily enjoin various federal officials --- arguing that the Constitution forbids them from removing him from the United States for either of the two cited reasons.

As to the first reason, the lawful permanent resident has not established a likelihood of success on the merits of his claim.

Therefore, his motion for a preliminary injunction is denied.

As to the second reason, the lawful permanent resident has established a likelihood of success on the merits.

But he has not put forward evidence as to the other things he must show to secure a preliminary injunction. The Court will now afford him a chance to do so.

*    *    *

I.    **Background**

    A.    **The Facts**

The relevant facts for now are as follows.

A lawful permanent resident[1] was arrested by federal officials. See Declaration of Amy E. Greer (ECF 11-1) ¶¶ 4-6; Second Supplemental Declaration of Acting Field Office Director William P. Joyce (ECF 72) ¶¶ 6-7.

He remains in immigration custody. See Petitioner's Amended Memorandum of Law in Support of Motion for Preliminary Injunctive Relief (ECF 124) ("Motion for Preliminary Injunction") at 1-2.

The Department of Homeland Security is seeking to remove him from the United States on two grounds.

The first ground:

To become a lawful permanent resident, a person must submit an application to federal officials. See 8 C.F.R. § 245.2(a)(3). The application has to be filled out "fully and accurately." U.S. Citizenship & Immigr. Servs., Instructions for Application to Register Permanent Residence or Adjust Status, https://perma.cc/RZ5K-N47Z (accessed on May 28, 2025) (page 5 of 42).

In 2024, the lawful permanent resident completed his lawful-permanent-resident application. See DHS Evidence, Tab 2 (Apr.

---

[1] Mahmoud Khalil. A lawful permanent resident is a person who has "been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws[.]" 8 U.S.C. § 1101(a)(20).

9, 2025) (Form I-485); <u>see</u> <u>also</u> Third Amended Petition ("Petition") ¶ 21.

But per federal officials, he did not accurately answer certain questions. <u>See</u> Additional Charges (Mar. 17, 2025).

This can be a basis for removal from the United States. <u>See</u> <u>id</u>.; <u>see</u> <u>also</u> 8 U.S.C. §§ 1182(a)(6)(C)(i), 1227(a)(1)(A).

The <u>second</u> ground for removal:

The Secretary of State determined that the lawful permanent resident's continued presence or activities in the United States would "compromise a compelling foreign policy interest." <u>See</u> Memorandum from Marco Rubio, Secretary of State, to Kristi Noem, Secretary of Homeland Security ("Determination") (ECF 198-1), at 1.[2]

Such a determination can also be a basis for removal. <u>See</u> 8 U.S.C. § 1227(a)(4)(C).

**B.    Procedural History**

There are two branches to this case.

Federal officials have brought removal proceedings in immigration court. And the lawful permanent resident has brought a habeas corpus case in federal court.

**1.    Immigration Court**

Removing a lawful permanent resident from the United States generally requires a hearing. <u>See</u> 8 U.S.C. § 1229a. Those typically go forward before an immigration judge. <u>See</u> <u>id</u>. § 1229a(a)(1); 8 C.F.R. § 1240.10(a).

Federal officials have begun removal proceedings against the Petitioner before an immigration judge.

The immigration judge has not ruled on the first ground, as to whether the lawful permanent resident can be removed based on the way he filled out the above-referenced application.

But she has ruled on the second ground, holding that the Petitioner can be removed from the United States based on the

---

[2]    The substance of the Secretary's determination is described in Part IV.

Secretary of State's determination.  <u>See</u> Audio Recording of Hearing (April 11, 2025) at 1:34:40 to 1:38:26.

## 2.  **Federal Court**

Separate from the above, the lawful permanent resident initiated his own proceedings.

He filed a habeas corpus petition in federal district court.

From here, he is called "the Petitioner."  The various people he named in his habeas petition are referred to, collectively, as "the Respondents."[3]

*    *    *

The Petitioner filed his suit in New York, but the case was transferred to New Jersey.  <u>See</u> <u>Khalil</u> v. <u>Joyce</u>, 2025 WL 849803 (S.D.N.Y. Mar. 19, 2025).

Here, the Respondents moved to dismiss the case, arguing that it should go forward only where the Petitioner has been in immigration custody --- Louisiana.  The motion was denied.  The Court held that habeas jurisdiction is proper in New Jersey. <u>See</u> <u>Khalil</u> v. <u>Joyce</u>, 2025 WL 972959 (D.N.J. Apr. 1, 2025).[4]

The Respondents also argued that jurisdiction was stripped from this Court under the Immigration and Nationality Act.  <u>See</u> Respondents' Opposition to Petitioner's Motion for a Preliminary Injunction ("Opposition Brief") (ECF 156) at 8-21.  The Court rejected this argument, holding that its habeas jurisdiction

---

[3]  The Respondents are listed in the current habeas petition as: President of the United States Donald Trump; Acting Field Office Director of New York, United States Immigration and Customs Enforcement, William P. Joyce; Warden of Elizabeth Contract Detention Facility Yolanda Pittman; Acting Director of United States Immigration and Customs Enforcement Caleb Vitello; Secretary of the United States Department of Homeland Security Kristi Noem; Secretary of the United States Department of State Marco Rubio; and Attorney General of the United States Pamela Bondi.

[4]  The Court certified its April 1 opinion and order under 28 U.S.C. § 1292(b), by an opinion dated April 4.  <u>See</u> <u>Khalil</u> v. <u>Joyce</u>, 2025 WL 1019658, at *2 (D.N.J. Apr. 4, 2025).  On May 6, the Third Circuit denied the petition to appeal.  <u>See</u> <u>Khalil</u> v. <u>President U.S.</u>, No. 25-08019 (3d Cir. May 6, 2025).

5

remains intact.  <u>See</u> <u>Khalil</u> v. <u>Joyce</u>, 2025 WL 1232369 (D.N.J. Apr. 29, 2025).[5]

Finally, the Respondents moved to dismiss or transfer this case for lack of venue.  The briefing was completed as of May 5, and the motion was denied that day.  <u>See</u> ECF 248.

> **C.**  <u>**The Motion**</u>

As noted, the Petitioner has moved for a preliminary injunction. <u>See</u> ECF 66.

The motion became fully submitted on May 14, with the filing of the parties' final legal brief.  <u>See</u> ECF 255.

The Petitioner's motion is based on two arguments.

First, the Petitioner claims that the efforts to remove him are retaliation for his exercise of First Amendment-protected speech.  <u>See</u> Motion for Preliminary Injunction at 10-18.

And second, he argues that the efforts to remove him violate the Due Process Clause, because they are rife with unconstitutional "vagueness."  <u>See</u> <u>id</u>. at 23-31.

The Petitioner's motion is before the Court.

**II.**  <u>**The Court's Approach**</u>

Federal officials, as noted, are seeking to remove the Petitioner from the United States on two grounds, <u>see</u> Part I.A., and the Petitioner's motion aims to enjoin them from doing so. <u>See</u> Part I.C.

*    *    *

The Court <u>first</u> considers whether the underlying federal statutes are unconstitutionally vague as they are being applied to the Petitioner by means of the Secretary of State's determination.  <u>See</u> Motion for Preliminary Injunction at 23-31.

---

[5]  On April 30, the Respondents moved to certify the April 29 opinion under 28 U.S.C. § 1292(b).  <u>See</u> ECF 218.  The Petitioner opposed the motion.  <u>See</u> ECF 221.  On May 1, the Court issued an opinion denying certification.  <u>See</u> <u>Khalil</u> v. <u>Joyce</u>, 2025 WL 1262349, at *2 (D.N.J. May 1, 2025).

As to this argument, the Court lays out the governing legal principles, see Part III, and then describes the Secretary's determination. See Part IV.

From there, the Court provides its conclusion: the Petitioner is likely to succeed[6] on the merits of this unconstitutional vagueness argument. See Part V.

But this does not entitle him to a preliminary injunction. He has not put before the Court evidence as to the various other things he must prove, see footnote 6, before an injunction might issue. See Part VII. The Court will give the Petitioner a chance to quickly fill out the record, and for the Respondents to then weigh in. See id.

\*    \*    \*

The Court also considers what it understands to be[7] the Petitioner's second argument: that he cannot be removed from the United States based on his alleged failure to accurately fill out his lawful-permanent-resident application --- because the effort to remove him flows from an allegedly unconstitutional policy established by the President and his senior advisors.

The Court's conclusion: this argument is not meaningfully developed, and the Petitioner therefore has not carried his burden of showing that he is likely to succeed on the merits. Accordingly, an injunction may not issue. See Part VI.

\*    \*    \*

Start off, just below, with the legal principles that govern the Petitioner's void-for-vagueness challenge to the Secretary of State's determination that he should be removed from the United States.

---

[6] The focus throughout is on likely success, not success. This is because to win on his preliminary injunction motion, the Petitioner must show "he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (emphasis added). The first two factors are "the most critical." Nken v. Holder, 434 U.S. 418, 434 (2009).

[7] "Understands to be" because, as noted in Part VI, the argument on this point is not crystal clear.

## III. **Vagueness: Legal Principles**

Our laws are required to strike a balance.

A law cannot be so narrow that it punishes pre-selected people. Think, for example, of the Constitution's limit on bills of attainder.  See U.S. Const., art. I, § 9, cl. 3; Cummings v. Missouri, 71 U.S. 277 (1866).

And at the same time, a law cannot be so broad that it covers just about anyone.  See United States v. Reese, 92 U.S. 214, 221 (1875).

A given law needs clarity, too.

The rule of lenity,[8] for example, helps to ensure that our criminal laws are exacting.  See, e.g., Liparota v. United States, 471 U.S. 419, 427 (1985).

Constitutional vagueness doctrine is animated by each of these concerns.

The scope of a law matters for vagueness doctrine.  And so does how clear it is.

Take clarity first.

Vagueness doctrine requires that a law be clear enough to provide real notice --- understandable guidance as to the conduct a person should steer himself away from, to avoid the negative consequence the law lays out.

This sort of guidance "guarantees that ordinary people have fair notice of the conduct a statute proscribes." Sessions v. Dimaya, 584 U.S. 148, 155-56 (2018) (cleaned up).

And this "guarantee" is a matter of constitutional law.  Why? Because "[v]ague laws contravene the first essential of due process of law that statutes must give people of common

---

[8]  "The judicial doctrine holding that a court, in construing an ambiguous criminal statute that sets out multiple or inconsistent punishments, should resolve the ambiguity in favor of the more lenient punishment."  Rule of Lenity, Black's Law Dictionary (12th ed. 2024).

intelligence fair notice of what the law demands of them."
<u>United States</u> v. <u>Davis</u>, 588 U.S. 445, 451 (2019) (cleaned up).[9]

Vagueness doctrine zeros in on a <u>second</u> concern, too.

It aims to cut off laws that are so broad, or so fuzzy, that
they end up warping the separation of powers --- by handing over
de facto responsibility for deciding what the law forbids from
legislators (who are supposed to be the ones making the law) to
executive officials like police or prosecutors (who are only
supposed to be enforcing it).[10]

---

[9] <u>See also</u>, <u>e.g.</u>, <u>City of Chi.</u> v. <u>Morales</u>, 527 U.S. 41, 58
(1999) ("[T]he purpose of the fair notice requirement is to
enable the ordinary citizen to conform his or her conduct to the
law."); <u>Gentile</u> v. <u>State Bar of Nev.</u>, 501 U.S. 1030, 1077-78
(1991) ("The void-for-vagueness doctrine is concerned with a
defendant's right to fair notice and adequate warning that his
conduct runs afoul of the law."); <u>Grayned</u> v. <u>City of Rockford</u>,
408 U.S. 104, 108 (1972) ("[W]e insist that laws give the person
of ordinary intelligence a reasonable opportunity to know what
is prohibited, so that he may act accordingly."); <u>Rabe</u> v.
<u>Washington</u>, 405 U.S. 313, 315 (1972) ("To avoid the
constitutional vice of vagueness, it is necessary, at a minimum,
that a statute give fair notice that certain conduct is
proscribed."); <u>Papachristou</u> v. <u>City of Jacksonville</u>, 405 U.S.
156, 162 (1972) ("[A vague law] fails to give a person of
ordinary intelligence fair notice that his contemplated conduct
is forbidden by the statute.") (cleaned up); <u>Jordan</u> v. <u>De
George</u>, 341 U.S. 223, 230 (1951) ("The essential purpose [of
vagueness doctrine] . . . is to warn individuals of the . . .
consequences of their conduct."); <u>Connally</u> v. <u>Gen. Constr. Co.</u>,
269 U.S. 385, 391 (1926) ("[A] statute which either forbids or
requires the doing of an act in terms so vague that men of
common intelligence must necessarily guess at its meaning and
differ as to its application violates the first essential of due
process of law.").

[10] <u>See</u>, <u>e.g.</u>, <u>Davis</u>, 588 U.S. at 451 ("Vague statutes threaten
to hand responsibility for defining crimes to relatively
unaccountable police, prosecutors, and judges, eroding the
people's ability to oversee the creation of the laws they are
expected to abide."); <u>Kolender</u> v. <u>Lawson</u>, 461 U.S. 352, 358
(1983) ("Where the legislature fails to provide . . . minimal
guidelines, a criminal statute may permit a standardless sweep
that allows policemen, prosecutors, and juries to pursue their

This blurring of law-making power with law-enforcing power can be an "invit[ation] [to] arbitrary enforcement," because it can leave executive officials "free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case[.]" Beckles v. United States, 580 U.S. 256, 266 (2017) (cleaned up).[11]

In a nutshell: a concern for notice to "ordinary people," and a concern for subjecting government power to crisply drawn and "fixed" standards --- these are the two main engines of constitutional vagueness doctrine.

*    *    *

Take up the details of vagueness doctrine as they come up.

For now, two last things.

*    *    *

First, how vague a law can be depends on the kind of law it is.

Civil laws that deal mainly with economic matters take the lowest rung on the ladder.

---

personal predilections.") (cleaned up); cf. Reese, 92 U.S. at 221 ("[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained," and "[t]his would . . . substitute the judicial for the legislative department of the government"). Vague laws can also sometimes transfer lawmaking power to other actors, too. Juries and judges, for example. See, e.g., Beckles v. United States, 580 U.S. 256, 266 (2017); Johnson v. United States, 576 U.S. 591 (2015); see also Louisville & N. R. Co. v. R.R. Comm'n of Tenn., 19 F. 679, 691 (C.C.M.D. Tenn. 1884); Ex Parte Jackson, 45 Ark. 158, 164 (1885).

[11] See, e.g., Johnson, 576 U.S. at 595 (due process is violated when a law is "so standardless that it invites arbitrary enforcement"); Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498 (1982) ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.") (cleaned up); Smith v. Goguen, 415 U.S. 566, 572-73 (1974) (vagueness doctrine "requires legislatures to set reasonably clear guidelines for law enforcement and triers of fact in order to prevent arbitrary and discriminatory enforcement") (cleaned up).

As to these sorts of laws, vagueness doctrine is not especially demanding.  See, e.g., Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 499 (1982); Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 48-49 (1966); United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 34-35 (1963).

The next level up: criminal laws.

These get a much harder look from a vagueness perspective.  See, e.g., City of Chi. v. Morales, 527 U.S. 41, 56 (1999); Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 525 (1994); Kolender v. Lawson, 461 U.S. 352, 357 (1983); Papachristou v. City of Jacksonville, 405 U.S. 156, 165-66 (1972); Lanzetta v. New Jersey, 306 U.S. 451, 453 (1939).

And critically: this is also the category for immigration laws that can trigger removal from the United States, laws like the ones the Secretary of State's determination is based on.  See Dimaya, 584 U.S. at 156-57 (citing Jordan v. De George, 341 U.S. 223, 229, 231 (1951)).

Up at the top --- arguably vague laws that touch on First Amendment-protected rights.

These must meet the most exacting vagueness standards.  See, e.g., FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253-54 (2012); Smith v. Goguen, 415 U.S. 566, 573 (1974); Baggett v. Bullitt, 377 U.S. 360, 372 (1964); Cramp v. Bd. of Pub. Instruction of Orange Cnty., 368 U.S. 278, 287 (1961); Winters v. New York, 333 U.S. 507, 518 (1948).

                    *    *    *

A second point, the final one for now.

Vagueness challenges to a law run down one of two tracks.  There are facial challenges, and there are "as applied" challenges. See generally 32 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Judicial Review § 8141 (2d ed. 2025).

A facial challenge is about the law as it might be applied to everyone (or nearly everyone).

An as-applied challenge is about the law as it actually applies to the person who brings the challenge.

To win on a facial challenge, a person must show that a law is vague in all of its applications (or at least in a great many of

them).  See id.; Johnson v. United States, 576 U.S. 591, 595-96, 602-03 (2015); Hoffman Ests., 455 U.S. at 495.

To win on an as-applied challenge, a person must show that a law is vague in the way that it is being applied to him.  See Fed. Prac. & Proc. Judicial Review § 8141 n.13 (collecting cases).

* * *

More on the law as it comes.

Turn now to a description of the Secretary of State's determination.

## IV.  **The Secretary of State's Determination**

As noted, under 8 U.S.C. § 1227(a)(4)(C), a foreign national may be removed from the United States based on a determination from the Secretary of State.

Such determinations must meet higher standards when they are based on a foreign national's "otherwise lawful" "beliefs, statements, or associations."  See 8 U.S.C. § 1182(a)(3)(C)(iii).

Those higher standards have a procedural aspect and a substantive aspect.

As to procedure, the Secretary's determination must be (a) made by him personally and (b) reported to certain congressional leaders.  See id. §§ 1182(a)(3)(C)(iii), 1182(a)(3)(C)(iv).

As to substance, the Secretary must determine that the foreign national's "presence or activities" in the United States "would compromise a compelling United States foreign policy interest." Id. §§ 1227(a)(4)(C)(i), 1182(a)(3)(C)(iii).

* * *

Here, the Secretary of State's determination came in the form of a memorandum.  See Determination at 1.

In it, the Secretary referenced the higher standard.  See Determination at 1 ("Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.").

And in the memo, the Secretary seemed to apply the higher standard.  See id. ("I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.").

In short: the higher standard is the one that is invoked here.[12]

*     *     *

The Secretary determined that the Petitioner undertook activities within the United States.[13]

The effects of these activities, the Secretary determined, were felt inside the United States.[14]

---

[12]  Two things.  First, 8 U.S.C. § 1227(a)(4)(C) became law in 1990.  Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat 4978.  But until 1996, it was in a different place in Title 8 of the United States Code --- not in Section 1227, as it is now; but in Section 1251.  See 8 U.S.C. § 1251(a)(4)(C)(i) (1995); see also Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat 3009 (moving the provisions).  And second, the higher standard that is relevant here is in its own corner of Title 8.  It is at Section 1182.  For ease of reference, throughout this Opinion and Order the Court refers collectively to (a) Section 1227(a)(4)(C), (b) the former Section 1251, and (c) the relevant subsections of Section 1182 --- as "Section 1227."

[13]  The Secretary's determination described the Petitioner's "participation and role[] . . . in antisemitic protests and disruptive activities," and the Petitioner's "public actions . . . in the United States."  Determination at 2.

[14]  Per the determination, the Petitioner's activities "fostered a hostile environment for Jewish students in the United States," and the Petitioner's "continued presence . . . in the United States undermine[s] U.S. policy to combat anti-Semitism . . . in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States." Id.

The Secretary determined that these activities also had an impact outside of the United States.[15]   See id.

The full determination is at Appendix A.  The substantive part is this:

> I have determined that the activities and presence of [the Petitioner] in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.  Th[is] determination[] [is] based on information provided by the DHS/ICE/HIS regarding the participation and role[] of . . . [the Petitioner] in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States. . . .  The public actions and continued presence of . . . [the Petitioner] in the United States undermine[s] U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States.  Consistent with E.O. 14150,[16] America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

Id. at 1-2.

---

[15]  The Secretary determined that "[t]he public actions and continued presence" of the Petitioner "undermine[s] U.S. policy to combat anti-Semitism around the world."  Id.

[16]  This is a reference to Executive Order 14,150, issued by the President on January 20, 2025.  It is attached as Appendix B.

## V.    <u>Vagueness</u>

Is the Petitioner likely to succeed on the merits of his claim that Section 1227,[17] applied to him through the Secretary's determination, is unconstitutionally vague?

The Court's conclusion: yes.

This Part explains why.

### A.    <u>Section 1227</u>

#### 1.    <u>The Relevant Part</u>

At the core of any constitutional vagueness claim is the argument that a law is doubly flawed.

It does not put the ordinary person on notice as to what is allowed and what is not.  <u>See</u> Part III.

And it does not delineate the power of the government sharply enough.  <u>See</u> <u>id</u>.

Here, Section 1227 is the statute that is claimed to be vague. <u>See</u> Petitioner's Supplemental Vagueness Brief (ECF 233) ("Petitioner's Supplemental Brief") at 15.

But not all parts of Section 1227 matter for a vagueness analysis.

Some parts speak to <u>how</u> a removal might go forward --- removal happens, in cases like this one, via a "personal" determination by the Secretary of State.  <u>See</u> Part IV.

Other parts of the statute speak to <u>what</u> a person might do to potentially get himself removed --- "compromise a compelling United States foreign policy interest."  <u>See</u> <u>id</u>.

Only the latter piece of Section 1227 is relevant to the vagueness analysis.

Why?

Because only "compromise a compelling . . . foreign policy interest" purports to give a foreign national the notice that vagueness law requires.

---

[17]  Recall that this is shorthand for a set of laws.  <u>See</u> footnote 12.

And because only "compromise a compelling . . . foreign policy interest" purports to bolt on substantive guardrails --- outer-edge limits on the space in which an official (here, the Secretary) is free to act.

What notice does "compromise a compelling . . . foreign policy interest" supply to the ordinary person?  What limits do the quoted words put on who the Secretary can remove?[18]

Move through a set of sources, to see where the answer to these questions might come from.

## 2. <u>Sources</u>

Section 1227 is a statute, and to know what a statute conveys, the first stop is always the same: a look to its words.  <u>See</u>, <u>e.g.</u>, <u>Sw. Airlines Co.</u> v. <u>Saxon</u>, 596 U.S. 450, 457 (2022) ("As always, we begin with the text."); <u>accord</u>, <u>e.g.</u>, <u>Consumer Prod. Safety Comm'n</u> v. <u>GTE Sylvania, Inc.</u>, 447 U.S. 102, 108 (1980); <u>Touche Ross & Co.</u> v. <u>Redington</u>, 442 U.S. 560, 568 (1979).

