# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>    *Petitioner*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>    *Respondents*. | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF MAHMOUD KHALIL** |

    I, Mahmoud Khalil, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am the Petitioner-Plaintiff in this action. As my attorney previously stated in her declaration (ECF 50-1), we reviewed the amended habeas petition (ECF 38) together during a virtual attorney-client meeting on March 13, 2025, and I confirmed the accuracy of the factual statements in that petition as they pertain to me. I have also reviewed the second and third amended habeas petitions filed in this matter (ECF 162 and 236, respectively), including the new allegations regarding the post-hoc charge of inadmissibility, and I verify that the facts contained therein, as they relate to me, are true and correct to the best of my knowledge.

2. Some of the facts in this declaration are stated in my habeas petition. I include them here again for clarity and to assist the Court in reviewing my account directly and in my own words. I also welcome the opportunity to testify in person, at the courthouse, as to any of my experiences described here.

3. I understand that the Court has requested additional information about the irreparable harms I have suffered—and continue to suffer—as a result of the government's actions against me. These harms are wide-ranging: they include dignitary and reputational harm, personal and

familial hardship, including constant fear for personal safety, continued detention, restrictions on my freedom of expression, and severe damage to my professional future.

4. I submitted a declaration in my immigration proceedings describing the events of the night of my arrest on March 8. I understand my attorneys in this matter have also filed these documents (ECF 212-1). For the Court's ease, I am attaching a copy of that declaration as **Exhibit 1.**

5. I am 30 years old. I am a Palestinian Lawful Permanent Resident of the United States of America. I hold an Algerian passport. I was born in a Palestinian refugee camp in Syria named Khan Eshieh. I have dedicated my life to advocating for human rights, informed by my own life experiences. I am a husband to Dr. Noor Abdalla, a U.S. Citizen, and as of April 21, 2025, I am a father to our son, Deen, who is also a U.S. Citizen. As of May 22, 2025, I hold a master's degree in public administration from the Columbia University's School of International and Public Affairs ("SIPA"). I have never been accused or convicted of any crime.

6. I offer this declaration from inside LaSalle Detention center, where I have been confined since March 9, 2025, because of the government's determination that my protected speech in support of Palestinian rights somehow impacts U.S. foreign policy interests.

7. The most immediate and visceral harms I have experienced directly relate to the birth of my son, Deen. Instead of holding my wife's hand in the delivery room, I was crouched on a detention center floor, whispering through a crackling phone line as she labored alone. I listened to her pain, trying to comfort her while 70 other men slept around me. When I heard my son's first cries, I buried my face in my arms so no one would see me weep. The first time I saw my son in person was through a plate-glass window. The first time I held him was in an immigration courtroom, only after Noor traveled over ten hours with our newborn. I speak to her as often as possible, but these conversations are not private, everything is monitored by the government. Knowing that we are being recorded means we can't speak freely out of fear for further retaliation—not about how all of this is affecting us, not even about the private intimate things between a husband and wife. We leave so much unsaid, and that silence weighs heavily on both of us.

8. Noor and Deen mean everything to me. To not be able to see them, hold them, speak with them freely, enjoy everything I imagined our first days as a family would be like, is devastating. Worst still is knowing that they must face all the fear and notoriety of this case without me. The Rubio Determination is casting a shadow of suspicion across our entire family. I could never have imagined this would happen, and it is horrifying to experience this as a husband and father.

9. In speaking with Noor, I have been deeply disturbed by the harassment she has endured as a result of my arrest and detention. That harassment has been directed at both her and our family—not only because the government labeled me a U.S. foreign policy concern, but also because of this administration's public, deeply racist, and false accusations that I support Hamas or have engaged in antisemitic activity. None of this is true. I am a Palestinian who cares deeply about the Palestinian people and their inalienable rights. But the U.S. government believe that anyone who calls for Palestinian rights must support Hamas or be antisemitic. That is itself a form of anti-Palestinian racism and it is wrong.

10. I remember seeing the public statements issued by the White House and President Trump on social media, both after my arrest and again after the Immigration Judge upheld the Rubio Determination. It is hard to describe the humiliation and pain of seeing mugshot-style images of myself circulated from the highest levels of the U.S. government—accompanied by inflammatory language, grotesque and false accusations, and open celebration of my deportation. These were not just attacks on my character; they were efforts to erase my humanity. Below are true and correct copies of just four of the social media posts I have seen, as shown to me by my attorneys:






11. As someone who fled prosecution in Syria for my political beliefs, for who I am, I never imagined myself to be in immigration detention, here in the United States—a country that proclaims democracy and rule of law, freedom of expression—defending myself against baseless and retaliatory immigration charges, after being targeted for who I am, for who I advocated for.

