Exhibit F

F-1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

*Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF
VICTORIA PORELL**

I, Victoria Porell, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I submit this declaration in support of Petitioner Mahmoud's Khalil motion for a preliminary injunction in his above-captioned habeas corpus petition and in particular to address the ways in which the United States government's targeting of Mr. Khalil for his Palestinian rights advocacy is causing him irreparable harm and is contrary to the public interest.

2. Specifically, I write to explain the ways in which, even in the context of a long term campaign to target and silence students advocating for Palestinian human rights, Palestine Legal has observed and documented a substantial increase in concerns expressed by students – and corollary chill to their activism – in direct reaction to the arrest and detention of Mahmoud Khalil on March 8, 2025. I

conclude that the arrest, detention and attempted removal of Mr. Khalil for what the federal government has explicitly attributed to his campus activism on behalf of Palestine has had a considerable chilling effect on activism and particularly student campus activism.

## Background on Palestine Legal

3. Palestine Legal (a project of Tides Center) is a non-profit legal and advocacy organization specifically dedicated to protecting the civil and constitutional rights of people in the U.S. who speak out for Palestinian freedom. Palestine Legal tracks and responds to efforts to suppress expression supporting Palestinian rights, particularly those aiming to chill, or wholly eliminate, campus-based organizing. Palestine Legal has advised thousands of students, campus groups, and other advocates whose rights have been violated for expressive conduct supporting Palestinian rights and faced false accusations of support for terrorism, doxing, and other repressive efforts.

4. We have successfully defended the civil and constitutional rights of students advocating for Palestinian human rights through strategic litigation, amicus curiae filings, complaints alleging violations of Title VI of the Civil Rights Act of 1964 based on Palestinian national origin and related associational discrimination, along with other legal advocacy. See., e.g., *Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.*, No. 24-2683 PJM, 2024 U.S. Dist LEXIS 178359 (D. Md. Oct. 1, 2024).

## Qualifications

5. I am a Senior Staff Attorney at Palestine Legal and have worked at the organization since January 2024, primarily representing students and faculty members facing retaliation for their speech in support of Palestine. Prior to my employment at Palestine Legal, from 2018-2023, I was a member of Palestine Legal's attorney network and volunteered on cases referred to me. I also worked as a Legal Intern for Palestine Legal in 2016-2017.

6. At Palestine Legal, I have been serving at the head of our Intake Committee, overseeing all incoming requests for legal support, monitoring trends in requests for support, and ensuring requests are addressed either by a Palestine Legal attorney or a referral from our attorney network.

### Requests for Legal Support Following Mr. Khalil's Arrest—By the Numbers

7.  The movement for Palestinian rights and freedom has long been hotly contested in the United States. On college campuses, where there is a concentration of advocacy for Palestinian rights, student advocates have consistently faced pervasive threats to their political expression and associational rights via doxing by anti-Palestinian groups, differential treatment and disciplinary processes.

8.  Since the onset of Israel's latest military offensive against Palestinians in the Gaza Strip, more and more students have used common protest tactics to express their dissent against the United States' and their own institutions' support for Israel's prolonged military offensive that has killed over 54,000 Palestinians, including over 16,000 children. (*See*, Jay Ulfelder, *Crowd Counting Consortium: An Empirical Interview of Pro-Palestine Protests at U.S. Schools*, Harvard Kennedy School, Ash Center for Democratic Governance and Innovation, (May 30, 2024), https://ash.harvard.edu/articles/crowd-counting-blog-an-empirical-overview-of-recent-pro-palestine-protests-at-u-s-schools/.) With students' protests against the onslaught on Gaza has come unprecedented retaliation: in the 17 months since October 2023, Palestine Legal has received over 3,500 requests for legal support, the majority related to campus-based suppression.

9.  Since the onset of the Trump administration in late January 2025, student organizers face a new, dire threat to their political expression: the leveraging of the federal government's vast immigration powers to punish and thereby deter constitutionally protected advocacy for Palestinian rights. These efforts at state-directed political suppression have been deemed "the greatest threat to free speech since the Red Scare." (*See*, Michelle Goldberg, *This Is the Greatest Threat to Free Speech Since the Red Scare*, THE NEW YORK TIMES (Mar. 10, 2025), https://www.nytimes.com/2025/03/10/opinion/mahmoud-khalil-free-speech.html.)

