Exhibit G

G-1

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

     *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

     *Respondents*.

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF RASHID KHALIDI**

I, Rashid Khalidi, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is Rashid Khalidi, and I am the Edward Said Professor Emeritus of Modern Arab Studies at Columbia University, where I taught for 23 years.

2. I declare under penalty of perjury that the foregoing is true and correct.

3. I have personally observed multiple instances of the Trump administration's targeting of Mahmoud Khalil causing many of my colleagues and students to change their behavior. I feel obliged to avoid all identifying details regarding these individuals, out of fear that they might also become targets of the Trump administration and other harassing private actors.

4. These instances include many foreign students, whether they have been involved in student activism or not, who are fearful of detention or deportation on the basis of their real or supposed past, current, or future speech or activity. These students are avoiding travel back to their homes, or travel that is necessary for their studies, out of concern they may be detained or deported upon their return. Foreign students of my acquaintance are all fearful for their future as students in the United States. Some of the students and faculty of my acquaintance at a variety of universities (Columbia, City University of New York, Princeton University) who are permanent residents or have student or work visas have been advised by their institutions not to leave the United States for fear of detention or deportation on their return.

5. These are not imaginary fears. A relative of mine who is an MA student at a Washington area university and was returning recently from a university-sponsored event abroad was detained at a United States airport for 7 hours, had his phone confiscated, and was threatened with deportation, while one of his fellow students, a United Kingdom citizen, was denied re-entry.

6. Two of my PhD students and several MA students and undergraduates who studied with me have been restricting their engagement in political speech on social media, and fear participation in class, or writing about subjects that might be considered objectionable by the Trump administration. This has thrown a chill over both teaching and studying a broad range of topics of this nature, out of fear that one might be deported for saying something in class that might be reported to the Trump administration by fellow students, as has apparently happened in the past.

7. As a result of the climate of fear created by the Trump administration's targeting of Mahmoud Khalil (and others), some of my colleagues at Columbia and other universities have been censoring the content of their instruction and scholarship, have avoided any political activity, and have limited their engagement on social media. Others have chosen to continue their advocacy, but have felt obliged to mask themselves while doing so out of fear that they might also become targets of the Trump administration and other harassing private actors, who appear to be acting in coordination with the administration.

Signed:

Rashid Khalidi

2

G-2

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

       *Respondents*.

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF JAMES SCHAMUS**

    I, James Schamus, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1.  My name is James Schamus,  and I am a Professor of Professional Practice in the School of the Arts at Columbia University. I have been a professor at Columbia for 36 years.

2.  The removal and detention of former Columbia student Mahmoud Khalil has had and continues to have a profound and overwhelmingly chilling effect on campus. Students and colleagues of all backgrounds and political orientations are keenly aware that a Columbia student, accused of no crime, has been disappeared from their midst, and they have perhaps rightfully concluded that thoughts and expressions of thoughts may someday retroactively be declared, regardless of citizenship or legal status, cause for their own detention or other punishment. As

we are a community devoted to the sharing and expression of often difficult and challenging thoughts, Mr. Khalil's removal and continued detention cut to the very core of the community.

3. Among the specific examples I can share of the impact of Mr. Khalil's removal are: Students opting not to attend academic talks and other events out of fear that the topics discussed at the talk would draw operatives who would seek to photograph and identify attendees; students telling me they are now hesitant to participate in classroom discussions that might be construed as "political," even about ancient texts and on topics far removed from current debates and protests; students and colleagues, permanent residents and on various visas, cancelling academic research and conference trips abroad out of fear they will be detained and deported should they seek to cross the border. Of course many of these examples (and I can count many more) are informed by subsequent actions taken by the current administration, but all of them are concretized and experienced with the very intimate knowledge that Mr. Khalil served as an inaugural embodiment of and instrument for the administration's instauration of fear among our students; and his continued detention only strengthens the potency of that fear.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 31 , 2025                    Signed:
New York, NY

James Schamus

2

G-3

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>      *Petitioner*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>      *Respondents.* | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF NADIA ABU EL-HAJ** |

I, Nadia Abu El-Haj, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is Nadia Abu El-Haj, and I am a Professor of Anthropology at Barnard College and Columbia University.

