Exhibit H

H-1

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL, <br><br> *Petitioner,* <br><br> v. <br><br> Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, <br><br> *Respondents.* | Case No. 25-cv-01963 (MEF-MAH) <br><br> **DECLARATION OF** ▮▮▮▮▮▮▮ |

I, ▮▮▮▮▮▮▮, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ▮▮▮▮▮▮, and I am a student at Columbia University pursuing an ▮▮▮▮▮▮▮▮▮▮▮▮▮. Much of my community at Columbia are outspoken young advocates and activists who have been chilled by the recent crackdown on free speech, notably in Mahmoud Khalil's case.

2. Mahmoud Khalil's detention in March has had a visible effect on the ability and willingness of students to exercise their fundamental freedoms, particularly as it relates to political speech and behavior. Everybody knows that the United States government, via Secretary of State Marco Rubio, has determined that participating in campus protest and speech in support of Palestinians is contrary to "U.S. foreign policy" and could render a person deportable. As a result, students are less willing

now to attend protests, post on their social media accounts, express support for Palestine, or associate with anyone who does.

3. At least one undergraduate international student has consulted my opinion on transferring to an institution outside of the United States to complete their degree. This student had previously been incredibly vocal about their support for Palestine following the beginning of the Israeli assault on Gaza in 2023. However, they now feel that they can no longer voice their opinions freely in the United States, especially as all students at Columbia University face heightened surveillance by the federal government.

4. Graduate international students have also voiced similar fears. Many feel uncomfortable in their own homes and fear being abducted by Department of Homeland Security agents. For this reason, they have started staying with friends instead of in their own homes or have taken other measures to protect themselves.

5. Students who are American citizens or legal residents have expressed that they are unwilling to publicly voice their support for Palestine for fear that they will be surveilled in public or that their speech on social media will be documented and reported. These students are also wary of potential criminal charges as a repercussion of exercising free speech in support of Palestine, now that Mahmoud has faced three months of detention for his speech alone.

6. One particular student who had written a thesis paper on the First Amendment as it relates to the Free Palestine movement in the US expressed that she wanted to have her writing published in an academic journal, but was reticent about using her real name as this might cause legal problems in the future or cause her to be otherwise targeted. I know of at least one other student who has published a paper online using a pseudonym for this reason.

7. Many students in my community have also expressed hesitation about traveling abroad to visit family or for career opportunities over the summer. They fear being interrogated or their devices being searched at the border since interactions with law enforcement could lead to their arbitrary arrest, even if a crime has not been committed.

8. This chilling effect is due to the circumstances of Mahmoud's detention. As far as the community understands, Mahmoud is being detained for his speech alone. As such, not only are students afraid to speak politically about Palestine, but they are also afraid to publicly associate with others who do exercise their speech in support of Palestine.

I declare under penalty of perjury that the foregoing is true and correct.

.

Dated: June 1, 2025          Signed:
New York, NY



H-2

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Mahmoud KHALIL,<br><br>        *Petitioner,*<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br>        *Respondents.* | Case No. 25-cv-01963 (MEF-MAH)<br><br>**DECLARATION OF** <br> |

I, ███████████████████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ██████████████████, and I am a recent graduate from Columbia University.

2. The targeting and unjust detention of Mahmoud Khalil has had ripple effects across communities. As we know, Mahmoud was targeted for speaking up against the ongoing genocide in Gaza and for the liberation of his own people, for Palestine. Much of his activism was based at the school we attended, Columbia University. Mahmoud also lived in Columbia housing.

3. In my capacity as a Columbia student at the time of his detention, I have seen a lot of fear for Gaza, for Mahmoud, and for peoples' freedoms in their advocacy for

Palestine. The way Mahmoud is being targeted for deportation and deemed a "threat to U.S. foreign policy," simply because of his speech in support of the Palestinian people, has had direct implications, especially on people who do not have American citizenship.

4. For example, after the government abducted Mahmoud, many students (my classmates) stopped going to their classes. Having noted Columbia's collaboration with DHS, there were students who were afraid to step onto Columbia-owned property. Some students who lived in Columbia buildings moved, out of fear for their safety and freedom. Students who have not been able to move out of their Columbia housing have lived in a perpetual fear and anxiety at the potentially violent outcomes they could face from the school and DHS. Since Mahmoud was detained, some people have barely left their homes out of fear of being detained as he was.

5. I have seen how students and faculty who have publicly spoken up, written, published, and taught in support for a free Palestine and end to the ongoing genocide in Gaza are facing targeting. Some students are afraid to leave the country and be detained upon return and some students have been pushed to leave the U.S. as living here in fear became unsustainable for them. Since Mahmoud's detentions, international students who are Palestinian, and/or advocates for Palestine, have confided in me their fears about articles they've written, or social media posts, interviews, or photos depicting their participation in protests. Many international students are now afraid to attend protests and marches for Palestine, out of the fear of political detention as is being done to Mahmoud. They have lived in a perpetual anxiety at the very real threat of DHS targeting and indefinite detention, as is happening to Mahmoud.

6. Since the targeting of Mahmoud, and the subsequent rampage targeting of Palestinians, pro-Palestine activists, and immigrants by DHS and the Trump administration broadly, many people are always on the lookout, are in constant panic and hypervigilance, many people have not been able to sleep from this fear. This is especially true with students at Columbia because of the way that Mahmoud's activism as a Palestinian student at Columbia has been explicitly used against him to justify his indefinite detention. Many students fear that they are next, and there are many students who have been explicitly threatened by the same inhumane treatment.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 1, 2025                    Signed:
New York, NY



H-3

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

<table>
<tr><td>

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

       *Respondents*.

</td><td>

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF**
██████████████
████████

</td></tr>
</table>

I, █████████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ████████████, and I was a Jewish graduate student ████████ | ████████
████. Attached hereto, are the exhibits listed below, are true and correct copies of the following materials:

    A. After Mahmoud was detained, a chilling effect swept through the Columbia ███ student body. As a Jewish American, I felt deeply afraid. The fact that such horrifying actions were being carried out in the name of protecting Jewish students made me fear an increase in antisemitism—not only because of the injustice itself, but because it risked fueling backlash and resentment. Mahmoud's detainment didn't make me feel safer as a Jew—it made me feel more vulnerable.

    B. I served as a board member for a Columbia ███ student group at Columbia during the 2024–2025 academic year, alongside several international students. After Mahmoud was detained, one of our board members—an international student—asked to resign out of fear

that their involvement with the group could lead to their own detainment. The atmosphere of fear and repression was palpable.

C.  That same international student even asked to leave a group chat simply because Mahmoud was in it—fearing that any association with him could put them at risk of detainment. Out of that same fear, they archived all of their previous anti-war advocacy posts on social media, despite having been outspoken on those issues before. The repression wasn't just chilling—it forced students to erase parts of their identity and activism to feel safe.

D.  As a Jewish student, the night I saw President Trump post 'Shalom Columbia,' I texted my mom that I felt like I was having a panic attack. That phrase—meant to suggest Jewish support for his targeting of pro-Palestinian students—was terrifying. It felt like our identities were being weaponized to justify the crackdown on freedom of speech at our tight-knit community of Columbia ██. That night I worried it would lead to a potential detention of one of my peers that I cared about fueling my anxiety.  This fear later came to be true when my peer, that I care about Mahmoud Khalil was detained. Please see my text messages with my mother from March 7, 2025, which document my immediate panic and fear in real time. I went to the hospital later this evening.



E.

F.  Immediately after Mahmoud was detained, I helped organize a ██-wide letter-writing campaign so members of our community could send him messages of support. I also did public press to raise awareness about the campaign. Shortly after, a professor pulled me aside and warned me that I could be charged with terrorism simply for publicly advocating for Mahmoud. I was terrified—I broke down in tears and began shaking uncontrollably.  It was hard for me to comprehend that advocacy for a peer I know and trust could lead to my own criminalization, but because of everything that had happened to Mahmoud, I was terrified that what this professor warned of could mean I was next.

