# Exhibit M

## DECLARATION OF JOSH PAUL

I, Josh Paul, declare as follows, pursuant to 28 U.S.C. §1746:

1. 8 U.S.C. §1227(a)(4)(C) requires that the Secretary of State "has reasonable ground to believe" that the presence or activities of an alien in the United States would have potentially serious adverse foreign policy consequences. I write as former State Department official to address the "reasonable ground" standard in this statute.

2. I am familiar with statutes affording the President and/or the Secretary of State with discretion in matters of foreign policy based on my employment for over a decade as a Director in the Bureau of Political-Military Affairs. For instance, I was a part of the policy process to make determinations under 22 U.S.C. §2753 and 22 U.S.C. §2776 which relate to the transfer of arms to foreign countries. Such transfers require a formal notification to Congress, triggering a 'notify and wait' period to allow for Congressional action, unless, to quote typical language that is reflected in four places in the above statutes, "the President states in his certification that an emergency exists which requires the proposed export in the national security interests of the United States" (22 U.S.C. §2776(c)), in which case the notification to Congress is waived, and the sale proceeds immediately. In this most weighty matter of arms transfers, which could involve the transfer of a major weapons system such as a fleet of fighter jets, with lasting global defense and foreign policy consequences, there is no modifying language to the President's authority to certify that an "emergency exists." Indeed, as we were advised by the Department's Attorney Advisors when making a series of such emergency certifications in 2019 for deeply controversial arms sales to the Middle East, and in the absence of what any of us believed to be any compelling reason to bypass the Congressional notification process beyond the then-Secretary of State's desire to do so, under this statute an "emergency" is whatever the President, or the Secretary of State acting under his delegated authority, says it is.

3. The same does not apply to the statute at question in this case, because it not only includes a significant caveat to the determination process – "reasonable ground to believe" – but applies this caveat in a circumstance which is far less likely to have the broad and lasting national security impact of a major weapons export. As a foreign policy practitioner who is experienced in the application of statutes to circumstances, it is my view that the inclusion of this qualifying language is significant. Unlike the example cited above that relates to weapons transfers, it is clear that the intent of 8 U.S.C. §1227(a)(4)(C) is not to provide absolute discretion to, in this case, the Secretary of State, as is the case for the emergency certification authority for arms sales, but rather to circumscribe their authority only to cases in which there is "reasonable ground to believe" that the circumstances otherwise meet the requirements of the statute.

4. This caveat having been established, we come to the consideration of whether there is, indeed, "reasonable ground to believe" that the "presence or activities" in the United

States of the Respondent, Mahmoud Khalil, would "have potentially serious adverse consequences." In my view as a former State Department official, there is not.

5. Khalil is a graduate student of international affairs at Columbia University and is not charged with any crime. The Secretary of State's determination pursuant to 8 U.S.C. §1227(a)(4)(C) only argues that the basis for the Secretary's assessment regards "the participation and roles of... Khalil in antisemitic protests and disruptive activities, which foster[s] a hostile environment for Jewish students in the United States."

6. I note first of all that there is no prima facie evidence for any antisemitic activity on the part of Khalil; indeed, Khalil has been joined in his first amendment activity by many Jewish students, and has publicly made clear that his protest activity concerns the actions of a political entity (i.e. the State of Israel) and not any specific religion or ethnicity.

7. But even were Khalil's actions somehow antisemitic (I aver, again, that they are not) or disruptive, I am not aware of any circumstances in which the conduct of such activities by a graduate student would in any way mean that their presence in the U.S. would have "potentially serious adverse foreign policy consequences." Having both been at one point a graduate student of international affairs, and having worked in academia after that service to teach U.S. and international students about the conduct of foreign policy, I can rather attest to the contrary – that in my experience the words and actions of international affairs students are most often of no consequence whatsoever!

8. Indeed, if there is anything that sets apart the American educational system, particularly at the graduate studies level, it is the freedoms that accompany it – the freedoms to express unpopular ideas and to probe and tackle common assumptions. At no time in American academic history am I aware of a circumstance in which the voice of a student posed "serious adverse foreign policy consequences." Rather, it would be the silencing of such voices, or the deportation of said students, that would pose "serious adverse foreign policy consequences" to the United States.

9. This is because, as the U.S. Government itself has long recognized, the presence of foreign students strengthens American national security. For instance, the State Department itself funds a program, International Military Education and Training (IMET) which the official Security Assistance Management Manual (SAMM) describes as "one of the most important security cooperation (SC) engagements the U.S. has with another country," because "[l]ong after a country purchases, utilizes, and disposes of U.S. military equipment, what remains are the experiences the international military student (IMS) had during training. Through exposure to the American way of life and direct observation of U.S. commitment to universal human rights, the IMS comes to understand and appreciate American democratic ideals." It is my view that not only is there no "reasonable ground" for the Secretary to believe that the presence of Respondent Khalil poses any potentially serious adverse consequences to U.S. foreign policy, but that it is the Secretary's determination itself, by undercutting the basic appeal of American

    academic freedom, and disincentivizing the next generation of global leadership in their respective fields from coming to America and building the lasting cultural familiarity and friendships with our nation and its people, which poses the only "serious adverse foreign policy consequences" to the United States emanating from this case.

10. In sum, unlike the broad discretion that is often available in law to foreign policy decisionmakers such as the President or Secretary of State, the statute at hand in this case imposes a limitation in the form of a standard, and that standard has not been met. I urge the court to reject the Secretary's determination, and to permit Khalil to remain.

I declare under penalty of perjury that the foregoing statement is true to the best of my knowledge, information, and belief. Executed on this 12th day of May 2025 at Washington, D.C.

                                                                         Josh Paul  
                                                                         Declarant