# Exhibit N

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

    *Petitioner,*

  v.

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,

    Respondents.

Case No. 25-cv-01963 (MEF-MAH)

### DECLARATION OF CHRISTOPHER J. LE MON

I, CHRISTOPHER J. LE MON, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1. I submit this declaration in connection with Petitioner Mahmoud Khalil's motion for a preliminary injunction in his above-captioned habeas corpus case. In particular, I address an issue before the Court of whether it is in the "public interest" for noncitizens to be subject to the determination of the Secretary of State that the individual's continued presence or activities in the United States would "compromise a compelling foreign policy interest" (*See* Memorandum from Marco Rubio, Secretary of State, to Kristi Noem, Secretary of Homeland Security ("Rubio Determination") (ECF 198-1), at 1, where the activities in question amount to constitutionally protected expression.

2. As a former senior White House, National Security Council, and State Department official with significant international relations and foreign policy experience, including analyzing, assessing, promoting, and protecting internationally-recognized human rights, I believe Secretary Rubio's use of the Determination to punish nonviolent student speech and activism is contrary to internationally-recognized human rights, contrary to longstanding

1

bipartisan U.S. foreign policy and national interests, and contrary to fundamental American values as set forth in the U.S. Constitution and as expressed vocally by Presidents of both parties and by America's founders. The longstanding and bipartisan American tradition and foreign policy objective of promoting and respecting the fundamental human right to freedom of expression and opinion, particularly speech that expresses dissent from U.S. foreign policy, overwhelmingly demonstrates that the Rubio Determination and the arrest, detention, and attempted deportation of Petitioner is in fact *contrary* to the public interest of the United States.

3. The arrest, detention, and attempted deportation of Petitioner, and his deprivation of liberty solely as a response to his protected speech, beliefs, and/or opinions, is antidemocratic activity that is commonplace in any number of autocratic countries whose abuses I monitored and sought to prevent when I served at the White House and Department of State, including countries like Egypt, Saudi Arabia, or the United Arab Emirates. For decades, the U.S. Government has condemned the similar autocratic tactic of silencing critics through arrest, detention, or deportation, as being contrary to internationally-recognized human rights and as contrary to longstanding, bipartisan U.S. foreign policy interests in promoting and protecting these universal rights worldwide, regardless of the citizenship status of the individual exercising those rights.

## Background and Qualifications

4. I have over 20 years' experience in international law and policy, including as a senior U.S. Government official. I served as Deputy Assistant Secretary in the Bureau of Democracy, Human Rights, and Labor at the U.S. Department of State between January 2021 and January 2025, where I oversaw the offices of Near Eastern Affairs and Security and Human Rights. Previously, from 2017 to 2021 I was the Washington Director at Crisis Action, an international human rights advocacy NGO. I served on the National Security Council staff at the White House from 2016 to 2017 as Special Assistant to the President and Senior Advisor for Multilateral Affairs and Human Rights, and from 2013 to 2014 as Director for Multilateral Affairs. From 2014 to 2017, I served at the White House as Special Assistant to the President for Presidential Personnel (National Security), and from 2009 to 2013 I served as Senior Advisor in the Bureau of International Organization Affairs at the Department of State. Prior to my public service, I was an international lawyer in private practice from 2004 to 2009, and from 2003 to 2004 I clerked for Judge Thomas Buergenthal at the UN International Court of Justice. I received my law degree from New York University School of Law, and received my B.A. from the University of California, Santa Cruz, and am a member of the Council on Foreign Relations.

## The Public Interest in Safeguarding Free Expression Rights of Dissenters and Preventing Arbitrary Detention

5. I understand the basic facts surrounding Mr. Khalil's case from the publicity that his case has generated, and from the widely-publicized news media reporting about other similarly situated noncitizen students who have been detained by ICE and been subject to

deportation pursuant to the Rubio Determination. In preparing this declaration, I further reviewed the publicly-accessible Rubio Determination, which comprises only three paragraphs.[1]

