**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

———————————————————

MAHMOUD KHALIL,

    Plaintiff,            CIVIL ACTION NUMBER:

       vs.             2:25-cv-1963-MEF

Deputy Director William P.    Oral Argument
Joyce, in his official
capacity as Acting Field
Office Director of New York,
Immigration and Customs
Enforcement, et al.,

    Defendants.

———————————————————————

    **Frank R. Lautenberg Post Office and Courthouse**
    **Two Federal Square**
    **Newark, New Jersey  07102**
    **June 20, 2025**

**B E F O R E:**           **THE HONORABLE MICHAEL E. FARBIARZ,**
                    **UNITED STATES DISTRICT COURT JUDGE**

**A P P E A R A N C E S:**

    IMMIGRATION RIGHTS CLINIC, BY:
    ALINA DAS, ESQ.
    NYU School of Law
    245 Sullivan Street
    5th Floor
    New York, New York  10012

      appeared on behalf of Petitioner;

        Lisa Larsen, RPR, RMR, CRR, FCRR
          Official Court Reporter
        Lisa_Larsen@njd.uscourts.gov
           (973)776-7741

    **Proceedings recorded by mechanical stenography.**
    **Transcript produced by computer-aided transcription.**

**A P P E A R A N C E S**: (Cont'd.)

UNITED STATES DEPARTMENT OF JUSTICE, BY:
BY:  DHRUMAN Y. SAMPAT, SENIOR LITIGATION COUNSEL
     SARAH S. WILSON, ASST. DIRECTOR
     P.O. Box 878
     Ben Franklin Station
     Washington, D.C.  20044

     appeared on behalf of Respondents; and

**A L S O   P R E S E N T:**

Amy Greer
Amy Belsher
Veronica Salama
Robert Hodgson
Omar Jadwat
Esha Bhandari
Noor Zafar
Brian Hauss
Brett Kaufman
Baher Azmy
Samah Sisay
Naz Ahmad
Ramzi Kassem
Mudassar Toppa
Diala Shamas
Marc Van Der Hout
Johnny Sinodis
Oona Cahill
Jeanne LoCicero
Liza Weisberg

(PROCEEDINGS held via Teams before the

HONORABLE MICHAEL E. FARBIARZ, United States

District Court Judge, on June 20, 2025.)

THE COURT:  Good afternoon.  This is Judge Farbiarz.

I'll ask will the courtroom deputy please confirm that the court reporter is on the line.

THE DEPUTY CLERK:  Good afternoon, Judge.  Yes, Lisa Larsen is on the Teams conference.

THE COURT:  Thanks very much.

We are here for *Khalil v. Trump, et al.*

I want to go around the horn and get appearances but, given the number of lawyers I know who have appeared on this case, I'm gonna do what I did last time, which is I'm simply going to ask the lawyer or lawyers who expect to speak to the pending motion to introduce just themselves and we'll take it from there.

First, the lawyer or lawyers who will be appearing -- rather, speaking today, for the petitioner.

MS. DAS:  Good afternoon, Your Honor.  This is Alina Das from the NYU Immigrant Rights Clinic, Washington Square Legal Services.  I'll be arguing on behalf of the petitioner today.

THE COURT:  Ms. Das, good afternoon to you.

And for the respondents.

MR. SAMPAT:  Good afternoon, Your Honor.  Dhruman

*United States District Court*
*District of New Jersey*

Sampat and I'll be arguing on behalf of the respondents today.

THE COURT:  Good afternoon to you.

What I'll ask you to do, the lawyer for the petitioner and also the lawyer for the respondent, just so the record is complete, could I ask you to please at the end of today's proceeding file a very simple one-sentence letter that indicates all of your colleagues who are on the phone so we have a full and complete record of everybody who has appeared.

Can I ask you to do that, please.

MS. DAS:  Yes, Your Honor.

MR. SAMPAT:  Of course, Your Honor.

THE COURT:  Thanks a lot.  I appreciate it.

I want to start out -- let's just start out for half a moment as to where we are.  Motion for -- a letter with respect to bail and release was filed on Monday from petitioner, including a short letter brief, the respondents responded on Tuesday, the petitioner filed his response on Wednesday, yesterday was of course a court holiday, and today, Friday noon, we are here for oral argument with respect to the motion for bail or for release.  That's where we are.

In the interest of saving us some time, I want to address at the outset an argument that was made by the respondents that I don't find persuasive.  I want to just explain my reasons so that we not invest our time on it.

The respondents essentially argue, among other things,

that the petitioners have simply made what functions as a motion for reconsideration of my Friday decision, which is to say my decision of seven days ago.

I think that's simply not right.  What happened a week ago, a week ago today, is that as of 9:30 in the morning I preliminarily enjoined certain things, detention as to and efforts to remove as to the Secretary of State's determination as to the petitioner here.

An hour or so later the petitioner filed a letter saying, given the Court's decision as to the Secretary of State's determination, the petitioner needed to be released on the other ground he was held.

That is simply not persuasive, and it's not persuasive because the fact that a person cannot be held or removed on one charge simply does not logically imply that he or she cannot be held or removed on another charge.

If this were a criminal case, which it's of course not, the court held that a person -- a charge of theft could not go forward.  That would not imply that the other charge in the case, pretend it's robbery, could not go forward.  That doesn't follow logically.

As of Friday, that was the only argument that the petitioner had made, as I understood it, and as I do understand it now.

Over the weekend the petitioner apparently developed

and on Monday filed a different argument.  That argument is not that the preliminarily enjoining of the Secretary of State's determination charge, that that preliminary enjoining implied logically that another charge could not go forward; rather, it's a different argument.

The Monday argument is that the remaining charge is one as to which the petitioner is entitled to either release or removal -- excuse me, release or -- not "removal," forgive me, release or transfer to this district.

So they're just simply different things.  The Friday argument was that there is a logical reason why enjoining Charge A requires not going forward on Charge B.  That's not logical.

The argument made Monday and the one we are here principally to discuss, the argument as to bail, is an argument simply that as to Charge B there is a request for bail the petitioner.

I do not understand the petitioner to be making a motion for reconsideration.  I think that's a misunderstanding of the argument that was pressed by the petitioner last week and a misunderstanding of the decision I made on Friday.

So I wanted to say all that at the outset, Mr. Sampat, so we don't spend any time on it because I don't view it as a meaningful -- not that it's not meaningful but it's just an argument that I don't think is persuasive.  So I wanted to say

that from the outset.

I'll ask Ms. Das if I could just get an update from you as to where things stand in terms of the process of seeking bail in front of the immigration judge.

MS. DAS:  Yes, Your Honor, and thank you.

So on Friday, as you know, immigration counsel sought release directly from the DHS.  That was denied on Monday.  On Tuesday immigration counsel filed a motion for a bond hearing with the immigration judge.

As of this morning or just before this hearing, we have not heard back as to whether that bond hearing has been scheduled.  In addition, Mr. Van Der Hout had also asked DHS on Friday if it would direct the immigration judge to this Court's opinion and indicate that it would be withdrawing or dismissing that charge so that the case could move forward.

As far as we know, there has not been a filing from DHS to the immigration judge about that matter, either.

THE COURT:  Can you explain a little bit -- I understood from Exhibit C to your Wednesday filing, Ms. Das, that Mr. Van Der Hout, who I believe is the immigration counsel you alluded to, that Mr. Van Der Hout was seeking an immigration judge proceeding as soon as this coming Monday.

So, first, I hear you to be saying that that has not yet been scheduled.

Do I have that right?

MS. DAS:  That's right, Your Honor.

THE COURT:  What was the second point, if you could just slow it down a bit and explain that a little more fully.

MS. DAS:  Absolutely, Your Honor.

In the same letter to -- the e-mail to the Department of Homeland Security where Mr. Van Der Hout attached the request for release directly to DHS, there was also a request to DHS that they indicate to the immigration court that they will be dismissing or withdrawing the foreign policy ground or otherwise not relying on it, given this Court's order.

In our view, that would facilitate the bond hearing for the Government to actually be conveying to the immigration judge that it can go forward on the bond hearing.  Of course Mr. Van Der Hout has also given the court ruling to the immigration court and has sought reconsideration of her prior determination directly, just to cover all bases; but I just wanted to indicate that as far as we know we're not aware of DHS submitting any filings with respect to our request for bond to the immigration judge or any filings related to the foreign policy ground.

THE COURT:  Right.  But what I'm just not fully understanding is why it matters.  It sounds like the petitioner has himself conveyed to the immigration judge that the charge that rests on the Secretary of State's determination has been preliminarily enjoined.

What difference does it make if DHS also says something about that to the immigration judge?

MS. DAS:  Your Honor, it may not make a difference. It's certainly our position that the immigration judge should grant a motion for a bond hearing and hold that bond hearing as quickly as possible; but in our experience in litigating these issues, the immigration judge generally

does like to hear from both sides, and so that's why we suggested it.

THE COURT:  That makes sense.  I wondered if there was something else I was missing, but I do appreciate how that makes sense.

One other -- Mr. Sampat, is there anything about what Ms. Das just said that is inaccurate, from your perspective?

Mr. Sampat, we don't hear you, if you're speaking.

MR. SAMPAT:  Sorry, Your Honor.  I was muted and I lost Your Honor's questions when I was trying to un-mute.  I apologize.

THE COURT:  Not at all.  No worries.

Is there anything in what Ms. Das said that is inaccurate, from your perspective?

MR. SAMPAT:  Not that I know of.  I will say that from my understanding the bond hearing -- I agree with Ms. Das that the bond hearing has not yet been scheduled in front of the immigration judge, but I can represent that they are usually

scheduled pretty quickly.  So if it's not scheduled for this upcoming Monday, as per Mr. Khalil's request, we anticipate it should be scheduled pretty soon.

