## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

        *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE, in
his official capacity as Acting Field Office Director of
New York, Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention Facility;
Caleb VITELLO, Acting Director, U.S. Immigration
and Customs Enforcement; Kristi NOEM, in her
official capacity as Secretary of the United States
Department of Homeland Security; Marco RUBIO, in
his official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney General,
U.S. Department of Justice,

        *Respondents*.

Case No. 25-cv-01963 (MEF-MAH)

ORAL ARGUMENT
REQUESTED

MOTION DAY:
AUGUST 4, 2025

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION REGARDING THE POST-HOC CHARGE

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................i

TABLE OF AUTHORITIES .............................................................................................ii

INTRODUCTION ............................................................................................................1

BACKGROUND AND PROCEDURAL HISTORY ..........................................................2

    The Government Adds the Post-Hoc Charge .................................................................3

    Undisputed Evidence Confirms the Post-Hoc Charge is Highly Unusual........................4

    After the Rubio Determination Is Enjoined, the Government Makes the "Highly,
        Highly Unusual" Decision to Detain Mr. Khalil Based on the
        Post-Hoc Charge ...............................................................................................5

    The Post-Hoc Charge Is Part of a Pattern of Government Statements and Antagonism
        Towards Mr. Khalil and His Speech ....................................................................7

    Mr. Khalil Brings This Motion Seeking Preliminary Relief.................................................8

    Mr. Khalil Moves on Different Claims Than In His First Motion for
        Preliminary Relief ..............................................................................................9

ARGUMENT.....................................................................................................................9

I.      MR. KHALIL IS LIKELY TO SUCCEED ON THE MERITS.....................................10

   A.   The government's decisions to add the Post-Hoc Charge and detain Mr. Khalil on that
      basis were retaliatory in violation of the First Amendment................................................10

    1.   Mr. Khalil meets his burden on the *Mt. Healthy* factors. .......................................10

      a.   Factor 1: Mr. Khalil Engaged in Protected Conduct. .........................................11

      b.   Factor 2: The Government Took Retaliatory Action. ..........................................11

      c.   Factor 3: Mr. Khalil's Expression Was a Substantial or Motivating Factor For the
         Government's Actions. .....................................................................................12

    2.   The Government Has Not and Cannot Meet Its Burden.........................................17

    3.   *Nieves* does not apply, and, even if it did, that standard is met here. ..................18

   B.   Mr. Khalil's detention under the Post-Hoc Charge violated his right to substantive due
      process. ...........................................................................................................................21

II.     MR. KHALIL IS EXPERIENCING IRREPARABLE HARM. .....................................25

III.    THE EQUITIES WEIGH HEAVILY IN MR. KHALIL'S FAVOR. ............................28

CONCLUSION.................................................................................................................29

## TABLE OF AUTHORITIES

**Cases** ...................................................................................................................... **Page(s)**

*Acierno v. New Castle Cnty.,*
    40 F.3d 645 (3d Cir. 1994) ............................................................................... 27

*Aditya W. H. v. Trump,*
    No. 25-CV-1976, 2025 WL 1420131 (D. Minn. May 14, 2025) .................... 12, 15, 16

*Anderson v. Davila,*
    125 F.3d 148 (3d Cir. 1997) ........................................................................ 11, 15, 16, 17

*Bell v. Wolfish,*
    441 U.S. 520 (1979) ........................................................................................... 22

*Bello-Reyes v. Gaynor,*
    985 F.3d 696 (9th Cir. 2021) ......................................................................... 19, 20

*Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP,*
    528 F.3d 176 (3d Cir. 2008) ............................................................................. 27

*Bridges v. Wixon,*
    326 U.S. 135, 148 (1945) ................................................................................. 11

*Calderon-Rosas v. Att'y Gen. United States,*
    957 F.3d 378 (3d Cir. 2020) ............................................................................ 22

*Carson v. Am. Brands, Inc.,*
    450 U.S. 79 (1981) ............................................................................................ 27

*Chung v. Trump,*
    No. 25-cv-2412 (S.D.N.Y. June 5, 2025) ......................................................... 30

*Conard v. Pennsylvania State Police,*
    902 F.3d 178 (3d Cir. 2018) ...................................................................... 10, 11, 13

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.,*
    108 F.4th 194 (3d Cir. 2024), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (2025) ........ 25

*Demore v. Kim,*
    538 U.S. 510 (2003) ..................................................................................... 23, 24

*Dombrowski v. Pfister,*
    380 U.S. 479 (1965) ......................................................................................... 26

*Ercelik v. Hyde,*
 No. 1:25-CV-11007, 2025 WL 1361543 (D. Mass. May 8, 2025) ....................................... 12, 24

*Falco v. Zimmer,*
 767 F. App'x 288 (3d Cir. 2019) ................................................................................................. 13

*Fong Yue Ting v. United States,*
 149 U.S. 698 (1893) ..................................................................................................................... 11

*German Santos v. Warden Pike Cnty. Corr. Facility,*
 965 F.3d 203 (3d Cir. 2020) ................................................................................................. 22, 23

*Gonzalez v. Trevino,*
 602 U.S. 653 (2024) ..................................................................................................................... 21

*Greater Phila. Chamber of Com. v. City of Phila.,*
 949 F.3d 116 (3d Cir. 2020) ....................................................................................................... 10

*Guardian Life Ins. Co. of Am. v. Est. of Cerniglia,*
 446 F. App'x 453 (3d Cir. 2011) ................................................................................................ 27

*Gutierrez-Soto v. Sessions,*
 317 F. Supp. 3d 917 (W.D. Tex. 2018) ................................................................................ 14, 17

*Hill v. City of Scranton,*
 411 F.3d 118 (3d Cir. 2005) .................................................................................................. 17, 18

*Kamdem-Ouaffo v. Task Mgmt. Inc.,*
 792 F. App'x 218 (3d Cir. 2019) ................................................................................................ 26

*Kansas v. Crane,*
 534 U.S. 407 (2002) ..................................................................................................................... 22

*Kos Pharms., Inc. v. Andrx Corp.,*
 369 F.3d 700 (3d Cir. 2004) ....................................................................................................... 27

*Life Spine, Inc. v. Aegis Spine, Inc.,*
 8 F.4th 531 (7th Cir. 2021) ......................................................................................................... 27

*Lozman v. Riviera Beach,*
 585 U.S. 87 (2018) ................................................................................................................. 20, 21

*Mahdawi v. Trump,*
 No. 2:25-CV-389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025) ......................................... 22, 24, 25

*Matter of Guerra,*
    24 I&N Dec. 37 (BIA 2006) ................................................................................23

*McTernan v. City of York, Pa.,*
    577 F.3d 521 (3d Cir. 2009) ............................................................................10

*Media Matters v. Bailey,*
    No. 24-CV-147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024)..........................19

*Miller v. Mitchell,*
    598 F.3d 139 (3d Cir. 2010) ............................................................................13

*Mirabella v. Villard,*
    853 F.3d 641 (3d Cir. 2017) ............................................................................10

*Mohammed H. v. Trump,*
    No. 25-CV-1576, 2025 WL 1334847 (D. Minn. May 5, 2025) ...............12, 17, 24

*Mohammed H. v. Trump,*
    No. 25-CV-1576, 2025 WL 1692739 (D. Minn. June 17, 2025)...........12, 14, 18, 22

*Morton v. Beyer,*
    822 F.2d 364 (3d Cir. 1987) ............................................................................27

*Mt. Healthy City Sch. Dist. v. Doyle,*
    429 U. S. 274 (1977).............................................................................1, 10, 13, 17

*NAACP, Inc. v. Town of E. Haven,*
    70 F.3d 219 (2d Cir. 1995) ..............................................................................27

*Nieves v. Bartlett,*
    587 U.S. 391 (2019)................................................................................*passim*

*Nken v. Holder,*
    556 U.S. 418 (2009).........................................................................................10

*Novak v. City of Parma,*
    932 F.3d 421 (6th Cir. 2019) ...........................................................................21

*O'Connor v. City of Newark,*
    440 F.3d 125 (3d Cir. 2006) ............................................................................11

*Ozturk v. Trump,*
    No. 25-cv-374, F. Supp. 3d, 2025 WL 1145250 (D. Vt. Apr. 18, 2025) ........22, 23, 24, 29

*Padilla v. Kentucky,*
  559 U.S. 356 (2010) ..................................................................................................11

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,*
  143 F.3d 800 (3d Cir. 1998) ....................................................................................27

*Ragbir v. Homan,*
  923 F.3d 53 (2d Cir. 2019) ...............................................................11, 14, 15, 19

*Rauser v. Horn,*
  241 F.3d 330 (3d Cir. 2001) ....................................................................................13

*Register.com., Inc. v. Verio, Inc.,*
  356 F.3d 393 (2d Cir. 2004) ....................................................................................27

