October 6, 2025

VIA ECF
Honorable Michael E. Farbiarz
United States District Judge
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street, Newark, New Jersey 07101

Re: *Khalil v. Trump, et al.*, No. 25-cv-1963 (MEF) (MAH)

Dear Judge Farbiarz,

Petitioner Mahmoud Khalil respectfully writes to notify the Court that he will shortly file, on consent, a Fourth Amended Petition for Writ of Habeas Corpus and Complaint.

Petitioner previously indicated to the Court that he intended to seek leave to amend his pleading. ECF 378 at 3. Petitioner subsequently conferred about the planned motion to amend with counsel for Respondents, who consented in writing to the amendment today. Attach. A (email dated Oct. 6, 2025). Pursuant to Federal Rule of Civil Procedure 15(a)(2), a party may amend its pleading "only with the opposing party's written consent or the court's leave." Where the adverse party consents, "the usual motion procedure need not be followed." 6 *Wright & Miller's Federal Practice and Procedure* §1490 (3d ed. 2025). "The pleader's right to amend is not subject to the court's discretion and the court must permit the amendment to be filed." *Id.*; *see also Sunset Fin. Res., Inc. v. Redevelopment Grp. V, LLC*, 417 F. Supp. 2d 632, 640 (D.N.J. 2006) (finding that while plaintiff "would normally be required to seek leave of court to amend," plaintiff could file their amended complaint based on defendants' written consent).

Accordingly, no motion is necessary, and Petitioner will file his Fourth Amended Petition for Writ of Habeas Corpus and Complaint forthwith. A redline highlighting changes to the Third Amended Petition for Writ of Habeas Corpus and Complaint, ECF 236, is attached to this letter for the Court's convenience. Attach. B.

Respectfully submitted,

/s/*Naz Ahmad*

AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY FOUNDATION
Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
Liza Weisberg
570 Broad Street, 11th Floor
Newark, New Jersey 07102
973-854-1715

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem*
Naz Ahmad
Shezza Abboushi Dallal*
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558

NEW YORK CIVIL LIBERTIES UNION FOUNDATION
Amy Belsher*
Robert Hodgson*
Veronica Salama*
Molly Biklen*
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Omar Jadwat
Noor Zafar*
Sidra Mahfooz*
Michael K.T. Tan*
Brian Hauss*
Esha Bhandari*
Vera Eidelman*
Brett Max Kaufman*
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay*
Diala Shamas*
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

WASHINGTON SQUARE LEGAL SERVICES, INC.
Alina Das*
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-8805
Fax: (212) 571-3792

VAN DER HOUT LLP
Marc Van Der Hout (CA Bar #80778)*
Johnny Sinodis (CA Bar #290402)*
Oona Cahill (CA Bar #354525)*
360 Post St., Suite 800
San Francisco, CA 94108
Tel: (415) 981-3000
Fax: (415) 981-3003

*Counsel for Petitioner*

*\* Appearing pro hac vice*

# **ATTACHMENT A**

## **Respondents' Written Consent (Oct. 6, 2025)**

**From:** Duong, Alanna (CIV)
**Sent:** Monday, October 6, 2025 3:57 PM
**To:** Veronica Salama; Amy Greer; DeSimone, Aniello (CIV); Bazmy Bazmy
**Cc:** McCroskey, Joshua C. (CIV); Browning, Rachel (CIV); Ramzi Kassem; Arce-Romero, Erika (CIV); Glen, Patrick (CIV)
**Subject:** RE: [EXTERNAL] Government Position on Amendment and Discovery


Understood; thank you for confirming, Counsel. The government consents to the filing of the fourth amended petition and will respond to the claims and allegations in due course.

I'll circle back to you regarding the government's position about the Court's standing order; I just need to make sure we'll being consistent.

Thanks so much,

Alanna

# ATTACHMENT B

## Redline of Third Amended Petition (ECF 236)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Mahmoud KHALIL, | |
| *Petitioner*, | |
| v. | Case No. 25-cv-01963 (MEF-MAH) |
| Donald J. TRUMP, in his official capacity as President of the United States; LaDeon FRANCIS,[1] William P. JOYCE in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Caleb VITELLO Todd LYONS, Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice, | **FOURTHTHIRD AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT** |
| *Respondents*. | |

## INTRODUCTION

1.     This case concerns the government's targeted, retaliatory detention and attempted removal of a student protestor because of his constitutionally protected speech. Petitioner Mahmoud Khalil is Palestinian, a lawful permanent resident of the United States, and a recent graduate student at Columbia University. Over the last year and a halfDuring his time at Columbia, Mr. Khalil hashad been a mediator, an active participant in, and at times the public face of, student protests on Columbia's campus related to Israel's military campaign in Gaza. The Trump administration has made no secret of its opposition to those protests and has repeatedly threatened to weaponize immigration law to punish noncitizens who

---

[1] Pursuant to FRCP 25(d), the successor of any public officer sued in their official capacity is automatically substituted as a party and amendment is not required. Petitioner has nonetheless updated the caption to reflect current officeholders for clarity and ease of reference.

have participated.

2.      On or before March 8, 2025, Respondents adopted a policy ("the Policy") to retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. ~~Under~~ Specifically, one aspect of the Policy~~,~~ involves Respondent Marco Rubio, the Secretary of State, ~~would make~~making determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors.

3.      Pursuant to the Policy, Respondent Rubio, the Secretary of State, purportedly made such a determination as to Mr. Khalil (the "Rubio Determination"). Secretary Rubio made this determination based on Mr. Khalil's lawful activity protected by the First Amendment: his participation in protests and his statements regarding Palestine and Israel.

4.      Neither Secretary Rubio nor any other government official has alleged that Mr. Khalil has committed any crime or, indeed, broken any law whatsoever.

5.      Pursuant to the Rubio Determination, the Department of Homeland Security decided to arrest Mr. Khalil, detain him, and place him in removal proceedings. On the evening of March 8, 2025, agents from the U.S. Department of Homeland Security ("DHS") arrested Mr. Khalil with no prior notice at his home and initiated proceedings to remove him from this country. After repeatedly transferring him across jurisdictions, the government ultimately detained Mr. Khalil in Louisiana, over a thousand miles from his attorneys and his wife, who is a U.S. citizen and ~~due to give birth next month~~was at the time eight months pregnant.

6.      During his arrest, the agents stated first that Mr. Khalil's "student visa" was being "revoked." After learning that he was in fact a lawful permanent resident, they instead stated that status was being "revoked" too.

7.      It later came to light that the Department of Homeland Security was charging Mr. Khalil with being removable based on Section 237(a)(4)(C)(i) and (ii), 8 U.S.C. § 1227(a)(4)(C)(i) and (ii) of the Immigration and Nationality Act ("INA") (the "Foreign Policy Ground") and the Rubio Determination.

8.      The Rubio Determination and the government's subsequent actions, including its ongoing detention of Mr. Khalil in rural Louisiana, isolatingwhich isolated him from his wife, community, and legal team, the addition of a second pretextual charge of removal, under INA § 237(a)(1)(A), 8 U.S.C. 1227(a)(1)(A), and other actions taken in the course of seeking his removal, are plainly intended as retaliation and punishment for Mr. Khalil's protected speech and intended to silence, or at the very least restrict and chill, his speech now and in the future, all in violation of the First Amendment. Indeed, contemporaneous and subsequent statements by administration officials expressly characterize the invocation of thisthe Foreign Policy Ground, a rarely used provision of the INA, as punishment for Mr. Khalil's lawful and protected speech. The Rubio Determination and Mr. Khalil's unjustified detention also violate his due process rights. Finally, the government's unlawful Policy of targetingretaliating against and punishing noncitizens like Mr. Khalil for removal based ontheir protected speech is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, and viewpoint discriminatory in violation of the First Amendment. Accordingly, this Court should vacate the Rubio Determination and the Policy, order Mr. Khalil's immediate release, prohibit the government from seeking Mr. Khalil's removal on retaliatory grounds, and set aside the government's unlawful Policy.

## PARTIES

9.      Petitioner Mahmoud Khalil is a Palestinian, born in a refugee camp in Syria, who holds Algerian citizenship. He is married to a U.S. Citizen, a soon-to-benew father to a U.S. Citizen child, his first, a lawful permanent resident of the United States with no criminal history, and was a Palestinian human rights activist on Columbia University's campus. In May 2025, he will graduategraduated with a master's degree in public administration from the Columbia University'sUniversity's School of International and

Public Affairs ("SIPA"), where he ~~has~~had been a student since January 2023. At the time of his arrest, Mr.

Khalil and his wife, who ~~is~~was eight months

pregrant, ~~live~~lived in Columbia's residential housing in New York City.

10.    Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.  Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

11.    Respondent ~~William P. Joyce~~LaDeon Francis is named in his official capacity as the Acting Field Office Director of the New York Field Office for Immigration and Customs Enforcement ("ICE") within ~~the United States Department of Homeland Security.~~DHS. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent ~~Joyce's~~Francis's address is New York ICE Field Office, 26 Federal Plaza, New York, New York 10278.

12.    ~~11a.~~Respondent Yolanda Pittman is named in her official capacity as the Warden of Elizabeth Contract Detention Facility, also referred to as Elizabeth Detention Center. As Warden, she is responsible for the operations of Elizabeth Detention Center, including overseeing the people in the facility's custody, and as such she is a custodian of the Petitioner. Respondent Pittman's office address is Elizabeth Detention Center, 625 Evans St, Elizabeth, New Jersey, 07201.