Vagueness law is no exception.

To understand both the heads-up that a law gives to a "person of ordinary intelligence," <u>Papachristou</u>, 405 U.S. at 162, and the extent to which a law crisply hems in the power of government officials, the words of the statute are the place to start.  <u>See</u> <u>Dimaya</u>, 584 U.S. at 164; <u>Holder</u> v. <u>Humanitarian L. Project</u>, 561

---

[18]  The notice question and the enforcement-power question often run together.  If an ordinary person needs to guess at what a law means, government enforcers may need to guess, too.  <u>Cf</u>. <u>Winters</u>, 333 U.S. at 519 (it would be "utter[ly] impossib[le] [for] the actor <u>or</u> the trier to know where this . . . standard of guilt would draw the line") (emphasis added).  And more notice often means tighter limits on what the government can do.  To see the point, imagine if Section 1227 were tweaked --- if it said a person could be removed only for "compromising a compelling foreign policy interest related to nuclear weapons." The hypothesized change adds specificity, which improves notice.  And the change also tightens the range of who can be removed, which trims back executive discretion.  Removal "related to nuclear weapons" rings a clearer warning bell.  And it also limits the Secretary to nuclear-related removals.  In a nutshell: notice and limits on government power are often yoked together, pulling in the same direction.  (Not always, though.  <u>See</u>, <u>e.g.</u>, footnote 20.)

U.S. 1, 20-21 (2010); <u>Morales</u>, 527 U.S. at 56-59; <u>Posters 'N' Things</u>, 511 U.S. at 525-26.

But they are not usually the place to finish.

This is because, for the purposes of vagueness law, sources outside the statutory text are also relevant.

But walk through the usual outside-the-text sources here, and it becomes clear that they have no role to play in this case, with one exception.

*    *    *

<u>First</u>, courts look to prior judicial decisions that interpret the statute.  Precedents might have clarified the statute, or whittled it back.  <u>See</u>, <u>e.g.</u>, <u>Johnson</u>, 576 U.S. at 601; <u>Skilling</u> v. <u>United States</u>, 561 U.S. 358, 407-08 (2010); <u>Grayned</u> v. <u>City of Rockford</u>, 408 U.S. 104, 111-12 (1972); <u>United States</u> v. <u>Loy</u>, 237 F.3d 251, 263 (3d Cir. 2001).

But that is irrelevant here.

Section 1227 has been meaningfully analyzed by a federal court only once --- by Judge Barry, when she sat on this Court.  <u>See</u> <u>Massieu</u> v. <u>Reno</u>, 915 F. Supp. 681, 699-703 (D.N.J. 1996), <u>rev'd on other grounds</u>, 91 F.3d 416 (3d Cir. 1996).

Judge Barry did not impose any interpretation on Section 1227.  <u>See</u> <u>id</u>. at 703.

Rather, she simply struck it down as unconstitutionally vague --- across the board, on its face.  <u>See</u> <u>id</u>.[19]

*    *    *

<u>Second</u>, courts look to the ways in which prior interpretations by administrative tribunals have molded a statute's meaning.  <u>See</u>, <u>e.g.</u>, <u>Fox Television Stations</u>, 567 U.S. at 254-55; <u>U.S. Civ. Serv. Comm'n</u> v. <u>Nat'l Ass'n of Letter Carriers, AFL-CIO</u>, 413 U.S. 548, 572 (1973); <u>see also</u> <u>Alphonsus</u> v. <u>Holder</u>, 705 F.3d 1031, 1043 (9th Cir. 2013), <u>abrogated on other grounds by</u> <u>Guerrero</u> v. <u>Whitaker</u>, 908 F.3d 541 (9th Cir. 2018); <u>Miranda</u> v. <u>U.S. Att'y Gen.</u>, 632 F. App'x 997, 999 (11th Cir. 2015); <u>Hess</u> v.

---

[19]  The Petitioner has specifically stated that he is not pursuing a facial vagueness challenge.  <u>See</u> Motion for Preliminary Injunction at 29 n.27.  Rather, his is an as-applied challenge only.  <u>See</u> <u>id</u>. at 23-24; <u>see</u> <u>generally</u> Part III.

17

Bd. of Parole & Post-Prison Supervision, 514 F.3d 909, 914 (9th Cir. 2008).

But there is no real administrative case law to lean on here.

In 1999, the Board of Immigration Appeals, the top administrative court in this area, held that a Secretary of State's Section 1227 determination is conclusive.  See In re Ruiz-Massieu, 22 I. & N. Dec. 833, 842 (BIA 1999).  An immigration judge must take the determination at face value, without further analysis.  See id.

That nipped in the bud the development of any potentially clarifying administrative case law.

\*     \*     \*

Third, courts thinking through vagueness challenges look to administrative regulations that might clarify a statute's meaning and limit the sorts of actions the government can take. See, e.g., Northstar Wireless, LLC v. FCC, 38 F.4th 190, 216 (D.C. Cir. 2022); United States v. Blaszczak, 947 F.3d 19, 40 (2d Cir. 2019), cert. granted, judgment vacated sub nom. Olan v. United States, 141 S. Ct. 1040 (2021); Wis. Res. Prot. Council v. Flambeau Mining Co., 727 F.3d 700, 708 (7th Cir. 2013); United States v. McAusland, 979 F.2d 970, 975 (4th Cir. 1992).

But again: nothing like that on the table.

No regulation, for example, lists the broad categories of "foreign policy interests" that could trigger a Section 1227 removal, or spells out criteria for what might count as "compelling."

\*     \*     \*

Fourth, courts in vagueness cases sometimes look to guidance materials --- a manual posted online, for example, can provide a heads-up as to how the government might be looking to enforce a particular statute.  See, e.g., FTC v. Wyndham Worldwide Corp., 799 F.3d 236, 257-58 & nn.22-24 (3rd Cir. 2015); accord, e.g., Carman v. Yellen, 112 F.4th 386, 404 (6th Cir. 2024); Cal. Pac. Bank v. FDIC, 885 F.3d 560, 571-72 (9th Cir. 2018) (as to

interpretative materials, such as policy statements, agency manuals, etc.).[20]

But there is no public manual, or anything else of the kind, that sheds light on when the Secretary of State might opt to use his Section 1227 power.

\*    \*    \*

Fifth, courts ask if the statute uses technical words.  See, e.g., Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926); Hygrade Provision Co. v. Sherman, 266 U.S. 497, 502 (1925); Omaechevarria v. Idaho, 246 U.S. 343, 348 (1918).  Or well-understood legal terms, like phrases pulled in from the common law.  See, e.g., Cameron v. Johnson, 390 U.S. 611, 616 n.7 (1968); Winters, 333 U.S. at 519; Mahler v. Eby, 264 U.S. 32, 40 (1924); accord, e.g., United States v. Nason, 269 F.3d 10, 22 (1st Cir. 2001); Jellum v. Cupp, 475 F.2d 829, 831 (9th Cir. 1973).

"Public interest," for example, might sound impossibly open-ended.  See FCC v. RCA Commc'ns, 346 U.S. 86, 90-91 (1953) (discussing the term).  But decades of judicial precedent have defined it, see id. --- and so in some cases, with the common law meaning read into the statute, "public interest" can pass a vagueness test.  See, e.g., N.Y. Cent. Sec. Corp. v. United States, 287 U.S. 12, 25 (1932) (taking this approach).

But none of this is in the mix here.

"Foreign policy interest" is not a legal term of art.  Neither is "compromise."

"Compelling" often comes up in constitutional law.  See, e.g., Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 532 (2022); Fisher v. Univ. of Tex. at Austin, 570 U.S. 297, 314-15 (2013).

---

[20]  Guidance materials provide potential notice --- they help "ordinary people," Morales, 527 U.S. at 64, see what the government might do.  But they do not generally purport to constrain government power by limiting what it can do.  So when it comes to guidance materials, notice and power do not travel together.  Guidance supplies notice.  But it does not provide an equal measure of constraint on the scope of government power.  Cf. footnote 18.

But Section 1227 does not import the constitutional law meaning of "compelling."[21]

\*    \*    \*

Sixth, federal courts routinely look to legislative history to decide whether a particular statute is too vague.[22]

And in this case, both the Petitioner and the Respondents direct the Court to Section 1227's legislative history.  See

---

[21]  In constitutional law, "compelling" indicates which interests (ends) the government must be pursuing for an action to have a chance to make it past the means-ends gauntlet ("narrowly tailored") required by the doctrine of strict scrutiny.  See, e.g., Kennedy, 597 U.S. at 532; Fisher, 570 U.S. at 314-15.  A campaign-finance law that triggers strict scrutiny might clear the hurdle if it aims to achieve the compelling interest of battling overt corruption.  But not if its goal is a non-compelling interest, like evening out resources between candidates.  "Compelling," in short, matters in constitutional law because it defines the subset of government interests that can be invoked to try to justify certain government actions.  But here, there is no need to pick an interest.  Congress has done that.  Section 1227 says it: a "foreign policy interest."  In Section 1227, therefore, "compelling" is not shorthand for those interests that, as in constitutional law, might be important enough to allow for certain government actions.  Rather, "compelling" in Section 1227 is simply an adjective that modifies an already selected interest, a "foreign policy interest."

[22]  See Davis, 588 U.S. at 459-60; Nat'l Dairy Prods. Corp., 372 U.S. at 32-34; United States v. Harriss, 347 U.S. 612, 620-21 (1954); Boyce Motor Lines v. United States, 342 U.S. 337, 341-42 (1952); see also Gougen, 415 U.S. at 582 n.30; Kahn v. United States, 753 F.2d 1208, 1222 n.8 (3d Cir. 1985); accord, e.g., CPR for Skid Row v. City of L.A., 779 F.3d 1098, 1108 (9th Cir. 2015); United States v. Rybicki, 354 F.3d 124, 132-37 (2d Cir. 2003); United States v. Colon-Ortiz, 866 F.2d 6, 11 (1st Cir. 1989); United States v. Ocegueda, 564 F.2d 1363, 1365 (9th Cir. 1977); cf. Skilling, 561 U.S. at 404-05; United States v. Powell, 423 U.S. 87, 91 (1975); Nat'l Ass'n of Letter Carriers, 413 U.S. at 571-72; but see United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 83-84 (1932); Fleuti v. Rosenberg, 302 F.2d 652, 657 (9th Cir. 1962).

Petitioner's Supplemental Brief at 18-19; Respondents' Supplemental Vagueness Brief (ECF 256) ("Respondents' Supplemental Brief") at 5-7.

Here, the legislative history sheds light on how an ordinary person might understand Section 1227.  That is taken up below, in Part V.D.1.

*    *    *

In sum:

Courts can often draw on outside-the-text sources as part of a vagueness analysis.

These sources can provide notice.  And they can limit government enforcement discretion.

But with the exception of legislative history, none of this is in play here.  As to Section 1227, there are no relevant judicial or administrative decisions, regulations, guidance materials, or borrowed technical or legal terms.

Therefore, the statute mostly stands alone.

Move now to an analysis of its meaning.

###    3.    Meaning

A statute's words are generally given their "ordinary meaning." See New Prime Inc. v. Oliveira, 586 U.S. 105, 113 (2019); Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 207 (1997); Perrin v. United States, 444 U.S. 37, 42 (1979); Caminetti v. United States, 242 U.S. 470, 485-86 (1917).

And for an objective, down-the-middle understanding of ordinary meaning, courts typically do what everyone else does --- they reach for the dictionary.  See, e.g., Wis. Bell, Inc. v. United States ex rel. Heath, 145 S. Ct. 498, 505 (2025); Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 567-69 (2012); Reiter v. Sonotone Corp., 442 U.S. 330, 338 (1979); Eisner v. Macomber, 252 U.S. 189, 207 (1920); Osborne v. S.D. Land & Town Co., 178 U.S. 22, 38 (1900); Fanning v. Gregoire, 57 U.S. 524, 525 (1853); United States v. Tenbroek, 15 U.S. (2 Wheat.) 248, 251-52 (1817).

Vagueness doctrine works the same way.

Courts thinking through vagueness questions start with the words of the statute.  See Dimaya, 584 U.S. at 160-61; Johnson, 576

U.S. at 597; <u>Holder</u>, 561 U.S. at 20–21; <u>United States</u> v. <u>Williams</u>, 553 U.S. 285, 306 (2008); <u>Morales</u>, 527 U.S. at 56–59; <u>Posters 'N' Things</u>, 511 U.S. at 525–26; <u>Hoffman Ests.</u>, 455 U.S. at 500; <u>Coates</u> v. <u>City of Cincinnati</u>, 402 U.S. 611, 614 (1971).

And they rely on dictionaries to find the "ordinary meaning" of the statute's words, <u>Oliveira</u>, 586 U.S. at 113, so as to land on a sense of what "ordinary people," <u>Johnson</u>, 576 U.S. at 595, would take from them.[23]

The Supreme Court has taken this approach. <u>See</u>, <u>e.g.</u>, <u>Holder</u>, 561 U.S. at 23–24 (reasoning from a statute's dictionary definition in a vagueness case); <u>Hoffman Ests.</u>, 455 U.S. at 501-02 (same). And so has the Third Circuit. <u>See</u> <u>CMR D.N. Corp.</u> v. <u>City of Phila.</u>, 703 F.3d 612, 632 (3d Cir. 2013) (same); <u>United States</u> v. <u>Maurer</u>, 639 F.3d 72, 78 (3d Cir. 2011) (same).

\*    \*    \*

Against this backdrop, recall that the relevant part of Section 1227 is the piece that says a foreign national can be removed if he has "compromise[d] a compelling United States foreign policy interest." <u>See</u> Part V.A.1.

Zoom in on two of these words: "foreign policy."

One current[24] definition of "foreign policy": "the underlying basic direction of the activity and relationships of a sovereign

---

[23] When a statute defines a word, the statute's definition is plugged in, not a dictionary's. <u>See</u>, <u>e.g.</u>, <u>Holder</u>, 561 U.S. at 20-21. Section 1227's key words for vagueness purposes are "compromise," "compelling," and "foreign policy interests." <u>See</u> Part V.A.1. But the statute does not define them.

[24] The law generally asks about a statute's meaning at the time it was enacted. <u>See</u> <u>Niz-Chavez</u> v. <u>Garland</u>, 593 U.S. 155, 160 (2021); <u>Bostock</u> v. <u>Clayton Cnty.</u>, 590 U.S. 644, 654 (2020); <u>Tanzin</u> v. <u>Tanvir</u>, 592 U.S. 43, 48 (2020); <u>Oliveira</u>, 586 U.S. at 113. Time-of-enactment dictionaries help with that work. <u>See</u> <u>Delaware</u> v. <u>Pennsylvania</u>, 598 U.S. 115, 128 (2023); <u>Wis. Cent. Ltd.</u> v. <u>United States</u>, 585 U.S. 274, 277-78 (2018); <u>see also</u> <u>Khalil</u>, 2025 WL 1232369, at \*8-9; <u>Khalil</u>, 2025 WL 972959, at \*17. But here, things may be more complicated. Recall vagueness doctrine's two underlying concerns. One is ensuring that the government's enforcement discretion under a statute is appropriately delineated. <u>See</u> <u>Kolender</u>, 461 U.S. at 358;

state in its interaction with other sovereign states typically manifested in peace, war, neutrality, and alliance or various combinations of or approaches to these."  Foreign Policy, n., Merriam-Webster's Unabridged Dictionary (2025).

Another current definition: "the policies of a government regarding relations with other countries."  Foreign Policy, n., Collins English Dictionary (2025).

And some others.

"The diplomatic policy of a nation in its interactions with other nations."  Foreign Policy, n., New American Heritage Dictionary of the English Language (5th ed. 2022).

"[A] government's strategy in dealing with other nations." Foreign Policy, n., New Oxford American Dictionary (3d ed. 2015).[25]

---

Papachristou, 405 U.S. at 162.  That starts off with this question: what is the government's enforcement discretion under the statute?  That is mainly a statutory interpretation question.  And for Section 1227, that question turns to an extent on the meaning of the statute when it was passed, in 1990.  But vagueness doctrine also focuses on notice to ordinary people.  And that could conceivably require a different focus. Not on the meaning of the law when it was passed.  But rather on what the law was taken to mean when the Petitioner allegedly acted --- here, seemingly in 2023 to 2025.  All of this may suggest that the Court should look to two sets of dictionaries. To circa-1990 dictionaries, to get a handle on the precise scope of the power Section 1227 gave to the government when the law was passed.  And to present-day dictionaries, from around 2023 to 2025, to understand the notice the Petitioner would have taken from Section 1227.  But there is no need to wade into this issue here.  The reason why: there is no meaningful difference between "foreign policy" as it is understood today and as it was understood around 1990.  See footnotes 25, 26, and 27.

[25]  Dictionaries from around 1990 turn up the same basic meaning. Foreign Policy, n., Webster's Third New International Dictionary of the English Language, Unabridged 889 (1993) ("the underlying basic direction of the activity and relationships of a sovereign state in its interaction with other sovereign states typically manifested in peace, war, neutrality, alliance or various combinations or approaches to these"); Foreign Policy, n.,

What all of this adds up to: in everyday English, what we mean by a country's "foreign policy" is its approach to <u>other countries</u>.

                    *    *    *

Now kick the tires on this reading by breaking up "foreign policy" into its component parts.

Start from the back end.  "Policy" means "[a] principle or course of action adopted or proposed as desirable, advantageous, or expedient; esp. one formally advocated by a government, political party, etc."  <u>Policy</u>, n., sense I.4, <u>Oxford English Dictionary</u> (2025); <u>accord</u>, <u>e.g.</u>, <u>Policy</u>, n., sense 5.a, <u>Merriam-Webster's Unabridged Dictionary</u> (2025); <u>Policy</u>, n., <u>New Oxford American Dictionary</u> (3d ed. 2015).[26]

As to "foreign," that means "[d]ealing with matters concerning other countries[.]"  <u>Foreign</u>, adj., sense II.9.a, <u>Oxford English Dictionary</u> (2022); <u>accord</u>, <u>e.g.</u>, <u>Foreign</u>, adj., sense 5, <u>Merriam-Webster's Unabridged Dictionary</u> (2025) ("related to or dealing with other nations"); <u>Foreign</u>, adj., sense 3, <u>Brittanica Dictionary</u> (2025) ("relating to or dealing with other nations"); <u>Foreign</u>, adj., sense 1, <u>New Oxford American Dictionary</u> (3d ed. 2015) ("dealing with or relating to other countries").[27]

_____

<u>Merriam-Webster's Collegiate Dictionary</u> 456 (10th ed. 1993) ("the policy of a sovereign state in its interaction with other sovereign states"); <u>Foreign Policy</u>, n., <u>American Heritage Dictionary of the English Language</u> (3d ed. 1992) ("The diplomatic policy of a nation in its interactions with other nations.").

[26]  Somewhat older definitions, <u>see</u> footnote 24, run along the same lines.  <u>See</u> <u>Policy</u>, n., sense 5, <u>Oxford English Dictionary</u> (1989); <u>Policy</u>, n., sense 2, <u>Webster's Encyclopedic Unabridged Dictionary of the English Language</u> 1113 (1989).

[27]  Again, definitions from around 1990 point in the same direction.  <u>See</u>, <u>e.g.</u>, <u>Foreign</u>, adj., sense 4, <u>New Merriam-Webster Dictionary for Large Print Users</u> 352 (1989) ("related to or dealing with other nations"); <u>Foreign</u>, sense 10, VI <u>Oxford English Dictionary</u> 52 (1989) ("Dealing with matters concerning other countries."); <u>Foreign</u>, adj., sense 5, <u>New Penguin English Dictionary</u> 364 (1986) ("of, concerned with, or dealing with other nations").

\*    \*    \*

Bottom line: a country's "foreign policy" is the course of action it takes as to other countries.

That is true to how the words land on people's ears today, and also to how they were understood when Section 1227 was passed in 1990.

And the above definition makes sense whether "foreign policy" is scrutinized as a whole, or if it is understood based on the meaning of its parts, "foreign" and "policy."

B. __Other Countries__

Section 1227 can come into play only when a person has a severe negative impact ("compromise[s]") on an especially important ("compelling") American "foreign policy interest" --- and that last phrase concerns the United States' relations with other countries. See Part V.A.3.

With this understanding in mind, is the Petitioner likely to win on the merits of his argument that Section 1227 is unconstitutionally vague as applied to the effort to remove him under the statute?

The Court's conclusion: yes.

To see why, compare two things.

First, what Section 1227 tells an "ordinary person" that he might be removed from the United States for.

And second, what, per the Secretary of State's determination, the Petitioner is to be removed for.[28]

---

[28]  This Opinion and Order is solely concerned with what the Secretary of State determined.  To get at why, note that when it comes to vagueness doctrine the Supreme Court has analogized removal cases like this one to criminal cases.  See Dimaya, 584 U.S. at 156-57 (citing Jordan, 341 U.S. at 229, 231).  The Secretary's determination is like a criminal indictment --- a formal instrument that tells someone what he allegedly did, and kicks off a legal process against him.  In criminal cases in which there is a vagueness challenge, courts routinely anchor the analysis in the allegations of the indictment, at least early in the litigation, as here.  See United States v.

*    *    *

Congress empowered the Secretary of State to seek removal of foreign nationals if they compromise American "foreign policy" interests --- which here means a compromise to the United States' relations with another country or countries.

But the Secretary did not affirmatively determine that the Petitioner's alleged conduct has impacted U.S. relations with other countries.

Indeed, the Secretary's determination[29] says nothing about any country other than America.

It also does not mention a region of the world that encompasses particular countries.

And while it cites an executive order,[30] the order does not mention any country other than America or any global region.

*    *    *

_____

Birbragher, 603 F.3d 478, 480-81 (8th Cir. 2010); United States v. Woznichak, 2023 WL 7324442, at *2 (W.D. Pa. Nov. 7, 2023); United States v. Auernheimer, 2012 WL 5389142, at *3 (D.N.J. Oct. 26, 2012), rev'd, 748 F.3d 525 (3d Cir. 2014); United States v. Gigante, 737 F. Supp. 292, 295 (D.N.J. 1990); see also Nat'l Dairy Prods. Corp., 372 U.S. at 32-33, 37; United States v. Stock, 728 F.3d 287, 299 (3d Cir. 2013). But cf. Peoples Rts. Org., Inc. v. City of Columbus, 152 F.3d 522, 530 (6th Cir. 1998). Moreover, Congress specifically directed that in cases like this one, see Part IV, the Secretary would be required to make a personal determination. At this stage, looking to other information would be to skirt Congress' choice. And it would also be to diminish the seriousness of the step the Secretary of State has himself taken and the respect it deserves; the Secretary of State has determined certain things but not others. All of this is consistent with where the Respondents are. They do not meaningfully argue against vagueness-as-applied based on information outside the Secretary's determination. They do not provide such information. Quite the opposite. They are opposed to "peer[ing] behind," Respondents' Supplemental Brief at 14, the determination, and the Court does not do so here.