12. Like the thousands of students that I've protested with across the United States and in my university—including Muslim, Jewish and Christian friends—I advocate for human rights, for international law, for the end of the killing of innocent people. I believe in the innate equality of all human beings. I believe in human dignity. I believe in the right of my people to look at the blue sky and not fear an impending missile. Why should protesting this Israel government's indiscriminate killing of thousands of innocent Palestinians result in the erosion of my constitutional rights?

13. As I remain detained because of the Rubio Determination, and because of the government's stated intent to punish me for my speech, I am unable to protest the ongoing genocide of the Palestinian people—my own people— a fundamental aspect of my freedom of expression that is deeply important to me.

14. Beyond my immediate detention, as the Rubio Determination continues to hang over me, I know that any expressive activity I undertake carries the risk of further punishment or surveillance. I still believe it is important to speak out against the ongoing genocide of the Palestinian people and broader systemic injustices. But even as I try to do so now from a distant prison, I do so under the weight of extreme fear—that my words will be mischaracterized, used against me, or taken as further evidence of wrongdoing. It is impossible for me to understand what words the U.S. government believes are the basis for arrest and exile, and what words are not.

15. Before the Rubio Determination and my consequent arrest and detention, my career projection was to work in diplomacy and international affairs, whether at the United Nations (UN) or at a diplomatic mission. In fact, just days before my arrest and detention, I had accepted a position at Oxfam International as a Palestine and Middle East/North Africa Policy Advisor. In this role, I was set to work towards helping to uphold international law and human rights at the UN, including by achieving a permanent ceasefire in Gaza that would end the genocide that this Israeli government is committing in Palestine. I was scheduled to start this job in April 2025.

16. On April 3rd, Oxfam International formally revoked my employment offer. I strongly believe that the Rubio Determination, my arrest and detention—and the public stigma that followed—played a significant role in this decision. I was not surprised; roles like this depend on your reputation. How could someone who has been labeled a risk to U.S. foreign policy credibly represent an international organization in diplomatic spaces—let alone serve as an advisor on human rights and regional policy in the Middle East and North Africa? Beyond credibility, how could I effectively perform the essential duties of a position like this—which requires traveling internationally—where visa denial or intense scrutiny would be nearly inevitable?

17. I have devoted my academic and professional life to international development, public service

and diplomacy. And I've long aspired to serve in international organizations or diplomatic missions—perhaps as a U.S. citizen someday. But if the Rubio Determination stands, that is not possible—the harm to my professional career would be career-ending.

18. In addition to the professional aspirations I've spent over a decade pursuing, I now face immediate relational and safety harms because of the Rubio Determination.

19. This label is now embedded in government systems and records—including DHS databases, consular files, and likely even diplomatic cables. I face the risk of being flagged, delayed, or denied when traveling, applying for visas, or engaging with consular authorities anywhere in the world. The suspicion has real implications for my family and my safety. Because of my arrest and the government's publicized and false determination that my protected speech in support of Palestinian rights is antisemitic and compromises "a compelling U.S. foreign policy interest," I—and by extension, my wife and newborn son—have become targets for attack and surveillance by government agencies, as well as by private actors. If this determination remains in place, I will continue to live in constant fear for our safety—from formal institutions and informal, but very real, threats of harm.

20. In addition to the ongoing risks to our physical safety because of the Rubio determination, other harms to my family are already accruing: my mother had applied for a U.S. visa so she could be with us for the birth of my son, listing me as her host. Her visa was approved in March 2025, and the U.S. embassy ask her to send in her passport to get the visa stamped. However, after she submitted her passport, the embassy returned it without stamping, saying that her case was under administrative processing. The timing of this change is directly correlated with the Rubio Determination and my arrest and detention. As of today, my mother's visa has not been approved.

21. And while my family is unlikely to be able to visit me, to bond with my newborn son or assist me and Noor as we navigate parenthood for the first time, I also fear I will no longer be admitted into Germany to see my father, who is 70 years old and severely disabled. This is deeply devastating for me. Before the Rubio Determination, I prioritized seeing him at least three times a year. Even during the travel-restricted period after applying for adjustment of status, I applied for, and was granted, USCIS emergency parole so I could visit him due to his disability. Will Germany, or any U.S. ally, allow entry to someone the U.S. government has determined to be a foreign policy concern? I worry I will never be able to see him again if the Rubio Determination is allowed to remain in place.

22. There are similar relational harms that have already begun to accrue because of the Rubio Determination, as many people in my life seek to distance themselves from me and from Noor, out of fear for their own reputation, safety, and potential targeting of the next Rubio Determination.