10. Since March 8, 2025[1], the date of Mr. Khalil's arrest and detention by ICE, Palestine Legal has received 409 requests for legal support. In the same amount of time (82 days) immediately preceding March 8, 2025, we received 322 requests for legal support. This amounts to a nearly 30% increase, at a time (since October 2023) when we have been receiving an already heightened volume of requests. As a point of comparison, in all of 2022, we received 290 requests for legal support.

11. I personally responded to 39 of the 409 requests for legal support that we received.

---

[1] As of May 29, 2025, 9:08pm PST.

12. Of the 409 requests that Palestine Legal received since March 8, 2025, 167 requests were related to educational institutions, the majority coming from students or faculty members from colleges and universities.

13. Many non-citizen students and faculty reaching out for legal support have been targeted and doxed by the same or similar pro-Israel organizations that targeted Mr. Khalil prior to his detention, including Betar, Canary Mission, and Documenting Jew Hatred on Campus. (*See,* Tsehai Alfred, *Mahmoud Khalil, SIPA '24, asked Columbia for protection a day before detainment, lawyers confirm*, COLUMBIA SPECTATOR (Mar. 12, 2025), https://www.columbiaspectator.com/news/2025/03/12/mahmoud-khalil-sipa-24-asked-columbia-for-protection-a-day-before-detainment-lawyers-confirm/.)

14. Palestine Legal does not inquire about the citizenship status of those seeking legal support, so precise numbers are not available, but anecdotally, requests for immigration consultation and representation from students and faculty increased dramatically after March 8, 2025, with many individuals directly referencing the high-profile detention of non-citizen students such as Mahmoud Khalil.

15. After March 8, 2025, Palestine Legal also received a significant increase in the number of requests for "Know Your Rights" presentations and materials, particularly for non-citizens resulting from escalating fear from pro-Palestinian activists about possible retribution by ICE and/or universities.

16. Since March 8, 2025, Palestine Legal staff have participated in at least 13 "Know Your Rights" trainings or other public presentations that reached an estimated audience of over 2,700 people.

## Increasing Requests for Legal Support—Individual Examples

17. In the days and weeks following Mr. Khalil's arrest, as we saw an increase in the numbers of requests for legal support, I also saw an intensification of the emotional state of those reaching out for support. Students I spoke to expressed anxiety, panic, and terror at the possibility that they may be disappeared off the street and detained without warning. Multiple student clients, and even one member of Palestine Legal's attorney network, broke down in tears while we were on the phone.

18. A law student organization asked me if they shouldn't have meetings anymore so as to protect their members, especially non-citizens on campus.

4

19. Multiple graduate students and faculty members (citizens and non-citizens) asked if it was safe to travel abroad or if they should reschedule international conferences and field work. An international graduate student from a US university who was abroad conducting research reached out because he was concerned about his ability to re-enter the US because his name appeared in a news article about a Palestinian rights demonstration.

20. Multiple non-citizen students who were in leadership positions of student organizations or officers in student government asked if they could or should request that their institutions remove their names from internal and external websites. One chapter of Students for Justice in Palestine (SJP) contacted Palestine Legal after their university refused to make private a spreadsheet listing the leadership of student clubs. They expressed that they were especially worried one of their board members, a non-citizen, would be retaliated against by the federal government if this information remained public.

21. Student journalists, from at least two universities, asked if they should remove by-lines from articles having anything to do with the Middle East or campus protests. These questions followed reporting that professors, including Dean of the Columbia Journalism School Jelani Cobb, had publicly told students who were not U.S. citizens to avoid publishing work on Gaza, Ukraine and their former classmate's arrest, and that "nobody can protect you. These are dangerous times." (*See*, Liam Stack and Katherine Rosman, *At Columbia, Tension Over Gaza Protests Hits Breaking Point Under Trump,* THE NEW YORK TIMES (Mar. 12, 2025), https://www.nytimes.com/2025/03/12/nyregion/columbia-university-trump-protests.html.)