2. Mahmoud Khalil's arrest and continued detention has had a noticeable impact on both students and faculty at Columbia. A green card holder who was arrested under the purview of the Secretary of State for, allegedly, harming US foreign policy has sent a chill through campus life. No one had previously feared arrest on the basis of political speech. Once Mahmoud Khalil, a green card holder at that, was abducted without a judicial warrant and whisked off to a detention center 1000 miles away virtually everyone became fearful. The consequences are clear and the fear palpable. I list but a few of the direct consequences below. I have direct knowledge of the

examples I enumerate either because I was involved in the decision making or because I discussed and/or offered advice to individuals regarding their situations and decisions.

3. A green card holding Palestinian student hid in his apartment for 3 weeks for fear that he would be detained by ICE agents if he was seen walking around.

4. A naturalized U.S. citizen of Palestinian descent was too frightened to come to campus. As a consequence, he moved his class off campus, with the consent of his department.

5. Two Palestinian PhD students who hold Israeli citizenship had planned to return home for the summer in order to do research for their dissertations. Fearing they were more likely to end up on the Department of Homeland Security's radar if they traveled, they decided to stay in New York. This decision was made despite the fact that staying in the city for the summer poses a substantial financial burden on each of them, and they may need to go into debt. (Columbia PhD fellowships provide 9, not 12-month stipends).

6. As Co-Director of the Center for Palestine Studies at Columbia, I canceled our two final events of the semester, one of which was to host a Palestinian lawyer together with a Middle East Studies scholar, and the second writers and translators of literature and poetry. Given that three of the participants are Palestinians in the US on either work or student visas, we did not go forward with the events. After discussions with each participant, we collectively decided that these events, while they certainly would have enriched discussions on campus, put the participants at too high a risk of being targeted by DHS.

7. More generally, Mahmoud Khalil's detention has had a chilling effect on colleagues who are foreigners, U.S. green-card holders, as well as naturalized citizens. Those of Arab and/or Muslim origin are feeling vulnerable and withdrawing from public speech; several are reassessing whether or not to leave the US for academic conferences or vacations out of fear that they will not be allowed to re-enter. What is more, at least one Lebanese-born naturalized citizen is considering not returning to Columbia next year, because she is fearful for her own safety. A naturalized citizen of Israeli (Jewish) origin was told she was on the federal government's radar and was at risk of detention when she returned from traveling abroad; she delayed her return until a law school colleague accompanied her back and through the border. A British professor on a green card cut-off all contact with a student pursued by ICE out of fear that he too would be swept up in the frenzy.

8. In general, there is nothing "normal" about Columbia University's campus today.

Foreign students live in fear of their visas being revoked: many students of myriad national origins took part in pro-Palestinian demonstrations last year, before it became, in effect if not formally, a crime. Likewise, faculty of many national origins stood outside the encampment in an effort to deescalate the situation and, potentially, protect students from a likely police raid. They too live in fear that they will be picked up and detained for merely acting like the adults in the room.

9. The effects of such fear are permeating well beyond the "mood" of campus life. Academic workshops and conferences on a wide range of topics have seen participants withdraw, or have been canceled or moved off campus because many non-Columbia speakers—foreigners, green-card holders and US citizens—are too frightened to participate in events on Columbia's campus. For my part, I canceled a recent talk at Harvard University's Middle East Studies Center after delivering the talk at Princeton. Even though I am unsure what the federal government could do to me for my academic speech, I too felt I needed to withdraw and rethink how I am going to go forward in this increasingly repressive political environment.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 1, 2025                                Signed:
NEW YORK, NY

Nadia Abu El-Haj

G-4

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

*Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
████████

I, ██████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that
the following is true and correct to the best of my knowledge.

1. My name is ████████. I am the ████████████████
   ████████████████████████ at Columbia University.

2. The effect of Mahmood Khalil's arrest has been profound on myself, my colleagues,
   and my students. It has created a climate of fear and uncertainty that has chilled
   speech and political participation, as well as circumscribed our personal and
   professional activities.