G.  Since Mahmoud's detainment, I've experienced persistent nightmares, insomnia, and an overwhelming sense of fear that I, or another peer that I care about could be taken next—despite being a Jewish American citizen. At one point, I was alone in my Columbia campus

housing when maintenance began banging on my door for a repair. I panicked, broke down crying, and called my mom, terrified that law enforcement had come to find me, or even worse, someone who had wished harm upon me as a Jewish student on one of these doxxing pages had come to hurt me. The constant state of fear has become part of my daily life.

H. On another occasion, I came home from class to find an NYPD car parked outside my Columbia housing. I was so overcome with fear that I couldn't bring myself to enter the building—instead, I walked aimlessly around the neighborhood until the car eventually left. Ever since Mahmoud's detention, I've been living with a constant, irrational fear that I, too, could be targeted or detained at any moment. That's what it felt like happened to him.

I. Columbia ████'s student body is made up of over 50% international students. Since Mahmoud's detainment, many of those students have shared that they no longer feel safe attending class. I've witnessed this firsthand—class attendance has noticeably declined, particularly among international students. Those who do continue to attend are often too afraid to speak up, whether in the classroom or even in informal spaces like our cohort's WhatsApp group. The fear and silence are unmistakable.

Dated: May 31, 2025          Signed: ████████████
New York, NY

3

H-4

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

      *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity
as Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs
Enforcement; Kristi NOEM, in her official
capacity as Secretary of the United States
Department of Homeland Security; Marco
RUBIO, in his official capacity as Secretary
of State; and Pamela BONDI, in her official
capacity as Attorney General, U.S.
Department of Justice,

      *Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
██████████

I, ████████████, declare under penalty of perjury, pursuant to 28
U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ████████████, and I was a Jewish undergraduate student
   at Barnard College at Columbia University, ██████████.

2. Mahmoud's abduction has created a chilling effect and caused mass fear and distress to Columbia students. As a Jewish student, the fact that his detainment was done in the name of Jewish safety was incredibly scary. I fear that tying such a blatant, fascist attack on free speech to the religion I love will only fuel antisemitism and I am heartbroken to see my religion weaponized in the abduction of my peers.

3. Moreover, I am deeply scared for my friends and community. For the month after Mahmoud was taken, I woke up every morning and checked my phone to make sure none of my other friends were taken by ICE. I had trouble sleeping and would wake up in the middle of the night with feelings of dread. I cried almost every day for a month and a half, and had a really hard time keeping up with schoolwork.

4. I recall on one occasion experiencing a bout of panic and distress in anticipation of an ███████████ midterm, and writing to my mother that I feared for my classmates and community members that there would be an ICE raid



5. A few days after my peer, Mohsen Madawi, was also detained by ICE, I broke down sobbing in the middle of my senior thesis seminar, in front of the whole class, because I was so scared. I felt as if no one on campus was safe, and like I was witnessing the rise of fascism and powerless to stop it.

6. Growing up in a Jewish community, I have been taught from a young age to look for the warning signs of fascism. Seeing people I care about deported for their political beliefs and identity filled me with dread. I couldn't comprehend how everyone was continuing to go to class and go about their daily life.

7. I know many of my friends have experienced the same. My boyfriend has been having flare ups of OCD and anxiety attacks due to the culture of fear and apprehension we experienced knowing our community members were at risk of deportation.  On one occasion, he experienced a panic attack and walked himself to the hospital because he was having trouble breathing.

8. I know multiple international students who fear for their safety and have been too scared to speak out in support of Mahmoud, or to engage in pro-Palestinian speech. A few days after Mahmoud was taken, I sat next to my international friend at a Purim party as she cried for fear she would be deported too, having attended a few rallies and reposted some posts. She has not felt safe attending protests or engaging in pro Palestinian content on Instagram.

9. Another international classmate told me multiple times how much he wished he could stand with us at rallies, or contribute to our divestment efforts, but he is too scared he will be targeted and lose his visa. As a result of his very real fear, our whole community lost out on the benefit of his voice, opinions, and contributions.

10. Fellow Jewish organizers and I were terrified that any public response to our friend Mahmoud Khalil's abduction, or any type of protest or exercise of free speech that got the Trump administration's attention would trigger

another ICE raid and put our friends at risk. For this reason, we discouraged international students from attending our demonstration and felt it was only safe for demonstrations to be led by Jewish students. Again, this meant that our entire community lost out on the incredible contributions of our international peers because they rightly fear retaliation and potential deportation.

Dated: June 3, 2025                    Signed: ████████████████████
New York, NY

H-5

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

        *Petitioner,*

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

        *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF
SHAY LEV
ORENTLICHER**

    I, Shay Lev Orentlicher, declare under penalty of perjury, pursuant to 28 U.S.C.
§ 1746, that the following is true and correct to the best of my knowledge.

1. I am Shay Lev Orentlicher.  I am a Jewish student at Columbia University and an
   organizer with Columbia-Barnard Jewish Voice for Peace.

2. Since Mahmoud has been detained, I have found myself second guessing everything
   I do. I am afraid that I or people I love will be targeted if I am politically active.
   Though I have tried to continue to exercise my free speech rights since Mahmoud
   was taken, I second-guess everything in a way I never did before because the
   potential consequences feel so much greater not just for me but for my community.

3. I have told my international friends that they do not have to spend time with me in public in case association with me jeopardizes their safety. Out of fear, some of my friends and I now only meet in private spaces to ensure their safety.

4. One of the classes I took last spring was a large political theory lecture about justice. Mahmoud was detained shortly before our midterm examination, and as a result, the professor sent out an email informing us that if any student in the class had real reason to think they were at risk of being targeted by immigration and were afraid to come on campus, they did not have to come in for the midterm and could take it at a later date. A couple weeks later, my Teaching Assistant sent out an email providing information about accommodations for those who had been unable to come in person to take the midterm — indication that students in the class did indeed have to miss the examination out of fear.

5. Later in the semester, the same class included a lecture on Palestine and Israel. Though it is a large class, the professor likes to open it up for discussion and debate, especially when the lectures are on specific issues. We had lively debates about surrogacy, abortion, and hate speech, among other controversial topics without issue. Not a single student raised their hand to voice an opinion when the topic was Palestine. When I went to ask the professor a question after the lecture, he told me he has been teaching this course for over twenty years, and every single time he taught it, the same lively debate ensued for the Palestine-Israel lecture. This was the first time he had taught the course that nobody had been willing to share an opinion. He told me he thought Mahmoud's detention was a huge factor in creating this atmosphere of fear.

6. The scariest moment for me after Mahmoud was taken, when I saw the true depth of this chill, came with Passover. I was inviting all of my Jewish friends to the seder I was organizing for anti-Zionist Jews, and I invited one Jewish friend who was an international student. She said she would love to, especially since she didn't have another seder to attend, but she asked me, "Is this seder the kind of thing that could make me lose my visa?" I did not know how to answer. I clarified that it was a community space for religious ritual, not a political action or protest, but that given Mahmoud's circumstances, I didn't know if that made it safe for her to attend. She did not come to the seder.

7. The atmosphere of fear at Columbia is palpable. What happened to Mahmoud is impossible to ignore, and it has shaped how we interact with one another and our academic environment. When students are afraid to go to class, take exams, raise their hand in lecture, attend religious events, and spend time with their friends,

2

that constitutes a terrifying chill. It is a chill that undoubtedly has affected international students most, but the rest of us feel it, too.

8. I am afraid of how anything and everything I say will reflect upon international students at Columbia. Before I say anything related to Palestine, I question if my words will be maligned in tabloids that are later submitted as evidence against another international student.

9. I cannot speak freely if my words – for which I and only I should be responsible – will be weaponized by the federal government against my peers in immigration courts.


Dated: May 31, 2025                          Signed:
Indianapolis, IN

                                             */s/ Shay Lev Orentlicher*

H-6

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

        *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

        *Respondents.*

Case No. 25-cv-01963 (MEF-MAH)

**DECLARATION OF** ███████

I, ███████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ███████, and I am a rising third year PhD student and instructor at Columbia University.