6. As I understand the facts of this case, Mr. Khalil is a Syrian national of Palestinian ancestry and a Legal Permanent Resident of the United States who was a student pursuing a graduate degree in Public Administration at Columbia University's School of International and Public Affairs. On campus, he became a prominent advocate and spokesperson for Palestinian human rights, and a strong critic of Israel's military campaign in Gaza following the Hamas terrorist attacks of October 7, 2023, as well as a critic of the support the United States government – and he believed, Columbia University itself – has provided to Israel's military campaign. In other words, Mr. Khalil, as a Palestinian student enrolled at Columbia University, vociferously disagreed with, dissented from, and strongly and vocally spoke out against U.S. foreign policy toward Israeli-Palestinian issues, and against what he perceived as his university's support for that policy. I am unaware of any credible evidence that Mr. Khalil personally engaged in any activities involving violence, or that he personally engaged in any antisemitic conduct or speech. I am of course aware that antisemitic speech and conduct has occurred at some student protests against Israel's military campaign, which I strongly and unreservedly condemn.[2]

7. In reviewing the Rubio Determination, I understand Secretary Rubio has determined that "the activities and presence" of Mr. Khalil in the United States "would have potentially serious adverse policy consequences," which the Secretary based on a conclusion that the protests Mr. Khalil was alleged to be engaged in were "antisemitic" and "disruptive," such that Mr. Khalil's continued presence in the United States would "undermine U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States." However, nowhere does the Rubio Determination accuse Mr. Khalil of committing any crime, of engaging in any acts of violence, of posing any physical danger or harm to anyone, or of personally engaging himself in any antisemitic speech or conduct. Nor does the Rubio Declaration accuse Mr. Khalil of any specific or concrete actions that would undermine a foreign policy interest of the United States. I am unaware of any accusation or suggestion that Mr. Khalil's speech sought to or did incite violence or other unlawful conduct. Instead, the basis of the Rubio Determination, and of the United States' arrest, detention, and attempted deportation of Mr. Khalil (and other students), appears exclusively to stem from Mr. Khalil's exercise of his constitutionally-protected rights to dissenting speech, nonviolent protest activity, and nonviolent advocacy that criticized U.S. and Israeli policy, and it appears that it is in fact this exercise of rights that the Trump administration finds objectionable.

---

[1] However, I am unaware of and thus have not reviewed any publicly available substantive legal or policy analysis by the U.S. Government that would support the Rubio Determination's sweeping conclusions.

[2] As detailed in this Declaration, alongside my strong condemnation of any and all antisemitic speech or conduct (and of all hate speech, no matter the target), I do not believe nonviolent expression is legitimate grounds for legal punishment (including deportation), given First Amendment protections. Nor do I believe that the existence of such condemnable speech or conduct on U.S. soil produces adverse foreign policy consequences for the United States that are not far outweighed by the adverse foreign policy consequences to accrue were the U.S. Government to punish such nonviolent free expression through detentions, deportations, or other deprivations.

8. It is important to highlight that the weaponization by the Trump administration and others of the term "antisemitism" to target individuals nonviolently criticizing policies of the Israeli government not only violates the right to freedom of expression and undermines democratic debate, but also recklessly erodes the moral clarity needed to confront the sincerely worrying rise in actual antisemitism worldwide, making the fight against that scourge even more difficult by diluting and politicizing the underlying principle.

### The Historical Importance of Human Rights as an Element of U.S. Foreign Policy and as a Public Interest

9. From the early words of the Declaration of Independence to the first sentence of the Bill of Rights, certain fundamental rights rest indisputably at the heart of American history and America's identity as a nation. Reflecting on the centrality of human rights to America's founding, President Carter observed that "America did not invent human rights. In a very real sense, it is the other way round. Human rights invented America."[3]

10. Nearly two centuries after the founding of the United States, the robust American constitutional tradition of protecting free expression and free assembly drove the United States to lead in crafting and promoting the now universally-recognized international human rights norms around these and other fundamental freedoms following the Second World War, including the adoption of the Universal Declaration of Human Rights ("UDHR") in 1948 and the International Covenant on Civil and Political Rights ("ICCPR") in 1966. Over nearly eight decades since the concept of human rights became an international legal reality, Presidents of both parties – despite at times wide differences in foreign policy priorities across administrations – nonetheless consistently have asserted that the promotion and protection of human rights is not just an essential U.S. foreign policy interest,[4] but is central to American identity.[5] Democratic and

---

[3] Remarks by President Carter, Jan. 14, 1981.