THE COURT:  Okay.  All right.  I appreciate that.

Ms. Das, I'm going to come back to you for half a moment.

Do you have an understanding as to what your expectation is as to how an immigration judge detention hearing would go, which is to say, live witnesses, a decision in one day?

What is your expectation based on experience with this particular judge in general, et cetera?

MS. DAS:  Yes, Your Honor.

So it can go in different ways, so it's not precisely clear.  But as a general matter, when an immigration judge receives a request to schedule a bond hearing, the immigration judge will typically set a date for that hearing.

The parties are generally given the opportunity to submit bond submissions.  In a bond hearing the immigration judge would put the burden on the non-citizen respondent to demonstrate lack of flight risk and danger, and in addition to written submissions to that effect the immigration judge would typically take testimony at a bond hearing, although there are occasions where they will simply rely on argumentation from both sides.

In the typical case, an immigration judge would rule on bond on that day, but there are instances where a judge will reserve decision and take some time to issue a decision on bond.

As we noted in our papers, what we have seen most recently with respect to students in particular engaged in political speech is that the Government has been filing an automatic stay.  If they file an appeal of the bond decision within one day of the decision, they receive an automatic stay where the bond decision would not be implemented while the Department of Homeland Security pursued an appeal to the Board of Immigration appeals which is a process that typically takes months to resolve.

THE COURT:  Mr. Sampat, do the respondents have a position as to what they would do with respect to the referenced automatic stay if an immigration judge granted release here?

MR. SAMPAT:  No, Your Honor, we don't have a position because we think it's speculative at this moment.  We still don't know what the immigration judge is gonna do.

THE COURT:  All right.  I got it.

Mr. Sampat, just to round it out, anything that Ms. Das said that strikes you as inaccurate in terms of characterization of the process?

MR. SAMPAT:  No.  The only note that I had was noting

that sometimes bond decisions can be reserved, but Ms. Das said that so I think we're good on our end.

THE COURT:  Thanks very much.

This is the petitioner's motion, so ordinarily I'd have the petitioner go first in terms of argument, but the respondents here have a number of threshold issues that they press.

The first and most important is, as always, jurisdiction, not most important but necessarily first, which is to say an argument under 1226(e).  There's also an argument about exhaustion.

Mr. Sampat, I wanted to hear you out on one or both of those arguments at the outset.  Why don't you just give me a few moments on your position now.

MR. SAMPAT:  Of course, Your Honor.

Understanding that we're not gonna talk about the motion for reconsideration, so on the 1226(e), Your Honor --

THE COURT:  Mr. Sampat, let me stop you for a second. There is no motion for reconsideration.  My point was that I do not view what was filed by the petitioner on Monday as a motion to reconsider my Friday decision.  I view it as just simply a separate motion that progresses a different theory.

The Friday theory was, in my judgment, not persuasive because, as I said, analogically, not being able to go forward on theft does not mean that somebody cannot go forward on

robbery.  Those are simply separate.

This is a different argument, so I just want to be crystal clear, Mr. Sampat, my point is that I do not view the Monday motion by the petitioner as a motion for reconsideration.

With that, back to you.

MR. SAMPAT:  I appreciate that, Your Honor.  I was only characterizing what our position was in our papers.  Understood.

On 1226(e), Your Honor, we think the text is pretty clear.  It sets forth that the Attorney General's discretionary judgment regarding the application of this section shall not be subject to review and that no court may set aside an action or decision under this section regarding the detention of any alien.

Mr. Khalil is currently detained pursuant to 1226(a) in light of the fraud and willful misrepresentation charge.  Congress has authorized the executive to detain aliens if they're deemed removable or inadmissible.  That decision is not subject for review and a court order requiring release would offend 1226(e).

We think that the Third Circuit's decision in *Borbot v. The Warden* at 906 F.3d 274 says exactly that.  So we think the release request is actually foreclosed by Third Circuit law, as well.

THE COURT:  Here is the thing I don't get about that:

You briefed that argument without saying anything about the Supreme Court's decision in *St. Cyr* in 2001 or the Supreme Court's decision in *Demore* in 2003.

As you know, those decisions stand for the proposition -- well, step back.  As we know from *Colorado River* and many other cases, federal courts have a, quote, unquote, virtually unflagging obligation to exercise their jurisdiction.

United States Congress has given the court habeas jurisdiction.  The Supreme Court in *St. Cyr* said that jurisdiction stripping or habeas jurisdiction stripping in the immigration context has to be extraordinarily clear.

The Supreme Court said in *St. Cyr* that jurisdiction was not stripped as to a passage that was headed "elimination of custody review by habeas corpus."  That's what Congress had written, and the Supreme Court said it wasn't clear enough.

Then in 2003 in *Demore,* Chief Justice Rehnquist says that as to 1226(e), which is the portion of the statute that you're invoking, that it, quote, contains no explicit provision barring habeas review.

So what I don't fundamentally understand is how it can be that the Supreme Court has said in general as to the immigration statute and in particular as to this portion of the immigration statute that it's not clear enough to vitiate

habeas and -- to eliminate habeas jurisdiction and yet you're arguing here today that 1226(e) does strip away habeas jurisdiction.

How do those live together?

MR. SAMPAT:  So, Your Honor, to take Your Honor's points in turn, *St. Cyr* pre-dated the REAL ID Act which obviously curtails federal court's habeas jurisdiction moving forward where removal orders were now channeled through the petition for review process.

*Demore* talks about 1226(e), but I think it's important to note that *Borbot* post-dates all of those decisions.  And the Third Circuit was clear on -- that a challenge to a particular action or decision to detain would be barred under 1226(a).

THE COURT:  I don't think any of that is right.  I think the problem you have is that there is a longstanding idea -- well, let's step back for half a moment.

The fact that *St. Cyr* pre-dates the REAL ID I think cuts strongly against your position because what it suggests is that Congress was well aware of the requisite level of specificity that it required if it was gonna strip habeas jurisdiction and 1226(e) is not particularly specific.

There are circuit courts all over the country -- Second, Ninth, the Fifth, the Seventh -- all of whom have held that 1226(e) does not bar the exercise of habeas jurisdiction.

I'll just say the names of those cases so we have them. The Second Circuit is *Ozturk*, O-Z-T-U-R-K.  The Ninth Circuit is *Martinez*, citing the *Singh* case, S-I-N-G-H.  The Fifth Circuit is *Najera*, N-A-J-E-R-A, and the Seventh Circuit is *Al-Siddiqui*, which I think is an especially helpful case, A-L, dash, S-I-D-D-I-Q-U-I, all of which emphasizes that *Demore* has a clear -- that *St. Cyr* requires a clear statement. *Demore* makes it clear that there's no clear statement in 1226(e) so there's no stripping of habeas jurisdiction.

And to close it out, federal courts have held for -- since the 19th century that one of the incidents of habeas jurisdiction is the ability to grant or not grant bail pending resolution of a habeas case.

You cited in your March filing the Third Circuit's *Johnston* decision on that from the '50s.  The Second Circuit's *Mapp v. Reno* case collects decisions way back to the 19th century.

I have Judge Posner -- I scribbled a note to myself -- from 2007 for the Second Circuit talking about the possibility of bail in the habeas context being a, quote, natural incident, end quote, of habeas jurisdiction.

So I think the problem you have fundamentally, Mr. Sampat, is that over and over again the circuit courts of the United States have held that there's insufficient clarity in 1226(e) under *St. Cyr* to strip habeas jurisdiction, and a

core aspect of habeas jurisdiction -- in the Third Circuit, *Lucas*, *Landano*, *Johnston* -- throughout the United States a core incident of habeas jurisdiction is the possibility of admitting somebody into bail.

So I don't see 1226(e) as being clear enough under *Demore* to strip habeas jurisdiction; and if it does not strip habeas jurisdiction, 1226(e) does not strip one of the basic incidents of habeas jurisdiction, which is the ability of a federal court to grant someone bail in advance of a final decision as to the habeas claim.

Anything else you want to add on this, Mr. Sampat?

MR. SAMPAT:  Yeah, Your Honor.  Yes, Your Honor.  Just on the *Demore* point.

THE COURT:  Sure.

MR. SAMPAT:  I very quickly pulled it up, and it seems like the Court's reasoning on 1226(e) was that because Mr. Kim there was not challenging the individual judgment or decision to detain, that it was rather challenging the statutory framework --

THE COURT:  Mr. Sampat, Mr. Sampat, this is what happens when you pull things up during oral argument.

There's a reason I cited you to *Al-Siddiqui* out of the Seventh Circuit in particular.  It makes it crystal clear that there are -- it is true that in *Demore* itself that was the issue, but, number one, Chief Justice Rehnquist said -- this

is why I quoted this particular line that, quote, Section 1226(e) contains no explicit provision barring habeas review.

Under *St. Cyr* that is dispositive, whether the case is one that challenges a regulation or challenges something as applied.

That's number one.

Number two, that's why the *Al-Siddiqui* case out of the Seventh Circuit matters.  It collects a number of cases that emphasize that *Demore's* holding is controlling regardless of the nature of the challenge.

Now, there are gonna be some outer limits aspects to that, but the problem is Congress needs to speak clearly.  And having not spoken clearly, that is, under the cases I have cited, even under Chief Justice Rehnquist's quote that I read to you from the Supreme Court, that's in my judgment the end of the matter.

Anything else, Mr. Sampat?

MR. SAMPAT:  Not on that, Your Honor.  I think we have exhausted our arguments on 1226.

THE COURT:  Fair enough.

I do not view 1226(e) as a jurisdictional bar here to admitting or not admitting the petition to bail.

What's the exhaustion argument?  Is that an argument you're making, Mr. Sampat, that there's administrative

exhaustion?  What's your position on that?