*Reilly v. City of Harrisburg,*
  858 F.3d 173 (3d Cir. 2017) ....................................................................................29

*Reno v. Flores,*
  507 U.S. 292 (1993) ..................................................................................................22

*Rent-a-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,*
  944 F.2d 597 (9th Cir. 1991) ...................................................................................27

*San Filippo v. Bongiovanni,*
  30 F.3d 424 (3d Cir. 1994) ......................................................................................10

*Snyder v. Phelps,*
  562 U.S. 443 (2011) ..................................................................................................11

*Stilp v. Contino,*
  613 F.3d 405 (3d Cir. 2010) ....................................................................................25

*Suppan v. Dadonna,*
  203 F.3d 228 (3d Cir. 2000) ..............................................................................10, 12

*Valley v. Rapides Parish Sch. Bd.,*
  118 F.3d 1047 (5th Cir. 1997) .................................................................................27

*Velasaca v. Decker,*
  458 F. Supp. 3d 224 (S.D.N.Y. 2020) ....................................................................23

*Watson v. Rozum,*
  834 F.3d 417 (3d Cir. 2016) ..............................................................................13, 16

*Wichert v. Walter,*
    606 F. Supp. 1516 (D.N.J. 1985) .......................................................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008). ................................................................................................................. 9

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) .................................................................................................. 22, 23, 24

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller,
    Federal Practice & Procedure § 2948.1 (4th ed. 2025) ............................................... 27

## INTRODUCTION

Days after petitioner Mahmoud Khalil filed a habeas corpus petition challenging his arrest and detention pursuant to Secretary of State Rubio's determination (the "Rubio Determination"), and on the same day he sought to enjoin that determination, the government took the extraordinary step of adding a new and highly unusual charge that Mr. Khalil was independently removable because he allegedly failed to fill out certain immigration paperwork correctly (the "Post-Hoc Charge"). Then, immediately after this Court enjoined the government from seeking to remove or detain Mr. Khalil based on the Rubio Determination, the government took the equally extraordinary step of detaining him based on the Post-Hoc Charge. Mr. Khalil now moves for an order preliminarily enjoining the government from seeking to remove or detain him based on the Post-Hoc Charge. The record and this Court's prior factual and legal findings demonstrate he is likely to succeed on his First and Fifth Amendment claims supporting this relief.

First, there is now overwhelming and uncontested evidence that both the government's decision to add the Post-Hoc Charge and Mr. Khalil's detention under that charge were retaliatory in violation of the First Amendment. Specifically, the government is retaliating for both Mr. Khalil's protected speech about Palestinian rights and critical of Israel, and for his protected petitioning of the government via this habeas. In addition to direct evidence that the government has, from the outset, targeted Mr. Khalil on account of his protected expressive activities, now the record also includes multiple additional forms of legally relevant and largely uncontested subjective and objective evidence of retaliation. This evidence includes (i) the timing of the government's addition of the Post-Hoc Charge, (ii) the vanishingly rare use of detention for lawful permanent residents facing allegations comparable to the Post-Hoc Charge, (iii) the government's statements, and (iv) a pattern of antagonism against Mr. Khalil and others engaging in the same type of expressive activity. Under the governing standard, *see Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977), the government

has not—and cannot—dispute the record evidence that makes Mr. Khalil likely to succeed on the merits of this claim.

Second, any detention based on the Post-Hoc Charge would also violate the Fifth Amendment. To comport with substantive due process, civil immigration detention must not be punitive, and it must be justified by a showing of flight risk or danger. Here, the uncontested record demonstrates Mr. Khalil's detention *was* punitive, and it *was not* justified by any risk of flight or danger—in a manner multiple courts in similar cases have found violates due process. This claim provides an independent ground for enjoining detention based on the Post-Hoc Charge.

The other preliminary injunction factors also weigh heavily in favor of the requested injunction. Mr. Khalil is currently experiencing multiple irreparable harms. These include harms to his core speech rights, career, and reputation, all untethered to detention—*and* additional specific harms flowing from the fact that, without an order enjoining detention based on the Post-Hoc Charge, his current release is conditional and heavily restricted. The equities and the public interest also weigh strongly in favor of Mr. Khalil. For all these reasons, this Court should preliminarily enjoin the government from seeking to deport Mr. Khalil or detaining him based on the Post-Hoc Charge.

## BACKGROUND AND PROCEDURAL HISTORY

The facts that precede the government's decision to bring the Post-Hoc Charge have been summarized at ECF 50, 53, 93, 124; *see also* ECF 236 ("Th. Am. Pet."); ECF 299[1] at 6 n.6 (noting the petition has been verified and treating it as evidence). In short: Mahmoud Khalil is a Palestinian and a lawful U.S. permanent resident who, after engaging in protected expressive activity in support of

---

[1] The Court has issued multiple Opinions and Orders in this matter. For ease of reference, Petitioner cites them by their ECF numbers throughout this motion and summarizes them here: ECF 214, Order finding the Court has Habeas Jurisdiction (Apr. 29, 2025); ECF 272, Order Finding Likelihood of Success on the Merits of Petitioner's Vagueness Claim (May 28, 2025); ECF 299, Order Partially Granting Petitioner's Motion for a Preliminary Injunction (June 11, 2025); ECF 316, Order Granting Bail (June 20, 2025).

Palestinian rights and critical of Israel, drew the attention of the government and became one of the first targets of a retaliatory campaign to use immigration law to censor and punish those who express such viewpoints. *See* Th. Am. Pet. ¶¶ 19-26, 45-53. On March 8, 2025, the government arrested, detained, and placed Mr. Khalil in removal proceedings pursuant to a publicly announced policy ("the Policy") to target for arrest, detention, and removal noncitizens who engage in such protected expression. Th. Am. Pet. ¶¶ 44-56. To justify their actions, the government relied solely on the Rubio Determination's assertion that, because of Mr. Khalil's lawful protected expressive activity, his continued presence and activities in the country would compromise a compelling U.S. foreign policy interest pursuant to 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1127(a)(4)(C) ("the Foreign Policy Ground"). *See* ECF 124 at 5-8; ECF 272 at 13-15*; see also id.* at 44.

Within hours of his warrantless arrest on March 8, 2025, Mr. Khalil filed a habeas petition challenging his detention. ECF 2. Days later, on March 13, he filed an amended habeas petition and complaint challenging the constitutionality of the Rubio Determination, his detention, and the Policy under which both decisions were made. ECF 38. By March 14, he had also filed motions for release on bail, ECF 53, and in the alternative for transfer from Louisiana back to the New York City area, ECF 11, and proposed a preliminary injunction motion schedule, ECF 40, all of which highlighted the retaliatory nature of the Rubio Determination, the extraordinary and unusual pattern of antagonism that characterized the government's actions, and the fact that the sole basis for his arrest and detention was his expression critical of U.S. and Israeli government policy underlying the invocation of the Foreign Policy Ground, *see* ECF 11, 53.[2]

*The Government Adds the Post-Hoc Charge*

_____

[2] Of Mr. Khalil's lightning-fast transfer to Louisiana, former ICE Principal Legal Advisor Kerry Doyle has stated the move was "highly unusual" and that, in nearly 30 years of practice, she could not recall "a situation in which something similar happened to one of [her] clients." ECF 284-16, Declaration of Kerry Doyle ("June 4 Doyle Decl."), ¶¶ 11–12.

Pursuant to the ordered briefing schedule, ECF 43, Mr. Khalil moved on March 17 for a preliminary injunction enjoining, among other things, the Rubio Determination, ECF 67. Also on March 17, the government issued "Additional Charges of Inadmissibility/Deportability." ECF 284-1, June 4 Declaration of Mahmoud Khalil ("June 4 Khalil Decl.") ¶ 25. For the first time, DHS alleged that Mr. Khalil was also removable under section 237(a)(1)(A) of the Immigration and Nationality Act ("INA") based on inadmissibility under section 212(a)(6)(C)(i),[3] specifically alleging that he misrepresented or omitted material information in his March 2024 green card (permanent resident) application, namely: (1) alleged membership in the United Nations Relief and Works Agency for Palestine Refugees ("UNRWA") from June to November 2023 (Allegation 6); (2) alleged continued employment with the British Embassy beyond 2022 (Allegation 7); and (3) alleged membership in Columbia University Apartheid Divest (CUAD) (Allegation 8). *Id.*; ECF 90-1 (I-261).