13.    Respondent ~~Caleb Vitello~~Todd Lyons is the Acting Director of ICE~~.~~, a component within DHS. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for overseeing the directorates within ICE, such as Homeland Security Investigations ("HSI"), Enforcement and Removal Operations ("ERO"), as well as any divisions, subdivisions, and offices therein, such as HSI's Office of Intelligence and HSI's National Security Division and their respective officers, employees, contractors, and agents. He is also responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is

ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

14.    Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she isIn this capacity, she has ultimate authority over DHS and is responsible overseeing all DHS components, sub-agencies, directorates, divisions, subdivisions, offices, and their respective officers, employees, contractors, and agents including ICE, ICE's HSI directorate, and HSI's divisions; she is also responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

15.    Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, he has ultimate authority over the operations of the U.S. Department of State ("State Department"). Among other things, he also has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i) (INA § 237(a)(4)(C)(i).) In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Southern District of New York and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

16.    Respondent Pamela Bondi is Attorney General ofof the United States. In this capacity, she routinely transacts business in the Southern District of New York; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g) (2007); and as such is a

custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

## **JURISDICTION & VENUE**

17.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, § 9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

18.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

19.     Venue is proper in the District of New Jersey under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. At the time Mr. Khalil filed his original petition, he was physically detained in this judicial district at the direction and under the authority of the Respondents at the Elizabeth Contract Detention Facility, in Elizabeth New Jersey. Respondent Yolanda Pittman is the director of Elizabeth Contract Detention Facility, where Mr. Khalil was physically held at the time of the time of filing, and resides in the District of New Jersey. Respondent ~~William P. Joyce~~LaDeon Francis is the Acting Field Office Director of the New York Field Office, whose officers under his authority initially arrested Mr. Khalil, communicated that he was being taken to 26 Federal Plaza in New York, arranged for Mr. Khalil's detention in this District, transported Mr. Khalil to and from this District, and directed the ICE Online Detainee Locator to show Mr. Khalil's location as 26 Federal Plaza in New York, which was the location specified for Mr. Khalil at the time of filing. Respondents Pittman and William P. Joyce, who was the Acting Field Office Director of the New York Office at the time of Mr. Khalil's arrest, also denied Petitioner's requests to call his attorney or family members during the period immediate preceding, during, and following the filing of this petition, including during Mr. Khalil's transport to, detention in, and transport from this District.

## **FACTS**

*Mr. Khalil's Background*

20.     Petitioner Mahmoud Khalil is Palestinian, but he grew up in a Palestinian refugee camp in Syria because his grandparents were forcibly removed from their ancestral home in Tiberias, Palestine. When war broke out in Syria, his family was again displaced and are now dispersed throughout Europe and West Asia.

21.     Mr. Khalil entered the United States on a student visa in ~~or around~~ December 2022 to pursue a Master's degree in Public Administration from the Columbia University's School of International and Public Affairs ("SIPA"). Mr. Khalil completed his program in December 2024~~, and~~ ~~has an anticipated graduation date of~~graduated in May 2025, while being held in immigration detention in Jena, Louisiana.

22.     Mr. Khalil became a Lawful Permanent Resident in 2024. Mr. Khalil and his wife, a U.S. citizen, ~~are expecting~~welcomed their first child ~~next month,~~ in April 2025. ~~Together~~Until July 2025, they ~~live~~lived in an apartment building owned and operated by Columbia University~~.~~, and they still reside in New York City.

*Mr. Khalil's Student Activism and Speech on Matters of Public Concern*

23.     As a Palestinian, Mr. Khalil has felt compelled to be an outspoken advocate for Palestinian human rights and, since October 2023, has spoken repeatedly about Israel's military operation in Gaza. Mr. Khalil has called Israel's actions in Gaza a genocide and criticized Columbia University for, in his view, financing and in other ways facilitating such violence. Mr. Khalil is committed to peaceful protest and being a voice for his people.

24.     That commitment has taken on many forms. For example, in April 2023, Mr. Khalil became co-president of the Palestine Working Group at the School of International and Public Affairs (SIPA), where he helped organize educational events and lectures on Palestine. In the fall of 2023, Mr. Khalil became president of the Palestinian Student Society at Columbia (DAR), which "serves to engage with and celebrate Palestinian culture, history, and identity."

25.     Additionally, Mr. Khalil has acted as a mediator and negotiator, facilitating dialogue between Columbia University's administration and its students. In this role, Mr. Khalil has advocated for his peers to be treated humanely and fairly by the university, while helping to ensure student safety and the smooth functioning of the university. For example, in the Spring of 2024, Mr. Khalil facilitated negotiations between members of the Gaza Solidarity Encampment[2] and the university administration. Indeed, Mr. Khalil was approached to take on this role because of his prior work at a British Embassy overseas, an internship with the United Nations in New York, as well his established relationships with the university administration.

26.     Mr. Khalil stated in a CNN interview in Spring of 2024 that "as a Palestinian student, I believe that the liberation of the Palestinian people and the Jewish people are intertwined and go hand-by-hand and you cannot achieve one without the other."  Mr. Khalil also explained that the student movement "is a movement for social justice and freedom and equality for everyone."[3]

27.     Mr. Khalil's prominence as an outspoken student activist, along with Columbia University's position as a national focal point of student protests against Israel's military campaign in Gaza over the past year and a half, has propelled Mr. Khalil into the public eye. His visibility has been further amplified through his continued participation in interviews with national and international media outlets, including the BBC and CNN, as well as local press conferences.

28.     Mr. Khalil's speech regarding international law, the obligations that the U.S. and Columbia University have under that law, the human rights of the Palestinian people, and related matters is speech

---

[2] *See* Isha Banerjee, *Timeline of the Gaza Solidarity Encampment*, Columbia Spectator (May 2, 2024), *available at* https://www.columbiaspectator.com/news/2024/05/02/timeline-the-gaza-solidarity-encampment/.

[3] Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN, *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html. ~~Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN, *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.~~

protected by the First Amendment, including because it is speech on matters of public concern and is political speech at the core of the protection of the First Amendment.

29.    Like many student activists advocating for Palestinian rights, Mr. Khalil has endured immense scrutiny and personal attacks by private actors, including doxing and harassment. But until recently, he understood that because of the First Amendment, the government would not be able to retaliate against or punish him for his speech, or silence him by locking him up or banishing him from the country, even if powerful government officials disagreed with what he had to say.

***The Federal Government's Hostile Campaign Against Palestinian Rights Advocacy: A Concerted Effort to Silence Protected Political Speech***

30.    In the fall of 2023, students from diverse racial, ethnic, religious, and socioeconomic backgrounds—including Mr. Khalil—began to mobilize on their campuses, many criticizing what they characterized as their universities' and the United States government's unwavering support for Israel's policies. These protests included Jewish students who sought to convey the message that such policies were "not in our name." In response, opponents of these students' messages—including President Donald J. Trump—frequently characterized peaceful protest and any speech in favor of Palestinian rights as inherently supportive of Hamas and antisemitic. For example, in several instances, he President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[4]

31.    During his campaign for re-election, President Trump repeatedly vowed to revoke the visas of international students engaged in pro-Palestinian protests or who publicly criticized Israel's actions.

---

[4] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (March 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur/. Indeed, in his first term, President Trump also issued Executive Order 13899, titled "Combating Anti-Semitism," which, among other things, adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis").

32.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[5]

33.     While the Gaza Solidarity encampments at college campuses took place in the Spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[6]

34.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[67]

### *President Trump Issues Executive Orders to Target Speech of Noncitizen Protestors*

35.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

---

[5] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/

[6] *Trump told donors he will crush pro-Palestinian protestors*, Washington Post, available at: https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

[7] Twitter, *available at*: https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

36.    Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including Palestinian rights advocacy.

37.    Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[8] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

***The Government Responds to Groups Identifying Noncitizen Protestors for Deportation By Adopting the Unlawful Policy***

38.    In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, prominent groups ~~at Columbia University~~ opposed to Palestinian rights protests began publicizing names of individuals they wanted the government to deport. Specifically, these ~~groups~~ third-party entities compiled lists of students who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line and tip form.[9]

---

[8] *See supra* note 4 (describing definitions adopted in Executive Order 13899, titled "Combating Anti-Semitism," 84 Fed. Reg. 68779 (Dec. 11, 2019), and reaffirmed in Executive Order 14188).

[9] Natasha Lennard and Akela Lacy, "The Columbia Network Pushing Behind the Scenes to Deport and

39.    For example, Canary Mission, an anonymous entity that publishes blacklists and doxes individuals who have expressed support for Palestinians or criticized the actions of the Israeli government, published profiles of Columbia students involved in the Gaza Solidarity encampments, and called for the punishment of student protestors. Similarly, Betar USA—a self-described "Zionist activist organization"[9]  has[10] has published lists of Columbia student protestors, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump administration."[10][11]

40. In January 2025, Canary Mission posted a profile of Mr. Khalil.  Shortly thereafter, Betar identified Mr. Khalil, specifically, as one of its targets for deportation, including him on their "deport list." On January 29, the organization posted on social media that ICE is "aware of his home address and whereabouts" and confirmed that they "have provided all his information to multiple contacts."[11]

41.40. Media[12] Media reports in March of this year described widespread fear of retaliation for pro-Palestine speech among noncitizen students, noting that the executive orders "already appear to be chilling political activism."[12][13]

---

Arrest    Student    Protesters,"    *The    Intercept*    (Feb.    15,    2025),    *available    at* https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/; https://www.ice.gov/webform/ice-tip-form; https://www.ice.gov/tipline.

[10] https://betarus.org/; https://www.middleeasteye.net/explainers/betar-who-is-far-right-jewish-american-group-blood-gaza

[11] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.

[12] Betar    Worldwide    (@Betar_USA),    Twitter    (Jan.    29,    2025),    9:52PM),    *available    at* https://x.com/Betar_USA/status/1884796686020550930. This social media post falsely accused Mr. Khalil of saying inflammatory statements. *See id. See also*, Prem Thakker, "SCOOP: Emails Show Mahmoud Khalil Asked Columbia for Protection a Day Before He Was Detained," *Zeteo* (Mar. 10, 2025), *available at* https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice.

[13] Tovia Smith, "Foreign students say the threat of Trump's executive orders is getting real," *NPR* (Mar. 3, 2025),  *available at*  https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-

41.    ~~Then, the. Then,~~ On or before March 8, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Khalil for their speech and participation in protests that are critical of Israel or U.S. support for Israel, or in support of Palestinian human rights. In early 2025, unbeknownst to the public at the time, a series of interagency meetings took place with senior officials from various federal government agencies—including the White House's Homeland Security Council chaired by White House Deputy Chief of Staff Stephen Miller, DHS, the State Department, and the Department of Defense—to coordinate implementation of the Executive Orders. These meetings included discussions about student protestors and were supplied with guidance from the White House. Shortly thereafter, Respondents began relying on the aforementioned third-party entities to identify and compile lists of thousands of potential noncitizen targets for investigation and punishment, including through arrest, detention, and deportation.

42.    Homeland Security Investigations (HSI), a division of Immigration and Customs Enforcement (ICE) whose mission is to dismantle transnational criminal organizations, and which had never previously been tasked with reviewing protest activity, formed a fast-moving "Tiger Team."[14] This team drew analysts from various units within HSI's Office of Intelligence—including the Counterintelligence Unit, Counterterrorism Intelligence Unit, and the Cyber Intelligence Unit—to investigate noncitizen protestors. Peter Hatch, Assistant Director of HSI Office of Intelligence who led the Tiger Team, was directed by DHS leadership to review names of student protesters on the Canary Mission website. The Tiger Team also pulled names from the Betar US website, with more names provided by HSI leadership on a rolling basis. Additional leads came from civilian tips (via the ICE form, ICE tip line, public phone numbers, emails, other HSI connection points), and from the Office of the Border Czar, Tom Homan.