[29]  Recall: it is at Appendix A, reproduced there in full.

[30]  At Appendix B.

26

Would an ordinary person have a sense that he could be removed from the United States because he "compromise[d]" American "foreign policy interests" --- that is, because he compromised U.S. relations with <u>other</u> <u>countries</u> --- when the Secretary has not determined that his actions impacted U.S. relations with a foreign country?

Probably not.

*    *    *

And if Section 1227 "foreign policy" is read to allow removals for conduct not affirmatively determined by the Secretary to have impacted any foreign country, can the statute be said to "provide [an] explicit standard[]" that could prevent "arbitrary . . . enforcement"?  <u>Grayned</u>, 408 U.S. at 108.

Again, probably not.

The reason is this: if a person can be removed without the Secretary determining that there is a "foreign policy" impact, an impact on U.S. relations with a foreign country --- then there is <u>no</u> "explicit standard," <u>id</u>., left behind in Section 1227.

To see why, recall that Section 1227's relevant provision is this: "compromise[s] a compelling . . . foreign policy interest."  <u>See</u> Part V.A.1.

Each of these words limits the government's enforcement power.

"Compromise[s]" implies a serious impairment to "foreign policy," not a slight one.  "Compelling" points to an especially important "foreign policy interest," not a minor one or a mid-sized one.

These words constrain the Secretary's Section 1227 power.

But they do no independent work.  They are bundled together with "foreign policy."

What under the statute must be "compromise[d]"?  Foreign policy.

What does "compelling" do?  It trims back on the kind of foreign policy that can count.

What this adds up to: because the Secretary has not affirmatively determined here that there <u>is</u> a foreign policy impact, there is nothing left of the <u>other</u> constraints that Congress laid down in Section 1227.

27

Congress required an especially strong impact ("compromise[s]") on foreign policy. But that does not matter if what has been put on the table is not foreign policy.

And Congress required that the foreign policy be an especially important one --- "compelling." But that does not matter if the Secretary is not acting in relation to "foreign policy" in the first place.

In short: a Section 1227 removal effort that is not based on a determination from the Secretary that there is a foreign policy impact is left _fully_ standardless --- because without a "foreign policy" link there is nothing left of the standard ("compromise[s] a compelling . . . foreign policy interest") that Congress laid down when it passed Section 1227. See Johnson, 576 U.S. at 595 (a law is vague when, among other things, it is "standardless"); Kolender, 461 U.S. at 358 (similar); Goguen, 415 U.S. at 578 (a statute is vague when it "simply has no core"); Coates, 402 U.S. at 614 (a statute is vague when "no standard of conduct is supplied at all"); Giaccio v. Pennsylvania, 382 U.S. 399, 402 (1966) (similar).

*     *     *

Lack of notice and "standardless" enforcement --- these tilt the scale in favor of the conclusion that the Petitioner is likely to succeed on the merits of his claim that Section 1227 is vague as applied to efforts to remove him via the Secretary of State's determination.[31]

To see the point from a different perspective, step back for a moment, starting just below.

### 1.   "Want of Proper Words"

It has long been the "the law of the land" that "no one [can] be taken by surprise" by having to "answer in court for what [he]

---

[31]   Does this, on its own, move things all the way to the conclusion that the Petitioner is likely to succeed on the merits? There is no need to answer. There are _other_ important things that weigh in the Petitioner's direction. See Part V.C to Part V.F. How this case might look without those --- that is a separate question.

has not been warned to answer." Goldington v. Bassingburn, Y.B. Trin. 3 Edw. II, f. 27b, 196 (1310).[32]

But "surprise" can come from different directions.

It can be a matter of "Uncertainty." And it can also flow from "the Want of proper legal words." 2 W. Hawkins, Pleas of the Crown, ch. 25, § 100, p. 245 (2d ed. 1724) ("[I]t seems to have been anciently the common Practice, where an Indictment appeared to be insufficient, either for its Uncertainty or the Want of proper legal words, not to put the defendant to answer it[.]").

The source of "surprise" just discussed is not mainly "Uncertainty." Rather, it is "the Want of proper legal words."

This is explained just below.

*    *    *

Surprise of the "Uncertainty" sort generally concerns the ambiguity of a key statutory term.[33]

This is bread-and-butter vagueness doctrine, and the classic example comes from English legal history.

A statute made it a crime to steal "cattle." And "cattle" used to include a broader group of animals than it does today. See Dimaya, 584 U.S. at 178 (Gorsuch, J., concurring). Did the word also cover snatching an ox or a lamb? See 1 William Blackstone, Commentaries *88 (discussing this example). It was unclear, "so the court treated the term 'cattle' as a nullity." Dimaya, 584 U.S. at 178 (Gorsuch, J., concurring) (describing this statute).

Along these lines, think of a case like Connally v. General Construction Co., 269 U.S. 385 (1926).

---

[32] Goldington's "law of the land," invokes the Magna Carta, and the Supreme Court has said that "[t]he words, 'due process of law' [in the Constitution] were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in Magna Charta." Den ex dem. Murray v. Hoboken Land & Improvement Co., 59 U.S. 272, 276 (1855). In turn, the Constitution's Due Process Clause is the source of contemporary vagueness doctrine. See Beckles, 580 U.S. at 262; Johnson, 576 U.S. at 598; Williams, 553 U.S. at 304.

[33] "Generally," but not always. Another kind of "surprise" is the subject of Part V.E.

There, the Supreme Court held there was too much vagueness in a law that required employers to pay the wage that prevailed "in the locality where the work is performed."  <u>See id</u>. at 388.  The law was ambiguous.  It was not clear which places might make up "the locality."

> Who can say, with any degree of accuracy, what areas constitute the locality where a given piece of work is being done?  Two men, moving in any direction from the place of operations, would not be at all likely to agree upon the point where they had passed the boundary which separated the locality of that work from the next locality.

<u>Id</u>. at 394.

*    *    *

The kind of surprise that is relevant for now is not "Uncertainty."  It is a "Want of proper legal words."

"Want of proper legal words" happens when the problem is <u>not</u> ambiguity.

The language in a statute might provide sufficient and clear notice.  And it might appropriately constrain government action.

But when the statute has virtually nothing to do with the case at hand, its language cannot do its work.

An ox may or may not count as cattle.  That is an "[u]ncertainty" case.

But everyone knows that a teapot is not cattle.  When a teapot is stolen, the statute simply cannot apply, and not by a long shot.

The statute does not provide notice to those who might steal teapots.  And because the statute does not give the government power to take on teapot cases, it does not supply a standard to apply in such cases, either.

That is a "Want of proper legal words"-type situation.

As to this category, think of a case like <u>Rabe</u> v. <u>Washington</u>, 405 U.S. 313 (1972).

There, the Supreme Court struck down on vagueness grounds a conviction for screening an obscene movie.  Why?  Because the

30

conclusion that the movie was obscene was based on its "context" --- and that idea was nowhere to be found in the statute.

> To avoid the constitutional vice of vagueness, it is necessary, at a minimum, that a statute give fair notice that certain conduct is proscribed.  The [Washington] statute under which petitioner was prosecuted, however, made no mention that the 'context' or location of the exhibition was an element of the offense . . . . Petitioner's conviction was thus affirmed under a statute with a meaning quite different from the one he was charged with violating.
>
> It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.

Id. at 315 (cleaned up); see also, e.g., Bouie v. City of Columbia, 378 U.S. 347, 351-56 (1964).

*    *    *

Come back now to Section 1227, and to this case.

Section 1227 allows for removal of a person who the Secretary of State determines is negatively impacting American foreign policy --- that is, the United States' relations with other countries.

But the Secretary of State has not made that determination here.  His determination says nothing about foreign countries.  Not explicitly.  And not implicitly, either.  There is no suggestion in the Secretary's determination that U.S. relations with other countries have been impacted by the Petitioner's conduct.

This is a dramatic misfit, a "Want of proper legal words." Hawkins, Pleas of the Crown p. 245.

As to the law's concern with notice: how could an "ordinary person" have known that Section 1227 might be used in this circumstance?

And as to the law's concern with enforcement discretion: how could the Secretary, who needed under Section 1227 to determine that U.S. relations with other countries were being impacted,

use Section 1227 without making that determination?  And once he did, what legislative standard was left behind to guide his discretion?

## 2.   **Domestic Impact**

Before moving on, consider a narrow point.

The Secretary of State's determination says that some of the Petitioner's activities had a domestic impact.  <u>See</u> Determination at 2.

To the extent inside-the-United-States conduct by the Petitioner was determined by the Secretary to have had <u>only</u> inside-the-United-States consequences, there is an added reason, beyond what has been discussed above, to think Section 1227 is vague as applied to that particular subset of the Petitioner's activities.

Take the point up here.

\*     \*     \*

Recall that the Secretary's determination described only activities undertaken by the Petitioner in the United States. <u>See</u> <u>id</u>. at 2 (describing "participation and role[] . . . in antisemitic protests and disruptive activities," and the Petitioner's "public actions . . . in the United States").

And recall that some of the effects of these activities, per the Secretary, were felt in the United States.  <u>See</u> <u>id</u>. (the Petitioner's activities "foster[] a hostile environment for Jewish students in the United States"); <u>id</u>. (the Petitioner's "continued presence . . . in the United States undermine[s] U.S. policy to combat anti-Semitism . . . in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States").

But protecting students "in the United States" is a domestic concern, not a "foreign policy" concern.

And foreign and domestic are understood to be distinct.

Therefore, to an ordinary person, giving the Secretary power over a "foreign policy" impact is not the same as <u>also</u> giving the Secretary power over domestic conduct to the extent it had only a domestic impact.

\*     \*     \*

32

To see the point, start with the words.

"Foreign" is often marked down as the opposite of "domestic." See Foreign, adj., sense 1, Merriam-Webster.com Thesaurus (2025); Foreign, adj., sense 1, Merriam-Webster's Collegiate Thesaurus (2025); Foreign, adj., sense 1, Collins English Thesaurus (2025); Foreign, adj., sense 1, Pocket Oxford American Thesaurus (2012); cf. Domestic, adj., Cambridge English Thesaurus (2025) (listing "foreign" as an antonym).

And "domestic" is usually taken to mean "[e]xisting, occurring, or produced inside a particular region or country; not foreign or international." Domestic, adj., sense 4, Oxford English Dictionary (2023) (emphasis added); see also, e.g., Domestic, adj., sense 3, Merriam-Webster Unabridged Dictionary (2025) ("relating and limited to one's own country or the country under consideration or its internal affairs and interests"); Domestic, adj., Cambridge English Dictionary (2025) ("relating to a person's own country"); Domestic, adj., sense 1, Collins English Dictionary (2025) ("political activities, events, and situations [that] happen or exist within one particular country"); Domestic, adj., sense 4, American Heritage Dictionary of the English Language (5th ed. 2022) ("[o]f or relating to a country's internal affairs").[34]

In keeping with these understandings, Supreme Court opinions have often assumed that foreign concerns and domestic concerns are distinct.[35]

---

[34] Older dictionaries, see footnote 24, dredge up the same basic meanings. See, e.g., Foreign, Collins English Dictionary & Thesaurus 443 (1993) (listing "domestic" as an antonym); Domestic, adj., sense 3.a, Oxford English Dictionary (1989) ("Of or pertaining to one's own country or nation; not foreign, internal, inland, 'home'."); Domestic, adj., sense 4, Webster's Encyclopedic Unabridged Dictionary of the English Language 424 (1989) ("of or pertaining to one's own or a particular country as apart from other countries").

[35] See, e.g., Fleming v. Page, 50 U.S. 603, 606 (1850) ("A foreign country is one exclusively within the sovereignty of a foreign nation, and without the sovereignty of the United States. This is the well-settled meaning of the word 'foreign,' in acts of Congress."); Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 16 (1831) (Marshall, C.J.) ("In the general, nations

And this is no artifact of legal culture, a way of thinking that is particular to lawyers or judges. Not at all. Virtually everyone treats foreign and domestic as contrast points (if not opposites).

One way to see this: by looking to newspaper articles[36] for the two or three months before the Petitioner's arrest. These overwhelmingly show that foreign and domestic are generally taken as separate (and indeed as contrasts).[37]

---

not owing a common allegiance are foreign to each other."); see also, e.g., Haaland v. Brackeen, 599 U.S. 255, 274 (2023); Medellin v. Texas, 552 U.S. 491, 564 (2008) (Breyer, J., dissenting); United States v. Lara, 541 U.S. 193, 201 (2004); Kent v. Dulles, 357 U.S. 116, 127 (1958); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 176 (1951) (Douglas, J., concurring); United States v. Pink, 315 U.S. 203, 233 (1942) ("No State can rewrite our foreign policy to conform to its own domestic policies."); see also William Blackstone, Commentaries *66 (contrasting "foreign emergencies" with "domestic discontents"); The Federalist No. 3 (John Jay) (differentiating between "dangers from foreign arms and influence . . . [and] dangers of the like kind arising from domestic causes") (cleaned up).

[36] Notice to an ordinary person can be supplied by a look to "common usage." United States v. Tykarsky, 446 F.3d 458, 473 (3d Cir. 2006); accord, e.g., Kovacs v. Cooper, 336 U.S. 77 (1959) (considering the "daily use" of certain words); Sproles v. Binford, 286 U.S. 374, 393 (1932) (invoking "common usage and understanding"); Mahler, 264 U.S. at 40 (citing "common understanding" that gives words "the quality of a recognized standard"). In keeping with this, the Third Circuit has scrutinized newspaper articles in the vagueness context to get a sense of the notice that a statute might provide to an "ordinary person." See United States v. Blake, 288 F. App'x 791, 794-95 (3d Cir. 2008). Moreover, "analyzing 'how particular combinations of words are used in a vast database of English prose' can shed light on how ordinary people understand statutory terms." Delligatti v. United States, 145 S. Ct. 797, 813 (2025) (Gorsuch, J., dissenting) (emphasis added) (quoting Facebook, Inc. v. Duguid, 592 U.S. 395, 412 (2021) (Alito, J., concurring in judgment)). Newspapers can provide that database.

[37] See, e.g., Tom O'Connor, Trump Takes on Xi and Putin at their Own Great Power Game, Newsweek, Mar. 7, 2025 (contrasting

34

And it is presumably because the statute's reference to foreign policy is indeed about foreign affairs, not domestic ones, that it is the Secretary of State who has an important role to play in Section 1227 removals.

After all, the State Department's business is not domestic matters, but foreign ones.  The State Department "exists to assist the President . . . in formulating and executing [] foreign policy."  1 Foreign Affairs Manual 011.2; accord, e.g., Kumar v. Republic of Sudan, 880 F.3d 144, 157 (4th Cir. 2018); Thomas v. Baker, 925 F.2d 1523, 1524 (D.C. Cir. 1991); United States v. Green, 671 F.2d 46, 51 n.7 (1st Cir. 1982); see also 22 U.S.C. § 2656 ("The Secretary of State shall perform such duties as shall from time to time be . . . intrusted to him by the President relative . . . to such . . . matters respecting

_____

foreign and domestic); Ross Douthat, Trump and Vance are Stripping Away Foreign Policy Illusions, N.Y. Times, Mar. 1, 2025 (same); Daniel Bush, Donald Trump Has Promised a "Golden Age" for the US.  Can He Deliver?, Newsweek, Feb. 7, 2025 (same); Shane Brennan, Biden's Long, Unique Legacy, News Journal, Jan. 19, 2025, at A.9 (same); Francesca Chambers, Biden Argues US Stronger on World Stage: President Uses Farewell Speeches to Define Legacy, USA Today, Jan. 14, 2025 (same); Stuart E. Eizenstat, Jimmy Carter's Underrated Legacy: A Strong, Ethical America and a More Peaceful World, USA Today, Dec. 29, 2024 (same).  For articles that take the same approach from when Section 1227 became law through to the present, see, for example: George F. Will, The 'Better Off' Diversion: A Kerry Win Might Not Mean Marked Changes in Either Domestic or Foreign Policy, Pitt. Post-Gazette, July 12, 2004, at A.13; Patrick Healy & Susan Milligan, Kerry Calls Bush's Domestic, Foreign Policies 'Extreme', Bos. Globe, Feb. 8, 2004, at A.20; David M. Shribman, Democrats Turn to Foreign Policy, Bos. Globe, Aug. 14, 2001, at A.3; David S. Broder, Needed: A Voice for Foreign Policy, Record, Nov. 25, 1996, at A12; Michael Remez, Foreign Policy Takes Back Seat in Presidential Campaign, Hartford Courant, Oct. 28, 1996 at A.1; John F. Harris, Clinton Learning Foreign Policy Can Be Fun Shifts His Focus from Domestic Issues, Record, Dec. 15, 1995, at A18; Richard Benedetto, Bush Goes to China; Criticizes Clinton's Domestic, Foreign Policies, USA Today, Jan. 12, 1994, at 08A; Johanna Neuman, Economy Takes Front Seat to Foreign Policy, USA Today, Nov. 6, 1992, at 03A; Jonathan Schell, Foreign Policy --- Who Needs It?, Newsday, Sept. 26, 1991, at 117.

35

foreign affairs as the President of the United States shall assign to the [State] Department[.]").[38]

                    *    *    *

---

[38]  Immigration law straddles the foreign-domestic line.  But that does not blur away the normal foreign-versus-domestic distinction.  Take the Administrative Procedure Act.  Under it, proposed rules must usually wait out a notice-and-comment period.  See 5 U.S.C. § 553.  But not rules that involve a "foreign affairs function of the United States." Id. § 553(a)(1).  Do all immigration-related rules involve a "foreign affairs function"?  No.  "For the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences." Yassini v. Crosland, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (citing S. Rep. No. 752, 79th Cong., 1st Sess. 13 (1945)); accord City of N.Y. v. Permanent Mission of India to U.N., 618 F.3d 172, 202 (2d Cir. 2010); Hou Ching Chow v. Att'y Gen., 362 F. Supp. 1288, 1290 (D.D.C. 1973).  And look to 8 U.S.C. § 1182(f) --- which lets the President limit the entry of foreign nationals when he finds their arrival "would be detrimental to the interests of the United States."  What "interests"?  In Trump v. Hawaii, 585 U.S. 667 (2018), the President invoked Section 1182(f), see id. at 675, and the Supreme Court noted that his "stated objective" was "to protect the country and improve vetting processes."  Id. at 704-05.  And this was not the first time, the Court noted, that a President had suspended entry "to retaliate for conduct by [foreigners'] governments that conflicted with U.S. foreign policy interests."  Id. at 693.  In light of the international interests invoked, the Court ruled that the President's invocation of Section 1182(f) passed muster.  See id. at 711. Contrast that with Doe #1 v. Trump, 957 F.3d 1050 (9th Cir. 2020).  There, the President invoked Section 1182(f) to restrict particular foreign nationals from entering the country without certain health insurance.  See id. at 1056, 1065.  Foreign policy interests were not on the table.  See id. at 1067. Rather, the focus was healthcare costs, "a purely domestic economic issue."  Id. at 1067.  This interest, per the court of appeals, was likely outside the "traditional spheres authorized by § 1182(f)" --- "international affairs and national security." Id. at 1067.  Therefore, the President was unlikely to "succeed in [hi]s broad reliance on § 1182(f)."  Id. at 1067.  In sum: immigration law holds the line between foreign and domestic; courts have refused to conflate the two, under both the APA and Section 1182(f).

Bottom line as to the narrow point covered in this section:

To the extent the Secretary determined that any domestic conduct had only a domestic impact, there is an additional reason to think Section 1227 is vague as applied to that particular conduct.

A statute that empowers the Secretary only when it comes to impacts on foreign policy does not also empower him as to impacts on purely domestic matters.[39]

Using Section 1227 in that circumstance undermines notice. And it makes it impossible to say the Secretary is acting in accord with an "explicit standard," Grayned, 408 U.S. at 108, laid down by Congress.

### C.    In Comparison

Where things stand.

Under Section 1227, a person can be removed if the Secretary of State determines he is negatively impacting U.S. relations with a foreign country or countries. See Part V.A.3.

But the Secretary did not make that determination here.

His determination does not say whether the Petitioner's conduct affected U.S. relations with any other country. See id.

An ordinary person would have had no real inkling that a Section 1227 removal could go forward in this way --- without the Secretary first determining that there has been an impact on American relations with another country. See Part V.B.

And using Section 1227 like this is to use it without reference to the only "explicit standard," Grayned, 408 U.S. at 108, laid

---

[39] See Amy Coney Barrett, Congressional Insiders & Outsiders, 84 U. Chi. L. Rev. 2193, 2197 n.12 (2017) (noting that under the canon of expressio unius, "the inclusion of specific terms signifies the exclusion of others"); see, e.g., Tucker v. Alexandroff, 183 U.S. 424, 436 (1902) (applying that canon; see also Bittner v. United States, 598 U.S. 85, 94 (2023) (same). And the point is stronger yet given the gulf that is generally taken to exist between "foreign" and "domestic," as described above.

down by Congress --- the linchpin of which is a link to foreign policy.  See id.

\*    \*    \*

There is another vagueness problem here, too.

Namely, Section 1227 is markedly vaguer than a number of statutes the Supreme Court has struck down over the years on vagueness grounds, see Part V.C.1 --- and the Respondents' counterargument on this point is not persuasive.  See Part V.C.2.

Move through these points now, and then in Part V.C.3 consider their implications for this case.

### 1.    Precedent

As discussed, see Part V.A.1, Section 1227's key operative term is "foreign policy."

The statute's reliance on that term makes Section 1227 more vague than other statutes the Supreme Court has struck down.

Apples-to-apples comparisons do not work smoothly in this area. This is because each statute covers a different subject area. And each uses different words.

But the pattern is clear.  A few examples make the point.[40]

### a)    Kolender

The stepping-off point: Kolender v. Lawson, 461 U.S. 352 (1983). The statute there required anyone loitering in certain circumstances to hand over identification.  See id. at 353.  The statute was attacked as facially unconstitutional.  See id. at

---

[40]  Recall here that how vague a law can be depends on the kind of law it is.  See generally Part III.  Civil laws that deal mainly with economic matters do not get especially rigorous scrutiny.  Criminal laws, though, come in for a much harder look.  (And a key point: immigration laws like Section 1227 get the same treatment as criminal laws.  See Dimaya, 584 U.S. at 156-57 (citing Jordan, 341 U.S. at 229, 231).)  There is also another level up.  As to statutes that touch on First Amendment-protected rights, vagueness review is at its most exacting. First Amendment issues are taken up in Part V.F.