23. I believe that undoing the Rubio Determination will allow me to be with my son and my wife beyond the walls of this detention center, to speak, write, and protest freely, to continue my career trajectory in diplomacy, to see my family and return to the community in New York that I have worked so intentionally to build since I moved to the United States.

5

24. I also want to provide this Court with more information regarding DHS's baseless post-hoc charges against me:

25. On March 17, 2025—after one week in detention at LaSalle and just days after filing my habeas petition—I was approached by LaSalle staff and handed a Form I-261, "Additional Charges of Inadmissibility/Deportability." I have reviewed ECF 90-1 and confirm it is a copy of the form I received. The I-261 stated that these new charges were "in lieu of those set forth in the original charging document," which I understand refers to the NTA I was given on March 9 at 26 Federal Plaza. While the original NTA alleged that the Secretary of State had determined my "presence or activities would have serious adverse foreign policy consequences," the I-261 claimed they would *also* "compromise a compelling U.S. foreign policy interest." It also added three new allegations, claiming I "failed to disclose" certain information in my Form I-485, Application to Register Permanent Residence or Adjust Status. Specifically, the I-261 alleged:

    A. "you failed to disclose that you were a member of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) from June through November 2023, as a political affairs officer" (Allegation 6); "you failed to disclose your continuing employment as a Program Manager by the Syria Office in the British Embassy in Beirut beyond 2022" (Allegation 7); and "you failed to disclose that you were a member of the Columbia University Apartheid Divest (CUAD)" (Allegation 8).

26. I answered all questions in my green card application truthfully and to the best of my knowledge. As to Allegation 6: I was never employed by UNRWA, nor was I ever an "officer" of the organization. Rather, I completed an unpaid internship at UNRWA in 2023 as part of my graduate program at Columbia University. Columbia approved me for the internship, paid me a stipend directly, and remained my employer throughout. As part of that internship, I was required to submit reports and blog posts to Columbia about my experience, and my supervisor at UNRWA was required to submit a report to the university, after which I received a passing grade from the university. I understood that the U.S. Department of State was notified of my internship because UN agencies must notify the U.S. Mission to the United Nations. My LinkedIn profile accurately reflected this internship, and I disclosed my employment with Columbia—which included this internship—on my green card application. Indeed, I am proud of my internship experience. I had simply understood that reflecting my employment with Columbia was sufficient to fully and truthfully disclose my employment history, including the internship at UNRWA, on my green card application.

27. As to Allegation 7: I stopped working at the British Embassy in December 2022, when I moved to the United States. The reference in my green card application was therefore accurate. At my Immigration Court hearing on May 22nd, the immigration judge dismissed this allegation.

28. As to Allegation 8: I have always been clear about my role as a negotiator and facilitator between student protestors, groups, coalitions, including CUAD, and the university administration. To the best of my knowledge, CUAD is a coalition made up of over 120 different student groups. It is not a standalone organization with individual membership. As far as I am aware, it has always operated horizontally, without formal leadership or hierarchy.

Importantly, when the April 2024 student encampment protests began at Columbia—I had already submitted my green card application (in March 2024). Faculty members reached out to me and asked me to help as a mediator between the students and the administration. They specifically sought someone who was not affiliated with the student groups organizing the encampment and who was trusted by the administration, students, and faculty alike. I believe they approached me because of my background in diplomacy and negotiation, and because of the relationships I had established with the university administration. At the same time, students in the encampment—which included many who were not affiliated with CUAD—also chose me to serve in this role. I agreed, and I began going back and forth, sharing messages and stated positions between the two sides.

29. I testified about these facts at my immigration court hearing on May 22, 2025. The government attorneys did not ask me any questions regarding these issues.

30. While all of the allegations against me in my immigration court case are false, I know that the Rubio Determination is the one that carries the heaviest consequences. It is the only allegation that, if it stands, will have the greatest impact on the future of my family—particularly my wife and son, who are U.S. citizens. I understand that the Rubio Determination is not only a ground for deportation, but it is also a bar to entry and is not subject to routine waiver like the post-hoc charges. In other words, no matter what happens to the other charge against me, it is the Rubio Determination that will make this country—the country of my wife and child—a country I cannot return to in the future. This harms all of us.

31. I have read every decision issued by the Court in this matter. I ask my lawyers to walk me through the decisions in detail during my virtual legal visits and I wait for the decision to be uploaded to LexisNexis so I can access it from the detention center for myself. I remember reading the Court's finding that, when it comes to here-and-now harms on First Amendment freedoms, and political speech in particular, the law requires "no unnecessary delay."

32. I have authorized my attorney to sign this declaration on my behalf, given the difficulty in arranging in-person visits to the LaSalle Detention Center in Jena, Louisiana where I am presently detained. If required to do so, I will provide a signature when I am able to do so.