22. A non-citizen student expressed that they had not left their apartments out of fear that they would be arrested by ICE.

23. A student who was President of SJP at her University and a United States citizen asked if her non-citizen roommates were at risk because of her position of leadership.

24. A faculty member reported to Palestine Legal that they were supposed to give a lecture in March. However, the event was cancelled at the last minute and the reason provided to the faculty member was that the organizers had concerns about retaliation against non-citizen academics.

25. A member of a graduate student government reached out because they had

5

received a number of questions from doctoral students about whether they would be able to remain enrolled and/or finish their degrees from oversees if they are deported for their Palestine organizing or have their F-1 student visas cancelled.

26. At least three non-citizen students who had written op-eds about campus protests reached out seeking legal representation because they believed that they may be targeted as a result.

27. Multiple students who had been interviewed or photographed for campus newspaper articles concerning demonstrations asked if they could or should request their names or pictures be removed from previously published articles.

28. Many students asked if it was safe for them to be members of student organizations or attend campus events having to do with Palestine. A first-year doctoral student and legal permanent resident asked whether he was at risk of having his green card revoked for having been a member of SJP and whether he should stop associating with the group.

29. A non-citizen Palestine Legal client who was a lawful permanent resident expressed intense fear of retaliation for being involved in campus activities concerning Palestine and decided to put her application for citizenship on hold.

30. I am attaching as **Exhibit A** an article that Palestine Legal attorneys and clients were consulted on that includes some additional examples that illustrate the climate of fear that has set in on campuses, particularly amongst non-citizen students and scholars.

31. Attached hereto, at the exhibits listed below, are true and correct copies of the following materials:

    A. Attached as **Exhibit A**: Sanya Mansoor, *Will ICE Come to My Dorm Today? International students who protested Israel's war in Gaza grapple with Trump's crackdown.*, THE CUT (Mar. 26, 2025), https://www.thecut.com/article/pro-palestine-student-protesters-worry-will-ice-come-for-me.html.

Dated: June 3, 2025                Signed:
Oakland, CA

*/s/* Victoria Porell

6

# F-1
# Exhibit A

# Will ICE Come to My Dorm Today? International students who protested Israel's war in Gaza grapple with Trump's crackdown.

By Sanya Mansoor, a freelance reporter who covers immigration and Gaza

MAR. 26, 2025

🔖 SAVE    |    💬 22

Photo-Illustration: by The Cut; Photo: Michael Nigro/Sipa USA via AP

Since ICE agents arrested Columbia graduate Mahmoud Khalil in early March, Maryam, a student at Cornell University, doesn't leave the house unless they need to. They started getting groceries delivered and rarely go out to the shops. While they still help support and organize local demonstrations against Israel's war in Gaza, they no longer attend in person. When they do go out to class or to work, they write an employment lawyer's phone number on their body and carry all their documentation. As a person of Arab descent who is in the U.S. on a student visa, Maryam worries that they could be swept up in the Trump administration's crackdown on pro-Palestine activists. Recently, they installed security cameras outside their off-campus apartment. "It felt like a way I could protect myself," they say, if immigration agents were to show up at the door.

On top of all this, Maryam's sister is pregnant and they are now unsure of when they will be able to visit family. If they leave the country, they fear they won't be allowed to return. They try their best to calm down their parents, who are scared of ICE detaining their child. Maryam's mother texts that she loves them more frequently, while their father, who normally talks a lot, now trails off and becomes quiet on the phone. "He understands that it is not in me to be bullied or cowed," they say.