3. One factor in the creation of this climate of fear and uncertainty is the government's
   invocation of a particular provision of the Immigration and Nationality Act in
   justifying Mahmood Khalil's arrest. This is due to the way that the government has

classified Khalil's activities as a threat to foreign policy. This classification calls into question that which we understand as protected speech and basic rights. This is frightening to many due to two factors: one, Khalil has engaged in peaceful anti-war speech and protests against Israeli military actions and US support for those actions, and two, the way the certain political groups and the current administration identify a broad array of political speech that is counter their own views as "pro-Hamas." This conflation makes anti-war or protests of government policy the same as support for Hamas. Given that this is a political group classified by the government as a terrorist group, many fear that such an equivalence opens the door to many further forms of government persecution and retaliation.

4. The government's invocation of the INA provision as justification for Khalil's arrest and detention has led us to conclude that any past activities in which we have participated or speech that we have engaged in that espouses views disfavored by the current administration will be used against us, whether we are green card or international student visa holders. For example, after the government announcement that it was using AI to scan social media accounts, many students and colleagues have scrubbed their social media of all mentions of anti-war sentiments, or even just any mention of factual statements about Palestinians or Israel.

5. Many have been told by legal counsel specializing in immigration issues that either their place of origin or their political participation and/or speech—especially if they have been doxed by private organizations—could result in visa revocations, arrests, or, the inability to return to the US if they leave.

6. One colleague who holds a green card fears he will not be allowed back into the US if he goes to visit his family in Lebanon. Other colleagues fear traveling abroad to conduct research necessary to their profession. Many students have been told that they should not leave the country if they have student visas. The inability to leave the country causes psychological hardship, since many students cannot see their families, some of them going on a year with no end in sight. This has resulted in financial hardship because the summer stipend they receive is not sufficient to live in New York.

7. This has also resulted in disruption of progress towards their degrees because they are unable to conduct research or engage in necessary language training. One student has had to change his dissertation topic entirely, since it is not clear when or if he will be able to travel to conduct research. Another student has needed to request an extension in submitting a dissertation proposal because she cannot travel to conduct necessary research for the topic she was accepted into a doctoral program to study.

2

8. Given that certain groups, who are responsible for carrying out sustained doxing campaigns since October 7, have reported names (such as Khalil's) to the government, many students and colleagues are worried that any current or future activities will invite government scrutiny and retaliation. As a result many censor their social media posts of any mention of Israel or Palestine, or of any disagreement with Israeli or US government policy. Many students and colleagues do not attend any protests, political rallies, or events at which they can be photographed or identified for fear that their names will be given to the government by persons and groups hostile to their political views.

9. This is self-censorship is further reinforced as apparently necessary given the fact that such targeting seems to have been how Mahmood Khalil was identified. That this has resulted in his arrest and prolonged detention has created a deep sense of fear and danger that extends to fear of coming to campus or even answering their doors.

10. One student, who lives in Mahmood Khalil's building and witnessed his arrest from the window was afraid to leave his apartment for a week. Many students and colleagues were afraid to come to campus or walk on streets around campus for the fear of immigration agents, severely inhibiting their ability to participate in their daily personal and professional lives.

11. As a naturalized citizen I am also afraid to speak about politics on social media or attend any kind of public or political event that the current administration views with disfavor for fear of being further doxed. I fear that the way certain partisan groups are giving names to the government, as well as the way the government is using AI to scan social media will result in government retaliation against me at the border.

12. This is also why I wished to submit this declaration under seal. I need to travel for professional reasons and I fear that this will inhibit my ability to do so and result in other amorphous repercussions for my daily life. Part of the fear is also due to the unprecedented nature of government actions against people like Mahmood Khalil and to the vague nature of the justification, which makes it unclear how far the administration will go even against its own citizens.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2025          Signed:
New York, NY

G-5

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Mahmoud KHALIL,<br><br>        *Petitioner*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>        *Respondents*. | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF YANNIK THIEM** |

I, Yannik Thiem, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is Yannik Thiem, and I am an associate professor in the Department of Religion at Columbia University.

2. I joined the Religion Department at Columbia University as a tenured faculty member at the rank of associate professor in the summer of 2019. Prior to that I was a full-time tenured faculty member in the Philosophy Department at Villanova University in Villanova, Pennsylvania. My teaching and research fall into the area of social and political philosophy and more specifically I work on the relationship of politics and religion as well as on questions of gender and sexuality.

3. I received my first doctorate in Catholic Theology from the University of

Tübingen in Germany and my second doctorate in Rhetoric from the University of California in Berkeley, after having spent a year as a visiting scholar at Harvard University in Cambridge on a Fulbright Scholarship.