2. Prior to Mahmoud's detention, Columbia University was already hostile to pro-Palestinian speech. Students were frequently doxxed, harassed, and harshly disciplined by university faculty and administration.

3. The Trump Administration's abduction of Mahmoud Khalil has had a very chilling effect throughout the campus. His warrantless detention set off a new wave of trauma throughout the campus. Students felt extremely unsafe knowing that the

University administration that was meant to protect them was actively putting them at risk, colluding with the Government to detain our peers for being associated with protest activity. As a result, many students stopped attending classes, missed vital health appointments (which were located on campus), were absent at mandatory meetings, and stepped down from leadership roles at the University, all due to fear of being targeted.

4. The examples I describe in this declaration are the testaments of my classmates, professors, staff, and friends – stories I have been trusted with, and stressors I've first-hand observed in my immediate community.

5. His arrest and detention on university property demonstrated how easily the Department of Homeland Security (DHS) accessed private campus property without a warrant. Several students, including US citizens, sought refuge outside of University housing out of fear of being targeted by the federal government.

6. And for those who had nowhere to go, the loss of housing was a looming concern for many (including some that had minor children), further compounding the stress and fear.

7. Some events hosted by various Departments (including events broadly related to the Middle East) were canceled during this time, fearing DHS would use them as a venue for surveillance and targeting.

8. Several instructors attempted to cancel or relocate their classes to Zoom in order to protect students, but Columbia's Provost expressly prohibited them from doing so. This forced students to choose between pursuing their education and navigating a hostile and repressive campus environment.

9. As a result of this environment, many students also did not travel to academic conferences, refrained from publishing their scholarship, chose not to speak on panels, and ceased their duties as teaching assistants, fearing that those activities might make them vulnerable to the same targeting and detention Mahmoud experienced for their political speech and activity. Graduate student workers found themselves unable to fulfill their academic and professional responsibilities under the same extreme stress.

10. Numerous Palestinian students sought psychological support through Columbia Psychological Services (CPS) during this period. At least half a dozen students expressed experiencing debilitating symptoms including vomiting, diarrhea, paranoia, nightmares, depression, suicidal ideation, anxiety, emotional distress, and

panic attacks. Some were so severely impacted that they had to register with the Office of Disability Services, which is documented in the University's official records.

11. This ongoing crisis interfered with students' ability to meet graduation and academic program requirements. In the case of PhD students like myself, many of whom are required to teach as a condition of their fellowships, the environment constituted a hostile work environment. These students were expected to perform their teaching responsibilities under unreasonably distressing conditions, fearing their classrooms and their students would be targeted by ICE raids. Some attempted to relocate their classes off-campus but were admonished by University administrators for doing so.

12. The fear instilled by doxxing campaigns by University affiliates (student and faculty), who in turn reported individuals to the government, and the abduction of Mahmoud caused some students to hesitate in reaching out to University support systems. This hesitation was intensified by reports of FERPA violations by the University, alleged to have shared protected student information with members of Congress. This breakdown of trust deterred students from seeking institutional assistance during an already perilous time.

13. Staff members also expressed intense fear, both from the University administration and the federal government under the Trump Administration. Many were deeply concerned about the University's documented history of cooperation with law enforcement agencies including the NYPD, FBI, and DHS. As a result, staff were afraid to assist Palestinian and Pro-Palestinian students, to even mention Mahmoud's name in meetings or communications, or to provide meaningful services beyond basic referrals to CPS, fearing legal reprimand from the University and the federal government.

14. Staff were immediately afraid to organize, speak publicly, hold meetings with impacted students, or make any on-the-record statements, once again in fear of legal or professional reprimand, by the University or the federal government. The widespread fear and unwillingness to act reflected the gravity of the repression witnessed at Columbia University during the past 20 months and under the Trump Administration.

15. Similar to the staff, faculty were terrified to speak out, fearing it would make them targets of the Trump Administration—especially those on visas or temporary immigration statuses. Even among U.S. citizens, the vast majority experienced a chilling effect on their First Amendment rights. Many were too afraid to publicly

advocate for their students or address the repression they were witnessing.

16. Students, Faculty and Staff began seeking refuge elsewhere, applying to programs, jobs and positions at other universities, some even outside of the United States.

17. Similar to students and staff, faculty also were either hesitant about or stopped international travel, conferences, panels, publishing, interviews, research, and so on.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2025                          Signed:
New York, NY



H-7

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

    *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

    *Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
██████████████

  I, ██████████████, declare under penalty of perjury, pursuant to 28
U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. My name is ██████████████. I am a U.S. citizen currently residing in
   Astoria, New York. I was a graduate student at Columbia University's School of
   International and Public Affairs, also known as SIPA, ██████████████.

2. Mahmoud Khalil was also a student at SIPA and graduated in December 2024.

3. SIPA is a professional school of global public policy and international affairs,
   where approximately 30 to 40 percent of students hold international visas.

4. I submit this declaration to explain how Rubio provision has not only created fear
   and confusion but also caused concrete harm to students and professionals like

me, particularly in a setting like SIPA, where international perspectives are central to our learning environment.

5. SIPA is intended to prepare future policymakers, diplomats, and global leaders, and its value depends on the open exchange of diverse international perspectives.

6. When students are too afraid to speak, particularly those from regions directly affected by U.S. foreign policy, the entire academic environment suffers.

7. The chilling effect caused by the Rubio provision has undermined the quality of my education because students who should be central to these discussions are silencing themselves out of fear.

8. As a result, classroom discussions, campus events, and peer engagement have all become more constrained, limiting my ability to learn from the very voices SIPA was built to elevate.

9. One of the clearest examples of this was our cohort WhatsApp chat, in which students used to share event invitations and discuss international policy issues.

10. After Mahmoud's detention, several international students expressed fear that even registering for a Palestine-related event or expressing an opinion in the chat could be interpreted as threatening or grounds for surveillance.

11. Some stopped participating altogether because they were unsure what was safe.

12. International students also raised concerns about the very existence of the student group I organize with, which focuses on Palestine, saying they feared being associated with it. Several people said that the group's visibility and outward speech in support of Mahmoud might put a target on their backs and suggested we hold fewer events or speak about Mahmoud less to avoid antagonizing the administration.

13. One alarming incident involved SIPASA, our student government.

14. In the weeks after Mahmoud's detention, SIPASA planned to release a statement acknowledging student concerns about ICE and international students.

15. ████████████████████████████████████████████████████████

2

16. She told her classmates she feared being targeted by the Trump administration and that even a modest show of solidarity could endanger her immigration status.

17. These were not theoretical fears. ████████████████████████
████████████████████████████████████████████████████
████████ All she was trying to do was avoid scrutiny, risk, and spotlight, and the very act of describing her efforts to stay safe may now violate that intent. That is the irony of this moment.

18. One of our classmates was born and raised in ████ and holds a J-1 visa. She told us she feared that her mere presence in the United States could be misinterpreted and used against her.

19. She was here to study public policy and international affairs, yet even speaking in class felt dangerous to her.

20. She was rarely alone in the days and weeks after Mahmoud's arrest. We checked in on her regularly and asked her to sit out of protests and events, even though she wanted to attend.

21. We made these decisions not because she had done anything wrong but because we feared for her safety under this broad and unpredictable law.

22. In my case, I accepted a job offer in February 2025 for the role of Manager, Immigration, with a confirmed start date of April 29.

23. My vacation dates were approved in writing as part of the offer.

24. On April 28, just one day before my scheduled start, I received a message rescinding the offer.

25. I had already completed the onboarding steps and received welcome emails from the team.

26. I believe this decision was not based on performance or communication but rather influenced by my Palestinian identity, my affiliation with student organizing, and my visible support for Mahmoud Khalil.

27. The government's targeting of Mahmoud has created an atmosphere where constitutionally protected speech and association, especially when connected to Palestine, are treated as potential threats. I believe this environment emboldened my employer to view me as a liability, leading to the sudden rescission of my offer with no valid justification.