[4] See, e.g., Remarks by President Carter, Dec. 6, 1978 ("human rights are not peripheral to the foreign policy of the United States… Human rights is the soul of our foreign policy. And I say this with assurance, because human rights is the soul of our sense of nationhood."); Remarks by President Reagan, Dec, 10, 1985 ("The United States will never cease to be in the forefront of the noble battle for human rights."); Remarks by President Clinton, Dec. 9, 1997 ("advancing human rights must always be a central pillar of America's foreign policy"); Remarks by President Obama, May 19, 2011 ("The United States supports a set of universal rights. And these rights include free speech, the freedom of peaceful assembly, the freedom of religion, equality for men and women under the rule of law, and the right to choose your own leaders… Our support for these principles is not a secondary interest. Today I want to make clear that it is a top priority that must be translated into concrete actions, and supported by all of the diplomatic, economic and strategic tools at our disposal"); Remarks by President Biden, Aug. 16, 2021 ("I have been clear that human rights must be at the center of our foreign policy, not the periphery.").

[5] See, e.g., Remarks by President Eisenhower, Jun. 4, 1958 ("Basic to our democratic civilization are the principles and convictions that have bound us together as a nation. Among these are personal liberty, human rights, and the dignity of man."); Remarks by President Carter, Jan. 19., 1978 ("The very heart of our identity as a nation is our firm commitment to human rights… The world must know that in support of human rights, the United States will stand firm."); Remarks by President Reagan, Dec. 3, 1987 ("The United States declared its independence with a document that proclaimed rights to be inalienable gifts from God, not just those who could make it to our shores but to all people, everywhere."); Remarks by President Bush, Jan. 29, 2002 ("America will always stand firm for the non-negotiable demands of human dignity: the rule of law; limits on the power of the state; respect for women; private property; free speech; equal justice; and religious tolerance. America will take the side of brave men and

4

Republican Presidents alike also have insisted that, aside from the inalienability and intrinsic value of human rights, improving respect for human rights at home and abroad advances other U.S. national interests and buoys U.S. credibility and global standing,[6] and have warned that diminished respect for human rights poses serious national security risks for the United States and the world.[7] Of course, every Presidential administration without exception has taken foreign policy decisions that deviated at times from its publicly-stated commitment to prioritize human rights. But the Trump administration stands all but alone in recent American history in suggesting that the exercise or defense of human rights, whether domestically or internationally, is *contrary* rather than *fundamental* to U.S. foreign policy or to U.S. national interests; indeed, every other President in recent memory has asserted the exact opposite. Among America's chief diplomats, the same is true: a survey of public remarks by Secretary Rubio's predecessors over the past several decades demonstrates remarkably consistent public commitment[8] to the importance of human rights in U.S. foreign policy by previous Secretaries of State across administrations of both parties, making the Trump administration's public and transparent abandonment of this principle even more ahistorical and appalling.[9]

---

women who advocate these values around the world, including the Islamic world, because we have a greater objective than eliminating threats and containing resentment.  We seek a just and peaceful world.")

[6]     See, e.g., Remarks by President Reagan, Dec. 10, 1985 ("Respect for human rights is essential to true peace on Earth.  Governments that must answer to their peoples do not launch wars of aggression.  That's why the American people cannot close their eyes to abuses of human rights and injustice, whether they occur among friend or adversary or even on our own shores."); Remarks by President Clinton, Dec. 9, 1997 ("As long as America is determined to stand for human rights, then free people all around the world will choose to stand with America."); Remarks by President Obama, Dec. 10, 2009 ("peace is unstable where citizens are denied the right to speak freely or worship as they please; choose their own leaders or assemble without fear… No matter how callously defined, neither America's interests – nor the world's – are served by the denial of human aspirations."); Remarks by President Biden, Oct. 15, 2021 ("Demonstrating that our commitment to human rights begins at home is among the most powerful and persuasive tools in our foreign policy kit.").

[7]     See, e.g., Remarks by President Reagan, Dec. 10, 1984 ("The American people recognize that it is the denial of human rights, not their advocacy, that is a source of world tension."); Remarks by President Reagan, Nov. 21, 1985 ("We Americans believe that history teaches no clearer lesson than this: Those countries which respect the rights of their own people tend, inevitably, to respect the rights of their neighbors. Human rights, therefore, is not an abstract moral issue; it is a peace issue."); Remarks by President Obama, May 28, 2014 ("America's support for democracy and human rights goes beyond idealism – it is a matter of national security… Respect for human rights is an antidote to instability and the grievances that fuel violence and terror.").