MR. SAMPAT:  So, Your Honor, our position is that as a prudential matter it makes for sense for Mr. Khalil to avail himself at the administrative process and to avoid conflicting decisions between this Court and the immigration judge.

He's currently -- as we know, he has filed for a motion of custody re-determination before the immigration Judge. He's availing himself to those processes.  It makes more sense for him to go through that process right now than it is for Your Honor to weigh in.

THE COURT:  Okay.  What is the -- that argument proves very little in the sense that it says nothing about why I should wait for the immigration judge versus why the immigration judge should wait for me.

What is the argument for why I should wait for the immigration judge?

MR. SAMPAT:  Well, Your Honor, it goes back to some of the cases that we have cited in our briefs where judges within the district have said that they won't exercise habeas jurisdiction or won't review claims absent a petitioner exhausting administrative remedy.

I'll also point Your Honor to a decision that just came out a few days ago out of the Southern District of New York. The name of the case is *Guzman vs. Joyce*, which can be found at 2025 Westlaw 1696891.

That case, Your Honor, discusses and supports the fact that exhaustion is an important part of this process before a party was to run into federal court because if the issue can be resolved administratively it is better for -- it's a better course of action than expending judicial resources here.

THE COURT:  I hear that, but I think it's a -- look, you invoke in your papers and you invoked at the outset of what you just said two District of New Jersey cases.  There's the opinion from Judge McNulty and there's the opinion from Judge Wigenton.

I think the problem you have is that both of those cases rely on *DeValle* and *Yi*, which are Third Circuit cases that say that administrative exhaustion is jurisdiction.  But of course -- and I'm honestly surprised that nobody brings these cases to my attention in these papers, but such is life. It's the same issue I have with *Demore.*  Again, nobody brings this up.

In 2023 the Supreme Court held, as we all know, that the exhaustion provisions such as they are of 8 U.S.C. 1252(d)(1), that those exhaustion provisions are not jurisdiction.

And so the cases, Mr. Sampat, you're citing are -- they just look a whole lot different.  They are based on a Third Circuit conception that administrative exhaustion is jurisdiction; but after those district court decisions came

down, the United States Supreme Court explicitly held in 2023 that 1252(d)(1) is not jurisdiction.

Instead, the conclusion from the Supreme Court is that there is, if anything, some kind of common law exhaustion required.  I don't know if that common law exhaustion is in play here or not.

The Third Circuit in *DeValle* suggested that 1252(d)(1) requires exhaustion, even in the context of something that long pre-dates review of a final order.  One can look at that in many different ways, and one can look at that as surviving or not surviving the Supreme Court's decision in *Santos-Zacaria* of 2023.

But assuming arguendo Santos-Zacaria applies here, then exhaustion is only a prudential issue, which is how you started off, Mr. Sampat.

First, let me just say I'm not sure under *DeValle* that there is a need for prudential exhaustion before the entry -- before the entry of an order of final removal.  I don't know the answer to that.

But even assuming arguendo that there is some need for that kind of exhaustion, all of the factors that Justice Jackson for the Supreme Court in *Santos-Zacaria* pointed out, all of those factors weigh heavily in the direction of me taking this issue on.

Supreme Court Justice Jackson speaks about the, quote,

unquote, orderly progression of the litigation.  Here there are bail arguments that have been made in front of me.  There has not even been a scheduled bail hearing in front of the immigration judge so it's hard to know why orderly progression does not cut in favor of me simply resolving the issue.

The Supreme Court in *Santos-Zacaria* invokes efficiency, it invokes, quote, unquote, waste of work.  That would seem to cut in favor of me resolving the issue here as well.

There's been many, many, many pieces of evidence filed.  There has been a great deal of litigation on this particular issue.

Hard to know why at this stage it's more efficient in terms of the judicial resources you alluded to, Mr. Sampat, for me not to just take the case and resolve it myself.

Finally, there is something of a futility reason to avoid exhaustion.  I have to say that with respect to that there is a very strong and uncontested record here as to lack of flight risk and lack of dangerousness.

Given that strong and uncontested record, it becomes hard to know what the reason, other than waste of time, is to send this to an immigration judge who will look at those same two factors under C.F.R. 1003.19(h)(3) and will come to what I imagine is a pretty obvious solution.

I think the New Jersey cases you cite rest on Third Circuit decisions that themselves treat exhaustion as

jurisdiction.  The Supreme Court in 2023 made crystal clear that exhaustion is not jurisdictional.

To the extent that exhaustion is required, in contexts like this one it is required as a prudential matter; and if it is required, if it is required as a prudential matter, for all the reasons I have just mentioned, I don't understand why it would be required here under the factors set out in *Santos-Zacaria* in 2023.

So it's a prudential matter, it's a discretionary matter, and I will not exercise my discretion to avoid this decision, given where things are postured.

Mr. Sampat, anything else you want to add on exhaustion?

MR. SAMPAT:  Nothing else, Your Honor.

THE COURT:  Mr. Sampat, I'm going to keep sticking with you because a lot of the preliminary things run through arguments the respondents have made.

The standard here with respect to bail, I want to understand where you're coming from on this.

MR. SAMPAT:  On the extraordinary circumstances standard, Your Honor?

THE COURT:  Yeah, what the key case is and what the substantive standard that that case or cases stands for.

MR. SAMPAT:  Yes, Your Honor.

So *Landano* sets forth the extraordinary circumstances

standard, and we think that means, you know, it is something in the form of severe health complication or something that would be irreparable in a case where an individual would not -- further delay would severely prejudice a petitioner.

We don't have that here.  Mr. Khalil, again, is before an immigration judge, is receiving his due process.  If he's released, his case would be transferred to the non-detained docket, so those proceedings would remain ongoing.

It's a pretty high burden, and we don't think Mr. Khalil has made it.  We think a lot of that is rooted in our March 23rd filing on the opposition for his motion for release.

THE COURT:  Why do you think *Landano* provides the standard?  Let me step back even further.

What is the standard that you view as the one that you've made?

MR. SAMPAT:  I'm sorry, Your Honor.  Give me one moment.

THE COURT:  Let me explain to you why I'm asking the question.

In your March 23rd filing you just alluded to, at page 17 you indicate that the standard that needs meeting here is what you described as the *Landano* standard, and you say that it is, quote, unquote, conjunctive, that there needs to be a showing of both high probability of success on

substantial claims and extraordinary circumstances.

I'm not sure -- is that your position today, or do you have a different position?

MR. SAMPAT:  No, that is our position today.  That is a -- it is a conjunctive standard, Your Honor.

THE COURT:  So in other words, your judgment is that there needs to be a showing of extraordinary circumstances, whatever that means, plus there needs to be a high probability -- let's pretend that's 51 percent -- of winning on a substantial claim.  Is that --

MR. SAMPAT:  Yes.

THE COURT:  I'm not sure I understand how you get that out of the case.  I think the problem you have with that is to make that argument you pin cite to a particular page in *Landano* but that particular page in *Landano* is simply reciting the standard set out by the Fifth Circuit circuit.

And a couple paragraphs later the circuit says, well, gee, we, the Third Circuit, have set out a standard in *Lucas* previously.  And the *Lucas* standard is not conjunctive.  The *Lucas* standard does not say something about high probability and also extraordinary circumstances.  The *Lucas* standard simply says extraordinary circumstances.

So I'm not sure why the *Landano* court's simple citation -- the *Landano* court literally says this is how other courts have done it and then cites the Fifth Circuit's

conjunctive standard but then two paragraphs later has what I take to be a contrast with its own pre-*Landano* statement in *Lucas* which is simply about extraordinary circumstances, not about the merits.

I'm not sure why I read *Landano* as displacing by mere citation to the Fifth Circuit the Third Circuit's *Lucas* position.

MR. SAMPAT:  Your Honor, so we cited -- there are a couple cases that we cited in our March 23rd filing where courts within the circuit have used it as a conjunctive standard.  That's in *Ingram* where the court denied bail after a state prisoner failed to establish both prongs.

There's also the *Hudler* case out of the Middle District of Pennsylvania where it was denied.  I'm sorry, Your Honor. I don't mean to --

THE COURT:  No, no, no, go on.

MR. SAMPAT:  Sure.

So *Hudler* was denied on the basis that petitioner had failed to establish a substantial constitutional claim.  I will also note that when we briefed the release motion back in March, the fraud and willful misrepresentation charge wasn't before the Court or had not been briefed in the PI or in the operative pleadings that were tethered to the motion, so we haven't had a chance to actually brief it.

We don't think it's necessary because at the end of the

day we think this is a discretionary decision obviously, but this is just a separate independent charge that continues to justify Mr. Khalil's detention today.

THE COURT:  What I would say that -- I read all the district court opinions you cited and they're thoughtful, of course.  They're my colleagues throughout the circuit thinking this through very carefully, no doubt about it.

It's just that when I read *Landano*, I do not see a Third Circuit adapting the Fifth Circuit's conjunctive two-part test.  In fact, I see it as very explicitly drawing a contrast with the Third Circuit's own *Lucas* test, which is simply focused on extraordinary circumstances.

I think that -- so I think that my own judgment is that what governs here is the *Lucas* standard, not the *Landano* standard.  The thing that's a little complicated is what extraordinary circumstances mean.  And I appreciate that the Second Circuit in *Mapp v. Reno* has said that extraordinary circumstances means something like circumstances so extraordinary that the habeas writ would be ineffective if bail were not granted.

But I don't see that in the Third Circuit's binding *Lucas* decision.  I don't see the extraordinary circumstances are limited to that qualification.

I'll go even further.  The *Mapp v. Reno* decision is itself based on an older Second Circuit decision, two of them.

One of them is *Iuteri*, I-U-T-E-R-I.  And that seems like one of the cases that *Lucas* explicitly walked away from.