*Undisputed Evidence Confirms the Post-Hoc Charge is Highly Unusual*

"[S]easoned, expert [immigration] practitioners," ECF 330 ("June 20 Hearing Tr.") at 57:9-12, have characterized the government's issuance of the Post-Hoc Charge against Mr. Khalil as highly unusual—both in timing and substance. For example, Stacey Tolchin, with over 23 years of experience representing immigrants, explained that the question related to "membership" in certain advocacy groups on the green card application is so vague that officials "essentially ignor[e]" it, and that the "vast majority" of her clients answer "no" without consequence. *See* ECF 284-12, Declaration of Stacy Tolchin ("June 4 Tolchin Decl.") at ¶¶ 6-9, 12; ECF 299 at 9. She further stated that she has "never seen" a material misrepresentation charge based on omissions pertaining to internships or student clubs. June 4 Tolchin Decl. ¶ 15. Similarly, Ira Kurzban, one of the country's foremost immigration scholars and practitioners, has stated it is rare for ICE to amend a Notice to Appear ("NTA") to add

---

[3] These sections of the INA are codified at 8 U.S.C. §§ 1227(a)(1)(A), 1182(a)(6)(C)(i).

charges of this nature—particularly against a lawful permanent resident—and that the government's decision here was "extraordinarily unusual." ECF 284-11, Declaration of Ira Kurzban ("June 4 Kurzban Decl.") ¶¶ 17-18. Former ICE Principal Legal Advisor Kerry Doyle likewise described the charge as "unusual," especially given that it was brought only after Mr. Khalil's arrest and habeas filing, and absent any pending immigration application. June 4 Doyle Decl. ¶¶ 16; July 9 Declaration of Veronica Salama Ex. D ("July 9 Doyle Decl.") ¶¶ 8-9 (describing "even more unusual" aspects of the charge).[4]

*After the Rubio Determination Is Enjoined, the Government Makes the "Highly, Highly Unusual" Decision to Detain Mr. Khalil Based on the Post-Hoc Charge*

On June 11, the Court preliminarily enjoined the government from removing or detaining Mr. Khalil based on the Rubio Determination. ECF 299 at 12-13. Noting the Court's finding that Mr. Khalil's detention to date "almost surely flow[ed]" from the Rubio Determination, *id.* at 10, Mr. Khalil informed the Court on June 13 that ICE refused to release him and noted the government had not "represented that Mr. Khalil is being detained based on any ground other than the one the Court enjoined," ECF 301. In response, the government asserted—for the first time—that Mr. Khalil was "now detained based on" the Post-Hoc Charge. ECF 304 at 1.

This Court has already found—crediting the "extensive professional experience" of "seasoned, expert practitioners" Doyle, Tolchin, and Kurzban, ECF 299 at 8-10, June 20 Hearing Tr.

---

[4] The Immigration Judge sustained Allegations 6 and 8, despite extensive evidence and testimony that the allegations were unfounded. *See* June 4 Khalil Decl. ¶ 29; July 9 Salama Decl. Ex. E (Declaration of Dana Leigh Marks) ("Marks Decl.") ¶¶ 7-10 (former immigration judge of 35 years stating that this finding was "not at all supported by the evidence and caselaw"); July 9 Salama Decl. Ex. D ("July 9 Doyle Decl.") ¶ 9; ECF 284-3, June 4 Declaration of Johnny Sinodis ("June 4 Sinodis Decl.") ¶¶ 7, 20-27; June 4 Tolchin Decl. ¶¶ 6-16; July 8 Ryo Decl. ¶¶ 10-11. The Immigration Judge sustained the misrepresentation charge without permitting Mr. Khalil to present arguments in support of a misrepresentation waiver for which he is eligible as the spouse and parent of U.S. citizens who was not otherwise inadmissible at the time of admission, citing the enjoined Foreign Policy Ground of removal. *See* ECF 333, IJ Decision (June 20, 2025); ECF 341-1 at 1-2 (summarizing procedural history of waiver request); July 9 Doyle Decl. ¶ 10 (describing waiver process).

57:9-12, and the uncontested factual record—that Mr. Khalil's detention based solely on the Post-Hoc Charge was "highly, highly, highly unusual," ECF 330, June 20 Hearing Tr. at 57:4-8. Specifically, the uncontested evidence the Court relied upon included a statement from Kerry Doyle that "lawful permanent residents are certainly not detained . . . based solely on the types of allegedly missing information described here." ECF 299 at 8-9 (cleaned up). Stacey Tolchin confirmed it is "incredibly rare" for a lawful permanent resident to be detained for failing to disclose past membership or associations on an adjustment application. *Id.* at 9. And Ira Kurzban described such detention as "extremely unusual" absent aggravating factors like a criminal record. *Id.* at 10.

These statements are consistent with ICE and Executive Office for Immigration Review ("EOIR") data. Over the most recent ten-year period where EOIR data is available (2012-2022), cases involving individuals with U.S. citizen or lawful permanent resident spouses or parents where willful misrepresentation is the sole charge of deportability comprised only 0.01 % of all removal proceedings. Declaration of Emily Ryo ("July 8 Ryo Decl.") ¶ 10. Of that 0.01%, only 1.76% were detained throughout their removal proceedings: 11 cases out of more than 5 million in removal proceedings in the last decade. *Id.* And while this data does not distinguish by the status of the individual facing removal or the type of application (*i.e.*, all 11 cases may be undocumented individuals seeking asylum status), ICE detention data over the same ten-year period indicates that only 0.14% of all adult male detentions on *any* removal ground involved lawful permanent residents without criminal convictions—a tiny percentage that can include those facing criminal charges. *Id.* ¶ 11. Thus it is entirely possible that DHS has never continued to detain someone like Mr. Khalil—a lawful permanent resident, who has never been charged or convicted of a crime, and who has a U.S. citizen spouse and child—solely on the basis of a willful misrepresentation charge. At minimum, the evidence demonstrates the use of detention in these circumstances is vanishingly small. *See id.*

6

*The Post-Hoc Charge Is Part of a Pattern of Government Statements and Antagonism*
*Towards Mr. Khalil and His Speech*

The government's actions with respect to the Post-Hoc Charge—culminating most recently in its extraordinary efforts to keep Mr. Khalil detained on that sole basis—are consistent with its well-established pattern of hostility towards him based on his constitutionally protected expression. The record now includes many statements by Respondents and other government officials explicitly characterizing Mr. Khalil's arrest and continued detention as punishment for his speech, claiming his arrest would be the first of many, and targeting others for similar detentions or attempted detentions on the basis of speech, including in cases where it relied on grounds other than the Foreign Policy Ground to achieve its retaliatory aims. *See, e.g.*, Th. Am. Pet. ¶¶ 30-33, 73-84;  June 4 Khalil Decl., ¶ 10 (describing the impact seeing such statements has had on him); June 20 Hearing Tr. at 61:23-25, 62:1 (noting, based on the record as of June 20, "that there is at least something to the underlying claim that there is an effort to use the immigration charge here to punish the petitioner," which, "of course… would be unconstitutional."); *see also infra* at 16 (collecting similar cases).

In the weeks leading up to Mr. Khalil's release on bail, the government's pattern of antagonism intensified. For example, the government refused to permit him a contact visit with his wife and newborn son until this Court intervened, *see* ECF 284-2, June 3 Declaration of Noor Abdalla ("June 3 Abdalla Decl.") ¶¶ 18–22; June 4 Khalil Decl. ¶ 7; ECF 271, and ICE also denied his request to be moved closer to his son in contravention of its own directive requiring the agency to place parents "as close as practicable" to their minor children, *see* ECF 308 at 4; ECF 308-1. And after the Court ordered Mr. Khalil released based on "uncontroverted evidence" that Mr. Khalil is neither a flight risk nor a danger to the community, June 20 Hearing Tr. at 54:12-16; 55:14-23; 56:5-11, government officials continued to make plain their intent to punish him and others conveying similar messages on the basis

of their political viewpoints. *See, e.g.*, July 9 Salama Decl. Ex. G[5] (White House spokesperson Abigail Jackson describing Mr. Khalil and others as "individuals who don't have a right to be in the United States siding with Hamas terrorists and organizing group protests" and stating the administration "won't hesitate to hold Khalil, and others who mimic his tactics, accountable"); Ex. H[6] (Homeland Security Assistant Secretary Tricia McLaughlin stating Mr. Khalil "should use the CBP Home app to self-deport"). This pattern also includes the government's ongoing efforts seeking to remove Mr. Khalil based on the Secretary of State's enjoined foreign policy determination despite this Court's order enjoining it from doing so. *See* ECF 332.

*Mr. Khalil Brings This Motion Seeking Preliminary Relief*

Mr. Khalil continues to suffer irreparable harm flowing from the government's retaliatory decision to bring the Post-Hoc Charge and detain him on that ground. He faces the ongoing threat of removal based on the Post-Hoc Charge, *see* ECF 332 (summarizing ongoing progress of immigration proceedings as of July 1, 2025), and, because his detention based on the Post-Hoc Charge has not been enjoined, his release order includes bail conditions that limit his ability to travel within or without the United States to engage in advocacy, speak on issues of public concern, or visit friends and family, *see* ECF 317 (order setting conditions of release). The Post-Hoc Charge also designates him a perpetrator of fraud in the view of the United States, causing Mr. Khalil reputational harm and continuing long-term damage to his career prospects. *See* July 9 Salama Decl. Ex. A ("July 9 Khalil Decl.") ¶¶ 12-17.