---

palestinian-foreign-students-protests-hamas-hezbollah-israel.

[14] A "tiger team" is a term of art within the U.S. federal government. They are either interagency or intra-agency teams, helmed by senior officials, and tasked with the rapid development or implementation of policies that have been prioritized by leadership.

The Tiger Team then produced reports—known as "Subject Profiles" or "Reports of Analysis"—about those noncitizens based on materials from the third-party entities, without vetting their veracity and even though the materials in question relied on constitutionally-protected speech and expressive activities almost exclusively as listing and reporting criteria of individuals.

43.    The HSI reports were then attached to referral letters and forwarded to the State Department, which responded by revoking  protesters' visas and/or referring green cards holders for removal, including by issuing determinations that their presence or activities in the United States would have potentially serious foreign policy consequences for the United States, and/or that their lawful past, current, or expected beliefs, statements, or associations would compromise a compelling U.S. foreign policy interest—again without further vetting. DHS then relied on these determinations to pursue the detention and removal of targeted individuals based on their speech and protest activity.

44.    For example, in the similar case of a Turkish student activist, Efe Ercelik, the U.S. District Court for the District of Massachusetts found that only one day after Betar tweeted, "we have submitted his name for deportation" (adding that "there's so many of these bastards nationwide, he's an egregious one in Massachusetts, a rotten state"), the State Department revoked Ercelik's visa relying on a memo that referenced his "activities" and "rhetoric." *Ercelik v. Hyde*, No. 25 CV 11007 at 22 (D. Mass, May 8, 2025). The court thus concluded, "Respondents' pursuit of detention seems to have been almost exclusively triggered by Betar Worldwide." *Id.*

42.45. The week beginning Monday, March 3, 2025, ICE was spotted on Columbia's campus, increasing fears and further chilling students' ability to speak freely.

43.46. That same week, pro-Israel activists reportedly met with members of Congress as well as Secretary of State Rubio, specifically seeking Mr. Khalil's deportation.[1315]

---

[15] Arno Rosenfeld, "Jewish groups targeted Columbia grad Mahmoud Khalil — then ICE arrested him," *The Forward* (Mar. 10, 2025), *available at* https://forward.com/news/703018/mahmoud-khalil-columbia-cuad-ice/.

44.    On March 7, 2025, Mr. Khalil emailed the Columbia University interim president writing that, "I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home."[14]

47.    On or before On March 6, 2025, the Tiger Team produced a Report of Analysis ("ROA") regarding Mr. Khalil, which included links to the unvetted Canary Mission Profile of Mr. Khalil, as well as other unverified tabloid articles and social media posts, all of which related to his expressive activities regarding Israel and Palestine and no other topic. It also attached a Canary Mission article that characterized Mr. Khalil as having "participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator on behalf of Columbia University Apartheid Divest (CUAD), an anti- Israel student coalition." The ROA did not note any criminal history, as Mr. Khalil has never been accused or convicted of any crime. Peter Hatch, Assistant Director of HSI Office of Intelligence then discussed Mr. Khalil's ROA with senior HSI leadership before submitting it to Andre Watson, Assistant Director of the HSI National Security Division (NSD).

48.    On March 7, DHS's Andre Watson signed and submitted a referral letter regarding Mr. Khalil ("DHS referral letter")—along with Mr. Khalil's ROA—to Andrea Toll Whiting, Director of Field Operations at the State Department. In making this referral, Watson relied solely on information contained in Mr. Khalil's ROA. The DHS referral letter confirmed Mr. Khalil's status as a lawful permanent resident and purported to summarize actions that violate the White House's recent executive orders. It asserted that Mr. Khalil's actions "may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from" his "presence or activities consistent with" the Foreign Policy Ground. The DHS referral letter described Mr. Khalil as a "prominent pro-Palestinian activist involved in antisemitic activities" and cited his alleged participation in a March 6, 2025, protest as an example of "leadership" in "disruptive protests" that "create[] a hostile environment for Jewish students." It claimed that such participation aligns with the Executive Orders' "focus on deporting Hamas sympathizers." The letter also conveyed HSI's "concern" that Mr. Khalil's activities "may undermine U.S.

foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization" and concluded by requesting that the Secretary of State determine whether the Foreign Policy Ground applies to Mr. Khalil, stating that DHS would initiate removal charges against him if so.

49.    That same day, March 7, HSI New York began engaging in a pattern of life surveillance of Mr. Khalil, based on an instruction from HSI Headquarters that the Secretary of State and/or the White House had an interest in him.

50.    The doxing of Mr. Khalil continued throughout this period. On March 7, 2025, Mr. Khalil emailed the Columbia University interim president, attaching the recent social media posts and doxing materials, which called for his deportation and tagged Secretary Marco Rubio. Mr. Khalil wrote, "I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home."[16]

51.    On March 8, 2025, Respondents the senior-most official in the State Department's Bureau of Consular Affairs John Armstrong submitted an "action memo" to Secretary Rubio recommending that Mr. Khalil be found removable under the INA's Foreign Policy Ground. In making this recommendation, State Department Official John Armstrong relied solely on the DHS referral letter and the ROA. The action memo specified that "DHS has not identified any alternative grounds of removability that would be applicable" to Mr. Khalil. It also noted that given Mr. Khalil's LPR status and the unprecedented application of the Foreign Policy Ground, he was likely to challenge his removability under this authority and that courts may scrutinize the legal basis for such a determination.

45.52. Secretary Rubio adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that the  presence

---

[16] Prem Thakker, "SCOOP: Emails Show Mahmoud Khalil Asked Columbia for Protection a Day Before He Was Detained," *Zeteo* (Mar. 10, 2025), *available at* https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice.

or activities in the United States action memo's recommendation, and, at an unknown date and time, signed and issued the Rubio Determination, a memorandum that provided the DHS Secretary with a formal notification of his decision. According to the Rubio Determination, submitted by the government in Mr. Khalil's immigration proceeding on April 9 and subsequently filed in this action at ECF 198-1, Secretary Rubio determined Mr. Khalil's presence or activities would have "potentially serious adverse foreign policy consequences for the United States" and that Mr. Khalil's "otherwise lawful … past, current, or expected beliefs, statements, or associations … would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protesters." The Rubio Determination listed, *inter alia*, Mr. Khalil's ROA and the DHS referral letter as attachments, neither of which has been disclosed by the government in this action.

53.    On March 8, the State Department also provided DHS with informal notification of Secretary Rubio's decision. HSI headquarters then instructed Deputy Special Agent in Charge of HSI New York, Darren McCormack, to do his best to find and arrest Mr. Khalil. Because HSI had not conducted civil immigration enforcement in recent history, DSAC McCormack confirmed with ERO New York's Acting Field Office Director, then William P. Joyce, that there was authority to carry out the arrest. After receiving such confirmation, HSI agents proceeded to conduct a warrantless arrest of Mr. Khalil in the lobby of his apartment building on the evening of March 8.

54.    None of the components of the State Department, DHS, or the Department of Justice has received any formalized training on, nor were they provided any definitions or guidance or materials defining, what activity constitutes antisemitism, support for terrorism, or activity that would otherwise impact U.S. foreign policy.

55.    State Department, DHS, and Department of Justice components have relied on public statements by Secretary Rubio and President Trump as well as their own understandings to disseminate informal and formal policies, memos, cables, and guidance documents implementing the White House's

executive orders, and to make related decisions. This has resulted in lawful expressions of support for Palestinian human rights and criticism of Israel, or of U.S. support for Israel, being relied on as grounds for targeting, punishment and removal. For example, State Department Official John Armstrong, who signed the action memo regarding Mr. Khalil, has testified that "views" contrary to Israel, statements calling for limiting military aid to Israel, and statements describing Israel as an "apartheid state" are all antisemitic and grounds for targeting for punishment and removal.

*Variety of Retaliatory Actions Taken Pursuant to the Policy*

56.    Respondents have taken a variety of actions pursuant to their Policy to punish noncitizens living in the United States for their speech and participation in protests advocating for Palestinian human rights and criticizing Israel and U.S. support for Israel. Such punitive actions include but are not limited to questioning, investigating, and/or surveilling noncitizens; deeming noncitizens' presence or activities in the United States to have potentially serious adverse foreign policy consequences; determining that noncitizens' past, present, or future lawful expressive activity in the United States compromises a compelling U.S. foreign policy interest; lodging pretextual immigration charges against noncitizens; canceling the otherwise valid visas of noncitizens or terminating their Student Exchange Visitor Information System ("SEVIS") records; detaining noncitizens; subjecting detained noncitizens to harsher conditions than usual practice; initiating removal proceedings against noncitizens; expediting and otherwise manipulating the ordinary processes of removal proceedings; and ultimately removing noncitizens.

57.    The goal of the Policy is for Respondents to punish noncitizens who have engaged in speech the Administration disfavors—particularly, speech that is critical of Israel, including its current military campaign in Gaza, or of U.S. support for Israel, as well as speech supportive of Palestinian human rights. It also aims to deter citizens and noncitizens from ever engaging in such speech in the future in order to avoid similar punitive consequences. The Policy therefore seeks to censor speech expressing a

19

particular viewpoint on a matter of great political and public importance at a time when such speech could affect the conduct of government affairs and public support for government action.

58.     To date, the Policy has been applied to at least a dozen noncitizen visa-holders and lawful permanent residents including Mr. Khalil, Dr. Badar Khan Suri, Yunseo Chung, Rümeysa Öztürk, Mohsen Mahdawi, Leqaa Kordia, Ranjani Srinivasan, Momodou Taal, Aditya Wahyu Harsono, Mohammed Hoque, and Efe Ercelik.