355.  Why?  Because it required the ID to be "credible and reliable," and, per the Supreme Court, that was vague.  See id. at 353-54.

Standing alone, "credible and reliable" is about as vague as "compelling foreign policy interest."

Can an out-of-town water bill count?  What about a new credit card?  How about both together?

Does America have a compelling foreign policy interest in working with Colombia to prevent narcotics trafficking or in working with Syria to eliminate chemical weapons stockpiles?  What about in helping Egypt to preserve antiquities?  Preventing poaching in Kenya?  What about disincentivizing poor working conditions at garment factories in Bangladesh?  What about preserving security there?

In Kolender, the face of the statute was not the end of the story.

A previous judicial decision had narrowed down the law.  Per a state appeals court, "credible and reliable" "meant identification 'carrying reasonable assurance that the identification is authentic and providing means for later getting in touch with the person who has identified himself.'" Id. at 357 (quoting People v. Solomon, 33 Cal. App. 3d 429, 438 (Cal. Ct. App. 1973)).

That interpretation arguably seemed to provide the harder-edged standard that was missing from the statute's text.  See id. at 373 (White, J., dissenting).

But no matter, the Supreme Court held.

Even as interpreted, the Court explained, "the statute vests virtually complete discretion in the hands of the police."  Id. at 358.

And this even though there was another constraint built into the law: police officers were allowed to ask for identification only in "circumstances that would justify a stop under the standards of Terry v. Ohio, 392 U.S. 1 (1968)."  Id. at 353.

Nonetheless, the statute was struck down by the Supreme Court as unconstitutionally vague, invalid on its face.  See id. at 361.

In short: the statute in Kolender was roughly as vague as Section 1227.  But it did not clear the bar.  Even though it had

been interpreted and pared back by a prior court decision ---
but there is none here.  And even though government discretion
was tied down to the dense body of rules developed under <u>Terry</u>.
Again, nothing like that here.

### b)  <u>Akron</u>

Move to <u>City of Akron</u> v. <u>Akron Center for Reproductive Health,
Inc.</u>, 462 U.S. 416 (1983).

Per an Akron ordinance, doctors performing abortions had to
"[e]nsure that the remains of the unborn child are disposed of
in a humane and sanitary manner."  <u>Id</u>. at 451.

The doctors challenged "humane" as unconstitutionally vague, <u>see
id</u>. at 451-52, and the Court agreed --- striking down the
statute.

This was not surprising.  "Humane" is open-ended.

But some years before, a different federal court had upheld a
"humane disposition" law against a vagueness attack in light of
the state's representation that the law aimed "to preclude the
mindless dumping of aborted fetuses on garbage piles."  <u>See id</u>.
at 451 (citing <u>Planned Parenthood Ass'n</u> v. <u>Fitzpatrick</u>, 401 F.
Supp. 554, 573 (E.D. Pa. 1975), <u>aff'd sub nom. Franklin</u> v.
<u>Fitzpatrick</u>, 428 U.S. 901 (1976)); <u>see also id</u>. at 475
(O'Connor, J., dissenting).

At the Supreme Court, Akron tried to lean on this same
representation.  <u>See id</u>. at 474-75 (O'Connor, J., dissenting).

But that did not do the trick, and the Supreme Court struck down
the law as too vague.  <u>See id</u>. at 452 (majority opinion).

### c)  <u>Cramp</u>

Take a final case, <u>Cramp</u> v. <u>Board of Public Instruction of
Orange County</u>, 368 U.S. 278 (1961).

A Florida law required every state employee to swear "he has
never lent his 'aid, support, advice, counsel or influence to
the Communist Party.'"  <u>Id</u>. at 279.

A teacher sued, claiming the state law was void for vagueness.
<u>See id</u>. at 280, 283.

The law left plenty of room for guesswork.

The Supreme Court asked: "[c]ould a lawyer who had ever represented the Communist Party or its members swear with either confidence or honesty that he had never knowingly lent his 'counsel' to the Party?"  Id. at 286.

The statute did not say, and the Court held the law unconstitutionally vague.  See id. at 280, 288.

But the Florida law was less vague than Section 1227.

Pushing back on communism was an unmissable American foreign policy interest when the Supreme Court reached its decision. See, e.g., 22 U.S.C. § 2370(h) (banning "aid" to communist countries when against "the best interests of the United States"); Communist Party of U.S. v. Subversive Activities Control Bd., 367 U.S. 1, 93–96 (1961).

And the Florida law honed in on that interest, and just that interest, in a single, clear way --- by requiring an oath.

Now see the contrast.

Section 1227 catches within its net not just one U.S. foreign policy interest, but large numbers of them.  Anything that can be chalked up as "compelling."

And it protects those interests not by forbidding a specific and knowable action, like refusing to take an oath.

Rather, it does so in an opaque and catch-all way --- by reaching anything that "compromise[s]" those interests, however a "compromise" might happen.

Moreover, the law is much more forgiving of vagueness in a statute that includes a mens rea requirement.  The thinking is that if a statute requires a person to know she is acting intentionally, then it may matter less that the law is somewhat unclear.  See, e.g., Loy, 237 F.3d at 265 (collecting cases).

The Florida law, as construed by the Florida Supreme Court, had a mens rea requirement.  See id. at 285 (citing Cramp v. Bd. of Pub. Instruction of Orange Cnty., 125 So. 2d 554, 557 (Fla. 1960)).

But Section 1227 does not have one.  A person can be removed from the United States for compromising a compelling foreign policy interest.  Even if he does not aim to.  And even if he does not know that he has done so.

41

To be sure, it might be said, the Florida law implicated First Amendment issues.

It required state employees to swear an oath.  Compelled speech is a classic First Amendment concern.  See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31, 585 U.S. 878, 892 (2018); W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).  And for purposes of vagueness law, statutes that put pressure on free speech are held to a higher standard.  See Part III.

But that is no distinction from this case.

Here, the Petitioner protested, see Determination at 2 --- and the Secretary's determination relied on the part of Section 1227 that kicks in only when removal is sought based on "beliefs, statements, or associations" that are "lawful."  See id. at 1-2 (tracking the text of Section 1182(a)(3)(C)).

*    *    *

In short:

The Secretary's determination does not say what Section 1227 requires.  The Secretary did not affirmatively determine that the Petitioner's conduct has affected U.S. relations with other countries.

This undermines notice.  It leaves enforcement standardless. And it weighs in favor of the conclusion that Section 1227 is unconstitutionally vague as applied here.  See Part V.B.

That conclusion is strengthened by comparing Section 1227 to the laws struck down by the Supreme Court in Kolender, Akron, and Cramp --- which suggest that Section 1227 already starts off on its back foot, hovering close to the line that separates what is constitutional from what is not.

### 2.   **The Counterargument**

The Respondents see things differently.

Section 1227, they contend, "is plainly more definite than other provisions that the Supreme Court has upheld against vagueness challenges."  See Respondents' Supplemental Brief at 7-8 (emphasis in original).

But they do not take on any of the cases discussed above.

And in any event, the Respondents' argument does not work.  To see why, tick through the cases they cite.

\*    \*    \*

First, Jordan v. De George, 341 U.S. 223 (1951).

There, the Supreme Court rejected a vagueness challenge to a provision allowing the deportation of someone who had committed more than one "crime involving moral turpitude."  See id. at 225, 229-32.

That sounds vague.

But its meaning was no mystery.  "Moral turpitude" had been part of our immigration laws since 1891, during which time it had been construed by the Supreme Court.  See id. at 229-30 & n.14.  And other statutes used the same phrase.  Those, too, had received judicial interpretation.  See id. at 230.  And no court in any context had held the phrase was too vague.  See id.

Moreover, as to the statute in the Jordan case, underlying due process concerns[41] were plainly satisfied --- the "moral turpitude" provision was triggered only "after conviction and sentence of the requisite two crimes."  Id.  "[T]he statute [as to moral turpitude] provided adequate notice, at least to the extent that if an alien behaved him or herself and did not violate the traditionally well-defined penal laws, the alien could rest assured that he or she would not be deported, at least under that statute."  Massieu, 915 F. Supp. at 700.

This case is not like Jordan.

No court, much less the Supreme Court, has construed Section 1227.

No court seems to have interpreted the Section 1227 language as it may appear in another obviously relevant statute.

And the Petitioner has not been convicted of multiple crimes (or any crime) as a prerequisite for removal.

Indeed, the Secretary is going forward under a determination that alludes to alleged criminal conduct by another person, but not the Petitioner.  See Determination at 2.  And moreover, the Secretary affirmatively suggests that the Petitioner's

---

[41]  Recall that the void-for-vagueness doctrine is rooted in the Due Process Clause.  See footnote 32.

underlying "beliefs, statements, or associations" are "lawful."
Id. at 1 (citing Section 1227).

                    *    *    *

Second, the Respondents point to Mahler v. Eby, 264 U.S. 32
(1924).

That was a vagueness challenge to a law that provided for the
deportation of noncitizens that the Secretary of Labor found to
be "undesirable residents of the United States."   Id. at 36
(cleaned up).

The Supreme Court rejected the challenge.

The Respondents take from Mahler that "the expression
'undesirable residents of the United States' is sufficiently
definite to make the delegation quite within the power of
Congress."  Respondents' Supplemental Brief at 7 (quoting
Mahler, 264 U.S. at 40) (cleaned up).

The argument seems to run like this: if the Secretary of Labor
can determine that someone is "undesirable" and secure their
removal on that basis, then the Secretary of State should be
able to determine that someone is compromising "compelling
foreign policy interests" and have them removed for that.

This argument sounds strong.

But a look at the fuller Supreme Court excerpt shows that the
"undesirable" standard did not stand alone, and in fact had been
dramatically narrowed down and specified.

The Respondents paste into their legal brief the part of Mahler
the Court has underlined below.  But they leave on the cutting-
room floor everything else --- and those are the critical
passages:

> [Congress] has established classes of
> persons who in its judgment constitute an
> eligible list for deportation, of whom the
> Secretary is directed to deport those he
> finds to be undesirable residents of this
> country.  With the background of a declared
> policy of Congress to exclude aliens
> classified in great detail by their
> undesirable qualities in the Immigration Act
> of 1917, and in previous legislation of a
> similar character, we think the expression

<u>'undesirable residents of the United States'
is sufficiently definite to make the
delegation quite within the power of
Congress</u>.

<u>Mahler</u>, 264 U.S. at 40 (emphasis added).

What were the undesirable qualities that had been "classified"?

The classes include all aliens interned as
enemies by the President's proclamation
under R. S. § 4067 (Comp. St. § 7615) and
alien convicts under the Espionage Act, the
Explosives Act, the act restricting foreign
travel, the Sabotage Act, the Selective
Draft Act, the act punishing threats against
the President, the Trading with the Enemy
Act, and certain sections of the Penal Code.

<u>Id</u>. at 36–37.

These are hard-edged, public standards --- and "great[ly]
detail[ed]" ones, <u>id</u>. at 40, as the Supreme Court put it.  They
dramatically reduced any vagueness otherwise inherent in the
term "undesirable residents."

There is no persuasive way to analogize <u>Mahler</u> to this case.

Section 1227, like the law in <u>Mahler</u>, starts off with broad
language.  But then in <u>Mahler</u>, a list of "great detail," <u>id</u>.,
came in to flesh things out.  There is nothing like that list
associated with Section 1227.  No regulations, for example.

To ignore the list, as the Respondents do, is to miss why the
statute in <u>Mahler</u> passed muster --- and to miss, too, why
Section 1227 is much vaguer than the law that was at issue in
that case.

And another point.

One of the terms in <u>Mahler</u>, "undesirable residents," had been
used in American immigration law as far back as 1802.  And so,
per the Supreme Court in <u>Mahler</u>, "[o]ur history has created a
common understanding of the words 'undesirable residents' which
gives them the quality of a recognized standard."  <u>Id</u>

But again, that is not this case.

No word in Section 1227 hauls along with it the built-up clarity
of our common law.  <u>See</u> Part V.A.2.

Mahler is, simply, a long way off.  The analogy does not work.

*     *     *

The Respondents' third and final case is Boutilier v. Immigration & Naturalization Service, 387 U.S. 118 (1967).  See Respondents' Supplemental Brief at 8.

The Boutilier petitioner had been ordered deported under a law that made excludable those foreign nationals who had a "psychopathic personality," which federal officials read to include gay men.  See 387 U.S. at 118.  The petitioner argued that this reading of the law was void for vagueness, see id. at 119, but the Supreme Court disagreed.

The Court explained why: "[t]he legislative history of the Act indicates beyond a shadow of a doubt that the Congress intended the phrase 'psychopathic personality' to include homosexuals such as petitioner."  Id. at 120.

The Court went on to describe that clarifying history.  See id. at 121-22.  One example: a Senate report defined "'psychopathic personality' . . . to include homosexuals."  Id. at 121.

Another data point: a report of the Public Health Service that buttressed the legislative history defined "psychopathic personality" to include homosexuality.  See id. at 120.

The legislative history of Section 1227 is a world away from all this.

Far from specifying "beyond a shadow of a doubt" what might be meant by a "compelling . . . foreign policy interest," Congress took the exact opposite tack --- indicating that it wanted to leave things open-textured and flexible, undefined.

Per the State Department's Legal Adviser in the run-up to the passage of Section 1227: "[w]e recognize that the revised standard leaves considerable discretion in the Executive branch. But we believe it is . . . inadvisable to be more precise[.]" Exclusion and Deportation of Aliens: Hearing Before the Subcomm. on Immigr., Refugees, and Int'l L. of the Comm. of the H. Comm. on the Judiciary, 100th Cong. 40 (1987) ("1987 Hearing") (statement of Abraham D. Sofaer, Legal Adviser of the State Dep't).

And to the extent that legislative history is relevant here, it suggests, if anything, that the Secretary's determination as to

46

the Petitioner is out of step with the statute.  That is the subject of Part V.D.

### 3.   Implications

Where things stand.

Section 1227, as applied here, appears to be a good deal vaguer than other statutes the Supreme Court has struck down for vagueness.  See Part V.C.1.

And the problem is not solved by the Respondents' cited cases. See Part V.C.2.

Is this the end of the road?  Does the above require the conclusion that Section 1227, as applied, must simply be struck down?

After all, the Supreme Court cases cited above, see Part V.C.1, were facial challenges, and this one is an as-applied challenge.

A facial challenge traditionally attacks a statute as "impermissibly vague in all of its applications."  Hoffman Ests., 455 U.S. at 495 (emphasis added).

And "[i]f a statute is vague in all its applications then it will necessarily be vague 'as applied' in every case."  United States v. Gaudreau, 860 F.2d 357, 361 (10th Cir. 1988) (emphasis added).

If less vague statutes did not survive facial challenges in Kolender, Akron, and Cramp, can the vaguer Section 1227 survive the current as-applied challenge?

The Court's judgment: yes, it can.

Take two reasons why.

*    *    *

First, the quote from the Supreme Court in Hoffman, just above, may no longer be good law.

In Johnson, for example, the Court looked back on L. Cohen Grocery, a case in which a statute that barred "unjust and unreasonable" prices was voided as vague on its face.

The Johnson Court asked: was the pricing statute really vague in all its applications?  See 576 U.S. at 602.  After all, "charging someone a thousand dollars for a pound of sugar would

surely be unjust and unreasonable." <u>Id</u>. (interpreting <u>L. Cohen Grocery</u>) (emphasis added).

But, the <u>Johnson</u> Court noted, that did not stop the Supreme Court in <u>L. Cohen Grocery</u> from striking down the pricing law on its face, as void for vagueness across the board. <u>See id</u>.

Why not? Because per the Supreme Court in <u>Johnson</u>, a holding of facial vagueness need not mean that literally <u>every</u> application of a law is vague. <u>See id</u>. at 602-03.

On this understanding, the fact that "a statute is vague in all its applications" does <u>not</u> "necessarily" suggest the statute will "be vague 'as applied' in every case." <u>Gaudreau</u>, 860 F.2d at 361.

And this means that the Supreme Court cases cited above --- <u>Kolender</u>, <u>Akron</u>, and <u>Cramp</u> --- do not <u>require</u> the conclusion that Section 1227 is vague as applied here, even as they push things a long way down the road in that direction.

\*    \*    \*

A <u>second</u> reason why <u>Kolender</u>, <u>Akron</u>, and <u>Cramp</u> do not strictly compel any conclusion here: those cases may be distinguishable, at least to an extent.

Take two ways.

When assessing a vagueness challenge, the Supreme Court has aimed to account for the sheer difficulty of crafting an appropriately tight law. Think of a disorderly conduct ordinance, for example.

> There are areas of human conduct where, by
> the nature of the problems presented,
> legislatures simply cannot establish
> standards with great precision. Control of
> the broad range of disorderly conduct that
> may inhibit a policeman in the performance
> of his official duties may be one such area,
> requiring as it does an on-the-spot
> assessment of the need to keep order.

<u>Goguen</u>, 415 U.S. at 581; <u>accord</u>, <u>e.g.</u>, <u>Kolender</u>, 461 U.S. at 360-61; <u>United States</u> v. <u>Petrillo</u>, 322 U.S. 1, 7 (1947).

48

Section 1227 looks like a backstop statute --- to be deployed rarely,[42] and in situations where there is a gap between the formidable range of on-the-books immigration-law powers[43] and the felt needs of an unforeseen case.

Drafting a statute to cover these sorts of situations is intrinsically hard.  See 1987 Hearing at 40-41 ("it is difficult . . . to be more precise") (statement of Abraham D. Sofaer, Legal Adviser of the State Dep't).

And the drafting task was likely harder than anything that needed writing up in Kolender, Akron, or Cramp.

Take now another possible distinction.

Vagueness law's concern with sharp delineation of government power is said to rest on the need to limit the possibility of arbitrary enforcement.

That can result when a too-broad law gives de facto lawmaking power to many lower-level enforcement officials.  See, e.g., Davis, 588 U.S. at 451 ("Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide."); accord, e.g., Johnson, 576 U.S. at 595 (similar); Kolender, 461 U.S. at 358 (similar).[44]

---

[42]  See 1987 Hearing at 40-41 (statement of Abraham D. Sofaer, Legal Adviser of the State Dep't) (suggesting this).

[43]  See, e.g., 8 U.S.C. § 1227(a)(4)(B) (authorizing removal in cases involving terrorism); id. § 1227(a)(4)(E) (same, religious persecution); id. § 1227(a)(2)(A)(iii) (same, commission of aggravated felony); id. § 1227(a)(6)(B) (same, unlawful voting); id. § 1227(a)(6)(B) (same, public charge).

[44]  The concern in this situation dovetails with the double difficulties associated with (a) a broadly written injunction that then (b) gives many different people a hand in enforcing it.  See, e.g., Merch Traffic, LLC v. Does 1-100, 686 F. Supp. 3d 380, 386 (D.N.J. 2023) ("Where . . . the injunction's starting point is loose language, many interpreters . . . means many different interpretations.  And many different interpretations multiplies the chances for uncertainty and confusion, along with the risk that the injunction will be

But the Supreme Court has indicated there are <u>also</u> possible vagueness problems when a single senior official or a single official body is expected to make enforcement decisions without the benefit of a crisp legal standard from the legislature.  <u>See</u> <u>Bantam Books, Inc.</u> v. <u>Sullivan</u>, 372 U.S. 58, 71 (1963) (statewide commission); <u>Mahler</u>, 264 U.S. at 40 (Secretary of Labor); <u>cf</u>. <u>Aptheker</u> v. <u>Sec'y of State</u>, 378 U.S. 500 (1964) (Secretary of State).

Is <u>all</u> relatively standardless enforcement to be treated in the same way?  Is decentralized enforcement under a loose standard (as in <u>Kolender</u>, <u>Akron</u>, and <u>Cramp</u>) to be directly analogized, without doctrinal adjustment, to centralized enforcement under a loose standard (as in <u>Bantam</u> and <u>Mahler</u> --- and also as envisioned for the Secretary of State in Section 1227)?[45]

These are complex questions, and they suggest that it would be too hasty to simply treat <u>Kolender</u>, <u>Akron</u>, and <u>Cramp</u> as compelling the outcome in this case.

---

misunderstood in ways that sweep in people it should not.") (cleaned up).

[45]  Thinking this through might require wrestling with another set of questions.  Namely, in its cabining-government-power prong, is vagueness doctrine concerned only with arbitrary enforcement, or is it also concerned with democratic accountability?  And if vagueness doctrine is concerned with accountability (as some cases suggest, <u>see</u>, <u>e.g.</u>, <u>Davis</u>, 588 U.S. at 451), does that imply that it should be more forgiving of relatively looser standards when they are visibly administered only by a single, senior official?  <u>See</u> Alexander Bickel, <u>The Least Dangerous Branch: The Supreme Court at the Bar of Politics</u> 151 (1962) ("A vague statute delegates to administrators, prosecutors, juries, and judges the authority of ad hoc decision, which is in its nature difficult if not impossible to hold to account, because of its narrow impact."); <u>cf</u>. <u>Dimaya</u>, 584 U.S. at 182-83 (Gorsuch J., concurring); Memorandum from David J. Barron, Acting Assistant Att'y Gen., Office of Legal Counsel, to Eric Holder, U.S. Att'y Gen., <u>Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi</u> 38-41 (July 16, 2010) (in a context that is far afield, implicitly suggesting that due process concerns may be lessened when "high-level" officials are the key decision-makers).

*    *    *

In sum:

Section 1227 as applied here is more vague than other statutes the Supreme Court has struck down, see Part V.C.1, but this does not end things.  It weighs in favor of the conclusion that Section 1227 is vague as applied.  But it does not require that conclusion.

###    D.    History

When it comes to vagueness, the Supreme Court and other federal courts have often looked to legislative history.  See Part V.A.2.

And in this case, the parties have affirmatively brought Section 1227's legislative history to the Court's attention.  See Petitioner's Supplemental Brief at 18-19; Respondents' Supplemental Brief at 5-7.[46]

Take up here Section 1227's legislative history, see Part V.D.1, and then its enforcement history.  See Part V.D.2.