Executed on June 4, 2025
New York, New York

                                                                             /s/ Mahmoud Khalil
                                                                             Mahmoud Khalil

*Signed on his behalf by counsel*
*Veronica R. Salama*

## DECLARATION OF VERONICA R. SALAMA

I, Veronica R. Salama, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is Veronica R. Salama. I am a licensed attorney in good standing in the state of New York. I am an attorney of record in the above-captioned case.

2. I represent the petitioner, Mahmoud Khalil, in this action.

3. Mr. Khalil is currently detained by ICE at the LaSalle Detention Center in Jena, Louisiana, and I am unable to travel to him.

4. On June 4, 2025, I met with Mr. Khalil in a virtual attorney-client meeting. I signed Mr. Khalil's declaration on his behalf with his express consent, after reviewing it with him and confirming its accuracy, as reflected in his declaration.

Executed on June 4, 2025
New York, New York

*Veronica Salama*
Veronica R. Salama
Staff Attorney
New York Civil Liberties Union Foundation

# EXHIBIT A-1

## Declaration of Mahmoud Khalil

I, Mahmoud Khalil, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. On Saturday, March 8, 2025, at approximately 8:25 PM, my wife and I were returning from dinner at a friend's apartment next door to our Columbia-owned apartment building when two agents in plain clothing followed us from outside our building into the foyer. The agents asked me if I was Mahmoud Khalil, and I confirmed that I was. The agents claimed to be from the police and I asked them which police. They said the Department of Homeland Security ("DHS") and that I had to go with them. At that point, I handed them my driver's license and asked them why I should go with them. They told me that my visa has been revoked. I explained that I am not a visa holder, but in fact have a green card. They were visibly confused when they heard that I have a green card. I requested to see an arrest warrant.

2. They asked my wife to leave me and said otherwise she would be detained. I asked my wife to go upstairs to our apartment to get my green card. I waited in the foyer with the agents as my wife went up to our apartment to find my green card.

3. At 8:26 PM, I called my attorney, Amy Greer, as I was surrounded by people claiming to be from the DHS inside my Columbia-owned apartment and who wanted me to go with them. My attorney asked me if they had shown me an arrest warrant. I asked the agent again to see the arrest warrant, to which he replied that he had the warrant on his phone. The same agent told me to hand over my phone to him and identified himself as special agent ████████████ to Amy Greer. During the call between my attorney and Agent ████████████, he reiterated that he had an administrative warrant. But despite repeated

Uploaded on 04/24/2025 at 04:30:24 AM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH   Document 284-1   Filed 06/05/25   Page 12 of 28
PageID: 3248

requests, he did not show the warrant. After a brief phone call with my attorney regarding my status as a green card holder and if a warrant existed, the agent abruptly ended the phone call. The other agents asked me to move to the other side of the foyer, and I complied. I sat in the foyer while waiting for my wife.

4. Once my wife returned and showed the agents my green card, Agent ▇▇▇▇▇, on the phone with an unknown individual, informed them that I was a green card holder. I tried to call my lawyer again on my phone.

5. Then, a DHS agent told me I was under arrest and directed me to turn around. I asked again about the warrant, but complied with the request. As I turned, I attempted to hand my wife my phone to talk to the lawyer. The agent said "stop resisting" to which my wife and I both responded that I was not resisting but attempting to hand my phone to my wife. I placed my hands behind my back as they arrested me and stated to them, "I am coming with you, don't worry," as clearly shown in the video my wife was recording. Once I was handcuffed, the agents escorted me out of the building and on to ▇▇▇▇▇ ▇▇▇▇▇. The agents placed me in a car and drove me to 26 Federal Plaza.

6. At no point in my interactions with these agents did I attempt to resist, flee, or otherwise not comply with the agents' orders. Throughout this interaction, I insisted on seeing the warrant that the agent stated he had on his phone and that he would show me, but he did not at any point show me a warrant.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 23rd day of April, 2025.

                                                   /s/ Mahmoud Khalil

Uploaded on 04/24/2025 at 04:30:21 AM (Central Daylight Time) Base City: JNA
Case 2:25-cv-01963-MEF-MAH    Document 282-1    Filed 06/05/25    Page 18 of 28
PageID: 3244

Mahmoud Khalil

I, Oona Cahill, declare as follows:

1. My name is Oona Cahill. I am a licensed attorney in good standing in the state of California. I am an attorney of record in the above-referenced case.
2. I represent the Petitioner, Mahmoud Khalil.
3. I signed Mr. Khalil's declaration on his behalf with his express consent, after reviewing it with him, as reflected in his declaration. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on the 23rd day of April, 2025.

/s/ Oona Cahill

Oona Cahill