International students across the country like Maryam are spooked by the arrests of Khalil, a U.S. permanent resident, and Georgetown University researcher Badar Khan Suri, an Indian national. (Maryam's name and that of other students in this story have been changed, as they fear the federal government may target them for deportation.) Trump's campaign-trail rhetoric about throwing student protesters out of the country has since become a real threat. The administration rescinded a longstanding policy that protected universities and other vulnerable locations from immigration enforcement; the State Department is launching an AI-driven program to help deport foreign nationals perceived as supporting Hamas; sweeping executive orders threaten deportation or criminal prosecution over actions the administration

views as <u>antisemitic</u> or expressing a "<u>hostile attitude</u>" toward the U.S.; and <u>Trump is</u>
<u>pressuring</u> universities to impose stricter protest rules or else lose their federal funding.

This all leaves international students wrestling with how to criticize the U.S.'s continued
military support of Israel without jeopardizing their visa status. Several students I spoke with
worried that identifying their country of origin or which university they attend, let alone
talking about their protest activity, would put a target on their backs. Some are doubling down
by engaging more publicly, including by protesting without a mask, while others are paring
back their social-media activity and taking more precautions at protests. James, who attends
New York University on a student visa, has continued to go to demonstrations and wears a
shiesty to obscure his face and cover his eyebrows — "all this stuff we know can stop facial
recognition," he explains. Stopping his activism was not an option. "I don't see myself
disengaging completely," he says. "It's just a matter of picking different ways of engagement
and supporting people who can be more visible." Still, he's nervous that authorities seem to be
casting a wide net in their pursuit of pro-Palestine activists. "It's not just lead organizers, it's
people who were at protests or signed letters," he says. "That makes me afraid, because how
much more can they expand it? How much leeway do they have that I don't know about?
Where do I fall?"

Salman, an Arab graduate student at NYU, had briefly met Khalil at a friend's birthday party
last year. They didn't speak much, but the interaction was enough to make the news of the
Columbia graduate's detention feel less abstract. *If they're deporting someone with a green*
*card, then what protection does my F-1 student visa offer me?* Salman thought. He also saw
parallels between his situation and the argument the Trump administration made for
detaining Khalil: While he is not an organizer, Salman has frequently posted on social media
about protests and policy demands, like calling for a cease-fire and arms embargo. "I don't
think I post more or less than your average pro-Palestinian advocate," he says, but he fears that
"people can read into what you post in whatever way." He's started to pull back from sharing
his personal political opinions on social media. He did go to a protest earlier this month to
demand Khalil's release, however, and then to another demonstration to protest Israeli
airstrikes on Gaza. He wore a mask after friends and family urged him to take steps to conceal
his identity. "I'm not taking a step back on this," he says.

Salman says his parents want him to be safe and finish his degree. "They also understand that
I'm at a point in my life right now where even if they were to tell me 'Don't do this' or 'Don't do
that,' they know me too well to think that I'm going to become silent all of a sudden out of
fear," he says. Salman currently plans to fly to attend his sibling's engagement outside of the

U.S., which he knows involves risk, but he plans to have a lawyer or emergency contact on standby in case he runs into issues reentering the United States.

NYU is one of several universities, including Brown and UC Berkeley, that are urging international students to reconsider traveling out of the country. (Cornell had advised international students to return to campus before Trump took office in anticipation of changing immigration policies.) The U.S. government wields more power and discretion at the border than it does within its borders, and "severe consequences can emerge very quickly," says Golnaz Fakhimi, legal director of the civil-rights organization Muslim Advocates. In the span of a few hours, one interaction with a border agent could lead to a person's removal from the country and a ban on seeking reentry for years. Muslim Advocates is helping students prepare for all scenarios, including ICE detention; that means figuring out a care plan for any dependents and putting a process in place to notify emergency contacts.

Both Muslim Advocates and the advocacy group Palestine Legal tell me they've received an uptick in inquiries recently from non-citizen students who are trying to gauge the risks involved in traveling, living in on-campus housing, protesting, and posting pro-Palestine content on social media. Some students who've reached out to them have a more public profile, but many of them don't and are still worried they may be on the government's radar. Palestine Legal senior staff attorney Radhika Sainath says there has been a subtle shift in the group's approach to providing Know Your Rights training for students, given that "we have an administration in place that does not respect the law." "There's more of a focus on different scenarios and what people might expect given what they said, or who they are, and their citizenship status," she said. Still, she stresses, everybody in the U.S. — regardless of their immigration status — has a right to freedom of speech and expression, which includes criticizing the American and foreign governments.