4. During the 1980s and 1990s I grew up and went to school in Germany, in an area in former West Germany about 30 minutes from the former German-German border. I mention this circumstance because it points to two aspects that have affected—and continue to impact—my understanding of what it means to be a citizen in a democracy protected by the rule of law. This background also is why I am so gravely concerned by the kinds of alterations in approaching political speech and political activity that I have observed in students and colleagues, but also in myself since Mahmoud Khalil was arrested by ICE on the evening of March 8, 2025.

5. Firstly, for me, what is commonly referred to as "the fall of the Berlin Wall" in November 1989 was and is — as for any of us who lived in proximity to the German-German border — neither mainly about Berlin nor far away nor an abstract concept. Within hours of the opening of the border, the local volunteer fire brigade was driving through our town, using the only vehicles with sound systems able to make announcements, asking everyone who could spare a couch or a cot to take in some of the people who had newly arrived from the East. Nobody knew how long the border would stay open, so people from the East had packed what they could and just left. We in our little town had spent weeks glued to the television watching people come out every Monday in East Germany for demonstrations. It was extraordinary to see the demonstrators assert week after week "WE are the people." But what would happen next was far from certain. I viscerally remember how tense everyone was, both the reporters as well as we, who were watching from our home an hour or so southwest from the closest demonstrations. School was in session at the time, but the tried and tested worksheets and lesson plans were suspended. The world outside on our own doorstep had become the textbook for the time being. The Tiananmen Square massacre had just happened that June. As much as everyone was exhilarated to see people protesting, our teachers' and parents' fear was palpable. (I recall my parents buying inordinate amounts of canned food — which we never ate and would later give away. My father was a child during World War II and my mother had been born during the so-called "hunger years" just after the war. Our parents, as were all the adults around us, were preparing for war.) The haste with which East Germans were coming to our town in November 1989, having left their entire lives behind, and my parents' fear about imminent war have taught me that the power of "we, the people" remains always vulnerable to the might of weapons — physical and psychological. What remains seared into my own memory is how tenuous,

2

precious, and extraordinary that foundation of all democratic self-governance is — "We, the people" coming together and laying claim to the right to government of the people by the people for the people. But most of all, I carry with me from that childhood experience that if we wish to live in a democracy, the depth of our commitment to the freedom of expression must be matched by an equal depth of a commitment to the freedom to assembly.

6. The other formative aspect of growing up and going to school in Germany was the German high school curriculum and its emphasis on Germany's recent fascist past. During the time when I was in school, the curriculum emphasized not only a detailed reckoning with the unfolding of the atrocities of Nazi Germany, but also confronted us as youth on a yearly basis from seventh grade on with questions such as "How could the authoritarian fascist Nazi regime entrench itself?", "How did which institutions give way to their own Nazification?", "When and how could the Nazis have been stopped by our grandparents and great-grandparents?", "Why did they not do more to resist in the early days?" and "How can we ensure that should anti-democratic forces rear their ugly heads again that we stand up and defend democracy in ways that our ancestors failed?" When I grew up, the phrase "never again" was a given, but the far more vexing ethical and political imperative issued from its corollary: "Fight against the beginnings *(Wehret den Anfängen)*!" The lesson we learned was that authoritarians and those working with them seek to make dissent costly. As I absorbed growing up, when a democracy functions well, it might be uncomfortable to speak out or show up to participate in political speech and activity. But it should not be costly. It should not carry a penalty when we engage in political speech and political activity. In a democracy, nobody should need to be a hero or a saint to participate.

7. The news of Mahmoud Khalil's arrest on the evening of March 8, 2025 was jarring and deeply disconcerting. Since the inauguration in January 2025, many of us had shared a general sense of apprehension about what the Trump administration would mean for a variety of issues and populations, such as immigrants and transgender individuals but also academic freedom and freedom of speech and assembly more generally. But up until Mahmoud Khalil was taken by ICE agents on March 8 that general atmosphere of apprehension had more of a "wait and see" character to it. However, when Khalil was arrested, detained, and labeled as a "threat to foreign policy interests" of the United States, and then subsequently other students and scholars were detained as well, the threat became very real. And since then there has been a noticeable shift in the sense of how risky political speech and activity are but also in how confident we are that academic freedom protections will in fact protect us.