28. I was also interviewed by a journalist from The Washington Post about Mahmoud's case due to my background in immigration and our friendship.

29. I ultimately declined to go on the record because I feared how it might affect my job prospects and my family.

30. My mother is a 72-year-old noncitizen and my father is a 78-year-old disabled American citizen.

31. They often travel together, and I was afraid that my visibility might create complications for them at the airport. I asked them not to travel to the United States or come visit me for my upcoming May graduation, despite how excited I was to see them.

32. When I visited Mahmoud at the ICE detention facility, I brought my U.S. passport with me instead of my New York State ID.

33. I made that decision because I was afraid I might be misidentified and detained despite being a citizen.

34. These moment crystallized what this law has done to our sense of safety and citizenship.

35. In Louisiana, I was hosted by members of the Palestinian community who supported me but were terrified to be seen entering the prison facility.

36. One elderly man who drove me said, "You believe in this freedom of speech stuff? This is for them, not for people like us."

37. Some community members refused to even speak with me at all because they were all immigrants and feared retaliation.

38. I was born and raised in Saudi Arabia. I came to the United States in part because I believed in this country's commitment to freedom of speech and democratic

values.

39. This experience has profoundly shaken that belief and made me question whether I truly belong in this country.

40. If Mahmoud can be deported under this law, the government is sending a message that Americans like me are not truly welcome here.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 3, 2025                          Signed:
New York, NY

H-8

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner,*

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

       *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
███████████████

I, ███████████████, declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, that the following is true and correct to the best of my knowledge.

1. My name is ███████████████, and I attended ██████████████████████
███████████████████.

2. Following October 7th 2024 and the onslaught of Israel's war on Gaza, surveillance
and repression by the Columbia University administration and private actors against
anyone calling for the liberation of the Palestinian people had escalated to new levels
I had never seen before. Classmates and peers of mine, particularly students of color,
became hyper aware of the ways they expressed beliefs that went against the school
or government administrations. However, with the horrifying illegal abduction of
Mahmoud Khalil and the targeting that led to it, the resulting damages go far beyond
just a suspicion of being surveilled. Now, people have actively changed their

behaviors due to fear resulting from Mahmoud's targeting.

3. Not even a week after Mahmoud's detention, an international student had taken the difficult decision to step down from a position of leadership in a student organization at the School of International Public Affairs (SIPA) that held events and focused on political education on the unfolding genocide in Palestine. They expressed a deep concern of being detained after seeing what the state had done to Mahmoud. They expressed to me and our peers that they are afraid to even post anything advertising the student group's events out of fear that their mere association might have repercussions.

4. Similarly, many students at SIPA, where they had hoped to learn and apply policies in the name of justice, have instead found themselves having to alter their lifestyles and silence themselves in order to continue their education and careers, and out of fear that they might be targeted next and, as Mahmoud was, labeled a "threat" to foreign policy interests in the United States. SIPA is majority international students and, in learning about Columbia's cooperating with DHS, they feared for not just themselves but also for their family members. For instance, a peer at the School of International Affairs felt the need to self-censor a public statement they were preparing to make at an event. They confided in me by explaining how they wished they could give more of a platform to speaking about the unjust detention of Mahmoud Khalil, but since they are not an American citizen and have to care for their family members who also are not citizens, they feel more than just their life is at risk.

5. For many students, the fear of DHS and Columbia targeting our loved ones has kept us up at night and has had irreparable effects on our mental health and, consequently, our ability to engage in the community or academic aspects of university life. After finding out what happened to Mahmoud, a friend of mine had suffered an episode of debilitating depression and anxiety that prevented them from attending classes or leaving their home. They feared walking on campus with the unprecedented amount of targeted surveillance on students speaking out for Palestinians.

6. Just like this peer and friend of mine, I shared these debilitating experiences as a result of Mahmoud's detention that prevented me from focusing on my school work or functioning in a healthy way. We would console each other in the harsh reality that we don't feel comfortable speaking to our professors either.

7. The professors at SIPA have their own fears about losing their jobs for speaking out about what happened to Mahmoud, including the Monday after he was taken. Classes resumed with little to no mention of Mahmoud which made me much more

frightful in asking for support.

8.  One of the most devastating instances I have encountered of censorship as a result of Mahmoud's targeting and detention is that of a friend whose family members have been directly impacted by the genocide in Palestine, and who has felt too afraid to speak out about the genocide of their own family and Palestinian community. They are afraid of being targeted and detained the same way Mahmoud was, and fully consumed by this understandable fear instead of spending the necessary time and energy focusing on their own wellbeing and healing with their community.

9.  The kidnapping of Mahmoud has undoubtedly impacted and instilled immense fear in many students, community members, and people around the world. Students at Columbia know the consequences looming ahead and the threats being made to their futures and lives. Having to choose between putting your life and future at risk or giving up your morals by staying silent while a human is detained for speaking out against genocide should never be the reality.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2025                    Signed:
New York, NY

███████████

███████████

H-9

March 12, 2025

We, Jewish alumni of Columbia University across a spectrum of political views, schools, and years of graduation, join together to unequivocally denounce the illegal detention of green-card holder and recent Columbia School of International and Public Affairs (SIPA) graduate Mahmoud Khalil by agents of the U.S. Immigration and Customs Enforcement (ICE) merely for exercising his constitutionally-protected rights to free expression.

The Trump administration cynically exploits Jewish feelings of vulnerability and fear to justify its egregious assault on higher education and academic freedom, including on our alma mater. The Republican assault upon the First Amendment and principles of free expression and inquiry which underpin American universities do not make Jews safe. It endangers all of us.

We speak out now to denounce the Trump Administration's assault on higher education, science and the rule of law—and its cruel efforts to divide the Jewish community from our neighbors, colleagues and classmates. We say now, clearly and unequivocally, as Jewish graduates of Columbia, that the Trump Administration's brazen assault on our democracy, including on freedoms protected by the Constitution harms the Jewish community, our neighbors and our loved ones.

We therefore reject in absolute terms the Trump Administration's attempt to characterize its conduct as an act taken in our interests—the interests of our Jewish communities. Seizing, detaining, and threatening with deportation a member of Columbia's broader community for the act of peaceful protest of the acts of a foreign government and of U.S. foreign policy constitutes an assault upon the fabric of our democracy—a democratic society where American Jews have found refuge from absolutist and authoritarian regimes they fled. We refuse to be used to dismantle American democracy, and we accuse the Trump Administration for its cynical exploitation of our people's aspirations for safety and inclusion for its own purposes as itself an act of anti-Semitism.

The Trump administration's actions, first and foremost, endanger Mahmoud Khalil and his family. We hope that they are reunited safely and soon. But these dangerous and unconstitutional acts threaten the foundations of democratic life and free expression which lies at the heart of it.