[8]     Again, the foreign policy *conduct* of many administrations has fallen far short of public commitments on human rights, including through highly selective criticism of violations and a willingness to turn a blind eye toward human rights abuses by U.S. partners.  But rhetorical commitment by Presidents and Secretaries of State throughout modern history demonstrates the continuing importance of the principle to U.S. national and foreign policy interests.

[9]     See, e.g., Remarks by Secretary Blinken, Mar. 30, 2021 ("We will bring to bear all the tools of our diplomacy to defend human rights and hold accountable perpetrators of abuse… Standing up for human rights everywhere is in America's interests… Standing for people's freedom and dignity honors America's most sacred values."); Remarks by Secretary Pompeo, Mar. 13, 2019 ("our committed defense of human rights stems from America's founding principles."); Written Statement by Secretary Tillerson, Mar. 6, 2017 ("Promoting human rights and democratic governance is a core element of U.S. foreign policy… Our values are our interests when it comes to human rights."); Remarks by Secretary Kerry, Apr. 19, 2013 ("promoting human rights isn't a foreign policy priority simply because it's the right thing to do. It's tied to our own security.  It's tied to the possibilities of prosperity and of nations living by rule of law and of nations living in peace… Because part of the American spirit is the fierce belief in the dignity and potential of every single person, part of American leadership is speaking out for

**Targeting Dissent as a Tool of Autocracies and Other Undemocratic Governments**

11.     Among my duties as Deputy Assistant Secretary of State for Democracy, Human Rights, and Labor, I daily monitored and assessed human rights conditions across the Middle East and North Africa, as well as human rights issues relating to the provision of U.S. security assistance worldwide. This included reviewing diplomatic, intelligence, media, and NGO reporting; meeting and speaking directly with human rights defenders, journalists, civil society

---

people who can't speak for themselves. It's also standing up for those who fight for their own rights – as I said, sometimes in the most desolate places, without support. It is our effort to stand up for the universal rights of all people."); Remarks by Secretary Clinton, Apr. 8, 2011 ("Here at the State Department, human rights is a priority 365 days a year… because it actually is in line with our values, our interests, and our security."); Remarks by Secretary Rice, Mar. 8, 2006 ("Our promotion of human rights and democracy is in keeping with America's most cherished principles and it helps to lay the foundation for lasting peace in the world."); Remarks by Secretary Powell, Mar. 4, 2002 ("the American people are united in the conviction that active support for human rights must be an integral part of American foreign policy. The United States will be a steadfast friend to men and women around the world who bravely seek to improve the observance of international human rights standards within their own countries and worldwide."); Remarks by Secretary Albright, Dec. 6, 2000 ("Respect for human rights belongs within the heart of American foreign policy… That is where it ought to stay for many years to come."); Remarks by Secretary Christopher, Dec. 10, 1996 ("We have to be vigilant in defending human rights and political freedom"); Remarks by former Secretary Baker, Apr. 10, 2011 ("I think we need to be clear that we're going to always support our principles and values, that is the promotion of democracy and the protection of human rights, politically, diplomatically and economically"); Remarks by Secretary Schultz, Feb. 22, 1984 ("moral values and a commitment to human dignity have been not an appendage to our foreign policy but an essential part of it, and a powerful impulse driving it. These values are the very bonds that unite us with our closest allies, and they are the very issues that divide us from our adversaries… It is the difference between tyranny and freedom – an age-old struggle in which the United States never could, and cannot today, remain neutral."); Remarks by Secretary Haig, May 15, 1981 ("Let me deal first with the question of whether a concern for human rights is compatible with the pursuit of America's national interest. My answer to this is a resounding 'yes.' The supreme American national interest is simple and compelling: we want a world hospitable to our society and our common ideals. As a practical matter, our national interest requires us to resist those who would extinguish those ideals and are hostile to our common aspirations… Human rights are not only compatible with our national interest, they are an integral element of the American approach – at home and abroad."); Remarks by Secretary Muskie, Aug. 7, 1980 ("There are those who suggest that the freedom of other people is none of our business, that with enough military hardware our freedom can be secure while the freedom of others is stifled, that our purpose in the world is to preserve the status quo. I say, and I believe you say, that is an invitation to trouble. It is a narrow vision of ourselves and of the world… If we do not promote freedom in the world, there will be less freedom in the future for Americans."); Remarks by Secretary Vance, Apr. 30, 1977 ("Our concern for human rights is built upon ancient values. It looks with hope to a world in which liberty is not just a great cause, but the common condition. In the past, it may have seemed sufficient to put our name to international documents that spoke loftily of human rights. That is not enough. We will go to work, alongside other people and governments, to protect and enhance the dignity of the individual."); Remarks by former Secretary Rusk, ca. 1985 ("I know that there are countries in which human rights are in a better position because of the continuous and steady influence of the United States… a number of places where human rights matters were taken more seriously because of us. I would hope that we would continue to work at it that way."); Remarks by Secretary Marshall, Sep. 23, 1948 ("Not only is it appropriate that we should here reaffirm our respect for the human rights and fundamental freedoms, but that we should renew our determination to develop and protect those rights and freedoms… Systematic and deliberate denials of basic human rights lie at the root of most of our troubles… It is not only fundamentally wrong that millions of men and women live in daily terror of secret police, subject to seizure, imprisonment or forced labor without just cause and without fair trial, but these wrongs have repercussions in the community of nations. Governments which systematically disregard the rights of their own people are not likely to respect the rights of other nations and other people, and are likely to seek their objectives by coercion and force in the international field."); cf. Statement by then-Senator Rubio, Mar. 31, 2021 ("As Americans who are blessed to live in this great country, we have a moral obligation and a strong national security interest to defend and promote the fundamental rights of all people.").