So I'm left with two complexities in terms of the standard here.  First, I think *Lucas* controls and not *Landano*.  I appreciate that many colleagues or some colleagues in the Third Circuit, other district judges, have seen it perhaps differently; but I think the most faithful read of the circuit's precedence is that *Lucas* controls.

I am left with two issues.  The first is extraordinary circumstances as to what?  *Mapp v. Reno* or the Second Circuit based on *Iuteri* says that it's extraordinary circumstances that are specifically tied to the efficacy of a later habeas remedy, but the Third Circuit did not say that in *Lucas* and has not said that in its case law, so far as I have been able to see it.

In addition, and I think this is quite important, *Mapp v. Reno* requires some showing of meatiness to the underlying claim.  It doesn't seem like *Lucas* requires that.

Now, if *Landano* was the law in the Third Circuit, there would need to be some kind of, quote, unquote, high probability showing, but I don't think *Landano* is the law.  I think *Lucas* is the law.

Under *Lucas*, what I take away is the extraordinary circumstances do not need to be focused on the preservation of the habeas remedy.  The Third Circuit in *Lucas* left open a

broader remit for federal judges considering bail to simply assess extraordinary circumstances and all of the possible permutations that might arise, and the *Lucas* court did not seem to take the step that the Second Circuit did. That is to say the *Lucas* court did not seem to require that there be some showing of likelihood of success on the merits or some showing of even a substantial claim on the merits.

So my judgment is *Lucas* controls here and that *Lucas* has a very broad idea of extraordinary circumstances, not one tethered, as in *Mapp v. Reno*, to the efficacy or non-efficacy of the habeas remedy. And at least within its four corners *Lucas* does not seem to require any sort of showing that there is a kind of level of strength in the underlying claims.

I'll note two other things about *Lucas*. First of all, it seems to me that the Third Circuit almost surely takes the view -- would take the view, excuse me, that the standard set out for bail in habeas criminal cases is higher than the standard that would apply here, and that's in part based on a simple a fortiori assessment, which is that in a criminal context somebody has, by hypothesis, been convicted with all the guarantees that the Constitution implies. And there are in the state criminal context imported federalism issues.

None of that is present of course in the immigration context. There are not criminal protections, there is not a criminal judgment, and there are not federalism issues.

The a fortiori, by that I mean whatever the standard for release is, in criminal habeas is higher than the standard for release in immigration habeas.

The buttress for that a fortiori argument is what the Third Circuit in *Landano* cites, which is Justice Douglas's opinion *in Aronson*, his in-Chambers opinion in 1964.

I'll also note that *Landano* and *Lucas* seem hesitant about the idea of tying the standard of -- for granting bail in the habeas context.  They seem hesitant about tying it to the substantive likelihood of success.

One of the things that is said in one of those cases is exhaustion doesn't generally turn on whether you have a good claim or not, which is really what we're talking about here.

So, bottom line, I think the *Lucas* standard controls, not *Landano*.  I think the *Lucas* standard under the reasoning of Justice Douglas as cited in *Landano* is almost surely higher than the standard that is in play here.

The *Lucas* standard is about extraordinary circumstances.  Period.  Full stop.  The *Lucas* standard is not about extraordinary circumstances related to ultimate efficacy of a habeas decision.  That's the Second Circuit's perspective but it's not what *Lucas* says.

Finally, *Lucas* is not about the strength of the underlying claim.  That is *Iuteri* out of the Second Circuit, that is *Mapp* out of the Second Circuit, but that is not what

the Third Circuit said in *Lucas*.  And of course it's my job to faithfully apply the standard set out by the circuit and not to subtract from them and not to add to them.  That's where I stand on the standard.

Mr. Sampat, do you have anything you want to add on any of this?

MR. SAMPAT:  Yes, Your Honor, if I may, understanding Your Honor's point that you believe that *Lucas* is the standard and not *Landano*.

THE COURT:  Right, right.

MR. SAMPAT:  I think it's important to note that if *Lucas* is the standard, anyone would be able to just file a habeas petition and just say their case is different, it's special enough, there's extraordinary circumstances, and that standard is met.

I think *Landano* was meant to say that it needs to be tethered to the underlying claims that's raised in the petition itself.  It makes logical sense for -- we think that it makes logical sense to read *Landano* that way because at the end of the day release pending habeas review is, in effect, sort of an injunctive relief.

There needs to be some sort of showing that there's a likelihood of success on the merits before we go forward and before release actually results.  What the Third Circuit has said repeatedly is an exceptional form of relief of release on

bail pending habeas.

THE COURT:  I hear all that, but my responses are twofold.  First, maybe the Third Circuit should have articulated a different standard, but that's ultimately not my job.  My job is to faithfully follow the circuit's standard as I understand it.

The second point I would make is extraordinary circumstances is a pretty high standard.  It is certainly the case that litigants all over the country can make any claim they want, but the fact that claims are makeable doesn't mean that claims win, and extraordinary circumstances sets a pretty high bar.

The third problem with what you've said about the idea that bail pending a determination is analogous to an injunctive remedy and therefore a likelihood of success is necessary, there are a bunch of problems with that.  I'll take two.

Problem one is that the Third Circuit -- forgive me for not recalling if it's in *Landano* or *Lucas*, I think it's in *Landano* -- has explicitly said no to that, has explicitly said we don't think of likelihood of success on the merits as the key issue.

The second thing is, the only circuit court that has specifically addressed the question of bail in the habeas context, which is to say the Second Circuit in *Mapp v. Reno*,

the only modern circuit that's done it, they too have not followed what you suggested.

They haven't required a likelihood of success on the merits.  They have required something quite a bit lower.  They have required something like a substantial claim.  I'm quoting, I think, there.

So, maybe, but that's just not the state of the law, and it's the state of the law as it stands today that I'm bound to apply here.

The other problem I think you have to deal with is the a fortiori point that I alluded to earlier and that is central to *Landano*'s citation of Justice Douglas, which is that if the standard doesn't include -- and it doesn't, the *Lucas* standard does not include likelihood of success on the merits in a criminal case, why would we imagine a higher standard in an immigration case?

Indeed the logic -- not the implicit logic but the explicit logic of *Landano* would seem to be that immigration is a lower standard because, by hypothesis, nobody has received the very strict protections associated with a criminal conviction, including the full range of constitutional rights that are triggered there.

So, ultimately, I'm not persuaded by what you're saying on that point, Mr. Sampat, but I appreciate it.

Anything else you want to add?

*United States District Court*
*District of New Jersey*

MR. SAMPAT:  No, Your Honor.  Thank you.

THE COURT:  Thank you.

So those were a whole bunch of preliminary issues, and they are complicated in this case in part for a reason that Mr. Sampat alluded to.  These are -- extraordinary circumstances a high standard, it's hard to meet, and there are simply not a lot of cases in this area, in part because it's hard to meet and in part because generally this sort of litigation goes forward not in a federal district court but in front of an immigration judge.

Ms. Das, I haven't heard from you.  We're now at the merits of your argument with respect to release.  I won't ask you to repeat everything you've said in your papers, but I'd like to hear from you on the extraordinary circumstances argument, anything else you want to say, and then I'll ask Mr. Sampat to be heard as well at that point.

MS. DAS:  Thank you, Your Honor.

Yes, we certainly are able to address the extraordinary circumstances, which we would essentially put into three buckets at this point.

One is certainly the fact that this is a First Amendment case, and the Government's most recent actions underscore our First Amendment concerns, which I will address in a moment.  The other, as you've already noted, is that this is a case where there is extensive evidence in the record,

much of which goes to flight risk and danger, and that's evidence that the Government has not controverted.

Finally, there's a whole set of harms related to what this has meant to Mr. Khalil and his family and the prejudice that further delay would cause him.

Taking the first point on the First Amendment issues first, certainly for more than three months the Government has relied on a rarely used and unconstitutionally vague foreign policy ground to justify its detention of Mr. Khalil.

When this Court enjoined that detention and removal on that ground, ICE made the extraordinary decision this past Friday not to release Mr. Khalil as it would in an ordinary case but now to detain him on the basis of the separate immigration application charge, a charge that the evidence we presented already shows is rarely, if ever, used as a basis to detain lawful permanent residents like Mr. Khalil.

So the Government's latest actions confirm what we have alleged in this petition all along that retaliatory detention is the Government's goal, that the purpose of every step that the Government has taken in this case has been to ensure that Mr. Khalil remains locked away until he is deported as retaliation and punishment for his speech and viewpoint.

So at this stage of the case the Court does have the power and the sufficient evidentiary record to grant bail in light of that extraordinary circumstance.  His petition has

been verified.  He submitted extensive evidence of the Government's own statements about his protected political speech, the timing and baselessness of these characterizations, and the extraordinary irregularity of the Government's latest justification for his detention.

It's clear that this case is core about detention. It is a rare case where there's actually direct evidence of First Amendment retaliation from day one.  The Government's own statements and their supplemental charging document make explicit that they have been targeting Mr. Khalil from the start based on his speech and viewpoint.

This Court has made findings with respect to the fact that Mr. Khalil has engaged in protected speech and the fact that the Government has now swapped in what we would argue to be an even weaker justification for his continuing detention, because this Court's injunction has forced them to do so, doesn't break that causal chain.  If anything, it strengthens it.

THE COURT:  May I ask you something on that for the moment?

MS. DAS:  Yes.

THE COURT:  There are two charges here and one of them has been enjoined.  The second charge was not filed last Friday.  It was filed many months ago.  So I'm a little bit not exactly sure what you mean by swapping out a

justification.

I would imagine -- the Department of Homeland Security, I imagine, saw itself as justified in proceeding on both charges and there's just -- one is now preliminary enjoined and the other one wasn't invented on Friday.  It's been on the books for months.

MS. DAS:  Yes, Your Honor.  Absolutely.