For all these reasons, Mr. Khalil now moves for preliminary relief on his First and Fifth Amendment claims challenging the Post-Hoc Charge. Specifically, he seeks an order enjoining the government from seeking to remove him or detain him based on the Post-Hoc Charge.

---

[5] *Available at* https://perma.cc/RZ99-QDUJ.
[6] *Available at* https://perma.cc/98JZ-XVGS.

*Mr. Khalil Moves on Different Claims Than In His First Motion for Preliminary Relief*

Mr. Khalil's first motion for a preliminary injunction, ECF 67, remains partially pending, *see* ECF 124; ECF 175; ECF 214; ECF 272; ECF 299. All evidence in support of that motion is incorporated by reference. Of relevance here, in that motion Mr. Khalil moved on claims alleging that his detention was retaliatory in violation of the First Amendment and punitive in violation of the Fifth Amendment. *See* ECF 67 at 19-22. In addition, Mr. Khalil moved on his First and Fifth Amendment claims challenging the Policy as viewpoint discriminatory and unconstitutionally vague. *See id.* at 11-19. He has argued with respect to that motion that the Post-Hoc Charge should be set aside as one application of the unlawful Policy to Mr. Khalil. *See* Th. Am. Pet. ¶¶ 88-91; ECF 124 at 8, 18 n.20; ECF 223-1 ¶ 89; ECF 280 at 2. The motion remains pending with respect to those claims. *See* ECF 272; ECF 299.

While the Court, on the record then before it, denied Mr. Khalil's first motion "to the extent" that it sought to "preliminarily enjoin the failure-to-disclose ground for removal," ECF 272 at 99, until now, Mr. Khalil had not moved for preliminary relief against the Post-Hoc Charge as a standalone matter. *See* ECF 223 at 1; *id.* at n.3 (in which petitioner expressly states that, "as noted in the Court's recent Opinion, ECF 214, 7 n.7, Mr. Khalil does not move for preliminary relief on an independent claim directly challenging the new charge separate and apart from his challenges to the Policy," while noting that the then-proposed Third Amended Petition would "add such a claim"). He does so now.

## ARGUMENT

On this record, Mr. Khalil demonstrates each factor required to obtain the relief he seeks. Namely, Mr. Khalil must establish that "he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." ECF 299 at 4 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Of these, the "most critical" elements are the first and second.

*Id.* (*quoting Nken v. Holder*, 556 U.S. 418, 434 (2009)); *see also id.* at 11 n.12, 12 n.13 (noting that the third and fourth requirements are "less important than the first two"). He need only show a "reasonable probability" of success on the merits to satisfy the first prong. *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).[7]

As discussed below, Mr. Khalil satisfies each prong of the preliminary injunction analysis.

### I.     MR. KHALIL IS LIKELY TO SUCCEED ON THE MERITS.

#### A.  The government's decisions to add the Post-Hoc Charge and detain Mr. Khalil on that basis were retaliatory in violation of the First Amendment.

##### 1.   Mr. Khalil meets his burden on the *Mt. Healthy* factors.

First Amendment retaliation claims are analyzed under the two-step *Mt. Healthy* framework. 429 U.S. 274, 287. Mr. Khalil must first make out a prima facie case that: "(1) [he engaged in] constitutionally protected conduct, (2) [there was] retaliatory action sufficient to deter a person of ordinary firmness from exercising [his] constitutional rights, and (3) [there was] a causal link between the constitutionally protected conduct and the retaliatory action." *Conard v. Pennsylvania State Police*, 902 F.3d 178, 183 (3d Cir. 2018) (quoting *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017)). Once Mr. Khalil makes the requisite showing, the burden shifts to the government to prove, by a preponderance of the evidence, it would have taken the same adverse action even absent the protected speech. *Mt. Healthy*, 429 U.S. at 287; *see also Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000) (explaining that plaintiff prevails "if the protected conduct played any substantial role and the defendant is unable to carry its burden of showing" no adverse consequences); *see also San Filippo v. Bongiovanni*, 30 F.3d 424, 430 n.7 (3d Cir. 1994) (noting that unlike Title VII, First Amendment retaliation claims shift the

---

[7] When a government law or policy restricts constitutionally protected expression, "[t]he government bears the burden of proving that the [policy] is constitutional; thus, the plaintiff must be deemed likely to prevail if the government fails to show the constitutionality" of the challenged policy. *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (internal quotation marks omitted).

burden of persuasion to the defendant to prove lack of but-for causation). Mr. Khalil is likely to demonstrate each of the requisite elements here.

### a.  Factor 1: Mr. Khalil Engaged in Protected Conduct.

First, as this Court has already found, there is "ample record evidence" that Mr. Khalil has engaged in protected speech in support of Palestinian rights, critical of Israel and of U.S. support for Israel's actions in Gaza—including making public statements, participating in peaceful protests, and serving as mediator between student activists and university administrators. ECF 299 at 6 n.5 (citing Th. Am. Pet. ¶¶ 22–23, 26, 29; June 4 Khalil Decl. ¶¶ 12–14)). Such political speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  ECF 214 at 82 (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)); *see also Bridges v. Wixon,* 326 U.S. 135, 148 (1945) (holding that noncitizens in the United States are afforded the same First Amendment rights as citizens). In addition, Mr. Khalil's subsequent filing of this lawsuit is also First Amendment-protected speech and petitioning. *Conard*, 902 F.3d at 184 (finding "no doubt that [plaintiff's] initiation of the first action was constitutionally protected"); *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997) (filing of lawsuit is constitutionally protected).

### b.  Factor 2: The Government Took Retaliatory Action.

As to the second factor, the government's attempts to remove Mr. Khalil by lodging the Post-Hoc Charge constitute retaliatory action sufficient to deter a person of "ordinary firmness" from exercising their First Amendment rights. *See O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) (explaining that the "deterrence threshold" for First Amendment retaliation claims is "very low"). The Supreme Court has "long recognized" that deportation is "a particularly severe 'penalty'" for lawful permanent residents. *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (citing *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893)); *see also Ragbir v. Homan*, 923 F.3d 53, 71–72 (2d Cir. 2019) (holding that threat of removal constitutes adverse action under First Amendment analysis). In

11

addition, Mr. Khalil's detention incident to the Post-Hoc Charge is also an adverse action sufficient to satisfy this prong of the analysis. *See Ercelik v. Hyde*, No. 1:25-CV-11007, 2025 WL 1361543, at *11 (D. Mass. May 8, 2025) (holding petitioner's immigration detention was sufficient evidence to show he had been "clearly … subjected to an adverse action"); *see also Mohammed H. v. Trump*, No. 25-1576, 2025 WL 1334847, at *3 (D. Minn. May 5, 2025) ("Being detained by ICE interferes with Petitioner's ability to speak, and it is reasonable that losing one's freedom would chill an ordinary person from continuing to speak.");[8] *Aditya W. H. v. Trump*, No. 25-CV-1976, 2025 WL 1420131, at *11 (D. Minn. May 14, 2025) (same). And although subjective evidence of speech chilling is not necessary to establish the objective "person of ordinary firmness" standard, *see Suppan*, 203 F.3d at 235; *Cordero v. Warren*, 612 F. App'x 650, 652 (explaining that the second prong is an objective inquiry), Mr. Khalil's detention did, as the Court has found, actively chill his ability to engage in protected speech, including to participate in peaceful protest, *see* ECF 214 at 96; *see also* ECF 299 at 6. It has also chilled that of his family and academic community, *see* ECF 280 at 5—reinforcing that a person of "ordinary firmness" would be deterred from engaging in similar protected expression.

### c. Factor 3: Mr. Khalil's Expression Was a Substantial or Motivating Factor For the Government's Actions.

As to the third factor, causal connection, the undisputed record shows that the government's decision to target Mr. Khalil for removal under the Post-Hoc Charge was, and continues to be, substantially motivated by his protected activity—both his speech in support of Palestinian rights and his initiation of this action. *See Ercelik*, 2025 WL 1361543, at *11 (finding, on similar facts, that "every

---

[8] Petitioner previously submitted the district court's opinion in *Mohammed H.*, in which the court granted petitioner's request for release after finding, *inter alia*, that petitioner had "presented substantial First and Fifth Amendment claims." ECF 237. The court in that case has since granted the petitioner's habeas and held that his arrest and detention based on the Secretary of State's determination that he created a public safety risk—despite the presence of facially valid additional charges—were retaliatory. *See* 2025 WL 1692739, at *4 (D. Minn. June 17, 2025).

fact points to Petitioner's protected conduct as the substantial or motivating factor for Respondents'
pursuit of detention"); Th. Am. Pet. ¶¶ 88-89; ECF 280 at 1-2. To prove causation, Mr. Khalil may
rely on both subjective and objective evidence showing that his protected activity was "a substantial"
or "a motivating factor" in the government's decision to take adverse action against him. *Mt. Healthy*,
429 U.S. at 287; *see Falco v. Zimmer*, 767 F. App'x 288, 311 (3d Cir. 2019) (stating that plaintiff need not
show the decision was "motivated solely" or even primarily by anti-speech animus, only that protected
conduct was a substantial or motivating factor for the retaliation). Evidence of a causal link may
include government statements, timing and proximity of the adverse action, a pattern of antagonism,
and other evidence "gleaned from the record as a whole." *Conard*, 902 F.3d at 184 (citation omitted);
*see also Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) (same). All are present here.