59.     Details regarding the Policy and its application to Mr. Khalil and other noncitizens were recently revealed in a federal civil bench trial in *American Association of University Professors v. Rubio*, No. 1:25-cv-10685 (D. Mass.) ("AAUP v. Rubio"), a lawsuit challenging the same actions at issue here and finding that it constituted a Policy to send a broader threatening message to pro-Palestine student activists so as to curtail and chill their speech critical of Israeli policy. Mr. Khalil was one of the noncitizens found to have been targeted by this Policy. The trial took place between July 7 and July 21, 2025. On September 29, 2025, the district court in *AAUP v. Rubio* issued a 161-page decision finding, *inter alia*, by clear and convincing evidence, that Secretary of State Marco Rubio and DHS Secretary Kristi Noem have "intentionally and in concert implemented Executive Orders in 14161 and 14188 in a viewpoint-discriminatory way" with the intent to "chill protected speech" and that such conduct "is not only unconstitutional, but a thing virtually unknown to our constitutional tradition." *AAUP v. Rubio*, ECF 261 at 101. In particular, the court found the relevant government decisionmakers sought "to target a few for speaking out and then use the full rigor of the Immigration and Nationality Act (in ways it had never been used before) to have them publicly deported with the goal of tamping down pro-Palestinian student protests and terrorizing similarly situated non-citizen (and other) pro-Palestinians into silence because their views were unwelcome." *Id*. at 95.  The district court also held that the policy, which operates as a speech regulation and under which "Lawful Permanent Residents' green cards and student visa-holders' visas may be revoked, and these persons may be detained and deported, based on any public anti-Israel or

pro-Palestine speech or association" violates the Administrative Procedure Act. *Id.* at 101. The policy is "contrary to constitutional right. It is also arbitrary or capricious because it reverses prior policy without reasoned explanation or consideration of reliance interests, and is based on statutes that have never been used in this way." *Id.*; see *id.* at 106 n.34.

60.    In finding that the Policy intentionally targeted specific viewpoints to chill speech, the district court in *AAUP v. Rubio* relied on trial evidence showing a pattern of viewpoint-based enforcement. This included "[p]ublic Officials' many public statements suggesting that they wished to staunch public protest related to Israel's treatment of Palestinians." *Id.* at 130. According to the court, officials consistently described campus protests related to Palestine as "per se 'pro-Hamas.'" *Id.* at 131. And "decisionmakers at every step" … "interpreted the 'support' for terrorists (a key term from Executive Order 14161) that they construed as potentially subject to the penalty of detention, deportation, and visa revocation to encompass, and indeed to be centered on, core First Amendment speech and expressive conduct, such as attending public protests, leading such protests, or even publishing op-eds." *Id.* In reviewing how the Executive Orders were implemented through this Policy, the court found that officials "appear to have treated 'antisemitism,' which, however heinous, is, without more, protected speech, as something that, in essence, one simply knows when one sees it." *Id.* at 132. As a result, "if it looked like the Executive Orders might have disapproved of it, that was potential grounds for deportation." *Id.* Next, the district court in *AAUP v. Rubio* plans to promptly schedule a hearing to order an appropriate remedy. *Id.* at 161.

61.    While much of the evidentiary record in *AAUP v. Rubio* remains under seal or subject to a protective order—and thus is inaccessible to Mr. Khalil—the publicly available portions of the trial record, including the portions quoted and summarized in the district court's findings of fact and conclusions of law, witness testimony, and unsealed exhibits relied on herein, have provided new evidence showing how Mr. Khalil and others were targeted under this Policy of retaliation for their protected expression.

*DHS Arrests Mr. Khalil as a First Implementation of the Policy and a "Blueprint" for Future Investigations and Deportations of Prominent Student Activists*

46.62. On the evening of March 8, 2025, at approximately 8:30 p.m., Mr. Khalil and his wife were returning to their apartment from an Iftar[17] dinner at a friend's home.

47.63. When Mr. Khalil and his wife arrived at their apartment building, two individuals in plain clothes followed them into the lobby of the apartment building, which is owned and operated by Columbia University.

48.64. The individuals approached Mr. Khalil and asked, "Are you Mahmoud Khalil?"  When Mr. Khalil answered in the affirmative, the men identified themselves as being with the Department of Homeland Security ("DHS") and announced that they had to take Mr. Khalil into custody. Mr. Khalil heard them announce on a radio, "he's here," at which point Mr. Khalil noticed two other individuals approach from inside of the building. Based on their location, they would have required a key or otherwise been given permission to enter the building.

49.65. Mr. Khalil asked whether the agents had a warrant and they said that they had one on the phone and that they would show it to him. However, the agents never showed him a warrant. Mr. Khalil asked why they were here and they asserted that Mr. Khalil's student visa was revoked. Mr. Khalil explained that he has a green card. At this point, the agents were creating a barrier between Mr. Khalil and his wife. The agents threatened Mr. Khalil's wife that she would also be arrested if she did not comply.

50.66. Mr. Khalil called his attorney, Amy Greer.  Attorney Greer spoke with an agent who identified himself as Special Agent Elvin Hernandez. Agent Hernandez stated they had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. Department of State and therefore they were detaining him.  Despite several requests by Mr. Khalil to see the warrant, the agents never showed him the administrative warrant.

---

[17] Iftar is the name of the evening meal eaten at sunset by Muslims to break their fast during the holy month of Ramadan.

~~51.~~67.Mr. Khalil's wife then went to the apartment to retrieve Mr. Khalil's immigration documents. She saw another individual in plain clothes on their floor of the apartment building holding a radio.

~~52.~~68.Attorney Greer advised Agent Hernandez that Mr. Khalil is a lawful permanent resident and has the right to due process.  Agent Hernandez responded that the Department of State had revoked Mr. Khalil's green card, too, and that he would be brought in front of an immigration judge.  Agent Hernandez stated that he would be taking Mr. Khalil to 26 Federal Plaza, the location of the ICE Field Office in Manhattan, New York. When Attorney Greer began to ask more questions, Agent Hernandez hung up on her. When Mr. Khalil requested to call her back, Agent Hernandez refused to allow Mr. Khalil to speak to his attorney again.

~~53.~~69. Mr. Khalil's wife presented the DHS agents with documents confirming Mr. Khalil's status as a lawful permanent resident, handing them to an agent who was speaking on the phone. The agent looked confused when he saw the documents and said, "He has a green card" to the individual with whom he was on the phone.  Mr. Khalil's wife heard the agent repeat that they were being ordered to bring Mr. Khalil in anyway.

~~54.~~70. The agents then handcuffed Mr. Khalil and brought him outside where there were multiple unmarked vehicles waiting.  Mr. Khalil's wife asked for the names of the agents, their contact information, and how to reach them to follow up on her husband's detention, but they only advised her that Mr. Khalil would be taken to 26 Federal Plaza and otherwise refused to speak with her.  They left her no business card or any information at all as to how to find out where her husband would be taken, on what grounds, or who she could contact.

~~55.~~71. The night of the arrest, Attorney Greer checked the ICE Detainee Locator ("ICE Locator") several times to confirm her client's location. She first checked the locator at 10:00 p.m. on Saturday, March 8th and found that Mr. Khalil was not yet listed in the system. She checked again at 1:35 a.m. on

Sunday, March 9th, and saw that Mr. Khalil was listed as being in custody in New York. The ICE Locator entry also included an instruction to contact the New York field office. At 4:29 a.m. on Sunday, March 9,[~~16~~18] Attorney Greer checked the locator once more, and the information remained the same. Shortly thereafter, at around 4:40 a.m. on Sunday, March 9th, Attorney Greer filed the original habeas corpus petition in in this case (ECF 2) in the Southern District of New York, based on information and belief that ICE was still holding Mr. Khalil at 26 Federal Plaza. During this time, Mr. Khalil made continuous requests to contact his attorney, including when agents asked him to sign several documents, but he was repeatedly denied.

The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated that

---

[18] Daylight Saving time began on March 9, meaning that clocks moved forward from 1:59am to 3am over the course of these events.

56.72.that Mr. Khalil was still in New York. Sometime after 9 a.m. on Sunday, the ICE locator changed to say that Mahmoud Mr. Khalil was detained in Elizabeth, New Jersey, at the Elizabeth Contract Detention Facility, a detention center privately owned and operated by the corporation CoreCivic. At 9:29 am, Mr. Khalil's immigration attorney attempted to call the Elizabeth facility twice, but no one answered. Around 11:20 a.m., Mahmoud's wife went to the Elizabeth Detention Center to see him, but she was told that Mahmoud was not showing up in the system.

57.73.At 1:47 p.m. on Sunday, March 9, after counsel had submitted a G-28 and sent a 1:22 p.m. email to ICE asking to be connected with him immediately, ICE responded by email informing that Mr. Khalil was in the process of being transferred to a detention facility within the New Orleans ERO Field Office, over 1,000 miles away.[17][19] Counsel emailed the U.S. Attorney's Office for the Southern District of New York, which confirmed that Mr. Khalil was en route to Louisiana. Counsel requested Mr. Khalil's immediate return, but was told that ICE would not consent to his return absent a court order. When Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that typically occurs the same day or the next day in New York—authorities in the Louisiana ICE detention facility offered a date ten days away.

58.74.Mr. Khalil's wife, who is 8was then eight-months pregnant, iswas unable to travel to Louisiana to see Mr. Khalil.

### Mr. Khalil's Experience being Transferred Repeatedly and in Detention in Louisiana

59.75.While at 26 Federal Plaza on the night of March 8, the ICE agents took Mr. Khalil's biometrics. As they did so, Mr. Khalil saw an agent approach Agent Hernandez and say, "the White House is requesting an update."

60.76. Mr. Khalil was subsequently presented with several documents and asked to sign them,

---

[19] According to the copy of the March 9 NTA that Mr. Khalil's Counsel received on March 11, ICE was already preparing to transfer Mr. Khalil to the Central Louisiana ICE Processing Center while he was still detained at 26 Federal Plaza a few hours after his arrest. *See infra ¶* 73.

including a Notice to Appear ("NTA") for removal proceedings and a Custody Determination document. Mr. Khalil reviewed the NTA and Custody Determination and, because he did not fully understand the implications of signing them, he requested to speak with his lawyer before doing so. The ICE agent denied his request, prompting Mr. Khalil to refuse to sign.

61.77. The copy of the NTA states "YOU ARE ORDERED to appear before the immigration judge of the United States Department of Justice at: 830 Pinehill Rd, Jena, LA, 71342, LASALLE DETENTION FACILITY on March 27, 2025 at 8:30 AM to show why you should not be removed from the United States based on the charges set forth above." The copy is dated March 9, 2025, timestamped at 12:40 a.m., and signed by Supervisory Special Agent Timothy Moran at 26 Federal Plaza, New York, NY.