A quick preview of what they show:

The legislative history generally suggests that Section 1227 removal was intended for cases in which (a) the underlying conduct happened abroad or almost exclusively abroad, and (b) it was determined by the Secretary of State that the underlying conduct would have impacted U.S. relations with other countries.

And the enforcement history shows Section 1227 has generally been used over the years in keeping with the legislative-history blueprint --- for removals based on conduct that took place entirely (or almost entirely) abroad, and that, per the Secretary, affected America's relations with other countries.

This case does not fit into those categories.

_____

[46]  And the Respondents have focused the Court on Boutilier v. INS, 387 U.S. 118 (1967), discussed above, in which the Supreme Court squinted hard at legislative history to resolve a vagueness challenge.  See id. at 121-22 (citing S. Rep. No. 82-1137, at 9 (1952)).

As determined by the Secretary of State, all of the Petitioner's conduct took place in the United States. See Determination at 2. And the Secretary has not affirmatively determined that the Petitioner's conduct impacted U.S. relations with any foreign country. See id.

The takeaway: a further reduction in the likelihood that an "ordinary person" in the Petitioner's position would have had a sense that Section 1227 might be used to seek to remove him.

### 1. <u>Legislative History</u>

#### a) <u>Its Role</u>

Ensuring that there are clear limits on the scope of government power is one of the bases for the vagueness doctrine. See Part III.

And this is largely a matter of two things.

First, understanding what the statute does and does not empower the government to do. And then second, asking the vagueness question --- how crisp is Congress' command, and what sort of space does it leave behind for potentially arbitrary enforcement?

The first part of the inquiry is mainly a matter of statutory interpretation. And as to that, legislative history can have a role to play only when the underlying statute is ambiguous. See, e.g., Bostock v. Clayton Cnty., 590 U.S. 644, 674 (2020).

Here, the linchpin words in Section 1227 are "foreign policy." The dictionary definitions of those words are essentially uniform. See Part V.A.3. The words are not ambiguous.

Therefore, as to delineating the power that Section 1227 gives the Secretary, legislative history has no role.[47]

But that is not the end of the matter.

In addition to zeroing in on the limits to government power, vagueness doctrine also takes up notice questions. What would

---

[47] No role for now. See footnote 68.

an ordinary person take away from the law?  What would he or she be warned about as a practical matter?

This sort of notice is a matter of what things mean in "the common mind."  <u>McBoyle</u> v. <u>United States</u>, 283 U.S. 25, 27 (1931); <u>Mahler</u>, 264 U.S. at 40 ("common understanding"); <u>Kovacs</u> v. <u>Cooper</u>, 336 U.S. 77 (1959) ("daily use"); <u>Sproles</u> v. <u>Binford</u>, 286 U.S. 374, 393 (1932) ("common usage and understanding").

Getting at that often requires panning out, to consider the broader range of information that might inform the understanding of ordinary people.  This can mean a look to newspaper articles, for example, <u>see</u> <u>Blake</u>, 288 F. App'x at 794-95, and to enforcement history.  <u>See</u> <u>Wyndham</u>, 799 F.3d at 257-58 & nn.22-24.  And it is hard to know why it should not also mean a look to legislative history.

What this adds up to: the parties have each pointed the Court to Section 1227's legislative history, and the Court refers to it here to shed light on the notice an ordinary person in the Petitioner's position would have had.

Now look to two parts of the legislative history.

### b)    The Conference Report

Start with the 1990 House Conference Report.[48]  <u>See</u> Petitioner's Supplemental Brief at 18-19 (citing the Report); Respondents' Supplemental Brief at 7 (same).

The Report was issued in the run-up to the passage of Section 1227.  <u>See</u> H.R. Rep. No. 101-955 (1990) (Conf. Rep.), <u>as reprinted in</u> 1990 U.S.C.C.A.N. 6784, 6794.

---

[48]  A conference report "presents the formal legislative language on which the conference committee has agreed."  Christopher M. Davis, Cong. Rsch. Serv., R98-382, <u>Conference Reports & Joint Explanatory Statements</u> 1 (2015).  Such reports are sometimes regarded as relatively more reliable sources of legislative history.  <u>See</u>, <u>e.g.</u>, <u>Ry. Lab. Execs. Ass'n</u> v. <u>Interstate Com. Comm'n</u>, 735 F.2d 691, 701 (2d Cir. 1984); <u>Demby</u> v. <u>Schweiker</u>, 671 F.2d 507, 510 (D.C. Cir. 1981).

When, per the Report, might Section 1227 be invoked?[49]

The Report gave two examples.

The first: Section 1227 might be brought to bear when there could be "imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad (as occurred with the former Shah of Iran)." Id. at 6795.

The reference to the Shah is apparently this: on October 29, 1979, the Shah of Iran was admitted to the United States for medical treatment, and six days later scores of Americans were taken hostage in the storming of the United States Embassy in Tehran.  See Mark Bowden, Guests of the Ayatollah (2006) at 5-6, 19-20.

By then, the Shah had ruled Iran for more than 35 years.  He was not someone who undertook meaningful activities in the United States.  He moved around in the last year of his life to a succession of countries for treatment, including Egypt, Morocco, the Bahamas, and Mexico.  One of those countries was the United States.

And the concern as to the Shah's treatment was that it could have impacted "lives or property of United States persons abroad," or "property of the United States government abroad." See H.R. Rep. No. 101-955 (1990) (Conf. Rep.), as reprinted in 1990 U.S.C.C.A.N. 6784, 6795 (emphasis added).

Bottom line: per the Report's first example, Section 1227 was to focus on conduct outside of the United States that involved a direct impact on U.S. relations with a foreign country, Iran.

The Report's second example: Section 1227 might be used when there "would [be a] viol[ation] [of] a treaty or international agreement to which the United States is a party."  Id.

_____

[49]  The Report discussed Section 1227 in the context of the decision to exclude a person from entering the United States, see H.R. Rep. No. 101-955, 1990 U.S.C.C.A.N. at 6794-95 --- not, as here, in the context of an effort to remove a person from the United States.  No matter.  Section 1227 makes clear that these are interchangeable.  They are governed by the same standard. Compare 8 U.S.C. § 1227(a)(4)(C)(ii), with id. § 1182(a)(3)(C)(iii).

As a general matter, treaties are externally focused, concerned with foreign matters, not domestic ones.[50]  See Medellin v. Texas, 552 U.S. 491, 505 (2008) ("A treaty is . . . primarily a compact between independent nations.") (cleaned up); see also 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliott ed., 1836) at 514 (statement of James Madison: "The object of treaties is the regulation of intercourse with foreign nations, and is external."); Treaties and Executive Agreements: Hearings on S.J. Res. 1 before a Subcomm. of the Sen. Comm. on the Judiciary, 84th Cong. 183 (1955) (Secretary of State Dulles) (stating that treaties cannot regulate matters "which do not essentially affect the actions of nations in relation to international affairs, but are purely internal").

Treaties are overwhelmingly entered between the United States and other counties.  See Medellin, 552 U.S. at 505; Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675 (1979); Restatement (Fourth) of the Foreign Relations Law of the United States § 301 (2018); Phillip R. Trimble, International Law: United States Foreign Relations Law 129 (1st ed. 2002).

And "viol[ating]" a treaty --- the Report's stated concern --- would plainly impact U.S. relations with the country that was America's treaty partner.[51]

---

[50]  "As a general matter" because of some arguable drift during recent decades.  Compare Restatement (Second) of the Foreign Relations Law of the United States § 117(1)(a) (1965) (stating that the Constitution's treaty power can be put in play only if the subject matter of the treaty "is of international concern"), with Restatement (Third) of the Foreign Relations Law of the United States § 302, cmt. c (1987) ("Contrary to what was once suggested, the Constitution does not require that an international agreement deal only with 'matters of international concern.'").

[51]  It is not crystal clear how a Section 1227 removal might prevent a treaty breach.  But maybe the idea is that a country whose extradition request is not fulfilled by the United States would think of its extradition treaty as having been breached. On this understanding, Section 1227 might have been envisioned as working, in part, as a kind of back-up extradition-type mechanism, as when, for example, there is a failure of proof

In short, the Report's examples point in the same direction: Section 1227 was expected to be used in contexts in which the underlying conduct (a) took place mainly abroad, not inside the United States, and (b) was determined by the Secretary to impact U.S. relations with another country.

### c)    The Prior Statute

Look now to another piece of legislative history.

Section 1227 became law in 1990, and the Respondents direct the Court to Section 1227's pre-enactment history.  See Respondents' Supplemental Brief at 6.

That history is laid out here over the next page or two.

* * *

A 1952 statute empowered the Secretary of State to order the removal of certain foreign nationals from the United States. See Immigration & Nationality Act of 1952, Pub. L. No. 82-414 § 241(a)(7), 66 Stat. 163, 206 (codified at 8 U.S.C. § 1251(a)(7)).

This statute had "for years" been understood to reach foreign nationals who might generate "adverse foreign policy consequences" for the United States.  See 1987 Hearing at 47 (letter of Assistant Att'y Gen. John Bolton).

The 1952 statute did not mention the words "foreign policy." See Immigration & Nationality Act of 1952 §§ 212(a)(27) (exclusion), 241(a)(7) (deportation).

Rather, per the 1952 statute, a foreign national could be removed if he "engage[d] in activities which would be prejudicial to the public interest . . . of the United States." See id. §§ 212(a)(27) (exclusion), 241(a)(7) (deportation).

---

before the American extradition court, and an extradition therefore does not go forward.  That is how Section 1227 was used in Massieu v. Reno, 91 F.3d 416, 418-19 (3d Cir. 1996). (In terms of the location-of-the-underlying-conduct point, note that when the United States extradites a person to country X, it is virtually always for conduct that occurred in country X, not for conduct that took place in the United States.  See, e.g., Extradition Treaty, Mex.-U.S., art. 1(1), May 4, 1978, 31 U.S.T. 5059.)

That worked because "public interest" could be read to cover foreign policy concerns.  See 1987 Hearing at 47 (letter of Assistant Att'y Gen. John Bolton) (describing the Department of Justice's long-standing interpretation of the 1952 statue).

But it did so by casting a wide net --- one so broad that it allowed the Secretary of State to act on foreign policy concerns and also based on purely domestic concerns.

During the late 1980s, Attorney General Meese and Secretary of State Schultz gave a set of major speeches focused on changing immigration laws to pry open more space for free expression. See id. at 33 (statement of Abraham D. Sofaer, Legal Adviser of the State Dep't) (describing the speeches).

Citing these speeches, former Judge Sofaer, then the State Department Legal Adviser, testified for the Reagan administration that the foreign-and-domestic 1952 statute could be eliminated, provided that a replacement statute gave back to the Secretary of State the foreign policy-focused powers that he needed.

Judge Sofaer's testimony:

> We recognize . . . that the "public interest" standard is broad, and we are prepared to support replacing it with language that limits the grounds of exclusion to potentially serious foreign policy consequences.  (The public interest standard also encompasses internal security cases, but we feel these are adequately handled under other sections of the law.) This narrowing of our authority is significant. . . .  We recognize that the revised standard leaves considerable discretion in the Executive branch.  But we believe it is difficult and inadvisable to be more precise in defining what cons[t]itutes a serious adverse foreign policy consequence.  New crises and difficulties arise every day in our international relations, and we need some flexibility to deal with them.

Id. at 40-41.

The gist of Judge Sofaer's testimony: the 1952 statute swept broadly and included powers to address both domestic ("internal") concerns and also foreign policy concerns. <u>Cf</u>., <u>e.g.</u>, <u>id</u>. at 57-58 (testimony of then-INS Commissioner Alan Nelson). The 1952 statute, he argued, could be struck from the books, so long as its kernel of foreign policy power was kept.

And that is where things went.

In 1990, Congress repealed the relevant part of the 1952 statute and replaced it with the current Section 1227. <u>See</u> Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 (1990).

By eliminating the broad 1952 "public interest" standard and allowing for removal only on grounds related to "foreign policy interests," Section 1227 provided what the Reagan administration had wanted: a narrower statute, focused solely on the Secretary's power as to foreign policy concerns, without any of the power of the old "public interest" standard as to matters of "internal" concern.

In a nutshell: Section 1227 was meant to focus on foreign concerns, not domestic ones. And that view undergirded the Reagan administration's position --- which was to walk away from removal powers triggered by "internal" conduct, so long as foreign-focused removal powers stayed on the books.

### 2.  **Enforcement History**

The Court can also look to Section 1227's enforcement history.

In its <u>Wyndham</u> decision, the Third Circuit assessed enforcement history to help resolve a vagueness question. It scrutinized the complaints filed by an enforcement agency, the FTC, to get a handle on the notice that might have been provided to an entity that was later sued by the agency. <u>See</u> <u>Wyndham</u>, 799 F.3d at 257-58 & nn.22-24.[52]

---

[52]  Three points here. <u>First</u>, in <u>Wyndham</u> the Third Circuit pointed to enforcement history to show that a company was not in the dark and therefore could not successfully make a lack-of-notice argument. <u>See</u> 799 F.3d at 258. But it makes little sense to think that enforcement history might be used to help <u>defeat</u> a lack-of-notice argument (as in <u>Wyndham</u>) but not to help <u>bolster</u> one (as here). <u>Second</u>, there are, in general, solid

Take up Section 1227's enforcement history now.[53]

_____

reasons to look to enforcement history.  For example, it comes closer in time to a person's alleged conduct than legislative history, and the example of a concrete case looms larger for an ordinary person than a given congressional report.  Moreover, in terms of notice, what is actually being done (what the enforcement history shows) is likely more telling that what was first planned (which is what the legislative history shows).  In addition, if the government always enforces a statute in one way but then spins it around and uses it in a wholly different way, that may lead to the sort of arbitrary enforcement that vagueness doctrine is specifically intended to guard against.  Why ignore it?  A third point.  Enforcement history can count only if it provides public notice.  Wyndham makes that clear, see 799 F.3d at 257, and public examples are the Court's sole focus here.  A seemingly non-public case put forward by the Respondents, see Respondents' Letter (May 9, 2025) (ECF 241) at 1, has been put aside.  (Note that the State Department has published three examples from Section 1227's enforcement history on the internet, in its widely used compendium, the Digest of United States Practice in International Law 1991-1999.)

[53]  A note on enforcement history in this case.  This month, the Court convened a conference in lieu of oral argument and set a schedule for supplemental briefing.  See ECF 224, 228.  At the conference, the Court indicated it would be looking to enforcement history.  See Transcript of May 2, 2025 Teleconference (ECF 229) at 7:14-19, 8:6-10.  No one objected.  Five days later the Court ordered the Respondents to provide enforcement-history information.  See ECF 231.  The Respondents apparently agreed that such materials were relevant.  They said they were "in the process" of gathering those materials themselves and "already intended to provide some of this information to the Court in [their then-upcoming] supplemental [legal brief]."  ECF 232.  But the Respondents asked for more time to provide the information.  See id.  More time was afforded, see ECF 234; the Respondents produced enforcement history materials, see ECF 241, 246 --- and then, only after that, objected for the first time to the production of further information, and seemingly to the use of such materials, too. See Respondents' Letter (May 9, 2025) (ECF 247).  The Court did not press the matter.  But one way or another, the Respondents' objection came too late.

*   *   *

The enforcement history of Section 1227 lines up with its legislative history.

They point in the same direction: the statute was <u>meant</u> to be used, and generally <u>was</u> used (until the Petitioner's case) as to people whose relevant conduct took place entirely abroad, or all but entirely abroad, and which was determined by the Secretary to impact U.S. relations with a foreign country.

Walk through the enforcement history now.

*   *   *

In 1995, the Secretary of State issued a Section 1227 determination as to a Jordanian national.  The underlying facts:

> [T]he respondent was indicted in Jordan of conspiracy with the intention of committing terrorist acts.  The indictment describes a deliberately unnamed organization in Jordan established for the purpose of fighting tyrant Arab rulers, resisting the "peace process," combating vice, and fighting Jews and Americans.  This documentation alleges that the organization collected arms and explosives and attempted a number of bombings in cinemas in Jordan, and also a supermarket there, in January 1994.  The respondent's alleged role was training one of the organization's founders at a training camp in the Philippines and agreeing to finance the organization after a visit to Jordan to assess the organization's capabilities in early 1994.  As a result of the legal proceeding in Jordan, the respondent was evidently sentenced to death in absentia for his role in the terrorist attacks.

<u>In Re Mohammad J.A. Khalifa</u>, 21 I. & N. Dec. 107, 108-09 (BIA 1995).

The Secretary of State's determination indicated that Jordan had requested the removal, <u>see</u> ECF 252 at 5-6, and that saying no would "damage U.S. relations with Jordan."  <u>Id</u>. at 6.

60

*    *    *

Later in 1995, the Secretary of State determined that the leader of a Haitian paramilitary force should be removed from the United States.

More of the same.  Conduct that took place wholly abroad, and a determination by the Secretary that zeroed in on harm to U.S. relations with a foreign country.

Secretary of State Christopher's determination:

> [T]he Revolutionary Front for the Advancement and Progress of Haiti ("FRAPH") . . . claims to be a political party, [but] it has never in fact participated in the national political process.  It is officially regarded by the Department of State as an illegitimate paramilitary organization whose members were responsible for numerous rights violations in Haiti in 1993 and 1994.  Opposition to FRAPH is a key element of our Haitian foreign policy, and we have said so publicly. . . .

> [The foreign national whose removal is sought] is one of the co-founders and current President of FRAPH.  He was instrumental in sustaining the repression that prevailed in Haiti under the illegal military-led regime until it was displaced last September by the multinational force led by the United States.  On February 3, 1995, Mr. Constant sent a letter on behalf of FRAPH to the Special Representative of the Secretary General of the United Nations for Haiti using a Washington, D.C., return address and telephone number.  In addition, since his arrival in the United States, FRAPH elements in Haiti have broadcast on Haitian radio tape recordings of Mr. Constant speaking on behalf of FRAPH to the Haitian people.

> These activities create the impression in Haiti that the United States is permitting

61

Mr. Constant to use the United States as a
base of operations for FRAPH.  They fuel
false but widespread perceptions in Haiti
that Mr. Constant was deliberately allowed
to enter the United States in December and
that the United States Government is
secretly supporting him; that the United
States endorses both him and his positions;
and that we approve of FRAPH.  These
misperceptions persist notwithstanding that
we have consistently denounced FRAPH and
made statements distancing the United States
from it and Mr. Constant.

My concern about Mr. Constant's presence and
activities in the United States is
heightened by the fact that elections for a
new Haitian Parliament and for over 2,000
local government positions are scheduled for
June 4, 1995.  The United States has a huge
stake in making sure that these elections --
- the best manifestation of democracy ---
are held successfully.  Because Mr. Constant
for many Haitians symbolizes the antithesis
of democracy, permitting him to remain at
large in the United States could undermine
this important foreign policy
objective. . . .

The Haitian Government shares our belief
that Mr. Constant is in the United States
and has requested his extradition so that he
may face criminal charges in Haiti.  We have
returned the request, which was technically
deficient, to the Haitian Government, to
which we have offered assistance in
perfecting the documents.  Given the
compelling foreign policy interests at
stake, it is essential that we seek Mr.
Constant's deportation independent of any
extradition efforts.

Letter from Warren Christopher, Sec'y of State, to Janet Reno,
Att'y Gen. (Mar. 29, 1995), U.S. Dep't of State,
https://perma.cc/24DS-V4DR (accessed on May 28, 2025) (retrieved

through the <u>Digest of United States Practice in International Law 1991-1999</u>).[54]

*    *    *

Fast-forward two years, to a 1997 determination from Secretary of State Albright and another example of the same pattern.

A foreign national's removal was sought based on purely foreign conduct, and also based on an impact on U.S. relations with other countries.  Among other things, a refusal might have harmed a U.S.-led peace process, and might have made other countries less likely to help America deny safe havens to terrorists.

> I have determined that the entry, continued presence, or activities in the United States of Mousa Mohammed Abu Marzook . . . would have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest.  My determination is based on the following considerations. . . .

> Mr. Marzook, who acknowledges that he is a top official of Hamas, has been declared a "Specially Designated Terrorist" under the authority of [a Presidential] executive order by virtue of his actions on behalf of Hamas.  All assets of both Hamas and Mr. Marzook in the United States are blocked, and financial transactions with each are prohibited unless authorized by the Department of the Treasury's Office of Foreign Assets Control.

> Additionally, during the course of recent extradition proceedings against Mr. Marzook

---

[54]  <u>See</u> <u>also</u>, <u>e.g.</u>, Matthew Purdy, <u>Hiding in Plain Sight: Search for Haitian Exile</u>, N.Y. Times, May 24, 1995, at B.1 (newspaper article describing Constant's removal from the United States); <u>INS Agents Arrest Emmanuel Constant</u>, United Press Int'l (May 11, 1995), https://perma.cc/8UMS-MFSR  (accessed on May 28, 2025) (same).

initiated at the request of the Government of Israel, two U.S. courts found probable cause that he was criminally responsible for ten specific, grave incidents of terrorism in and around Israel before his arrival in the United States.  Judge Duffy stated:

> "I find that there is probable cause to believe Abu Marzook engaged in and intended to further aims of the conspiracy by his membership in and support of the Hamas organization.  I also find that probable cause exists that Abu Marzook knew of Hamas's plan to carry out violent, murderous attacks, that he selected the leadership and supplied the money to enable the attacks to take place and that such attacks were, therefore, a foreseeable consequence of the conspiracy."

Judge Wood, in her ruling, found that "the evidence [Judge Duffy] relied upon is more than sufficient to sustain his ruling," noting as an example Mr. Marzook's public acceptance of responsibility on behalf of Hamas for an October 9, 1994, attack in a pedestrian mall in downtown Jerusalem. . . .

The credibility of United States policies would be jeopardized if a prominent leader of a designated terrorist organization were allowed to reside in the United States.  This in turn would undermine our ability to seek cooperation from others in denying terrorists [safe haven].  Moreover, this is a particularly crucial moment in the Middle East peace process, when senior United States officials are making a maximum effort to secure cooperation in the fight against Hamas terrorism and to resume the negotiating process.

Letter from Madeleine Albright, Sec'y of State, to Janet Reno, Att'y Gen. (Apr. 4, 1997) (quoting <u>Marzook</u> v. <u>Christopher</u>, 1996 WL 583378 (S.D.N.Y. Oct. 10, 1996)), https://perma.cc/Q87M-UD99 (retrieved through the <u>Digest of United States Practice in International Law 1991-1999</u>) (accessed on May 28, 2025) (cleaned up).