At Columbia, which has become Trump's biggest campus target, the international student community is rallying together after ICE detained Khalil and attempted to arrest Fulbright student Ranjani Srinivasan, who subsequently left for Canada. Grant Miner, the president of Columbia's student workers union, said that typically about five people come to its international student working group meetings. Following Khalil's arrest, 80 showed up. "People I've never seen before are coming to union meetings," Miner says, "and that's not because we did a good job organizing them, it's because they feel angry." Ph.D. student Allie Wong has been referring these students to mutual-aid funds and friendly lawyers, helping provide walking escorts for those who feel unsafe, and connecting them to healing circles. She's also heard from international students who are considering moving off-campus or want a

secondary place to stay should ICE agents show up at their residence. Some of her peers have expressed interest in helping out, but the Justice Department recently directed federal prosecutors to investigate local compliance with Trump's immigration crackdown. That can include cases where the government believes U.S. citizens are harboring people who are in the country illegally. "This is paralyzing people who do have good intentions, and who want to help their friends, who are not promoting terrorism; they're just trying to get a good education," Wong says.

Some international students are confronting the Trump administration head-on. At Cornell, Momodou Taal, a British Gambian Ph.D. student, filed a lawsuit this month alongside two U.S. citizens that alleged the executive orders Trump is using to crack down on pro-Palestine activists amount to an unconstitutional silencing of their political views. "It got to a point where international students are becoming sitting ducks," Taal says. "We shouldn't be penalized and punished with the threat of deportation because of expressing our views." Residents of Taal's building tipped him off last week that unidentified law-enforcement officers had arrived at his Ithaca home, and in a statement on X he wrote, "Trump is attempting to detain me to prevent me from having my day in court." On Friday, the Justice Department asked Taal to surrender to ICE; his legal team filed an emergency petition seeking to prevent the government from detaining him before a Tuesday hearing on the merits of his case.

Columbia student Yunseo Chung also filed a lawsuit Monday after immigration officials unsuccessfully tried to deport her. Chung is a lawful permanent resident like Khalil, and the government is relying on the same obscure immigration law to argue that her conduct — she was arrested after a campus sit-in — negatively affects America's foreign policy. Chung, who does not appear to have a leadership role in the student protest movement, and her legal team filed a petition that would block her detention while her lawsuit is ongoing, which a judge granted Tuesday.

The crackdown has led several of the students I spoke with, including those from countries that routinely stifle free speech, to question their long-term plans. Even if they want to stay in America because of their strong community ties and a desire to fight for the cause they believe is right, they're grappling with whether it's worth living in a country that won't allow them to freely express their political beliefs. James says he planned to stay in New York after his program ends, "not for nationalistic reasons" but because of the city and the friendships he's built there. But now, he's not sure it'll be possible. "It's not a question of wanting" to remain in

the States, he says. "How long will it be until they find something to use as a reason to not let me in?"

Maryam came to the U.S. to work with particular scholars at Cornell and had no plans to stay in the country longer. Then they got into a relationship with an American citizen. "I started to think, *Maybe I could settle down here. Maybe this is a place where we could have a family and be happy*," they say. But in the wake of Khalil's arrest, the couple is talking about living "anywhere that is not here." The future they envisioned together no longer feels realistic when "international students are being hunted by the federal government," Maryam says. They're not surprised that Trump is making good on his campaign promise, but they are increasingly worried that the American public won't push back enough on the administration's crackdown. "That scares me more than anything else," they say. "That the entire world is finding a way to make this a personal failing rather than a structural issue of targeting students who engage in constitutionally protected speech."