3

8. Perhaps among the most shocking realizations is that it seems that even Columbia University as represented by its leadership is quite intentionally censoring itself. In the days immediately following Khalil's arrest by ICE we received email communications from Interim President Dr. Katriana Armstrong, Provost Dr. Angela Olinto, and Executive Vice President of the Arts and Sciences Dr. Amy Hungerford. Email correspondence from high-level administrators in the aftermath of events that deeply shake the community are nothing unusual. What was unusual in this instance was that such emails usually name the specifics of the circumstances of what has occurred, but in this case the emails were notable in their vagueness, especially in neither mentioning Khalil's name nor reporting that a student had suddenly been taken from Columbia-owned housing into ICE custody.

9. The first mention of his name in official correspondence from University leadership came in an email on April 28, 2025, with the subject line "Supporting Our International Community." By this time Interim President Armstrong had resigned and the Board of Trustees had appointed the then Co-Chair of the Board Claire Shipman as Acting President. Initially it was not clear to us as University community members why exactly our University leadership would not mention Khalil's name. But it now appears that this too was an instance of the government chilling speech. At Columbia's commencement two weeks ago, Acting President Shipman publicly mentioned Mahmoud Khalil's name and acknowledged that many students were missing his presence. The Education Secretary Linda McMahon immediately commented on how "disappointing" and unnecessary it was to mention Khalil's name in public.[1] It suddenly became apparent that our University's administrators have been adjusting their communications with us, the Columbia University community, to avoid "disappointing" the Trump administration.

10. Immediately following Khalil's arrest many international students were absolutely terrified of leaving their apartments. Provost Olinto's email correspondence March 10, 2025 acknowledged that "this last week has been a stressful time for many on campus" and reminded us "Students may always reach out to their teachers to request accommodation if they are unable to attend class, and we hope that faculty will be as helpful as possible with these requests." My undergraduate class during

---

[1] "President Shipman is trying to balance different factions, but I was disappointed," McMahon said. Naming Khalil wasn't "necessary for her to say, considering all of the campus unrest that had happened," McMahon said. https://www.wsj.com/us-news/education/trump-college-university-federal-funding-fight-91c2a274?gaa_at=eafs&gaa_n=ASWzDAhSd_NNKxd_AdL0_pHNSlyZ3vfM4Hq39cjA2QCo1b8_XwSTxL5mXH
Fe79Y-
rjQ%3D&gaa_ts=683d60b7&gaa_sig=WrH_tWSqLaq4VzqFkZgJnXjYwLoUYSTPo39Zfw92z42_Eu5m_39KsFE_
w3mpRHGgJUODG5X4-igNQwUmztmqvg%3D%3D

the Spring term 2025 met in a building outside of the gates of the Morningside campus. Many students who lived in the dorms had indicated that they were worried about leaving campus since some had been active in campus demonstrations while others had simply shared their political views on social media over the past year. Since there were students who were among those terrified to leave campus, I met my undergraduate class on the Morningside campus during the week immediately following Khalil's arrest. Even then, several students were wrecked with anxiety that there might be an ICE official suddenly appearing to arrest them.

11. Holding normal classes was next to impossible during that week. Even students who were U.S. citizens were concerned not only for Khalil and their peers on visas, but also expressed their own fears of arrest and asked for advice for themselves. Should they get a lawyer, just as a precaution? Is it true that everyone has First Amendment rights or only citizens? But what if the government doesn't respect those rights? Would it be best to delete all political social media content? Students also worried about being in touch with family, friends, classmates, or instructors over Columbia University email, fearing that the University might turn over their emails to the Trump administration.

12. International students and a few native-born but minority students in that undergraduate class became quiet from the time of Khalil's arrest onwards, carrying a palpable sense of fear with them, and several mentioned to me that they remained anxious and worried because they feel that they should be more courageous and participate in political speech and action despite the obvious risks. Several have mentioned that they consider being politically engaged to be what Columbia had taught them it meant to be a citizen of the world.