Signed,

| Name | School | Class |
|---|---|---|
| Aaron Gans | Medical School | 2022 |
| Abby H Lublin | Columbia College | 1998 |
| Abby Kamen | Social Work | 2021 |
| Abby Shuster | GS, Jewish Theological Seminary | 2014 |
| Abby White | Columbia College or Barnard | 2019 |
| Abraham Greene | Columbia College or Barnard | 1999 |
| Adam Conner-Sax | Columbia College or Barnard | |
| Adam Jacobs | GS, Jewish Theological Seminary, Teachers College | 2001, 2006 |
| Adam S. Levine | Arts and Sciences (Graduate) | 2010 |
| Albert Kohn | GS, Jewish Theological Seminary | 2018 |
| Alena Graedon | School of the Arts | 2007 |
| Alex Fendrich | Columbia College or Barnard | 2017 |
| Alexander K Ames | Columbia College or Barnard | 1999 |
| Alisa Baer | Columbia College | 2002 |
| Alisa Gross Parker | Columbia College or Barnard | 2007 |
| Alison (Keimowitz) Spodek | Department of Earth and Environmental Sciences | 2006 (PhD) |
| Aliza Lifshitz | Columbia College or Barnard | 2020 |
| Amanda Gersh | School of the Arts | 1997 |
| Amara Jaeger | Columbia College or Barnard | 2020 |
| Amy Phillips | Columbia College or Barnard | 2003 |
| Andrea Floersheimer | Columbia College | 2019 |
| Andrew Irving | Columbia Law School | 1976 |
| Anna Jesseman | School of Social Work | 2011 |
| Anna Kalm | Columbia College or Barnard | 2019 |
| Anne Levy | Columbia College or Barnard, Teachers College | 2001, 2016 |
| Anya Bernstein | Columbia College or Barnard | 1996 |
| Arinn Amer | Columbia College or Barnard | 2011 |
| Austen Leah Rose | Arts and Sciences (Graduate) | 2013 |
| Avi Allison | Columbia College or Barnard | 2011 |

| Name | School | Class |
|---|---|---|
| Avi Alpert | Columbia College or Barnard | 2006 |
| Avi Hoffman | Engineering and Applied Science | 2009 |
| Avidan Halivni | Columbia College or Barnard | 2019 |
| Avinoam Joseph Stillman | Columbia College | 2017 |
| Avner Gvaryahu | Arts and Sciences (Graduate) | |
| B. Levitt | GS | 2010 |
| Becca Stussman | Engineering and Applied Science | 206 |
| Ben Feder | Columbia College or Barnard | 1986 |
| Beth Zikronah Rosen | School of International and Public Affairs | 2010 |
| Carl Biers | Columbia College | 1990 |
| Carlyn Kolker | Columbia College | 1998 |
| Chase Henry Mechanick | Columbia Law School | 2015 |
| Claire (Chaim) Spaulding | Columbia College or Barnard | 2019 |
| Corinne Greenblatt | Columbia College or Barnard College | 2020 |
| Daniela Lapidous | Columbia College or Barnard | 2016 |
| David Klion | | 2006 |
| David N. Myers | Arts and Sciences (Graduate) | 1991 |
| David Schlitt | Columbia College or Barnard | 2004 |
| Debbie Wecksell | Columbia College or Barnard | 2014 |
| Deborah Appel | GS | 2006 |
| Dina Blanc | Barnard College | 1983 |
| Dr. Jennifer A Lupu | Columbia College or Barnard | 2012 |
| Edo Roth | Engineering and Applied Science | 2017 |
| Elena Ross | School of Social Work | 2023 |
| Eleni Malka Zimiles | Social Work | 2014 |
| Eli Pinker | Columbia College or Barnard | 2021 |
| Eliana Fishman | | 2018 |
| Emma Kessler | GSAS | 2012 |

| Name | School | Class |
|---|---|---|
| Emma Sarachan | Columbia College or Barnard | 2015 |
| Eric Alterman | Columbia College or Barnard College | 1984 |
| Eric Schuman | School of the Arts | 2012 |
| Frances Miriam Kreimer | Columbia College or Barnard | 2006 |
| Fred Block | Columbia College or Barnard | 1968 |
| Gabe Pont | GS, Jewish Theological Seminary | 2020 |
| Gabriella Spitzer | Columbia College or Barnard | 2013 |
| Gary A. Cohen | Columbia Law School | 1986 |
| Gavi Strauss | GS, Jewish Theological Seminary | 2019 |
| Hali Weiss | Columbia College or Barnard, Architecture, Planning, & Preservation (Graduate) | 1984, 1987 |
| Hannah Christianson | Columbia College or Barnard | 2022 |
| Hannah Rose Gorman | Columbia College or Barnard | 2016 |
| Hannah Selinger | Columbia College or Barnard | 2002 |
| Harry Reis | Columbia Law School | 2024 |
| Hollis Architzel | Columbia College or Barnard | 2005 |
| Ira Temple | Columbia College or Barnard | 2007 |
| Isaac Brooks Fishman | Columbia Law School | 2018 |
| Isabel Nelson | Barnard College, Columbia School of Public Health | 2016, 2021 |
| Isadora Nogueira | Columbia College or Barnard | 2020 |
| Jacqueline Karp | Barnard College, JTS | 2017 |
| James Rutherford | School of the Arts | 2011 |
| Jamie Klein | Columbia College or Barnard | 2011 |
| Jan de Bakker | Columbia College or Barnard, Engineering and Applied Science | 2003, 2005 |
| Jeff Alexander | Columbia Law School | 2008 |
| Jen Rice | Columbia College or Barnard | 2008 |
| Jenn Wyse | Columbia College or Barnard, Social Work | 2014, 2007 |

| Name | School | Class |
|---|---|---|
| Jenna Barzelay | SIPA | 2015 |
| Jenna Zucker | Barnard College | 2021 |
| Jennifer Gottlieb | Columbia College or Barnard | 1993 |
| Jennifer Rosenstein | Teachers College | 2002 |
| Jenny Dubnau | Columbia College or Barnard | 1985 |
| Jenny Labendz | Columbia College or Barnard | 2002 |
| Jessica Becker | Columbia College or Barnard, Business School | 2010, 2014 |
| Jessica Ullian | Barnard College, Journalism | 2002 |
| Julie Abbruscato | Columbia College or Barnard | 1986 |
| Julie Keefe | Columbia College or Barnard | 2005 |
| Juliet Herzberg | Social Work | 2013 |
| Justin Singer (JD/MBA '09) | Business School, Columbia Law School | 2009 |
| Kalila Jaeger | Columbia College or Barnard | 2017 |
| Kalman Victor | Columbia College or Barnard College | 2016 |
| Karen Abrams | Teachers College | 2001, 2009 |
| Karl Klare | Columbia College or Barnard | 1967 |
| Kate Axelrod | School of Social Work | 2013 |
| Kate Steiker-Ginzberg | Columbia College or Barnard | 2012 |
| Katherine Herman | Columbia College or Barnard | 2005 |
| Kayla Ablin | Columbia College or Barnard | |
| Kyle Lukoff | Columbia College or Barnard | 2006 |
| Kyra Bloom | Columbia College or Barnard, Teachers College | 2015, 2022 |
| L. Berger | Social Work | 2012 |
| Laura Pisoni | Columbia College or Barnard | 2006 |
| Laura Shmishkiss | School of International and Public Affairs | 2003 |
| Laura Wernick | School of International and Public Affairs, Social Work | 1998 |
| Lauren Deitz | Arts and Sciences (Graduate) | 2023 |

| Name | School | Class |
|---|---|---|
| Lauren Kesner O'Brien | SIPA | 2008 |
| Leah Bellow-Handelman | Public Health | 2012 |
| Lee Pinkas | Teachers College | 2006 |
| Leeza Gavronsky | Columbia College or Barnard | 2017 |
| Lena Rudnick | School of the Arts | 2014 |
| Leo Goldberg | Columbia College or Barnard | |
| Linda Slodki | Banard, Arts and Sciences (Graduate) | 1972 |
| Lisa Namdar Kaufman | School of the Arts | |
| Louise Yelin | Department of English and Comparative Literature | 1977 (PhD) |
| Maddie Molot | Columbia College or Barnard | 2018 |
| Madelyn Baker | Columbia College or Barnard | 2019 |
| Mara D. Kravitz | GS | 2013 |
| Matthew Weisberg | Public Health | 2022 |
| Max Cohen | General Studies, Jewish Theological Seminary | 2007 |
| Max David Finkel | GS/JTS | 2016 |
| Maya Porath | | 2014 |
| Megan Millenky | Columbia College or Barnard | 2001 |
| Melanie Pflaum | Teachers College | 1995 |
| Micah Nelson | School of International and Public Affairs | 2024 |
| Michael Altman-Lupu | Columbia Law School | 2020 |
| Michal Richardson | Columbia College or Barnard | 2006 |
| Michelle Caswell, CC'97 | Columbia College or Barnard | 1997 |
| Michelle Kamens | School of Social Work | 2004 |
| Miriam Krent M.S.ed, M.S. CCC-SLP | Teachers College | 2017 |