activists, and foreign government officials; and collaborating with experts across the State Department, the broader U.S. Government, and nongovernmental organizations in the United States. Beyond this daily human rights diplomacy and analysis, I also supervised the compilation of the Department of State's annual Human Rights Reports for countries across the Middle East and North Africa covering calendar years 2020 through 2023.

12. Under international human rights law, all persons are entitled to the right to freedom of expression[10] and the right to freedom of peaceful assembly,[11] and are entitled to be free from arbitrary detention.[12] For detention to be considered "arbitrary" under international law, it must not be unlawful under domestic law, and also must not be unjust, unpredictable, or disproportionate to a legitimate state interest pursued by the government.[13] Over the decades since the UDHR and ICCPR were adopted, judicial and scholarly interpretations of the interplay between these rights has established that when an individual is deprived of liberty in response to their exercise of fundamental rights like freedom of expression, that detention is by definition "arbitrary."[14] International jurists have clarified further that any government restrictions on the fundamental rights to freedom of expression or freedom of peaceful assembly not only must be in pursuit of a legitimate state interest (vice designed merely to quash the exercise of those

---

[10] See UDHR, art. 19 ("Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers."); ICCPR, art. 19(1)-(2) ("Everyone shall have the right to hold opinions without interference. Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice.").

[11] See UDHR, art. 20(1) ("Everyone has the right to freedom of peaceful assembly and association."); ICCPR, art. 21 ("The right of peaceful assembly shall be recognized. No restrictions may be placed on the exercise of this right other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (ordre public), the protection of public health or morals or the protection of the rights and freedoms of others.").

[12] See UDHR, art. 9 ("No one shall be subjected to arbitrary arrest, detention or exile."); ICCPR, art. 9(1) ("Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention.").

[13] See UN Human Rights Committee, General Comment 35, Dec. 16, 2014, para. 12 ("An arrest or detention may be authorized by domestic law and nonetheless be arbitrary. The notion of 'arbitrariness' is not to be equated with 'against the law,' but must be interpreted more broadly to include elements of inappropriateness, injustice, lack of predictability and due process of law, as well as elements of reasonableness, necessity and proportionality.").

[14] See, e.g., UN Human Rights Committee, General Comment 35, para. 17 ("Arrest or detention as punishment for the legitimate exercise of the rights as guaranteed by the [ICCPR] is arbitrary, including freedom of opinion and expression, freedom of assembly, freedom of association, freedom of religion and the right to privacy.") (internal citations omitted); UN Working Group on Arbitrary Detention, Op. No. 2022/24 (Belarus), May 25, 2022 (finding the politically-motivated detention of an opposition lawyer was "arbitrary" as it was "quite clear to the Working Group that the basis for the arrest and subsequent detention of Mr. Znak was in fact his exercise of freedom of expression and freedom of assembly as well as the right to take part in public affairs of Belarus. There is no evidence whatsoever that any of his actions have been violent, that he incited violence or that his actions have indeed led to violence perpetrated by others."); UN Working Group on Arbitrary Detention, Op. No. 2020/86 (Saudi Arabia) (finding the detention of a Shi'a cleric in response to his criticism of sectarian violence and sectarian discrimination to be "arbitrary" given his detention "resulted from the active exercise of civil and political rights").