To be sure -- and this Court has made clear that First Amendment issues regarding the charge itself will require further development, and we, you know, intend to file those submissions promptly.

But with respect to detention itself, the Government has only relied on the foreign policy ground for detention and we know that because when in our bail briefing we argued, well, he's not a flight risk and danger and the Government has not contested that in these proceedings, the Government's response was that it was relying on the foreign policy ground, that this was somehow in the category of security cases where flight risk and dangerousness was unnecessary to detention.

We also know that based on the Government's letter on Friday that they are taking the position that they are now relying on the immigration application charge as the basis of his detention.  So it's really the Government's actions that are bringing the detention part of this case based on the willful misrepresentation charge to the forefront.

But even if this issue has been in the case all along -- and certainly we have argued that retaliation is the goal and that it really doesn't matter which charge the Government is relying on, regardless of whether charges themselves are valid and give the Government discretion to detain an individual in removal proceedings, the First Amendment itself forbids the Government from exercising that discretion in retaliation for someone's speech and the Fifth Amendment forbids the Government from exercising that discretion to punish someone.

And given the fact that these issues have been developed in the evidence, that both sides have submitted evidence, including all the immigration filings, this issue has been teed up, and the fact that there is a strong First Amendment issue that will be litigated over the course of this case is an extraordinary circumstance such that Mr. Khalil should not be remaining in detention, having his First Amendment rights be impaired as these issues are further litigated.

THE COURT:  What do you do with the argument that Mr. Sampat has made that is essentially the consequences for this petitioner of being detained are, while difficult for him undoubtedly, quite a bit like the consequences for many, many, many detainees?

And in terms of showing that they are, quote, unquote,

extraordinary as the law requires, why is this petitioner's situation any different or worse than that of many, many, many other people who are in detention who have their own collateral consequences, who have their own life disruptions?

MS. DAS:  Well, Mr. Khalil's case is unique because this is a First Amendment case.

THE COURT:  I've got you on that.  Bracket that for half a moment if you could, but I took Mr. Sampat to be saying in the brief he filed in March on this subject that the normal extraordinary circumstance is something like a person who is very ill and at the end of their life and they can't wait for a habeas remedy because they will otherwise not make it, they need to go to a hospital or something like that, and that there's nothing like that that you all have put forward with respect to the petitioner here.

What do you do with that argument, Ms. Das?

MS. DAS:  Our position in this case has been all along that both the retaliation and the punishment are the two impermissible motivations and goals behind what the Government is doing.  And if he has to remain in detention only to get a victory on those claims, you know, several months from now, then the Government wins.

If the argument is, no, he should have never been detained, that they are doing this to punish him for speaking out about issues that he cares about, matters of pressing

public concern, the fact that he will have to remain in detention for those punitive or retaliatory reasons, that is the extraordinary circumstance and that his ability to live his life freely is the controversy that preceded all of this. That is the status quo to which he should be restored.

I think in this case that is not true for every non-citizen who faces detention and there are processes that are available to them in the ordinary course, but for Mr. Khalil this has never been an ordinary immigration case.

Our entire theory is that the Government is abusing the ordinary processes of immigration court of putting someone in removal proceedings, of detaining them for a constitutionally improper purpose.

And of course in Mr. Khalil's case we have alleged that there are the kinds of concerns that are extraordinary, that the loss that he's already suffered in terms of his ability to be there for the birth of his first child, to attend his graduation.  These are the punitive experiences he's experienced, again, not just in the way that every person who is detained experiences them but because that is part of the punishment.

That's what makes this case extraordinary.  I am aware, you know, in my 20 years of representing immigrants of no other case where the Government announced the day that it detains someone that they were detaining them in order to send

a message that their arrest would be the first of many, that they were going after student protestors.

That chilling effect has made this case an extraordinary case, and it's something that's been recognized in the small handful of cases that have emerged over the last several months that have dealt with similar issues, in the *Ozturk* case, *Concerti*, *Mahdawi*, *Aditya*, *Muhammad*, these are all cases where the First Amendment concerns, the chilling effect, the punitive effect it's having on the individuals have demonstrated extraordinary circumstances.

I certainly agree that in the Third Circuit the standard here is a very capacious one and that goes back not just to *Lucas* but to *Johnston v. Marsh*, really talking about the inherent power to grant petitioner's bail in the exercise of the judge's discretion.

I think in some of the other cases some of the extraordinary circumstances have been really discussed more as a kind of interest of justice model.  Here we can see, given the extensive record, including the record on lack of a flight risk or dangerousness, of the Government never coming forward with a valid justification for why Mr. Khalil must remain detained while we litigate these very weighty issues.  Those are all extraordinary circumstances that set this case apart.

I think one very illustrative case is the *Ozturk* case in many ways.  It's very similar to what we are seeing here.

*United States District Court*
*District of New Jersey*

In her case, Ms. *Ozturk*, like Mr. Khalil, she was originally detained based on these foreign policy allegations; but in her case her student visa was revoked and ICE ultimately decided to pursue removal proceedings on the basis of the revoked visa charge alone and not the foreign policy ground.

She raised her First Amendment and due process challenges to detention. Initially the district court in Ms. Ozturk's case concluded it was too soon to consider bail, given the foreign policy allegations and the limited factual record; but after the Government declined to present any evidence to controvert Ms. Ozturk's allegations and submissions, the court granted bail and did so even when the immigration judge had denied bail.

It held that Ms. Ozturk had raised substantial claims that her detention violated First Amendment and due process and that there were several extraordinary circumstances, including the chilling effect that her detention had on her speech.

So this is a case in which those extraordinary circumstances are clear from every method that the Government has used and every decision they have made in this case to pursue Mr. Khalil's detention and their plan to remove him.

THE COURT: Ms. Das, anything else you want to add?

MS. DAS: I wanted to address the idea about waiting for immigration court bond proceedings.

I think, as the Court has already noted, there is no statutory exhaustion requirement in this case.  I would also note that the 1252(d) exhaustion requirements do not apply to detention matters because there's no avenue in which detention issues ever get to a court of appeals on a petition for review because it's not --

THE COURT:  Ms. Das, let me pause you there.  I see the argument you're making, and on a blank slate it's not clear how to think about it.  The complexity is that in *DeValle* the Third Circuit suggested that decisions on the way to a final order of removal may require a kind of common law exhaustion.

How *DeValle* might or might not play in a detention context and how *DeValle* might or might not work as to that point, as to that point, after the Supreme Court's decision in *Santos-Zacaria*, I don't know the answer to that.  But that's why I presumed arguendo that prudential exhaustion is required in the circumstances; but, as you've heard, I've determined that on the facts of this case, given when the record was built, how thickly the record has been developed, how much time has been put into it, and what the record shows about flight and dangerousness, which are those same two things the immigration judge would need to look to, given all of that, I have concluded that -- even assuming arguendo that there is an exhaustion obligation under *DeValle* there is no need for exhaustion here under the factors laid out by the

United States Supreme Court in *Santos-Zacaria* in 2023.

So that's where we are on that. I mention all that at this moment, Ms. Das, because I think that if you want to tell me that there's no exhaustion in the detention -- excuse me, in the habeas bail context, you're gonna have to explain to me why *DeValle* doesn't work. I don't know if you want to do that or not, but that's the key data point here.

MS. DAS: No, Your Honor. I simply -- to the extent that there is a prudential exhaustion requirement in the detention context, our position would be that it doesn't stem from 1252. It's a prudential exhaustion requirement that may stem from general principles, and we would agree that exceptions -- normal exceptions would certainly apply here on this record, so I don't need to belabor that particular point.

We are concerned that the ordinary immigration court processes will not provide Mr. Khalil with the opportunity to protect his rights, and certainly this is a case -- and this is something that was also considered in the *Ozturk* decision -- where it's not fair that an immigration court proceeding could ever be a substitute for this Court's consideration of release since an executive branch employee would not be able to address First and Fifth Amendment issues, powerless to consider constitutional claims, and certainly it would be unusual for them to be considering evidence of the executive branch as retaliatory or punitive motives.

So it just isn't a substitute for the power that this Court has and the issues that this Court would be considering.

Fundamentally, you know, we would just ask that this Court grant Mr. Khalil bail, and, you know, we certainly believe that ordering Mr. Khalil's return to this jurisdiction in the alternative would be appropriate if the Court were not to grant bail.  And I'd be happy to address any concerns the Court has about that.

But release at this stage, given the development of the record and the opportunity that both sides have had to explain why Mr. Khalil is being detained and given all of the harms that he suffered over the 104 days that he's been in detention, we hope that this Court will grant his immediate release on bail.

THE COURT:  Ms. Das, thank you very much.

Mr. Sampat, over to you.

MR. SAMPAT:  Thank you, Your Honor.

If I may just make a quick point on factual -- a factual point that my friend made on the other side regarding the *Ozturk* case.

THE COURT:  Sure.

MR. SAMPAT:  If I remember that case correctly, I don't believe Ms. Ozturk was held on the foreign policy ground.  I think there was some debate as to whether she was or was not being held on that ground; but I think at the end of the day

when the Government submitted its briefing, it was the fact that she was out of status after her student visa was terminated.  That was the reason that she was detained and placed into proceedings.

I wanted to make that point very quickly.

As to the extraordinary circumstances, Your Honor, I think it's important to note, at least on the Fifth Amendment issue, that the detention -- detention of aliens has been upheld by the Supreme Court as being constitutional.  It's part of the process.

It's integral to determine whether somebody is -- should be found removable, is removable, and then is ultimately ordered removed.  I think that's an important point to note as the Court is considering the Fifth Amendment issues.