The record demonstrates the Post-Hoc Charge was "substantially motivated" by Mr. Khalil's
protected expressive activities and was in fact just one of many retaliatory acts taken by the
government to shore up its constitutionally infirm attempt to remove Mr. Khalil under the Foreign
Policy Ground. As an initial matter, the government first arrested and detained him in direct response
to his speech. *See* Th. Am. Pet. ¶¶ 82-83. Notably, the government has never bothered to dispute any
of Mr. Khalil's substantial evidence on this point. *See* ECF 156 at 28-32 (conflating Mr. Khalil's distinct
First Amendment claims and arguing only that the government can detain him because it has "facially
neutral" reasons to remove him). Nor could it. The purported basis of his initial arrest and detention—
the Foreign Policy Ground—expressly relied on Mr. Khalil's protected activity. *See* ECF 90-1 (I-261
form). Thus, although retaliatory motive is "almost never subject to proof by direct evidence," *Watson*,
834 F.3d at 422, here there is actually such direct evidence, *see, e.g., Miller v. Mitchell*, 598 F.3d 139, 152–
55 (3d Cir. 2010) (finding that district attorney's threats to prosecute protected speech constituted
evidence of retaliatory motive); *see also Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001) (finding that

prison official's threats of parole denial in response to constitutional challenge was evidence of retaliatory motive).

Moreover, the government's own executive orders outlining plans to target such advocacy, *see* Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) (instructing agencies to target noncitizens who "espouse hateful ideology"); Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025) (instructing agencies to investigate "campus anti-Semitism"); July 9 Salama Decl. Ex. C (Exec. Order No. 14188 "Fact Sheet" (Jan. 30, 2025)) (describing the order as a "promise" to "deport Hamas sympathizers," sending a message to all "resident aliens who participated in pro-jihadist protests" that the government "will find you . . . and deport you"), public statements reflecting hostility toward pro-Palestine speech, *see* ECF 68, March 17 Declaration of Veronica Salama Exs. A-D (collecting interviews, public statements, and reporting where the government conflates any participation in pro-Palestinian advocacy or protest with being "pro-jihadist," "pro-Hamas," and antisemitic); ECF 175-2, April 6 Declaration of Molly Linhorst ("April 6 Linhorst Decl.") Exs. A-S (same), and statements praising Mr. Khalil's arrest and detention as a "blueprint" for future immigration enforcement, Th. Am. Pet ¶ 77; *see also id.* ¶¶ 73-81, further evince that the government's intent has always been to arrest and detain Mr. Khalil in response to his protected speech, *see Ragbir*, 923 F.3d at 70-71 (citing remarks of immigration officials as indicia of retaliation); *Gutierrez-Soto v. Sessions,* 317 F. Supp. 3d 917, 934 (W.D. Tex. 2018) (same); *Mohammed H.*, 2025 WL 1692739, at *3 (finding that petitioner's evidence of the Trump administration's "stated … disfavor for international students who express support for Palestine or criticize Israel"—including "executive orders, public statements, and social media posts"—was sufficient to show, by a preponderance of the evidence, that his speech "prompted the enforcement and detention").

The government's addition of a second ground for removal and detention—the Post-Hoc Charge—does not undermine the retaliatory nature of Mr. Khalil's arrest and detention, it reinforces

it. When faced with a petition and a preliminary injunction motion challenging the constitutionality of the Rubio Determination, the government promptly added a highly unusual charge that is rarely, if ever, brought against lawful permanent residents with no criminal history. *See* July 9 Marks Decl. ¶¶ 8-9; July 9 Doyle Decl. ¶ 8; July 8 Ryo Decl. ¶ 10; June 4 Kurzban Decl. ¶¶ 17-18. And when faced with a court order enjoining detention based on the Rubio Determination, the government made the even more unusual decision to detain Mr. Khalil on the basis of the Post-Hoc Charge. *See* June 4 Doyle Decl. ¶¶ 18 (explaining that in her experience, including as ICE's Principal Legal Advisor, detention based on the Post-Hoc Charge was unusual); July 9 Doyle Decl. ¶ 8 (same); June 4 Kurzban Decl. ¶¶ 14-18 (same); June 4 Tolchin Decl.  ¶¶ 16-17 (same); July 8 Ryo Decl. ¶¶ 10-11 (summarizing data showing 0.14% of male immigration detention cases involved lawful permanent residents without criminal convictions, and of the 0.01% of people facing removal proceedings based solely on the same misrepresentation charge as Mr. Khalil and in the same procedural posture, 1.76% of that 0.01% were detained). "Instead of engaging in [] repair, the Government compounded [the plaintiff's] grievances." *Anderson*, 125 F.3d at 162 ("Were we to ignore the Government's retaliation, we would render [the plaintiff]'s First Amendment petition right effectively useless.").

The timing of the government's decisions to add the Post-Hoc Charge and, later, to continue detaining Mr. Khalil based on it, provides compelling evidence of retaliatory motive. *Ragbir*, 923 F.3d at 79 (cautioning that additional near-term attempts to remove plaintiff would carry the "taint of the unconstitutional conduct"). Within days of arresting Mr. Khalil—and facing a lawsuit highlighting the dubious constitutionality of the Rubio Determination—the government added a new claim. *See Aditya W. H.*, 2025 WL 1420131, at *12 (noting that, since "DHS/ICE had apparently already determined that it would immediately pursue removal of Mr. H *before*" it added a new basis for removal, that timing "flatly undercuts" the nonpretextual motives asserted by the government for the later-added basis) (emphasis in original); Th. Am. Pet. ¶ 88. And within hours of Mr. Khalil's court filing noting that he

15

had never been detained pursuant to any charge other than the just-enjoined Rubio Determination, the government asserted for the first time that Mr. Khalil was "now detained" pursuant to the Post-Hoc Charge. ECF 304 at 1. This sequence of events demonstrates an "unusually suggestive" temporal connection between Mr. Khalil's protected conduct and his continued detention, *Watson*, 834 F.3d at 424, both as immediate retaliation for his litigation, and as another avenue of retaliation for his expressive activities in light of the progress of that litigation, *see also Anderson*, 125 F.3d at 163 (police surveillance of plaintiff shortly after publication of article about his discrimination lawsuit against the police department was retaliation); *Aditya W. H.*, 2025 WL 1420131, at *12 (noting "inference of retaliatory motive is further supported by DHS first citing and then abruptly disavowing the Foreign Policy Ground as the stated justification" for its adverse acts).

Finally, this case is replete with evidence of a "pattern of antagonism" and retaliatory conduct, both within Mr. Khalil's case and across related cases. *See Watson*, 834 F.3d at 422. The pattern began with Mr. Khalil's warrantless arrest and unusual transfer more than a thousand miles away from his then-pregnant wife. Th. Am. Pet. ¶¶ 48, 54-57; June 4 Doyle Decl. ¶¶ 7-8. It continued with the aggressive and taunting statements government officials made publicly celebrating his detention and promising the detention of others. *See, e.g.*, Th. Am. Pet. ¶¶ 73-81. Mr. Khalil sued, and since then the government has added additional removal charges, refused to schedule—without Court intervention—a contact visit with his wife and newborn son, denied his request to be moved closer to his child in contravention of ICE's own directives, held him in detention on unusual grounds, and criticized his recent release by further taunting him and suggesting he "self-deport." *Supra* at 3-8. Even after this Court's injunction, public statements by White House officials have focused on Mr. Khalil's speech specifically—not the Post-Hoc Charge—as their justification of detention and removal. July 9 Salama Decl. Ex. G (White House spokesperson Abigail Jackson characterizing Mr. Khalil as "siding with Hamas terrorists and organizing group protests" and stating the government will hold him

16

"accountable"). Mr. Khalil's case also falls within a broader pattern of antagonism involving other students and professors engaged in pro-Palestinian speech where ICE has engaged in similar conduct: unusual arrests, transfers, and continued detention. *See* ECF 124 at 7-8; ECF 68-2; Linhorst Decl. Exhibits A-F, ECF 175-2 (collecting cases); ECF 284-5; ECF 237 (same); ECF 251 (same); ECF 225; ECF 233 at 10; ECF 280 at 3, n.4; ECF 308 at 2-3. Taken together, these patterns of conduct weigh overwhelmingly in support of a finding of retaliation. *See Gutierrez-Soto,* 317 F. Supp. 3d at 934.