62.78. At some point in the night, Mr. Khalil was transported in handcuffs and shackles to Elizabeth Detention Center in New Jersey ("Elizabeth") but was not allowed to take his belongings—his shoes, jacket, and belt—with him. When Mr. Khalil asked about his belongings, he was told that he would be coming back to 26 Federal Plaza tomorrow, but that he could not spend the night there.

63.79. While at Elizabeth, Mr. Khalil again requested to speak with his lawyer, to which the officers responded that he would be allowed to do so after he was processed. Mr. Khalil spent the night in the cold waiting room for processing. Mr. Khalil requested a blanket but was denied. The next morning, as Mr. Khalil reached the front of the line to be processed, he was informed that processing would not be completed because ICE was coming from New York to transport him.

64.80. Around 12 p.m., ICE officers—one of whom Mr. Khalil believes he recognized from the night before at 26 Federal Plaza—handcuffed and shackled Mr. Khalil and placed him in a van. The van had Mr. Khalil's belongings inside that were kept in 26 Federal Plaza. Mr. Khalil was told he was then going to JFK without further clarification.

65.81. At JFK, he was transferred to other government agents. None of the agents identified themselves or provided their badge information. At one point, Mr. Khalil noticed one of the agents received

a text message instructing not to let his escort, Mr. Khalil, use his phone.

66.82.  Mr. Khalil took an American Airlines flight from JFK around 2:45 p.m. to Dallas, Texas. During that flight, Mr. Khalil saw one of the officers receive a text message that instructed him not to let Mr. Khalil have a phone call.

67.83.  Mr. Khalil arrived in Dallas, Texas around 5:30 p.m. and remained there until 9:30 p.m., at which time he was placed on another American Airlines flight—this time to Alexandria, Louisiana.

68.84.  Mr. Khalil arrived in in Alexandria, Louisiana around 1:00 a.m. on Monday March 10. Upon his arrival, he saw between about four to five agents waiting for him. He was again shackled and placed in handcuffs. He was then placed in an ICE car, driven for about a minute, and then placed in a police car. The agents drove him to Jena, Louisiana.

69.85.  Throughout this process, Mr. Khalil felt as though he was being kidnapped. He was reminded of prior experience fleeing arbitrary detention in Syria and forced disappearance of his friends in Syria in 2013. It was shortly after this that Mr. Khalil left Syria.

70.86.  At no time throughout this process did any of the agents identify themselves.

71.87.  Mr. Khalil then arrived at the Louisiana Detention Facility, where he was processed again. During his initial medical examination in Elizabeth, Mr. Khalil notified agents that he has an ulcer and needs to take his medication for it every day. Despite this, he was not given access to his medication until Tuesday evening. He slept in a bunker without a pillow or blanket. He continues to worry worried continuously about the wellbeing of his then-8-month pregnant wife and what willwould happen to them. He's alsoveryHe was also very concerned about missing the birth of his first child, which ultimately came to pass.   In fact, Mr. Khalil had previously turned down job offers that would have required him to miss the birth of his child.  Throughout his wife's pregnancy, Mr. KhalilKhalil had been present for her doctor appointments.

Mr. Khalil

72.88.  Mr. Khalilhad also recently secured a coveted job position after four months of searching, and was scheduled to start this role in April of this year. In addition to fearing the loss of his expected salary, Mr. Khalil and his wife planned to obtain medical insurance through this role in order to cover health care costs, including for the birth and care of their expected child. Mr. Khalil continues to worryworried continuously about the loss of income and health care, especially so close to the expected birth of his child. Unfortunately, this too came to pass and Mr. Khalil's job offer was rescinded after his arrest and detention.

73.89.  It is very important to Mr. Khalil to be able to continue his protected political speech, advocating and protesting for the rights of Palestinians—both domestically and abroad. Indeed, at the time of his arrest, Mr. Khalil was recentlyhad been invited to go to Copenhagen to attend the premiere of a documentary in which he is featured and to speak on the panel after the premiere.

***The Government Confirms that Mr. Khalil was Targeted for Deportation Because of His Protected Political Speech, in the First Implementation of theirits Policy***

74.90.  On March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University." The President warned that Mr. Khalil's arrest was "the first of many to come," declaring that his administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[1820]

75.91.  The White House reposted President Trump's statement on the social media platform X, accompanied by a mug-style graphic featuring an image of Mr. Khalil. Surrounding the photo were the words "ARRESTED BY ICE ON MARCH 9, 2025" and "LED ACTIVITIES ALIGNED TO HAMAS." The White House caption included the phrase "SHALOM, MAHMOUD" before quoting the President's

---

[20] Donald J. Trump (@realDonaldTrump), TruthSocial (Mar. 10, 2025, 1:05 PM), *available at* https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

statement.~~19~~21

76.92.  Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."~~20~~22

77.93.  The following day, the Department of Homeland Security issued a statement through its social media account, X, confirming Mr. Khalil's arrest by ICE was carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to Hamas, a designated terrorist organization" and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."~~21~~23

78.94.  In a statement to The Free Press on March 10, a White House official stated that Mr. Khalil was a 'threat to the foreign policy and national security interests of the United States' and that the federal government's "basis" for targeting Mr. Khalil was being used "as a blueprint for investigations against other students."~~22~~24

79.95.  On March 11, in response to an inquiry from the NY Times regarding Mr. Khalil's arrest, a spokesperson for the administration reportedly stated that "United States' foreign policy includes combating antisemitism across the globe and that Mr. Khalil's residency in the nation undermines that

---

[21] The White House (@WhiteHouse), X (Mar. 10, 2025, 1:34 PM), *available at* https://x.com/WhiteHouse/status/1899151926777749618.

[22] Marco Rubio (@marcorubio), X (Mar. 9, 2025, 6:10 PM), *available at* https://x.com/marcorubio/status/1898858967532441945.

[23] Homeland Security (@DHSgov), X (Mar. 9, 2025, 9:29 PM), *available at* https://x.com/DHSgov/status/1898908955675357314; Surina Venkat, "Department of Homeland Security confirms arrest of Palestinian activist Mahmoud Khalil, SIPA '24," *The Columbia Spectator* (Mar. 10, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/.

[24] Gabe Kaminsky, Madeleine Rowley, and Maya Sulkin, "The ICE Detention of a Columbia Student Is Just the Beginning," *The Free Press* (Mar. 10, 2025), *available at* https://www.thefp.com/p/the-ice-detention-of-a-columbia-student.

policy objective."~~23~~25

~~80.~~96.  At a White House Press Briefing on March 11, Press Secretary Karoline Leavitt responded to questions about the arrest, asserting that the Secretary of State has "the right to revoke a green card or a visa for individuals who serve or are adversarial to the foreign policy and national security interest" and accusing Mr. Khalil of "siding with terrorists."~~24~~26

~~81.~~97.  In a press conference regarding this case on March 12, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . anti-Semitic activities," and "if you end up having a green card . . . we're going to kick you out."~~25~~27

~~82.~~98.  On March 13, 2025, when asked to justify the government's actions, Troy Edgar, the Deputy Secretary of DHS, did not dispute that Mr. Khalil had not broken any laws and instead asserted that he was "agitating and supporting Hamas" by "put[ting] himself in the middle of the process of basically pro-Palestinian activity." When asked directly if "any criticism of the Israeli government [is] a deportable offense," if "any criticism of the United States [is] a deportable offense," if "any criticism of the government [is] a deportable offense," and if "protesting [is] a deportable offense," Deputy Secretary Edgar did not dispute any of those statements.~~26~~28

***DHS Invokes the INA's Foreign Policy Ground against Mr. Khalil, in violation of the INA and the Constitution***

~~83.~~99.  Mr. Khalil's counsel did not receive DHS's asserted legal basis for his arrest and detention

---

[25] Minho Kim, "The U.S. Is Trying to Deport Mahmoud Khalil, a Legal Resident. Here's What to Know.," *The New York Times* (Mar. 10, 2025), *available at* https://archive.ph/rD4sk#selection-1147.0-1159.428.

[26] https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022     (timestamp 10:16).

[27] "Secretary of State Marco Rubio Remarks to Press," U.S. Dept. of State (Mar. 12, 2025), *available at* http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/.

[28] NPR, *Morning Edition* (March 13, 2025), *available at* https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.

until the afternoon of Tuesday, March 11, pursuant to an agreement with counsel for the government. His NTA, dated March 9, 2025, states "the Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States." Citing Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the Foreign Policy Ground), the NTA further states "the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States."[29]

84.100.     The Rubio Determination was exclusively motivated by Mr. Khalil's lawful, constitutionally-protected past, current, or expected beliefs, statements, or associations. Public statements by government officials, up to and including the President and Secretary of State, establish that Respondents are punishing, detaining, and attempting to silence Mr. Khalil because of his constitutionally-protected past, current, or expected beliefs, statements, or associations.

101.     Respondents would not have issued the Rubio Determination against Mr. Khalil if he had not engaged in lawful protest and speech critical of Israel and U.S. support for Israel, or in support of Palestinian human rights.

102.     Respondents would not have detained Mr. Khalil following the Rubio Determination if he had not engaged in lawful protest and speech critical of Israel and U.S. support for Israel, or in support of Palestinian human rights.

85.103.     The Foreign Policy BarGround expressly prohibits the Secretary of State from issuing a policy or a determination to exclude, seek to deport, or condition entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary meets a heightened standard by personally certifiescertifying to Congress that admitting the individual would compromise a compelling U.S. foreign

_____

[29] The U.S. Code equivalent of INA § 237(a)(4)(C) is 8 U.S.C. § 1227(a)(4)(C).

policy interest. *See* ~~id.~~INA § 237(a)(4)(C)(ii) (citing INA § 212(a)(3)(C)(ii) and (iii)). Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Mr. Khalil to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

~~86.~~104.        Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

~~87.~~105.        Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

~~88.~~106.        In the decades since the Foreign Policy Ground was enacted, it appears to have been rarely invoked and reserved for cases involving high-ranking government officials or an alleged terrorist removable on other grounds and subject to high-profile prosecutions in their country of origin. It does not appear to have ever been applied to any person for engaging in First Amendment protected speech.