*    *    *

Finally: <u>Matter of Ruiz-Massieu</u>, 22 I. & N. Dec. 833 (BIA 1999).

There, federal officials sought to remove Mario Ruiz-Massieu. <u>See</u> <u>Massieu</u>, 91 F.3d at 417-19.  He was "the second ranking law enforcement authority in Mexico" and was facing "serious" and "unprecedented" criminal charges there.  <u>Massieu</u>, 915 F. Supp. at 711.

Ruiz-Massieu was alleged to have violated Mexican criminal law while serving in Mexico as a Mexican government official.  <u>See</u> <u>id</u>.  The Secretary's determination focused entirely on his alleged activities abroad.  And it zeroed in on damage in the absence of removal to "U.S.-Mexican relations."

> The U.S. Government has consistently urged Mexico to take the steps towards reform in its justice system that President Zedillo is so forcefully pursuing.  The ability to prosecute Mr. Ruiz Massieu and other powerful individuals in Mexico for the crimes of which they are accused is key to the success of Zedillo's pledge to transform totally the judicial and law enforcement system and to rid Mexico of corruption and abuse of power.  Should the U.S. Government not return Mr. Ruiz Massieu to Mexico, our support of such reforms would be seen as hollow and self-serving and would be a major setback for President Zedillo and our combined efforts to chart a new and effective course of U.S.-Mexican relations.

<u>Id</u>. at 712.[55]

---

[55]  <u>See</u> <u>generally</u> Ronald Smothers, <u>Former Mexican Deputy Attorney General Indicted for Drug Trafficking</u>, N.Y. Times (Aug. 28,

\*    \*    \*

The legislative history and the enforcement history of Section 1227 sit on the same side of the scale.

Section 1227 was generally meant to be used, and has been used, for conduct (a) that entirely or all but entirely took place outside the United States and (b) that, as determined by the Secretary, would impact U.S. relations with a foreign country.

But here, per the Secretary's determination, the Petitioner acted solely within the United States.  <u>See</u> Determination at 2. And the Secretary did not affirmatively determine that the Petitioner's conduct had any impact on U.S. relations with another country.

The legislative and enforcement history do not suggest in "the common mind," <u>McBoyle</u>, 283 U.S. at 27, that removal might be sought in these circumstances.[56]

Rather, they underscore that a Section 1227 removal of the kind at issue here is unprecedented --- not within the realm of conduct that the statute normally covers, of which an ordinary person would have notice.

### E.    <u>Difficulty</u>

To see the next point, start with this legal principle: a law can be unconstitutionally vague when it conditions liability or punishment (or here, removal) on a standard that requires analysis that is simply too hard for an ordinary person to realistically pull off.

---

1999), https://perma.cc/3DZZ-EBG8 (accessed on May 28, 2025); <u>Ex-Official of Mexico Indicted</u>, Wash. Post. (Aug. 27, 1999), https://www.washingtonpost.com/archive/politics/1999/08/28/ex-official-of-mexico-indicted/8633fe6d-5e2b-476a-8496-cc72cbca6a5d (accessed on May 28, 2025).

[56]  If anything, the relevant "history and practice," <u>Beauharnais</u> v. <u>Illinois</u>, 343 U.S. 250, 253 (1952), might have led an ordinary person to affirmatively believe that domestic conduct which the Secretary has not determined affects U.S. relations with another country is beyond the reach of Section 1227.

The Supreme Court has made that clear, as discussed below.  And it is not hard to see its reasoning.

A standard that is too hard to use undermines notice.  As a practical matter, it leaves people guessing as to whether they are violating the law.

And such a standard also ups the odds of arbitrary enforcement, because it leaves enforcers to guess, too.

Take this up now, along with its implications for this case.

                        *    *    *

Legal standards often require <u>some</u> analysis, and that is not generally a vagueness problem.

Take an ordinance that says a person picketing outside a school commits a crime if she makes noise that disturbs a class.

The ordinance requires the demonstrator to think through the possible relationship between a cause (her protest) and a possible effect (disruption of the students and teachers working away inside).

If she gets the analysis wrong --- or at least analyzes things differently than a police officer might --- the demonstrator can be arrested.

This is no vagueness issue.

The ordinance requires an analysis that is not especially complicated or obscure.  People can figure out whether "normal . . . activity . . . is about to be disrupted."  <u>Grayned</u>, 408 U.S. at 112.

No surprise, then, that anti-noise ordinances along the lines of the above have routinely survived vagueness challenges.  <u>See</u>, <u>e.g.</u>, <u>id.</u>; <u>Cameron</u>, 390 U.S. at 615-17 (rejecting vagueness challenge to an ordinance that prohibited demonstrations that disturbed activity inside a courthouse); <u>see generally</u> <u>Nash</u> v. <u>United States</u>, 229 U.S. 373, 377 (1913) ("[T]he law is full of instances where a man's fate depends on his estimating rightly.").

Consider another law.

This one told truck drivers hauling explosives to avoid "driving into or through congested thoroughfares, places where crowds are

assembled" --- "so far as practicable, and, where feasible." Boyce Motor Lines, 342 U.S. at 339.

This can be tricky to figure out in big cities, and a truck company hauling loads from New Jersey to New York was charged with breaking the referenced law.  See id.

It argued the law was unconstitutionally vague.  See id. at 339–40.  But the Supreme Court disagreed.  See id. at 343.

Trucking-industry groups had been involved in formulating the law, see id. at 341–42, and truckers could realistically be expected to thread the needle by mapping out routes that dodged "congested" streets and "crowd[ed]" places.  See id. at 342–43; accord, e.g., Sproles, 286 U.S. at 393 (rejecting vagueness challenge to a law that required truckers to use the "shortest practicable route to [their] destination").

In the noise-ordinance cases and in the trucking cases, the operative legal standards required some analysis.  But not too much, and so the Supreme Court held there was no vagueness problem.

There are cases, though, that go the other way --- cases in which the analysis required by a statute's operative standard was too difficult as a practical matter, and so the Supreme Court struck down the statute.

Walk through the cases now.

\*    \*    \*

First, International Harvester Co. of America v. Kentucky, 234 U.S. 216 (1914).

A Kentucky law allowed certain businesses to come together to sell their goods --- but only if that would not raise prices. See id. at 221.

How to confirm that prices did not jump?

Per the Kentucky law, that was a matter of determining whether current prices were no more than what "the market value under fair competition" would have been --- that is, the prices "under normal market conditions," id., had the businesses not decided to join together in the first place.

68

A company, International Harvester, was convicted under this law.  See id. at 219.  But the Supreme Court, per Justice Holmes, struck down the law as unconstitutionally vague.

Why?  Not because the Kentucky law required wading through some shades of gray.  Many laws require that.

Negligence law, per the Supreme Court, was one such example: "between the two extremes of the obviously illegal and the plainly lawful there is a gradual approach, and that the complexity of life makes it impossible to draw a line in advance without an artificial simplification that would be unjust."  Id. at 223.  Laws against negligence leave room for judgment, but they are not vague.  They involve well-known concepts, which makes it "comparatively easy for common sense to keep to what is safe."  Id.

But the Kentucky law was vague because "common sense" could be no help.  Only "complex[]," id., counterfactual economic analysis could indicate what prices might have been had the businesses not come together --- and without doing that analysis, International Harvester could not stay on the right side of the law.

But why not just require International Harvester to loose accountants and economists on the pricing question?

The Supreme Court's answer: the required analysis was simply too hard.

Working through it would vex "the acutest commercial mind."  Id. The facts --- necessary grist for any financial analysis --- were "uncertain both in nature and degree."  Id.  They were "only partially determinate."  Id.  The end result would be "[t]o compel [businesses] to guess," "to divine prophetically." Id.

All of this, per the Supreme Court, was too much, and so it struck down the law as vague.  See id. at 222-24; accord, e.g., Am. Seeding Mach. Co. v. Kentucky, 236 U.S. 660, 662 (1915); Collins v. Kentucky, 234 U.S. 634, 638 (1914).

Ordinary people need to have a real shot at understanding what the law requires.  That is impossible when a law's requirements are articulated through an analysis that must be done --- but which is so challenging that it ultimately calls for a great deal of guesswork.  See Harriss, 347 U.S. at 617 ("The

underlying principle [of vagueness law] is that no man shall be held criminally responsible,[57] for conduct which he could not reasonably understand to be proscribed.").[58]

Now take another case, United States v. L. Cohen Grocery Co., 255 U.S. 81 (1921).

The defendant, a grocer, was charged with violating a law that barred sales of certain goods at an "unjust or unreasonable rate." Id. at 89 (cleaned up).

District judges had taken numerous approaches to determining a "[]reasonable" rate. See id. at 90 n.2. They came up with various formulas; these accounted for the price the defendant paid, handling costs, and typical industry profits. See id.

The Supreme Court might have gone with any one of those --- especially because the statute in question had a mens rea requirement, see id. at 86, something that has long been understood as stiff medicine for curing a vagueness problem. See, e.g., Screws v. United States, 325 U.S. 91, 101–103 (1945);

---

[57] As noted in Part III, the vagueness doctrine that applies to criminal cases applies in removal cases. See Dimaya, 584 U.S. at 156–57 (citing Jordan, 341 U.S. at 229, 231).

[58] A passage in International Harvester suggests that the analysis the statute required was not just difficult, but impossible --- requiring "gifts that mankind does not possess." 234 U.S. at 224. But an impossibility reading of the case would be too strong. Judges routinely deal with counterfactual questions. What would a person have earned if she had not been injured? And counterfactual questions can be sprawling. Think of an antitrust class action. Or some of the lost-profits issues in major commercial disputes. Or the price effects of foreign goods dumped in the domestic market. See, e.g., Swiff-Train Co. v. United States, 793 F.3d 1355 (Fed. Cir. 2015). The counterfactual economics question in International Harvester question would have been very hard. That was the Supreme Court's point. But it would not likely have seemed literally impossible to Justice Holmes and his colleagues. (Indeed, economists often resolve tough questions by seeking out "natural experiments." And one could have been at hand in International Harvester. To ask how the market would have worked without the combinations Kentucky allowed, it might have been possible to simply look to the prices being charged in similar markets that did not have a combinations law like Kentucky's.)

<u>United States</u> v. <u>Ragen</u>, 314 U.S. 513, 524 (1942); <u>Gorin</u> v. <u>United States</u>, 312 U.S. 19, 27—28 (1941); <u>Omaechevarria</u>, 246 U.S. at 348.

But the Court struck down the statute as vague.  <u>See</u> <u>L. Cohen Grocery</u>, 255 U.S. at 92–93.  The range of facts that might relate to whether a price is "unreasonable" was simply too broad to get a solid handle on.

> [The statute] confines the subject-matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides.  It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against.

<u>Id</u>. at 89.

The statute, in short, envisioned a standard ("[]reasonable" and "[]just") for allowable prices.  <u>See id</u>. at 86.

That standard, on its own, may not have been too hard to administer.  <u>See</u> <u>Cameron</u>, 390 U.S. at 616 & n.7 (holding that "unreasonable" is not vague --- and noting that the Constitution itself uses that term).

But <u>applying</u> the standard, figuring out how it might actually work as to the price of a pound of sugar --- that was too much.  The equation was too difficult to work through, because its factual inputs could be anything and everything --- "the widest conceivable inquiry."

A third case is <u>Johnson</u> v. <u>United States</u>, 576 U.S. 591 (2015).

There, the Supreme Court considered a provision of federal law that lengthened a defendant's prison term if she had three or more prior convictions for a "violent felony."  <u>See id</u>. at 593 (cleaned up).  The law, as interpreted by the Supreme Court, defined "violent felony" in light of whether the underlying crime's "ordinary case" posed a serious risk of physical injury.  <u>See id</u>. at 596 (cleaned up).

This was too vague an approach under the Constitution, the Supreme Court held.  One of the main reasons why:

> How does one go about deciding what kind of
> conduct the 'ordinary case' of a crime
> involves?  A statistical analysis of the
> state reporter?  A survey?  Expert evidence?
> Google?  Gut instinct?  To take an example,
> does the ordinary instance of witness
> tampering involve offering a witness a
> bribe?  Or threatening a witness with
> violence? . . . Explaining why attempted
> burglary poses a serious potential risk of
> physical injury, the Court said: "An armed
> would-be burglar may be spotted by a police
> officer, a private security guard, or a
> participant in a neighborhood watch program.
> Or a homeowner . . . may give chase, and a
> violent encounter may ensue."  The dissent,
> by contrast, asserted that any confrontation
> that occurs during an attempted burglary "is
> likely to consist of nothing more than the
> occupant's yelling 'Who's there?' from his
> window, and the burglar's running away."
> The [statute] offers no reliable way to
> choose between these competing accounts of
> what 'ordinary' attempted burglary involves.

Id. at 597 (cleaned up).

The questions posed by the Supreme Court, through Justice
Scalia, were sharp and telling.  But they were clearly
rhetorical.

It is possible to work out, at least roughly, what the
"ordinary" case of a crime is.  For example, a "statistical
analysis" of reported cases would likely shed light on that,[59]
and an expert deep dive might, too.  Indeed, the Sentencing

---

[59]  There are, for example, around two to three dozen people
charged each year in the federal system under the statute that
forbids witness tampering.  See Federal Criminal Case Processing
Statistics Data Tool, Bureau of Just. Stats.,
https://fccps.bjs.ojp.gov/home.html?dashboard=FJSP-
CriminalCodeStats&tab=CriminalCodeStatistics&ccm=4 (accessed on
May 28, 2025) (Select "Number of persons in cases filed" and
"18:1512 B").  The indictments for these can help show what is
typical.

Guidelines are in part premised on typicality.  See Koon v. United States, 518 U.S. 81, 94 (1996) (noting that the United States Sentencing Commission bases its Guidelines on "a heartland of typical cases"); U.S. Sent'g Guidelines Manual at 7 (U.S. Sent'g Comm'n 2024) ("When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.").

The point is only this: Johnson does not rest on the idea that it is literally impossible to determine what the "ordinary" case of a crime is --- only that the analysis is enormously difficult and consuming.

And when the law requires an analysis like that, vagueness red flags go up, as they did in International Harvester and L. Cohen Grocery, too.

This point looms especially large in First Amendment-related cases.[60]

To see how, look to a final case, Herndon v. Lowry, 301 U.S. 242 (1937).

There, the Supreme Court reviewed a state criminal conviction. The underlying statute had been construed as requiring an element of violence, see id. at 262-63, but the defendant had done little more than recruit Communist Party members and possess certain literature.  See id. at 253.

On what basis, then, could he have been convicted?  How could the violence aspect of the conviction be sustained?

The state courts' answer: based on the potential actions of others --- on the defendant's "influence . . . in causing such action by those whom he sought to induce."  Id. at 262.

Quoting L. Cohen Grocery at length, see id. at 263, and citing a set of other vagueness cases, see id. at 263 n.14, the Supreme Court reversed the conviction.

The state's criminal law, the Supreme Court held, improperly allowed for conviction based on a "forecast," id. at 262, the

---

[60]  The Petitioner's case is a First Amendment case.  See Part V.F.

"result of a chain of causation," id., as to how others might in the future respond to the defendant's past actions.

> The question thus proposed to a jury
> involves pure speculation as to future
> trends of thought and action.  Within what
> time might one reasonably expect that an
> attempted organization of the Communist
> Party in the United States would result in
> violent action by that party?  If a jury
> returned a special verdict saying twenty
> years or even fifty years, the verdict could
> not be shown to be wrong.  The law, as thus
> construed, licenses the jury to create its
> own standard in each case.

Id. at 263.

The theory that the defendant "ought to have foreseen his words would have some effect in the future conduct of others," id. at 263-64, was, per the Supreme Court, too "vague."  See id. at 264.

*    *    *

Come back now to this case.

Section 1227, the subject of the Petitioner's as-applied challenge, triggers the same difficulties as the just-cited cases.

The Secretary of State's determination rests, as relevant here, on the idea that the Petitioner's conduct in the United States impacted the global fight against anti-Semitism.  See Determination at 2.[61]

But there is no suggestion as to how.

The Secretary's determination does not say that the Petitioner contacted anyone outside the United States.  And the Secretary's determination does not suggest that people abroad paid any attention to the Petitioner --- let alone that he influenced them in the direction of prejudice (or in any other direction for that matter).

---

[61]  Put aside for now that the Secretary of State did not affirmatively determine whether this had the required impact on U.S. relations with other countries.

The implied understanding of Section 1227 at work in the
Secretary's determination would seem to be this: while the
statute covers only impacts on "foreign policy," those impacts
can be the product of domestic action that is not said to be
directed to the outside world.

Impacts of that sort can plainly happen.  Ideas and words can
spread.  An act here can cause bias there.  One person's example
can "influence" another person --- "as a result of a chain of
causation."  Herndon, 301 U.S. at 262.

But if that is the idea, how is an ordinary person to have
notice that his conduct in America may have the impact that
Section 1227 requires?  How will he know whether people are
hearing his words?  That they are being influenced by them?
That he is being seen by others as a kind of role model?  What
facts will he need to look to in order to answer these
questions?  Is he to read foreign newspapers to see whether he
is being covered and how?  In what languages?  Newspapers from
what places?  Should he look to YouTube?  TikTok?  How
thoroughly must he search for himself online?  And critically:
how much influence abroad is enough?  When will he have a sense
that his influence has risen to the high level of
"compromis[ing]" --- "undermin[ing]," Compromise, v., sense 2,
Oxford American Writer's Thesaurus (2024) (emphasis added) --- a
compelling American foreign policy interest?[62]

If a person wishes to steer clear of the possibility of being
removed from the United States under Section 1227, he will have
to go quiet, or he will have to figure these things out.

But having people go quiet because they cannot readily determine
how to stay on the right side of the law --- that is one of the
things vagueness doctrine exists to guard against.[63]

_____

[62]  Cf. Johnson, 576 U.S. at 597 ("How does one go about deciding
what kind of conduct the 'ordinary case' of a crime involves?  A
statistical analysis of the state reporter?  A survey?  Expert
evidence?  Google?  Gut instinct?").

[63]  See Grayned, 408 U.S. at 109 ("[W]here a vague statute abuts
upon sensitive areas of basic First Amendment freedoms, it
operates to inhibit the exercise of those freedoms.  Uncertain
meanings inevitably lead citizens to steer far wider of the

And as to figuring things out, the task is, simply, very hard.

Answering the questions listed out above depends on an extraordinarily broad range of information.

And the questions are, in any event, difficult --- around as hard as the questions in International Harvester, L. Cohen Grocery, and Johnson, cases in which the legal standards were too hard to realistically apply, to the point that they did not allow for real notice to potential violators and the underlying statutes were struck down by the Supreme Court as unconstitutionally vague.

And more pointedly: a standard that turned on a "forecast" as to how others might be "influenced" by one's conduct was stuck down as vague by the Supreme Court in Herndon.

But that is what Section 1227 asks of the Petitioner here.

### F.    **The First Amendment**

A final point.

When it comes to First Amendment-protected speech, the Supreme Court has repeatedly said that vagueness doctrine is especially demanding.[64]

The Secretary's determination here falls into First Amendment category.

---

unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (cleaned up).

[64]    See Fox Television Stations, 567 U.S. at 253-54; Reno v. Am. C.L. Union, 521 U.S. 844, 871-72 (1997); Marks v. United States, 430 U.S. 188, 196 (1977); Buckley v. Valeo, 424 U.S. 1, 41 (1976); Parker v. Levy, 417 U.S. 733, 756 (1974); Goguen, 415 U.S. at 573; Grayned, 408 U.S. at 109; Ashton v. Kentucky, 384 U.S. 195, 200 (1966); Baggett, 377 U.S. at 372-73 & n.10; Cramp, 368 U.S. at 287-88; Smith v. California, 361 U.S. 147, 151 (1959); Cantwell v. Connecticut, 310 U.S. 296, 308 (1940); see also Ashcroft v. Free Speech Coal., 535 U.S. 234, 258 (2002); Interstate Cir., Inc. v. City of Dall., 390 U.S. 676, 684-90 (1968); Cox v. Louisiana, 379 U.S. 536, 551-52 (1965); Edwards v. South Carolina, 372 U.S. 229, 237 (1963); Winters, 333 U.S. at 509-10; Stromberg v. California, 283 U.S. 359, 369 (1931).

The Secretary's determination suggests it was based on the Petitioner's "lawful" "beliefs, statements, or associations." Determination at 1.

And "beliefs," "statements," and "associations" are generally protected by the First Amendment.  See, e.g., Elfbrandt v. Russell, 384 U.S. 11, 18 (1966); Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y., 360 U.S. 684, 688 (1959).[65]

*    *    *

When the First Amendment is implicated, as here, vagueness doctrine becomes especially unforgiving.

To see the point, look first to Buckley v. Valeo, 424 U.S. 1 (1976).

There, the Supreme Court considered a vagueness challenge to a campaign-finance statute.

The challenged provision read: "No person may make any expenditure . . . relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000."  Id. at 193.

This is much more specific and sharply drawn than Section 1227's "compromise[s] a compelling . . . foreign policy interest."

And on first glance, it looks like it easily clears the vagueness bar.

After all, the statute's words limit the giving of one person ("no person") towards another ("a clearly identified candidate") during a clearly defined time ("a calendar year") to a fixed amount of money ("$1,000").  On top of that, the act included

---

[65]  Sometimes, though, they are not.  Think, for example, of "fighting" words or "true threats."  See Counterman v. Colorado, 600 U.S. 66, 72 (2023); Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942).  But those carveouts are not in play.  The Secretary has proceeded on the basis that the Petitioner's "beliefs, statements, or associations" were "otherwise lawful" --- lawful, that is, but for their being a predicate for a Section 1227 removal.

its own definitions for "expenditure," "clearly identified," and "candidate." See id. at 41.

But there was a problem, the Supreme Court said.

One statutory term, "relative to," was left undefined. See id. at 41. And that suggested possible vagueness. See id.

To salvage the statute, the Court looked to context and legislative history. Context permitted (and maybe required) "'relative to' a candidate to be read to mean 'advocating the election or defeat of' a candidate." Id. at 42. And this definition also found support in the Senate Report, House Report, Conference Report, and the opinion of the court of appeals. See id. at 42 n.49.

But even that did not close the door on the vagueness problem. See id. at 42. It just opened the way to new questions. What did it mean to advocate "the election or defeat of" a candidate? The line between such advocacy, which the statute limited, and "discussion of issues or candidates," which it did not, was too hazy, the Court said. See id. at 42–43.

"Such a distinction offers no security for free discussion." Id. at 43 (cleaned up). "In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim." Id. (cleaned up).