TAGS:   POLITICS    POWER    TRUMP 2.0    THE CLASH ON CAMPUS    MORE

■ SHOW 22 COMMENTS

F-2

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MAHMOUD KHALIL, | |
| *Petitioner*, | Civ. No. 25-1963 (MEF) (MAH) |
| v. | **DECLARATION OF** |
| DONALD J. TRUMP, *et al.*, | **GOLNAZ FAKHIMI** |
| *Respondents*. | |

Pursuant to 28 U.S.C. § 1746, I declare as follows:

1.  My name is Golnaz Fakhimi. I am over the age of eighteen and have personal knowledge of the facts stated in this declaration.

2.  I am a civil and human rights attorney, and, since October 2, 2023, I have been the legal director of Muslim Advocates ("MA"), a national legal advocacy and social justice organization.

3.  MA's work includes providing education, counsel, and defense to non-citizens at risk of or facing wrongful immigration-related surveillance or scrutiny, denial of immigration benefits or visas, interior immigration enforcement, and/or border enforcement by the U.S. government—on the basis of any protected ground, including viewpoint, race, national origin, and/or religion.

4.  MA's work also addresses the interests of U.S. citizens who are harmed by these, and other, wrongful U.S. governmental practices against non-citizens.

5.  MA's work on these issues includes conducting related Know Your Rights trainings ("KYRs"); providing legal consults to impacted individuals; providing direct representation to clients in litigation and non-litigation matters; and coordinating and supporting other attorneys in their provision of education, counsel, and defense to impacted people.

1

6. In the time that has passed since the March 8, 2025, immigration arrest of Mr. Khalil and many others like him—such as Mohsen Mahdawi, Rümeysa Öztürk, Dr. Badar Khan Suri, and Leqaa Kordia (an MA client)—MA has experienced a sharp uptick in contact from non-citizen community members from across the nation who are alarmed by the administration's policy and practice of weaponizing its carceral power under the Immigration and Nationality Act for the purpose of chilling and punishing speech and conduct supportive of Palestinian lives and freedom, critical of U.S. and Israeli governmental conduct that harms Palestinians, or otherwise expressive of viewpoints that the administration does not like.

7. Since March 8, 2025:

   a) Community members have asked MA to conduct approximately eleven (11) KYRs addressing viewpoint-related immigration risks and consequences for non-citizens. Between January 20, 2025, and March 8, 2025, MA had only received one (1) such request.

   b) MA has provided approximately fifty (50) individual consults to non-citizens personally concerned by viewpoint-related immigration risks and consequences. Between January 20, 2025, and March 8, 2025, MA had received few to no such requests.

   c) MA has provided support for the consideration or preparation of anticipatory habeas corpus actions for approximately thirteen (13) non-citizens acutely worried that viewpoint-based immigration custody could precipitate against them, as it has for Mr. Khalil and others. These individuals have included students, professors, and journalists. By contrast, between January 20, 2025, and March 8, 2025, MA had never been asked to support the consideration or

preparation of an anticipatory habeas action concerning viewpoint-based confinement.

d) In the course of the support and coordination that I have provided nationally to other attorneys supporting and defending non-citizens concerned by viewpoint-related immigration risks and consequences in the aftermath of Mr. Khalil's immigration arrest—many such attorneys have expressed to me that non-citizens are now routinely asking them to prepare anticipatory habeas corpus actions for them.

8. Across the aforementioned categories, many non-citizens have directly expressed to me that, in hopes of mitigating or navigating risks of viewpoint-based immigration consequences to them, they have: deleted social media accounts, deleted social media content, reduced social media usage, changed social media settings to "private," decided against protest attendance, decided against domestic air travel, and/or decided against international travel.

9. U.S. citizens have also directly expressed to me having changed their usage of and/or behaviors on social media along the lines described above, in hopes of reducing immigration-related risks to non-citizens with whom they associate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June 4, 2025

Respectfully submitted,

Golnaz Fakhimi
Muslim Advocates
1032 15th Street N.W. #362
Washington, D.C. 20005
Tel: (202) 655-2969
golnaz@muslimadvocates.org

3

F-3

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<table>
<tr>
<td>

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

       *Respondents*.