13. My other course this past Spring semester was a graduate seminar on the work of the German-Jewish thinker Walter Benjamin who died in 1940 while fleeing from the Nazis. On March 11, 2025, a few days after the arrest of Khalil, I sent out an email to my graduate seminar, similar to the email that I had sent earlier to my undergraduate class. The only difference in content was that I planned on meeting the graduate seminar in the usual off-campus building since most students in that seminar did not live on campus already. With the exception of one student on a visa who was concerned about leaving their home, all the students were present in person for this seminar session and expressed their appreciation not only for being able to meet in person but also for the explicitness of the email that I had sent. Among the nearly 20 different instructors which the students had during that semester, apparently I was the only one who mentioned Khalil by name in the email sent to the class.

5

14. The conversation during that first seminar session after Khalil's arrest focused mostly on why there was such an anxious silence among everyone, as if even stating what had happened or mentioning Khalil's name in writing was dangerous. One student asked whether I had hesitated to send the email that I had sent them. I admitted that of course I had considered that we know that there have already been subpoenas for the correspondence of some Columbia administrators and faculty colleagues. In a large course, I would quite possible not have written the email. I wish I could say with certainty that I would have written this email no matter what, but I am not sure.

15. One student observed that even though many of us do not know Mahmoud Khalil personally, his arrest and continued detention by ICE have catapulted us into a different moment in time. "It hits home differently when they come for a student at your own university, someone in your neighborhood," the student commented. Another student agreed and added that we <u>all</u> have already changed so much in how we act, because we all are now constantly evaluating and assessing the risks of what used to not even cross our minds as a potentially risky political statement. We all already self-censor in ways that we never used to. Even if we overcome our initial fears and say something, that hesitation and the need to wrestle up courage changes things. The students understood this. But still, why, they wanted to know, was there not even one other faculty member who would mention Khalil's name in their email to their class? What does it say about us and who we have become when we are too scared to accord a fellow human the dignity of calling them by their name?

16. Since the end of March, I have had several discussions with graduate students and colleagues about what we should expect in terms of being targeted for working on questions regarding queer and especially transgender communities and individuals and how we should proceed in our academic research. I mention this concern here, because Khalil's detention is also in the background of these conversations. A colleague commented that "They start with non-citizens first and it won't be long until they move on to citizens who they don't like." For a junior colleague with whom I spoke about Khalil's detention, that Khalil appears to remain imprisoned solely for his political activity, prompts the question "Would I be willing to lose my job and possibly even go to jail for this research?" One graduate student explicitly wanted help with thinking about how they could reorient their research because they are concerned about being unable to find academic employment in the United States with a research project focused on the interplay of politics and religion in recent debates on transgender youth.

6

17. Since Khalil's arrest on March 8 and the other students and scholars who have subsequently been detained or who have fled the country, three non-citizen graduate students have since consulted me about summer travel plans and how they should approach their fears that upon returning to the country they might be denied entry. One is concerned because of the countries in which they will be conducting their research. The other two worry because of the political content that they have posted on social media. Both these students have since deleted the social media content in question and were considering deleting their social media accounts altogether (while understanding of course that "the Internet forgets nothing"). All three of the students were planning to consult with an immigration lawyer before making a final decision on whether they would travel abroad this summer. In the nearly 25 years of having been in the United States first as an F1-visa holder myself and for several decades now working regularly with international graduate students, this is the first time that I am encountering such considerations and worries about being denied reentry to the United States because of a research project topic, the location where such research is undertaken, or public political speech.

18. For myself, I have decided against traveling abroad to see my family in Germany this summer. I am a dual citizen, I am transgender, I am affiliated with Columbia University, and I have not hidden my political views. I made this decision primarily because it remains extraordinarily alarming to me that even though Khalil is a green-card holder and has deep local community ties, including a native-born wife and newborn son, he has been in detention for nearly three months for what looks like nothing more than his political activity in support of freedom and justice for the Palestinian people.

19. It has also been noticeable that at Palestine-related academic events since Khalil's arrest, there are far more people in the audience who now wear face masks than even just a few months ago at the end of the Fall semester 2024. Similarly, several undergraduate students with whom I have spoken have commented on how they felt comfortable last year to attend pro-Palestinian demonstrations without concealing their identities, but now they fear that the risk of being doxed is too high. International students have largely opted not to attend political demonstrations at all, but even students who are U.S. citizens feel the need to conceal their identities.