| Name | School | Class |
|------|--------|-------|
| Mollie Krent | Columbia College or Barnard | 2015 |
| Molly Chilingerian | Teachers College | |
| Naeta Rohr | Teachers College | 2014 |
| Naida Tushnet | Arts and Sciences (Graduate) | 1962 (MA) |
| Naomi Sharlin | Teachers College | 2011 |
| Naomi Shatz | Columbia College or Barnard | 2004 |
| Naomi Sobel | Arts and Sciences (Graduate) | 2009 |
| Nathan Levine | Columbia College or Barnard | 2017 |
| Nina Paroff | Public Health | 2017 |
| Noa Appleton | Public Health | 2016 |
| Noa Kattler Kupetz | Columbia College or Barnard | 2018 |
| Noa Myers | Columbia College or Barnard | |
| Noa Tann | School of International and Public Affairs | 2023 |
| Noa Urbach | | 2025 |
| Noah Schoen | Columbia College | 2016 |
| Noam A Lindenbaum | GS, Jewish Theological Seminary | 2021 |
| Nora Rodriguez | Columbia College or Barnard | 2011 |
| Orli M | | 2015 |
| Orli M | GS, Jewish Theological Seminary | 2015 |
| Phoebe Spanier | Columbia College or Barnard | |
| Pippi Kessler | Teachers College | 2017 |
| Rabbi Aaron Rotenberg | GS, Jewish Theological Seminary | 2009 |
| Rabbi Allen Lipson | GS, Jewish Theological Seminary | 2015 |
| Rabbi Aryeh Bernstein | GS, Jewish Theological Seminary | 1998 |
| Rabbi David Jaffe | Social Work | 1994 |
| Rabbi Jennie Rosenn | Columbia College or Barnard College | 1991 |
| Rabbi Rachel Goldenberg | Columbia College | 1997 |
| Rabbi Rachel Kahn-Troster | Columbia College or Barnard, Jewish Theological Seminary | 2001 |

| Name | School | Class |
|---|---|---|
| Rabbi Rebecca T. Alpert | Barnard College | 1971 |
| Rabbi Solomon Hoffman | Columbia College or Barnard | 2014 |
| Rachel Aviv | School of the Arts | 2009 |
| Rachel Blau DuPlessis | Columbia College or Barnard, Arts and Sciences (Graduate) | 1963, 1970 |
| Rachel Mazor | Columbia College | 1998 |
| Rachel Mewes | Teachers College | 2020 |
| Rachel Rosenbloom | Columbia College or Barnard | 1990 |
| Rachel Tsuna | Columbia College or Barnard | 2018 |
| Rae Abileah, Kohenet | Columbia College or Barnard | 2004 |
| Raye Farber | | 2011 |
| Rebecca Grabiner | Social Work | 2003 |
| Rebecca Green | Teachers College | 2014 |
| Rebecca Rosen | School of International and Public Affairs | 2020 |
| Rebecca Schiff | School of the Arts | 2009 |
| Rebecca Subar | Barnard | 1981 |
| Rebekah Dempsey | Columbia College or Barnard | 2017 |
| Rebekeh Packer | Columbia College or Barnard | 2017 |
| Robert Newton | | 2001 |
| Robyn Uri | Columbia College or Barnard | 2011 |
| Romi Messer | Columbia College or Barnard | 2016 |
| Samuel Gross | Columbia College or Barnard | 1968 |
| Samuel Norich | Columbia College or Barnard | 1968 |
| Samuel Reider | Columbia College or Barnard | 2011 |
| Samuel Sontag | Columbia Law School | 2024 |
| Sarah B. Johnson | Social Work | 2014 |
| Sarah Chandler | School of International and Public Affairs, Jewish Theological Seminary | 2005, 2008 |
| Sarah Deutsch | Columbia College or Barnard | 2011 |

| Name | School | Class |
|------|--------|-------|
| Sarah Dorman Sveen | School of the Arts | 2014 |
| Sarah Katz | Columbia College or Barnard | 1997 |
| Sarah Leonard | Columbia College or Barnard | Yes |
| Sarah Rosenblatt | Architecture, Planning, & Preservation (Graduate) | 2012 |
| Sarah Saadoun | Columbia Law School | 2014 |
| Sarah Stone | GS, SIPA | 2016, 2019 |
| Sarah Weinstein | Columbia College or Barnard | 2016 |
| Senator Julia Salazar | Columbia College or Barnard | 2014 |
| Shachar Cohen-Hodos | GS | 2019 |
| Shahar Colt | Columbia College or Barnard | 2006 |
| Shana Leshko | Columbia College or Barnard | 2017 |
| Shana Parker | Columbia College or Barnard | 2004 |
| Shara Morris | Columbia College or Barnard | 2011 |
| Shari Turitz | School of International and Public Affairs | 1995 |
| Shira Botzum | GS, Jewish Theological Seminary | 2019 |
| Shira Danan | Columbia College or Barnard | 2007 |
| Shoshana Levy | Columbia College or Barnard | 2018 |
| Shoshana Williams | Barnard College | 2020 |
| Sofia Rubenstein | Social Work | 2017 |
| Sophie Ellman-Golan | Columbia College or Barnard | 2014 |
| Sophie Finkelstein | Arts and Sciences (Graduate), School of the Arts | 2016 |
| Stephanie Krent | Columbia College or Barnard | 2011 |
| Steve Quester | Columbia College or Barnard | 1985 |
| Steve Weinberg | Columbia College or Barnard, Architecture, Planning, & Preservation (Graduate) | 1966, 1968 |
| Suzanne Blanc | Columbia College or Barnard | 1974 |
| Suzanne Herman | Columbia College or Barnard | 2015 |

| Name | School | Class |
|------|--------|-------|
| Sylvie Rosen | Columbia College or Barnard, Jewish Theological Seminary | 2019 |
| Tali Myers | Columbia College or Barnard | 2014 |
| Talya Wintman | Columbia College or Barnard | 2020 |
| Tess Solomon | Columbia College or Barnard, Public Health | 2015, 2019 |
| Tony Kushner | Columbia College or Barnard | 1978, 2010 (Honorary Doctorate of Letters) |
| Valerie Schenkman | School of the Arts | 2010 |
| Vanessa Thill | Columbia College or Barnard College | 2013 |
| Wesley (Yehudah) Webster | GS, Jewish Theological Seminary | |
| Yaffa Fogel | Columbia College or Barnard | 2017 |

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

     *Petitioner,*

v.

Donald J. TRUMP, in his official capacity
as President of the United States; William
P. JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity
as Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs
Enforcement; Kristi NOEM, in her official
capacity as Secretary of the United States
Department of Homeland Security; Marco
RUBIO, in his official capacity as Secretary of
State; and Pamela BONDI, in her official
capacity as Attorney General, U.S.
Department of Justice,

     *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
█████████████

I, ███████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746,
that the following is true and correct to the best of my knowledge.

1. My name is ████████, and I am a Jewish alumnus of Columbia University. I
graduated recently and remain actively involved in the Columbia community.

2. I, along with more than 250 other Jewish Columbia University alumni, signed a letter
(see attached exhibit) expressing our unequivocal condemnation of Mahmoud's
Khalil's detention by U.S. Immigrations and Customs Enforcement (ICE). I am
particularly disgusted and horrified by the federal government's cooptation and
abuse of Jewish identity to justify the wrongful detention of a fellow Columbia

graduate. Like many Jewish Americans, my family came to this country fleeing religious persecution, and several members of my family who stayed behind were killed during the Holocaust. I object in the strongest possible sense to the notion that the federal government's targeting of individuals like Mahmoud for detention and deportation based on their political beliefs and constitutionally-protected free speech will ensure the safety of Jewish members of the Columbia University community or Jewish Americans at large. On the contrary, Mahmoud's detention is a violation of many of the essential freedoms that ensure the safety of Jewish Americans from the exact same kinds of persecution our families have faced in the past.