rights), but also must be undertaken in the manner that is least intrusive to the exercise of those fundamental rights.[15]

13. Arbitrary detention is a silent weapon of modern autocracy. Undemocratic governments the world over employ arbitrary detention to suppress dissent, entrench power, and stifle protest movements, attempting to stem public outcry and prevent the legitimate public criticism, protest, and debate that is essential to functional democracy. By targeting dissent and other critical speech through arbitrary detention, undemocratic regimes seek to sever the lifeblood of protest movements, including the ability of individuals and groups to communicate, organize, and express political will, aiming to incapacitate political critics and to infect society with fear and intimidation. Particularly when employed against individuals criticizing government policy, arbitrary detention seeks to punish the very acts (e.g., protests or speech aimed at raising public awareness) that otherwise could enable legal or political accountability for the disfavored policy. Frequently used selectively to publicly target high-profile protestors, arbitrary detention is a tool of repression calculated to inspire fear in individuals, communities, and movements who disagree with government policies, sending the chilling message that the mere exercise of fundamental freedoms of expression or assembly could lead to detention, imprisonment, deportation, or disappearance.

14. Within the region on which I worked most closely during my most recent service at the Department of State, such abuses are sadly commonplace. In Egypt, the el-Sisi government has arrested and detained many thousands of human rights defenders, journalists, activists, opposition politicians, and even ordinary citizens, abusing vaguely-worded laws to detain or imprison for years individuals whose only "offense" was criticism of government policies. The Iranian regime has arrested and tortured thousands of protesters and dissenters, especially during and after the 2022 protests sparked by Mahsa Zhina Amini's death in custody, citing vague national security charges and consistently depriving defendants of due process as punishment for protests demanding simply respect for basic human rights. In Saudi Arabia, women who have demanded equal treatment under law and ordinary citizens who have criticized the autocratic behavior of Crown Prince Mohammed bin Salman have found themselves sentenced to lengthy prison sentences after closed trials by state security courts; some were convicted after being pressured to repatriate or extradited from other countries on charges related to critical speech, while others like Washington Post columnist (and U.S. Legal Permanent Resident) Jamal Khashoggi have faced fates far worse than arbitrary detention, including torture and extrajudicial execution at the hands of the government. In the United Arab Emirates, authorities have imprisoned activists, lawyers, and students, holding many of them incommunicado for long periods of time simply for forming an independent advocacy group that publicly recommended changes to government policy, even going so far as to re-convict and re-sentence many of them on the same charges years later to ensure their continued detention.

---

[15] See, e.g., UN Human Rights Committee, General Comment 34, Jul. 29, 2011, para. 23 (government restrictions on the exercise of freedom of expression "may never be invoked as a justification for the muzzling of any advocacy of multi-party democracy, democratic tenets and human rights. Nor, under any circumstance, can an attack on a person, because of the exercise of his or her freedom of opinion or expression, including such forms of attack as arbitrary arrest, torture, threats to life and killing, be compatible with [ICCPR] article 19.").

15. There are myriad further examples of governments in other parts of the world as well that utilize arbitrary detention to target the expression of critical or dissenting speech. The Chinese government has institutionalized arbitrary detention as a tool of ideological control and political repression, systematically targeting lawyers, journalists, and civil society activists under vague statutes that criminalize "picking quarrels and provoking trouble," and detaining or disappearing rights advocates and government critics; its massive incarceration of more than a million Uyghurs and other ethnic minorities in "re-education camps" in Xinjiang aims to silence not only individual critics, but entire communities. Russia under Putin has aggressively used arbitrary detention to extinguish political opposition, control public narratives, and prevent widespread protest; beyond the poisoning and imprisonment of iconic human rights defender Alexei Navalny (who later died in a Siberian gulag), the Russian government has preemptively detained thousands of demonstrators nationwide ahead of planned protests using broad laws banning "unauthorized" gatherings and legislation criminalizing public statements that "discredit" the Russian military. The Lukashenko regime in Belarus used mass arbitrary arrests to quash 2020 pro-democracy protests, sentencing and imprisoning opposition leaders through closed-door trials that came nowhere near international standards for fairness. In Maduro's Venezuela, authorities routinely have detained activists, opposition politicians, and even government employees and health workers, for criticizing government maladministration, relying on a controversial and vague law criminalizing acts that "incite hatred." Cuba's one-party state has long used speech-related detention to maintain political control, including in response to protests demanding adequate food and medicine, relying on vague criminal laws covering contempt and public disorder to punish and suppress criticism of government policies and government shortcomings.