On the First Amendment issues, I'll just note that the Court hasn't ruled on the First Amendment issues yet. Obviously my concern -- you know, the Government's concern with the argument that Mr. Khalil -- that the petitioner is posing here is that it kind of invites a magic word test where petitioners could raise First Amendment claims in habeas and then that by itself would be deemed extraordinary circumstances.

I don't think that's what the Third Circuit had in mind when it kept saying that the extraordinary circumstances

standard is a very high bar, that that high bar could be circumvented by some sort of artful pleading or coloring their claims in constitutional guard that way.

THE COURT: The problem with that -- look, I think that is potentially your real issue. And Ms. Das left out one of the key First Amendment cases in this area which is the case I believe she litigated, the *Ragbir* case, in front of the Second Circuit.

It is the case that treating First Amendment chilling as potentially a basis for extraordinary circumstances could open the door to more people seeking extraordinary circumstances, but there are two answers to that.

The first is, it is then on district judges to not simply accept magic words and be done with it.

As you know, Mr. Sampat, I previously found that the petitioner here -- I found as a matter of fact that the petitioner here engaged in, quote, unquote, political speech within the meaning of the Supreme Court's jurisprudence; and I found as a matter of fact that he wishes to and would return to such speech. So it's not simply a question of magic words.

But the other point is that the mere -- we had this back-and-forth, you and I, in our first interaction with Mr. Flentje, but the mere fact that a claim might be made under a standard is not an argument against that standard. It's just a fact of the standard, number one.

Number two, I'm not in the standard-making business. I'm in the standard-applying business.  So Ms. Das's argument that First Amendment chilling is an extraordinary circumstances, that argument may work or may not, but the fact that it might doesn't tell me whether it should or should not. It's simply a restatement of the question.

Her argument is that First Amendment chilling might count as an extraordinary circumstances, and what you're saying back is, well, if it does, that would allow those claims to go forward.  True, but that doesn't tell me anything.  That just restates the issue.

If what it means to tell me is that people could use magic words, well, then, A, it's over to district judges to not simply accept magic words, and, B, you know the factual findings I've made here as to First Amendment speech.

I'm not sure I'm fully persuaded by the argument, at least as you've made it until now, on that particular piece.

MR. SAMPAT:  I absolutely hear you, Your Honor.  I would just say that, you know, if we're gonna get to the First Amendment issue, we are getting to the merits of his First Amendment claim which then goes back to our point of, like, why just extraordinary circumstances by itself can't be the standard for bail pending -- in a habeas case that needs to be likelihood of success on the merits, as well.  This is how it all -- we think that it all sort of ties together.

THE COURT: I want to just say, Mr. Sampat, that's why we spent so much time discussing the standard. I appreciate that point, which is to say I have held that the petitioner has failed to develop any likely to succeed argument on anything other than the vagueness ground as to the Secretary of State's determination. And Ms. Das, 15 minutes ago, noted the petition has been verified.

But as we all understand, the petition was very belatedly verified. It was -- in Mr. Khalil's latest declaration, there was a reference in sentence two or three to: And, yes, I have gone back and verified the petition.

But the point is, in terms of the materials I've had before me in a merits-type context, I have indeed found that there is no factual evidence because at the relevant point no one had put any evidence in front of me, including no verified petition, and no meaningful legal arguments had been made.

So I have already held that there is no likelihood of success as developed by the petitioner on those things.

So I agree with you, Mr. Sampat, that the standard here matters a great deal, because if the standard requires likelihood of success on an underlying claim, as I've already held, that has simply not been shown by the petitioner to this point.

So I think you're right to say it all flows together, but that's of course why it was so important to spend time and

explain, in my judgment, why *Lucas* does not involve likelihood of success on the merits and indeed even *Mapp* doesn't.  That's part of how I'm thinking about the situation that the case is currently in.

Mr. Sampat, back to you.

MR. SAMPAT:  Thank you, Your Honor.  If I may have just a quick moment to just consult my notes.

THE COURT:  Of course, of course.  Take your time.

MR. SAMPAT:  Thank you.

MS. DAS:  Your Honor, I don't want to interrupt Mr. Sampat, but there is a development in the immigration case that's relative.

THE COURT:  Hang on for just one second.  Let Mr. Sampat do his thinking and we'll get to it in a half a moment.

MS. DAS:  Yes, Your Honor.

THE COURT:  Thanks.

(Brief pause.)

MR. SAMPAT:  Thank you, Your Honor.

I don't think we have anything else to add on the extraordinary circumstances point, other than what's in our briefing; but if Your Honor has questions, we're of course -- I'm ready to answer them.

THE COURT:  Okay.  No.  I appreciate that.

Mr. Sampat, while you're looking at your notes, Ms. Das

had something that she wanted to bring to all of our attention.

Ms. Das, over to you.

MS. DAS:  Mr. Khalil's immigration counsel just informed me that the immigration judge has just denied a bond hearing, relying on the foreign policy ground.

THE COURT:  Okay.

MS. DAS:  So I think that alone is an extraordinary circumstances that would be relevant both to, even if there were at the highest level, the *Landano* substantial constitutional claim that Your Honor has already found.  And it goes to demonstrate that there's no administrative proceeding that will otherwise resolve this being an extraordinary circumstance.

It also appears that she's found him removable on the remaining charge and denied asylum, but we can certainly -- obviously this is coming in now.  We can send a letter to the Court immediately with these developments.

THE COURT:  Right.  I appreciate that.

Mr. Sampat, do you know anything about any of that?

MR. SAMPAT:  No, Your Honor.  I'm hearing it for the first time right now.

THE COURT:  I get it.  If we were in court physically with nobody checking their phones, we wouldn't have known this, but here we are remotely, and at least Ms. Das had some

information.  Okay.

Ms. Das, we've heard from yourself, we've heard from Mr. Sampat.

Anything else that you feel compelled to add at this point?

MS. DAS:  Just briefly, Your Honor.

I would note that in addition to the verified petition much of the evidence that we referred to in our latest letter also comes from the submissions that were attached to the declaration, I believe at ECF-284, which go to the irregularities around the foreign policy ground, around the misrepresentation charge.

And certainly the fact now that it appears that the Government or at least the immigration court is not complying with this Court's injunction is another extraordinary circumstances, so we do believe that the factual record at this stage has been sufficiently developed under any standard that's applicable to bail.

THE COURT:  I appreciate all that.

I want to learn more before suggesting even for a moment that anyone has not complied with the judgment order, but we'll learn more.

Ms. Das, you indicated you would file a letter, and I'm sure you and Mr. Sampat can huddle after today's proceeding just so we have a fuller understanding of what's going on with

the immigration judge and what advice is being provided to the immigration judge about the meaning of the Court's preliminary injunction.

Let me take you through my thinking as to the compliance with the relevant standards here, which is to say the standards set out in *Lucas* and subject to the full discussion we had earlier about *Landano* and about *Mapp v. Reno* and *Iuteri* and all the rest of it.

The first thing that I just want to indicate here is that there is -- you know, here is some of the evidence in the record:

That the petitioner is married to a United States citizen, that he is the parent of a child in the United States who is -- the child is itself a United States citizen, the petitioner's wife is employed in the United States, the petitioner has pursued education in the United States, has had United States career plans which may be displaced at this point. In fact, some of them were displaced, which I previously found.

In addition, the petitioner has made himself into a highly public figure from the very get-go of the case. In the first and timely verified petition, there are references to his speaking to the media, et cetera.

All of that suggests very low flight risk, connections to the United States and publicness in terms of his person.

There are any number of sources for what I have laid out. They are in the petition itself, they're in the petitioner's various declarations, they're in the petitioner's wife's, one of her declarations, one of them doesn't speak to it.  It's at ECF 56-6.  The first letter speaks to some of these connections to the community, but that's just a portion of it.

There is strong evidence of lack of flight risk.  All of this is drawn from sworn affidavits that were put forward March 15, March 20, May 8th, June 4th by petitioner; and as to all of that, the respondents have opted not to controvert any of the evidence.

And so I find as a matter of fact that the petitioner here, based on the evidence that has been put in front of me, is not a flight risk.  The respondents have opted not to controvert the evidence, as Ms. Das noted, and the uncontroverted evidence points in only one direction.

The second issue here that is relevant -- and I'll come in a moment as to how all of this is relevant -- is danger to the public, danger to the community.

Again we're in a place where the petitioner has put in sworn evidence March 15, March 20, May 8th, June 4th, and the respondents have simply opted not to take on any of this evidence.  They haven't argued through affidavits, through declarations, through any other evidentiary means that the evidence put forward by the petitioner is wrong, is

unreliable.

They haven't attempted to put in their own evidence. They have done nothing of the kind. And so we're left with what the evidence that has been put forward by the petitioner that is uncontroverted shows.

That evidence shows that the petitioner has no criminal record. And there is some evidence in the record from which -- well, let me just emphasize what it is.

Exhibits 93 -- excuse me. Forgive me. ECF 93-1, that is ECF 93-1, the first letter and the third letter; ECF 56-1, ECF 56-1, letter 4, letter 7, letter 9. All of these shed evidentiary light on the petitioner's actions in what everyone assumes is the relevant context.

And the evidence that all of those -- excuse me. What all of that evidence adds up to is a lack of violence, a lack of property destruction, a lack of anything that might be characterized as incitement to violence.

All of that is simply uncontroverted here by the respondents. That evidence has been put before the Court in affidavits, in declarations, in letters that are sworn to, and the respondents have opted to say nothing in response of an evidentiary nature. And so where we are is similar to where we are, risk of flight.

All of the evidence in the record points to lack of danger to the community; that is, all evidence that has been

put on by the petitioner.  It might have been challenged as unreliable, it might have been challenged as an incomplete picture, but no such challenge has been made, even as there have been many opportunities for the respondents to do that.