### 2.  The Government Has Not and Cannot Meet Its Burden.

The government has not attempted to create any record showing it would have taken the same adverse actions absent Mr. Khalil's protected speech. *See Mt. Healthy*, 429 U.S. at 287. Instead, it has argued previously that the Post-Hoc Charge is "facially valid," ECF 156 at 28, and that the Court need not inquire further. But "[t]he presence of a facial statutory ground does not preclude inquiry into retaliatory motive, particularly where—as here—there is evidence that the [decision] was driven by political speech and followed by a detention unsupported by any individualized showing of danger to the public or flight risk." *Mohammed H.*, 2025 WL 1334847, at *5 (citing *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019)). As the Third Circuit has made clear, "[d]iscriminatory enforcement of a statute or ordinance is not justified simply because the enforcement is otherwise valid." *Hill v. City of Scranton*, 411 F.3d 118, 130 (3d Cir. 2005); *see also Anderson*, 125 F.3d at 161 ("[A]n otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech.").[9]

---

[9] To be sure, Mr. Khalil does not concede that the Post-Hoc Charge is anything other than meritless and frivolous. *See* July 9 Marks Decl. ¶¶ 7-10 (former IJ describing the charge as "so baseless as to appear to be pretextual" and "devoid of even a scintilla of evidence"); July 9 Doyle Decl. ¶ 9 (characterizing decision sustaining charge as "highly unusual" in light of the "scant" evidence presented and other factors); June 4 Sinodis Decl. ¶¶ 20-27 (summarizing evidence); June 4 Tolchin Decl. ¶¶ 6-16 (stating she has "never seen" charges like the Post-Hoc Charge alleged against Mr. Khalil brought or sustained); July 8 Ryo Decl. ¶¶ 10-11 (reporting on statistical data highlighting the infrequency of the charge). While Mr. Khalil "certainly [does] not need" to prove that he did not

*Hill v. City of Scranton* is instructive. 411 F.3d at 133. There, police officers who had sued the city were, within a year of losing that litigation, targeted for facially valid enforcement of a rarely applied residency ordinance. *Id.* at 131-33. The Third Circuit found the city's sporadic enforcement of the ordinance along with evidence that the mayor was "particularly concerned" with the officers who had brought the suit supported an inference of retaliation. *Id.* at 133. So too in *Mohammed H.*, where the Court held additional charges brought after an initial invocation of the Foreign Policy Ground were retaliatory in light of the "strong temporal and circumstantial link between the Government's statements regarding international students, Petitioner's public expression, and the enforcement actions taken against him." 2025 WL 1692739, at *4.

The same is true here. Mr. Khalil has more than met his burden to establish First Amendment retaliation, and the government has failed to contest these facts or otherwise demonstrate that it would have taken any of these adverse actions in the absence of Mr. Khalil's protected speech. Nor could any post-hoc rationalization carry any weight now, given the government's repeated public statements about why it has pursued the removal and detention of Mr. Khalil. *See* Th. Am. Pet. ¶¶ 73-81; June 4 Khalil Decl. ¶ 10. For all these reasons, Mr. Khalil is likely to succeed on the merits of his retaliation claim challenging the Post-Hoc Charge itself, and his separate retaliation claim against detention based on the Post-Hoc Charge.

### 3. Nieves does not apply, and, even if it did, that standard is met here.

The government has argued that *Nieves v. Bartlett* applies to Mr. Khalil's retaliation claims. *See* ECF 156 at 28. In *Nieves*, the Supreme Court held that a litigant who seeks damages to redress a

---

intentionally misrepresent a material fact on his green card application in order to succeed on his First Amendment retaliation claim, here the meritless nature of the charge is "powerful evidence" of its pretextual nature. *Hill*, 411 F.3d at 130; *see also Wichert v. Walter*, 606 F. Supp. 1516, 1521-22 (D.N.J. 1985) (finding that, given the context in which the charges were brought, and their underlying lack of merit, the charges were only brought for "the purpose of harassment and retaliation, with no hope of eventual success").

retaliatory criminal arrest by a police officer must prove the absence of probable cause for the arrest. *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019). This standard does not apply to this case for several reasons.

First, *Nieves* does not apply to civil arrests. *See Media Matters v. Bailey*, No. 24-CV-147, 2024 WL 3924573, at *12–13 (D.D.C. Aug. 23, 2024) (collecting cases and explaining why "rationales for the no-probable-cause rule are ill-fitting in the civil investigative setting"). This is particularly true in the immigration context, where there is no corresponding probable cause requirement.[10] *See Ragbir*, 923 F.3d at 67 & n.17 (noting that the probable cause requirement for the Fourth Amendment serves a specific purpose for securing an individual and evidence in the process of investigating a criminal offense, circumstances not readily translatable into the civil immigration context); *Bello-Reyes v. Gaynor*, 985 F.3d 696, 701 (9th Cir. 2021) (refusing to apply *Nieves* in part because "no equivalent benchmark [to probable cause] exists where ICE is revoking bond" and thus "extending [*Nieves*] to this situation would effectively eliminate almost any prospect of obtaining release on habeas for actually retaliatory, unconstitutional immigration bond revocation").

Second, even if *Nieves* applied to civil arrests, it applies only to split-second arrest decisions, rarely at issue in the immigration enforcement context and certainly not at issue here given the highly orchestrated decision to target, arrest, and detain Mr. Khalil. *See Nieves,* 587 U.S. at 401. Unlike police officers enforcing criminal law, federal immigration officers are generally not deciding whether to take action against someone in "split-second judgments" that might include consideration of an arrestee's protected speech in the heat of the moment or at the scene of a crime. *Id.*

---

[10] To avoid any doubt, Mr. Khalil does not concede that the government could demonstrate any immigration equivalent of "probable cause" to arrest and detain him. Unlike a criminal arrest, his immigration arrest involved no probable cause finding, judicial warrant, or even an administrative warrant. Salama Decl. Ex. B ("July 9 Sinodis Decl.") ¶¶ 2-6. At no point was he afforded a probable cause hearing. *Id.*

Third, even if *Nieves* applied to civil arrests involving non-split-second decision-making, it would not apply to habeas petitioners challenging detention. *Nieves* is a section 1983 damages case that addresses individual officer liability for past conduct. *Id.* at 396-97. It does nothing to alter long-standing First Amendment jurisprudence prohibiting government officials from engaging in retaliation. Justice Gorsuch explained this distinction in *Nieves*:

> Both sides accept that an officer violates the First Amendment when he arrests an individual in retaliation for his protected speech. They seem to agree, too, that the presence of probable cause does not undo that violation or erase its significance. . . . If the state could use these laws not for their intended purposes but to silence those who voice unpopular ideas, little would be left of our First Amendment liberties, and little would separate us from the tyrannies of the past or the malignant fiefdoms of our own age. . . . So if probable cause can't erase a First Amendment violation, the question becomes whether its presence at least forecloses a civil claim for damages as a statutory matter under § 1983.

587 U.S at 412-13 (Gorsuch, J., concurring). As the Ninth Circuit concluded in *Bello-Reyes*, *Nieves* is "closely dependent on § 1983 case law" whereas a habeas "petitioner need not identify a particular violator, only that his confinement is unconstitutional." 985 F.3d at 701. The typical sensitivities surrounding damages actions and liability are nonexistent in this case and cannot erase a First Amendment violation for purposes of habeas review.

Even if *Nieves* did apply to habeas claims involving civil arrests, this case would fall under two separate exceptions to the *Nieves* rule. The first is the *Lozman* line of cases: retaliation pursuant to official government policy or the orchestration of retaliation by government officials. *Lozman v. Riviera Beach*, 585 U.S. 87, 99-101 (2018) (holding that, in cases where retaliation stems from a policy or plan, there is "a compelling need for adequate avenues of redress," and the *Mt. Healthy* standard should apply). Mr. Khalil alleges and has provided evidence likely to establish

an official government policy of retaliation, *see, e.g.,* Th. Am. Pet. ¶¶ 2-3, 37-57, 73-89; ECF

124 at 4-8; *supra* at 16, which suffices to bring this case under the normal *Mt. Healthy* test.[11]

The second exception is where a litigant demonstrates that their retaliation involves

"circumstances where officers have probable cause to make arrests, but typically exercise their

discretion not to do so." *Nieves,* 587 U.S. at 406. Objective evidence that officers typically exercise

discretion not to pursue such charges is sufficient to meet this exception. *Gonzalez v. Trevino*, 602

U. S. 653, 658 (2024) (describing the objective evidence standard and rejecting a more

stringent requirement). The Supreme Court recognized that, in contexts in which officers exercise

prosecutorial discretion, "an unyielding requirement to show the absence of probable cause could

pose a risk that some police officers may exploit the arrest power as a means of suppressing

speech." *Nieves,* 587 U.S. at 406 (internal citations and quotations omitted). As established

above, the government pursues removal or detention based on the Post-Hoc Charge in a vanishingly

small number of cases, and rarely if ever on facts similar to those in this case. *See supra* at 4-6, 14-15

(collecting government's statistical data, data analysis, and sworn declarations). Thus this exception

also applies, and, under any version of the proper analysis, *Mt. Healthy* remains the relevant standard.