*~~The~~Pursuant to its Policy and in further retaliation against Mr. Khalil for his speech, the* government adds new pretextual allegations and a charge of removability ~~pursuant to the Policy and~~

*in further retaliation for Mr. Khalil's speech**, seeks to detain Mr. Khalil on those charges,* **and** *initiation of this lawsuit**then denies him a waiver of removability on those charges without a hearing, all contrary to longstanding precedent and practice*

107.    One week after Mr. Khalil filed the present action, and after his arrest and detention ignited national outrage and protest, and amid continued public promises by the federal government to punish Mr. Khalil and other noncitizens who engage in similar protected speech, the government engaged in further retaliatory action by adding new, pretextual allegations against him. On March 17, 2025, the ~~government amended Mr. Khalil's NTA~~same day that, pursuant to an ordered briefing schedule (ECF 43), Mr. Khalil moved for a preliminary injunction, the government issued a "Notice of Additional Charges of Inadmissibility/Deportability" (DHS Form I-261) ("I-261") to include new—false—allegations that Mr. Khalil engaged in "fraud" and "willfully misrepresent[ed] a material fact" on his application for adjustment of status process in March 2024 (the "Post-Hoc Charge"). The I-261 also added that Mr. Khalil's alleged removability under the Foreign Policy Ground was specifically based on his lawful expressive conduct. *Id.* (Allegation 5, adding "compelling U.S. foreign policy interest," under INA § 237(a)(4)(C)(ii), §212(a)(3)(C)(iii), the heightened standard the government is required to meet if the Foreign Policy Ground is based on "beliefs, statements, or associations [that] would be lawful within the United States"). *See* ECF 90-1 ~~(basing.~~

### March 17 Addition of the Post-Hoc Charge

108.    As to the Post-Hoc Charge in the March 17th I-261, Respondents for the first time alleged that Mr. Khalil was also removable under section 237(a)(1)(A) of the INA based on inadmissibility under section 212(a)(6)(C)(i), [30] specifically alleging that he misrepresented or omitted material information in his March 2024 green card (permanent resident) application, namely: (1) alleged membership in the United Nations Relief and Works Agency for Palestine Refugees ("UNRWA") from June to November 2023 (Allegation 6); (2) alleged continued employment with the British Embassy beyond 2022 (Allegation 7);

---

[30] These sections of the INA are codified at 8 U.S.C. §§ 1227(a)(1)(A), 1182(a)(6)(C)(i).

and (3) alleged membership in Columbia University Apartheid Divest ("CUAD") (Allegation 8). These allegations are retaliatory and pretextual. [31]

109.    Respondents' evidence submitted in immigration court in support of the Post-Hoc Charge included the Canary Mission profile of Mr. Khalil, as well as unvetted tweets, reports, and statements on social media about Mr. Khalil from other third-party actors and entities.

110.    Material misrepresentation charges (like the Post-Hoc Charge) against lawful permanent residents are vanishingly rare. Seasoned, expert immigration practitioners have characterized the government's issuance of the Post-Hoc Charge against Mr. Khalil as highly unusual—both in timing and substance. This is especially true where the nature of the alleged omissions relate to student internships or student clubs.

111.    The government's addition of the Post-Hoc charge on March 17 occurred not only amid contemporaneous concerns within the State Department that the original legal basis—the Rubio Determination and the Foreign Policy Ground—would face legal challenges and judicial scrutiny, (*supra* ¶ 51), but also against the backdrop of internal concern that Mr. Khalil's legal challenge could serve as a touchstone for similar challenges.

112.    On March 15—two days before the government added the Post-Hoc Charge—State Department Official John Armstrong submitted action memos recommending that Secretary Rubio determine two additional noncitizens' removability under the Foreign Policy Ground pursuant to the Policy. In the memo regarding Mohsen Mahdawi (a Palestinian, Columbia University student, and U.S. lawful permanent resident), Armstrong warned that, like Mr. Khalil, Mr. Mahdawi was likely to challenge his removability. He also noted: "Given the potential that a court may consider [Mahdawi's] actions

---

[31] Mr. Khalil and his immigration counsel are contesting these allegations in removal proceedings as meritless, false, and immaterial as to his eligibility for lawful permanent residency. While Mr. Khalil does not need to prove that he did not intentionally misrepresent a material fact on his green card application in order to succeed on his First Amendment retaliation claim, the meritless nature of the charge is additional evidence of its pretextual nature.

inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination. We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Mahdawi to do the same." Similarly, in his action memo regarding Dr. Badar Khan Suri (a Georgetown professor and a lawful J-1 visa holder), Armstrong warned: "Like the legal challenge brought by Mahmoud Khalil with respect to your March 8 determination regarding him, Suri is likely to challenge his removal under [INA 237(a)(4)(C)] authority." He also acknowledged: "Given the [determination's] reliance on Suri's public statements as an academic, and the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination. We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Suri to do the same."

**June 13 Shift to the Post-Hoc Charge to Justify Detention**

113.    On June 11, 2025, this Court preliminarily enjoined the government from seeking to remove and from detaining Mr. Khalil based on the Rubio Determination. ECF 299 at 12-13. In response, on June 13, the government asserted that Mr. Khalil was "now detained based on" the Post-Hoc Charge. ECF 304 at 1.

114.    Like the Post-Hoc Charge itself, Mr. Khalil's detention on such a charge was highly unusual. Immigration experts confirm that lawful permanent residents are rarely, if ever, detained based solely on the types of missing information as alleged in the Post-Hoc Charge.

89.115.        Noncitizens in general are rarely detained based on such a charge, and when they are, it is likely due to having an open criminal case. Over the most recent ten-year period where data from the Executive Office for Immigration Review (EOIR) is available (2012-2022), cases involving individuals with U.S. citizen or lawful permanent resident spouses or parents where willful misrepresentation is the sole charge of deportability comprised only 0.01 % of all removal proceedings. Of that 0.01%, only 1.76%

35

were detained throughout their removal proceedings: 11 cases (which may include those with criminal records) out of more than 5 million in removal proceedings in the last decade. ICE detention data over the same ten-year period (2012-2022), indicates that only 0.14% of all adult male detentions on *any* removal ground involved lawful permanent residents without criminal convictions (but who may be facing criminal charges). Combined, this data supports what experts have concluded: that the detention of a lawful permanent resident with no criminal record solely based on the Post-Hoc Charge is highly unusual. Detention on **these** ~~allegations on purported employment and associations not reported or reported incorrectly on an application which were, and still are, immaterial as to his eligibility for lawful permanent residency).~~grounds therefore evinces the government's unlawfully retaliatory and punitive motives against Mr. Khalil.

90.    .
~~Post-hoc~~ **June–September: Government Summarily Denies Mr. Khalil's Waiver Request on the Post-Hoc Charge, Then Expedites It, then Denies It Again Without a Hearing.**

116.    On April 11, 2025, the Immigration Judge in Louisiana, Jamie Comans, preliminarily found Mr. Khalil removable on the Foreign Policy Ground solely on the basis of the Rubio Determination, refusing to allow any challenge to it nor inquiry into the basis for it. She did not issue a final, appealable written opinion as to the Foreign Policy Ground on that day, nor did she  make a ruling on that day as to whether DHS had sustained its burden on the Post-Hoc Charge. She then set a hearing for May 22, 2025.

117.    On May 22, a hearing was conducted in immigration court at which Mr. Khalil testified and both factually and as a matter of law contested the Post-Hoc Charge. The government did not cross-examine Mr. Khalil on his testimony contesting the Post-Hoc Charge, nor did the government present any argument in support of the Post-Hoc Charge in its post-hearing briefing. Mr. Khalil also stated at this hearing, through counsel, that if the Immigration Judge were to find him removable on the Post-Hoc Charge, he would be applying for a discretionary waiver of removability from that charge and presenting evidence in support of that waiver at a to-be scheduled hearing. He also testified and presented multiple experts and evidence on his asylum-related applications, demonstrating why he faced a likelihood of

persecution, torture, and other grave harm if deported either to Syria or Algeria.

118.    On June 20, 2025, this Court ordered Mr. Khalil's release on bail. That same day, despite this Court's June 11 preliminary injunction, the Immigration Judge issued a written decision ordering Mr. Khalil's removal on the enjoined Foreign Policy Ground. The decision also found Mr. Khalil removable on the Post-Hoc Charge—sustaining allegations 6 and 8—without allowing any hearing on the discretionary waiver that Mr. Khalil had stated he was applying for.

119.    Mr. Khalil brought the Immigration Judge's decision to the attention of this Court and, after a series of briefings and clarification orders, the Immigration Judge vacated her June 20 decision and ordered documents in support of the motion for waiver on the Post-Hoc Charge to be submitted by August 11, 2025—affording Mr. Khalil an unreasonably truncated period of time (12 days) to prepare this important submission. No hearing date was set.  Mr. Khalil submitted the evidence he could assemble, but noted he needed more time to, for example, prepare a forthcoming psychological evaluation of Mr. Khalil and Dr. Abdalla relevant to the waiver application. DHS submitted no evidence.

120.    A month later, on September 12, 2025, the Immigration Judge issued several highly unusual orders, including: First, the judge denied Mr. Khalil's routine motion for a short extension of time to submit evidence in support of his application for a waiver, even though no hearing had yet been scheduled. Second, the judge denied Mr. Khalil's motion to change venue as moot, even though in an ordinary removal case, venue would have automatically changed to the noncitizen's new location after release from detention, even without the need for a motion. Third, the judge denied Mr. Khalil's request for a waiver of removability on the Post-Hoc Charge *without* providing an evidentiary hearing, and ordered that Mr. Khalil be removed from the United States.

121.    Respondents have displayed an ongoing pattern of punitive behavior toward Mr. Khalil on the basis of his protected expression  including by refusing to permit him a contact visit with his wife and newborn son until significant intervention and by denying his request to be moved to a detention facility

closer to his son in contravention of its own directive requiring the agency to place parents "as close as practicable" to their minor children. (ICE Directive 11064.3).

122.    Government officials have continued to issue threatening and derogatory statements mischaracterizing Mr. Khalil's protected speech and making clear their intent to target and punish him and other noncitizens for engaging in such protected expression criticizing Israel or U.S. support for Israel, or advocating for Palestinian human rights.

91.123.    The Post-Hoc Charge is meritless, pretextual, and further evidence of the government's unlawful Policy of ~~targeting for detention and removal~~punishing noncitizens ~~who engage in~~based on their protected expressive activity in support of Palestinian rights or critical of Israel., or U.S. support for Israel. Like the Rubio Determination, the government added the Post-Hoc Charge pursuant to this Policy as applied to Mr. Khalil.

92.124.    The government's decision to suddenly investigate Mr. Khalil's previously approved green card application, after noting on March 6, 2025 that DHS had found "no alternative grounds of removability" as to Mr. Khalil, and to add the Post-Hoc Charge on March 17, is retaliation for Mr. ~~Khalil's speech and~~ Khalil's protected expression that is critical of Israel and U.S. support for Israel, or in support of Palestinian human rights, as well as for the initiation of this lawsuit.