So the Supreme Court further narrowed the statute.

As newly construed, the provision would extend "only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." Id. at 44.

And the Court listed specific phrases ---- "express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject'" --- to show exactly where the line was. Id. at 44 n.52.

Only with that extraordinary amount of specificity now baked in did the Court hold that the provision could survive a vagueness challenge under the heightened First Amendment standard afforded to political speech. See id. at 44; see also id. at 41 (noting that the Buckley Court was wrestling with an area "permeated by First Amendment interests").

And there can be no doubt that the statute in <u>Buckley</u>, which barely squeaked by, was much less vague than Section 1227.

\*    \*    \*

<u>Buckley</u> is not alone.

Look to a final case, <u>United States</u> v. <u>Loy</u>, 237 F.3d 251 (3d Cir. 2001).

The defendant there, convicted for possessing child pornography, challenged a supervised-release condition as vague.  The condition barred him "from possessing all forms of pornography, including legal adult pornography." <u>Id</u>. at 261. (cleaned up).[66]

Was this too vague?  Yes, the Third Circuit held.

The court was not writing on a completely blank slate in defining "pornography."  The Supreme Court had at least pointed to a definition of the word, though that was dicta of the most glancing kind.  <u>See id</u>. at 263 (citing <u>Miller</u> v. <u>California</u>, 413 U.S. 15, 19 n.2 (1973)).

That definition and others in dictionaries left room for debate. <u>See id</u>. at 263-64.  And even with their help, the Third Circuit could not say whether pornography encompassed only visual materials or included pure text and sound recordings, or whether it would sweep in medical textbooks and classic novels.  <u>See id</u>. at 264, 266.

And while a federal statute defined a related term, "child pornography," that definition did not fit with the release condition.  <u>See id</u>. at 263 n.4 (citing 18 U.S.C. § 2256).  The court declined to adopt it (though it noted that the district court might borrow from it on remand).  <u>See id</u>. at 267.

The court also declined to salvage the condition by reading it to include a mental-state requirement.  <u>Mens rea</u> "cannot eliminate vagueness if it is satisfied by an 'intent' to do something that is in itself ambiguous," the court said.  <u>Id</u>. at 265 (cleaned up).

The no-pornography condition went too far, and the First Amendment was part of why.  "[W]ith no guidepost for [the defendant], the pornography prohibition as currently written

---

[66]  The court of appeals noted that pornography receives First Amendment protection.  <u>See id</u>. at 261-63.

violates due process by failing to provide [the defendant] with adequate notice of what he may and may not do, chilling his First Amendment rights." Id. at 267. The court of appeals vacated the condition. See id. at 270.

*    *    *

The Supreme Court has repeatedly held that when it comes to First Amendment vagueness, the kind at issue here, the bar is raised to its highest level. See Part III.

But the Court does not seem to have set down a doctrinal test that reflects the special rigor demanded in this area.

No matter, though.

Buckley and Loy make clear what it means.

Think of the Supreme Court in Buckley, which upheld the campaign-finance statute, but only after working at length to pin it down.

And think of the Third Circuit in Loy, which looked to dictionaries, another statute, and a mens rea requirement --- but still struck down the supervised-release condition as vague.

As the Court has shown, the Secretary's determination has many vagueness-as-applied strikes against it.

Section 1227 is vaguer than other statutes that have been struck down. See Part V.C.

Section 1227 has been applied here in a surprising way --- one that lessens the notice that an "ordinary person" receives and leaves enforcement fully "standardless."

The Secretary has not determined that the Petitioner's conduct has impacted U.S. relations with another country. But that is what Section 1227 requires. See Part V.B.

And the statute's legislative and enforcement history do not foreshadow the Secretary's determination. See Part V.D.

Moreover, Section 1227, as applied here, requires hard thinking to even know whether it is being triggered. See Part V.E.

Take all of those headwinds, and add to them the First Amendment's.

The result is that the Petitioner is likely to succeed on the merits of his claim that Section 1227 is unconstitutionally

vague as applied to him through the Secretary of State's determination.

### G.    Another Approach

The premise of the analysis set out above in Part V.B to Part V.F is that (a) dictionaries say that "foreign policy" concerns state-to-state relations, see Part V.A.3, and (b) vagueness doctrine instructs that statutes like Section 1227 must be interpreted in light of such dictionary definitions.  See id.

All of this is sound.

But nonetheless, consider now an alternative approach to the vagueness question that appears to implicitly drive part of the Respondents' argument.

Namely, what if Section 1227's "foreign policy" has a broader meaning?  What if it means not just America's relations with other countries, as the dictionaries say, but also encompasses a wider concern --- the United States' relations with the external world as a whole?[67]

If that were the shape of the umbrella, fighting the social and religious scourge of global anti-Semitism could well fit under it.

And if so, it would be beside the point that the Secretary has not determined that the Petitioner's conduct impacts U.S.

---

[67]  The United States has a foreign policy interest in other countries.  But it may also have a general interest, wholly separate from its relation to any countries, in securing access from abroad to certain minerals.  See Exec. Order 14,241, 90 Fed. Reg. 13673 (Mar. 20, 2025); Exec. Order 14,017, 86 Fed. Reg. 11849 (Feb. 24, 2021).  Or in limiting global emissions of certain chemicals.  See Exec. Order 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021); Montreal Protocol on Substances that Deplete the Ozone Layer, Preamble, Sept. 16, 1987, S. Treaty Doc. 100-10.  Or in curbing piracy on the high seas.  See U.S. Counter Piracy & Maritime Security Action Plan, U.S. Dep't of State, Bureau of Pol.-Mil. Affs. (June 2, 2014).  An occasional dictionary maps out this understanding, of "foreign policy" as concerned with "[t]he political and security policies adopted by a state in relation to the outside world."  Foreign Policy, sense 1, A Dictionary of Diplomacy 107 (2d ed. 2003).

relations with any country or countries, because foreign policy could be taken as including things (like fighting global anti-Semitism) separate from any impact on relations with particular countries.

On this broader understanding --- call it an "external affairs" understanding --- is Section 1227 still vague as applied in this case?

The Court's conclusion: yes.

                              *      *      *

To see why, begin by noting that an external affairs reading of "foreign policy" scrambles the picture --- but only to a point.

It does not alter the fact that Section 1227 is vaguer than a number of statutes that the Supreme Court has struck down.  See Part V.C.  It does not undo the legislative- and enforcement-history points.[68]  See Part V.D.  And it does not cast doubt on the parts of the analysis that turn on the difficulty of knowing whether one has violated the law, see Part V.E, or on the relevance of the First Amendment.  See Part V.F.

                              *      *      *

This said, the external affairs understanding of foreign policy would seem to improve notice.

Because, on that interpretation, the statute's words ("foreign policy") would now better fit the Secretary's determination.[69]

---

[68]  The Court has looked to legislative history here only as to notice.  See Part V.D.1(a).  But if there are competing understandings of "foreign policy," each pulling hard in a different direction, then Section 1227 is ambiguous.  If so, the Court can consult the statute's legislative history not just as to notice but also as to the delineation of government powers.  See Delaware, 598 U.S. at 138-39; McDaniel v. Sanchez, 452 U.S. 130, 146-47 (1981); Dir., Off. of Workers' Comp. Programs v. Sun Ship, Inc., 150 F.3d 288, 291 (3d Cir. 1998); cf. Pringle v. Ct. of Common Pleas, 778 F.2d 998, 1003 n.5 (3d Cir. 1985).  And the legislative history generally supports the narrower, "other countries" reading of foreign policy.  See Part V.D.

[69]  Notice seems improved.  But maybe not really.  After all, the Secretary's effort to remove the Petitioner can be squeezed into

And moreover, using the broader external affairs understanding would mean that the Secretary is operating <u>within</u> a legislated standard.

After all, "foreign policy," on the external affairs understanding, can apply to efforts to take on a social or religious issue, like combatting global anti-Semitism.

*    *    *

But all of this is on first glance only.

Look harder at what it would mean to read "foreign policy" broadly, and Section 1227 only becomes vaguer, supplying on balance both less notice and fewer curbs on enforcement discretion.

This Part explains the point.

*    *    *

---

the words of Section 1227 only by ignoring the leading dictionary definitions of "foreign policy."  But why should an ordinary person be expected to whistle past those?  Maybe, it might be said, this issue can be addressed by treating the "other countries" understanding as the <u>primary</u> dictionary definition of foreign policy --- and the broader "external affairs" understanding as a kind of <u>secondary</u> dictionary definition.  But there is little warrant for doing this in the dictionaries themselves.  And in any event, that renames the problem.  It does not solve it.  <u>See</u> <u>Lanzetta</u>, 306 U.S. at 454 (holding law unconstitutionally vague because, in part, dictionary definitions were "numerous and varied"); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Sharp</u>, 27 F. Cas. 1041, 1043 (C.C.D. Pa. 1815) (noting that Justice Washington, riding circuit, declined to recommend a guilty verdict to the jury because when it came to the key term, revolt, "[i]f we resort to definitions given by philologists, they are so multifarious, and so different, that I cannot avoid feeling a natural repugnance, to selecting from this mass of definitions, one, which may fix a crime upon these men"); <u>McJunkins</u> v. <u>State</u>, 10 Ind. 140, 144-45 (1858) (determining that a law is "vague" after consulting multiple dictionaries and finding different definitions for the same term); <u>cf</u>. <u>Lifchez</u> v. <u>Hartigan</u>, 735 F. Supp. 1361, 1365 (N.D. Ill. 1990) ("wildly different definitions" of a key term "offer[] little help to persons of common intelligence who want to know what the state forbids").

83

Here is a list of some things that have been described as American "foreign policy interests" that do not seem to be linked to the United States' relations with any particular country:

(1) ensuring the global economic competitiveness of American companies, (2) ensuring resiliency in global supply chains, (3) defending democracy around the world, (4) regulating unmanned-aerial-systems exports, (5) containing the spread of "radical Islam," (6) ensuring American armed forces maintain a technological edge over potential foes, (7) promoting gender equality, (8) preventing the violation of United States export laws, (9) promoting human rights globally, (10) promoting certain international broadcasting, (11) preserving the trade of ethically sourced diamonds, (12) promoting trade, (13) combatting terrorism, (14) increasing transparency in governance, (15) maintaining the aerospace industry's competitiveness globally, (16) achieving a Comprehensive Test Ban, (17) furthering economic growth, (18) promoting human rights in the Western Hemisphere, (19) supporting free markets, (20) enlarging the number of democracies, (21) pursuing world freedom, (22) improving international relations, (23) building a more peaceful world, (24) promoting science and technology in America's relations with other nations, (25) preventing nuclear proliferation, (26) fostering world economic stability, (27) increasing individuals' capacity to meet their basic human needs, (28) adequately funding foreign aid, (29) ensuring equitable economic intercourse among nations, (30) reducing direct military involvement abroad, (31) fostering good will towards the United States, (32) reducing unnecessary barriers to trade, and (33) assisting the economic growth of less-developed countries.[70]

---

[70]  The source for (1) is Exec. Order 14,209, 90 Fed. Reg. 9587 (Feb. 10, 2025).  For (2), President Joseph Biden, National Security Memorandum on United States Conventional Arms Transfer Policy (Feb. 23, 2023).  For (3), President Joseph Biden, Memorandum on Deferred Enforced Departure for Certain Hong Kong Residents (Aug. 5, 2021).  For (4), Kayleigh McEnany, Statement by the Press Secretary on Unmanned Aerial Systems Exports (July 24, 2020).  For (5), President Donald Trump, Remarks on Foreign Policy (Apr. 27, 2016).  For (6), Presidential Policy Directive 27, Directive on United States Conventional Arms Transfer Policy (President Obama) (Jan. 15, 2014).  For (7), President Barack

---

Obama, Memorandum on Coordination of Policies and Programs to Promote Gender Equality and Empower Women and Girls Globally (Jan. 30, 2013).  For (8), Exec. Order 13,558, 75 Fed. Reg. 69573 (Nov. 9, 2010).  For (9), Robert Gibbs, Press Sec., Press Briefing (Aug. 18, 2009).  For (10), President George W. Bush, Statement of Administration Policy: H.R. 2764 (June 19, 2007). For (11), President George W. Bush, Statement on Signing the Clean Diamond Trade Act (Apr. 25, 2003).  For (12), Ari Fleischer, Press Sec., Press Briefing (Oct. 10, 2001).  For (13), Letter from President George W. Bush to Vice President Dick Cheney and J. Dennis Hastert, Speaker of the House of Representatives (Aug. 17, 2001).  For (14), President George W. Bush, Statement on the Global Forum on Fighting Corruption and Safeguarding Integrity II (May 28, 2001).  For (15), Mike McCurry, Press Sec., Press Briefing (July 3, 1997).  For (16), Mike McCurry, Press Sec., Press Briefing (Sept. 9, 1996).  For (17), Letter from President Bill Clinton to Thomas S. Foley, Speaker of the House of Representatives, Claiborne Pell, Chairman of the S. Comm. on Foreign Rels., and John Glenn, Chairman of the S. Comm. on Gov't Affs. (Mar. 20, 1996).  For (18), Dee Dee Myers, Press Sec., Press Briefing (Sept. 8, 1994). For (19), President Bill Clinton, News Conference with President Boris Yeltsin of Russia (July 10, 1994).  For (20), Dee Dee Myers, Press Sec., Press Briefing (Oct. 20, 1993).  For (21), President Ronald Reagan, Address to the Nation on the Soviet-United States Summit Meeting (Dec. 10, 1987).  For (22), President Ronald Reagan, Message to the Congress Transmitting the Annual Report on International Activities in Science and Technology (June 17, 1987).  For (23), President Ronald Reagan, Remarks to Participants in the National YMCA Youth Governors' Conference (June 21, 1984).  For (24), President Ronald Reagan, Message to the Congress Transmitting the Annual Report on U.S. International Activities in Science and Technology (July 11, 1983).  For (25), President Ronald Reagan, Statement on United States Nuclear Nonproliferation Policy (July 16, 1981).  For (26), President Jimmy Carter, State of the Union Address (Jan. 19, 1979).  For (27), President Jimmy Carter, International Health Program Statement Announcing a Program to Strengthen U.S. Participation (May 2, 1978).  For (28), President Richard Nixon, Special Message to the Congress Proposing Reform of the Foreign Assistance Program (Apr. 21, 1971).  For (29), President Richard Nixon, Second Annual Report to the Congress on United States Foreign Policy (Feb. 25, 1971).  For (30), President Richard Nixon, Special Message to the Congress Proposing Supplemental Foreign Assistance Appropriations (Nov. 18, 1970).  For (31),

*    *    *

Note four things about this list.

*    *    *

<u>First</u>, it could run on and on.  Added pages could easily have been laid down.

What notice is provided if "foreign policy interest" can mean relations with other countries --- plus the 33 things noted above, plus the many multiples of the 33 that might have been put down here?  Not very much.

What sort of limits on enforcement discretion does this list imply?  Only light ones.

If "foreign policy" means what the dictionaries say --- U.S. relations with other countries --- then the denominator is big. But it is knowable.  The United States recognizes 197 countries. <u>See</u> <u>Independent States in the World</u>, U.S. Department of State (Mar. 12, 2025), https://perma.cc/9JMZ-UBAE (accessed on May 28, 2025).  Not 196 or 198, and not 296 or 298.

But how many <u>extra</u> "foreign policy interests" get added in when the external affairs interpretation is put on the table?  The number is very large --- and that diminishes both notice and the possibility of genuine limits on enforcement discretion.[71]

*    *    *

---

President Lyndon B. Johnson, Statement by the President Upon Signing Bill Extending the Agricultural Trade and Assistance Act (Oct. 8, 1964).  For (32), President Dwight Eisenhower, Memorandum of Disapproval of Bill Concerning the Marking of Imported Articles and Containers (Sept. 7, 1960).  For (33), President Dwight Eisenhower, Annual Budget Message to the Congress (Jan. 18, 1960).

[71]  The breadth of a statute plainly affects an as-applied vagueness challenge.  <u>See</u> <u>Holder</u>, 561 U.S. at 21 (holding, in as-applied case, that the statute was not impermissibly vague in light of a statutory definition that narrowed the key provision).  This is common sense.  For a given ordinary person, the signal he is seeking (I want to do X, is that allowed?) can get buried in what is to him noise (everything <u>else</u> the too-broad statute might cover).

<u>Second</u>, there is no one-stop shop, no single place to see all of America's foreign policy interests put down on paper.

Look through the sources cited in footnote 70.

They are all over the map, from executive orders to speeches to statements during press briefings.  <u>See</u>, <u>e.g.</u>, Exec. Order 14,209, 90 Fed. Reg. 9587 (Feb. 10, 2025) (an executive order); President Jimmy Carter, State of the Union Address (Jan. 19, 1979) (speech); Dee Dee Myers, Press Sec., Press Briefing (Sept. 8, 1994) (press briefing).

An external affairs understanding generates not only a <u>large</u> number of "foreign policy interests," but also a number that is <u>unknowable</u> as a practical matter.[72]

Where would an "ordinary person" look to get the answer to what counts as a foreign policy interest?

America, for example, has an announced interest in promoting trade in ethically sourced diamonds.  <u>See</u> President George W. Bush, Statement on Signing the Clean Diamond Trade Act (Apr. 25, 2003).

Is that still an interest?  How to know?  What about trade in gold or cobalt?  Can someone be removed from the United States for compromising our interest in lithium imports?  Who to ask?  Where to check?  <u>See</u> <u>Johnson</u>, 576 U.S. at 597 ("We are convinced that the indeterminacy of the wide-ranging inquiry required . . . denies fair notice to defendants[.]"); <u>Morales</u>, 527 U.S. at 56 (a law may be unconstitutionally vague if it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits"); <u>Giaccio</u>, 382 U.S. at 402 ("a law fails to meet the requirements of the Due Process Clause if it . . . leaves the public uncertain as to the conduct it prohibits").

*     *     *

<u>Third</u>, plugging in the adjective "compelling" does not meaningfully clear things up.

---

[72]  Also: the United States presumably has secret foreign policy interests.  What to do about those?  <u>See</u> <u>Massieu</u>, 915 F. Supp. at 700 (alluding to this issue).

Of the interests set out above, around a third are characterized in the underlying foreign-policy documents as being especially important.

And on the Petitioner's challenge to Section 1227 as it is being applied to him, there is an additional issue.

As the Respondents argue, see Opposition Brief at 23-25, the Secretary of State deserves deference in terms of American foreign policy interests and their hierarchy.

But here it may not ultimately be crystal clear that the Secretary determined that the Petitioner's conduct has affected a "compelling foreign policy interest."

At the end of the analysis portion of his determination, the Secretary said that the Petitioner's conduct impacted a "significant foreign policy objective," Determination at 2, not a "compelling" one.

And "significant" implies a bar set lower than "compelling." Compare Significant, adj., sense 1, New Oxford American Dictionary (2024) ("sufficiently great or important to be worthy of attention; noteworthy"), and Significant, adj., sense 3.a, Merriam-Webster's Unabridged Dictionary (2025) ("having or likely to have influence or effect: deserving to be considered"), with Compelling, adj., New Oxford American Dictionary (2024) ("not able to be resisted; overwhelming"), and Compelling, adj., sense 1, Merriam-Webster's Unabridged Dictionary (2025) ("forcing, impelling, driving").

\*    \*    \*

Fourth, many of the interests listed out above are both enormously broad and fuzzy at their edges.

If foreign policy means relations with Canada or South Korea, that is concrete.  On a relations-with-countries understanding, "foreign policy" is broad and highly flexible.  It can, for example, be used to remove terrorists from the United States. See Part V.D (providing examples of this).

But on that understanding, Section 1227 nonetheless has an outer-edge limit, and a crisp, objective one at that --- the need for a link to America's relations with other countries.

What if "foreign policy" under Section 1227 is taken to include interests in fostering world economic stability or in creating good will towards the United States, to take two examples from

the list above?  How to know where these begin and end?  See
City of Akron, 462 U.S. at 451 (finding law unconstitutional
when a word was "impermissibly vague as a definition").

And this is no abstract concern.

What "foreign policy interest" was the Secretary invoking here?

Maybe the answer is "combat[ting] anti-Semitism around the
world."  Determination at 2.

But one possible reading of the Secretary's determination is
that "the foreign policy of the United States champions . . .
American citizens" --- and that is the "foreign policy
objective" in play.  Id.

But if that is so: what are the limits on this sort of interest?
On this understanding, what would not be a basis for a Section
1227 removal?  See City of Mesquite v. Aladdin's Castle, Inc.,
455 U.S. 283, 290 n.12 (1982) ("[V]ague laws do not limit the
exercise of discretion by law enforcement officials; thus they
engender the possibility of arbitrary and discriminatory
enforcement."); Grayned, 408 U.S. at 108-09 ("[a] vague law
impermissibly delegates basic policy matters" and in doing so
opens the way to enforcement on "an ad hoc and subjective basis,
with the attendant dangers of arbitrary and discriminatory
application").

*     *     *

To sum up:

If "foreign policy interests" are understood as based on U.S.
relations with other countries, the term drops a solid anchor,
though a large one.  The statutory words point to something
concrete that exists out in the real world --- the 197 countries
recognized by the United States.

But if "foreign policy interests" reach more broadly, to cover
U.S. relations with other countries, and also the full range of
America's external affairs --- then the term loses much of its
real-world mooring.  It becomes hard to even begin to pin down.

When it comes to making foreign policy, great flexibility may be
more virtue than vice.

But when it comes to the notice to ordinary people that the
Constitution requires, there is a deep difficulty with a statute

that, on the "external affairs" interpretation, hangs its hat on a term whose meaning can move around all but freely.[73]

And there is a similar difficulty for the goal of cabining government enforcement discretion.  See, e.g., Nat'l Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 466 (1963) (Harlan, J., dissenting) ("Laws that have failed to meet [the vagueness] standard are, almost without exception, those which turn on language calling for the exercise of subjective judgment, unaided by objective norms."); Coates, 402 U.S. at 616 (noting that an ordinance against "annoying" conduct "contains an obvious invitation to discriminatory enforcement"); see also Papachristou, 405 U.S. at 170 ("Where . . . there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law."); Daniels v. Allen, 344 U.S. 443, 496 (1953) ("Discretion without a criterion for its exercise is authorization of arbitrariness."), overruled by Townsend v. Sain, 372 U.S. 293 (1963).[74]

---

[73]  See, e.g., Beckles, 580 U.S. at 266 (focusing on the need for "legally fixed standards"); accord The Federalist No. 62 (James Madison) (discussing the difficulties associated with "a mutable policy," with laws that are not "fixed" and can "undergo . . . incessant changes").