</td>
<td>

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF JOSHUA DRATEL, PARTNER AT DRATEL & LEWIS**

</td>
</tr>
</table>

     I, Joshua Dratel, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

     1.     I am the founding partner of Dratel & Lewis, one of the law firms representing Petitioner Mahmoud Khalil in the above captioned case. After graduating law school in June 1981, I was admitted to the New York State Bar in March 1982, and have practiced law continuously since, primarily as a criminal defense lawyer. I have handled matters at all stages (investigations, trials, and appeals) in the U.S. state and federal courts – principally in New York – across the U.S., as well as some internationally. Throughout my career, my practice has included a wide range of matters, including "white collar," "organized crime," drugs, sex offenses, cybercrime, terrorism and national security, and capital cases.

     2.     Currently, I am co-chair (since 2018) of the Defense Function Committee of

the American Bar Association ("ABA"), and co-chair of the *Amicus Curiae* Committee of the National Association of Criminal Defense Lawyers ("NACDL") (since 1994), as well as NACDL's National Security Committee (since 2011). From 2011-2022 I was NACDL's representative on ABA's Criminal Justice Section Council. I am also a member of the New York City Bar's Capital Punishment Committee (since 2002). I am a past President (2005) of the New York State Association of Criminal Defense Lawyers. I am a member of the Criminal Justice Act panel in the Southern District of New York since 1988, and a member of that District's capital representation panel since its inception.

3.      I have testified as an expert multiple times in the courts of the United Kingdom and Canada as an expert on various aspects of U.S. law and its criminal legal system, and also in a U.S. arbitration.

4.      Dratel & Lewis associate attorney Amy E. Greer, Esq., has been involved in the above-captioned case since Mr. Khalil's arrest March 8, 2025.

5.      Since March 9, 2025, Dratel & Lewis has been contacted by more than three dozen individuals and entities representing an extraordinarily diverse group of vocations and professions, including students (undergraduate and graduate), academics, lawyers, journalists, artists (in various disciplines), personnel working for non-governmental organizations ("NGO's"), and activists. Also, spouses and other family members of the above-listed individuals have contacted us as well.

6.      The individuals described above also possess all ranges of immigration status in the U.S. – from visa holders to Legal Permanent Residents to naturalized citizens to native-born citizens. Nearly all are without any criminal history, and none have been convicted of a crime (or are currently charged with or accused of any criminal conduct). They also have expressed concern about family members whose status could be used as leverage against them.

7.      Notwithstanding this diversity, all of these people and entities who have consulted and/or retained our firm have one factor in common: they each have sought advice and/or representation as a prophylactic measure because they have genuine fear of retaliation by the United States government for exercising their protected speech, expressive activities, and associations related to advocacy for Palestinian human rights and/or against the genocide being perpetrated in Gaza, and/or relating to their particular areas of scholarship and/or work related to Palestine.

8.      In addition, some of the lawyers described above have defended others

2

exercising their First Amendment rights, or engaged in proactive litigation to vindicate the First Amendment rights of others.

9.      Mr. Khalil's arrest and nearly three-month-long detention has caused the individuals described in ¶¶ 4-5 above to possess a credible fear – notwithstanding their citizenship or immigration status – of U.S. government retaliation for past and future First Amendment expression that could have an adverse impact their liberty, their ability to continue living, working, and/or studying or teaching in the U.S., their ability to re-enter the U.S., and their ability to retain their current employment, housing, and/or parental rights.

10.      The individuals who have sought counsel and a formal relationship with an attorney have done so in large part because the vagueness and lack of standards in the Secretary of States "foreign policy ground" leaves them without sufficient guidance as to what expression would be the subject of an enforcement action of some sort.

10.  This reaction across such a broad spectrum – transcending age, economic position, social or professional status, race, gender, religion, and nationality – is unprecedented in my nearly half-century career.  It does not have even a remote analog, even among the several cycles of political upheaval that have occurred in the U.S. through the past five decades.  The fear and intimidation spread rapidly and widely after Mr. Khalil's arrest and detention, and persists, as we have continued to field such inquiries on a regular basis.  Indeed, the steady volume has compelled us to refer some of them to other lawyers.

Dated: June 3, 2025                     Signed:
New York, NY