20. If there is a vagueness to my accounts here, it is because I have omitted the names of students and colleagues because they do not wish to be identified. I omitted one particularly striking instance of academic self-censorship because I was not able to come up with a satisfactorily concrete way of describing the event while at the

same time protecting the identity of the student to the extent that they and I would feel comfortable with.

21. It is very sobering to observe just how deeply Khalil's arrest in early March 2025 and his continuing detention have impacted how we approach political speech and activity, academic work, and the particulars of our lives where we have good reason to assume that they run counter to the agenda of the Trump administration. Writing these sentences here feels risky. But it is necessary.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 1, 2025                       Signed:
New York, NY

Yannik Thiem

G-6

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner,*

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

       *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF
HAROLD STOLPER**

       I, Harold Stolper, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is Harold Stolper, and I am a Lecturer at Columbia University's School of International and Public Affairs (SIPA), where I have taught quantitative methods and data analysis for the past ten years. I submit this declaration in support of Mahmoud Khalil and based on my direct experience as a faculty member working with SIPA students, both in and outside the classroom.

2. In my capacity as a faculty member, I have observed a profound chilling effect on students' sense of safety and willingness to engage in political speech, organizing, and even routine academic activities following the detention of Mahmoud Khalil by federal immigration officers.

3. A noncitizen student from Gaza shared with me that they "would have loved to book an office hour appointment with me but I am avoiding campus for the past few weeks." This student, whose family and friends in Gaza have been killed by Israeli airstrikes, told me they no longer feel safe at Columbia or SIPA and have effectively abandoned the professional goal of working in the United States. Instead, they expressed an urgent desire to leave the country after graduation so they could live and work freely and without fear. They cited Mahmoud's detention as a central reason for avoiding campus and staying largely confined to their home.

4. In the days immediately following Mahmoud's detention, another Muslim student from Saudi Arabia, who to my knowledge has not engaged in public political speech, asked to attend class remotely. They told me that SIPA "is no longer being a proper place to knowledge share and spread education with all this hostility," and expressed fear about being physically present on campus.

5. While I cannot speak to the internal deliberations of my faculty colleagues, I am aware that some have declined to write publicly in support of Mahmoud because they feared doing so could negatively impact their own immigration status or green card applications. This suggests that Mahmoud's detention has caused even faculty members to self-censor and fear professional or legal consequences for acts of solidarity or speech.

6. After Mahmoud's detention in March 2025, several second-year students in my class—students who typically travel abroad for their capstone projects during Spring Break—expressed concern about leaving the U.S. One Muslim student from Indonesia cancelled their planned travel with their capstone group and stayed in New York, telling me they were afraid they would not be allowed back into the country to complete their degree. I recall that they cited Mahmoud's detention as one of the sources of their fear.

7. Based on these and other experiences, I believe Mahmoud's detention has had a substantial chilling effect across SIPA's academic community. The atmosphere on campus has shifted from frustration and exasperation to one of real fear: fear that students, particularly those who are Muslim, Arab, or otherwise visibly associated with advocacy for Palestinian safety and freedom, may be detained, surveilled, or otherwise penalized for their political views or identity.

8. I, too, feel this shift. Even as a U.S. citizen and full-time faculty member, I have found myself more hesitant to speak openly or advocate on behalf of students. I know others share this fear. Many students—citizens and non-citizens alike—worry that even peaceful, non-disruptive expressions of political opinion could lead to federal or institutional repercussions.

9.  SIPA's website proudly states that its "graduates and faculty strive to improve social services, advocate for human rights, strengthen markets, protect the environment, and secure peace, in their home communities and around the world." And yet, since the humanitarian catastrophe in Gaza escalated, to my knowledge SIPA has not held any public academic events addressing the crisis, despite its undeniable relevance to global public policy, human rights, and peace and security. I believe that this institutional silence is not accidental. Rather, it reflects the profound chilling effect of Mahmoud's detention and broader governmental and institutional actions that have caused faculty and administrators alike to avoid public discourse on this topic.