3. In the months since Mahmoud was detained, several international students attending Columbia University have expressed to me their fears that what happened to Mahmoud might happen to them. Some of them deleted their social media accounts, avoided attending class in-person, or stopped leaving the house altogether out of fear. About a week after Mahmoud was detained, I offered to escort an international student to the grocery store so they could buy food. The student confided that they had not left their apartment in a week out of fear.

4. Palestinian Columbia students who are U.S. citizens have also expressed to me their fear of being targeted by the federal government in a similar fashion to Mahmoud. Palestinian students have told me they are afraid to interface directly with members of University leadership, including the Columbia University President, Claire Shipman, because they know Mahmoud was targeted due to his role as a negotiator with the Columbia administration. As a result, these students have been prevented from advocating for themselves and their needs as Palestinian students during this time due to fear.

5. The chilling effect of Mahmoud's detention on members of the Columbia community has not been limited to international and Palestinian students. Although I am a U.S. citizen and no longer a Columbia student, I too have felt afraid to speak out against Mahmoud's detention and participate in peaceful protests as a member of the Columbia community out of fear that any dissent against the federal government by Columbia students, faculty, staff, or alumni could trigger the detention of more Columbia students by ICE, in retribution. In the week after Mahmoud's detention, there were widespread rumors among members of the Columbia community that the federal government would respond to any act of peaceful protest at Columbia with a raid of campus by ICE and mass detentions of non-citizen students. As a result, many Columbia students chose not to speak out publicly against the detention of Mahmoud or the demands of the federal government imposed upon Columbia University at that time out of fear that their

actions could cause their friends and peers to be detained and deported.

6. Since Mahmoud was detained, I have felt profoundly worried for my friends and community. For at least a week after Mahmoud's detention, I regularly refused to go to sleep until the early hours of the morning because I was afraid that I would wake up to the news that another one of my friends or community members had been detained by ICE during the night.

7. Attached hereto, at the exhibits listed below, are true and correct copies of the following materials:

   A. Attached as **Exhibit A**, a letter drafted and signed by Jewish Columbia alumni denouncing the detention of Mahmoud Khalil.

Dated: June 1, 2025                           Signed:

H-10

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner,*

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

       *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
█████████████████

I, █████████████, declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, that the following is true and correct to the best of my knowledge.

1. My name is █████████████, and I am ████████████████
█████████████████████████████████████████
████████████████

2. I was a student organizer, and a member of a student organization focused on
educating the community on Palestine.

3. For the SIPA student community, of which the majority are international students,
Mahmoud's sudden abduction has had tangible and irrevocable consequences and
has drastically impacted daily life.

4.  Mahmoud's abduction and continued detention has been exceptionally impactful for a classmate who I have organized with previously, whose father was a political prisoner, abducted in similar manner, and severely tortured by their government, and who later passed away due to health complications caused by this torture.

5.  This friend came to study in the United States to find safety and reprieve from the constant fear of political imprisonment they are accustomed to. Yet they have found themselves in an alarmingly similar position; instead of staying in the United States after graduation as they had hoped, they are planning to immediately flee to a country where they are truly safe from this sort of targeting and violence. They told me that this is the same sentiment many of their friends have expressed following Mahmoud's abduction.

6.  This person also was unable to attend their sibling's wedding—the first person in their family to get married—because they feared being denied entry if they left the country and subsequently sought return. I was with them that night, as they had to stay up until 4 in the morning to watch over Zoom as their entire family gathered to celebrate this momentous occasion. They expressed to me their conflicting feelings and guilt for missing this milestone in their sibling's life, contrasting their very real fear of being detained upon return to the U.S. because they have occasionally expressed support for Palestinian life.

7.  Another international friend of mine who I have organized with had a terminally ill father whose health began to deteriorate dramatically in April 2025. They had to return home to be with their family and their father in his last moments. Yet, the moment was marred and burdened by planning around visa concerns, by carrying this immense tragedy alongside the very real threat of being rejected or detained at the border.

8.  They told me how this anxiety weighed on them throughout the trip, and in their final moments with their father. They expressed grief and frustration at their desire to stay with their family longer after their father's death, but their inability to because of increasing repression and anxiety around their visa status as a graduating student.

9.  They told me how this fear affected what they said, what they did, and the way they expressed themselves publicly. They distanced themselves from a student organization they care about deeply because the organization engaged in political activity, they scrubbed their Instagram of any political discourse, and they stopped posting about politics completely.

10. They feel isolated and unable to make new friends because they are unsure of who will take offense to something they say and report them, either to the school (which

would lead to their name possibly being handed over to DHS/ICE), or to the federal government directly. They worried about public deportation campaigns—similar to the campaign Mahmoud suffered—being started against them by bad actors, resulting in federal immigration agents knocking at their door.

11. They are a fantastic political writer who chose to stop writing before their trip, concerned about the scrutiny that comes with publicly engaging in topics like Palestine, and beyond that, politics and current affairs as a whole.

12. Despite having returned to the United States, they have remained silent—fearful of jeopardizing their visa status and of being held in detention, hundreds or even thousands of miles from their community, like Mahmoud.

13. Yet another international friend of mine and fellow organizer told me how they arrived to the U.S. as an international student full of hope, eager to work hard, and with a deep belief in this country's strongly held value of free speech as foundational to our democracy. Yet, they expressed that this belief was shattered on March 8 upon Mahmoud's arrest—and continues eroding with his ongoing detention. They voiced that something inside them broke when they saw him targeted for nothing more than exercising this very right.

14. And they have expressed that this fear is no longer theoretical following the announcement that the U.S. Embassy would pause student visa applications alongside U.S. Secretary of State Marco Rubio's call for mass revocations of Chinese student visas.

15. They told me that after Mahmoud's abduction, they could not eat, they could not sleep, they could not focus. They were admitted to the ER days after his abduction with stress-induced acid reflux that mimicked heart problems. They said that they were so overwhelmed they thought they were dying.

16. They told me that Mahmoud's abduction and ongoing detention feels like a targeted message to all U.S. visa holders—a warning that they are only welcome here as long as they stay silent. His case, they said, serves a broader signal to international students of what this country is both willing and capable of doing. Even someone with far more legal protections than this friend was taken without a warrant.

17. This friend had an internship abroad this summer that they have now had to cancel because they are terrified of the consequences of leaving the country, both because they are a U.S. visa holder and because of their beliefs and expressions in support of Palestinian human rights.

18. I have a friend from Latin America who completed their undergraduate degree at

one of the top 5 universities in the world, and who was accepted into a dual degree graduate program at Columbia for the fall semester. We have spoken at length about his excitement of attending his dream program, of exploring his passions in an environment as challenging as Columbia, of moving to New York and traveling to the United States for the first time in his entire life.

19. In fact, part of this excitement stemmed from the belief that he would have a voice in the conversation on Palestine—a voice that would be respected and heard, given Columbia's visibility and its students' influence in shaping a national discourse that affirms the humanity of Palestinians in the face of their erasure. At the same time, he struggled with the prospect of becoming a passive observer—of being sidelined from both the work and the ongoing discourse on campus.

20. I spoke with him recently about his plans for the fall, and he shared the heartbreak of having to reject his offer—not because he wanted to, but because he feared being detained like Mahmoud. That fear stemmed from his nationality, his political beliefs, his support for Palestinian human rights, and the fact that his program and his own moral compass would require him to speak openly about all these things. Now, he won't be attending any graduate program this fall. He hasn't found an alternative that comes close to what Columbia offers.

21. The culture of fear at SIPA is real. Among students who represent the future of diplomacy, global policymaking, development, and humanitarian action, this fear hinders their learning and engagement in and out of the classroom. This is not only because they fear reprisal for discussing ongoing crises and conflicts, but also because the atmosphere of uncertainty—fueled by the government's seemingly arbitrary abductions—has taken a profound emotional and mental toll.