16. Details of the practice of arbitrary detention have been well documented historically in the annual Human Rights Report by the Department of State; sadly, even more examples abound in countries beyond those noted above.[16]

17. The use of arbitrary detention by governments to suppress criticism and speech is particularly potent in extinguishing fundamental human rights when a country's judiciary lacks independence, or where the judiciary is overly influenced by the executive. In these instances, judges perform little to no independent fact-finding to test the government's assertions that an individual has committed a criminal act, or they fail to appropriately tailor the government's overbroad interpretations of laws and thus allow the criminalization of speech or conduct constituting the exercise of universal human rights. In each of the countries noted above as well as numerous others, judges effectively operate as arms or subsidiaries of the executive, lacking the independence from the government needed for them to preserve the rule of law and respect for fundamental freedoms. Some, like Saudi Arabia's Specialized Criminal Court or Egypt's terrorism courts and state security emergency courts, have been reported to all-but-explicitly take direction from government officials. Others, like courts in Egypt, the UAE, or Iran, regularly have convicted protestors and dissidents on vague charges like "spreading false news" or "inciting hatred" in response to critical speech. Still others, like Qatar, have deported immigrants who held legal status after they peacefully protested mistreatment, in a clear effort to

---

[16] For recent examples, see generally Department of State, 2023 Country Reports on Human Rights Practices; Department of State, 2022 Country Reports on Human Rights Practices; Department of State, 2021 Country Reports on Human Rights Practices; Department of State, 2020 Country Reports on Human Rights Practices.

silence criticism by demonstrating protestors' vulnerability as noncitizens. In these and other countries, courts have based convictions of government critics on unreliable evidence, including coerced confessions and biased media or other sources. The lack of judicial independence and the inability or unwillingness by judges to stand up against governments targeting critics and dissidents potently multiplies the harm and risk of arbitrary detention.

18. Both globally and in the United States, the protection of speech and especially of the expression of dissent or criticism of government policy remains essential for the health of a country's democracy. From its founding through to the present, the United States has uniquely emphasized the paramount value that free expression has for the very concept of America, and has infused that commitment and principle into U.S. foreign policy. In my service at the Department of State, this primacy of free expression regularly invited tensions with counterparts from undemocratic governments, who argued it was better to emphasize societal cohesion or the preferences of the government or a popular majority (actual or simply imagined by a leader unbound by fair elections) over the rights of an individual to express criticism or dissent toward government policy. Even some of America's closest allies and partners in Europe, themselves robust democracies with admirable human rights records, advanced slightly more restrictive definitions of the right to free expression than the United States, in part given their histories with inciteful hate speech leading to catastrophic violence. No matter the interlocutor, I communicated to foreign counterparts, just as countless U.S. diplomats for decades have done, that not only does protecting critical or dissenting speech reinforce universal human rights; doing so also *enhanced* societal stability, by permitting grievances to be aired peacefully, and promoted more effective governance and policy by allowing feedback from civil society as well as legal and political accountability where government policies or programs fall short of their goals or of public desires, or where government policies or programs were marred by corruption or mismanagement.

19. The dangers of abandoning protections for dissenting or critical speech can be seen in the present and the past in societies across the Middle East and North Africa and elsewhere around the world. When a government is allowed to decide which speech it will tolerate and which speech it will not, the result throughout history has been a broadening crackdown that puts any government critic – citizen and noncitizen alike – squarely in the crosshairs of state repression. As noted above, critics or dissidents in countries with undemocratic governments unchecked by the rule of law or by independent judicial bulwarks regularly face grim fates, ranging from arbitrary detention to torture to disappearance and extrajudicial execution. Their societies suffer similar decay. The instability inherent in a system where dissent is met with detention or violence regularly leads to increased criticism and protest of that intolerance and abuse, which the government usually meets with further suppression of freedoms. Historically, this downward spiral that begins with government intolerance of critical or dissenting expression typically continues toward one of two outcomes: either a population crumbles under government repression, accepting official censorship and even self-censoring to avoid punishment, or a society decides it is unwilling to live without the ability of individuals to freely express themselves without fear of reprisal, and seeks to replace wholesale a repressive government with one that better respects their human rights.

20. During my service as Deputy Assistant Secretary in the Bureau of Democracy, Human Rights, and Labor at the Department of State, I observed firsthand how one of the most important tools of American diplomatic influence and power was the resilience and strength of our democratic values, including the importance of protecting human rights both at home and abroad, especially for individuals expressing criticism or dissent from government actions. In my official travels to the Middle East and North Africa, I met with numerous human rights defenders, journalists, activists, opposition politicians, academics, and business leaders, each keen to highlight threats to human rights or rule of law they and others faced in their country, and each eager to learn about and recommend avenues that the United States could follow to support progress and greater respect for human rights. I never approached these conversations, or those with foreign government officials with whom I raised concerns over their human rights practices, by presenting the United States as having achieved perfection or anything approaching it when it came to our own human rights record. Rather, I reflected with pride upon the constitutional and statutory guarantees the United States had enacted to protect human rights at home; reflected with humility on the yawning gaps between the promises of those guarantees and their actual implementation over American history, especially for Americans from marginalized populations; and reflected with commitment on the ongoing efforts by the U.S. Government to work to further close that gap.

21. My interlocutors in civil society, each of them fighting for progress on human rights issues in their own country, understood as I do that the struggle to protect human rights is not just generational, but likely unending. Yet the brave human rights defenders with whom I met (sometimes amid visible surveillance by their government) also recognized the deep contribution to global progress on human rights that came not only from concrete improvements on these issues in the United States (halting and uneven as those have been), but also from America's consistent and continued rhetorical and philosophical commitment to human rights as a core element of our foreign policy and of our approach to governments around the world. I was repeatedly told that the continued attention of the U.S. Government to human rights conditions in their countries was a powerful tool to prevent or mitigate abuses, and that the bathing of America's historical founding in the language of human rights gave the United States unique standing on the issue. When asked on a trip to Egypt in mid-November 2024 whether that fundamental American commitment and precept would disappear with the re-election of President Trump, I urged Egyptian human rights advocates to recall the strength of American institutions – including the judiciary, legislature, and rule of law – as checks against an executive that might try to abandon the bipartisan history of U.S. commitment to human rights.

22. Just a few short months after that confident exhortation about the strength of American institutions, Mr. Khalil's case has obtained world-wide notoriety, as have the cases of other student protestors in the United States whom the government has arrested and detained pursuant to Determinations by Secretary Rubio that their free expression and other speech activities supposedly undermine the foreign policy interests of the United States. Amid a yearslong trend of democratic backsliding worldwide, the clear commitment of the United States to universal human rights – especially the right to free expression and the ability to peacefully dissent and criticize government policy without reprisal – is needed more than ever. Should the U.S. Government be permitted to claim that suppressing the ability of individuals in the United States to exercise universal human rights enshrined in the U.S. Constitution, that precedent will

diminish the capability of the United States to execute the longstanding bipartisan foreign policy objective of standing up for human rights and democracy worldwide, an objective that has been pursued (unevenly, admittedly) across administrations of both parties for decades.  Moreover, allowing the Federal government to carry out reprisals against individuals as a response to dissent, protest, or critical speech that the current administration dislikes would strike a serious blow against the health and stability of American democracy; would deal serious damage to U.S. credibility worldwide on human rights issues; and would make every person in the United States – noncitizens and citizens alike – far less safe and far less free.[17]

_____
Christopher J. Le Mon

Sworn on this 4th day of
June, 2025

---

[17] See, e.g., Letter from George Washington to Officers of the Army, Mar. 15, 1783 ("For if Men are to be precluded from offering their sentiments on a matter, which may involve the most serious and alarming consequences, that can invite the consideration of Mankind; reason is of no use to us – the freedom of Speech may be taken away – and, dumb & silent we may be led, like sheep, to the Slaughter.").

12