So what I find as a matter of fact, given the evidence before me as it's been developed by the petitioner and as the respondents have simply opted not to develop anything on the flipside, is that the evidence, I find, is that the petitioner is not a flight risk, and the evidence that has been presented to me, at least, is that he is not a danger to the community. Period.  Full stop.

So, given those findings of fact, that is highly, highly unusual that in those settings the respondents and in particular the Secretary of the Department of Homeland Security would continue to seek the detention of a person in that setting.

It is of course the case that in the beginning of a proceeding there is ample room -- and the United States Supreme Court has made this clear in a set of recent opinions. There is ample room for a presumption of flight risk or a presumption of danger to justify short-term detention.

And in the first days or weeks or even beyond, the Supreme Court has made clear that that's consistent with the law.  But at this point what we have is a thick record that has not been objected to by the respondents, that has not been

supplemented by the respondents, and where we are is that it's not the first day or week or month.  There's been ample time to make a contrary submission if that was wanted.

So given the fact that, in my judgment, the standards for detention would clearly not be met in front of an immigration judge, it is highly, highly, highly unusual to be seeking the detention of the petitioner, given the factual record as of today.

That unusualness is amplified by the findings of fact that I made during the middle of last week, and those findings of fact were based on three declarations by seasoned, expert practitioners.

Those declarations were simply not objected to factually, they were not controverted in any way factually by the respondents, and those added up to the idea that it's overwhelming unlikely, I found, that a lawful permanent resident would be detained on the remaining available charge here -- not "available," the remaining charge here, which is to say a charge of failing to fill out accurately and honestly certain particular pieces of the LPR application, certain particular pieces of the LPR application as to things like groups, et cetera.

So where we are is that, given the evidence it is, as I said, highly unusual that there would be detention, which is to say the evidence that I have found as to flight risk and

danger.  And layered on top of that is the highly unusual aspect of seeking detention and of keeping someone detained, given the background charges here and in particular the pieces of the LPL application that this lawful permanent resident did not allegedly fill out properly.

That's another factor that leans in the direction of a finding of extraordinary circumstances: evidence of no flight risk, evidence of no danger, and evidence that I have already found is that it's overwhelming unlikely that a person would be detained on the charge that is not currently enjoined.

There are a couple of other things here.  One of them is that there is an extraordinary circumstance that flows in part from a chilling effect.  I have found previously that this petitioner, as I alluded to with Mr. Sampat a few moments ago, that this petitioner engaged in what counts as political speech under the Supreme Court's jurisprudence and would seek to return to it in a form that is inconsistent with detention, which is to say the petitioner has engaged in protests, and that is something that is not doable from inside of custody.

So it's a kind of chilling that is not obviated, for example, by giving an interview from a detention facility or sending a communication from a detention facility.

So another part of the extraordinary circumstances calculus here is a finding of fact that I make and that I previously made that the petitioner is being prevented from

engaging in his speech and that that chilling effect is another part of the extraordinary circumstance that is here.

I also agree that another piece of the extraordinary circumstance is that part of the theory here for release would require assessment by the immigration judge of issues that the immigration judge is almost surely not legally permitted to consider, which is whether or not detention continues to be appropriate or if release is more appropriate when those kinds of questions are bottomed on alleged constitutional violations.

It's an extraordinary circumstance if the argument that might be made is one -- if the argument for release that might be made is one that the immigration judge literally cannot address. That is both an additional argument for non-exhausting remedies but it's also part of what makes this circumstance unusual.

The final thing I want to note is that while it seems to me that *Lucas* does not require any showing of some kind of substantialness to the underlying legal claim, I see of course that the law is not thickly developed in this area and that it might be that *Mapp v. Reno* at least in part is relevant; and *Mapp v. Reno* suggests there needs to be some kind of showing as to the underlying merits of the claim.

There needs to be some kind of showing that there's something to them, that they're not trivial, that they're

serious, et cetera.

I don't take *Mapp v. Reno* as suggesting they need to be likely to succeed on the merits, not at all.  If I took *Mapp v. Reno* as governing, point one, and if I took *Mapp v. Reno* as requiring likelihood on the merits, point two, well, then, there could be no release here for the petitioner because, as I've already held, there has been no showing by the petitioner of likelihood of success on the merits as to the lawful permitting application charge, but that's not -- *Mapp v. Reno* is not obviously governing and that's not what *Mapp v. Reno* says.  It requires some kind of substantialness but not all the way to likelihood of success on the merits.

What I would say as to the claims here, Ms. Das today invokes a First Amendment claim and a due process punishment claim.  The due process punishment claim is based, as we know, on the idea -- and it's in the petition, of course.  It's at pages 25 or 26 of the petition.

But the due process punishment idea is that, as the Supreme Court held in the 19th century in the *Wong* case, as it's held more recently in the *Zadvydas* case, the criminal law is for punishment, the criminal law with all of its protections.

The civil law, including immigration law -- and that's what those Supreme Court cases hold -- are not a place for punishment.  They're a place for effectuating other government

interests.

One of the arguments the petitioner has made here is that he is being punished, that there is a disapproval of certain things he has said and done in the past, and that the immigration process is being used not to vindicate the immigration laws but to punish the petitioner for those things.

The petition has -- the verified petition has facts along those lines at paragraphs 33 and 73 and 82 and 83 and 84. And when you combine those facts with the current fact, which is that the petitioner -- the respondent, one of them, the Department of Homeland Security Secretary, is detaining and seeking to keep detained the petitioner in the absence -- not "in the absence," in the face of thick evidence that has not been controverted as to flight, as to dangerousness, and is keeping and seeking to keep the petitioner detained in light of strong evidence that I have found, that this is overwhelming unlikely to be the ordinary course.

All of that, the evidence that strongly suggests that there is no basis for detention here, combined with the paragraphs I've mentioned in the petition at 33 and 73 and 82 and 83 and 84, when you put all those together, they suggest that there is at least something to the underlying claim that there is an effort to use the immigration charge here to punish the petitioner, and of course that would be

unconstitutional.

There is at least enough to that claim that even if *Mapp v. Reno* were to apply here and even if there is some need to show a meaningful move in the direction of meritoriousness in the substantial claim, that part of the *Mapp v. Reno* test would be satisfied.

I do not hold that there is a likelihood of success on the merits based on what I have just said. It's a question that I don't need to reach in light of what I've said about the standard; and it's indeed a question that, as I have made clear in a prior decision, at least in the absence of all the extra things we now have would not have been made out by the petitioner.

So my finding is that there are extraordinary circumstances here. They relate to my findings on risk of flight, my finding on dangerousness to the community, my finding on the overwhelming unlikeliness the detention would be sought in a case of this sort in a context like this one, my finding as to chilling effect, my finding as to the inability of an immigration judge to take on these issues, and, finally, my finding that while it does not rise to the likelihood of success level, the claim that there is a due process violative effort to punish the petitioner is substantial enough that even if *Mapp v. Reno* is in play here, there would be enough as to that claim to justify release.

So given all of those factual findings, I'm gonna exercise the discretion that I have to order the release of the petitioner in this case.

I don't plan to write an opinion on this. I will simply issue a very brief release order, and I'll do it shortly, and refer the Court of Appeals, should there be an effort to take an appeal, back to today's transcript.

I haven't been reading from an opinion, as I'm sure you've all perceived, so things will be -- I'm sure the transcript will reflect that. But I'm hopeful that should there be an effort to seek review from the Third Circuit, this will give the Third Circuit a strong sense of my own factual findings and the basis for my exercise of discretion here as well as my decisions as to jurisdiction and exhaustion and the relevant standard.

So that's my decision, that the petitioner's motion for release will be granted and that obviates the need for consideration of the petitioner's motion to transfer.

Mr. Sampat, let me go to you for half a moment. Are there any conditions that the respondents would seek be imposed after the entry of the release order?

MR. SAMPAT: Your Honor, I think we would need time to consult with our clients on that to see what conditions would be appropriate, but what we would also ask is, understanding Your Honor's order granting the motion, we would ask that the

Court stay the effect of that order for seven days so that the respondents could seek emergency appeal and stay if so necessary.

THE COURT:  Let's stick with the first one, though, Mr. Sampat.

MR. SAMPAT:  Sure.

THE COURT:  I would -- the question of the conditions that are imposed upon a release, they're not usually very complicated.  I deal with criminal cases every single day.

They're usually about things like limits on where someone might travel to and they're usually about things like surrendering of a passport and they're usually about things like no applications for further travel documents, and that's usually the end of it.

I will also say that in my experience those things are usually pretty quickly consented to between the parties. You'll take whatever position you want, of course.  I respect that entirely.  But what I would just suggest is this probably doesn't take a whole lot of consultation with your client.

How long do you think you need to figure those things out?

MR. SAMPAT:  Your Honor, I think it's a little difficult to say how much time we need.  I'd say probably at least the rest of the day.  Understanding Your Honor's point on the criminal context in criminal proceedings, the

conditions are pretty quick.

I will just note that immigration detention -- when individuals are released, there's report requirements and things like that that we would have to consult with our clients about what would be appropriate, especially in light of the fact --

THE COURT:  But my point, Mr. Sampat, is not that it's easy or hard, and I hope I wasn't misunderstood that way, and if I was, my apologies.

My point is, these are high-volume affairs and they're pretty standard approaches in our country to release conditions, and so I would urge you to consult very quickly with respect to that because this is not the first time anyone has thought through these issues of what to do with a person who is released.

You know, for example, the reporting requirements you alluded to, these are pretty standard operating procedure things.  So let's just -- let's pause for a moment on that.

Ms. Das, I'm imagining that you will not have any issues with -- and you'll correct me if I'm wrong.  Just as with the respondents, the position is for you to formulate.

But I'm presuming you would not have issues with some reasonable geographic limitations on where the petitioner might go and the need for him to surrender his passport and to not apply for any new travel documents.

Would there be any disagreement with those things?

MS. DAS:  Your Honor, we would agree to reasonable conditions in terms of travel and the issues related to the passport.  I think in addition to that, we would hope that the order would specify that he should be released on his own recognizance, that there would be no electronic monitoring, and that there would be a 72-hour notice prior to re-detention.

Those are some of the grounds that were issued in other cases such as *Chung*, *Concerti*, *Mahdawi*.  They had different formulations of that, but essentially to ensure that the individual could travel and would be released on recognizance without GPS monitoring were particularly important.

THE COURT:  Right.  So what I would say is that there has been a thick record developed here with respect to the relevant bail considerations.  There is simply nothing that even begins to suggest that an electronic bracelet is appropriate or necessary.

With respect to the 72 hours before re-detention, I don't understand the basis for something like that.  There may be any number of reasons why a person is detained, and I'm not gonna presume that other bases that might be put forward are somehow infirm.

The idea of enjoining the United States, slowing it down from doing something it might do when I don't know what

that thing it might do is strikes me as not grounded in the record and something that would cause real problems in terms of this Court's ability, for example, under *Lyons* and under the limits of its own injunctive power as to prospective things.

So I'm not gonna go that way, Ms. Das.  I will not tell the United States that it can't proceed in certain ways.  If the United States proceeds in certain ways that are illegal, we will take it from there, Ms. Das.

MS. DAS:  Thank you, Your Honor.  That's understood. Two quick issues.

THE COURT:  Sure.

MS. DAS:  With respect to the passport, in our recent experience, he may need that passport to travel back to his home in New York.  So if there could be a period of time by which that has to be surrendered, that would be helpful.

THE COURT:  That's exactly why I'm a little bit surprised that this seems complicated.  The normal thing one would have expected would be something like limits on travel from Louisiana back to New York and surrender of passport immediately upon return to New York, something like that.

But these are the kinds of things that parties just work out between themselves.  This is not the kind of thing that a judge generally gets involved in.  Because while Mr. Sampat -- and I respect his position -- doesn't agree with

where I've ruled, it's not usually very tricky to fix these things between thoughtful lawyers such as yourself, Ms. Das, and such as Mr. Sampat.  I'm confident you all can figure that out.

MS. DAS:  Yes, Your Honor.  I think that's what we've done in the normal course.  If Your Honor were willing, we would ask that there be an order of his release immediately and then that release can start getting processed right away, and during that processing time we could work out with the Government if there are -- what those reasonable terms would be.

THE COURT:  Mr. Sampat, what is the argument for a seven-day stay?  What is that about?

MR. SAMPAT:  Your Honor, that's to give us enough time to process Your Honor's order and go through the necessary channels that we need to to get authorization -- to seek whether or not an appeal is warranted; and if so, then to go through the necessary channels to get authorization to pursue that appeal, Your Honor, and then potentially seek a stay of Your Honor's order at the Third Circuit, as well.

THE COURT:  Ms. Das, your view?

MS. DAS:  Your Honor, we don't think a stay is warranted for the reasons that Your Honor has already made with respect to the findings.  There's no risk of flight or dangerousness.

Ultimately, if the Government prevails on some sort of appeal, it has the ability to re-detain the petitioner, so there's no reason for this Court to stay its order based on the substantial findings it's already made.

THE COURT:  Mr. Sampat, what is -- the standard kind of argument for a district judge to stay its own order generally runs through, among other things, the applicant for the stay, this would be you here, being irreparably injured by the non-entry of a stay.

What would be the irreparable injury here?

MR. SAMPAT:  It is the release, Your Honor.  Obviously we're also seeking -- we're contemplating the appeal of Your Honor's PI order, as well.

THE COURT:  Sure.

MR. SAMPAT:  So it's whether or not -- that irreparable injury would be the potential that Mr. Khalil would be released and we wouldn't be able to re-detain him.

THE COURT:  But the problem with that argument is that, as Ms. Das has pointed out, the factual record here doesn't suggest any risk of flight.  To the extent the United States had that kind of concern, well, the time for putting in evidence on that was not -- it's not today or tomorrow.  It's over the course of these last days and weeks.

So if the irreparable injury is the concern that the Third Circuit will undo what I have done and you will not be

able to find and re-detain the petitioner, there's just no evidence of that.  And there was ample opportunity for the respondents to build an evidentiary record that might have suggested that.

Any other irreparable injury here?

MR. SAMPAT:  Nothing that I can find, Your Honor, but I'm consulting my notes, just making sure that I haven't missed anything.

THE COURT:  Take your time.  I don't mean to rush you.

(Brief pause.)

MR. SAMPAT:  Your Honor, just a couple points on irreparable injury.  There's also irreparable injury when courts do enjoin the effectuating of statutes enacted by Congress.  That's *Maryland v. King* at 567 --

THE COURT:  But the problem with that, Mr. Sampat, as you know, is that the Second Circuit in *Ozturk* made pretty quick work of that.  I'm not enjoining any statute, far from it.  I'm not saying a statute is unconstitutional, I'm not enjoining a statute, not in the slightest.  I'm simply ordering that a person be granted bail.

If it were the case that every time a federal litigant loses a granular decision like a bail decision they could say there's irreparable injury, there would be nothing left to the irreparable injury standard.  It would simply mean that there is a stay of a judicial decision every time a federal litigant

loses.  That's not the law.

MR. SAMPAT:  Nothing else to add, Your Honor.  Thank you.

THE COURT:  All right.  So I'm going to issue a release order.

Mr. Sampat, I don't want to put you in a difficult spot in terms of consultation, but what I'm gonna do is there's a United States magistrate judge on this case who you all have dealt with a little bit, Judge Hammer, who has been working on the case and who is, like all United States magistrate judges, enormously experienced with respect to issues of where a passport will go, what travel restrictions make sense.

I'm really hopeful the parties can simply agree to reasonable restrictions here, but if need be, there will be an order releasing the petitioner by a time certain today subject to conditions that Judge Hammer can impose if the parties are not themselves able to agree to, you know, reasonable conditions together.

I think that will allow everybody to have a little bit of time for consultation, but, candidly, these are just not issues that are so terribly complex that they require a great deal more than that.

Mr. Sampat, anything that you want to add before we wrap up?

MR. SAMPAT:  Not from the Government, Your Honor.

*United States District Court*
*District of New Jersey*

Thank you for your time this afternoon.

THE COURT:  Mr. Sampat, thank you, as always.

Ms. Das, from your perspective, anything that you want to add before we wrap up?

MS. DAS:  No, Your Honor.  But just to clarify, I understand that some of the conditions we may need to hash out as part of the release order, but our understanding is that Your Honor would be issuing an order that he be released by a time certain today.  And we're hoping that that order would specify that he would not be subject to electronic monitoring and would be allowed to travel to New York with his passport, and then any other conditions that we need to negotiate we could speak to the magistrate judge about.  I just wanted to clarify that point.

THE COURT:  Two things:  First, I'm going to write the order.  It will take a few moments to write.  I haven't pre-written it or anything like that.

It will direct that the petitioner be released today, subject to the conditions that are set today by the United States magistrate judge.

It just seems, to me, pretty straightforward that you all, Ms. Das, and you, Mr. Sampat, should rapidly consult as to these issues so that the United States magistrate judge has the benefit of your thoughts on these subjects and hopefully your agreement.

*United States District Court*
*District of New Jersey*

I don't want to micromanage the process.  There are things I don't know.  For instance, I don't know if the petitioner's passport is in his pocket or is somewhere in New York.  There are just things I don't know.

Those are not the kind of things that judges should take the first cut at.  Those are things that you all should work together on, but the release order will be drafted shortly by me and it will hit the docket and you'll see it, Ms. Das, and Mr. Sampat, as well.

MR. SAMPAT:  Thank you, Your Honor.

THE COURT:  As to the stay application, it's simply denied.  The stay factors are ones I understand.  There's no need, I don't think, to cite them here.  One of the two key stay factors -- I'm thinking, for example, of the *Hilton* case, which is the Supreme Court's case from 1987 that relates to this, and *United States v. Smith*, which is the Third Circuit's 1987 decision.  The stay applicants here are the respondents and their arguments as to irreparable injury, given the factual record that's been built here, that they haven't contested, there's just not an argument to move for a stay.

I appreciate that that means that the respondents will have to work quickly to seek an appeal, should they wish to, but that is a little bit the wages of having not contested over the course of this period the record and having the record lean in one direction with respect to the relative ease

of the re-detaining issue should the Third Circuit indicate that its decision will order him detained.

I also don't think that there's been the requisite showing by the respondents as to the likelihood of success as to jurisdiction, as to exhaustion, as to the standard, as to my factual findings, and as to exercise of discretion as to detention.

So the application for a stay is denied, as we just discussed, and an order will follow shortly with respect to the granting of a motion for release.

Having said that all, Ms. Das, any final things you wanted to convey, Ms. Das?

MR. SAMPAT:  No.  Thank you so much, Judge.

THE COURT:  Mr. Sampat, any final things that you wanted?

MR. SAMPAT:  Nothing from the Government, Your Honor. Thank you.

THE COURT:  Thank you all very much.  And I will prepare the order in a short while.  Thank you all very much. Appreciate it.

(Which were all the proceedings held in the above-entitled matter on said date.)

*United States District Court*
*District of New Jersey*

## FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

I, **Lisa A. Larsen**, **RPR**, **RMR**, **CRR**, **FCRR**, Official Court Reporter of the United States District Court for the District of New Jersey, do hereby certify that the foregoing proceedings are a true and accurate transcript from the record of proceedings in the above-entitled matter.

*/S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

Official U.S. District Court Reporter ~

District of New Jersey

DATED this June 21, 2025

*        *        *        *        *

*United States District Court*
*District of New Jersey*