### B. Mr. Khalil's detention under the Post-Hoc Charge violated his right to substantive due process.

Mr. Khalil is also likely to succeed on his separate claim that his detention under the Post-Hoc

Charge has violated his due process rights for two independent reasons: because it is retaliatory, and

---

[11] *Lozman* "applies to a case like this one," ECF 214 at 69 (citing *Novak v. City of Parma*, 932 F.3d 421, 429 (6th Cir. 2019)), because it is on all fours with that decision's reasoning as to why challenges to "official policies of retaliation" are "far afield from the typical retaliatory arrest claim" involving suits against "individual officers" who effectuated an arrest, *see Novak*, 932 F.3d at 429-30 (quoting *Lozman* and *Nieves*). *Lozman* and its progeny, including *Novak*, do not hold or suggest that federal "official policies" are meaningfully different from municipal "official policies" under this analysis, and instead focus on the core requirement that a challenge involve "more governmental action than simply arrest." *Lozman*, 585 U.S. at 899; *see also Novak*, 932 F.3d at 429 (focusing on the substantive import of these key features discussed in *Lozman*, and nothing specific to municipalities). This is precisely the challenge Mr. Khalil presents.

because it serves no constitutionally permissible purpose. "[T]he Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings," including in detention incident to those proceedings. *Calderon-Rosas v. Att'y Gen. United States*, 957 F.3d 378, 385 (3d Cir. 2020) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 210 (3d Cir. 2020). Immigration detention is civil and must "bear[] a reasonable relation to the purpose for which the individual [is] [detained]" so that it remains "nonpunitive in purpose and effect." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (cleaned up). Mr. Khalil's detention under the Post-Hoc Charge fails that test.

   As demonstrated above, the government detained Mr. Khalil not for any bona fide law enforcement purpose but to punish him for his speech. Civil detention cannot be a "mechanism for retribution," *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (cleaned up), because "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives," *Bell v. Wolfish*, 441 U.S. 520, 539 n. 20 (1979) (cleaned up); *see also Ozturk v. Trump*, F. Supp. 3d, 2025 WL 1145250, at *21 (D. Vt. Apr. 18, 2025) (finding Secretary Rubio's public statements "imply that . . . detention is motivated by a desire to compel [Ozturk] to voluntarily depart the country" and "suggest[] that her detention advances a message to others in similar situations that they should choose to leave the country rather than face detention," but holding "courts have not sanctioned the use of the immigration detention system to strike fear in or punish individuals" (citing U.S. Dep't of State, *Secretary of State Marco Rubio Remarks to the Press* (Mar. 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3/)). Thus, for all the reasons the government's efforts to detain Mr. Khalil's detention have been retaliatory in violation of the First Amendment, they have also been a violation of the Fifth Amendment. *See Mahdawi v. Trump*, No. 2:25-CV-389, 2025 WL 1243135, at *11 (D. Vt. Apr. 30, 2025) (noting that "[t]he same evidence that supports [petitioner's] First Amendment claim supports his Fifth Amendment claim"); *Mohammed H.*, 2025 WL 1692739, at *5 (same).

22

Even in the absence of the affirmative evidence of punitive intent, Mr. Khalil's detention under the Post-Hoc Charge violated substantive due process because the uncontroverted evidence demonstrates that he is not a flight risk or danger to the community, *see* June 20 Hearing Tr. 56:5-11, and therefore his detention serves no legitimate purpose. There are only two legitimate purposes for civil immigration detention: mitigating flight risk and preventing danger to the community. *See Demore v. Kim*, 538 U.S. 510, 531 (2003) (Kennedy, J., concurring); *Zadvydas*, 533 U.S. at 690; *German Santos*, 965 F.3d at 214; *Ozturk*, 2025 WL 1145250, at *20 ("Rather than punishment, immigration detention must be motivated by the two valid regulatory goals that the government has previously argued motivate the statute: ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community." (cleaned up)).[12] Here, as the uncontested evidence overwhelmingly shows, Mr. Khalil's detention under the Post-Hoc Charge has served neither purpose. *See, e.g.,* June 20 Hearing Tr. 56:5-11; Th. Am. Pet. ¶¶ 4-5; ECF 91-1, 93-1, 56-2, 56-6; June 3 Abdalla Decl. ¶¶ 4, 28-30; June 4 Khalil Decl. ¶¶ 5, 12, 15, 17; *see also* ECF 299 (repeatedly noting Respondents have not contested Mr. Khalil's evidence). And the fact that Mr. Khalil's detention could not be justified by legitimate reasons further underscores its punitive nature.

Because the government cannot justify Mr. Khalil's detention by reference to those constitutionally required factors, the government has ignored them and instead claimed broadly that "Congress authorized detention of aliens and gave the Executive significant discretion in that regard."

---

[12] Accordingly, the government's own regulations and guidance also require detention under Section 1226(a) be justified by flight and danger considerations. *See* June 4 Kurzban Decl. ¶¶ 10-13; *see also In re Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006) (when determining whether to release a noncitizen from detention, an IJ considers whether the individual "is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk"); *Velasaca v. Decker*, 458 F. Supp. 3d 224, 242 (S.D.N.Y. 2020) (finding ICE's 1226(a) detention without individualized consideration of flight risk and danger likely violated INA and implementing regulations).

ECF 310 at 1.[13] But, as this Court has recognized, Congress cannot authorize unconstitutional detention. ECF 299 at 12-13 (finding Mr. Khalil cannot be detained on the basis of an unconstitutionally applied statute). Nor does the government have "discretion" to detain someone for unconstitutional reasons, *see Demore*, 538 U.S. at 510, 532–33 (Kennedy, J., concurring) (noting courts may "inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons"); *Ercelik*, 2025 WL 1361543, at *14 ("Respondents have claimed nothing but ICE's discretion as a talisman of protection. In the name of discretion, Respondents ask the Court to close its eyes to reality. The guarantees of the Constitution allow no such thing."); *Mahdawi*, 2025 WL 1243135, at *11 (quoting *Zadvydas*, 533 U.S. at 721 (Kennedy, J., dissenting)) ("[T]he government's discretion is not unbounded, and 'both removable and inadmissible [noncitizens] are entitled to be free from detention that is arbitrary or capricious.'"). The government's reliance on the Immigration and Nationality Act misses the point; any detention must also satisfy the Constitution's guarantee of due process.

For these reasons, several courts have now ordered release of noncitizens similarly subject to the government's unlawful retaliatory Policy because punitive or unjustified detention runs afoul of substantive due process. *Mohammed H.*, 2025 WL 1334847, at *6 ("[T]o the extent that his arrest and detention are in furtherance of the Government's policy of punishing international students who voice pro-Palestinian views—the Fifth Amendment claim is sufficiently clear for the same reasons that the First Amendment claim is sufficiently clear."); *Ercelik*, 2025 WL 1361543, at *14 (holding the petitioner's detention likely violated due process because it was retaliatory and "prolonging the Petitioner's detention was intended to be punitive"); *Ozturk*, 2025 WL 1145250, at *21 ("Where a

---

[13] The government misconstrued this Court's prior order in claiming "the Court has already determined that Khalil's detention remains lawful" under the Post-Hoc Charge. ECF 310 at 1. This Court has never ruled on Mr. Khalil's First and Fifth Amendment claims that his detention was unconstitutional. *See* ECF 299.

detainee presents evidence that her detention, though discretionary, is motivated by unconstitutional purposes in violation of the Due Process Clause, the Court may reasonably conclude the same in the absence of countervailing evidence."); *Mahdawi*, 2025 WL 1243135, at *11 ("If the Government detained Mr. Mahdawi as punishment for his speech, that purpose is not legitimate, regardless of any alleged First Amendment violation. Immigration detention cannot be motivated by a punitive purpose. Nor can it be motivated by the desire to deter others from speaking."). In sum, any detention of Mr. Khalil on the basis of the Post-Hoc Charge—without more—would independently violate due process.

## II.    MR. KHALIL IS EXPERIENCING IRREPARABLE HARM.

The Third Circuit "presume[s] that First Amendment harms are irreparable." *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204 (3d Cir. 2024), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (2025); *see also* ECF 272 at 99 n. 87 ("A likely violation of a First Amendment right can excuse the need to show irreparable injury.") (citing *Delaware State Sportsmen's Ass'n*); ECF 299 at 6; *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010). Because Mr. Khalil is likely to succeed on his First Amendment retaliation claims, irreparable harm is established on that basis alone.

Nevertheless, Mr. Khalil can show additional concrete forms of irreparable harm both related and unrelated to his speech. This is because the very purpose of the Post-Hoc Charge—as with the government's other actions seeking to keep Mr. Khalil in detention and on a fast track to removal— is to silence, restrict, and chill his protected speech, now and in the future, and to send a message to other would-be protesters.

For example, as this Court has found, "even '[b]eyond . . . detention'" an active charge of removability against Mr. Khalil may still "chill[] his speech." ECF 299 at 10 n.11. While in the case of the Rubio Determination, that chilling arose "in part" because of the vagueness of the Foreign Policy

Ground, *id.*, it also flowed directly from Mr. Khalil's ongoing fear "that any expressive activity I undertake carries the risk of further punishment or surveillance," June 4 Khalil Decl. ¶ 14. The threat of detention and removal based on the retaliatory Post-Hoc Charge creates the same fear of further retaliatory action, and the same chill. *See* July 9 Khalil Decl. ¶¶ 5-13 (describing a "constant state of hypervigilance" and the need to "censor myself before speaking"). As long as the government's retaliatory Post-Hoc Charge remains live and proceeding through the immigration court, it achieves its purpose of deterring Mr. Khalil and others from engaging in protected expressive activity the government disfavors. *See, e.g.*, *Dombrowski v. Pfister*, 380 U.S. 479, 487-89 (1965) (finding "sufficient irreparable injury" to warrant a preliminary injunction in part because "[t]he chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure").

In addition, because his detention based on the Post-Hoc Charge has not been enjoined, Mr. Khalil's current release is pursuant to a bail order that includes conditions that materially limit his ability to travel within and without the United States to engage in advocacy, speak on issues of public concern, or visit friends and family, *see* ECF 317 (order setting limitations on travel as condition of release). Without these restrictions—in other words, if the government were enjoined from detaining him based on the Rubio Determination or the Post-Hoc Charge—he would be traveling to speak regularly, specifically on the core political issues for which he was targeted. July 9 Khalil Decl. ¶¶ 18-20; *see also* Th. Am. Pet. ¶¶ 23–27 (noting, in the past, Mr. Khalil has expressed his views by helping to organize educational events and lectures, participating in interviews with national and international media outlets, and advocating with international organizations, universities, and other spaces of influence).

Beyond the Post-Hoc Charge's effect on speech, "serious long-term damage to career prospects can count as irreparable harm," ECF 299 at 5 (citing *Kamdem-Ouaffo v. Task Mgmt. Inc.*, 792

F. App'x 218, 222 (3d Cir. 2019); *Morton v. Beyer*, 822 F.2d 364, 372 n.13 (3d Cir. 1987); *Acierno v. New Castle Cnty.*, 40 F.3d 645, 654 (3d Cir. 1994); *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 89 & n.16 (1981); *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1055-56 (5th Cir. 1997); *NAACP, Inc. v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995)), and here again the Post-Hoc Charge is causing severe damage to Mr. Khalil's ability to further his career, *see* July 9 Khalil Decl. ¶¶ 5, 14-17, 20 (describing ongoing harm to his credibility, short- and long-term career opportunities, and collateral consequences on his career). The same issues with travel, with credibility, and with reputation that the Rubio Determination caused and that the Court credited as an example of irreparable harm, ECF 299 at 5 (citing June 4 Khalil Decl. ¶¶ 3, 8-10, 16, 22), flow equally from the Post-Hoc Charge, which labels Mr. Khalil a fraud in the eyes of the United States government, severely restricts his ability to travel, and undermines his credibility, writ large, including in his field of diplomacy and international affairs, *see id.*; July 9 Khalil Decl. ¶¶ 14-17.

Similarly, "when it cannot be compensated through money damages, as cannot readily be done here, reputational injury can count as irreparable harm." ECF 299 at 5 (citing *Guardian Life Ins. Co. of Am. v. Est. of Cerniglia*, 446 F. App'x 453, 456 (3d Cir. 2011); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004); *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998); *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021); *Register.com., Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *Rent-a-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (4th ed. 2025) ("Injury to reputation . . . is not easily measurable in monetary terms, and so often is viewed as irreparable."); *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 178–79 (3d Cir. 2008)). And again, as with the Rubio Determination, the Post-Hoc Charge causes ongoing irreparable harm to Mr. Khalil's reputation: it designates him the rare lawful permanent resident whom the United States has chosen to seek to deport on the basis of a fraud charge involving

27

his immigration paperwork, and it continues to subject him to the humiliating public statements of the highest government officials trumpeting his deportation proceedings. *See id.* (citing June 4 Khalil Decl. ¶¶ 3, 8-10, 16, 22); July 9 Khalil Decl. ¶¶ 5, 14-17, 20.

## III.    THE EQUITIES WEIGH HEAVILY IN MR. KHALIL'S FAVOR.

The equities weigh in Mr. Khalil's favor for substantially the reasons already recognized in this Court's previous order. ECF 299 at 11 ("When a plaintiff is claiming the loss of a First Amendment right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue." (cleaned up)).

The public's interest is likewise, as this Court recognized, in favor of upholding the First Amendment. ECF 299 at 12 ("There is a strong public interest in upholding the requirements of the First Amendment. And, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." (cleaned up)). As the record here shows, the government's retaliatory actions have had an enormous chilling effect not just on Mr. Khalil, but on many other noncitizens and citizens nationwide, including his family and people in his surrounding academic community, who are refraining from speaking on a matter of political import. *See* June 3 Abdalla Decl. ¶¶ 25-27; ECF 284-4 (AAUP declarations describing chill); ECF 284-6, Ex. F-2 ¶¶ 8-9 (same with respect to legal organization Muslim Advocates); ECF 284-10, Ex. J ¶¶ 5-10 (Jewish activists and students); 284-6, Ex. F-3 ¶¶ 5-10 (legal intakes to the law firm Dratel & Lewis); *see generally* ECF 284-9 (organization Human Rights Watch); ECF 284-8, Exs. H-1-12 (students); ECF 284-7 Exs. G-1-11 (professors). Mr. Khalil has also submitted evidence that the government's Policy undermines the public's interest in upholding democratic and First Amendment principles domestically and abroad. *See generally* ECF 284-14 (Declaration of Christopher J Le Mon); *id.* ¶ 22 (former State Department official stating "allowing the Federal government to carry out reprisals against individuals as a response to dissent, protest, or

critical speech that the current administration dislikes would strike a serious blow against the health and stability of American democracy, would deal a serious blow to U.S. credibility worldwide on human rights issues, and would make every person in the United States—noncitizens and citizens alike—far less safe and far less free").

Furthermore, through imposing such a chilling effect on third party speakers, the government is able to manipulate public discourse and distort debate on an issue of public concern during a period of time when such issues are of greatest salience and are the subject of political decision-making. The ability to censor debate for any period of time is a loss to the public that cannot be remedied. These considerations weigh heavily in Mr. Khalil's favor. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176–77 (3d Cir. 2017) (requiring courts to consider the impact of a preliminary injunction on "other interested persons and the public interest").

## CONCLUSION

For all these reasons, this Court should preliminarily enjoin the government from seeking to remove Mr. Khalil and from re-detaining him based on the Post-Hoc Charge. Because Mr. Khalil's claims sound in retaliation, and because of the history of punitive and retaliatory detention in this case, *see supra* at 5-8, 12-16, Mr. Khalil respectfully requests that the Court also order that, should the government seek to re-detain Mr. Khalil in connection with his immigration status or proceedings, or for any violation of any conditions of release, the government must provide 72 hours' notice to the Court and to Mr. Khalil's counsel to enable Mr. Khalil to be heard regarding whether any such asserted basis for detention constitutes a pretext for First Amendment retaliation. *See, e.g.*, *Ozturk v. Trump*, No. 25-cv-374, ECF 141 ¶ 8 (D. Vt. May 16, 2025) (setting notice requirement for re-detention); *Chung v. Trump*, No. 25-cv-2412, ECF 57 ¶ 3 (S.D.N.Y. June 5, 2025) (same for any detention).[14]

---

[14]For the reasons discussed at ECF 332, the petitioner respectfully submits that any such order enjoining the respondents from "seeking to remove" or "seeking to detain" Mr. Khalil on the basis of

Respectfully submitted,

s/  *Liza Weisberg*

AMERICAN CIVIL LIBERTIES UNION OF NEW
JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
Liza Weisberg
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar*
Sidra Mahfooz*
Michael K.T. Tan*
Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Tyler Takemoto*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Mudassar Toppa*
Shezza Abboushi Dallal*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das*
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108

---

the Post-Hoc Charge would specifically prohibit DHS from relying on the Post-Hoc Charge in removal proceedings and would prohibit the immigration judge or the Board of Immigration Appeals from considering the enjoined charge.

30

Tel: (415) 981-3000
Fax: (415) 981-3003

*Appearing Pro hac vice*                    *Counsel for Petitioner*