125.    Respondents would not have investigated and added the Post-Hoc Charge against Mr. Khalil if he had not engaged in lawful speech and protest that is critical of Israel and U.S. support for Israel, or in support of Palestinian human rights.

126.    Respondents would not have investigated and added the Post-Hoc Charge against Mr. Khalil if he had not initiated this lawsuit challenging his detention and removal on the Foreign Policy Ground, which was based on the Rubio Determination.

127.    Respondents would not have detained Mr. Khalil on the basis of the Post-Hoc Charge if he had not engaged in lawful protest and speech critical of Israel, U.S. support for Israel, or in support of

Palestinian human rights.

128.    Respondents would not have detained Mr. Khalil on the basis of the Post-Hoc Charge if he had not initiated this lawsuit challenging, inter alia, his detention on the unconstitutional Foreign Policy Ground.

129.    The addition of the Post-Hoc Charge has forced Mr. Khalil to defend himself in removal proceedings based on the Post-Hoc Charge, which alone constitutes punishment or adverse action against him because of the time and resources that must be expended in defending himself and because of the reputational and occupational damage stemming from being accused of fraud by the United States government.

130.    Adding the Post-Hoc Charge and detaining and seeking removal on that basis has a chilling effect on Mr. Khalil's expressive activity and associations. It also has a broader chilling effect on noncitizens who express pro-Palestinian views, for fear that their speech will result in the government scrutinizing their past applications for allegedly missing information in order to pretextually detain them and strip them of their lawful status.

131.    Should the government obtain a final order of removal, thereby stripping Mr. Khalil of his lawful permanent resident  status, and then remove him on the basis of the Post-Hoc Charge, such actions would also constitute punishment or adverse action against Mr. Khalil for his constitutionally protected speech.

***The government's use of the Post-Hoc Charge comes in the context of a series of abuses of, and departures from, ordinary immigration process in order to achieve their retaliatory and punitive purpose.***

132.    The government's addition of the Post-Hoc Charge to seek detention and removal of Mr. Khalil comes in the context of a series of irregular and highly unusual decisions in furtherance of their punitive and retaliatory purpose.

133.    Upon information and belief, the government engaged in forum shopping by seeking to

venue and keep Mr. Khalil's case not in or near New York City, where he resided at the time of his arrest and where he has returned since his release on bail, but in an immigration court in Louisiana, where controlling Fifth Circuit law is more favorable to them, and where he would be detained far from counsel and family.

134.    The government treated Mr. Khalil harshly in detention, refusing to permit Mr. Khalil a contact visit with his wife and newborn son thereby forcing Mr. Khalil to seek intervention, denying his request to be moved closer to his son to a detention center in the New Jersey or New York area, in contravention of Respondents' own directive requiring them place parents "as close as practicable" to their minor children.

135.    The government has also made a series of irregular decisions relating to his removal proceedings. The government assigned his removal proceedings to the Assistant Chief Immigration Judge for the immigration court in Jena, Louisiana, who is not ordinarily assigned cases absent circumstances not relevant here, and who maintains direct communications with superiors, including political appointees, within the Department of Justice. This decision comes in the context of the government's decision to place Mr. Khalil on a target list for deportation and exerting enormous pressure to achieve this result.

136.    The government has expedited Mr. Khalil's removal proceedings, calendaring his case appearances much more quickly than other individuals detained in the same facility and opposing and denying routine, reasonable requests for continuances.

137.    After this Court's June 11 preliminary injunction, the government refused Mr. Khalil's request that DHS specify the impact of the injunction in an on-the-record filing to the immigration court. The immigration court then issued a decision that continued to rely on the Rubio Determination that this Court enjoined. Following this Court's order clarifying the injunction, the immigration court vacated her decision, but took the highly unusual step of criticizing the district court's order in footnotes.

138.    After this Court's June 20 decision granting Petitioner's motion for bail and ordering his

release from detention, subject to conditions and pending further adjudication of his case, the government refused to take the ordinary steps to change venue to the non-detained docket where Mr. Khalil resides (a New York immigration court). DHS regulations require the government to file a form notifying the Executive Office for Immigration Review ("EOIR") when a detained noncitizen has been released, triggering a transfer of the removal proceedings to the immigration court in the area where the released individual now resides (unless the immigration court has already ordered transfer *sua sponte* or upon motion). Indeed, at Mr. Khalil's June 20 bail hearing, Respondents' counsel acknowledged that "if [Mr. Khalil] is released, his case would be transferred to the non-detained docket." *See Khalil v. Trump*, Bail Tr. at 24: 5-8 (D.N.J. June 20, 2025). Yet, after this Court's bail order, the government failed to file such form, instead opposing Mr. Khalil's motion to the immigration court to change venue. The Immigration Judge subsequently denied Mr. Khalil's motion to change venue, despite such motions being routinely granted when a person is released from custody and resides in a new jurisdiction.

139.    The government sought and eventually obtained a stay of the portion of the district court's clarifying order, ECF 355, specifying that the immigration court should consider whether to hold an evidentiary hearing and whether to grant a waiver of the Post-Hoc Charge. Despite the government's representations to this Court and the Third Circuit that compliance with this Court's order to consider whether to schedule a hearing and whether to grant the waiver would produce irreparable harm, the immigration court nevertheless rushed ahead to take the steps the government represented were injurious to their interests.

140.    Specifically, on July 30, 2025, as Respondents' motion to stay this Court's clarification order, ECF 355, remained pending before the Third Circuit—where Respondents asserted that proceeding with such a waiver hearing/process would impose irreparable harm unto them—the immigration court issued a scheduling order directing "that both parties must submit any further evidence regarding [Mr. Khalil's] request for a waiver pursuant to INA § 237(a)(1)(H) no later than August 11, 2025, 5:00 p.m.

41

Central Standard Time." Shortly thereafter on that same day, the Third Circuit granted a partial stay of the requirement to consider whether to hold a hearing and whether to grant the waiver. The immigration court did not modify or rescind its scheduling order in the wake of the stay, so Mr. Khalil submitted as much of his evidence as he could on deadline, while DHS submitted none.

141.    Then, on September 12, 2025, the immigration court quickly issued several decisions, including: (1) denying a reasonable request for a modest extension of time for Mr. Khalil to submit evidence supporting his waiver application, choosing instead to proceed on an expedited timeline more befitting of a case involving a detained noncitizen; (2) denying as moot Mr. Khalil's routine motion to change venue to the New York Immigration Court, which has jurisdiction over his current residence; (3) denying Mr. Khalil an opportunity for an evidentiary hearing on the waiver application, including the presentation of testimony of Dr. Abdalla on the relevant question of family hardship; and (4) denying the waiver itself.

142.    These decisions, severally or jointly, were rushed and otherwise highly unusual procedurally as well as plainly contrary to law.

143.    Upon information and belief, Respondents have abused and distorted the ordinary administrative immigration process to prevent Mr. Khalil from receiving full and fair consideration of his case and to achieve their desired outcome of a removal order, all in furtherance of their unconstitutional and otherwise unlawful punitive and retaliatory purpose.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

93.144.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

94.145.    The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to

petition the Government for a redress of grievances." U.S. Const. Amend. I.

95.146.    U.S. Const. Amend. I. The First Amendment protects past, present current, and future expected speech, including speech by noncitizens in the United States.

96.    The Rubio Determination, Policy,  Post-hoc Charge Mr. Khalil's targeting, arrest, transfer, and ongoing detention violate the First Amendment because they:

97.    retaliate against and punish Mr. Khalil for his past protected speech;

•    prevent him from speaking now (through detention);

98.    attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States;

99.    deprive audiences of his present and future speech on matters of public concern;

and

•    chill other individuals from expressing views sympathetic to Palestinians.

100.    These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Mr. Khalil and are, in government officials' own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

101.

## SECOND CLAIM

147.    The First Amendment protects the filing of a lawsuit and habeas petition as protected speech and petitioning. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997) (filing of lawsuit is constitutionally protected).

148.    The government's Policy to retaliate against and punish noncitizens like Mr. Khalil for their past, current, or expected constitutionally-protected speech that is critical of Israel and U.S. support

for Israel, and is in support of Palestinian human rights, violates the First Amendment.

149.    The government's Policy to deter noncitizens from engaging in future speech critical of Israel, U.S. support for Israel, and in support of Palestinian human rights constitutes censorship that violates the First Amendment.

150.    The purpose and effect of the government's Policy, in government officials' own telling, is to censor the speech of Mr. Khalil specifically, and of other noncitizens who would criticize Israel and U.S. support for Israel, and speak out in favor of Palestinian human rights, and the Policy therefore violates the First Amendment because it seeks to censor specific political viewpoints and constitutionally-protected speech.

151.    The government's punitive and adverse actions against Mr. Khalil, including the targeting and surveillance of Mr. Khalil, the issuance of the Rubio Determination, his arrest, detention, and transfer to detention in Louisiana, the manner by which his arrest and transfer were carried out, his treatment while in detention in Louisiana, the addition of the Post-Hoc Charge, the highly irregular manner in which his immigration proceedings have been carried out (including but not limited to the denial of a waiver on the Post-Hoc Charge without an evidentiary hearing), and other actions described here, violate the First Amendment because they were done pursuant to a Policy to punish noncitizens for their protected expression criticizing Israel and U.S. support for Israel, and advocating for Palestinian human rights.

152.    Even separate and apart from a Policy, the government's numerous actions constituting retaliation against and punishment of Mr. Khalil for his constitutionally-protected speech criticizing Israel and U.S. support for Israel, and supporting Palestinian human rights violates the First Amendment.

153.    The government's punitive and adverse actions against Mr. Khalil, including the targeting and surveillance of Mr. Khalil, the issuance of the Rubio Determination, his arrest, detention, and transfer to detention in Louisiana, the manner by which his arrest and transfer were carried out, his treatment while in detention in Louisiana, the addition of the Post-Hoc Charge, the highly irregular manner in which his

immigration proceedings have been carried out (including but not limited to denial of a waiver on the Post-Hoc Charge without an evidentiary hearing), and other actions described here, violate the First Amendment because they were done in retaliation for and because of his constitutionally-protected expression criticizing Israel and U.S. support for Israel, and supporting Palestinian human rights and/or because of his initiation of this lawsuit.

154.    The government's arrest, transfer, and detention of Mr. Khalil prevented him from speaking freely and participating in protests in public.

155.    The government's punitive and adverse actions against Mr. Khalil, including the targeting and surveillance of Mr. Khalil, the issuance of the Rubio Determination, his arrest, detention and transfer to detention in Louisiana, the manner by which his arrest and transfer were carried out, his treatment while in detention in Louisiana, the addition of the Post-Hoc Charge, the highly irregular manner in which his immigration proceedings have been carried out (including but not limited to denial of a waiver on the Post-Hoc Charge without an evidentiary hearing), and other actions described here, chill (through past punishment and ongoing threat of punishment) or prevent (through detention and/or eventual removal) his future speech in the United States.

156.    The government's punitive and adverse actions against Mr. Khalil, including the targeting and surveillance of Mr. Khalil, the issuance of the Rubio Determination, his arrest, detention and transfer to detention in Louisiana, the manner by which his arrest and transfer were carried out, his treatment while in detention in Louisiana, the addition of the Post-Hoc Charge, the highly irregular manner in which his immigration proceedings have been carried out (including but not limited to denial of a waiver on the Post-Hoc Charge without an evidentiary hearing), and other actions described here threaten to deprive audiences in the United States of his present and future speech on matters of public concern.

157.    The government's punitive and adverse actions against Mr. Khalil, including the targeting and surveillance of Mr. Khalil,  the issuance of the Rubio Determination, his arrest, detention and transfer

to detention in Louisiana, the manner by which his arrest and transfer were carried out, his treatment while in detention in Louisiana, the addition of the Post-Hoc Charge, the highly irregular manner in which his immigration proceedings have been carried out (including but not limited to denial of a waiver on the Post-Hoc Charge without an evidentiary hearing), and other actions described here chill other individuals from expressing views that are critical of Israel and U.S. support for Israel or otherwise in support of Palestinian human rights.

158.    The government's punitive and adverse actions against Mr. Khalil, a lawful permanent resident with no criminal record who has spoken out on matters of pressing public concern, are forms of outrageous discrimination and outrageous censorship of lawful speech.

## SECOND CLAIM
### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution

~~102.~~159.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

~~103.~~160.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). ~~U.S. 678, 693 (2001)).~~

~~104.~~161.    The government's detention of Mr. Khalil is wholly unjustified. See Black, 103 F.4th at 157 (collecting cases stating that "[w]here an individual's liberty is at stake, the Supreme Court has consistently required the government to justify continued detention by clear and convincing evidence."). The government has not demonstrated that Mr. Khalil—a husband to a U.S. citizen, ~~soon to be~~ father to a U.S~~.—~~citizen infant son, and lawful permanent resident with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the

community). There is no credible argument that Mr. ~~Khalil cannot be safely released~~Khalil cannot remain free.  Indeed, this Court has already found, based on ample, uncontested evidence, that Mr. Khalil poses no flight risk or danger to the community, in ordering him released on bail. *See* ECF 316.

~~back to his family.~~

162.    Moreover, Mr. Khalil's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas,* 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). ~~The sole basis of his detention—~~

~~105.~~163.        Detention based on the Foreign Policy Ground and the Rubio Determination ~~are~~ is unlawful for the reasons discussed supra. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

164.    Detention based on the Post-Hoc Charge is retaliatory and punishment for Mr. Khalil's past, current, and expected constitutionally-protected speech and petitioning and has no legitimate purpose. ~~The Policy and~~

165.    The Rubio Determination also violates Mr. Khalil's right to due process because it is unconstitutionally vague. This Court has already found that reliance on the Rubio Determination (which is a part of the government Policy challenged here) is likely unconstitutionally vague because it fails to give "notice that will enable ordinary people to understand what conduct it prohibits," and because "it would authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1997); see ECF 272 (finding Petitioner is likely to succeed on his claim that the Rubio Determination, as applied, is unconstitutionally vague).  Such constitutional defects have only been magnified in light of evidence emerging from the *AAUP v. Rubio* litigation that third-party entities like Canary Mission and Betar are targeting students for deportation and coordinating with government officials to do the same: no reasonable person could know if their conduct would put them on the organizations' radar and trigger State Department action. This collaboration further advances the risk of "arbitrary and discriminatory enforcement."

~~106.~~166.        More broadly, the government's Policy of targeting people like Mr. Khalil—lawful

permanent residents, living peacefully in the country who engage in speech advocating for Palestinian rights—also violates Mr. Khalil's right to due process because it is likewise unconstitutionally vague.

### THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

107.167.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a Policy of targetingretaliating against and punishing noncitizens like Mr. Khalil for removal based ontheir First Amendment protected speechexpression advocating for Palestinian human rights, or criticizing Israel or U.S. support for Israel. This Policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the Accardi doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

108.168.    In addition, the Secretary of State's determination that Mr. Khalil's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

169.    Finally, the government's pursuit of the Post-Hoc Charge against Mr. Khalil, related decisions in his removal proceedings, and denial of a waiver without an evidentiary hearing, violate the *Accardi* doctrine because Respondents are departing from their own rules and procedures in order to ensure his deportation.

### FOURTH CLAIM
### Release on Bail Pending Adjudication

109.170.    Petitioner repeats and re-alleges the allegations contained in the preceding

49

paragraphs of this Complaint-Petition as if fully set forth herein.

110.171.	This Court has the "inherent authority" to grant bail to habeas petitioners like Mr. Khalil. *See Mapp v.* Khalil. *See Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986) (holding that federal courts have inherent authority to set bail pending adjudication of a habeas petition in light of "extraordinary circumstances"); *see also Mapp v.* Reno, 241 F.3d 221, 230 (2d Cir. 2001) (holding that federal courts have inherent authority to set bail pending the adjudication of a habeas petition when the petition has raised substantial claims and extraordinary circumstances "make the grant of bail necessary to make the habeas remedy effective"); *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. ").2007) (in considering a petitioner's fitness for bail, courts assess (1) "whether the petition raises substantial claims" and (2) "whether extraordinary circumstances exist that make the grant of bail necessary to make the remedy effective." *Elkimya v.* "*Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007) (cleaned up).)).

111.	This petition raises numerous substantial constitutional and statutory claims challenging Mr. Khalil's retaliatory detention. As, including the lack of any legitimate justification for the second factor, his detention. And extraordinary circumstances exist here that make Mr. Khalil's release necessary to make the remedy effective. Mr. Khalil is neither a flight risk nor a danger to the community. As long as Mr. Khalil remainsis in ICE custody, he will beis prevented from protesting as well as from speaking freely and openly— instead, his speech is severely curtailed and controlled by DHS. And it is effectively impossible for him to speak to the broader public at all. His detention is also preventing him from adequately litigating his removal proceedings, which the government has chosen to justify only in the press. Moreover, Mr. Khalil and his U.S. citizen wife now have an infant U.S. citizen son. Mr. Khalil's wife is eight months pregnant with their first child. Not only is she unable to visit him detention in Louisiana, where ICE has chosenRespondents chose to detain him, in Louisiana, but his continued detention prevents

112.172.       ~~him from caring for her at a critical time and will cause~~caused him to miss the birth of his first child. Further detention would separate Mr. Khalil from his wife and infant, preventing him from caring for them both at a critical time. *See, e.g., S.N.C. v. Sessions*, No. 18-CV-7680, 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (ordering immediate release of petitioner pending consideration of her claim that her abrupt deportation would violate her due process right to an opportunity to be heard on her application and in order to care for her children).

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

1)       Assume jurisdiction over this matter;

2)       Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights, including as applied to Mr. Khalil through the Rubio Determination and the Post-Hoc Charge;

3)       Vacate and set aside the Rubio Determination;

4)       Enjoin Respondents from detaining and seeking to remove Petitioner based on the Post-Hoc Charge;

4)5)     Enjoin Respondents from transferring the Petitioner from the jurisdiction of this District pending these proceedings;

5)6)     Order the immediate release of Petitioner pending these proceedings;

6)7)     Order the release of Petitioner;

8)       Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

7)9)     Declare that Respondents' Policy and its application to Petitioner through the Rubio Determination and the Post-Hoc Charge violate the Administrative Procedure Act;

~~8)~~10)    Award reasonable attorneys' fees and costs for this action; and

~~9)~~11)    Grant such further relief as the Court deems just and proper.

Dated: October 3, 2025                    Respectfully submitted,
Newark, NJ                                 /s/ Naz Ahmad
                                           CLEAR PROJECT
NEW YORK CIVIL LIBERTIES UNION             MAIN STREET LEGAL SERVICES, INC.
FOUNDATION                                 Ramzi Kassem*
Amy Belsher*                               Naz Ahmad
Robert Hodgson*                            Shezza Abboushi Dallal*
Veronica Salama*                           CUNY School of Law
Molly Biklen *                             2 Court Square
125 Broad Street, 19th Floor               Long Island City, NY 11101
New York, NY 10004                         Tel: (718) 340-4558
Tel: (212) 607-3300
                                           AMERICAN CIVIL LIBERTIES UNION
AMERICAN CIVIL LIBERTIES UNION             FOUNDATION
OF NEW JERSEY FOUNDATION                   Omar Jadwat*
Jeanne LoCicero                            Noor Zafar*
Farrin R. Anello                           Sidra Mahfooz*
Molly K.C. Linhorst                        Michael K. T. Tan*
Liza Weisberg                              Brian Hauss*
570 Broad Street, 11th Floor               Brett Max Kaufman*
Newark, NJ 07102                           Esha Bhandari*
Tel: (973) 854-1715                        Vera Eidelman*
                                           125 Broad Street, Floor 18
VAN DER HOUT LLP                           New York, NY 10004
Marc Van Der Hout**                        Tel: (212) 549-2500
Johnny Sinodis**
Oona Cahill**                              CENTER FOR CONSTITUTIONAL RIGHTS
360 Post St., Suite 800                    Baher Azmy
San Francisco, CA 94108                    Samah Sisay*
Tel: (415) 981-3000                        Diala Shamas*
                                           666 Broadway, 7th Floor
WASHINGTON SQUARE LEGAL                    New York, NY 10012
SERVICES, INC.                             Tel: (212) 614-6464
IMMIGRANT RIGHTS CLINIC
Alina Das*                                 DRATEL & LEWIS
Kyle Barron                                Amy E. Greer
245 Sullivan Street, 5th Floor             29 Broadway, Suite 1412
New York, NY 10012                         New York, NY 10006
Tel: (212) 998-6430                        Tel: (212)732-8805

*Counsels for Petitioner*
*Admitted Pro Hac Vice*