[74]  And note here the main flaw in the Respondents' argument that the Petitioner's challenge to the Secretary's determination raises a non-justiciable "political question."  See Opposition Brief at 23-25.  Courts cannot usurp the Secretary's role by purporting to determine how the Nation should conduct its foreign policy.  See id. at 25.  Of course not.  But the Court here has asked only whether Section 1227, as applied through the Secretary's determination, provides enough notice and properly cabins government authority.  These are questions only about whether the Constitution's due process guarantee has been satisfied.  Not, for example, about the Secretary's underlying judgment as to the Petitioner.  (Indeed, the Court has taken the Secretary of State's determination entirely as a given.  See footnote 28.  It has not at this stage questioned it; questioning the determination might well raise different sorts of issues.)  There is no political question bar here.  See, e.g., Shachtman v. Dulles, 225 F.2d 938, 944 (D.C. Cir. 1955) (holding that challenge to Secretary of State's determination to

Bottom line: the Court concludes that the Petitioner is likely
to succeed on the merits of his Section 1227 vagueness argument
--- under the dictionary definition of "foreign policy," and
also on the broader, external affairs reading discussed in this
section.[75]

### H.  <u>Conclusion</u>

The Secretary of State determined that the Petitioner engaged in
anti-Semitic conduct that helped to create a hostile environment
for Jewish students.  <u>See</u> Determination at 2.  And there is at
least some suggestion in the determination that this may have
opened the door to the threat of violence.  <u>See</u> <u>id.</u>

If this is accurate, it offends some of our deepest values.

One of our country's proudest claims has been that ancient
prejudices have had a smaller footprint in America.[76]  And one
necessary thread of that fabric is this: Jews, like others, will
not be targeted or hounded, "harass[ed]," <u>id.</u>, as they take part
in public life.

─────────────────

deny passport in "the best interests of the United States" was
"within the scope of the due process clause").

[75] Indeed, on the external affairs understanding this is, if
anything, an easier case.  For example, on the dictionary
definition of foreign policy, Section 1227 is already vaguer
than other statutes the Supreme Court has struck down on
vagueness grounds.  <u>See</u> Part V.C.  But the external affairs
reading of Section 1227 would make the statute even vaguer.

[76]  <u>See</u>, <u>e.g.</u>, <u>Of the Study of the Law in the United States</u>
(1790–91) <u>in</u> 1 <u>Collected Works of James Wilson</u> 433–35 & n.(b)
(Kermit L. Hall & Mark David Hall eds., 2007) (a lecture on law
by Justice James Wilson, with President Washington present, at
which Justice Wilson said that it was Lord Baltimore who was
"truly the father of his country," because "before the doctrine
of toleration was published in Europe, the practice of it was
established in America," by a "law in favour of religious
freedom [that] was passed in Maryland, as early as the year one
thousand six hundred and forty nine" --- the Maryland Toleration
Act (Sept. 21, 1649) that had been championed by Lord
Baltimore).

But the Petitioner, in response to the Secretary of State's determination, is emphatic: the Secretary has it wrong.  See Petition ¶¶ 22-28.  He says that he is not a bigot, see id. ¶ 25, and claims that he is being persecuted from the highest level of our government for nothing more than speaking out on behalf of a cause he cherishes.  See id. ¶¶ 29-33.

But this case, at least for now, is not about choosing between competing accounts of what happened at Columbia between 2023 and 2025.  Or about whether the Petitioner's First Amendment rights are being violated.[77]

Rather, the issue now before the Court has been this: does the Constitution allow the Secretary of State to use Section 1227, as applied through the determination, to try to remove the Petitioner from the United States?

The Court's answer: likely not.

Our law asks about an "ordinary person."  Would he know that Section 1227 could be used against him based on his speech inside the United States, however odious it might allegedly have been --- speech that has not been affirmatively determined by the Secretary to have an impact on U.S. relations with other countries?

The Court's answer is no.

And our law asks about government power.  Would the loose interpretation of Section 1227 that the Secretary's determination rests on open the door to arbitrary enforcement?

The decided cases are mainly about close-to-the-ground officials --- police officers, prosecutors, judges.  See, e.g., Davis, 588 U.S. at 451; Kolender, 461 U.S. at 358.  Our law needs to be steady.  And to be steady, it cannot be written so broadly that it can mean different things to each different police officer or prosecutor who has a hand in enforcing it.

Here, there is only one possible enforcer of the law.

This is because when it comes to cases like this one, where the underlying conduct is "otherwise lawful" speech, Congress has

---

[77] Because the Court holds the Secretary's determination is likely unconstitutionally vague, the First Amendment issue does not need to be reached.

entrusted the Section 1227 removal power to one person --- the Secretary of State.  Under the statute, he must exercise his power personally, and here he has.  The Secretary of State's determination deserves, and gets, the highest respect.

But arbitrary enforcement is not just a danger when many people enforce the law.  It can also be a danger when one person is given the job,[78] if his determination veers too far away from the standard set down by Congress.  Here, the Secretary's did.[79]

*    *    *

Vagueness doctrine has sometimes been criticized.

"It is not likely," Justice Holmes said, "that a criminal will carefully consider the text of the law before he murders or steals."  McBoyle, 283 U.S. at 27.

That may very well be true.

But it is also true that "[t]he general outlines of the law --- or its lack of sufficiently definite shape, and hence its brooding, overreaching threat --- tend to be noticed by those who may be specially affected[.]"  Alexander Bickel, The Least

---

[78]  See Bantam Books, 372 U.S. at 71; Mahler, 264 U.S. at 40; cf. Aptheker, 378 U.S. at 501-02.

[79]  Void-for-vagueness doctrine is analogous in some ways to the non-delegation doctrine.  In a non-delegation case, Justice Gorsuch has said this:

> The Constitution promises that only the people's elected representatives may adopt new federal laws restricting liberty.  Yet the statute before us . . . endow[s] the nation's chief prosecutor [the Attorney General] with the power to write his own criminal code . . . .  Yes, those affected are some of the least popular among us.  But if a single executive branch official can write laws restricting the liberty of this group of persons, what does that mean for the next?

Gundy v. United States, 588 U.S. 128, 149 (2019) (Gorsuch, J., dissenting).

<u>Dangerous Branch: The Supreme Court at the Bar of Politics</u> 150-51 (1962).

Who will be "specially affected" here?

The Petitioner, to be sure.

And behind him a range of foreign nationals, of whom there are large numbers living ordinary lives in our country, who might feel the "threat" of Section 1227 being used without a "sufficiently definite shape." <u>Id</u>.

But to see the full, end-of-line answer to the question of who might be "affected," look more broadly.

The Supreme Court has repeatedly held that the vagueness law that applies in removal cases like this one is to be the same vagueness law that applies in criminal cases. <u>See</u> <u>Dimaya</u>, 584 U.S. at 156-57; <u>Jordan</u>, 341 U.S. at 229-31.

And there is every reason to think the street runs two ways.

If Section 1227 can apply, here, to the Petitioner, then other, similar statutes can also one day be made to apply.

Not just in the removal context, as to foreign nationals.  But also in the criminal context, as to everyone.

This point was alluded to in 1996, the first and only time before today that a federal court has written substantively on Section 1227.

> Imagine, for a moment, how quickly our constitutional hackles would rise if a local police chief were granted the power to arrest any person whose mere presence would cause potentially serious adverse consequences for the public peace. . . .  If the hypothetical police chief statute would be void for vagueness (as it obviously would), then so, too, must be Section 1227.

<u>Massieu</u>, 915 F. Supp. at 701 n.19.

                    *    *    *

The Court holds: the Petitioner is likely to succeed on the merits of his claim that Section 1227, as applied to him here

through the Secretary of State's determination, is vague in violation of the Due Process Clause of the Constitution.[80]

## VI.  **Failure to Disclose**

Recall that in addition to the Secretary of State's determination, federal officials have sought to remove the Petitioner from the United States on another ground.  See Part I.A.

The Petitioner obtained his permanent residence, it is alleged, "by fraud or by willfully misrepresenting a material fact." Additional Charges of Inadmissibility at 1 (ECF 90-1) (citing 8 U.S.C. § 1182(a)(6)(C)(i)).[81]

Per the Respondents, these alleged failures to disclose add up to "an independent basis to justify removal."  Opposition Brief at 30.

Last month, the Court noted that the Petitioner had not lodged any "challenge to the second charge."  Khalil, 2025 WL 1232369, at *3 n.7.  "[T]here is no reference to [such a claim] in the habeas petition."  Id.

After that, the Petitioner amended his habeas petition to include two paragraphs on the failure-to-disclose charge, and these new paragraphs allude to the First Amendment.  See Redline Petition Comparison ¶¶ 88-89 (May 1, 2025) (ECF 223-2).[82]

---

[80]  The citation to Massieu should not be misunderstood.  The Court does not suggest any view as to whether Section 1227 is facially vague.  That question has not been posed here.  See footnote 19.

[81]  In particular, federal officials contend that when the Petitioner applied for lawful permanent residence in 2024, he did not disclose that he was "a member" of the United Nations Relief and Works Agency for Palestinian Refugees ("UNRWA"), that he worked at the British Embassy in Beirut, or that he was in a group called Columbia University Apartheid Divest.  See Additional Charges of Inadmissibility at 1.

[82]  Does this Court have jurisdiction over a First Amendment-related challenge to the failure-to-disclose charge?  Plainly yes, if Section 1252(b)(9) of Title 8 does not apply to pre-final-order-of-removal cases like this.  See Khalil, 2025 WL

But even so, the amended portions of the Petition are unclear.

They say that the 2025 efforts to remove the Petitioner from the United States for his alleged 2024 failure to disclose are "<u>evidence</u> of the government's unlawful Policy of targeting for detention and removal noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israel."  Petition ¶ 89 (emphasis added).

Do they also imply a claim that if the alleged "Policy" is struck down on First Amendment grounds (as the Petitioner seeks, <u>see</u> <u>id</u>. at 28), then the Respondents must be enjoined from pursuing the failure-to-disclose grounds for removal?

Maybe, maybe not.

But assume for present purposes the answer is yes.

The Court's prior opinion emphasized that the Petitioner's legal briefs did not do meaningful work as to a challenge to the

---

1232369, at *16–21.  If it does, the questions are closer than those the Court resolved in its prior Opinion.  That is because an immigration court may be able to deploy its expertise to resolve the failure-to-disclose charge.  <u>Cf</u>. <u>id</u>. at *39–43.  For example, an immigration court could indicate whether immigration law indeed required certain disclosures, and it could resolve any possible factual disputes as to why forms may not have been filled out in a certain way.  <u>Cf</u>. <u>id</u>. at *40.  And if an immigration court holds that the Petitioner did <u>not</u> have to disclose the allegedly omitted information, that could fully dispose of the underlying ground for removal, without any need for a federal court to reach a potentially complex First Amendment question.  <u>Cf</u>. <u>Elgin</u> v. <u>Dep't of Treasury</u>, 567 U.S. 1, 23 (2012).  All this weighs against this Court's jurisdiction, but not heavily enough.  This is because the Petitioner seems to suggest the failure-to-disclose charge (as part of an allegedly retaliatory policy) violates the First Amendment.  First Amendment claims call for speed, and they raise issues an immigration court cannot remedy.  <u>See</u> <u>Khalil</u>, 2025 WL 1232369, at *30–34.  (As to the vagueness claim discussed in prior parts of this Opinion and Order, there is plainly jurisdiction.  There is no final order of removal.  Immigration courts cannot remedy constitutional challenges of the sort claimed.  There is no fact-finding to be done for now.  Immigration-law expertise has no place.  And the vagueness challenge as to the Secretary's determination is tightly bound up with First Amendment issues.)

failure-to-disclose claim.  See Khalil, 2025 WL 1232369, at *3 n.7 ("Nor does the legal brief purport to seek relief from the Court based on the second [failure-to-disclose] charge.").

But this has not changed.

The Petitioner's legal briefs still make no substantial argument as to the failure-to-disclose claim --- even as lengthy supplemental briefs have been filed.

To prevail on a First Amendment-retaliation claim, the Petitioner would presumably need to show that the effort to remove him based on his alleged failure to disclose was caused by his First Amendment-protected activity.  See Nieves v. Bartlett, 587 U.S. 391, 398 (2019).

But the burden is his, see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977), and he has made no real effort to carry it.  He has not developed any arguments in his legal briefs or cited anything[83] from a large body of potentially relevant case law.[84]

Recall that to obtain a preliminary injunction, a party must show that he is likely to succeed on the merits of his claim. See Lackey v. Stinnie, 145 S. Ct. 659, 667 (2025); Starbucks Corp. v. McKinney, 602 U.S. 339, 345 (2024); Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Munaf v. Geren, 553 U.S. 674, 690 (2008); Veterans Guardian VA Claim Consulting LLC v. Platkin, 133 F.4th 213, 218 (3d Cir. 2025); Ayers v. Phila. Hous. Auth., 908 F.2d 1184, 1195 & n.23 (3d Cir. 1990); In re

---

[83]  On, for example, the inferences that can and cannot be drawn as to causation from temporal proximity.  See Watson v. Rozum, 834 F.3d 417, 424 (3d Cir. 2016).

[84]  And presumably because the Petitioner says nothing substantial, there is hardly anything in response from the Respondents, beyond noting the Petitioner allegedly did not disclose on his lawful-permanent-resident application that he was a "member" of UNRWA, even as his LinkedIn account allegedly says he was employed there.  See Respondents' Supplemental Brief at 9 n.3.  (This might mean to suggest that a kind of inevitable-discovery rule is implicated --- applicable to a First Amendment-retaliation claim, as it might be to, say, a Fourth Amendment claim.)

<u>Arthur Treacher's Franchisee Litig.</u>, 689 F.2d 1137, 1143 (3d Cir. 1982); <u>see</u> <u>also</u> 42 Am. Jur. 2d Injunctions § 18 (2025).

The Petitioner has not meaningfully tried to do so.

And there is another problem, too.

The Third Circuit has held that a "preliminary injunction may not be based on facts not presented at a hearing, or not presented through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties." <u>Adams</u> v. <u>Freedom Forge Corp.</u>, 204 F.3d 475, 487 (3d Cir. 2000) (cleaned up); <u>see</u> <u>Bradley</u> v. <u>Pitt. Bd. of Educ.</u>, 910 F.2d 1172, 1178 (3d Cir. 1990); <u>see also</u> <u>Baker v. Fishman</u>, 2018 WL 6727536, at *5 (D.N.J. Dec. 21, 2018), <u>aff'd sub nom.</u> <u>Baker</u> v. <u>Ahsan</u>, 785 F. App'x 904 (3d Cir. 2019); <u>Herley Indus., Inc.</u> v. <u>R Cubed Eng'g, LLC</u>, 2020 WL 6504588, at *4 (E.D. Pa. Nov. 5, 2020) (collecting district court cases); <u>Bascom Food Prods. Corp.</u> v. <u>Reese Finer Foods, Inc.</u>, 715 F. Supp. 616, 624 n.14 (D.N.J. 1989).

Here, the Petitioner has not put forward relevant "affidavits, deposition testimony, or other documents."

To be sure, a verified[85] pleading can sometimes[86] close the gap. <u>See</u>, <u>e.g.</u>, <u>K-2 Ski Co.</u> v. <u>Head Ski Co.</u>, 467 F.2d 1087, 1088 (9th Cir. 1972); <u>see also</u> <u>Bascom Food Prods. Corp.</u>, 715 F. Supp. at 624 n.14 (D.N.J. 1989); <u>cf.</u> 28 U.S.C. § 2242 (requiring habeas petitions to be verified).

And a declaration filed in this case suggests that the Petitioner has "verif[ied]" his pleading.  <u>See</u> ECF 50-1.

But the verification was made as to the First Amended Petition for habeas relief (ECF 38), not the current one.  And the First Amended Petition said nothing about the failure-to-disclose basis for removal.  Indeed, the First Amended Petition was filed

---

[85]  A verified pleading "contains a sworn statement indicating its contents are true and may be treated as an affidavit." <u>Germain</u> v. <u>Shearin</u>, 725 F. App'x 225, 226 (4th Cir. 2018).

[86]  "Sometimes" because a verified pleading rarely supplies the sort of highly detailed and specific information, based on the personal knowledge of the affiant, that is especially telling.

before the failure-to-disclose charge was even <u>made</u> by federal officials.

The Petitioner, in short, has not put <u>evidence</u> in the record that relates to the failure-to-disclose charge.

The law is clear: preliminary injunctions cannot issue in such circumstances.  <u>See</u> <u>Adams</u>, 204 F.3d at 487; <u>Bradley</u>, 910 F.2d at 1178.

To sum up: to the extent the Petitioner is moving to preliminarily enjoin the failure-to-disclose ground for removal, that motion must be denied.  He has not carried his burden of showing a likelihood of success on the merits.

## VII.  <u>Remedy</u>

As to the merits, the Court has held two things.

First, that the Petitioner is likely to succeed on his vagueness challenge related to the Secretary of State's determination. <u>See</u> Part V.

And second, that he is not likely to succeed on his challenge as to the efforts to remove him for allegedly failing to make certain disclosures on his lawful-permanent-resident application.  <u>See</u> Part VI.

As to remedy, the Petitioner seeks a preliminary injunction, <u>see</u> Motion for Preliminary Injunction at 40, and to get one he must show "that he is likely to suffer irreparable harm in the absence of preliminary relief."  <u>Winter</u>, 555 U.S. at 20.

To do that, a litigant generally needs to put forward evidence of "irreparable harm."  <u>See</u> footnote 6.[87]

---

[87]  A likely violation of a First Amendment right can excuse the need to show irreparable injury.  <u>See</u> <u>Del. State Sportsmen's Ass'n, Inc.</u> v. <u>Del. Dep't of Safety & Homeland Sec.</u>, 108 F.4th 194, 204 (3d Cir. 2024) (citing <u>Roman Cath. Diocese of Brooklyn</u> v. <u>Cuomo</u>, 592 U.S. 14, 19 (2020) (per curiam)); <u>see also</u> <u>K.A. ex rel. Ayers</u> v. <u>Pocono Mountain Sch. Dist.</u>, 710 F.3d 99, 113 (3d Cir. 2013).  The Petitioner seems to be invoking this presumption.  <u>See</u> Motion for Preliminary Injunction at 35.  But does this exception get traction here?  The Court has not

As noted, see Part VI, the only relevant evidence comes from the Petitioner's verified First Amended Petition.

But the crux of the First Amended Petition's irreparable-injury contention is that the Secretary of State's determination "prevent[s] him from speaking now (through detention)[.]"  First Amended Petition ¶ 89 (emphasis added).

But preliminarily enjoining the Secretary's determination would not seem to end the Petitioner's "detention" to the extent he remains detained on another basis, for his alleged 2024 failure to make certain disclosures in his lawful-permanent-resident application.

There may be other bases for showing irreparable harm --- the Secretary's determination, for example, might add another meaningful layer of free speech chill, and there is some flavor of this contention in the First Amended Petition.  See id. (the determination is an "attempt to chill (through past punishment and ongoing threat) . . . his future speech in the United States") (emphasis added); see also id. ¶ 8 (among other things, the Secretary's determination is "plainly intended . . . to silence, or at the very least restrict and chill, his speech now and in the future") (emphasis added).

But nothing along these lines, or others, is developed --- maybe because the First Amended Petition's irreparable-injury sections were filed before federal officials brought the failure-to-disclose charge.

At that point in time, it looked like any irreparable injury as to the Secretary's determination was the "detention" it caused. But now the detention seems to have another, arguably independent cause --- the failure-to-disclose charge.

The Court will issue an Order shortly to permit the Petitioner to quickly address these issues, and for the Respondents to respond.[88]

_____

resolved the Petitioner's First Amendment claim, but rather his vagueness claim.

[88]  The Petitioner will be permitted to add affidavits or other factual evidence to the record, to explain why they are not necessary, see footnote 87, or both.  The Respondents have expressed dissatisfaction with the fast pace that a large number

VIII.    <u>Conclusion</u>

The Petitioner is likely to succeed on the merits of his claim
that Section 1227 is unconstitutional as applied to him.

As to that claim, an Order as to next steps will issue today.

The Petitioner is not likely to succeed on the merits of his
claim related to his alleged failure to accurately complete his
lawful-permanent-resident application.

As to that claim, his preliminary injunction motion is denied.

IT IS on this 28th day of May, 2025, so **ORDERED**.

_____

Michael E. Farbiarz, U.S.D.J.

_____

of the Court's orders in this case have required.  <u>See</u>
Respondents' Letter (May 9, 2025) (ECF 247).  But both parties
have rightly asked for this case to proceed at a quick clip, and
the Respondents will be expected to promptly respond to any
irreparable-injury filing made by the Petitioner.  (The Court
provides this information so that the Respondents' lawyers, who
have plainly been working hard, can thoughtfully allocate their
time in advance.)

# APPENDIX A

**THE SECRETARY OF STATE**
**WASHINGTON**

<u>SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE</u>

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM:   Marco Rubio

SUBJECT:   (SBU) Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 7, 2025, I have determined that ███████████████████ ███████████████ and Mahmoud Khalil (DOB: ███████████; POB: Algeria), both U.S. Lawful Permanent Residents (LPRs), are deportable aliens under INA section 237(a)(4)(C). I understand that ICE now intends to initiate removal charges against them, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. These determinations are based on

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
Classified by: Secretary of State Marco Rubio
E.O. 13526, Reason(s): 1.4 (justification sections)
Declassify on: Month DD, YYYY

Uploaded on: 04/28/2025 at 06:35:42 PM (Central Daylight Time) by Case Office No. 1

information provided by the DHS/ICE/HSI regarding the participation and roles of ████ and Khalil in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States. My determination for ████ is also based on ██ citations for unlawful activity during these protests. The public actions and continued presence of ████ and Khalil in the United States undermine U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

**Attachments**

Tab 1 – DHS Letter on ████████████
Tab 2 – HSI Subject Profile of ████████████
Tab 3 – DHS Letter on Mahmoud Khalil
Tab 5 – HSI Subject Profile of Mahmoud Khalil
Tab 5 – 8 USC 1227(a)(4)(C)

# APPENDIX B



Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents    8337

## Presidential Documents

**Executive Order 14150 of January 20, 2025**

### America First Policy Directive to the Secretary of State

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* From this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.

**Sec. 2.** *Policy.* As soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.

**Sec. 3.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01952
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P