10. The fear on campus is not theoretical. It is lived, felt, and daily expressed by students and faculty alike. I am submitting this declaration because I believe the detention of Mahmoud Khalil—without criminal charge and seemingly in response to political advocacy—has cast a shadow over our academic community. It undermines the mission of SIPA and the values we claim to uphold.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2025                          Signed:
London, United Kingdom

Harold Stolper, PhD
Lecturer in the Discipline of International &
Public Affairs
Columbia University | SIPA

G-7

Document Fully Redacted

G-8

Document Fully Redacted

G-9

Document Fully Redacted

G-10

Document Fully Redacted

G-11

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner,*

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

       *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
█████████████

I, ███████████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ███████████, and I am a lecturer in the Department of ████████████████████████ and a postdoctoral scholar in ████████████ ████████ at Columbia University. I also completed my PhD at Columbia University in 2021.

2. I came to study and later research and teach at Columbia University because I was under the impression that it was safe space for Palestinians and Palestine research and discourse. It hosts a dedicated Center for Palestine Studies, has an Edward Said reading library, and has many faculty and librarians with deep interests and commitments to Palestine. Regrettably, this was not my experience.

3. When Trump took office, the stage for further anti-Palestinian hostility on and by campus was already set by the prior actions of the Columbia University administration.[1] As government officials openly spoke about deporting students, doxxers began feeding them names of people to deport, one of whom was of course Mahmoud Khalil. Immediately I noticed students, faculty, and staff take measures to protect themselves – such as putting their social media on private or deleting it all together, or removing themselves from organizations advocating for Palestinian rights for fear of targeting and reprisal.

4. The abduction of Mahmoud Khalil in my building lobby (we are neighbors) brought a very chilling climate of fear, especially among Palestinian students, faculty, and staff. We were warned by lawyers of the risks of ICE abductions on campus that may target anyone, especially those doxxed.

5. As a result of student fears as I had several international students in my seminar, I moved my entire seminar off campus to a nearby venue that offered us sanctuary. Those of us with relatives in Gaza (myself included) have also taken measures to be careful of our own public facing work for the safety of our relatives – as Israel has

---

[1] Columbia's clear commitment to Israel and its desire to snuff out any presence of Palestine became most evident after October 7, 2023. Palestinians were increasingly made unwelcome and unsafe on Columbia's campus. I myself took leave for the remainder of the semester after my uncle's family was killed by an Israeli missile in November of 2023 in Gaza. There was no open acknowledgement of any of the losses Palestinian staff, faculty, and students faced by Columbia University. Instead, we were punished by the university for trying to even have open discussions about it.

Many Palestinians colleagues began to withdraw their presences for fear of the reprisals and the witch-hunting that came from doxxers—both campus community members and off-campus private parties. This doxxing was not new – Canary Mission has been around a long time, and they have long targeted Palestinian faculty at Columbia University specifically. However, this time it took new heights.

The targeting and harassment were also enabled and enacted by Columbia University's then president, Minouche Shafik, and by Columbia's board of trustees when questioned during the Congressional hearings. Rather than defend their students and faculty, they promised to do more to discipline them.  I myself was subject to a "disciplinary hearing," as I was targeted by faculty and staff in my department for speaking out for Palestine on a department listserv. My own complaints to the university for being doxxed and targeted were ignored. As a result of all this, I took mental health leave (FMLA) in the fall of 2024, as the university increasingly became a hostile environment.

been known to target people for public advocacy (such as the late Refaat Al-Areer). As one example: one international student I know but will not name for these reasons, has been laying very low, careful to even walk around alone, and is actively trying to figure out their future as funding has been withdrawn and their visa status is in question.

6.  Several non-citizen students or scholars, including legal permanent residents, that I know personally have decided against traveling abroad to visit their families for fear of being barred re-entry.

7.  I also know of many, many faculty who have stayed silent on the military assault on Gaza – even if they are opposed to it – for fear of the effects on their careers and livelihoods. Many continue to be doxxed, harassed, and ignored when addressing these matters with the administration (I myself have been ignored). At least 3 librarians have been fired (Barnard and Columbia) for advocating for Palestinian rights. And of course students who protest against the genocide in Gaza continue to be beaten, arrested, suspended, and/or expelled by the university and law enforcement. Columbia University has essentially become a police state in service of the Trump administration's demands, but as explained earlier, it had laid the groundwork itself to ensure the silencing and erasure of Palestine and Palestinians and the criminalization of anyone who protests this.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2025                    Signed:
New York, NY

3