22. After Mahmoud's abduction, I observed that my classrooms became nearly empty. I spoke with students who were too scared to stay in their campus housing and left to stay with friends or acquaintances off-campus, despite having nothing to do with on-campus organizing. There were students afraid to leave their apartments or even rooms, some students began attending class online, greatly impacting the quality of their education.

23. During a letter-writing campaign to Mahmoud and his family, many international students expressed to me fear at signing their name on a letter to him or even sending a letter at all, scared that they would become ICE/DHS' next targets for merely showing support for a beloved classmate stolen from our community. Some of those letters and the signatures on a petition that went alongside the campaign were signed "From a terrified international student," or similar.

24. Endless op-eds written by our peers smearing Mahmoud's name added to this level of fear because for us he is the shining example of good and moral behavior. Multiple international students have expressed to me that if this could be done to Mahmoud, then anyone could be abducted and have their name dragged through the mud, because Mahmoud did everything right.

25. This also speaks to the level of fear and distrust sowed amongst the student body, which already existed after Trump took office, but which was exponentially amplified after Mahmoud's abduction. Students became fearful of each other, worried about who was listening to their conversations, who was watching, who was recording. Multiple people I know began to self-censor, they became careful who they engaged with or they avoided speaking about politics entirely, they scrubbed their social medias or deleted them altogether, fearful that any one of these things would cause a fellow student to report them to either the University administration, of which there is low trust and good cause to believe they have handed information to the federal government, or directly to ICE/DHS.

26. Mahmoud's detention has had massive implications for the student organization I am a part of. Prior to his abduction, our group was a popular and well-respected organization at our school and across campus, our events and talks were always well-attended, we engaged students across the political spectrum and differing levels of interest and knowledge.

27. However, after Mahmoud's kidnapping, our engagement and active membership dropped drastically. People became terrified to interact or become publicly associated with us. We lost a board member who was panicked at the idea of losing their visa for merely being on the board of this student organization.

28. Boards of other student organizations asked to withdraw their sponsorship from our campaign in support of Mahmoud—not because they didn't care or support the cause, but because international board members now feared that publicly supporting him, or any cause connected to Palestine, could jeopardize their visas—and, by extension, their degrees.

29. After Mahmoud's abduction, this student organization became completely occupied with protecting its international students from the same fate. Instead of organizing educational panels or conversations intended to build understanding amongst the diverse perspectives that make up this student body, our focus was forced to shift; our time and energy were consumed with organizing in support of Mahmoud and in providing services, such as Know Your Rights trainings, to a terrified student body.

5

30. The organization itself was consumed by fear and grief caused by Mahmoud's sudden and traumatic forced disappearance. Because of this now very real and immediate threat to the safety of our active members, our decision making changed, with protecting our international students being our top priority. We spent hours discussing the implications for U.S. visa holders of decisions we had already made— or ones that we would have otherwise reached consensus on with ease. Every choice we made felt weighty and totalizing; suddenly, our friend's material safety hung in the balance with every decision we made.

31. We did almost nothing after March 8, except organize around Mahmoud, field outside threats, and try to restructure so that our vulnerable members were safe. We could not fulfill the organization's mission: to educate our peers about Palestine and provide a safe space on campus for students to engage in open, critical discourse.

32. For myself, an American citizen, Mahmoud's abduction deeply impacted my wellbeing and my ability to organize and speak freely about Palestine. My circle got smaller as I saw the devastating impact of being too open and trusting. Every single person I did not know became a person I could not trust, became a person who could put me or someone I love in harm's way.

33. I stopped going to class in person—as someone who is very outspoken with my beliefs, and who chose Columbia partially because of its history of fierce protection of the First Amendment and academic discourse, I became afraid of being reported to university administration or the federal government for merely expressing those beliefs. I worried about federal agents showing up to class for either myself or one of my international peers.

34. For me, Mahmoud's abduction and ongoing detention points to a horrifying trend this country seems to be following. I am worried that post-graduation, my job may put me at risk because it will be political by nature. I worry for my brother's safety, who works with trans-youth in the Midwest.

35. Right now, the government is disappearing international students without regard for whether they are here legally, or whether the government itself is acting legally. They are sending people to super-max prisons in El-Salvador for having tattoos. They are detaining entire families in courtrooms—people who are following the law and trying to stay in the United States legally. I believe it's only a matter of time before they start doing the same to American citizens, and that weighs on me every time I speak out—or stay silent. I fear getting a job and being stuck here in the United States as things continue to deteriorate. Yet I also worry about leaving my loved ones behind, without protection or plan. I feel paralyzed, and this paralysis began on March 8 with Mahmoud's abduction.

36. None of the stories I have shared in this declaration are unique or unusual. I could share many more with the Court. Still, what I have observed—and what I experienced myself—is just a small glimpse into what is happening in communities across the country. I want to impress upon the Court the devastating impact Mahmoud's abduction and ongoing detention has had on countless communities — it is not only those who know and care for him who are affected. Far from it.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2025                    Signed:
New York, NY

7

H-11

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

*Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and
Pamela BONDI, in her official capacity as
Attorney General, U.S. Department of
Justice,

*Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
█████████████████

I, █████████████, declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, that the following is true and correct to the best of my knowledge.

1. I am █████████████, and I graduated from Columbia University in █████████
with a █████████████ degree. I am Jewish and consider it to be an important part
of my identity. I have family members who live in Israel and whose homes were
destroyed on October 7th.

2. Since Mr. Khalil was arrested, the chill in speech I have observed on campus and
experienced firsthand has been drastic and far-reaching. It has even influenced my
decision to have my name publicly redacted in this statement as I do not wish to receive
unwanted attention or become a target of the US government.

3.  My senior year roommate was an international student who did not give much thought to political issues such as the Israel-Palestine conflict. Since Mr. Khalil's arrest, they told me that they avoided going anywhere near campus protests, not because they felt threatened by the protestors, but because they feared being seen or associated with any campus protest would lead to them potentially being detained and deported.

4.  This past April, I took part in a protest in support of the release of Mr. Khalil on Columbia's  campus. ███████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████

5.  The combination of Mr. Khalil's arrest and detention, as well as ██████
████████████ has had the effect of making me hesitant about publicly expressing my beliefs about the Israel-Palestine conflict and engaging visibly in protests on university property.


Dated: June 2nd, 2025                    Signed: ██████████████
████████████

                                         */s/*

H-12

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting Field
Office Director of New York, Immigration
and Customs Enforcement; Yolanda
PITTMAN, in her official capacity as Warden
of Elizabeth Contract Detention Facility;
Caleb VITELLO, Acting Director, U.S.
Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and
Pamela BONDI, in her official capacity as
Attorney General, U.S. Department of Justice,

       *Respondents.*

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF**
██████████

I, ██████████, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am ██████████, a graduate ██████ from Columbia University.

2. **Many of my friends who are international students have confided in me about their fears of being targeted for deportation if they exercise their right to freedom of speech.**

3. **I know the people I am speaking of are not even able to write in support of Mahmoud Khalil because of the danger they are in. They have told me they won't follow certain accounts on Instagram, or are deleting Instagram posts. Some of my friends have made their accounts private or deleted them altogether.**

4. **Many of my friends who were excited to start their lives post graduation in New York City are considering, or have ultimately decided to, move back to the country they came from. These are some of the smartest, most creative and kind people I know. Some of the reasons they've told me behind their decisions are that they don't like seeing their gay friends being harassed, they feel unsupported by the university, and most of all, the targeting of Mahmoud has made them afraid they'll be next.**

5. **It is obvious to me that the effect Mahmoud Khalil's detainment has had has been an increase in fear among my friends from other countries and a transformation of their view of the United States. No longer do my friends from around the world think of America as a free country that they can start their life in, but instead they view it as a dangerous place that is becoming more unstable every day. These are compassionate people, dedicated scholars, and principled human beings and I have seen them be transformed by fears of surveillance and governmental oppression.**

6. **Personally, as a Jewish student it is a cruel irony that I have spent the last months trying vainly to comfort my friends who are afraid that they will be taken by the government in the name of keeping me safe.**

Dated: June 2nd, 2025

Signed:

